# NO. 23-2611

In The

# United States Court Of Appeals
## For The Third Circuit

## ERIC DAIMLER,

*Appellant,*

v.

## CHRIS MOEHLE; ROBOTICS HUB FUND 1, LLC; COAL HILL VENTURES LLC.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
CASE NO. 2-18-CV-00165 - MARILYN J. HORAN, DISTRICT JUDGE

---

### BRIEF OF APPELLANT

---

**Mitchell G. Mandell**
**MANDELL PC**
**211 E 43rd Street**
**7th Floor**
**New York, NY 10017**
**(212) 779-6133**

*Counsel for Appellant*

**United States Court of Appeals for the Third Circuit**

**<u>Corporate Disclosure Statement and
Statement of Financial Interest</u>**

No. <u>23-2611</u>

ERIC DAIMLER

v.

CHRIS MOEHLE, ET AL.

<u>Instructions</u>

Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest. This information need be provided only if a party has something to report under that section of the LAR.

In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings. If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list. LAR 26.1(c).

The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first. A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed. Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

If additional space is needed, please attach a new page.

(Page 1 of 2)

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, <u>Eric Daimler</u>
makes the following disclosure: (Name of Party)

1) For non-governmental corporate parties please list all parent corporations: N/A

2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:
N/A

3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:
N/A

4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.
N/A

/s/ Mitchell G. Mandell
(Signature of Counsel or Party)

Dated: 9/20/60

rev: 09/2014                    (Page 2 of 2)

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT

TABLE OF AUTHORITIES ........................................................................................iv

I.     STATEMENT OF JURISDICTION OF THE DISTRICT COURT ...............1

II.     STATEMENT OF APPELLATE JURISDICTION ........................................1

III.     STATEMENT OF ISSUES FOR REVIEW ..................................................2

IV.     STATEMENT OF RELATED CASES ..........................................................4

V.     CONCISE STATEMENT OF THE CASE .....................................................4

         PROCEDURAL HISTORY .....................................................4

VI.     STATEMENT OF THE FACTS .....................................................................7

VII.     SUMMARY OF ARGUMENTS ..................................................................17

VIII.     ARGUMENTS ..............................................................................................18

         POINT I
         DAIMLER'S BREACH OF THE COVENANT OF GOOD FAITH
         CLAIM IS WELL PLED UNDER DELAWARE LAW ..............................18

         A.     STANDARD OF REVIEW...............................................................18

         B.     THE TRIAL COURT ERRED IN DISMISSING DAIMLER'S
                CLAIM FOR BREACH OF GOOD FAITH AND FAIR
                DEALING .........................................................................................18

         POINT II
         IN THE FACE OF GENUINE ISSUES OF MATERIAL FACT, THE
         LOWER COURT ERRED IN GRANTING DEFENDANTS'
         MOTION FOR SUMMARY JUDGMENT .................................................23

A.     STANDARD OF REVIEW ...................................................23

B.     THE LOWER COURT ERRED IN FAILING TO CONSIDER THE PROBATIVE EVIDENCE DAIMLER OFFERED IN SUPPORT OF HIS FRAUDULENT INDUCEMENT CLAIMS.......24

C.     THE LOWER COURT ENGAGED IN IMPROPER EVIDENTIARY DETERMINATIONS, BARRING OR UNDERMINING CERTAIN EVIDENCE OFFERED BY DAIMLER ..........................................................................................25

D.     THE FACTUAL QUESTION OF WHETHER DAIMLER REASONABLY RELIED ON MOEHLE'S GE REPRESENTATION CANNOT BE RESOLVED ON SUMMARY JUDGMENT ................................................33

E.     THE LOWER COURT IMPROPERLY DISREGARDED DAIMLER'S EVIDENCE OF DAMAGES .......................................37

F.     THE LOWER COURT ERRED IN GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON DAIMLER'S BREACH OF CONTRACT CLAIM ...........................41

POINT III
THE DISTRICT COURT ERRED IN DISMISSING DAIMLER'S
UNJUST ENRICHMENT CLAIMS ............................................................45

A.     STANDARD OF REVIEW ...................................................45

B.     THE LOWER COURT DISMISSED THE BREACH OF CONTRACT CLAIMS LEAVING DAIMLER WITH NO REMEDY AT LAW, REQUIRING THAT THE UNJUST ENRICHMENT CLAIMS BE REINSTATED ...................................45

POINT IV
THE TRIAL COURT ERRED IN DENYING DAIMLER'S MOTION
FOR NEW TRIAL OR, ALTERNATIVELY, REMITTITUR.......................47

A.     STANDARD OF REVIEW ...................................................47

B.    THE DAMAGE AWARD IS EXCESSIVE AND CONTRADICTS THE RECORD, JURY INSTRUCTIONS, AND EXPLICIT AND BINDING STATEMENTS OF DEFENDANTS. ................................................................48

    a) The Verdict Indicates Confusion, Mistake, and/or Compromise on The Part of the Jury .............................56

C.    THE TRIAL COURT ALSO ERRED IN DENYING DAIMLER'S REQUEST FOR REMITTITUR .................................58

POINT V
IT WAS AN ABUSE OF THE LOWER COURT'S DISCRETION TO AWARD ATTORNEYS' FEES TO THE COMPANIES ...............................59

A.    STANDARD OF REVIEW ..................................................59

B.    THE LANHAM ACT VIOLATIONS DID NOT MEET THE "EXCEPTIONALITY" REQUIREMENT FOR ATTORNEYS' FEES ................................................................................59

C.    ATTORNEYS' FEES SHOULD NOT HAVE BEEN AWARDED BECAUSE COUNSEL'S TIME ENTRIES CANNOT BE ATTRIBUTED TO PARTICULAR CLAIMS.............64

IX.    CONCLUSION.............................................................69

COMBINED CERTIFICATIONS ........................................................70

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aamco Transmissions, Inc. v. Graham,*
No. CIV. A. 89-4976, 1990 WL 118050
(E.D. Pa. Aug. 9, 1990) .......................................................... 68-69

*Adickes v. S. H. Kress & Co.,*
398 U.S. 144, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970) ......................... 24, 31

*Aetna Life Ins. Co. v. Huntingdon Valley Surgery Ctr.,*
No. CIV.A. 13-03101, 2015 WL 1954287
(E.D. Pa. Apr. 30, 2015) .................................................................. 46

*Alexander v. Red Star Exp. Lines of Auburn, Inc,*
646 F. Supp. 672 (E.D. Pa. 1986), aff'd,
813 F.2d 396 (3d Cir. 1987) ............................................................. 48

*Am. Air Filter Co. v. McNichol,*
527 F.2d 1297 (3d Cir. 1975) .......................................................... 49

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ....................... 24, 34

*Anderson v. Wachovia Mortg. Corp.,*
497 F. Supp. 2d 572 (D. Del. 2007) ............................................... 19, 23

*ATACS Corp. v. Trans World Commc'ns, Inc.,*
155 F.3d 659 (3d Cir. 1998) ......................................................... 42, 43

*Autoforge, Inc. v. Am. Axle & Mfg., Inc.,*
No. CIV.A. 02-01265, 2008 WL 65603 (W.D. Pa. Jan. 4, 2008) ................ 39

*B.A.S.S. Grp., LLC v. Coastal Supply Co.,*
No. CIV.A 3743-VCP, 2009 WL 1743730
(Del. Ch. June 19, 2009) ................................................................. 46

*Bd. of Trustees, Roofers Loc. No. 30 Combined Welfare Fund v.*
*Int'l Fid. Ins. Co.*,
    63 F. Supp. 3d 459 (E.D. Pa. 2014), aff'd,
    644 F. App'x 133 (3d Cir. 2016) ..................................................... 43

*Beck v. Wings Field, Inc.*,
    122 F.2d 114 (3d Cir. 1941) ........................................................... 56

*Benevento v. Life USA Holding, Inc.*,
    61 F. Supp. 2d 407 (E.D. Pa. 1999) ............................................... 36

*Bigelow v. RKO Radio Pictures*,
    327 U.S. 251 (1946) ......................................................................... 49

*Blue Cross Blue Shield Ass'n v. GlaxoSmithKline LLC*,
    417 F. Supp. 3d 531 (E.D. Pa. 2019) ............................................. 33

*Brooks v. AM Resorts, LLC*,
    954 F. Supp. 2d 331 (E.D. Pa. 2013) ............................................. 55

*Carino v. Stefan*,
    376 F.3d 156 (3d Cir. 2004) .................................................... 18, 45

*Carnegie Strategic Design Engineers, LLC v. Cloherty*,
    No. CIV.A. 13-1112, 2014 WL 896636
    (W.D. Pa. Mar. 6, 2014) ................................................................. 55

*Charlotte Broad., LLC v. Davis Broad. of Atlanta, L.L.C.*,
    No. CV13C04143WCCCCLD, 2015 WL 3863245
    (Del. Super. Ct. June 10, 2015), *aff'd,* 134 A.3d 759 (Del. 2016) ................ 22

*Charoff v. MarMaxx Operating Corp.*,
    No. CV 18-4712, 2020 WL 1694484 (E.D. Pa. Apr. 7, 2020) ...................... 25

*City of Riverside v. Santos Rivera*,
    477 U.S. 561 (1986) ......................................................................... 69

*Clinton Plumbing & Heating of Trenton, Inc. v. Ciaccio*,
    No. CIV.A. 09-2751, 2011 WL 6088611
    (E.D. Pa. Dec. 7, 2011) ................................................................... 55

v

*Conry v. Baltimore & O.R. Co.*,
   112F.Supp.252 (W.D. Pa.), aff'd, 209 F.2d 422 (3d Cir. 1953) ...................56

*Coolspring Stone Supply, Inc. v. Am. States Life Ins. Co.*,
   10 F.3d 144 (3d Cir. 1993) .............................................................34

*Cygnus Opportunity Fund, LLC v. Washington Prime Grp., LLC*,
   302 A.3d 430 (Del. Ch. 2023) .......................................................19

*Daimler v. Moehle*,
   No. CV 18-165, 2019 WL 2422843 (W.D. Pa. June 10, 2019) .............33, 36

*Davis v. Se. Pennsylvania Transp. Auth.*,
   735 F. Supp. 158 (E.D. Pa. 1990), aff'd,
   924 F.2d 51 (3d Cir. 1991) ............................................................48

*Dieckman v. Regency GP LP*,
   155 A.3d 358 (Del. 2017) ...........................................................19, 20

*E. C. Ernst, Inc. v. Koppers Co.*,
   626 F.2d 324 (3d Cir. 1980) ..........................................................38

*Ecore Int'l, Inc. v. Downey*,
   343 F. Supp. 3d 459 (E.D. Pa. 2018).............................................44, 45

*Fair Wind Sailing, Inc. v. Dempster*,
   764 F.3d 303 (3d Cir. 2014) .......................................................59, 60, 61

*Fetterolf v. Harcourt Gen., Inc.*,
   70 F. App'x 54 (3d Cir. 2003)..........................................................54

*Fleischmann Distilling Corp. v. Maier Brewing Co.*,
   386 U.S. 714, 87 S. Ct. 1404, 18 L. Ed. 2d 475 (1967) ..............................60

*Fleming Steel Co. v. Jacobs Eng'g Grp., Inc.*,
   373 F. Supp. 3d 567 (W.D. Pa. 2019) .............................................41

*Fogerty v. Fantasy, Inc.*,
   510 U.S. 517, 114 S. Ct. 1023, 127 L. Ed. 2d 455 (1994) ...........................61

*Fort Washington Res., Inc. v. Tannen*,
    858 F. Supp. 455 (E.D. Pa. 1994) ...................................................34

*Frain v. Andy Frain, Inc.*,
    660 F. Supp. 97 (N.D. Ill.1987) .....................................................56

*Gabriel v. Giant Eagle, Inc.*,
    124 F. Supp. 3d 550 (W.D. Pa. 2015) ...........................................46

*Ghee v. Marten Transp., Ltd.*,
    570 F. App'x 228 (3d Cir. 2014).....................................39, 43, 44

*Gilbert v. El Paso Co.*,
    490 A.2d 1050 (Del. Ch. 1984), *aff'd,*
    575 A.2d 1131 (Del. 1990) ............................................................22

*Glick v. White Motor Co.*,
    458 F.2d 1287 (3d Cir. 1972) ........................................................50

*Glob. Van Lines, Inc. v. Nebeker*,
    541 F.2d 865 (10th Cir. 1976)........................................................56

*Guidotti v. Legal Helpers Debt Resol., L.L.C.*,
    716 F.3d 764 (3d Cir. 2013) ..........................................................25

*Hanna v. Giant Eagle Inc.*,
    No. CV 15-1009, 2017 WL 1194676 (W.D. Pa. Mar. 9, 2017) ....................25

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983)...............................................................68, 69

*Hill v. Barnacle*,
    509 F. Supp. 3d 380 (W.D. Pa. 2020) ...........................................25

*Hughes v. Consol- Pennsylvania Coal Co .*,
    945 F .2d 594.( 3d Cir. 1991) ........................................................58

*Irving v. Chester Water Auth.*,
    439 F. App'x 125 (3d Cir. 2011) ...................................................26

*Johnson v. MetLife Bank, N.A.*,
    883 F. Supp. 2d 542 (E.D. Pa. 2012).......................................................28, 31

*Joy Mfg. Co. v. Sola Basic Indus., Inc.*,
    697 F.2d 104 (3d Cir. 1982) .........................................................................43

*Katz v. Oak Indus. Inc.*,
    508 A.2d 873 (Del. Ch. 1986) ......................................................................19

*Kelly v. Matlack, Inc.*,
    903 F.2d 978 (3d Cir. 1990) .........................................................................47

*Lind v. Jones, Lang Lasalle Americas, Inc.*,
    135 F. Supp. 2d 616 (E.D. Pa. 2001)............................................................26

*Loughman v. Consol-Pennsylvania Coal Co.*,
    740 F. Supp. 1114 (W.D. Pa. 1990) .............................................................58

*Lupyan v. Corinthian Colleges Inc.*,
    761 F.3d 314 (3d Cir. 2014) .........................................................................25

*Malley–Duff & Associates, Inc. v. Crown Life Ins. Co.*,
    734 F.2d 133 (3d Cir.1984) ..........................................................................38

*Mei-Chai Li v. Attorney General of the U.S.*,
    238 Fed. Appx. 777 (2007)...........................................................................30

*Metro Transp. Co. v. N. Star Reinsurance Co.*,
    912 F.2d 672 (3d Cir. 1990) .........................................................................23

*Meyerv. W. R. Grace & Co.*,
    421 F. Supp. 1331 (E.D. Pa. 1976), aff'd in part, rev'd in part,
    565 F.2d 152 (3d Cir. 1977) .........................................................................58

*Minehan v. McDowell*,
    No. CV 21-5314, 2023 WL 199276 (E.D. Pa. Jan. 17, 2023)................65, 69

*Ndubizu v. Drexel Univ.*,
    768 F. Supp. 2d 796 (E.D. Pa. 2011)............................................................34

*Nemec v. Shrader,*
    991 A.2d 1120 (Del. 2010) ............................................................21

*Ness v. Marshall,*
    660 F.2d 517 (3d Cir. 1981) ........................................................34

*Newsome v. Teagarden,*
    *No.* 1:18-CV-317, 2021 WL 1176102 (W.D. Pa. Mar. 29, 2021) ...............28

*O'Donnell v. United States,*
    891 F.2d 1079 (3d Cir. 1989) ......................................................24

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.,*
    572 U.S. 545, 134 S. Ct. 1749, 188 L. Ed. 2d 816 (2014) .....................60, 61

*Oscanyan v. Arms Co.,*
    103 U.S. 261, 26 L. Ed. 539 (1880) .............................................50

*Paramount Fin. Commc'ns, Inc. v. Broadridge Inv. Commc'n Sols., Inc.,*
    No. CV 15-405, 2019 WL 3022346 (E.D. Pa. May 23, 2019) ...................37

*Pivirotto v. Innovative Sys., Inc.,*
    191 F.3d 344 (3d Cir. 1999) ........................................................50

*Porreco v. Porreco,*
    571 Pa. 61, 811 A.2d 566 (2002) ..................................................33

*Power Restoration Int'l, Inc. v. PepsiCo, Inc.,*
    No. CIV.A. 12-1922, 2015 WL 1208128
    (E.D. Pa. Mar. 17, 2015) ............................................................43

*Rempel v. Nationwide Life Ins. Co.,*
    471 Pa. 404, 370 A.2d 366 (1977) ................................................35

*Riehl v. Travelers Ins. Co.,*
    772 F.2d 19 (3d Cir. 1985) ..........................................................34

*Robinson v. Hartzell Propeller Inc.,*
    326 F. Supp. 2d 631 (E.D. Pa. 2004) ............................................28

*Scaife Co. v. Rockwell-Standard Corp.*,
446 Pa. 280, 285 A.2d 451 (1971)..................................................................35

*Schirmer v. Principal Life Ins. Co.*,
No. 08-CV-2406, 2008 WL 4787568 (E.D. Pa. Oct. 29, 2008)....................46

*Sealord Holdings, Inc. v. Radler*,
No. CIV.A. 11-6125, 2012 WL 707075 (E.D. Pa. Mar. 6, 2012) .....................

*Securacomm Consulting, Inc. v. Securacom Inc.*,
224 F.3d 273 (3d Cir. 2000) .................................................................62, 63

*Sensus USA, Inc. v. Elliott Bay Eng'g, Inc.*,
No. CIV.A. 10-1363, 2011 WL 2650028
(W.D. Pa. July 6, 2011) ................................................................................46

*Silverman v. Bell Sav. & Loan Ass'n*,
367 Pa. Super. 464, 533 A.2d 110 (1987) ....................................................35

*Solomon v. Sch. Dist. of Philadelphia*,
532 F. App'x 154 (3d Cir. 2013)...................................................................49

*Spence v. Bd. of Educ. of Christina Sch. Dist.*,
806 F.2d 1198 (3d Cir. 1986) .......................................................................47

*Springer v. Henry*,
435 F.3d 268 (3d Cir. 2006) .........................................................................49

*Toy v. Metro. Life Ins. Co.*,
593 Pa. 20, 928 A.2d 186 (2007).................................................................35

*Tran v. Metro. Life Ins. Co.*,
408 F.3d 130 (3d Cir. 2005) ............................................................35, 36, 37

*Twp. of Millcreek v. Angela Cres Tr. of June 25, 1998*,
142 A.3d 948 (Pa. Commw. Ct. 2016) .........................................................66

*United States v. Butler*,
496 F. App'x 158 (3d Cir. 2012).................................................................50

*United States v. McKeon*,
    738 F.2d 26 (2d Cir. 1984) ............................................................50

*United States v. Rinaldi*,
    No. 3:18-CR-279, 2021 WL 1212669
    (M.D. Pa. Mar. 31, 2021), *aff'd,* No. 21-2419,
    2023 WL 3034327 (3d Cir. Apr. 21, 2023)....................................54

*Vargo v. Coslet*,
    126 F. App'x 533 (3d Cir. 2005)....................................................49

*Waldron v. SL Indus., Inc.*,
    56 F.3d 491 (3d Cir. 1995) ............................................................25

*Washington v. Philadelphia Cnty. Ct. of Common Pleas*,
    89 F.3d 1031 (3d Cir. 1996) ..........................................................65

*Welcker v. Smithkline Beckman*,
    746 F. Supp. 576 (E.D. Pa. 1990)..................................................38

*Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd.*,
    930 F.2d 1021 (2d Cir. 1991) ........................................................58

*Wholesale Fireworks, Corp. v. Wholesale Fireworks Enterprises, LLC*,
    No. 20CV0796, 2022 WL 1423095 (W.D. Pa. May 5, 2022).........60

*Williams v. Borough of W. Chester, Pa.*,
    891 F.2d 458 (3rd Cir. 1989).........................................................29

*Wilmington Leasing, Inc. v. Parrish Leasing Co., L.P.*,
    No. 15202, 1996 WL 560190 (Del. Ch. Sept. 25, 1996)...............22

*Windt v. Shepard's/McGraw-Hill, Inc.*,
    No. CIV.A. 96-1527, 1997 WL 698182 (E.D. Pa. Nov. 5, 1997)....38

*Zeno v. Ford Motor Co.*,
    480 F. Supp. 2d 825 (W.D. Pa. 2007) ...........................................41

**Statutes**

15 U.S.C. § 1117 ...............................................................................59

15 U.S.C. § 1121 ...................................................................................1

15 U.S.C. § 1125 .................................................................................63

15 U.S.C. § 1125(a) ..............................................................................6

15 U.S.C. § 1125(d) ........................................................................6, 63

18 U.S.C. § 1030 ............................................................................6, 63

28 U.S.C. § 1291 ...................................................................................1

28 U.S.C. § 1331 ...................................................................................1

28 U.S.C. § 1332 ...................................................................................1

28 U.S.C. § 1338 ...................................................................................1

Anti-Cybersquatting Consumer Protection Act (ACPA) ................................*passim*

Computer Fraud and Abuse Act (CFAA) ...........................................*passim*

Copyright Act..................................................................................61

Lanham Act ...............................................................................*passim*

## Treatises

*Black's Law Dictionary* 344 (6th ed.1990)...........................................30

*Corbin on Contracts* § 570 (Kaufman Supp. 1984) .................................19

## Rules

Fed. R. Civ. P. 8(d) .............................................................................46

Fed. R. Civ. P. 8(d)(3)...................................................................17, 46

Fed. R. Civ. P. 12(b)(6)…..............................................................23, 45

Fed. R. Civ. P. Rule 59(a).................................................................48

**Other Authorities**

S. REP. 93-1400, 1 (1974), reprinted in 1974 U.S.C.C.A.N. 7132 .........................62

S. REP. 93-1400, 2 (1974), reprinted in 1974 U.S.C.C.A.N. 7132 .........................60

## I.    STATEMENT OF JURISDICTION OF THE DISTRICT COURT

The District Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum of $75,000, exclusive of costs and interest, and there is complete diversity of citizenship between the parties.

The District Court also had subject matter jurisdiction pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and § 1338.

## II.    STATEMENT OF APPELLATE JURISDICTION

This Court has jurisdiction over this appeal of the orders of the District Court that were rendered final by virtue of the District Court's Order and Judgment entered August 2, 2023 [JA3-13], denying Eric Daimler's ("Daimler") Motion for a New Trial or Remittitur and granting the motion of Defendants Robotics Hub Fund 1, LLC ("Robotics Hub", "RH" or "the Fund") and Coal Hill Ventures LLC ("Coal Hill" or "CH", and together, the "Companies") for Attorneys' Fees, upon which the District Court marked the case closed.

On September 1, 2023, Daimler timely filed a notice of appeal. JA1. This Court has jurisdiction over the final orders of the District Court pursuant to 28 U.S.C. § 1291.

1

## III.    STATEMENT OF ISSUES FOR REVIEW

1.    Did the lower court improperly dismiss Daimler's Breach of the Implied Covenant of Good Faith and Fair Dealing claim[1] against Robotics Hub despite the pleading clearly alleging an abuse of Robotic Hub's discretion, which is not covered by the contract and is expressly recognized as a cause of action apart from the contract under Delaware law?

This issue was raised, objected to, and ruled on by (i) the parties underlying motion practice [JA324-328][2] and (ii) the lower court in its Memorandum Opinion and Order, entered July 30, 2018. JA75-98.

2.    Did the lower court improperly grant Defendants' motion for summary judgment and dismiss Daimler's fraudulent inducement and breach of contract claims?

This issue was raised, objected to, and ruled upon by (i) the parties underlying motion practice [JA619-624][3]; and (ii) the lower court in its Order and Opinion, entered July 18, 2022. JA20-55.

---

[1] Dkt. 1 at 25, "Breach of the Implied Covenant of Good Faith and Fair Dealing."

[2] *Motion to Dismiss*, March 30, 2018, (Dkt. No. 16) (JA237-323)); (Def Br.) (Dkt. No. 17); (Daimler Opp.) (Dkt. No. 19); (Def. R.) (Dkt. No. 20).

[3] *Motion for Summary Judgment*, November 23, 2021 (Dkt. No. 107) (JA541-566)): (Def. Br.) (Dkt. Nos. 108-111); (Daimler Opp.) (Dkt. Nos. 115-117); (Def. R.) (Dkt. No. 122-123).

3.      Did the lower court improperly dismiss Daimler's unjust enrichment claims[4] against Defendants, especially since the lower court ultimately dismissed Daimler's breach of contract claim?

These issues were raised, objected to, and ruled upon by (i) the parties underlying motion practice [JA324-328, JA389-394[5], JA619-624]; and (ii) the lower court in its Memorandum Opinion and Order, entered July 30, 2018. JA75-98.

4.      Did the lower court err in refusing to grant a new trial on damages or in the alternative remittitur to Daimler in the face of a jury award to the Companies in the amount of $225,000 – nearly five times the amount of the Companies' specific request to the jury for a total damage award of $51,467?

This issue was raised, objected to, and ruled upon by (i) the parties underlying motion practice [JA3852-3854][6]; and (ii) the lower court in its Order and Judgment, entered August 2, 2023. JA3-13

5.      Did the lower court err in awarding attorneys' fees to the Companies where the court erred as a matter of law in its determination that the case met the "exceptional" threshold for attorneys' fees under the Lanham Act and the Companies' billing records did not support their request?

---

[4] Dkt. No. 1 at 21 and 27 ("Unjust Enrichment").

[5] *Motion to Dismiss*, October 30, 2018 (Dkt. No. 34) (JA330-353)) (Dkt. No. 24)); (Def. Br.) (Dkt. Nos. 35-36); (Daimler Opp.) (Dkt. No. 39); (Def. R.) (Dkt. No. 41).

[6] *Motion for Relief*, May 25, 2023 (Dkt. No. 181); (Daimler Br.) (Dkt. No. 182); (Def. Opp.) (Dkt. No. 192) (Daimler R.) (Dkt. No. 193).

This issue was raised, objected to, and ruled upon by (i) the parties underlying motion practice [JA3813-3815][7]; and (ii) the lower court in its Order and Judgment, entered August 2, 2023. JA3-13.

## IV.    STATEMENT OF RELATED CASES

To counsel's knowledge, there are no related cases in this Court, as defined by L.A.R. 28.1(a)(2).

On August 11, 2022, Daimler filed a Notice of Appeal as to two Orders on motions to dismiss for failure to state a claim and the Order for summary judgment on the remaining claims asserted by Daimler against the Defendants.  Upon the unopposed motion of Defendants, the lower court reopened the case given that Defendants' counterclaims remained unresolved, upon which Daimler withdrew the aforesaid Notice of Appeal.

## V.    CONCISE STATEMENT OF THE CASE

## PROCEDURAL HISTORY

On February 5, 2018, Daimler commenced this action against Chris Moehle ("Moehle"), Robotics Hub Fund 1 LLC ("Robotics Hub") and Coal Hill Ventures LLC ("Coal Hill") (Robotics Hub and Coal Hill, together, the "Companies"); (Moehle and the Companies, together, "Defendants") for, inter alia, fraud in the

---

[7] *Motion for Attorneys' Fees,* May 11, 2023 (Def Br.) (Dkt. No. 178); (Daimler Opp.) (Dkt. No. 191); (Def. R.) (Dkt. No. 194).

inducement, breach of contract, and unjust enrichment, seeking at least $10,000,000 in damages. JA131-167.

Daimler filed a First Amended Complaint ("FAC") on February 14, 2018, addressing the lower court's *sua sponte* concern about subject matter jurisdiction. JA287-322.

By Memorandum Opinion and Order entered July 30, 2018, the lower court granted Defendants' motion to dismiss a number of the claims in Daimler's First Amended Complaint, including, specifically, Daimler's unjust enrichment claims. JA75-98.

After the parties met and conferred about a Second Amended Complaint, Daimler filed a Third Amended Complaint on October 16, 2018. JA361-388.

By Opinion and Order entered June 10, 2019 the lower court granted Defendants' motion to dismiss as to Count 4 of Daimler's Third Amended Complaint. JA56-74.

Thereafter, on June 28, 2019, Daimler filed his Fourth Amended Complaint, and on October 19, 2020, upon his unopposed motion to amend his prayer for relief, Daimler filed his Fifth Amended Complaint.  JA395-421, JA541-566.

On July 12, 2019, Respondents filed their Answer and Counterclaims, seeking over $1,000,000 in damages for fraudulent inducement; and unspecified damages

for violations of 15 U.S.C. § 1125(a), 18 U.S.C. § 1030, and 15 U.S.C. § 1125(d) (the statutory counterclaims, collectively, the "Intellectual Property Claims"). JA422-473.

By Opinion and Order entered July 18, 2022, the lower court granted Defendants' motion for summary judgment as to all counts of Daimler's Fifth Amended Complaint, including, at issue in the present appeal, his fraudulent inducement and breach of contract claims. JA20-55.

At the conclusion of a three-day jury trial, a verdict was returned on April 26, 2023, finding Daimler liable to the Companies on their crossclaims alleging violations of the Lanham Act, Computer Fraud and Abuse Act ("CFAA"), and Anti-Cybersquatting Consumer Protection Act (collectively, the "Intellectual Property Claims"). JA3856-3859 (Verdict Slip). The jury found no liability on the Companies' fraudulent misrepresentation crossclaim. JA3856-3859.

On April 25-26, 2023 the parties conducted a jury trial before the lower court and on April 27, 2023 the jury returned a verdict in favor of the Companies on their Intellectual Property Claims for $225,000. The jury found in favor of Daimler on the Companies' fraudulent inducement counterclaim. JA14-15.

By Opinion and Judgment entered on August 2, 2023, the lower court (a) denied Daimler's motion for a new trial on damages or remittitur and (b) granted the Companies attorneys' fees against Daimler in the amount of $129,183. JA3-13.

On September 1, 2023 Daimler filed a timely Notice of Appeal. JA1.

## VI.   STATEMENT OF THE FACTS

This case arises from intentional misrepresentations made by Moehle to mislead and induce Daimler to enter into: (i) a business partnership with Moehle, in connection with which Daimler made significant financial contributions to the Companies without which they would have not survived; and (ii) certain related common unit award agreements that contained different and less favorable vesting schedules than those of Moehle, Daimler's equal partner.

In late-2015, Daimler and Moehle agreed to enter into a partnership to invest in early-stage robotics companies. JA541-566.

Prior to meeting Moehle, Daimler had formed and had been negotiating with investors for his robotics investment venture called Skilled Science. JA3112, JA710-15, JA725. From late-2014 through mid-2015, Daimler was in the process of finalizing the terms of investments from at least two investors, totaling a combined $10,000,000. JA3136 (CSMF)[8], JA1106-1108, JA1120, JA1122. Then, in late-August 2015, Daimler's close friend and Carnegie Mellon Computer Science Advisory Board member, Dave Mawhinney, introduced Daimler to his former Carnegie Mellon colleague, Moehle. JA3134 (¶148), JA713, JA655. Upon meeting, Daimler learned that Moehle had recently formed two robotics investment funds:

---

[8] *See* JA3109-3165 (Combined Concise Statement of Material Facts) ("CSMF"), (Dkt. No. 123)).

Coal Hill and Robotics Hub Fund. JA3110 (¶3), JA657, JA705-707. Aside from their shared passion in robotics, Moehle was interested in Daimler's experience with robotics investments and the two scheduled a phone call. JA3138 (¶160), JA1106, JA713, JA735, JA561.

On or about August 18, 2015, Moehle and Daimler spoke on the phone for the first time, and it was during this call that Moehle first informed Daimler that General Electric ("GE") had committed to invest $20 million in the Fund (the "GE Representation" [9]). JA3138 (¶160), JA1106, JA713, JA736-737, JA561.

Between August and December 2015, Daimler and Moehle had several phone calls, during which Moehle repeatedly reinforced the GE Representation. JA3130 (¶62), JA545. Further, to the extent Daimler had any doubts about the GE Representation, Moehle reassured Daimler that he expected to have the GE funds in hand following the completion of a particular regulatory process related to the spin out of GE's financial arm which was "imminent." JA3118-3119 (¶54-¶56), JA3143 (¶165), JA736, JA738. Daimler was further assured of the truth of the GE Representation when, throughout 2015 and 2016, Daimler witnessed Moehle repeatedly inform potential investors about the $20 million GE investment. JA3144 (¶¶ 168-170), JA739-740, 690, JA1106 (¶52), JA545-546 (¶¶23-25).

---

[9] *See, generally,* JA32-JA34 ("Opinion, MSJ").

As a result of Moehle's repeated assurances of the GE investment to Daimler and third-party investors, as well as Daimler's understandable reliance on Moehle for information about GE (considering that Moehle had the relationship with GE and would naturally be the one to communicate with GE about the investment), Daimler had no basis for suspecting the GE Representation was false.  JA3146-3150.

Thus, in late-2015, because of, and in reliance on, the GE Representation, Daimler elected to walk away from Skilled Science and the $10,000,000 investment in the venture, and, in March of 2016, partner with Moehle in the Companies.[10] JA3150 (¶ 183), JA544 (¶17), JA690, JA699-702. Although Daimler was dedicated to Skilled Science when he met Moehle, Moehle's repeated GE Representation convinced Daimler that joining the Companies – which would not only be funded with twice the capital as Skilled Science but had the credibility and potential of an investor like GE – was a strategic business move. It was not until Daimler was ousted from the Companies in March 2017 that he came to realize that Moehle had purposefully lied to him about the GE investment all along. JA3164 (¶222).

In January 2016, Daimler was appointed as a Presidential Innovation Fellow for the Barack Obama White House (the "Fellowship").  JA3156 (¶199), JA292. Moehle encouraged Daimler to accept the 12-month Fellowship because of the value

---

[10] The $10 Million was not yet transferred to Skilled Science when Daimler opted to partner with Moehle, but Daimler was in the process of ironing out the final details of certain investments which, combined, totaled $10 million. JA1120.

that the Companies would derive from it. JA3157 (¶202). Daimler served as a Presidential Innovation Fellow from January 2016 to early 2017, during which time Daimler advised the White House on, among other things, issues relating to robotics and artificial intelligence. JA1093-1094 (¶203). Daimler and Robotics Hub received positive press coverage with respect to the Fellowship, and the Companies promoted Daimler's White House position in their marketing and fundraising efforts. JA3157 (¶204).

On or about March 10, 2016, shortly after Daimler's Fellowship began, the Companies retained the law firm Reed Smith LLP ("Reed Smith") to, among other things, prepare various corporate formation and governance documents, including certain Common Unit Award Agreements, as well as the Companies' Amended and Restated Operating Agreements. JA293 (FAC). Reed Smith interacted almost exclusively with Moehle in connection with this engagement. JA79 (Opinion, MTD[11]).

Pursuant to the Companies' respective Amended and Restated Operating Agreements, both dated March 23, 2016 (the "Operating Agreements"), Daimler and Moehle were the only Board Members. JA79-80, JA203-283, JA290-291.

---

[11] Memorandum Opinion, Defendants' Motion to Dismiss (Dkt. No. 22), July 30, 2018 ("Opinion, MTD").

Further, both Daimler and Moehle were named "Key Persons" in the Fund's Limited Partnership Agreement. JA79, JA301. Moehle and Companies promoted Daimler and Moehle as equal partners, including in private placement materials provided to potential investors. JA3143, JA3154-3155.

Daimler and Moehle entered into Common Unit Award Agreements, all dated March 23, 2016, with each of the Companies. JA81, JA168-202, JA551. Moehle was awarded 42 common units in both Robotics Hub and Coal Hill (collectively the "Moehle Awards"), which vested as follows:

20% vests on the first anniversary of Date of Award [March 23, 2017]; 1.6666% vests ratably on the last day of each month thereafter until the fifth anniversary of the Date of Award [March 23, 2021].[12]

Daimler was also awarded 42 common units in both Robotics Hub (the "Robotics Hub Daimler Award") and Coal Hill (the "Coal Hill Daimler Award", collectively, the "Daimler Awards"). Unlike Moehle's common units, however, Daimler's units vested as follows:

> 20% vests on the date when [Daimler] has provided 12 consecutive and uninterrupted months of Full Time Services to the Company Group, provided that [Daimler] must begin providing such Full Time Services to the Company Group no later than the first anniversary of the Date of Award [March 23, 2017]; and
> provided the above conditions are met, the remaining 80% vests on a pro-rata basis on the last day of each month thereafter until the fifth anniversary of the Date of Award [March 23, 2021].

---

[12] JA81, JA168-202, JA551

The disparate vesting schedules were contrary to representations Moehle repeatedly made to Daimler. In multiple conversations during 2015 and 2016, Moehle misrepresented to Daimler that: (i) Moehle and Daimler would be treated as equals; (ii) the terms of the Daimler Awards were identical to those of the Moehle Awards; and (iii) the Daimler Awards and Moehle Awards both contained vesting schedules pursuant to which a portion of the common units would vest automatically while the remaining units would vest over time.[13]

At no time did Moehle or the Companies inform Daimler that *only* the Daimler Awards, not the Moehle Awards, contained vesting schedules requiring 12 consecutive and uninterrupted months of "[f]ull-Time Services to the Company Group" beginning on or before March 23, 2017, before any common units would vest. JA82, JA526. Thus, it was never Daimler's understanding that there could be any circumstance under which his equity in the Companies would be forfeited against his will or without his failing to begin working full-time at the companies prior to the first anniversary of the award (JA549-550); Daimler certainly would not have voluntarily entered into an agreement with these terms. JA560.

When Daimler and Moehle began their partnership, each initially devoted equal time to the Companies. JA3158, JA551. Although Daimler worked for the Companies only part-time during the Fellowship, both Moehle and Daimler

---

[13] JA3127, JA3143, JA81-82, JA168-202, JA551.

understood that Daimler would return to his full-time position with the Companies when his 12-month Fellowship ended in early 2017. Indeed, as of January 2016, when Daimler began the Fellowship, the partnership had budgeted matching salaries for Moehle and Daimler. JA3158.

Despite Moehle's and Daimler's equal partnership, however, Daimler loaned or advanced an excess of $400,000 to Coal Hill, without which the Companies would not have had a chance of survival, whereas Moehle made an initial capital contribution of only $1,000. JA3155.[14]

From early to mid-2016, the relationship between Daimler and Moehle began to deteriorate. JA554. As Daimler testified, the attention and publicity Daimler received in connection with the Fellowship became a point of contention, and Moehle became highly critical of Daimler. JA554-557. Moehle prevented Daimler from accessing company information, and unilaterally assigned "deliverables" to Daimler without first consulting him. JA557. Only after Daimler was ousted from the Companies did he realize that these mounting tensions were evidence of Moehle's true intention – to takeover the Companies – but because the Companies desperately needed Daimler's financial contributions, and Daimler remained

---

[14]   On or about November 2, 2017, Coal Hill paid the promissory note in the amount of $125,000 in full, together with interest, and subsequently repaid Daimler $35,000, representing a small portion of the additional expenses he advanced to Coal Hill.

engaged throughout 2016, Moehle promoted the partnership and encouraged Daimler's Fellowship. JA560.

As Moehle had hoped, Daimler remained committed to the Companies' success, making repeated financial contributions to the Companies throughout 2016 (the "Financial Contributions"). JA3159-3161. At Moehle's request, Daimler made the Financial Contributions with the expectation that they would be treated as capital contributions; Moehle agreed that they would be treated as such. JA3129, JA3161, JA556. Although the Financial Contributions were intended by Daimler to cover corporate expenses, Moehle used some of the funds to pay for personal expenses, such as mortgage payments and family trips. JA3159-3161, JA555. Although Daimler made such contributions at Moehle's request, he did not receive common units in exchange for them, as required by Section 7.2 of the Operating Agreements. JA3136, JA552-553.

During the second half of 2016, Moehle began taking steps to gain sole control of the Companies. Moehle refused Daimler's requests to meet in Pittsburgh, where the Companies are based, and on several occasions in mid-to-late 2016, Moehle obstructed Daimler's efforts to communicate with the Fund's investors and portfolio companies. JA3132-3133. At the same time, Moehle continued telling investors that Daimler was his equal partner. JA3132-3133.

Daimler continued providing part-time services to the Companies in 2016 during the term of the Fellowship, for which he was not compensated. Instead,

Daimler and Moehle agreed that compensation for Daimler's services would accrue and be paid at a later date. JA3159, JA548. In late 2016, Moehle began discouraging Daimler from ending the Fellowship, claiming the Companies had no funds with which to pay him. In response, Daimler suggested that his salary could continue to accrue and be paid to him at a later date. Moehle opposed this idea, despite having previously agreed to it. JA554 (¶ 76).

Daimler and Moehle met in person on January 5-6, 2017, to discuss whether Daimler could return to his full-time role with the Companies. JA3133, JA558. On or about January 5, 2017, just before Daimler's Fellowship ended, Moehle recommended to the Companies' Boards (which constituted only Daimler and Moehle) that Daimler *not* be permitted to return to a full-time role with the Companies. JA3122-3133, JA558. Although Moehle and the Companies had contemplated Daimler's return to full-time employment from the outset and budgeted a full-time salary for him, Moehle purportedly made his recommendation to the Boards because the Companies allegedly lacked sufficient funds to pay Daimler a full-time salary. JA3122-3133, JA558. In response, Daimler offered to allow salary to continue to accrue and be paid at a later date, as it had in the past, but Moehle inexplicably refused the offer, ensuring Daimler not be able to return to his full-time work at the Companies. JA3122-3133, JA558.

At the Companies' respective Board meetings on or about January 5, 2017, Moehle voted against, and Daimler for, resuming Daimler's full-time role with the Companies. JA3122-3133, JA558. Because the Board members were deadlocked, the matter was referred to the Deadlock Advisor, David Mawhinney, in accordance with Section 5.5(c) of the Operating Agreements. JA3122-3133, JA221, JA558. On or about March 22, 2017, just before the first anniversary of the date of the Daimler Awards, Mawhinney broke the deadlock by voting against Daimler returning to a full-time, fully compensated role with the Companies at that time, for the sole reason that the Companies' lacked the financial capacity to pay Daimler at the time. JA3122-313, JA559. Critically, however, Mawhinney did not foreclose the possibility that Daimler could, if he so elected, return to work on a full-time basis with some portion of his compensation accrued, but not paid, as had occurred in the past. JA559. Moehle, however, ignored Daimler's solution, and continued to insist that Daimler not be permitted to return to the Companies on a full-time basis, citing the Deadlock Advisor's conclusion as binding and final.

Because Defendants wrongfully prevented Daimler from returning to his full-time role within a year after executing the Daimler Awards (*i.e.*, by March 23, 2017), the Companies deemed all 42 of his common units to be forfeited. JA3122-3133, JA559. As a result of the purported forfeiture, Defendants took the position that Daimler has no membership or ownership interest in the Companies, thereby

rendering Moehle the majority member of both Companies. JA3122-3133, JA559. After obtaining a majority membership interest, Moehle directed the Companies to remove Daimler from their respective Boards and to amend and restate the Fund's Limited Partnership Agreement to remove Daimler as a "Key Person". JA3122-3133, JA559-560.

## VII.    SUMMARY OF ARGUMENTS

Dismissal of Daimler's claim for breach of the covenant of good faith and fair dealing was improper since it was properly pled in Daimler's Complaint.

Summary judgment on Daimler's fraudulent inducement and breach of contract claims was inappropriate because, *inter alia*,: (1) genuine issues of material fact existed for each dismissed claim; (2) the lower court made improper determinations regarding truth and credibility, including, but not limited to, regarding the testimony of Daimler and Jamie Fee; and (3) Daimler has shown the existence of a contract, its material terms, and a breach thereof.

In dismissing the Daimler's unjust enrichment claim, the lower court ignored Fed. R. Civ. P. 8(d)(3), which provides that "[a] party may state as many separate claims or defenses as it has, regardless of consistency." Further, given the fact that the lower court ultimately dismissed Daimler's breach of contract claim, its predicate for dismissing the unjust enrichment claim -- the existence of a contract -- has been eliminated.

The lower court's denial of a new trial or, alternatively, remittitur was clearly erroneous and an abuse of the court's discretion. The testimony elicited from Moehle during the trial demonstrated that the maximum amount of damages sought for the Intellectual Property Claims was $51,467.00, which was expressly confirmed by the Companies' counsel during closing arguments. JA3479 (133:22-25).

The lower court's grant of the Companies' motion for attorneys' fees in prosecuting their Intellectual Property Claims is also clearly erroneous, both because (a) this case does not meet the "exceptionality" threshold requirement for attorneys' fees under the Lanham Act; and (b) the billing records submitted by the Companies' counsel are insufficient to justify the lower court's award.  JA8-10.

## VIII.    ARGUMENT

### POINT I

### DAIMLER'S BREACH OF THE COVENANT OF GOOD FAITH CLAIM IS WELL PLED UNDER DELAWARE LAW

#### A. STANDARD OF REVIEW

Appellate review of a district court's dismissal on a Rule 12(b)(6) motion to dismiss is de novo. *See Carino v. Stefan*, 376 F.3d 156, 159 (3d Cir. 2004).

#### B. THE TRIAL COURT ERRED IN DISMISSING DAIMLER'S CLAIM FOR BREACH OF GOOD FAITH AND FAIR DEALING.

To state a claim for breach of the implied covenant of good faith and fair dealing under Delaware law, "the plaintiff must allege a specific implied contractual

obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *Anderson v. Wachovia Mortg. Corp.*, 497 F. Supp. 2d 572, 581–82 (D. Del. 2007). This implied covenant "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain. *Id.* at 582. Thus, parties are liable for breaching the covenant when their conduct frustrates the 'overarching purpose' of the contract by taking advantage of their position to control implementation of the agreement's terms." *Id*.

The Delaware Supreme Court has summarized the implied covenant concisely as follows:

> The implied covenant is inherent in all contracts and is used to infer contract terms to handle developments or contractual gaps that ... neither party anticipated. It applies when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected. The reasonable expectations of the contracting parties are assessed at the time of contracting.

*Cygnus Opportunity Fund, LLC v. Washington Prime Grp., LLC*, 302 A.3d 430, 458 (Del. Ch. 2023) (quoting *Dieckman v. Regency GP LP*, 155 A.3d 358, 366 (Del. 2017) (cleaned up)); *see also Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986) (Allen, C.) (quoting *Corbin on Contracts* § 570, at 601 (Kaufman Supp. 1984)) ("parties occasionally have understandings or expectations that were so fundamental that they did not need to negotiate about those expectations.");

*Dieckman*, 155 A.3d at 361 ("The implied covenant is well-suited to imply contractual terms that are so obvious ... that the drafter would not have needed to include the conditions as express terms in the agreement.")

Here, the lower court based its dismissal on a misunderstanding of Daimler's claim for breach of implied duty of good faith, stating that Daimler argued that the contracts implied a duty to hire him and failing to do so was a breach. JA93. This is not so. In fact, Daimler was led to believe, through his negotiations with Moehle, that the Companies could not arbitrarily and permanently revoke his ability to vest his Units. Although the Companies reserved the right to terminate Daimler's employment, they did not reserve the right to arbitrarily prevent him from satisfying the predicate for his deal. JA145 ¶¶ 138-141.

Indeed, Daimler had the fundamental expectation that his full-time employment was not subject to arbitrary denial or that he could lose his financial and managerial stake in the Companies without any fault on his part or any opportunity for recourse or cure. Therefore, contrary to the lower court's misinterpretation, Daimler alleged an implied contractual term preventing the Companies from arbitrarily interfering with his ability to commence full-time employment. JA145 ¶¶ 138-141.

In fact, in this regard, the Award Agreements[15] contained nothing to suggest that the Companies had a unilateral right to deny Daimler's ability to satisfy the condition to vesting of Daimler's Units.

As Daimler alleged, the Companies breached this duty when, despite Daimler being ready and willing to work full-time, having demonstrated dedication and substantial financial commitment to the Companies, and being amenable to delayed compensation, Moehle voted against the commencement of his full-time employment and then twisted the scope of the Deadlock Arbitration decision as a basis to remove Daimler from the board and to block his units from vesting. JA145 (¶¶ 138-141).

Although the lower court is correct in its holding hat one generally cannot base a claim for breach of the implied covenant on conduct authorized by the agreement, the lower court fails to consider the Delaware caselaw addressing the fact pattern where a contracting party "has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the [other] party reasonably expected." *Nemec v. Shrader*, 991 A.2d 1120, 1125– 26 (Del. 2010). Delaware courts have found that, despite the contract technically permitting some conduct, if the party's conduct is as the *Nemec* Court describes, implied covenants are appropriate. *Id.*

---

[15] RH Common Unit Award Agreement (Dkt. No. 1-4). JA185-193; CH Common Unit Award Agreement (Dkt. No. 1-5). JA194-201

Likewise, in *Wilmington Leasing, Inc. v. Parrish Leasing Co., L.P.*, No. 15202, 1996 WL 560190, at *2 (Del. Ch. Sept. 25, 1996), the Chancery Court rejected an argument that, because the contract addressed the removal of the general partner, the implied covenant of good faith should not be implied. The Court held that the implied covenant still applied to the scope of discretion allowed to the limited partners in removing the general partner, explaining that "[w]here either the definition or the declaration of occurrence of the condition is left to the sole discretion of the invoking party, the application of a good faith standard to the enforcement of conditions is appropriate." *Id.* (citing *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1054–55 (Del. Ch. 1984), *aff'd,* 575 A.2d 1131 (Del. 1990)) ("An implied covenant of good faith… extends to the enforcement of conditions and may preclude a party from avoidance of a contractual undertaking through invoking a condition which occurred by reason of his own actions."); *see also Charlotte Broad., LLC v. Davis Broad. of Atlanta, L.L.C.*, No. CV13C04143WCCCCLD, 2015 WL 3863245, at *7 (Del. Super. Ct. June 10, 2015), *aff'd,* 134 A.3d 759 (Del. 2016) ("[E]ven though Plaintiffs had the right to terminate the Agreement, Plaintiffs still had an overarching obligation to comply with the implied covenant to terminate in good faith.").

Here, Daimler's First Amended Complaint alleges that Robotics Hub had an implied contractual obligation to act in good faith and to refrain from arbitrary or unreasonable conduct that would prevent Daimler from receiving the fruits of the

bargain, and that Robotics Hub breached this obligation by wrongfully preventing Daimler from returning to a full-time position as was required for his common units to begin vesting, and then treating all of Daimler's equity as forfeited.  JA145 (¶¶ 138-141).  These allegations are sufficient to defeat a motion to dismiss.  *See Anderson*, 497 F. Supp. 2d at 582–83 (holding that "[u]nder the forgiving standard of review set forth in Fed. R. Civ. P. 12(b)(6)… plaintiffs sufficiently stated a claim for breach of the covenant of good faith and fair dealing where it was alleged that defendants "erected unreasonable hurdles that plaintiffs were forced to clear before they could receive the mortgages for which they had contracted").

Accordingly, this Court should reverse the lower court's Order, dated July 30, 2018, and reinstate Daimler's claim for breach of the covenant of good faith and fair dealing.

## POINT II

### IN THE FACE OF GENUINE ISSUES OF MATERIAL FACT, THE LOWER COURT ERRED IN GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A. STANDARD OF REVIEW

On appeal from the district court's granting of a motion for summary judgment, the appellate court's standard of review is plenary. *Metro Transp. Co. v. N. Star Reinsurance Co.*, 912 F.2d 672, 678 (3d Cir. 1990). The appellate court is

required to apply the same test the district court should have utilized initially. *O'Donnell v. United States*, 891 F.2d 1079, 1081–82 (3d Cir. 1989).

**B. THE LOWER COURT ERRED IN FAILING TO CONSIDER THE PROBATIVE EVIDENCE DAIMLER OFFERED IN SUPPORT OF HIS FRAUDULENT INDUCEMENT CLAIMS.**

It is well-settled that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–56, 106 S. Ct. 2505, 2513–14, 91 L. Ed. 2d 202 (1986).

The Supreme Court further explained that, in the event that an inference must be drawn by the court, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–159, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970).

Here, summary judgment called for the lower court to recognize -- not decide -- the genuine issues of material fact regarding whether (i) Moehle made the GE Representation; (ii) whether the $20 Million GE Representation was a motivating factor in Daimler's decision to leave his former business, Skilled Science, to join Moehle and the Companies; and (iii) whether Daimler sustained damages as a result of Moehle's fraudulent misrepresentation. JA50.  According to prevailing caselaw,

these determinations should be left to a jury to decide and are improper for summary judgment.

### C. THE LOWER COURT ENGAGED IN IMPROPER EVIDENTIARY DETERMINATIONS, BARRING OR UNDERMINING CERTAIN EVIDENCE OFFERED BY DAIMLER.

Contrary to the lower court's holding, Daimler's testimony should have been considered in opposition to Defendants' motion for summary judgment. *Charoff v. MarMaxx Operating Corp.*, No. CV 18-4712, 2020 WL 1694484 (E.D. Pa. Apr. 7, 2020). A plaintiff may create a genuine issue of material fact by proffering her own affidavits. *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 501 (3d Cir. 1995). A single, non-conclusory affidavit or witness's testimony, when based on personal knowledge and directed at a material issue, is sufficient to defeat summary judgment, even if the affidavit is "self-serving." *Lupyan v. Corinthian Colleges Inc.*, 761 F.3d 314, 316 (3d Cir. 2014). Additionally, in conjunction with other evidence, a factfinder can credit a plaintiff's testimony despite any self-serving nature. *See, e.g. Hanna v. Giant Eagle Inc.,* No. CV 15-1009, 2017 WL 1194676, at *12 (W.D. Pa. Mar. 9, 2017), *report and recommendation adopted,* No. 2:15CV1009, 2017 WL 1194713 (W.D. Pa. Mar. 30, 2017); *see also Hill v. Barnacle*, 509 F. Supp. 3d 380, 385–86 (W.D. Pa. 2020) *(citing Guidotti v. Legal Helpers Debt Resol., L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013) ("The non-moving party must resort to affidavits, deposition testimony, admissions, and/or interrogatories to demonstrate the existence of a genuine issue.").

Indeed, the lower court's decision to reject Daimler's sworn testimony regarding Moehle's GE Representation begs the question – can an individual committing fraud in a private conversation be held accountable for that fraud if the only person with personal knowledge of that conversation is prevented from reaching a jury to assess the respective credibility of those two individuals?

Here, the various cases the lower court relied upon to support its rejection of Daimler's evidence of the GE Representation are misapplied. For example, in *Lind v. Jones, Lang Lasalle Americas, Inc.*, 135 F. Supp. 2d 616, 621 (E.D. Pa. 2001), the plaintiff's deposition testimony was the *only* evidence of a fraudulent representation, and the testimony demonstrated that the plaintiff should have known that the representation was false. However, here, plaintiff's testimony is corroborated in the record and clearly demonstrates that Daimler had no reason to know the representation was false. JA3144 (¶¶ 168-170), JA739-740, JA690, JA545-546 (¶¶23-25).

In *Irving v. Chester Water Auth.*, 439 F. App'x 125, 127 (3d Cir. 2011), the plaintiff's testimony was insufficient in a discrimination matter because it directly conflicted with his admissions during his hearing before, and the findings of, the Department of Labor, together with his failure to submit any evidence to contradict the testimony of other workers on the pivotal issue in the case. Here, however, Daimler's testimony as to the fraudulent representation is corroborated by the evidentiary record, including the deposition testimony of Jamie Fee. JA3416.

In this regard, the lower court's focus on issues relating to Daimler's claim that Moehle made the same $20 Million GE Representation to numerous potential investors misses the point – while it is true that Daimler saw those misrepresentations to potential investors as lending credence to Moehle's GE Representation, they are irrelevant to the actual fraudulent representations made privately by Moehle to Daimler prior to the representations to investors and, most importantly, prior to the decision made by Daimler to leave Skilled Science and join Moehle. JA3150, JA544 (¶17), JA690, JA699-702.

Daimler's fraudulent inducement claim is based on Moehle's repeated representations to him that GE had committed to invest $20 Million in the Fund. JA3144 (¶169), 739-740, 690, 1106 (¶52), 545-546 (¶¶23-25), 560-562. Indeed, Daimler has provided evidence that Moehle made this representation multiple times throughout 2015 and 2016 to Daimler, as well as to potential third-party investors. Id.

Here, although the conversations occurred six (6) years prior to his deposition, Daimler recalled the representation regarding GE's $20 million commitment made to him by Moehle. JA22-23, 3140 (¶164), 161, 544 (¶21). Daimler recalled this representation because it was critically important to his decision to walk away from his company, Skilled Science, to join Defendants. JA3150 (¶ 183), 544 (¶17), 690, JA699-702.

A genuine issue of material fact is presented where a plaintiff's deposition testimony is sufficient for a jury to credit his account of a defendant's representations to him. *Johnson v. MetLife Bank, N.A.*, 883 F. Supp. 2d 542 (E.D. Pa. 2012). Plaintiff's deposition testimony could be credited because it was not conclusory and was elicited by questions from Defendants' counsel that challenged the plaintiff's recollection of events *Id*. (Daimler Dep. 73-77, 87). Daimler specifically testified, under oath, and subject to cross-examination, that Moehle represented to him that GE had committed an investment of $20 Million to the Fund. JA1085 (¶149), 1087 (¶164). Further, his testimony demonstrates that he was fraudulently induced to walk away from Skilled Science and join Defendants, which, at a minimum, creates a genuine issue of material fact. JA1086 ¶155, 735-736.

Contrary to the lower court's decision, Daimler's testimony does not stand alone, is not conclusory, and is bolstered by both the testimony of Jamie Fee and the verified complaint filed by several of Defendants' investors in an action commenced by them against Defendants in Delaware Chancery Court. JA1089. Indeed, allegations that are based upon personal knowledge and which are contained in a verified complaint may be used to oppose a motion for summary judgment because a verified complaint can be treated as an affidavit or declaration. *Newsome v. Teagarden, No.* 1:18-CV-317, 2021 WL 1176102, at *8 (W.D. Pa. Mar. 29, 2021); *Robinson v. Hartzell Propeller Inc.*, 326 F. Supp. 2d 631, 645 (E.D. Pa. 2004)

(quoting *Williams v. Borough of W. Chester, Pa.*, 891 F.2d 458, 466 n. 12 (3rd Cir. 1989)) ("[T]he Court may consider evidence that is not admissible in the submitted form if the party offering the evidence could satisfy the applicable admissibility requirements at trial. 'For example, hearsay evidence produced in an affidavit opposing summary judgment may be considered if the out-of-court declarant could later present that evidence through direct testimony, i.e. in a form that would be admissible at trial."). Here, the lower court held that:

> The Delaware allegation is substantively identical to the allegations made by Daimler in his Complaint and carries no more probative force than Daimler's Complaint allegations herein. The allegation in the Delaware case arguably carries less probative force than Daimler's allegations in that the Delaware action assertion is not based upon the Delaware plaintiffs' personal knowledge. To that extent, the Delaware case allegation is also inadmissible hearsay. The Court will disregard the Delaware civil complaint has having no impact on determining whether a genuine issue of material fact exists in this case.[16]

Those investors' verified complaint states that "to entice investors, and to induce Daimler to focus his efforts on the Partnership over his other successful businesses, Moehle represented that GE Ventures had committed to invest $20 million in the Fund, which was a significant portion of the $50 million the Fund sought to raise." JA1089 (¶172).

The lower court also improperly characterized the testimony of Jamie Fee regarding the GE Representation, finding that Fee's testimony that "GEV was to

---

[16] JA44

invest a 'significant' amount of money, which Fee deemed to be around $5 million, not $20 million" [JA799[17]] "contradict[s]" Daimler's testimony about the GE Representation. Clearly, however, notwithstanding Fee's memory of a number less than $20 million, the number he did recall was still a large number and, as such, does not "contradict" Daimler's testimony. JA43. In fact, Jamie Fee stated that without Moehle's representation of the GE commitment to the Fund, Daimler never would have wanted to give up Skilled Science – a fact wholly consistent with the fact that Moehle did, in fact, make the GE Representation. JA816-817

As this Court explained in *Mei-Chai Li v. Attorney General of the U.S.*, 238 Fed. Appx. 777, 782 (2007):

> [c]orroboration is evidence that presents 'a different point of view of the same story.' *See, e.g., Black's Law Dictionary* 344 (6th ed.1990) (defining corroboration as testimony that 'corresponds with the representation of other witnesses ... or ... comport[ing] with some facts otherwise known or established.'); *see also id.* at 344–45 ('corroborating evidence,' is '[a]dditional evidence of a different character to the same point.').

Thus, the lower court's determination that Jamie Fee's testimony was not corroborative of Daimler's testimony and, even worse, contradicted Daimler's testimony constituted both (i) a failure by the lower court to view the evidence in the light most favorable to Daimler and draw all reasonable inferences in Daimler's

---

[17] Fee Dep.  20:4-10

favor, and (ii) an improper resolution – rather than recognition – of an issue of credibility, both of which required the denial of summary judgment in this case. *See Adickes*, 398 U.S. at 158-159.

In fact, Daimler's testimony that Moehle told him that GE had committed to invest $20 million in the Fund, a conversation that was private between Daimler and Moehle, is even more probative considering the fact that <u>Moehle never once denied that he made the GE Representation</u> to Daimler -- not in his deposition and not in support of his motion for summary judgment.

The lower court never considered the glaring evidentiary hole presented by Moehle's failure to deny this central fact – especially when compared with Daimler's testimony, under oath, of the $20 Million GE Representation – such that a reasonable jury could believe this occurred, again requiring the denial of summary judgment in this case. *See, e.g., Johnson v. MetLife Bank, N.A.*, 883 F. Supp. 2d 542, 550 (E.D. Pa. 2012).

Instead, for example, the lower court made am improper determination, albeit subtly, regarding Daimler's credibility.  More specifically, the lower court focused on a portion of Daimler's deposition testimony in which Daimler responded to defense counsel's query "how long was the introductory phone call with Mr. Moehle?", "[d]id you ask any questions?" that he did not recall.[18] JA22.  Following

---

[18] Citing Daimler Dep. 71:10-72:19

this testimony which, viewed in a light most favorable to Daimler, means only what he says – that he cannot recall these specific details about which defense counsel inquired – the lower court instead drew an inappropriate inference against Daimler, concluding that, "[g]iven Daimler's lack of recollection as to what was discussed on the phone call, defense counsel asked the following question regarding the central allegation of the Complaint…" JA22-23.

The lower court's impermissible inference against Daimler is all the more egregious given the clear lack of necessity of any inference. Indeed, as excerpted in the lower court's opinion, directly following his failure to recall certain details, Daimler testifies exactly why he remembered the GE Representation and not the other details about which he was asked:

> **Q.** In paragraph 20 of the Complaint, you write that – or you allege that Mr. Moehle represented to you that GE had committed to invest $20 million.  If you can't recall any of the topics that were covered, what's the basis for the allegation?

> **A.** Because that would have been burned in my memory. That's the germane issue. There would be nothing out of the ordinary about me talking to [Moehle] or even being introduced to [Moehle]. I would have no reason to have taken scrupulous notes, let alone notes that I can immediately recall at first being asked about the nature, or let alone the details, of a conversation from six years ago. But the germane issue, absolutely, was what would have changed the course

> of my decisions, or even the course of my professional life. That's a germane issue, that I would have recalled. 19  JA23.

---

[19] Citing Daimler Dep. 72:24-25; 73:1-13.

However, directly following Daimler's explanation of why he could not recall certain details but could recall the statement about the GE Representation, the lower court turned back to what other details Daimler could not recall, stating: "Daimler also could not recall whether he asked Moehle any questions about the GE Representation or whether he asked for any documents about the GE Representation." JA23.

Not only is this conclusion based on an inference drawn against Daimler, lacking in evidentiary support, and taken out of context, but it also impermissibly calls into question the credibility of Daimler's central allegations regarding the GE Representation.

### D. THE FACTUAL QUESTION OF WHETHER DAIMLER REASONABLY RELIED ON MOEHLE'S GE REPRESENTATION CANNOT BE RESOLVED ON SUMMARY JUDGMENT

In the context of common law fraud claims, the question of justifiable reliance is also most appropriately left to the jury. *Blue Cross Blue Shield Ass'n v. GlaxoSmithKline LLC*, 417 F. Supp. 3d 531, 537 (E.D. Pa. 2019). Under Pennsylvania law, for reliance upon another's representation to be justifiable, it must be reasonable. *Daimler v. Moehle*, No. CV 18-165, 2019 WL 2422843 (W.D. Pa. June 10, 2019); *Porreco v. Porreco*, 571 Pa. 61, 811 A.2d 566 (2002). Reasonableness of reliance involves all of the elements of the transaction and is rarely susceptible of summary disposition. *Id.* Additionally, where a plaintiff provides at least some

indication of forbearance of other opportunities, there is a question of reliance for the jury. *Ndubizu v. Drexel Univ.*, 768 F. Supp. 2d 796, 797 (E.D. Pa. 2011).

Whether reliance on an alleged misrepresentation is justified depends on whether the recipient knew or should have known that the information supplied was false. *Fort Washington Res., Inc. v. Tannen*,  858 F. Supp. 455, 458 (E.D. Pa. 1994). Of course, where the means of obtaining the information in question are not equal, the representations of the person believed to possess superior information may be relied upon. *Id*.

Courts have repeatedly determined that, as a general matter, a party's state of mind is an issue of fact for the jury. *See Coolspring Stone Supply, Inc. v. Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)) ("Summary judgment is inappropriate when a case will turn on credibility determinations."); *see also Riehl v. Travelers Ins. Co.*, 772 F.2d 19, 24 (3d Cir. 1985) (citing *Ness v. Marshall*, 660 F.2d 517, 519 (3d Cir. 1981)) ("The issue of intent is 'particularly inappropriate for resolution by summary judgment' because evaluating state of mind often requires the drawing of inferences from the conduct of parties about which reasonable persons might differ.").

Likewise, courts have also found that the "reasonableness inquiry" central to fraudulent inducement claims – i.e. whether the party "knew or should have known

that the information supplied was false" – "requires a consideration of the parties, their relationship, and the circumstances surrounding their transaction" – and is therefore also best left to the jury – not the court. *Toy v. Metro. Life Ins. Co.*, 593 Pa. 20, 55, 928 A.2d 186, 208 (2007) (citing *Scaife Co. v. Rockwell-Standard Corp.*, 446 Pa. 280, 285 A.2d 451, 455 (1971)); *see also Tran v. Metro. Life Ins. Co.*, 408 F.3d 130, 139 (3d Cir. 2005) (citing *Silverman v. Bell Sav. & Loan Ass'n*, 367 Pa. Super. 464, 533 A.2d 110, 115 (1987); *Rempel v. Nationwide Life Ins. Co.*, 471 Pa. 404, 370 A.2d 366, 368 (1977)) (finding that the court erred in making the justifiable reliance determination "as a matter of law," and explaining that "[w]e stress, as have the Pennsylvania courts, that the issue of whether reliance on a representation is reasonable (or justifiable) is generally a question of fact that should be presented to the jury.").

To that end, Daimler demonstrated that he justifiably relied on Moehle's representations to him. This representation resulted in Daimler ultimately joining Defendants and walking away from his company, Skilled Science. JA3137 (¶155). Daimler was introduced to Moehle by Dave Mawhinney, a trusted personal friend and member of the Carnegie Mellon School of Computer Science Advisory Board. JA3135 (¶148). Dave Mawhinney informed Daimler that Moehle had commitments from GE that were "a very big deal." *Id.* Daimler testified that he never imagined that Moehle would lie to him on such a fundamental issue, which was

reinforced by the fact that Moehle made the identical representation to potential investors. JA3153(¶¶189-190).

Additionally, the means of obtaining information about the GE Representation were not equal, as Moehle possessed superior information as to the investment. *Daimler v. Moehle*, No. CV 18-165, 2019 WL 2422843 (W.D. Pa. June 10, 2019). This issue, in fact, had also already been decided, when the District Court held that requiring Daimler to investigate more would be "tantamount to imposing a duty to investigate, contrary to current case law." *Id.* In fact, on top of not having the duty to investigate, Daimler was specifically foreclosed from the opportunity to ascertain the truth of the GE investment representation. *See Benevento v. Life USA Holding, Inc.*, 61 F. Supp. 2d 407 (E.D. Pa. 1999) (holding that whether reliance is justified is dependent on the opportunities to ascertain the truth of the representation at issue). The court should also consider the relationship of the parties involved and the nature of the transaction when determining whether one party's reliance on the allegedly fraudulent representations of another is reasonable. *Tran v. Metro. Life Ins. Co.*, 408 F.3d 130, 135 (3d Cir. 2005).

Here, Daimler was specifically directed by Moehle to not discuss the investment with GE's representative, Alex Tepper, as Tepper had not been involved in the decision process, and Moehle wanted to remain GE's point person regarding the investment. JA1090 (¶178). While Moehle was able to communicate with Tepper

on this issue, Daimler was not. *Id.* In fact, based on the relationship as business partners between Daimler and Moehle, and the nature of the transaction represented as "sensitive," Daimler accepted Moehle's representations as true.[20] JA3149 (¶¶180-181). Nevertheless, the issue of whether reliance on Moehle's representation was reasonable or justifiable is a question of fact that should be presented to the jury. *Tran*, 408 F.3d at 132.

### E. THE LOWER COURT IMPROPERLY DISREGARDED DAIMLER'S EVIDENCE OF DAMAGES.

Daimler demonstrated that he was damaged by relying on Moehle's representations of the GE commitment. On a fraudulent inducement claim, a plaintiff needs only to establish that they suffered some injury and that it was proximately caused by their reliance on a misrepresentation. *Paramount Fin. Commc'ns, Inc. v. Broadridge Inv. Commc'n Sols., Inc., No*. CV 15-405, 2019 WL 3022346 (E.D. Pa. May 23, 2019). "Under Pennsylvania law, damages need not be proved with

---

[20] The notion that Moehle would describe the GE investment as "sensitive" is bolstered by Moehle's identical description of the investment to Herman Herman, of Carnegie Mellon University, in which, in response to Mr. Herman's question as to why Moehle refused to answer a question about "the level of commitment/funding that GE has made," Moehle responded that "these terms are "sensitive and confidential." JA1090, JA1114, Daimler Dep. Tr. 79:16-17. Also of interest in that e- mail exchange is that, while Moehle maligns Daimler's interaction with Mr. Herman, by e-mail from Mr. Herman to Daimler dated May 26, 2016, Mr. Herman specifically states "[j]just so you know, my main frustration is with Chris, not you. I might not agree with you on some things, but you are straightforward and clear about your view, which I appreciate." JA1118.

mathematical certainty, only reasonable certainty." *E. C. Ernst, Inc. v. Koppers Co.*, 626 F.2d 324, 327 (3d Cir. 1980). Evidence of such damages may consist of probabilities and inferences. *Id*. This Court has also held that "[t]he proof of damages may be indirect and may include estimates based upon assumptions." *Malley–Duff & Associates, Inc. v. Crown Life Ins. Co.,* 734 F.2d 133, 148 (3d Cir.1984). It is only necessary that the assumptions of damages rest on adequate data. *Id.* Specifically, in a fraud case, damages are not considered speculative merely because they are not capable of exact calculation. Pennsylvania law merely requires that plaintiffs present a reasonable quantity of information from which a jury can fairly estimate the damages. *Windt v. Shepard's/McGraw-Hill, Inc*., No. CIV.A. 96-1527, 1997 WL 698182, at *8 (E.D. Pa. Nov. 5, 1997).

Rather, Pennsylvania law merely requires that plaintiffs present a reasonable quantity of information from which a jury can fairly estimate the damages. *Id*. Additionally, Pennsylvania law permits punitive damages to be awarded even when there are no compensatory damages. *See Welcker v. Smithkline Beckman*, 746 F. Supp. 576, 580 (E.D. Pa. 1990).

Daimler proffered evidence, and can testify at trial, that he suffered economic harm in reliance on Moehle's fraudulent representations. JA3136-3137. The Third Circuit favors the admission of lay opinion testimony, provided that it is well founded on personal knowledge and susceptible to specific cross-

examination. *Ghee v. Marten Transp., Ltd.*, 570 F. App'x 228, 229 (3d Cir. 2014).

Additionally, a lay witness qualifies to offer testimony as to damages where it relies

on facts within his knowledge by virtue of his position within the company.

*Autoforge, Inc. v. Am. Axle & Mfg., Inc.*, No. CIV.A. 02-01265, 2008 WL 65603

(W.D. Pa. Jan. 4, 2008).

Here, Daimler stated in his testimony that he walked away from his company,

and the likely $10 million investment in that company, due to Moehle's GE

investment representation.  JA3137.  Additionally, Jamie Fee stated that without the

representation of the GE commitment to the Fund, Daimler never would have wanted

to give up Skilled Science.  JA816-817.  Fee testified that the damages sustained

here would be the lost business opportunity of Skilled Science, which could be up

to five times the value of the portfolio. JA816-817

Daimler had prepared a proposal for Colin Beirne, of Two Sigma, which

included a $5 million investment with an initial release of $500,000.  JA3136,

JA1119-1120, JA3554.  At Mr. Beirne's request, Daimler also created a

Memorandum of Understanding to reflect the verbal understanding between Daimler

and Mr. Beirne about Two Sigma's investment commitment to Skilled Science.

JA3136, JA826-JA829.

Additionally, Keith Furuya, of Furuya & Co., confirmed a $100,000

investment in Skilled Science, with the belief that he had another $250,000. JA3136,

JA1124. Further, Fee testified that multiple investors, including the Sackler Family Office, were on the verge of investing in Skilled Science. JA3136 JA820.

More specifically, in concluding that the damages sustained by Daimler by walking away from his prior company, Skilled Science, to join Moehle and the Companies were too speculative [JA51], the lower court ignored several fundamental facts: (i) had Daimler not walked away from Skilled Science, the over $400,000 he provided to Moehle and the Companies would have been invested in Skilled Science [JA3161, JA818; JA824-825](ii) though Daimler was unable to identify a very tiny fraction of his expense receipts included in Exhibit O to his papers in opposition to Defendants' motion for summary judgment, the lower court simply ignored the hundreds of thousands of dollars in other expenses contained in that Exhibit [JA35-JA36, JA1179-1779]; and (iii) while the lower court focused on the fact that Daimler had no signed investor agreements at the time he walked away from Skilled Science (although he clearly had significant interest) [JA29-30, JA1085-1086] the lower court also ignored the very reasonable conclusion that the only reason Daimler did not have those signed investor agreements is exactly because he was defrauded to join Moehle and the Companies before any such signed agreements could be reached. JA51.

It is clear, therefore, that Daimler satisfied each element of his fraud claim – or, at a minimum, demonstrated the existence of genuine issues of material fact

on those elements. As a result, this Court should reverse the lower's court's order granting Defendants' motion for summary judgment and reinstate Daimler's fraud in the inducement claim. *See, generally*, JA3131-3164

### F. THE LOWER COURT ERRED IN GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON DAIMLER'S BREACH OF CONTRACT CLAIM

The lower court erred in determining that Daimler, as a matter of law, failed to prove that an oral contract existed between Daimler and Defendants such that Defendants' failure to treat Daimler's financial contributions as capital contributions constituted a breach. Rather, Daimler presented sufficient evidence to survive summary judgment on his breach of contract claim.

To prevail on a breach of contract claim, a plaintiff must establish three elements: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages. *Zeno v. Ford Motor Co.*, 480 F. Supp. 2d 825, 827 (W.D. Pa. 2007).

In the case of a disputed oral contract, what was said and done by the parties, as well as what was intended by what was said and done by the parties, are questions of fact to be resolved by the trier of fact. *Fleming Steel Co. v. Jacobs Eng'g Grp., Inc.*, 373 F. Supp. 3d 567, 582 (W.D. Pa. 2019). Whether the record contains any documentary evidence containing the term "contract" is not dispositive of whether an oral contract was formed *Id.* at 584.

Here, Daimler demonstrated that he entered into an oral agreement with Coal Hill. JA3145, JA3158 (¶¶192, 205). In his testimony, Daimler stated that he made substantial financial contributions to cover third-party expenses that were essential for the Companies to stay in business. JA3158-3159(¶¶ 206-207, 210-212). Daimler testified during his deposition, and confirmed in his Affidavit in opposition, that he contributed a considerable amount of money to the Companies, as well as to Moehle individually, over several years. JA3162 (¶¶ 214-217). Further, Fee testified that Daimler had been making contributions for the Companies expenses and "writing checks on an ongoing basis." JA3161 (¶¶ 212-213). In fact, in their Answer to the FAC, Defendants "admit[ted] that Daimler provided money to cover corporate expenses, which included expenses Daimler incurred in connection with his minimal and unsuccessful fundraising efforts." JA569 (¶43).

Next, Daimler demonstrated that Coal Hill breached this contract by failing to issue units in connection with his additional contributions. JA3163 (¶ 219). In breach of Section 7.2 of the Operating Agreement, which provides that "any future Capital Contributions made by any Member shall only be made with the consent of the Board and in connection with an issuance of Units," Daimler did not receive any additional common Units based on his contributions. JA3163 (¶ 219).

To prove damages, a plaintiff must give a fact finder evidence from which damages may be calculated to a reasonable certainty. *ATACS Corp. v. Trans World*

*Commc'ns, Inc.*, 155 F.3d 659, 669 (3d Cir. 1998). At a minimum, reasonable certainty embraces a rough calculation that is not too speculative, vague or contingent upon some unknown factor. *Id.* Whether damages are remote or speculative rests not on the difficulty of calculating the amount, but on the question of whether damages are identifiable. *Bd. of Trustees, Roofers Loc. No. 30 Combined Welfare Fund v. Int'l Fid. Ins. Co.*, 63 F. Supp. 3d 459 (E.D. Pa. 2014), aff'd, 644 F. App'x 133 (3d Cir. 2016).

The amount of damages "need not be proved with mathematical certainty, but only with reasonable certainty, and evidence of damages may consist of probabilities and inferences." *Id.* Additionally, a plaintiff is required to only provide the jury with a reasonable amount of information so as to enable the jury to fairly estimate damages without engaging in speculation. *See, e.g., Power Restoration Int'l, Inc. v. PepsiCo, Inc.*, No. CIV.A. 12-1922, 2015 WL 1208128, at *4 (E.D. Pa. Mar. 17, 2015)

Further, where a lay witness's opinion testimony "is based on sufficient experience or specialized knowledge," and a "sufficient connection" exists between such "knowledge and experience and the lay opinion," that opinion should be admitted because it "may be fairly considered to be 'rationally based on the perception of the witness,' and truly 'helpful' to the jury." *Ghee*, 570 F. App'x at 229; *see also Joy Mfg. Co. v. Sola Basic Indus., Inc.*, 697 F.2d 104 (3d Cir. 1982).

43

Here, Daimler's testimony as to his damages must be considered, as it is based on personal knowledge, his sufficient experience as a Member of Coal Hill, and his ongoing financial contributions to the company. JA3162-3163 (¶¶215-218); *Ghee*, 570 F. App'x at 229. Daimler identifies that he did not have Units issued to him based on his agreement with Defendants, and thus suffered monetary loss due to Defendants' breach. JA3163 (¶219).

Specifically, Daimler's unreimbursed contributions to Coal Hill totaled well over $200,000 with the expectation, based on his agreement with Defendants, that they would be treated as capital contributions. JA3162 (¶214).  In simplest terms, he certainly did not pay well over $200,000 out of the goodness of his heart, and the Companies should not be absolved of making a choice – provide Daimler with the common units promised or pay back all of the money Daimler advanced so that the Companies could survive and still exist today.

Instead, the lower court, however, relied upon *Ecore Int'l, Inc.*, holding that "where . . . there is no agreement or even a discussion as to any of the essential terms of an alleged bargain, such as time or manner of performance, or price or consideration, the 'agreement' is too indefinite for a party to reasonably believe that it could be enforceable in an action at law." *Ecore Int'l, Inc. v. Downey*, 343 F. Supp. 3d 459, 489 (E.D. Pa. 2018).

However, the court there also stated that under Pennsylvania law, "where the facts are in dispute, the question of whether a contract was formed is for the jury to decide." *Id.* at 487. Here, consideration for the contract was clearly the amount of expenses paid on Defendants' behalf and the material terms are addressed in Section 7.2 of the Operating Agreement. JA3163 (¶219). Those facts, together with any other facts that may be in dispute, should be left to resolution by a jury.

It is clear, therefore, that Daimler demonstrated the existence of genuine issues of material fact on the elements of his breach of contract claim. As a result, the lower court erred in granting Defendants' motion for summary judgment on Daimler's breach of contract claim.

## POINT III

### THE DISTRICT COURT ERRED IN DISMISSING DAIMLER'S UNJUST ENRICHMENT CLAIMS

#### A. STANDARD OF REVIEW

Appellate review of a district court's dismissal on a Fed. R. Civ. P. 12(b)(6) motion to dismiss is *de novo. See Carino*, 376 F.3d at 159.

#### B. THE LOWER COURT DISMISSED THE BREACH OF CONTRACT CLAIMS LEAVING DAIMLER WITH NO REMEDY AT LAW, REQUIRING THAT THE UNJUST ENRICHMENT CLAIMS BE REINSTATED

Daimler has properly alleged an unjust enrichment claim against Moehle and the Companies. "The elements of unjust enrichment under Pennsylvania law have

45

been defined as follows: (1) benefits conferred on defendant by Plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *Gabriel v. Giant Eagle, Inc.*, 124 F. Supp. 3d 550, 568 (W.D. Pa. 2015).

Delaware law is in accord. *See B.A.S.S. Grp., LLC v. Coastal Supply Co.*, No. CIV.A 3743-VCP, 2009 WL 1743730, at *6 (Del. Ch. June 19, 2009) ("The elements of unjust enrichment are: the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.").

However, the lower court overlooked the fact that the unjust enrichment claims against the Companies are expressly pled in the alternative to the contract claims, as allowed under Fed. R. Civ. P. 8(d). *See Aetna Life Ins. Co. v. Huntingdon Valley Surgery Ctr.*, No. CIV.A. 13-03101, 2015 WL 1954287, at *10 n.1 (E.D. Pa. Apr. 30, 2015) ("Fed. Rule Civ. P. 8(d)(3) permits inconsistent claims at the pleading stage, [ ] so courts have permitted plaintiffs to pursue alternative theories of recovery based both on breach of contract and unjust enrichment, even when the existence of a contract would preclude recovery under unjust enrichment."); *Sensus USA, Inc. v. Elliott Bay Eng'g, Inc.*, No. CIV.A. 10-1363, 2011 WL 2650028, at *5 (W.D. Pa. July 6, 2011); *Schirmer v. Principal Life Ins. Co.*, No. 08-CV-2406, 2008 WL 4787568, at *5 (E.D. Pa. Oct. 29, 2008).

46

Here, in its July 30, 2018 Decision dismissing Daimler's unjust enrichment claim[21], the lower court held that:

> Because the Court finds the existence of valid contracts, and because Plaintiff does not seek recission of the contracts and instead claims damages pursuant to those contracts (which the parties agree address the at-issue conduct), these claims must be dismissed.

However, in its July 18, 2022 Decision[22] the lower court dismissed Daimler's claim for breach of the contract under which he was promised that his capital contributions would be converted into common units, leaving Daimler with no contract to serve as the basis for the lower court's earlier July 30, 2018 Decision.

As a result, by the lower court's own logic, Daimler's unjust enrichment claim should be reinstated.

## POINT IV

## THE TRIAL COURT ERRED IN DENYING DAIMLER'S MOTION FOR NEW TRIAL OR, ALTERNATIVELY, REMITTITUR

### A. STANDARD OF REVIEW

The district court's denial of a new trial or remittitur is reviewed for abuse of discretion. *Kelly v. Matlack, Inc.*, 903 F.2d 978 (3d Cir. 1990); *Spence v. Bd. of Educ. of Christina Sch. Dist.*, 806 F.2d 1198 (3d Cir. 1986).

---

[21] JA77-99; Dkt No. 22

[22] JA20-56; Dkt No. 124

## B. THE DAMAGE AWARD IS EXCESSIVE AND CONTRADICTS THE RECORD, JURY INSTRUCTIONS, AND EXPLICIT AND BINDING STATEMENTS OF DEFENDANTS.

Pursuant to Fed. R. Civ. P. Rule 59(a), a new trial may be granted to all or any of the parties, and on all or part of the issues, in an action in which there has been a trial by jury for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States. Generally, a District Court may grant a new trial on grounds that the verdict is against the weight of the evidence, that damages are excessive, that the verdict was arrived at by compromise, or that for other reasons the trial was not fair to the moving party. *See,* e.g., *Davis v. Se. Pennsylvania Transp. Auth.*, 735 F. Supp. 158 (E.D. Pa. 1990), aff'd, 924 F.2d 51 (3d Cir. 1991); *Alexander v. Red Star Exp. Lines of Auburn, Inc.*, 646 F. Supp. 672 (E.D. Pa. 1986), aff'd, 813 F.2d 396 (3d Cir. 1987). As recognized by the Court in Alexander:

> A district court may grant a new trial if required to prevent injustice or to correct a verdict that was against the weight of the evidence...The authority to grant a new trial rests in the sound discretion of the district court...but if the judge is convinced that there has been a miscarriage of justice, then it is his or her duty to set the verdict aside.

646 F. Supp. at 683 (citations omitted).

A new trial is warranted in this case on the grounds that the damage award is contrary to the clear weight of the evidence, and was speculative, excessive, and indicates confusion or a compromise on the part of the jury.

A new trial may be granted when the great weight of the evidence cuts against the verdict and . . . a miscarriage of justice would result if the verdict were to stand.'" *Solomon v. Sch. Dist. of Philadelphia*, 532 F. App'x 154, 157 (3d Cir. 2013) (*quoting Springer v. Henry*, 435 F.3d 268, 274 (3d Cir. 2006)). Both the Supreme Court and this court have explained that the evidentiary record must provide a fair basis upon which a jury can calculate damages, and where a verdict is based upon "speculation or guesswork," it must be overturned. *See Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946); *see also Vargo v. Coslet*, 126 F. App'x 533, 534 (3d Cir. 2005) (a verdict against the weight of the evidentiary record evincing a miscarriage of justice warrants a new trial). A verdict granting purely speculative damages, therefore, should be overturned. *See Am. Air Filter Co. v. McNichol*, 527 F.2d 1297, 1301 (3d Cir. 1975). In light of the evidence presented at trial, the $225,000 verdict is entirely unsupported by the evidentiary record and is, in fact, directly contradicted by the testimony and binding statements of Moehle and the Companies' counsel.

Here, it is undisputed that the Companies' counsel specifically requested in his closing argument that the jury return $51,467 in damages on the claims that the jury returned in their favor. During closing arguments, the Companies' counsel summarized the evidence for the jury and unequivocally admitted that, on the Intellectual Property Claims, the damages the Companies sought to recover were limited to $51,467:

So if you add those numbers together as response costs, you'll come to a $51,467 and that's the amount that we're going to ask you to return on the intellectual property and information technology claims.[23]

Here, the lower court ignores caselaw supporting Daimler's argument that the Companies' counsel's request during his closing argument for $51,467 in damages on all four claims is binding on Defendants. *See Glick v. White Motor Co.*, 458 F.2d 1287, 1291 (3d Cir. 1972) (finding that concessions made in closing arguments about the authenticity of certain exhibits was binding on defendant's client); *see also Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 358 n.7 (3d Cir. 1999) (explaining "[i]t may be true ... that an attorney's clear and unambiguous statements of fact made during opening or closing arguments can constitute judicial admissions"); *United States v. Butler*, 496 F. App'x 158, 160 (3d Cir. 2012) (quoting *United States v. McKeon*, 738 F.2d 26, 30 (2d Cir. 1984) ("[t]he general admissibility of an attorney's statements, as well as the binding effect of an opening statement within the four corners of a single trial, are ... well established."); *id.*(citing *Oscanyan v. Arms Co.*, 103 U.S. 261, 263, 26 L. Ed. 539 (1880) ("any fact, bearing upon the issues involved, admitted by counsel, may be the ground of the court's procedure equally as if established by the clearest proof.").

As Daimler argued in his motion for a new trial, an unequivocal admission by counsel is precisely what occurred here.

---

[23] JA3479 (22-25)

It is also undisputed that Moehle testified to and proffered evidence of the costs the Companies incurred as a result of the Intellectual Property Claims, which equals $51,467[24].

While the lower court's jury instructions[25] explained that the jury "may consider" additional damages arising from the Lanham Act for "loss of goodwill" and "cost of corrective damages," the record is completely devoid of any evidence of "loss of goodwill."[26]

The lower court then considered the "costs of corrective advertising" and noted that any additional damages under the Lanham Act would have to fall under this umbrella.  This was defined as:

> …the amount spent by the [the Companies] to counteract the effects of Eric Daimler's infringement and/or false advertising and dispel any public confusion that lingers after the infringement and/or false advertising. You may not determine damages by speculation or conjecture, but rather evidence sufficient for you to draw reasonable inferences and make a fair and reasonable assessment of the amount of damages. Damages may be awarded even though they cannot be calculated with mathematical certainty.[27]

---

[24] Moehle offered the following evidence of costs incurred by the Companies resulting from Daimler's violations of the Intellectual Property Claims: (i) Reed Smith invoices attributable to its response work, totaling $6,059. JA3334; (ii) a retainer of bit-x-bit for three years, and two 2017 invoices totaling $3,408. [JA3479]; and (iii) testimony, without any supporting invoices, that through March 2023, the Companies had paid $48,000 to Reputation Defender. [JA3328].

[25] JA3450-3469 (Jury Instructions).

[26] JA3457.

[27] JA3502, 3458.

Clearly, however, the costs of corrective advertising were already included in the requested award (i.e. Reputation Defender) or, to the extent any additional evidence of corrective advertising did exist, it was not accompanied by any financial evidence by which the jury could reasonably assess the costs of such corrective advertising.

Despite there being no evidence of "loss of goodwill," the lower court nonetheless included "loss of good will" as a potential basis for the inflated damage award.

In addition to "loss of good will," the lower court considered "consequential damages" that the CFAA includes in its definition of "loss" as a basis for the excess damages that the court acknowledged "fall outside of" the $51,467 "concrete" damages.  As for damages stemming from a finding of liability on the CFAA the jury was instructed as follows:

> Cost that constitutes loss for these purposes include attorneys' fees and investigation and enforcement costs reasonably incurred responding to the offense, as well as fees paid to an expert for investigating Eric Daimler's access to the computer -- to the Google Drive and the results of such access or taking remedial measures in response to the access.[28]

As evidence of "loss of good will" and "consequential damages," the lower court stated:

> In terms of additional concrete numbers that the jury may have considered, Mr. Moehle testified that, as a result of Mr. Daimler's

---

[28] JA3460. *See* 113:1-16.

conduct, he continued and will continue to pay Reputation Defender, $6,000 per year, for Search Engine Optimization (SEO).[29]

First, not only did the Companies clearly decide against including $6,000 on an undefined continuous basis in its specific, calculated request for $51,467 in damages, but this sum was clearly considered by the Companies to be unnecessary to remedy the issues caused by Daimler's alleged misuse of the Companies' intellectual property.

Further, neither the jury instructions nor case law support a damage award for the annual SEO payment, Daimler's post-employment conduct, or the Companies' purported $8 million shortfall from their alleged "fundraising goals." JA8, JA3918, JA3450-3469.

Specifically, in regard to claims of false designation of origin and/or false advertising, the lower court instructed the jury that it "may not determine damages by speculation or conjecture but rather evidence sufficient for you to draw reasonable inferences and make a fair and reasonable assessment of the amount of damages." JA3458 112:4-11.  Likewise, in regard to liability stemming from the Computer Fraud and Abuse Act ("CFAA"), the court instructed the jury that "as I previously instructed you damages should not be awarded based on speculation." JA3460 (114:13-14).

---

[29] JA8

This Circuit has similarly rejected speculation in the damage award process. *Fetterolf v. Harcourt Gen., Inc.*, 70 F. App'x 54 (3d Cir. 2003) (affirming District Court rejection of speculative argument pertaining to jury instructions); *United States v Rinaldi*, *United States v. Rinaldi*, No. 3:18-CR-279, 2021 WL 1212669, at *6 (M.D. Pa. Mar. 31, 2021), *aff'd,* No. 21-2419, 2023 WL 3034327 (3d Cir. Apr. 21, 2023) (rejecting defendant's argument as to what testimony the jury believed or relied upon in reaching its verdict as "entirely speculative").

Contrary to the lower court's ruling, Daimler's alleged post-employment conduct calls for impermissible speculation. Indeed, the record is completely devoid of any financial statements, invoices, or other documents from which a jury could extrapolate dollar amounts from which it could "reasonably infer" additional damages on this basis. Likewise, the $8 million "fundraising goal" shortfall referenced by the lower court is impermissibly speculative on its face. JA8. Clearly, neither the jury instructions nor the law permit the jury to award damages for the "efforts" expended by the Companies to "respond to Daimler's actions" or the "fundraising goal" shortfall.

Finally, to the extent the lower court found that any of the aforementioned "evidence" constitutes "consequential damage" under the CFAA, this too is clearly contradicted by the law:

> [D]istrict court decisions in the [Court of Appeals for the] Third Circuit
> have held that to fall within this definition of 'loss,' the 'alleged "loss"

54

must be related to the impairment or damage to a computer or computer system.'" *Brooks v. AM Resorts, LLC*, 954 F. Supp. 2d 331, 338 (E.D. Pa. 2013) ((quoting *Sealord Holdings, Inc. v. Radler*, No. CIV.A. 11-6125, 2012 WL 707075, at *4 (E.D. Pa. Mar. 6, 2012)) (additional citations omitted)). Therefore, loss under the CFAA is compensable if "the cost of remedial measures taken to investigate or repair the damage to the computer, or loss is the amount of lost revenue resulting from a plaintiff's inability to utilize the computer while it was inoperable because of a defendant's misfeasance."

*Carnegie Strategic Design Engineers, LLC v. Cloherty*, No. CIV.A. 13-1112, 2014 WL 896636, at *3 (W.D. Pa. Mar. 6, 2014) (quoting *Clinton Plumbing & Heating of Trenton, Inc. v. Ciaccio*, No. CIV.A. 09-2751, 2011 WL 6088611,at *5 (E.D. Pa. Dec. 7, 2011)) (emphasis in original). Therefore, that the Companies "acted to reassure their investors, their portfolio companies, and others of their continued existence and operations" is not compensable as "cost[s] of remedial measures" or "lost revenue resulting from [the Companies'] inability to utilize the computer" under the CFAA. *Id.*

In fact, loss under the CFAA is compensable if "the cost of remedial measures taken to investigate or repair the damage to the computer, or loss is the amount of lost revenue resulting from a plaintiff's inability to utilize the computer while it was inoperable because of a defendant's misfeasance." *Id.*

In the face of the clear weight of the evidence at trial and the jury instructions provided by the lower court, the jury awarded damages for the Intellectual Property Claims in the amount of $225,000 – nearly five times the amount sought by the

Companies and in excess of what the record, jury instructions and law support. As such, the jury verdict is excessive and justifies a new trial.

### a) *The Verdict Indicates Confusion, Mistake, and/or Compromise on The Part of the Jury.*

Similarly, a jury verdict should be set aside if it is manifest that the verdict was the result of a mistake, caprice, prejudice or other improper motive on the part of the jury. *Conry v. Baltimore & O.R. Co.*,112.F.Supp.252 (W.D. Pa.), aff'd, 209 F.2d 422 (3d Cir. 1953). Federal courts have also recognized that a new trial is warranted where apparent inconsistencies in the verdict indicate confusion on the part of the jury. *See, e.g., Glob. Van Lines, Inc. v. Nebeker,* 541 F.2d 865 (10th Cir. 1976); *Frain v. Andy Frain, Inc.*, 660 F. Supp. 97 (N.D. Ill.1987). Moreover, the inconsistency of the verdict may be considered as possibly representing the compromise of a conflict among jury engendered by prejudice. *Beck v. Wings Field, Inc.*, 122 F.2d 114 (3d Cir. 1941).

Here, the evidence was uncontroverted that the Companies only sustained $51,467 in damages for the Intellectual Property Claims that the jury returned in their favor. Further, the Companies' attorney clearly and specifically limited his request to the jury for a damage award of $51,467 for the Companies.

It is noteworthy in this regard, as Daimler's attorney pointed out to the lower court at trial, the jury verdict slip provided a single line for a damage award, but the jury was returning damages for the three Intellectual Property Claims it found in

favor of the Companies. As such, Daimler's attorney was concerned about the risk

that the jury would return a verdict three times the amount it actually found.

MR. MANDELL:  I apologize, Judge.  As we're talking about it, I guess it does somehow perhaps need to be made clear though to the jury that essentially it's one number for any of them.

But in other words they find it's $10,000 in damages from one of them, it can't be ten for each of them so now the number is 30 because they are essentially duplicative. I don't know the instructions mean the jury understand that.

THE COURT:  We're only going to have one line and it's going to be, it's the same damage, so how are they -- if they have a bill for $6,000 to Reed Smith and they decide that's the damages are you suggesting that you think they're going to triple it?

MR. MANDELL:  Only because -- I don't know, Judge, is the answer. Only because they see that it's essentially a violation of three separate statutes. So I don't know if that's what they would do. I'm hoping not.  It's not like I have a powerful feeling that there's a risk, but it is still the concern that there should be clarity that they understand that it's essentially what the numbers there –

THE COURT:  Just wait till I get the verdict slip and we'll make adjustments.[30]

This may very well have been the reason, then, that the jury's verdict came

back for nearly five times the amount requested by the Companies' counsel. The

lower court, however, refused to "make the adjustments" that it assured it would

make and, as Daimler's counsel feared, were clearly necessary.

---

[30] JA3433(5)-3434 (7)

## C. THE TRIAL COURT ALSO ERRED IN DENYING DAIMLER'S REQUEST FOR REMITTITUR

The lower court also erred in denying Daimler's request for a remittitur of the jury verdict. If this Court determines that lower trial court properly denied Daimler's request for judgment as a matter of law and for a new trial, the case may be remanded, and the trial court directed to reopen the judgment and direct a remittitur of the verdict to no more than $51,467.

This Court has the power to offer the Companies the opportunity to make a remittitur and, if it is refused, to grant Daimler's motion for new trial. *See, e.g., Meyerv. W. R. Grace & Co.*, 421 F. Supp. 1331 (E.D. Pa. 1976), *aff'd in part, rev'd in part,* 565 F.2d 152 (3d Cir. 1977).  An order directing the Companies to remit all or part of the verdict in excess of the maximum amount supportable by the evidence is the proper procedure where the verdict is so large as to shock the conscience of the court. *Loughman v. Consol-Pennsylvania Coal Co.*, 740 F. Supp. 1114 (W.D. Pa. 1990), *aff'd in part, vacated in part sub nom; Hughes v. Consol- Pennsylvania Coal Co .*, 945 F .2d 594.( 3d Cir. 1991); *see also Werbungs Und Commerz  Union Austalt v. Collectors'  Guild, Ltd.*, 930 F.2d 1021 (2d Cir. 1991) (remittitur is appropriate to reduce verdicts where a properly-instructed jury, hearing properly-admitted evidence makes an excessive award).

In this case, the verdict was against the weight of the evidence and was excessive. Accordingly, the lower court abused its discretion in not ordering the Companies to remit all or part of the $225,000 verdict.

## POINT V

### IT WAS AN ABUSE OF THE LOWER COURT'S DISCRETION TO AWARD ATTORNEYS' FEES TO THE COMPANIES

### A. STANDARD OF REVIEW

The district court's award of attorney's fees under the Lanham Act is reviewed for abuse of discretion. *See Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 315 (3d Cir. 2014). However, deference to the district court is not given where, as here, the district court misapprehends and misapplies the correct legal standard. *Id.*

### B. THE LANHAM ACT VIOLATIONS DID NOT MEET THE "EXCEPTIONALITY" REQUIREMENT FOR ATTORNEYS' FEES.

Attorneys' fees are permitted – not mandated – for violations of the Lanham Act only in "exceptional cases." 15 U.S.C. § 1117. Though undefined by statute, the Third Circuit has held that a case is "exceptional" "when (a) there is an unusual discrepancy in the merits of the positions taken by the parties or (b) the losing party has litigated the case in an 'unreasonable manner.'" *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 315 (3d Cir. 2014) (citations omitted).`

Additionally, "[w]hether litigation positions or litigation tactics are 'exceptional' enough to merit attorneys' fees must be determined by district courts

'in the case-by-case exercise of their discretion, considering the totality of the circumstances.'" *Id.* (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554, 134 S. Ct. 1749, 188 L. Ed. 2d 816 (2014)). In determining whether an "unusual discrepancy in the merits exists" courts consider whether the case "'stands out from others with respect to the substantive strength of a party's litigating position,' considering both the governing law and the facts of the case." *Wholesale Fireworks, Corp. v. Wholesale Fireworks Enterprises, LLC*, No. 20CV0796, 2022 WL 1423095, at *4 (W.D. Pa. May 5, 2022) (citations omitted).

Congress added the attorneys' fee provision of § 35(a) to the Lanham Act in 1975 in response to the Supreme Court's decision in *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 87 S. Ct. 1404, 18 L. Ed. 2d 475 (1967), holding that attorneys' fees were not available in trademark cases under the Lanham Act absent express statutory authority. *See* S. REP. 93-1400, 2 (1974), reprinted in 1974 U.S.C.C.A.N. 7132, 7133.

Here, the lower court erred in concluding that this case is "exceptional." Specifically, the lower court's conclusion that the "exceptionality requirement of the Lanham Act is met in this case…." was based on two mistaken factual conclusions: Daimler had (1) acted in bad faith; and (2) conceded to culpability on the eve of the trial rather than at some earlier point in the litigation. Contrary to prevailing law, however, the lower court concluded that bad faith alone sufficed for exceptionality

and concluded that "such circumstances create the exceptionality that the Lanham Act intended in shifting fees to prevailing litigants…." JA9-11.

In concluding that Daimler acted in bad faith, the lower court failed to even name what specific facts belied the jury's determination of bad faith. Rather, the lower court stated that it agreed with the jury's finding of bad faith and that "the same" supports "exceptionality" under *Fair Wind* and *Octane Fitness* and an attorneys' fees award under the Lanham Act. JA9-10.

While it is unclear whether the court held that the evidence supporting the jury's bad faith determination or the bad faith determination itself "supports exceptionality," the distinction is moot because neither is sufficient for a finding of bad faith under *Fair Wind* or *Octane Fitness*. *See Fair Wind Sailing, Inc.* 764 F.3d at 315 (Whether litigation positions or litigation tactics are "exceptional" enough to merit attorneys' fees must be determined by district courts "in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Octane Fitness, LLC*, 134 S. Ct. at 1756. Importantly, that discretion is not cabined by a threshold requirement that the losing party acted culpably. *Octane Fitness, LLC*, 572 U.S. at 554 n. 6  ("In *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 114 S. Ct. 1023, 127 L. Ed. 2d 455 (1994), for example, we explained that in determining whether to award fees under a similar provision in the Copyright Act, district courts could consider a 'nonexclusive' list of 'factors,' including 'frivolousness, motivation,

objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence.'"). The Senate Report also confirms that whether a case is exceptional "ultimately turns on considerations of the equities in full" and "[a]ccordingly, although culpable conduct of a defendant in the act of infringement is a relevant factor to consider, it is not exclusive of other equitable considerations *Securacomm Consulting, Inc. v. Securacom Inc.*, 224 F.3d 273, 281 (3d Cir. 2000) (quoting S. REP. 93-1400, 1 (1974), reprinted in 1974 U.S.C.C.A.N. 7132, 7132).

The lower court then examined "Daimler's litigation position," concluding that his concession of culpability for the Intellectual Property Claims "on the eve of trial and after three and a half years constitutes "circumstances [that] create the exceptionality that the Lanham Act intended in shifting fees to prevailing litigants."

The Third Circuit examined abuse of litigation and exceptionality in detail in *Securacomm Consulting, Inc.*, affirming that district court's award of attorneys' fees because that case presented "more than isolated incidents of litigation abuse; it involves a sweeping attempt to beat a financially weaker opponent through the use of vexatious litigation." 224 F.3d at 279. The *Securacomm* Court further explained:

> The case involved a deliberate effort by Securacom New Jersey to "bury" Libengood financially and "take everything he had" by filing multiple suits and complaints against him and his attorneys in a variety of legal fora. Slip op. at 6. As the District Court found, based on documents and testimony presented at trial, Securacom New Jersey "did not confine itself to litigating the case fairly on the merits. Rather,

it tried to prevail by crushing Libengood and his corporation." Slip op. at 5. The facts of this case support the District Court's conclusion that this is an exceptional case involving culpable conduct on the part of Securacom New Jersey.

*Id.*

Clearly, Daimler's concession to culpability, if any, is nowhere near the nature and degree of the conduct that this court considers "exceptional" such that attorneys' fees are warranted. Indeed, the three and a half years during which the lower court found that Daimler failed to concede his culpability for the Intellectual Property Claims were in fact devoted exclusively to litigating Daimler's claims against Defendants.

Making this even less of an "exceptional case," the Companies' counsel acknowledged at trial that there is no evidence that Daimler attempted to sell the roboticshub.io domain. JA3336.

Moreover, Daimler's concessions did not contradict his denials of certain allegations and elements of the Intellectual Property Claims[31], nor did the

---

[31] Pretrial Statement by Eric Daimler (Dkt. No. 153). ("There are several fundamental flaws in Robotics Hub's claims under 18 U.S.C. § 1030 and 15 U.S.C. § 1125. More specifically: 1. Robotics Hub will be unable to prove that "Robotics Hub" is a distinctive or famous mark entitled to protection[;]2. Daimler did not create or register any other domain name, as required under 15 U.S.C. § 1125(D) [;] 3. Since Daimler purchased and maintained the Robotics Hub domain name, and thus initially thought it was his to use Robotics Hub cannot demonstrate that Daimler acted in bad faith[;] 4. The term "Robotics Hub" is not protected under the Lanham Act since use of the term "Robotics" is generic and/or "merely descriptive," is not inherently distinctive, and has not acquired any distinctiveness through secondary

concessions significantly lengthen trial preparation, which included four claims, one of which, fraudulent misrepresentation, was by far the most complex and by far sought the highest quantum in damages and which was successfully defended by Daimler.  Nor did the lower court consider the unexceptional nature of the litigation generally, which was a relatively short eight-month litigation of the Counterclaims – from the August 18, 2022 unopposed motion of Defendants' to reopen the case to the April 27, 2023 conclusion of the jury trial – the merits of Daimler's defenses, Daimler's consent and cooperation with court orders and opposing counsel's motions and requests for various extensions, and, critically, the fraudulent misrepresentation claim, which the jury ultimately decided in Daimler's favor, all of which had the positive effect of a significantly shortened trial and saving of the time and resources of the lower court and the jury.

## C. ATTORNEYS' FEES SHOULD NOT HAVE BEEN AWARDED BECAUSE COUNSEL'S TIME ENTRIES CANNOT BE ATTRIBUTED TO PARTICULAR CLAIMS

The lower court's reliance on the time entries submitted by the Companies' counsel was improper and an abuse of discretion.

First, the Companies' counsel's time entries do not segregate between

---

meaning[;]5. Robotics Hub cannot demonstrate confusion, likelihood of confusion, or that Daimler attempted to get a "free ride" on its reputation and goodwill.")

the Lanham Act, ACPA, CFAA, and fraudulent inducement claims. Their arbitrary reduction of 25% for claims that comprised a negligible portion of the damages sought speaks volumes to demonstrate that attorneys' fees are not appropriate here.

Second, the attorneys' fees award of $129,183 is facially unreasonable given that the Companies sought only $51,467 in damages for the Intellectual Property Claims, which is inclusive of the CFAA claim for which the Companies are not seeking attorneys' fees.

Even if this were an exceptional case (it is not), the lower court should not have awarded attorneys' fees because a significant percentage of the Companies' counsel's time entries, by their own admission, are not attributable to particular claims. This alone should be fatal to their claim for attorneys' fees. Further, many of the time entries were block-billed, preventing the court from ascertaining the reasonableness of the entries. "Attorneys seeking compensation must document the hours for which payment is sought 'with sufficient specificity'." *Washington v. Philadelphia Cnty. Ct. of Common Pleas*, 89 F.3d 1031, 1037 (3d Cir. 1996) (citations omitted). Courts strike block-billed entries that do not reflect the time spent on each relevant task. *See Minehan v. McDowell*, No. CV 21-5314, 2023 WL 199276, at *7 (E.D. Pa. Jan. 17, 2023)(striking entries that were block billed which reflected both relevant and irrelevant work and did not indicate the amount of time

spent on relevant work). Courts have also held that "[i]n the absence of explanatory testimony, the use of block billing precludes an objectively accurate determination of the reasonableness of time expended on particular tasks or the necessity of a particular attorney related activity." *Twp. of Millcreek v. Angela Cres Tr. of June 25, 1998*, 142 A.3d 948, 964 (Pa. Commw. Ct. 2016) (citations omitted).

Had the Companies intended to seek attorneys' fees of such magnitude, especially in the face of their request for $51,467 in damages, it is not unreasonable to surmise that their time entries would have carefully particularized whether work was done on either the Lanham Act or ACPA claims.

Here, the time entries do not indicate which entries are relevant to the prosecution of the Lanham Act, ACPA, CFCA or fraudulent inducement claims. This is at least suggestive of the fact that, during the course of litigation, the Companies had no intention to seek attorneys' fees and the amount sought is facially unreasonably (discussed below). Therefore, each and every time entry that does not identify on which claim work is being performed should be stricken.

In fact, there are only seven time entries that potentially identify or reference Lanham Act and/or ACPA claims:

> 3/8/2023 ALY Research on Lanham Act and CFAA and the recoverable damages available under each; locate case law surrounding the same; draft findings and send to David Jones and Stuart Gaul, Jr for review; email correspondences and discussion surrounding the same 3.80 $893.00

3/8/2023 DAJ Review Alexandra Yuill research regarding Lanham Act claims; analyze potential theories and evidence of damages; discuss issues for trial preparation with Stuart Gaul, Jr 1.30 $455.00

3/29/2023 ALY Email correspondences with David Jones regarding Lanham Act research and matters relevant to damages .2 $47.00

3/30/2023 ALY Research on Lanham Act, valid trademarks, and false designations; summarize findings and send to David Jones and Stuart Gaul, Jr for review; email correspondences with Stuart Gaul, Jr and David Jones regarding the same; telephone call with David Jones regarding the same 4.90 $1,151.50

4/2/2023 DAJ Conduct legal research regarding Lanham Act claims and damages 2.90 $1,015.00

4/4/2023 DAJ Conduct legal research and continue drafting jury instructions; emails and telephone call with Daimler counsel and court clerk regarding trial schedule; 7.10 $2,485.00; telephone call with Chris Verdini regarding strategy for Lanham Act claims

4/20/2023 ALY Review/analyze SpinGlass and C Squared decks for references to Robotics Hub and comparable overlaps between decks; flag portions for David Jones and Stuart Gaul, Jr review 2.30 $540.50 TOTAL 22.5 $6,587.00 See ECF 177-1, pgs. 4-15 (modified to exclude headings and hourly rate).

However, four of the seven time-entries are block billed, making it impossible for this Court to determine how much time was spent on the Lanham Act versus the ACPA claims. Therefore, those time entries should have been stricken. Only the March 29, 2023, March 30, 2023, and April 2, 2023 entries specifically identifying Lanham Act claims – comprising eight hours for a total of

$2,213.50 – should be counted. This is the maximum amount the Companies should be able to recover.

Further, the fact that the Companies only attribute $51,467 in damages to their Lanham Act claims, renders the $129,183 in attorneys' fees (487.6 hours of work) for only the Lanham Act and ACPA claims, outrageous. If this Court is to accept that the Companies' counsel indeed worked this many hours with a value totaling a figure so much higher than the potential damages sustained by the Companies, the Companies' counsel failed to exercise billing judgment when prosecuting the Lanham Act and ACPA claims. *See Hensley*, 461 U.S. at 447. Therefore, the lower court's award of attorneys' fees is unreasonable.

The Supreme Court in *Hensley* stated that "counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. Still, this Court should recall that the Companies commenced the trial seeking approximately $8 Million in damages under the fraudulent inducement claim, but had that damages calculation reduced to approximately $2 Million when the claim as to Robotics Hub Fund 1 LLC was dismissed mid-trial. "This 'billing judgment' does not necessarily mean that counsel should not be compensated for all hours spent on the case, 'but the hours he does seek compensation for must be reasonable. *Aamco Transmissions,*

*Inc. v. Graham*, No. CIV. A. 89-4976, 1990 WL 118050, at *5 (E.D. Pa. Aug. 9, 1990) (*quoting City of Riverside v. Santos Rivera*, 477 U.S. 561, 569 n. 4 (1986)). Here, expending 487.6 hours of work on a claim for which only $51,467.00 in damages was sought is unreasonable on its face.

Thus, the lower court's award of attorneys' fees should be reversed based on the Companies' counsel's failure to maintain billing time records    (a) "in a manner that will enable [the] court to identify distinct claims;"    (b) reflecting the time spent on each relevant task. *Hensley*, 461 U.S. at 437; *Minehan*, 2023 WL 199276, at *7; and (c) even remotely justifying spending 487.6 hours of work on a $51,467 claim.

## IX.    CONCLUSION

Based upon the foregoing, Daimler respectfully requests that this Court reverse the subject orders subject to this appeal, reinstate Daimler's dismissed claims, and order a new trial on Defendants' counterclaims.

Respectfully submitted,

*/s/ Mitchell G. Mandell*
Mitchell G. Mandell
MANDELL PC
211 E 43rd Street
7th Floor
New York, NY 10017
(212) 779-6133

## COMBINED CERTIFICATIONS

I, the undersigned, hereby certify the following:

1.      That I am a member of the Bar of the United States Court of Appeals for the Third Circuit.

2.      This brief complies with the order of this court, because it contains 16,249 words excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

3.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman.

4.      That the text of the electronic and paper versions of the foregoing brief are identical.

5.      That a virus check was performed on this brief using Avast Antivirus Software, and that no virus was indicated.

6.      That, on March 18, 2024, I caused the foregoing to be filed with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered users.

*/s/ Mitchell G. Mandell*
Mitchell G. Mandell
MANDELL PC

# NO. 23-2611

In The

# United States Court Of Appeals
## For The Third Circuit

## ERIC DAIMLER,

*Appellant,*

v.

## CHRIS MOEHLE; ROBOTICS HUB FUND 1, LLC; COAL HILL VENTURES LLC.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
CASE NO. 2-18-CV-00165 - MARILYN J. HORAN, DISTRICT JUDGE

---

## JOINT APPENDIX
### Volume I of IX
### (Pages: 1 – 98)

---

Mitchell G. Mandell
MANDELL PC
211 E 43rd Street
7th Floor
New York, NY 10017
(212) 779-6133

Stuart C. Gaul, Jr.
David A. Jones, Jr.
BERNSTEIN BURKLEY
601 Grant Street
9th Floor
Pittsburgh, PA 15219
(412) 456-8100

Patrick J. McElhinny
Jessica Moran
Christopher M. Verdini
K&L GATES
210 Sixth Avenue
Pittsburgh, PA 15222
(412) 355-6500

*Counsel for Appellant*

*Counsel for Appellees*

*Counsel for Appellees*

# TABLE OF CONTENTS
## Joint Appendix – Volume I of IX

**Page:**

**Notice of Appeal**
        **filed September 1, 2023 [DE204]** .................................................................1

**Order**
        **filed August 2, 2023 [DE196]**.......................................................................3

**Opinion**
        **filed August 2, 2023 [DE195]**.......................................................................4

**Judgment in a Civil Action**
        **filed April 27, 2023 [DE176]** ......................................................................14

**Jury Slip**
        **filed April 27, 2023 [DE175]** ......................................................................15

**Order**
        **filed July 18, 2022 [DE125]**........................................................................19

**Opinion**
        **filed July 18, 2022 [DE124]**........................................................................20

**Opinion and Order**
        **filed June 10, 2019 [DE47]**.........................................................................56

**Order**
        **filed July 30, 2018 [DE23]**..........................................................................75

**Memorandum Opinion**
        **filed July 30, 2018 [DE22]**..........................................................................77

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ERIC DAIMLER, | ) | |
| | ) | |
| Plaintiff/Cross-claim Defendant, | ) | |
| | ) | |
| v. | ) | No. 2:18-cv-00165-MJH |
| | ) | |
| CHRIS MOEHLE, ROBOTICS | ) | |
| HUB FUND 1 LLC, and COAL HILL | ) | |
| VENTURES LLC, | ) | |
| | ) | |
| Defendants/Cross-claim Plaintiffs. | ) | |

## <u>NOTICE OF APPEAL</u>

NOTICE IS HEREBY GIVEN that Plaintiff, Eric Daimler, hereby appeals to the United States Court of Appeals for the Third Circuit from: (1) that portion of this Court's Memorandum Opinion and Order entered July 30, 2018 (ECF Nos. 22 and 23, respectively) granting Defendants' Motion to Dismiss as to Counts 2-6, 8, 11-12, and 14-18 of Plaintiff's First Amended Complaint; (2) that portion of this Court's Opinion and Order entered June 10, 2019 (ECF No. 47) granting Defendants' Motion to Dismiss as to Count 4 of Plaintiff's Third Amended Complaint; (3) this Court's Opinion and Order entered July 18, 2022 (ECF Nos. 124 and 125, respectively) granting Defendants' Motion for Summary Judgment as to all counts of Plaintiff's Fifth Amended Complaint; (4) the portions of the jury verdict in favor of Defendants, Robotics Hub Fund 1 LLC and Coal Hill Ventures LLC, against Plaintiff and the portion of the Judgment in favor of Defendants, Robotics Hub Fund 1 LLC and Coal Hill Ventures LLC, against Plaintiff in the amount of $225,000, each entered April 27, 2023 (ECF Nos. 175 and 176, respectively); (6) this Court's Opinion and Order and Judgment (a) denying Plaintiff's Motion for a New Trial on Damages or Remittitur and (b) granting Robotics Hub Fund 1 LLC and Coal Hill Ventures LLC

**JA1**

attorneys' fees against Plaintiff in the amount of $129,183, each entered on August 2, 2023 (ECF Nos. 195 and 196, respectively).

The United States Court of Appeals for the Third Circuit has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

Dated: New York, New York
       August 31, 2023

                         Respectfully submitted,

                         **JACOBS P.C.**

                         /s/ Mitchell G. Mandell
                         Mitchell G. Mandell
                         595 Madison Avenue, 39th Floor
                         New York, New York 10022
                         (212) 229-0476
                         mitchell@jacobspc.com
                         Admitted *pro hac vice*

                         *Counsel For Eric Daimler*

2

**JA2**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ERIC DAIMLER, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| v. | ) | Civil No. 18-165 |
| | ) | |
| | ) | |
| CHRIS MOEHLE, ROBOTICS HUB | ) | |
| FUND 1, LLC, and COAL HILL | ) | |
| VENTURES LLC, | ) | |
| | ) | |
| Defendants/Counter-Plaintiffs. | ) | |

**ORDER**

Following Consideration of Mr. Daimler's Motion for New Trial on Damages or Remittitur (ECF No. 181), the respective briefs (ECF Nos. 182, 192, and 193), and for the reasons stated in this Court's Opinion (ECF No. 195), Mr. Daimler's Motion is denied. Further, following consideration of the Companies' Motion for Attorneys' Fees (ECF No. 177), the respective briefs (ECF No. 178, 191, and 194), and for the reasons stated in this Court's Opinion (ECF No.195), the Companies' Motion is Granted. The Companies are hereby awarded $129,183.00 in attorneys' fees. The Clerk will mark this case closed.

Dated: August 2, 2023

Marilyn J. Horan
United States District Court Judge

**JA3**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ERIC DAIMLER,** | ) | |
| | ) | |
| **Plaintiff/Counter-Defendant,** | ) | |
| v. | ) | **Civil No. 18-165** |
| | ) | |
| | ) | |
| **CHRIS MOEHLE, ROBOTICS HUB** | ) | |
| **FUND 1, LLC, and COAL HILL** | ) | |
| **VENTURES LLC,** | ) | |
| | ) | |
| **Defendants/Counter-Plaintiffs.** | ) | |

## <u>OPINION</u>

Presently before the Court are two post-trial motions following a jury verdict rendered in favor of Counter-Plaintiffs, Robotics Hub Fund 1, LLC and Coal Hill Ventures LLC (Companies), and against Counter-Defendant, Eric Daimler, in the amount of $225,000 for claims under the Lanham Act for False Designation of Origin and False Advertising, the Computer Fraud and Abuse Act (CFAA), and the Anti-Cybersquatting Consumer Protection Act (Intellectual Property claims) related to Mr. Daimler's improper use of the Companies' domain name and email.[1]

Mr. Daimler has moved for a new trial on damages or, in the alternative, for remittitur pursuant to Fed. R. Civ. P. 59. (ECF No. 181). The Companies have moved for an award of attorneys' fees pursuant to Fed. R. Civ. P. 54(d)(2) and the Lanham Act (15 U.S.C. § 1117(a)). (ECF No. 177). Those matters are now ripe for consideration.

Upon Consideration of Mr. Daimler's Motion for New Trial on Damages or Remittitur (ECF No. 181), the respective briefs (ECF Nos. 182, 192, and 193), and for the following reasons, Mr. Daimler's Motion will be denied. Further, following consideration of the

---

[1] The jury did not find in favor of the Companies for their claim of Fraudulent Misrepresentation.

Companies' Motion for Attorneys' Fees (ECF No. 177), the respective briefs (ECF No. 178, 191, and 194), and for the following reasons, the Companies' Motion will be granted.

     I.      Motion for New Trial on Damages or Remittitur

          A.  Relevant Standard

In reviewing a motion under Fed. R. Civ. P. 59, a district court "must draw all reasonable inferences in favor of the verdict winner." *Houser v. Folino*, No. 2:10-cv-00416, 2016 U.S. Dist. LEXIS 25165, at *5 (W.D. Pa. Mar. 1, 2016). The court should "uphold the jury's award if there exists a reasonable basis to do so." *Id.* (quoting *Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223, 1230 (3d Cir.1989)).

A new trial, however, cannot be granted merely because the court would have weighed the evidence differently or reached a different verdict. *Markovich v. Bell Helicopter Textron*, Inc., 805 F.Supp. 1231, 1235 (E.D.Pa.1992), *aff'd*, 977 F.2d 568 (3d Cir.1992). *See Also: Olefins Trading, Inc. v. Han Yang Chemical Corp.*, 9 F.3d 282, 290 (3d Cir.1993). A court should grant a new trial "only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir.1991)(citing *EEOC v. Del. Dep't Health*, 865 F.2d 1408, 1413 (3d Cir.1989)). Thus, absent a showing of substantial injustice or prejudicial error, a new trial is not warranted, and it is the court's duty to respect a plausible jury verdict. *Montgomery Cnty. v. MicroVote Corp.*, 152 F. Supp. 2d 784, 795 (E.D. Pa. 2001) (citing *Goodwin v. Seven–Up Bottling Co. of Philadelphia*, No. 96–2301, 1998 WL 438488 at *3 (E.D.Pa. July 31, 1998)).

The Third Circuit has also explained that remittitur "is well established as a device employed when the trial judge finds that a decision of the jury is **clearly** unsupported and/or

excessive." *Spence v. Bd. of Educ. of Christina Sch. Dist.*, 806 F.2d 1198, 1201 (3d Cir. 1986);

*Cortez v. Trans Union, LLC*, 617 F.3d 688, 715 (3d Cir. 2010) (emphasis added).

    B.  Discussion

    In his motion, Mr. Daimler argues that a new trial on damages is necessary because the

jury's verdict, $225,000 on the Intellectual Property Claims, was against the weight of the

evidence.  Alternatively, Mr. Daimler contends that remittitur is warranted because there is no

rational relationship between the injury sustained and the amount awarded.  Specifically, Mr.

Daimler maintains that the Companies only sought out-of-pocket costs on their Intellectual

Property Claims, and the Companies' only introduced testimony and evidence totaling $51,467.

    In response, the Companies argue that this Court should uphold the jury's damages

determination as reflecting both "damage" and "loss" under the CFAA. In the alternative, the

Companies assert, that if the jury award were reduced to $51,467, this Court should treble the

damages because of Daimler's willful violations of the Lanham Act.[2]

    With regard to damages under the Lanham Act, the Jury received the following

instructions:

> Damages consist of the amount of money required to compensate the Companies
> for the injury caused by Eric Daimler's infringement and/or false advertising.
> The Companies must prove their damages by a preponderance of the evidence.
> You may consider the following types of damages:
>
> •    Loss of goodwill. Goodwill is consumer recognition or drawing
> power of a trademark.  In determining loss of goodwill, you should
> compare the value of Companies' goodwill before the infringement and/or
> false advertising with the value of the goodwill after the infringement
> and/or false advertising.
>
> •    Cost of corrective advertising. This is the amount spent by
> Companies to counteract the effects of Eric Daimler's infringement and/or

---

[2] The Companies have not separately moved for treble damages.  Thus, the Court will not
address treble damages in its analysis of the jury's verdict.

3

**JA6**

> false advertising and dispel any public confusion that lingers after the
> infringement and/or false advertising.
>
> You may not determine damages by speculation or conjecture, but rather evidence
> sufficient for you to draw reasonable inferences and make a fair and reasonable
> assessment of the amount of damages.  **Damages may be awarded even though
> they cannot be calculated with mathematical certainty.**

(ECF No. 180 at pp. 111-112) (emphasis added).

> As regards damages and loss under the CFAA, the Court instructed as follows:
>
> For purposes of this cyberpiracy claim, the term "damage" is defined by the statute
> to mean "any impairment to the integrity or availability of data, a program, a
> system, or information[.]"
>
> Also for these purposes, "loss" is defined to mean "any reasonable cost to any
> victim, including the cost of responding to an offense, conducting a damage
> assessment, and restoring the data, program, system, or information to its condition
> prior to the offense, and any revenue lost, cost incurred, or **other consequential
> damages** incurred because of interruption of service[.]"

*Id*. at p. 113 (emphasis added).  With regard to all Intellectual Property claims, the Court

instructed:

> If you find that Eric Daimler violated the Lanham Act and thereby caused
> damages and/or Eric Daimler accessed the computer drive in bad faith and
> thereby caused damages or loss and/or Eric Daimler's violation of the Anti-
> Cybersquatting Consumer Protection Act caused damages, you should award an
> amount of money damages that will fairly and adequately compensate the
> companies for the harm caused by Eric Daimler.

*Id*. at p. 122.   The Court also instructed the jury, generally, as follows:

> You should use your common sense in weighing the evidence. Consider it in light
> of your everyday experience with people and events and give it whatever weight
> you believe it deserves. If your experience tells you that certain evidence
> reasonably leads to a conclusion, you are free to reach that conclusion.

*Id*. at p. 100.

Here, the Companies offered evidence, and their counsel highlighted, that out-of-pocket

costs on their Intellectual Property Claims included payments to Reed Smith, LLP ($6,059), bit-

x-bit ($3,408), and Reputation Defender through the end of 2022 ($42,000).  These costs total

$51,467.  While Mr. Daimler has only highlighted these numerical damages, the jury instructions

provided ample opportunity for an award greater than this amount.   The jury was instructed

regarding "goodwill" and "consequential" damages under the Lanham Act and CFAA.  Both

"goodwill" and "consequential" damages fall outside of the $51,467.  In terms of additional

concrete numbers that the jury may have considered, Mr. Moehle testified that, as a result of Mr.

Daimler's conduct, he continued and will continue to pay Reputation Defender, $6,000 per year,

for Search Engine Optimization (SEO).  (ECF No. 192-1 at pp. 154-155).

Mr. Moehle further testified that after Mr. Daimler departed in early 2017, his post-

employment conduct in April 2017 resulted in transferred data from the Companies' Google

Drive, confusion, missed emails, securing an alternative domain name and email, emailing

existing contacts who had been informed his email had been turned off, and addressing

miscellaneous issues with website redirection.  *Id*. at pp. 135, 150-151.  In addition, Mr. Moehle

testified that, the materials missing from the Robotics Hub account, included information that

would aid in attracting investors and maintaining a competitive advantage.  *Id*. at p. 136.  Mr.

Moehle also testified that, because of the hardships in early 2017, the Companies fell short of

their fundraising goals by $8 million.  (Sealed portions of Mr. Moehle's Testimony at pp. 18,

20).

In assessing the evidence against Mr. Daimler, as regards these claims, the jury

specifically found that Mr. Daimler acted willfully and in bad faith.  (ECF No. 175).  Given the

jury instructions on goodwill and consequential damages as well as using their "common sense,"

the jury could reasonably find and assess the awarded damages based upon the evidence and

testimony.  While higher than the aggregate damages of $51,467, a verdict of $225,000 was

**JA8**

neither against the weight of the evidence nor excessive to shock the Court's conscience.   Given the out-of-pocket expenses, damage to the Companies' goodwill, and the shortfalls in fundraising efforts, the jury produced a plausible award of $225,000. *See Montgomery Cnty. v. MicroVote Corp., supra.* Therefore, a new trial on damages or remittitur is not warranted.

Accordingly, Mr. Daimler's Motion for New Trial on Damages or Remittitur will be denied.

II.      Motion for Attorneys' Fees

In their motion for attorneys' fees, the Companies contend that, under the Lanham Act, Mr. Daimler's violations warrant the award of reasonable attorneys' fees. The Companies seek reasonable attorneys' fees and costs in the amount of $129,183.00. Mr. Daimler argues that attorneys' fees are not warranted because this not an "exceptional case."  He also contends that attorneys' fees cannot be awarded because counsels' time entries cannot be attributed to the Intellectual Property Claims.

A.  Exceptionality

Under the Lanham Act, a "court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). Cases are exceptional for purposes of the Lanham Act when "(a) there is an unusual discrepancy in the merits of the positions taken by the parties or (b) the losing party has litigated the case in an 'unreasonable manner.'" *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 313 (3d Cir. 2014) (citing *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)).  The Third Circuit has further described a "two-step process" for determining that a case is "exceptional" under Lanham Act:

> First, the District Court must decide whether the defendant engaged in any culpable conduct. We have listed bad faith, fraud, malice, and knowing infringement as non-exclusive examples of the sort of culpable conduct that could support a fee award. Moreover, the culpable conduct may relate not only to the

**JA9**

circumstances of the Lanham Act violation, but also to the way the losing party handled himself during the litigation. Second, if the District Court finds culpable conduct, it must decide whether the circumstances are "exceptional" enough to warrant a fee award.

*Id*. at 314 (citing *Green v. Fornario*, 486 F.3d 100, 103 (3d Cir. 2007). In *Octane Fitness*, the Supreme Court embraced an expansive definition of "exceptional" and explained that that "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Id*. at 1756. Thus, it is within a court's discretion to find a case "exceptional" based upon "the governing law and the facts of the case," irrespective of whether the losing party is culpable. For example, "a case presenting ... exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award." *Id*. at 1757. This is so even if the losing party's conduct did not suggest "bad faith, fraud, malice, [or] knowing infringement." *Green*, 486 F.3d at 103. Thus, it is within a court's discretion to find a case "exceptional" based upon "the governing law and the facts of the case," irrespective of whether the losing party is culpable.

Here, the jury found that Mr. Daimler's conduct was willful and in bad faith. The jury's finding was supported by evidence that, after his departure from the Companies, Mr. Daimler took the Companies' marketing materials, redirected the roboticshub.io website to c2.capital, which was a business Mr. Daimler had started (ECF No. 192-1 at pp. 151-53). Mr. Moehle also testified that Mr. Daimler reached out to at least one CEO of a company in which Robotics Hub was investing and attempted to solicit business for his own future business pursuits. *Id*. at 158-59. After this Court's careful review of the testimony and evidence, it concurs with the jury's finding that Mr. Daimler's conduct was willful and in bad faith, and that the same supports

**JA10**

"exceptionality" under *Fair Winds* and *Octane Fitness* and an attorneys' fees award under the Lanham Act.

Further in examining Mr. Daimler's litigation position, Mr. Daimler denied any wrongdoing relative to the Intellectual Property Claims in his Answer to the Companies' Counterclaim (ECF No. 52). Finally, on the eve of trial and after three and a half years, Mr. Daimler admitted culpability for the Intellectual Property Claims. Such circumstances forced the Companies to initiate, litigate, and try their Intellectual Property Claims and bear the expenses of the same. Such circumstances create the exceptionality that the Lanham Act intended in shifting fees to prevailing litigants especially where in Mr. Daimler's case, his conduct was brazenly in violation of the Companies' intellectual property rights.

Accordingly, the exceptionality requirement of the Lanham Act is met in this case that would warrant the award of reasonable attorneys' fees.

B. Reasonableness

Having concluded that attorneys' fees are warranted, "'[t]he most useful starting point for determining the amount of a reasonable fee' is the lodestar calculation," which multiplies a reasonable number of hours expended by a reasonable hourly rate. *United Auto. Workers Loc. 259 Soc. Sec. Dep't v. Metro Auto Ctr.*, 501 F.3d 283, 290 (3d Cir. 2007) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). "'[T]he relevant rate is the prevailing rate in the forum of the litigation' unless 'the special expertise of counsel from a distant district is shown' or 'local counsel are unwilling to handle the case.'" *A.B. by & through F.B. v. Pleasant Valley Sch. Dist.*, 839 Fed. Appx. 665, 668 (3d Cir. 2020) (quoting *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 426 F.3d 694, 704-05 (3d Cir. 2005)).

**JA11**

Here, Mr. Daimler does not challenge the hourly rates of the Companies' attorneys, but rather focuses on whether the claimed hours were attributable to the Lanham Act claims.   The Companies have only claimed attorneys' fees for the work performed between March 1, 2023 through April 30, 2023. This work included preparing the Companies' pretrial statement; preparing and working with opposing counsel on proposed jury instructions, a proposed jury slip, and joint stipulations; participating in pretrial conferences; participating in jury selection; and preparing for and participating in trial.  (ECF No. 177-2 ¶ 15).  The Companies submitted that their attorneys' billing records for said work totaled $178,752.50 for 503.9 hours of work performed by the firm's attorneys and paralegals at their standard hourly rates.   The Companies have adjusted this total downward to $129,183.00 to exclude fees for work unrelated to the Intellectual Property Claims.  Following this Court's careful review of the briefing, affidavits, and billing records, the Companies' attorneys have presented a petition for reasonable fees sufficiently specific for the Intellectual Property Claims.  Therefore, the Court finds that the hours worked and billing rates were reasonable in these circumstances.

Accordingly, the Companies' Motion for Attorneys' Fees will be granted.  The Companies will be awarded $129,183.00 in attorneys' fees.

   III.    Conclusion

Following Consideration of Mr. Daimler's Motion for New Trial on Damages or Remittitur (ECF No. 181), the respective briefs (ECF Nos. 182, 192, and 193), and for the foregoing reasons, Mr. Daimler's Motion will be denied.  Further, following consideration of the Companies' Motion for Attorneys' Fees (ECF No. 177), the respective briefs (ECF No. 178, 191, and 194), and for the foregoing reasons, the Companies' Motion will be granted.

A separate order will follow.

**JA12**

Dated:  August 2, 2023

Marilyn J. Horan
United States District Court Judge

**JA13**

AO 450 (Rev. 11/11)   Judgment in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Western District of Pennsylvania ▼

| | |
|---|---|
| ERIC DAIMLER et al | ) |
| _Plaintiff / Cross-claim Defendant_ | ) |
| v. | ) |
| CHRIS MOEHLE et al | ) |
| _Defendant / Cross-claim Plaintiff_ | ) |

Civil Action No. 2:18-cv-00165-MJH

## JUDGMENT IN A CIVIL ACTION

The court has ordered that _(check one)_:

☐  the plaintiff _(name)_ _____ recover from the
defendant _(name)_ _____ the amount of
_____ dollars ($ _____ ), which includes prejudgment
interest at the rate of _____ %, plus post judgment interest at the rate of _____ % per annum, along with costs.

☐  the plaintiff recover nothing, the action be dismissed on the merits, and the defendant _(name)_ _____
_____ recover costs from the plaintiff _(name)_ _____
_____ .

☑  other:  The Jury returned a verdict in favor of Defendant/Crossclaim Plaintiff  Robotics Hub Fund 1 LLC and Coal
Hill Ventures LLC in the amount of $225,000.00.  As to Fraudulent Misreprentation, Plaintiff/Cross
Defendant Daimler was found not liable.

This action was _(check one)_:

☑  tried by a jury with Judge Marilyn J. Horan _____ presiding, and the jury has
rendered a verdict.

☐  tried by Judge _____ without a jury and the above decision
was reached.

☐  decided by Judge _____ on a motion for

Date: 4/26/2023

CLERK OF COURT

_Signature of Clerk or Deputy Clerk_

**JA14**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ROBOTICS HUB  FUND 1, LLC, and COAL HILL VENTURES LLC, | ) |
| | ) Civil No. 2:18-cv-00165 |
| | ) |
| | ) Honorable Marilyn J. Horan |
| v. | ) |
| | ) |
| ERIC DAIMLER. | ) |

## VERDICT SLIP

### A.  False Designation of Origin and False Advertising in Violation of the Lanham Act

**Question 1:**

Do you find by a preponderance of the evidence that Eric Daimler engaged in a false designation of origin and/or false advertising by using the "ROBOTICS HUB" trademark or any similar name, word or imitation of the mark, including the roboticshub.io domain name?

Yes _____✓_____    No _____

If you answer "Yes" to Question 1, proceed to Question 2.

If you answer "No" to Question 1, proceed to Question 4.  Do not answer Questions 2 or 3.


**Question 2:**

Do you find by a preponderance of the evidence that the Companies suffered damages as the result of Eric Daimler's false designation of origin and/or false advertising?

Yes _____✓_____    No _____


If you answer "Yes" to Question 2, proceed to Question 3.

If you answer "No" to Question 2, proceed to Question 4.  Do not answer Question 3.


**Question 3:**  Do you find by a preponderance of the evidence that Eric Daimler acted willfully at the time he used the trademark or engaged in false advertising?

Yes  ✓     No _____

Proceed to Question 4.

### B.  Computer Fraud and Abuse Act

**Question 4:**

Do you find by a preponderance of the evidence that Eric Daimler's access to the Companies' Google Drive account without authority caused damage or loss?

Yes  ✓     No _____

Proceed to Question 5.

### C.  Anti-Cybersquatting Consumer Protection Act

**Question 5:**

Do you find by a preponderance of the evidence that Eric Daimler used the roboticshub.io domain name with the bad faith intent to profit from the "ROBOTICS HUB" trademark?

Yes  ✓     No _____

If you answer "Yes" to Question 5, proceed to Question 6.

If you answer "No" to Question 5, do not answer Question 6, proceed to Question 7.

**Question 6:**

Do you find by a preponderance of the evidence that the Companies sustained damages as the result of Daimler's  use and/or control of the roboticshub.io domain name.

Yes  ✓     No _____

Proceed to Question 7.

2

**JA16**

**Lanham Act, and/or the Computer Fraud and Abuse Act, and/or the Anti-Cybersquatting Consumer Protection Act Damages**

**Question 7:**

Set forth the amount of damages that the Companies sustained as a result of Eric Daimler's violation(s) of the Lanham Act, and/or the Computer Fraud and Abuse Act, and/or the Anti-Cybersquatting Consumer Protection Act.

Answer only if you have answered "Yes" to both Questions 1 and 2, and/or "Yes" to Question 4, and/or "Yes" to Questions 5 and 6.

$  225,000

## D.  Fraudulent Misrepresentation

**Question 8:**

Do you find by clear and convincing evidence that Eric Daimler is liable to Coal Hill Ventures, LLC for Fraudulent Misrepresentation because of statements that he made about his background, experience and/or ability to raise investment funds?

Yes _____   No __√__

If you answer "Yes" to Question 8, proceed to Question 9.

If you answer "No" to Question 8. Do not answer Question 9. 10, or 11.  Proceed to date and sign the Verdict Form and advise the Court officer you have reached a verdict.

**Question 9:**

State the amount of damages, if any, that Coal Hill Ventures, LLC suffered as the result of Eric Daimler's Fraudulent Misrepresentations.

$_____

Proceed to Question 10.

3

**JA17**

**Question 10:**

Do you find that Eric Daimler's conduct in making fraudulent misrepresentations to Coal Hill Ventures LLC was outrageous?

Yes \_\_\_\_\_     No \_\_\_\_\_

If you answer "Yes" to Question 10, proceed to Question 11.

If you answer "No" to Question 10.   Do not answer Question 11. Proceed to date and sign the Verdict Form and advise the Court officer you have reached a verdict.

**Question 11:**

State the amount of punitive damages, if any, to which Coal Hill Ventures LLC is entitled.

$_____

Proceed to date and sign the Verdict Form.

Advise the court officer that you have reached a verdict.

Dated: 4/26/2023

JURY FOREPERSON

4

**JA18**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ERIC DAIMLER,                          )
                                       )
    Plaintiff,                     )
              v.              )    Civil No. 18-165
                                       )
                                       )
CHRIS MOEHLE, ROBOTICS HUB             )
FUND 1, LLC, and COAL HILL             )
VENTURES LLC,                          )
                                       )
    Defendants.                    )

### ORDER

AND NOW, this 18th day of July 2020, for the reasons set forth in the accompanying

Opinion, it is hereby ORDERED that the Motion for Summary Judgment filed by Chris Moehle,

Robotics Hub Fund 1, LLC, and Coal Hill Ventures LLC (ECF No. 107) is GRANTED.

Judgment as a matter of law is entered in favor of Chris Moehle, Robotics Hub Fund 1,

LLC, and Coal Hill Ventures LLC and against Eric Daimler on Eric Daimler's fraudulent

inducement claims asserted in Counts One, Two, and Four.

Judgment as a matter of law is entered in favor of Coal Hill Ventures LLC and against

Eric Daimler on Eric Daimler's breach of contract claim asserted in Count Three.

The Clerk is to mark this case CLOSED.

_____
Marilyn J. Horan
United States District Court Judge

**JA19**

## THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ERIC DAIMLER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | **Civil No. 18-165** |
| | ) | |
| | ) | |
| **CHRIS MOEHLE, ROBOTICS HUB** | ) | |
| **FUND 1, LLC, and COAL HILL** | ) | |
| **VENTURES LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION

Plaintiff Eric Daimler brings suit against Defendants Chris Moehle, Robotics Hub Fund 1, LLC (the Fund), and Coal Hill Ventures LLC (Coal Hill) asserting claims of fraudulent inducement and breach of contract. Daimler alleges that, in order to induce Daimler to enter into a business relationship with Defendants, Moehle falsely misrepresented that General Electric Ventures had committed to invest $20 million into the Fund. Daimler also alleges that Coal Hill breached an oral agreement to compensate him for providing financial contributions to Moehle's businesses. Pending before the Court is Defendants' Motion for Summary Judgment. ECF No. 107. As more fully explained below, the Motion will be granted.

### I.    Factual Background

All material facts set forth below are undisputed unless otherwise indicated. With respect to certain disputed facts, the Court cites to the underlying documentary evidence, such as the actual testimony about a fact, rather than the parties' assertions. Additional facts may be discussed in context elsewhere in this Opinion.

### A.    Moehle's Business Ventures

Moehle formed Coal Hill in April 2015 to invest in early-stage robotics companies. Parties' Comb. Stmt. Mat. Facts, ¶ 1 (ECF No. 123).  To subsidize Coal Hill's startup costs, Moehle obtained a one-time $75,000 sponsorship gift from General Electric's venture capital and investment arm, General Electric Ventures (GEV).  Id. at ¶ 2.  In August 2015, Moehle and Coal Hill publicly announced the formation of Robotics Hub, a business accelerator company focused on identifying, building, and guiding promising startup companies in the field of advanced robotics.  Id. at ¶ 3.  GEV and Moehle's former employer, Carnegie Mellon University, issued a joint press release announcing the formation of Robotics Hub.  Id. at ¶ 4.  In connection with the formation of Robotics Hub, Moehle also formed the Robotics Hub Fund.  Id. at ¶ 5.  The Fund was created to be a vehicle through which Robotics Hub could invest in early-stage robotics companies.  Id. at ¶ 6.

### B.    Daimler and Moehle's Relationship

Daimler and Moehle were introduced through a mutual friend, Dave Mawhinney, who was a member of the Carnegie Mellon Computer Science Advisory Board .  Id. at ¶¶ 52, 148.  In his Complaint[1], Daimler alleges that "Moehle represented to Daimler throughout 2015 and 2016 that GE had committed to invest $20,000,000.00 in the Fund, which was a significant portion of the $50,000,000.00 the Fund sought to raise."[2]  Id. at ¶ 53, ECF No. 86 at ¶ 16.  Daimler testified that Moehle said that "GE would be investing at least $20 million as soon as they cleared a regulatory issue of spinning out a financial arm."  Parties' Comb. Stmt. Mat. Facts, ¶ 54; Daimler

---

[1]  The operative complaint in this matter is Plaintiff's Fifth Amended Complaint.  ECF No. 86.  For ease of reference, the Fifth Amended Complaint is referred to simply as the "Complaint."

[2]  The allegation: "Moehle represented that General Electric Ventures had committed to invest $20 million in the Fund," will be referred to by the shorthand term, "the GEV Representation".

Dep. 75:25–76:25. Daimler alleges that Moehle informed him not to discuss the GEV

Representation with anyone. Parties' Comb. Stmt. Mat. Facts, ¶ 55; ECF No. 86 at ¶ 27.

Daimler testified that Moehle told him in August 2015 that the GEV "investment would be

concluding in a matter of months, if not weeks, and that it was nearly imminent." Parties' Comb.

Stmt. Mat. Facts, ¶ 56; Daimler Dep. 82:10–82:16.

### 1.    Introductory Telephone Calls

Daimler and Moehle had an introductory phone call on August 18, 2015, followed by a

second telephone call on August 19, 2015. During one of these telephone calls, Daimler alleges

that Moehle first made the GEV Representation to Daimler. Parties' Comb. Stmt. Mat. Facts, ¶

7, ECF No. 86 at ¶¶ 20, 21. With respect to the August 18, 2015 telephone call, Daimler testified

as follows:

> **Q.** Who was on the call?
> **A.** I don't recall.
> . . .
> **Q.** How long was the introductory phone call with Mr. Moehle?
> **A.** I don't recall.
> **Q.** What did you discuss?
> **A.** I don't recall.
> **Q.** Did you ask any questions?
> **A.** I don't recall.
> **Q.** Did you discuss anything about Skilled Science[3]?
> **A.** I don't recall.
> **Q.** . . . - you don't recall any topics that were discussed in that first meeting?
> **A.** The first meeting in 2015, six years ago? No.
> **Q.** Yes. You don't recall any of the topics that you discussed?
> **A.** Correct?

Daimler Dep.71:10-72:19. Given Daimler's lack of recollection as to what was discussed on the

telephone call, defense counsel asked the following question regarding the central allegation of

---

[3] In 2011, Daimler had formed Skilled Science, an early-stage investment company, to commercialize scientific
innovations coming out of academia. Parties' Comb. Stmt. Mat. Facts, ¶¶ 7-8.

the Complaint:

> **Q.** In paragraph 20 of the Complaint, you write that – or you allege that Mr.
> Moehle represented to you that GE had committed to invest $20 million.
> If you can't recall any of the topics that were covered, what's the basis for the
> allegation?
> **A.** Because that would have been burned in my memory. That's the germane
> issue. There would be nothing out of the ordinary about me talking to [Moehle] or
> even being introduced to [Moehle]. I would have no reason to have taken
> scrupulous notes, let alone notes that I can immediately recall at first being asked
> about the nature, or let alone the details, of a conversation from six years ago. But
> the germane issue, absolutely, was what would have changed the course of my
> decisions, or even the course of my professional life. That's a germane issue, that I
> would have recalled.

Daimler Dep.  72:24-25; 73:1-13.  Daimler also could not recall whether he asked Moehle any

questions about the GEV Representation or whether he asked for any documents about the GEV

Representation.  Parties' Comb. Stmt. Mat. Facts, ¶ 59.

With respect to the August 19, 2015 telephone call, Daimler again was unable to recall

any details:

> **Q.** . . . Do you recall anything about that conversation?
> **A.** No.
> **Q.** Do you recall who was on the call?
> **A.** No.
> **Q.** How long the call was?
> **A.** No.
> **Q.** Any topics that you discussed?
> **A.** No.
> **Q.** . . . . Do you recall whether Mr. Moehle said anything about GE in that second
> conversation?
> **A.** I do not recall on which conversation [Moehle] represented GE's imminent
> investment into the companies.

Daimler Dep. 76:3-17.  Subsequently, Daimler and Moehle had a series of telephone calls on

September 15, 2015, September 24, 2015, November 3, 2015, and December 8, 2015.  62, ECF

No. 86 at ¶ 21.  With respect to all four telephone conversations, Daimler testified as follows:

> **Q.**  . . . Do you recall anything about any of those phone conversations with Mr.

Moehle?
**A.** I don't recall any specifics about any of those conversations.
**Q.** Do you recall generally how long any of those conversations were?
**A.** I do not.
**Q.** Do you recall whether there was anyone else on the phone with the two of you,
or other than the two of you on those conversations?
**A.** No.

Daimler Dep. 86:7-17.

### 2.    Potential Investors

Daimler testified that, between October 2015 and March 2016, Moehle and Daimler

made presentations about Robotics Hub and Coal Hill (collectively, the Companies) and the

Fund to potential third-party investors.  Parties' Comb. Stmt. Mat. Facts, ¶ 65.  Daimler testified

that Moehle made the alleged GEV Representation to "every" investor or potential investor in

the Fund.  Id. at ¶ 66; Daimler Dep. 89:1–4.  Daimler identified multiple meetings with third

parties where Daimler claims Moehle made the alleged GEV Representation.  Parties' Comb.

Stmt. Mat. Facts, ¶-67, ECF No. 86 at ¶¶ 23–25, 32.  In his initial disclosures, Daimler identified

approximately thirty potential investors to whom Moehle made the alleged GEV Representation.

Parties' Comb. Stmt. Mat. Facts, ¶ 68.  With respect to such  potential investors, Daimler

testified as follows:

> **Q.** Your allegations are that [the GEV Representation] was made to every
> investor in the Fund, or potential investor, right?
> **A.** Correct.
> . . .
> **A.** Everyone that I recall.
> **Q.** And not a single potential investor, other than you, has claimed that
> that representation was made or was false, right, to your knowledge?
> . . .
> **A.** Yeah, that's not what -- I don't know.

Daimler Dep. 89:1-12.  Daimler was asked, in Defendants' First Set of Interrogatories, to

identify all communications he had with anyone identified in his initial disclosures that refer to

or concern any allegations he has made in this litigation.  Daimler Obj.s and Resp. to Defs.' First

Set of Interrog., Interrogatory No. 3, ECF No. 110-2, at 4.   Daimler's relevant Response is:

"Plaintiff can represent that the only person identified in his Initial Disclosures with whom he

communicated about the allegations contained in the Complaint is Jamie Fee."  Id.; Resp. to

Interrogatory No. 4, ECF No. 110-2, at 5.  Jamie Fee is Daimler's non-retained expert on

damages.  Therefore, Daimler admits that he did not have any discussions with any of the

potential investors identified in his initial disclosures relating to any allegations asserted by

Daimler in this litigation.  Parties' Comb. Stmt. Mat. Facts, ¶ 70.

### a.    UPMC

Daimler alleges that Moehle "told representatives of the University of Pittsburgh Medical

Center . . . that GE was a sponsor of the Fund and had already committed to invest $20,000,000"

during a meeting on October 16, 2015.  Id. at ¶ 71, ECF No. 86 at ¶ 23.  The day after the

meeting, Moehle sent an email to UPMC representatives, thanking them "for listening to the

Coal Hill pitch yesterday."  Email from C. Moehle, Oct. 17, 2015, ECF No. 110-2, at 209.

Moehle included Daimler and Dave Mawhinney on the email.  Id.  On October 23, 2015, on the

same email chain, Daimler "replied all" and, in part, noted his regret "that my travel made me

unavailable to attend the last [UPMC] meeting."  Email from E. Daimler, Oct. 23, 2015, ECF

No. 110-2, at 208.  The GEV Representation is not mentioned in the email chain.

### b.    RIDC

Daimler alleges that Moehle repeated the GEV Representation, in Daimler's presence,

during a November 3, 2015 meeting with representatives of the Regional Industrial Development

Corporation of Southwestern Pennsylvania (RIDC).  Parties' Comb. Stmt. Mat. Facts, ¶ 78; ECF

No. 86 at ¶ 25.  On November 30, 2015, Daimler's and Moehle's mutual friend, Mr. Mawhinney, emailed representatives of RIDC.  Parties' Comb. Stmt. Mat. Facts, ¶¶ 80-81; Email from D. Mawhinney to D. Smith, C. Moehle, and E. Daimler, ECF No. 110-2, at 211.  Mr. Mawhinney wrote, "I would like to introduce you to Chris Moehle and Eric Daimler from the Robotics Hub and Coal Hill Ventures."  Id.  In response to Mr. Mawhinney's email, Moehle "replied all" and stated, "Thanks for the introduction, Dave.  Don – great to meet you."  Id.  There is no mention of a prior November 3, 2015 meeting, nor is the GEV Representation mentioned in the email chain.

### c.    GEV

A document entitled "GE Ventures Conversation" was created in connection with Daimler and Moehle preparing for a November 2015 meeting between Daimler and Moehle and Alex Tepper, a GEV representative.  Id. at ¶¶ 83-84.  As reflected in the "GE Ventures Conversation" document, Daimler and Moehle planned a "pitch" at which they would ask GEV to make an "initial commitment" investment of $500,000, "escalating" up to a total investment of $25 million.  Id. at ¶ 85.  Daimler testified that he could not recall whether he and Moehle actually did ask GEV to make an "initial commitment" of $500,000 scaling up to $25 million. Id. at ¶ 86.


In the fall of 2016, GEV asked Moehle to provide GEV with information about the Companies and the Fund.  Id. at ¶ 87.  In response, Moehle provided GEV with the Fund's private placement memorandum, limited partner agreement, investment summary document, and marketing material for a nuclear robotics event.  Id. at ¶ 88.

### 3.    The GEV Representation

Daimler did not allege in his Complaint, or state during his deposition, that Moehle had made the GEV Representation to Jamie Fee.  Nonetheless, Fee testified that Moehle represented to Fee that GEV was to invest in the Companies in the future, in the neighbored of $5 million "dependent upon some sort of divestiture."  Fee Dep. 19:13-25-20:1-10.  With regard to the GEV Representation, the remainder of Fee's testimony is based on what Daimler told Fee.  Fee testified that Daimler told Fee that GEV may make an investment in the neighborhood of $5 million.  Parties' Comb. Stmt. Mat. Facts ¶ 91.  Fee did not testify that the potential investment was a "commitment" and he did not testify that the investment amount was $20 million.

On March 14, 2016, Moehle sent an email to Daimler and Fee with the subject heading, "Lead Investor Tracking Presentation."  Parties' Comb. Stmt. Mat. Facts, ¶ 95.  Moehle attached a PowerPoint presentation  to the email entitled, "Fund I Offers Tracking."  Id.  The attached PowerPoint presentation does not identify GEV as a "potential lead investor" or as a "near-term potential deal."  Id. at ¶ 96.  Daimler did not ask Moehle why GEV was not included as a potential lead investor in the "Lead Investor Tracking Presentation."  Daimler Dep. 232:17–20.

With respect to GEV's investment commitment, Daimler testified that he could not recall any documents "that support that GE had committed to a $20 million investment" in the Fund.  Parties' Comb. Stmt. Mat. Facts ¶ 64.  Daimler also testified that he knew that "[t]he trigger of the $20 million would not occur until [GEV's] spinout happened," and "[t]hat was definitely a risk that [Daimler] was taking."  Id. at ¶ 90; Daimler Dep. 83:13–16; see also 82:6-9.  Daimler testified: "In theory," GEV "could have just walked away," because the investment commitment "was not a legal obligation, that's absolutely true."  Daimler Dep. 203:12–15.

**C.    Skilled Science – Daimler's Business Venture**

One of Daimler's business ventures was Skilled Science.  Daimler personally capitalized

8

**JA27**

Skilled Science with less than $500,000; thereafter, no additional capital was raised.  Parties'

Comb. Stmt. Mat. Facts, ¶¶ 11-12.  Although Daimler denies that his initial investment was less

than $500,000 and he denies that no additional capital was raised, he is unable to point to any

documentary evidence to show that said averments are untrue.[4]  Skilled Science prepared a

"Skilled Science Sponsorship Agreement."  Id. at ¶ 30.  Daimler testified that the Skilled Science

Sponsorship Agreement was to be used for "finalizing an investment from an investor, from a

limited partner."  Id. at ¶ 30; Daimler Dep. 39:25-40:22.  However, Skilled Science never

executed a sponsorship agreement with any investor.  Id. at ¶ 31.  Similarly, there is no evidence

that Skilled Science ever created a private placement memorandum or partnership agreement.

Id. at ¶ 32.

     Daimler also produced an untitled document, dated in or around August 2015, centered

around the primary term, "SkilledScience."  Id. at ¶ 40.  In relevant part, the document identifies

---

[4]  To support his denial that Daimler's "initial investment was less than $500,000" and that "no additional capital
was raised," Daimler cites to his Affidavit at paragraphs 7, 8, and 9, as well his Exhibits E, F, and G.  However,
none of that information contradicts Daimler's deposition testimony that he provided initial capitalization for Skilled
Science of "[u]nder a half million."  See Deposition E. Daimler, Feb. 24. 2021, 42:6-43:1-8 (ECF No. 110-2).
Daimler's Exhibits, which are authored by Daimler, demonstrate only that Daimler was preparing to seek additional
investment in Skilled Science; they do not show that Daimler in fact raised additional capital for Skilled Science.

**JA28**

the "current reality" for Skilled Science as: "hav[ing] no contract signed"; "started conversations

about this in fall '13"; and "have received, at various times, commitments of as much as 3.5M."

Id. at ¶ 41.  Daimler admitted that the "commitments of as much as 3.5M" never came to

fruition.  Id.

### 1.    Potential Investors into Skilled Science

Before joining Coal Hill and Robotics Hub, Daimler asserts that Skilled Science "was

planning to close on investments from two investors, totaling $10,000,000.00."  Id. at ¶ 14; ECF

No. 86 at ¶ 17.  Daimler testified that the two investors were Two Sigma and the Sackler Family.

Parties' Comb. Stmt. Mat. Facts, ¶ 15.  In his Summary Judgment pleadings, Daimler identifies a

third investor, Keith Furuya.  Id. at ¶ 154; Affidavit of E. Daimler, Jan. 7, 2022, at ¶ 9, ECF No.

117-2, at 2-5.

### a.    Two Sigma

Skilled Science provided Two Sigma with a draft Memorandum of Understanding, dated

September 11, 2014, reflecting proposed terms of a potential investment.  Id. at ¶ 16.  The

Memorandum of Understanding provided that Skilled Science would be "authorized by Two

Sigma to represent that it has a commitment of $5MM [$5 million] from investment partners,

including Two Sigma to be used under Skilled Science's direction, and in its discretion for the

purpose of effectively commercializing projects from selected research."  Id. at ¶ 17; Mem. of

Understanding, Sept. 11, 2014, at 1, ECF No. 110-2, at 173.  Daimler testified that he wanted

Two Sigma to agree to allow Skilled Science to represent that "investment partners" had

committed $5 million in investment, "[b]ecause once you have a first committed signed investor,

you can represent that to the public.  Once you can represent to the public that an investor has

committed money, that makes all the difference in starting off, starting off a business of this

nature." Parties' Comb. Stmt. Mat. Facts, ¶ 18; Daimler Dep. 48:1-49:7.

On September 29, 2014, Daimler asked Two Sigma if he could meet with Two Sigma's full investment committee, which meeting was required to "get started with the 500K" investment. Parties' Comb. Stmt. Mat. Facts, ¶ 20; September 29, 2014, Email from E. Daimler to C. Beirne, Sept. 29, 2014. However, Daimler never attended a meeting with Two Sigma's full investment committee. Parties' Comb. Stmt. Mat. Facts, ¶ 21. Two Sigma did not execute a memorandum of understanding or any other agreement with Skilled Science and Two Sigma never invested in Skilled Science. Id. at 19.

### b.    The Sackler Family

With respect to the Sackler Family's potential investment, Daimler testified that Skilled Science had a "verbal commitment" from Adam Fried who had agreed to make a "verbal advocacy" to the Sackler Family to invest in Skilled Science. Id. at ¶ 22; Daimler Dep. 37:22–39:18. Daimler did not recall if Mr. Fried actually did verbally advocate to the Sackler Family to invest in Skilled Science. Parties' Comb. Stmt. Mat. Facts, ¶ 23; Daimler Dep. 62:8–10; 68:19-24. Daimler also was not aware of any documents that reflected the nature of any verbal advocacy by Mr. Fried. Parties' Comb. Stmt. Mat. Facts, ¶ 26. In email correspondence dated September 24 and September 26, 2015, neither Daimler nor Mr. Fried referred to a commitment by Mr. Fried to verbally advocate to the Sackler Family to invest in Skilled Science or to any investment commitment by the Sackler Family. Id. at ¶ 27. Daimler testified he was not aware of any documents that reflected a commitment from the Sackler family to invest in Skilled Science and that such documents are not created until a decision to invest is made. Id. at ¶ 25. Daimler could not recall if he had ever met anyone from the Sackler Family, or if he had met or had a telephone conversation with Mortimer Sackler. Id. at ¶ 24; Daimler Dep. 66:8–15.

**JA30**

c.    **Keith Furuya**

Daimler also sought investment from Keith Furuya.  Id. at ¶ 154.  By email dated April

22, 2015, Keith Furuya, of Furuya & Co., wrote to Daimler: "I confirm $100k and believe that

[they] have another $250K (the investors are thinking about it)."  Email from K. Furuya to E.

Daimler, Apr. 22, 2015, ECF No. 117-2 at 20.  Mr. Furuya also related to Daimler that the

"[i]ssue is that the investors are le[e]ry about this."  Id.  There is no record evidence that Mr.

Furuya or Furuya & Co. invested in Skilled Science or that they committed to invest in Skilled

Science.

## 2.    **Fee's Testimony as to Investments in Skilled Science**

Daimler and Fee have been friends for over a decade.  Parties' Comb. Stmt. Mat. Facts, ¶

42.  During this time, Daimler has engaged Fee to assist him with his various investment

ventures, including Skilled Science.[5]  Id. at ¶ 43.  Fee testified there were supposedly a half a

dozen "investors that were moving toward engaging with [Skilled Science] to deploy capital."

Id. at ¶ 33; Fee Dep. 86:20–88:16.  Fee testified that Skilled Science was "talking terms" with

investors.  Parties' Comb. Stmt. Mat. Facts, ¶ 34; Fee Dep. 100:2–12.  Fee testified that Skilled

Science did not sign a term sheet with any potential investor.  Parties' Comb. Stmt. Mat. Facts, ¶

35; Fee Dep. 104:23–105:1.  Fee testified that Skilled Science "had a credible thesis, a credible

principle, and it established credible engagement with a number of potential investors."  Parties'

Comb. Stmt. Mat. Facts, ¶ 36; Fee Dep. 115:1–7.  37.  Although Fee identified the Sackler

---

[5] According to Fee's curriculum vitae, from October 2017 through June 2019, Fee was a partner in Daimler's
SpinGlass venture.  Parties' Comb. Stmt. Mat. Facts, ¶ 46.  While Fee worked for Daimler's SpinGlass venture,
Daimler was Fee's "sole source of income."  Id. at ¶ 47; Fee Dep. 59:5–7.  From October 2019 through the present,
Fee has been a managing director in Daimler's Conexus venture.  Parties' Comb. Stmt. Mat. Facts, ¶ 48.  During the
time Fee has worked for Conexus, Conexus has been his sole source of income.  Id. at ¶ 49.  Fee testified that while
he was working for Skilled Science, he spent half of his time on work for Skilled Science.  Id. at ¶ 50.  Fee does not
list Skilled Science on his resume.  Id. at ¶ 51.

**JA31**

family as one of the potential investors, he did not identify Two Sigma as a potential investor.
Parties' Comb. Stmt. Mat. Facts, ¶ 37.  Fee testified that a different entity, Wood Creek Capital,
"was talking about a potential 5 million" investment, with others, as pieces of a possible
investment.  Id. at ¶ 37; Fee Dep. 100:2–12.  Fee testified that "one of the rules of capital raising
is that it's not money until it's in the bank."  Parties' Comb. Stmt. Mat. Facts, ¶ 38; Fee Dep.
105:12–15.  Fee explained that the investment sphere is a world of "shoulda, coulda, woulda"
and that because of this uncertain nature, an investment "doesn't count unless it happens."
Parties' Comb. Stmt. Mat. Facts, ¶ 39; Fee Dep. 89:23–90:22.

### D.     Daimler's Questions as to the GEV Representation

Daimler testified that the GEV Representation was the sole reason he decided to "walk
away" from a purported $10 million in investments for Skilled Science to join Defendants.
Parties' Comb. Stmt. Mat. Facts, ¶ 99, Daimler Dep. 203:16–22.  Daimler also testified that the
GEV Representation was "the single most important issue for our pitch."  Parties' Comb. Stmt.
Mat. Facts, ¶ 98, Daimler Dep. Ex. 5 99:24–100:10.  Despite the significance of the GEV
Representation to Daimler, he was unable to recall whether he ever asked Moehle if the
Defendants had a signed investment commitment from GEV.  Parties' Comb. Stmt. Mat. Facts, ¶
101.  Daimler Dep. 49:8–24.  Daimler later testified that he did not recall any signed legal
agreements with GEV obligating them to invest $20 million.  Parties' Comb. Stmt. Mat. Facts, ¶
100, Daimler Dep. 77:19–78:12.  Daimler admitted that he could not recall taking any steps to
double-check Moehle's purported GEV Representation beyond reviewing in a "cursory way"
publicly available information related to GE's operations to determine if a spinoff of its financial
arm seemed reasonable.  Parties' Comb. Stmt. Mat. Facts, ¶ 102; Daimler Dep. 80:10–15.

Daimler also admitted that in multiple meetings with GEV representatives he did not ask

any questions about the nature, extent, or likelihood of any GEV commitment to invest in the

Companies.  Parties' Comb. Stmt. Mat. Facts, ¶ 103; Daimler Dep. 78:13–80:5.  With respect to

an alleged legal agreement between GEV and Robotics Hub, the following testimony occurred:

> **Q.** Okay. Let me ask the question: Did you know there was a written agreement
> between GE and Robotics Hub before you joined the companies?
> **A.** No.
> **Q.** Did you ever ask whether there was a written agreement?
> **A.** I don't recall.
> **Q.** So you never read an agreement between GE and Robotics Hub before you
> joined the  companies?
> **A.** If I said I didn't recall seeing an agreement, I certainly wouldn't be able to
> answer any differently about reading such an agreement.

Daimler Dep. 195:13–24.  The private placement memorandum that the Fund provided to

investors did not include any disclosure of a GEV $20 million commitment.  Parties' Comb.

Stmt. Mat. Facts, ¶ 105.  Daimler admitted that he read the Fund's private placement

memorandum.  Id.

Daimler did not speak with anyone, other than a single mutual friend of the parties,

before he entered into a business relationship with Moehle.  Id. at ¶ 106.  Daimler testified as

follows:

> **Q.** At this point the [GEV] spinout had been, according to your allegations,
> represented to you for about six months, right?  If it was August when it was first
> represented to you, and now it's in February and it's being represented still, is that
> right?
> **A.** Correct.
> **Q.** At this point did you do any of your own diligence as to what the status of that
> spinout was?
> **A.** I don't recall what additional, if any, diligence I did other than bring the issue
> up with [Moehle]. I would not have ignored that issue. It was a material issue
> foundational to the operation of the company.
> **Q.** But all you did was ask Mr. Moehle about it. Is that fair?
> **A.** That's not what I said.
> **Q.** You don't recall doing anything other than asking Mr. Moehle about it, right?
> **A.** I don't recall what else I did in addition.

14

**JA33**

Daimler Dep. 219:21–220:16.  Daimler also could not recall how, when, or why he came to learn that the alleged GEV Representation was allegedly untrue.  Parties' Comb. Stmt. Mat. Facts, ¶ 108.

### E.    Daimler Executes the Common Unit Agreements

In April 2016, Daimler executed amended operating agreements for the Companies that added Daimler as a member of the Companies.  Id. at ¶ 109.  Daimler also executed Common Unit Agreements in April 2016, which granted Daimler 42 common units in the Companies, subject to certain vesting conditions, one of which was that Daimler provide full-time services to the Companies by March 23, 2017.  Id. at ¶ 110; Coal Hill Ventures LLC Common Unit Award Agreement, Ex. 20, ECF No. 110-2, at 350-358; Robotics Hub Fund 1, LLC Common Unit Award Agreement., Ex. 21, ECF No. 110-2, at 361-368.  Per the Common Unit Agreements, if Daimler failed to provide full-time services by March 23, 2017, he would forfeit the common units in their entirety.  Parties' Comb. Stmt. Mat. Facts, ¶ 111.  The Common Unit Agreements define "Full Time Service," in pertinent part, as "providing greater than 95% of his professional activities . . . to a combination of the Compan[ies] . . . ."  Id. at 112.

### F.    Daimler's Loan

Daimler alleges that he loaned $125,000 to Coal Hill pursuant to a promissory note and that he wrote several checks to Coal Hill totaling approximately $30,000.  Parties' Comb. Stmt. Mat. Facts, ¶¶ 113, 114; ECF No. 86 at ¶¶ 43, 84.  Daimler admits that on or about November 2, 2017, Coal Hill paid him the $125,000 promissory note in full, with interest, and separately reimbursed him in the amount of $35,000 for the checks he wrote.  Parties' Comb. Stmt. Mat. Facts, ¶ 115; ECF No. 86 at ¶ 44.

### G.    Daimler's Financial Contributions and Proof of Expenses

Daimler alleges that he made financial contributions to Coal Hill in excess of $200,000 and that Moehle orally agreed that such would be treated as capital contributions. Parties' Comb. Stmt. Mat. Facts, ¶ 116, ECF No. 86 at ¶¶ 86–91. Moehle testified that the Companies asked Daimler on multiple occasions to produce documentation of any supposed unreimbursed monetary payments but that Daimler refused to do so. Parties' Comb. Stmt. Mat. Facts, ¶ 117.

During discovery, Daimler produced an undated document, which he testified looked "familiar" and "looks like a list of expenses that I incurred supporting the operations of the companies with my business partner at the time" Id. at 118; Ex. 22, ECF No. 110-2, at 369-385; Daimler Dep. 263:17-21. With regard to this undated document of expenses, Daimler testified that he did not recall when the document was created, how it was created, whether he created it (or someone else did), and that he had "no idea" how the document got in his files. Daimler Dep. 263:22–264:5. Daimler conceded that if he would have created the document, it was "very likely" he would have recalled doing so. Parties' Comb. Stmt. Mat. Facts, ¶ 120; Daimler Dep. at 280:17–19.

The undated document of expenses lists payments to a communications firm, Inside Revolution, Inc. Parties' Comb. Stmt. Mat. Facts, ¶ 123. Daimler could not specifically identify any services that Inside Revolution performed for Robotics Hub or Coal Hill. Id. at ¶ 124. The document also lists multiple laptop purchases for which Daimler had no information, as well as" block entries" for Daimler's travel. Id. at 125-126.

The undated document of expenses also reflects that Daimler made twelve monthly $15,000 payments to St. Maple 164 LLC, which is Fee's LLC through which Fee received payments, from August 28, 2015 through January 27, 2017. Parties' Comb. Stmt. Mat. Facts, ¶

121; Daimler Dep. 264:6–266:10; ECF No. 110-2, at 369-382.  As of August 28, 2015, Fee had

not yet been introduced to Moehle.  Parties' Comb. Stmt. Mat. Facts, ¶ 121.  In contrast to the

$15,000 payments Daimler made to Fee, Fee testified that he was being paid separately by

Robotics Hub at $10,000 a month for his work, and that he was "not being doubly compensated,

no." Fee Dep. 110:20-111:1-2; 3-11.  When asked specifically about $15,000 payments from

Daimler, Fee testified that "it's very possible that Eric-compensated the lower rate of $10,000 a

month from Robotics Hub with 5,000. Very possibly. But I don't recall."  Daimler Dep. 111:19-

22.  Counsel clarified that he was asking about "a separate $15,000 payment in addition to the

$10,000 that you earned," to which Fee responded, "Oh, absolutely not. I was not paid that

much."  Daimler Dep. 111:23-112:1.

　　　In his Opposition to Summary Judgment, Daimler provides 1,879 pages of unorganized

alleged "back-up" expenses.  Parties' Comb. Stmt. Mat. Facts, ¶ 207.  Other than asserting that

such are evidence of Daimler's expenses incurred on behalf of the Companies, he fails to cite to

any document or documents or to provide an explanation or argument as to why such documents

support his allegations.

####    H.    Alleged Oral Agreement

　　　When asked about the material terms of Moehle's alleged oral agreement to treat

Daimler's financial contributions as capital contributions, Daimler testified as follows:

> **Q.** And you don't recall sitting here today any phone call where Mr.
> Moehle agreed to treat any financial contributions as capital contributions,
> is that right?
> . . .
> **A.** I don't recall any specific phone call.
> **Q.** How many units were you going to receive?
> **A.** I don't recall.

17

**JA36**

> **Q.** What kind of units were they?
> **A.** I don't recall.
> **Q.** What were the vesting terms?
> **A.** I don't recall.
> **Q.** How much money was going to be exchanged for the units? What was the number?
> **A.** I'll stand by what I wrote in the Complaint.
> **Q.** In the Complaint, you don't really provide a number. You say in excess of $200,000.
>
> So how much was agreed, according to your Complaint, to be treated as capital contribution?
> **A.** I would have to go back and take a look at the totality of the communications and the financial records.
> **Q.** Was it $200,000?
> **A.** I don't recall.

Daimler Dep. 256:18–257:18. Fee likewise was unable to provide any specific information as to the alleged agreement, testifying as follows:

> [W]hen you're talking about the value of units that [Daimler] should have been provided, I'm not privy nor do I know what was his arrangement in terms of what he was given…I don't know whether or not that should have resulted in units or whether it was supposed to be just paid back. And if capital wasn't available to pay it back, then it would be paid in units. How many units for $200- to $300,000? I don't know. What are the value of the units he should have been provided? I don't know.

Parties' Comb. Stmt. Mat. Facts, ¶ 131; Fee Dep. 116:24–117:24. Fee further testified that he was not privy to the accounting of the Companies and had no independent knowledge of how much money, if any, Daimler contributed to the Companies. Parties' Comb. Stmt. Mat. Facts, ¶ 128; Fee Dep. 95:6–96:14. Fee testified that there "was very little acrimony" about the finances of the Companies while Daimler was with the Companies and "it's afterward that there was acrimony and a discussion of hey, I'm [Daimler] owed something." Parties' Comb. Stmt. Mat. Facts, ¶ 129; Fee Dep. 120:18–121:2. 130. Fee testified that Daimler did not say anything to him about Daimler contributing in excess of $200,000 until after they left the Companies. Parties' Comb. Stmt. Mat. Facts, ¶ 130; Fee Dep. 120:5–22.

18
**JA37**

### I.   Daimler's Removal from the Companies

In 2016, Daimler was appointed as a Presidential Innovation Fellow for the Office of Science and Technology Policy.  Parties' Comb. Stmt. Mat. Facts, ¶ 132.  The fellowship was expected to continue until January 2017.  Id. at ¶ 134.  While Daimler was engaged in his fellowship, Moehle believed that Daimler was not devoting sufficient time to the Companies.  Id. at ¶ 135.  In January 2017, Moehle and Daimler discussed Daimler's future role with the Companies in light of Moehle's belief that Daimler was not devoting sufficient time to the Companies.  Id. at ¶ 136.  After Moehle and Daimler met, the Board of the Companies voted on whether to offer Daimler full-time employment.  Id. at ¶ 137.  Daimler voted in favor of full-time employment and Moehle voted against.  Id. at ¶ 138.  The resulting deadlock was referred to the contractually prescribed neutral deadlock advisor, which was Moehle and Daimler's mutual friend, Mr. Mawhinney.  Id. at ¶ 139.  On March 27, 2017, the deadlock advisor broke the deadlock and voted against offering Daimler full-time employment.  Id. at ¶ 140.  Daimler was then removed from the Companies' Boards of Managers.  Id. at ¶ 141.

### J.   Expert Testimony as to Damages

Daimler described his non-retained damages expert, Jamie Fee, as "qualified to serve as a Business Development Executive expert commenting on issues related to damages."  Parties' Comb. Stmt. Mat. Facts, ¶ 143.  Daimler disclosed that Fee would provide his opinion on (1) "the cost of lost opportunities borne by Daimler because he left [Skilled Science] to enter into a partnership with Moehle"; and (2) "the value of units that should have been provided to Daimler in return for his investment in the company, Robotics Hub."  Parties' Comb. Stmt. Mat. Facts, ¶ 144.  With respect to calculating the monetary value of Daimler's lost business opportunities,

Fee admitted that it is "a hard thing to say . . . In fact, you cannot say." Fee Dep. 88:20–89:10.

Fee testified that any "lost business opportunity" for Skilled Science was dependent upon

whether "Skilled Science would have been able to build a portfolio successfully that would have

made for a big equity growth." Fee Dep. 89:3–8. With respect to calculating the value of the

units Daimler is purportedly entitled to, Fee stated "[w]hat are the value of the units he should

have been provided? I don't know." Fee Dep. 116:24–117:24.

### K.    Procedural Background

Daimler filed a Complaint on February 5, 2018, followed by an Amended Complaint on

February 14, 2018.[6] ECF Nos. 1 & 4. Daimler filed a Second Amended Complaint on August

24, 2018. ECF No. 24. After the parties met and conferred regarding the Second Amended

Complaint, Daimler filed a Third Amended Complaint on October 16, 2018. ECF No. 33.

Following the Court's Order denying in part, and granting in part, Defendants' Motion to

Dismiss the Third Amended Complaint, Daimler filed his Fourth Amended Complaint on June

28, 2019. ECF No. 48. The Court then granted Daimler's unopposed Motion to Amend his

Complaint to modify his prayer for relief, and thus the Fifth Amended Complaint was filed on

October 19, 2020. ECF No. 86. In Counts One, Two, and Four, Daimler asserts identical

individual claims of fraudulent inducement against Moehle, the Fund, and Coal Hill,

respectively, based upon the allegation that Moehle fraudulently represented to Daimler that

GEV had committed to invest $20,000,000.00 in the Fund. In Count Three, Daimler alleges that

Coal Hill breached an oral agreement to provide Daimler with Units in exchange for his financial

contributions to the Companies.

---

[6] The First Amended Complaint was filed pursuant to the Court's sua sponte Order finding that the initial
Complaint did not demonstrate that the Court had subject matter jurisdiction. ECF No. 3.

II.     **Standard of Review**

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate where

the moving party "shows that there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a).  The court must enter summary

judgment against a party who fails to make a showing sufficient to establish an element essential

to his or her case, and on which he or she will bear the burden of proof at trial.  Celotex Corp. v.

Catrett, 477 U.S. 317, 322 (1986).  In evaluating the evidence, the court must interpret the facts

in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or

her favor.  Watson v. Abington Twp., 578 F.3d 144, 147 (3d Cir. 2007).

In ruling on a motion for summary judgment, the court's function is not to weigh the

evidence, make credibility determinations, or determine the truth of the matter; rather, its

function is to determine whether the evidence of record is such that a reasonable jury could

return a verdict for the nonmoving party.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S.

133, 150–51 (2000) (citing decisions); Anderson v. Liberty Lobby, 477 U.S. 242, 248–49

(1986); Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 643 n. 3 (3d Cir. 1998).

The mere existence of a factual dispute, however, will not necessarily defeat a motion for

summary judgment.  Only a dispute over a material fact—that is, a fact that would affect the

outcome of the suit under the governing substantive law—will preclude the entry of summary

judgment.  Liberty Lobby, 477 U.S. at 248.  A dispute is "genuine" if the evidence is such that a

reasonable trier of fact could render a finding in favor of the nonmoving party. McGreevy v.

Stroup, 413 F.3d 359, 363 (3d Cir. 2005).

Where the nonmoving party will bear the burden of proof at trial, the moving party may

meet its burden by showing that the admissible evidence contained in the record would be

insufficient to carry the nonmoving party's burden of proof or that there is an absence of

evidence to support the nonmoving party's case. Celotex, 477 U.S. at 322, 325; Marten v.

Godwin, 499 F.3d 290, 295 (3d Cir. 2007). If the movant meets his or her burden, the burden

shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for

trial" and to present sufficient evidence demonstrating that there is indeed a genuine and material

factual dispute for a jury to decide. Fed. R. Civ. P. 56(e); see Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 247-48 (1986); Celotex, 477 U.S. at 323-25. The nonmoving party must go

beyond his or her pleadings and designate specific facts using affidavits, depositions, admissions

or answers to interrogatories showing that there is a genuine issue of material fact for trial.

Celotex, 477 U.S. at 324. The nonmoving party cannot defeat a well-supported motion for

summary judgment by simply reasserting unsupported factual allegations contained in his or her

pleadings. Williams v. Borough of West Chester, 891 F.2d 458, 260 (3d Cir. 1989).

Furthermore, "[w]hen opposing summary judgment, the non-movant may not rest upon mere

allegations, but rather must 'identify those facts of record which would contradict the facts

identified by the movant.'" Corliss v. Varner, 247 F. App'x 353, 354 (3d Cir. 2007) (quoting

Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2002)).

Inferences based upon speculation or conjecture do not create a material factual dispute

sufficient to defeat a motion for summary judgment. Robertson v. Allied Signal, Inc., 914 F.2d

360, 382 n.12 (3d Cir. 1990).

## III.    Discussion

Defendants seek summary judgment as a matter of law on all of Daimler's claims. They

argue that Daimler is unable to establish the elements of his fraudulent inducement claim as

asserted in Counts One, Two, and Four, and that he cannot demonstrate the elements of his breach of contract claim asserted against Coal Hill in Count Three. The Court addresses Defendants' arguments in turn.

**A.    Fraudulent Inducement Claims**

To recover on a claim of fraudulent inducement, Pennsylvania requires proof of the following elements by clear and convincing evidence: "'(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.'" Eigen v. Textron Lycoming Reciprocating Engine Div., 874 A.2d 1179, 1185 (Pa. Super. Ct. 2005) (quoting Skurnowicz v. Lucci, 798 A.2d 788, 793 (Pa. Super. Ct. 2002)).


Defendants argue that Daimler is unable to establish that a representation was made; that he cannot demonstrate that the representation is an actionable false statement; that Daimler cannot establish that Moehle intended to deceive Daimler; that Daimler is unable to show that he justifiably relied on the GEV Representation; and that Daimler cannot establish that he suffered resulting damages.

**1.    The Representation**

First, Defendants argue that Daimler has not produced clear and convincing evidence that Moehle made the representation that GEV had committed to invest $20 million in the Fund. In support of the proposition that there is a genuine issue of material fact as to whether the GEV representation was made, Daimler relies on his deposition testimony and his Affidavit. He argues that such evidence is corroborated by Fee's testimony and by allegations in a verified

23

**JA42**

complaint filed in the Delaware Chancery Court against the same Defendants.  As explained below, neither Fee's testimony, nor the Delaware Court verified Complaint, qualify as competent corroborating evidence.  Therefore, Daimler's argument rests solely on his own self-serving testimony and Affidavit.  As discussed below, Daimlers' testimony and Affidavit are unsupported and conclusory reassertions of his Complaint allegations, which are insufficient to create a genuine issue of material fact.

### a.    Fee's Testimony

Fee's testimony does not support the allegation that Moehle represented to Daimler that GEV had committed to invest $20,000,000.00 in the Fund.  Fee testified that Moehle represented to Fee, one time, that GEV was to invest in the neighborhood of $5 million in the Fund, sometime in the future.  Fee Dep. 19:15-16.  The remainder of Fee's relevant testimony is hearsay testimony of what Daimler told Fee.  Fee Dep. 18:24-25-19:1-4.  In addition, Fee's testimony, both direct and hearsay, is inconsistent with, and contradictory to Daimler's allegation that Moehle represented to Daimler that GEV had *committed* to invest *$20,000,000.00* in the Fund.  Fee did not testify that a "commitment" was made, and he testified that GEV was to invest a "significant" amount of money, which Fee deemed to be around $5 million, not $20 million.  Fee Dep. 19:18-25-20:1-2; 20:4-10; 82:19-25-83:1.  Thus, Fee's testimony does not corroborate, and in fact contradicts, Daimler's testimony that Moehle had represented that GEV had committed to invest $20 million.  Finally, Fee provided no independent testimony corroborating the allegation that Moehle continued to make the GEV Representation multiple times to multiple investors throughout 2015 and 2016.

### b.    Delaware Civil Action

Daimler also asserts that his testimony is corroborated by the allegations asserted in a

civil action in the Delaware Chancery Court in which the plaintiffs therein seek declaratory and injunctive relief.  ECF No. 117-2; <u>Friddle v. Moehle</u>, Court of the Chancery of the State of Delaware.  The <u>Friddle</u> Complaint includes the following allegation:

> To entice investors, and to induce Daimler to focus his efforts on the Partnership over his other successful businesses, Moehle represented that GE Ventures had committed to invest $20 million in the Fund, which was a significant portion of the $50 million the Fund sought to raise.

ECF No. 117-2, at 41 (Paragraph 27 of the <u>Friddle</u> Complaint).  The Delaware allegation is substantively identical to the allegations made by Daimler in his Complaint and carries no more probative force than Daimler's Complaint allegations herein.  The allegation in the Delaware case arguably carries less probative force than Daimler's allegations in that the Delaware action assertion is not based upon the Delaware plaintiffs' personal knowledge.  To that extent, the Delaware case allegation is also inadmissible hearsay.  The Court will disregard the Delaware civil complaint has having no impact on determining whether a genuine issue of material fact exists in this case.

### c.    Daimler's Testimony and Affidavit

In apparent recognition that Fee's testimony and the Delaware Complaint are not competent corroborating evidence, Daimler primarily argues that his self-serving testimony and Affidavit, when considered in conjunction with other evidence,[7] are sufficient to defeat summary judgment.  Pltf. Br. Opp. 6-9.  Daimler's argument does not apply where, as here, the self-serving testimony is conclusory, unsupported by other evidence, and is contested and rebutted by record evidence.  <u>Nunez v. McCool</u>, No. 21-3321, 2022 WL 1315087, at *2 (3d Cir. May 3,

---

[7] <u>Hanna v. Giant Eagle Inc.</u>, No. CV 15-1009, 2017 WL 1194676, at *12 (W.D. Pa. Mar. 9, 2017), Rep. and Recomm. adopted, No. 2:15CV1009, 2017 WL 1194713 (W.D. Pa. Mar. 30, 2017) (self-serving testimony and affidavit sufficient to withstand summary judgment only "when considered in conjunction with other evidence.")

2022) ("unsupported assertions [] insufficient to create a material question of fact"); <u>Trivedi v. Slawecki</u>, 642 F. App'x 163, 168 (3d Cir. 2016) (plaintiffs' unsupported conclusory assertions combined with the failure to produce documentary evidence to support allegations insufficient to defeat summary judgment); <u>Irving v. Chester Water Auth.</u>, 439 F. App'x 125, 127 (3d Cir. 2011) (self-serving testimony insufficient to defeat summary judgment when other evidence of record rebuts the testimony); and <u>Lind v. Jones, Lang Lasalle Americas, Inc.</u>, 135 F. Supp. 2d 616, 621 (E.D. Pa. 2001) ("only evidence which Plaintiff has adduced consists of his own deposition testimony," which is insufficient to establish a prima facie case of fraud). A party cannot defeat summary judgment "by simply reasserting unsupported factual allegations contained in his [] pleadings." <u>Williams</u>, 891 F.2d at 460.

Daimler's testimony and Affidavit are conclusory and merely repeat his Complaint allegations that Moehle represented to Daimler that GEV had committed to invest $20 million in the Fund and that Moehle made this representation multiple times to dozens of potential investors over the course of eight months. Daimler's Affidavit purports to incorporate the entirety of his Complaint allegations within his Affidavit. Daimler Aff. ¶ 2. The Complaint is the record pleading that is challenged by Defendants. It is improper for a plaintiff to rely upon Complaint allegations as "bootstrap evidence" to support said plaintiff's testimony by repeating the same allegations. Such is the very definition of self-serving and conclusory. In Paragraph 4 of his Affidavit, Daimler addresses his lack of recall during his deposition testimony.

> While I may not remember immaterial facts from meetings or conversations that took place six (6) years ago, <u>I do remember, with absolute and unequivocal certainty, Moehle's representation to me, and to numerous potential investors, that GE had committed to invest $20 Million in the Fund.</u>

Daimler Aff. ¶ 4 (emphasis in original). This assertion does not support or corroborate his

allegations – it just repeats Daimler's Complaint allegations and his deposition testimony.  See, generally, Daimler Dep.72-76.

In addition to contesting Daimler's testimony, the Defense has provided specific and general rebuttal evidence challenging Daimler's assertions that the GEV Representation was made.  First, Daimler alleged that he had attended an October 16, 2015 meeting with UPMC representatives at which Moehle made the GEV Representation.  However, in an email chain concerning said UPMC presentation, Daimler makes no mention of any such GEV Representation, and it confirms that Daimler did not even attend said meeting.  Email from E. Daimler, Oct. 23, 2015.  In response to such evidence that clearly contradicts Daimler's Complaint allegations, Daimler's Affidavit relates, "I remember quite clearly that Moehle made the GE investment representation to Talbot Heppenstall [of UPMC]. Whether my memory is mistaken about the date of that representation, or whether I was told by someone else in that meeting that Moehle made the representation, does not change the fundamental fact that the representation was made."  Daimler Aff. ¶ 4 n.1.  The problem with Daimler's attempt to challenge the evidence rebutting his allegation is, again, that it consists of conclusory, self-serving and possibly hearsay testimony that is not supported by other evidence.  Daimler's Affidavit also attempts to supplement his Complaint allegations to include assertions that Moehle made the GEV Representation to UPMC personnel on a different date than originally alleged, and that Daimler may or may not have attended a meeting on a different date; and/or that an unidentified person, who attended the October 16, 2015 UPMC meeting, later told Daimler that Moehle had made the GEV Representation.  Daimler has produced no evidence to corroborate said assertions about any such GEV Representation.

Similarly, Daimler's allegation, that Moehle made the GEV Representation at a

November 3, 2015 meeting with RIDC, is rebutted by record evidence. An email from Mr. Mawhinney to Daimler, Moehle, and an RIDC representative shows that Moehle was not introduced to the RIDC representative until November 30, 2015. Email from D. Mawhinney to D. Smith, C. Moehle, and E. Daimler. In addition, the documentary evidence regarding RIDC contains no mention of the GEV Representation, and it does not corroborate Daimler's assertion that the GEV Representation was made. Further, the November 2015 "GE Ventures Conversation" document does not even mention the asserted $20 million investment commitment. It only references that Moehle and Daimler planned to ask GEV to make an initial investment commitment of $500,000, which they hoped would then scale up to $25 million. When asked about this inconsistency, Daimler had no answer as to why Moehle would plan to seek an initial investment of $500,000 from GEV if Moehle had already received an investment commitment of $20 million from GEV. Daimler Dep. 184:12-187:23.

Finally, GEV was not identified as an investor in a March 2016 PowerPoint, that Moehle sent to Daimler and Fee, wherein Moehle discussed seeking investments from "lead investors." Parties' Comb. Stmt. Mat. Facts, ¶¶ 95-96. Daimler testified that he did not ask Moehle why GEV was not included as a potential investor in the March 2016 PowerPoint. Daimler Dep. 232:17–20.

Daimler did not produce any evidence to support his allegation that the GEV Representation was made. Daimler's self-serving and conclusory testimony and Affidavit, which Defendants have contested and rebutted with evidence of record, cannot be used as competent evidence to defeat summary judgment. Nunez, No. 21-3321, 2022 WL 1315087, at *2; Trivedi, 642 F. App'x at 168; Irving, 439 F. App'x at 127; and Lind, 135 F. Supp. 2d at 621. The totality of the record fails to establish any question of material fact for a jury to determine

28

**JA47**

that a GEV Representation as alleged by Daimler was made.  Thus, Daimler has not met his

burden as to the first element of his fraudulent inducement claim.  As such, Daimler's fraudulent

inducement claims fail, and Defendants' Motion for Summary Judgment will be granted.

### 2.   Justifiable Reliance

Defendants next argue that Daimler's reliance on the alleged misrepresentation was not

justified.  The Court agrees that Daimler has not shown clear and convincing evidence to

establish any question of material fact that his alleged reliance was justified.  While the law does

not impose a duty to investigate, for reliance upon another's representation to be justifiable, it

must be reasonable.  Porreco v. Porreco, 811 A.2d 566, 571 (Pa. 2002).  A reviewing court thus

will consider whether the recipient of the alleged misrepresentation "knew or should have known

that the information supplied was false." Fort Wash. Res., Inc. v. Tannen, 858 F. Supp. 455, 460

(E.D. Pa. 1994) (citing Scaife Co. v. Rockwell-Standard Corp., 446 A.2d 280, 286–88 (Pa.

1971)).  Courts consider factors such as the relationship of the parties, the degree of the parties'

sophistication, the nature of the transaction, and the history of the parties' negotiations in

determining whether the plaintiff's reliance was reasonable.  See Fort Wash. Res., Inc., 858 F.

Supp. at 460; Huu Nam Tran v. Metro. Life Ins. Co., 408 F.3d 130, 135 (3d Cir. 2005).  As the

Pennsylvania Superior Court explained,

> "although the recipient of a fraudulent misrepresentation is not barred from
> recovery because he could have discovered its falsity if he had shown his
> distrust of the maker's honesty by investigating its truth, he is nonetheless
> required to use his senses, and cannot recover if he blindly relies upon a
> misrepresentation the falsity of which would be patent to him if he had
> utilized his opportunity to make a cursory examination or investigation."

Kline v. EDS Relocation & Assignment Servs., No. 1:CV-08-0980, 2008 WL 4822026, at *6

(M.D. Pa. Nov. 4, 2008) (quoting Toy v. Metropolitan Life Insurance Company. 863 A.2d 1, 12

(Pa.Super.Ct.2004)).

Daimler was an experienced investor, familiar with raising investment funds for similar advanced technological businesses.  In his own business, Daimler sought to obtain a signed agreement from a potential investor so that he could represent to other investors that he had already obtained a committed investor.  He testified that it was important to be able to represent to other potential investors that there were already committed investors in order to raise additional funds.  Yet, Daimler did not inquire as to whether the Companies had obtained, or should obtain, a similar signed agreement from GEV.  He further testified that he was unaware of the existence of any documents memorializing GEV's alleged commitment.  When asked if it would have been important to know that Moehle had obtained a signed commitment from GEV, Daimler answered that it "would have been a very wise course of action."  Daimler Dep. 49:15-20.  He also did not ask why GEV's $20 million commitment was not identified in the Companies' private placement memorandum.  Further, despite being present in meetings with GEV representatives, Daimler did not ask about the GEV Representation.  Although Daimler testified that he did not make such inquiries because Moehle told him not to, there is no documentary or corroborating testimonial evidence to support that Moehle told him not to make inquires.

GEV had already made an initial investment of $75,000 prior to Daimler meeting Moehle.  In November 2015, Moehle and Daimler planned to request an initial $500,000 investment from GEV, which they hoped would increase over time to $25 million.  Faced with such an obvious incongruence between the alleged GEV Representation and an actual plan to request only $500,000 from GEV, Daimler was "required to use his senses," and not "blindly" rely upon the falsity of the GEV Representation, "which would be patent to him if he had utilized

his opportunity to make a cursory examination or investigation" (in this case, by simply comparing the pitch material to the GEV Representation). Toy, 863 A.2d at 12.

Furthermore, Daimler testified that Moehle told him that "GE would be investing at least $20 million as soon as they cleared a regulatory issue of spinning out a financial arm." Daimler Dep. 75:25–76:25. Thus, Daimler understood that GEV's commitment was contingent upon a future event and that his reliance on such GEV investment was not certain. Daimler in fact testified that his reliance on the GEV investment to occur "was definitely a risk that I was taking[,]" knowing that "[t]he trigger of the $20 million would not occur until [GE's] spinout [of an investment] happened." Daimler Dep. 83:13–16. Finally, Daimler knew that GEV's future potential investment was "not a legal obligation" and that it was "absolutely true" that GEV "could have just walked away." Daimler Dep. 203:12–15.

Considering Moehle and Daimler's relationship, Daimler's relevant knowledge and experience, the fact that Daimler was familiar with innovative tech investment companies, and Daimler's failure to make inquiries when faced with multiple opportunities to do so, the Court finds that Daimler has not produced clear and convincing evidence to establish a question of material fact that Daimler's asserted reliance on Moehle's oral representation was justifiable.

### 3.    Resulting Damages

Finally, Defendants argue that Daimler cannot establish that he suffered damages as a result of relying on the GEV Representation. In Pennsylvania, "lost future income is the appropriate measure of damages for a plaintiff who was fraudulently induced to leave otherwise secure employment." Martin v. Hale Prod., Inc., 699 A.2d 1283, 1287 (Pa. Super. Ct. 1997) (citing Lokay v. Lehigh Valley Co-op. Farmers, Inc., 492 A.2d 405, 410 (Pa. Super. Ct. 1985)). Daimler alleges that he suffered economic damages of at least $10 million when he was

fraudulently induced to walk away from $10 million in investment fund commitments in Skilled Science. However, he has not presented evidence of a causal connection between Daimler entering into a business relationship with Moehle and Daimler suffering a resulting economic injury.

Daimler's assertion that he suffered economic harm is at best speculative. The record evidence demonstrates that the only investment capital Skilled Science received was Daimler's initial $500,000. There is no evidence that any other party invested any money into Skilled Science. Daimler did not obtain any signed documents or other documentary evidence showing that any other investor had committed to invest in Skilled Science. Fee's testimony confirms that Skilled Science had no written investment agreements or commitments and had never drafted a private placement memorandum for an investment. Fee Dep. 101:2-22; 104:23-105:1. In August 2015, instead of investment commitments of $10 million from multiple investors, the then "current reality" of Skilled Science was that Skilled Science had no contract signed and it had "at various times" investment commitments of as much as $3.5 million, but no such funds were ever invested. Parties' Comb. Stmt. Mat. Facts, ¶ 40. Thus, there is no evidence that Skilled Science had any committed investments upon which a claim of damages can be shown. Skilled Science was an entity that had no investments for Daimler to walk away from. Accordingly, Daimler is unable to show by clear and convincing evidence that there is a genuine issue of material fact regarding damages.

**B.     Breach of Contract Claim**

As regards the breach of contract claim, Daimler alleges that he entered into an oral agreement with Coal Hill for Daimler to provide financial contributions to cover third-party expenses. He alleges that the parties agreed that Daimler's financial contributions would be

32

**JA51**

treated as capital contributions, and that in exchange he would receive Coal Hill Units.  Daimler

alleges that Coal Hill breached the oral agreement by failing to issue him Units in exchange for

his additional capital contributions, "[d]espite Section 7.2 of the [written] Operating

Agreement."[8] Pltf. Br. Opp. 24 (ECF No. 115).  "It is well-established that three elements are

necessary to plead a cause of action for breach of contract: (1) the existence of a contract,

including its essential terms, (2) a breach of the contract; and, (3) resultant damages."  Meyer,

Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C., 137 A.3d

1247, 1258 (Pa. 2016) (citing J.F. Walker Co., Inc. v. Excalibur Oil Grp., Inc., 792 A.2d 1269,

1272 (Pa. Super. Ct. 2002).

### 1.     Existence of a Contract

Defendants first argue that Daimler has not produced sufficient evidence to establish the

existence of a valid, enforceable oral contract.  Daimler, as the "party relying on an alleged oral

contract . . . has the burden of proving its existence."  Ecore Int'l, Inc. v. Downey, 343 F. Supp.

3d 459, 486 (E.D. Pa. 2018).  "To establish the existence of an agreement one must show that:

(1) both parties have manifested an intention to be bound by the terms of the agreement; (2) the

terms of the agreement are sufficiently definite to be specifically enforced; and, (3) there is

mutuality of consideration."  Id. at 487 (citations and quotations omitted).

Daimler has not produced evidence to show that he and Coal Hill intended to be bound

by an oral agreement or to establish the material terms of any such alleged oral agreement.

---

[8]  Pursuant to Section 7.2 of the Coal Hill Operating Agreement, Coal Hill is required to issue Units in connection
with members' additional capital contributions, with the caveat that "future Capital Contributions made by any
Member shall only be made with the consent of the Board and in connection with an issuance of Units."  ECF No.
86-6, at 21.  Daimler does not assert any Board consent to support issuance of Units pursuant to Section 7.2.
Therefore, despite Daimler's reference to Section 7.2, his breach of contract claim rests entirely on a separate
alleged oral agreement.

Daimler has not produced evidence to establish the type of Unit (Management Units or Common Units) he was to receive, the value of the Units in relation to his financial contribution, or the timing for issuance of the Units to Daimler.  When asked about the details of the alleged oral agreement to treat Daimler's financial contributions as capital contributions to be reimbursed by the issuance of Units, Daimler testified as follows:

> **Q.** And you don't recall sitting here today any phone call where Mr. Moehle agreed to treat any financial contributions as capital contributions, is that right?
> . . .
> **A.** I don't recall any specific phone call.
> **Q.** How many units were you going to receive?
> **A.** I don't recall.
> **Q.** What kind of units were they?
> **A.** I don't recall.
> **Q.** What were the vesting terms?
> **A.** I don't recall.
> **Q.** How much money was going to be exchanged for the units? What was the number?
> **A.** I'll stand by what I wrote in the Complaint.
> **Q.** In the Complaint, you don't really provide a number. You say in excess of $200,000.
> So how much was agreed, according to your Complaint, to be treated as capital contribution?
> **A.** I would have to go back and take a look at the totality of the communications and the financial records.
> **Q.** Was it $200,000?
> **A.** I don't recall.

Daimler Dep. 256:18–257:18.  Consistent with the above testimony, there is no evidence that there ever was "a discussion as to any of the essential terms of an alleged bargain." Ecore Int'l, 343 F. Supp. 3d at 489.  Accordingly, "[i]t defies reason to suggest that these parties would have agreed to be bound by an oral agreement that omitted any mention of such material terms". Ecore Int'l, 343 F. Supp. 3d at 490-91.

In addition, there is no evidence that Daimler ever requested that Coal Hill perform on

the alleged agreement by awarding him Units; either while Daimler was in a business relationship with Moehle or after Daimler was removed from the Companies. Finally, Fee testified that it was not until after Daimler left the Companies that he told Fee that he had made financial contributions to the Companies for which he felt he was "owed something." Fee Dep. 120:18–121:2.

The Court concludes that the alleged oral agreement between Daimler and Coal Hill is "too indefinite for a party to reasonably believe that it could be enforceable in an action at law." Ecore Int'l, 343 F. Supp. 3d at 489. There being no sufficient record evidence to establish any question of material fact as to the terms of any agreement entered into between Daimler and Coal Hill, Daimler has not met his burden to show the existence of the alleged oral agreement.

**2.      Evidence of Damages**

Defendants also argue that, assuming the existence of an oral agreement, Daimler has failed to provide admissible, non-speculative evidence to support his damages claim. Defendants argue that an undated, unsubstantiated, and unreliable document of expenses produced by Daimler during discovery cannot be considered as competent evidence of Daimler's expenditures on behalf of the Companies. Defendants further note that Daimler was unable to recall who created the document, when it was created, how it was created, or how it got into his files. Daimler Dep. 263:17-22–264:5. Furthermore, he could not explain many of the entries therein. Daimler Dep. 263:17-22–264:5. Daimler also proffers 1,879 pages of purported "back up" documents for expenses he incurred on behalf of the Companies. Daimler Aff. ¶ 12; Ex. O.– Said documents are not separated, categorized, identified, or organized for meaningful review relative to Daimler's claim for damages. There is no evidence that Daimler averred that any of said documents were submitted to Moehle or to the Companies for reimbursement. Several

35

**JA54**

items from the Exhibit also cut against Daimler's assertion that such documents support his claim for damages. Thus, there are significant evidentiary issues related to Daimler's claim for damages. Despite the damages issues presented by said documentary evidence, the relevancy and admissibility of such documents are not amenable to a clear determination to support a finding of no question of material fact. Thus, at this stage of the proceedings, there are questions of material fact as to the element of damages.

**IV.    Conclusion**

Viewing the record evidence in a light most favorable to Daimler, the Court finds that Defendants have demonstrated that there is no genuine dispute of material fact as to Daimler's fraudulent inducement claims. Daimler is unable to show by clear and convincing evidence that a representation was made, justifiable reliance, or resulting damages. Accordingly, Defendants' Motion for Summary Judgment will be granted and judgment on Daimler's fraudulent inducement claims asserted in Counts One, Two, and Four, will be entered in favor of Moehle, the Fund, and Coal Hill, and against Daimler. The Court also finds that Daimler has failed to produce evidence to establish questions of material fact as to the existence of a contract and its material terms. Absent such evidence, there is no question of material fact as regards any breach. Thus, Daimler's breach of contract claim fails. Accordingly, Defendants' Motion for Summary Judgment will be granted and judgment as a matter of law on Daimler's breach of contract claim asserted in Count Three will be entered in favor of Coal Hill and against Daimler.

An appropriate order will be entered.

Dated: <u>July 18, 2022</u>

Marilyn J. Horan
United States District Court Judge

**JA55**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ERIC DAIMLER, | ) |
| | )    Civil Action No. 18-165 |
|         Plaintiff, | ) |
| | )    Judge Marilyn J. Horan |
|    v. | ) |
| | ) |
| CHRIS MOEHLE, ROBOTICS HUB | ) |
| FUND 1, LLC, and COAL HILL | ) |
| VENTURES LLC, | ) |
| | ) |
|         Defendants. | ) |

**OPINION AND ORDER**

Plaintiff Eric Daimler initially filed suited on February 5, 2018 against Defendants Chris

Moehle, Robotics Hub Fund 1, LLC, and Coal Hill Ventures LLC. (ECF No. 1). The Court, on

its own motion, dismissed the Complaint for lack of subject matter jurisdiction on February 7,

2018. (ECF No. 3). On February 14, 2018, Plaintiff Daimler filed his First Amended

Complaint, which alleged eighteen counts arising out of the formation and operation of a

business partnership between Plaintiff Daimler and Defendant Moehle. (ECF No. 4). The

claims included: fraud in the inducement, in Counts One, Nine, and Fourteen; fraud in the

execution, in Counts Two, Ten, and Fifteen; tortious interference with contract, in Counts Three

and Four; unjust enrichment, in Counts Five, Eleven, and Sixteen; breach of contract, in Counts

Six, Seven, Twelve, and Thirteen; breach of the implied covenant of good faith and fair dealing,

in Count Eight; and accounting and legal accounting, in Counts Seventeen and Eighteen,

respectively. (ECF No. 4).

On March 30, 2018, Defendants moved to dismissed the First Amended Complaint.

(ECF No. 16). On July 30, 2018, the Court dismissed all Counts except the breach of contract

1

claims in Counts Seven and Thirteen, as to which the Court granted the Motion to Dismiss in part and denied it in part. (ECF Nos. 22, 23). The Court also allowed Plaintiff Daimler leave to re-plead certain factual allegations related to the fraud-in-the-inducement claims in Counts One, Nine, and Fourteen. (ECF Nos. 22, 23).

Subsequently, on August 24, 2018, Plaintiff Daimler filed a Second Amended Complaint. (ECF No. 24). Defendants again moved to dismiss for failure to state a claim, and moved for a more definite statement. (ECF No. 26). The Court denied the Motion without prejudice, ordering that the parties meet and confer in an effort to resolve their disputes as to deficiencies in the Second Amended Complaint. (ECF No. 28). Plaintiff Daimler then filed his Third Amended Complaint on October 16, 2018, alleging fraud in the inducement against each Defendant, in Counts One, Two, and Five, and alleging breach of contract against Defendant Coal Hill, in Counts Three and Four. (ECF No. 33). On October 30, 2018, Defendants filed the present Motion to Dismiss. (ECF No. 34). The parties briefed the issues, (ECF Nos. 35, 40, 41), and on February 20, 2018, the Court heard oral argument on the Motion, (ECF No. 46).

For the following reasons, Defendants' Motion to Dismiss will be denied in part and granted in part.

## I. Factual background

In 2015, Plaintiff Eric Daimler operated Skilled Science, a company engaged in robotics and venture finance. (ECF No. 33, at ¶ 11). In April 2015, Defendant Chris Moehle formed Coal Hill Ventures, LLC (hereinafter "Coal Hill" or "Defendant Coal Hill"), also a robotics and venture finance company, under the laws of the Commonwealth of Pennsylvania. *Id.* at ¶¶ 7, 11 and n.2. Sometime in 2015, Plaintiff Daimler and Defendant Moehle "decided to move forward with an equal partnership by combining Skilled Science and Coal Hill through a de-facto

merger." *Id.* at ¶ 12. Plaintiff Daimler and Defendant Moehle ultimately co-founded two new

entities, Robotics Hub Fund 1, LLC (hereinafter "Robotics Hub" or "Defendant Robotics Hub")

and Robotics Hub Fund 1, LP (hereinafter "the Fund") in March 2016, under the laws of the

State of Delaware. *Id.* at ¶¶ 12, 36–37.

　　　　In the lead up to forming the partnership, starting in the very first phone call between

Defendant Moehle and Plaintiff Daimler on or around August 18, 2015, Defendant Moehle

"stated that GE had already invested in Coal Hill, and had committed to invest another

$20,000,000.00 in the Fund." *Id.* at ¶ 20. Defendant Moehle subsequently repeated his claim

regarding GE's commitment to invest $20,000,000.00 in the Fund on numerous occasions in the

latter half of 2015: during phone calls with Plaintiff Daimler on August 19, September 15,

September 24, November 3, and December 8, *id.* at ¶ 21, and during in-person meetings with

Plaintiff Daimler and potential investors on October 16, November 1, November 3, November

10, November 18, and December 15, *id.* at ¶¶ 23–26. Defendant Moehle told Plaintiff Daimler

that he expected to have the GE funds in hand in early or mid-2016, following the completion

"of a particular regulatory process" related to "the spin out of GE's financial arm." *Id.* at ¶ 22.

Defendant Moehle further explained to Plaintiff Daimler that the completion of the regulatory

process "was *not* a condition of GE's funding of its committed investment, but merely something

that affected the timing of funding." *Id.* Plaintiff Daimler ultimately never spoke with GE

regarding the investment, at least in part because Defendant Moehle "specifically directed

Daimler to not discuss the investment" during a meeting with a GE contact. *Id.* at ¶ 27. Plaintiff

Daimler states that he "did not view this as unusual, but rather consistent with Moehle's

personality and oft-expressed desire to maintain control of the relationships he cultivated." *Id.*

While Plaintiff Daimler and Defendant Moehle were planning their partnership, Plaintiff Daimler continued operating Skilled Science "and was planning to close on investments from two investors, totaling $10,000,000.00." *Id.* at ¶ 17. Skilled Science's structure, however, was different from the structure that Plaintiff Daimler and Defendant Moehle contemplated for Defendant Robotics Hub and the Fund. *Id.* at ¶ 19. Plaintiff Daimler and Defendant Moehle thus "could not simply 'shift' their investments to the new, joint venture." *Id.* Consequently, Plaintiff Daimler decided to walk away from Skilled Science in late 2015 because of Defendant Moehle's assurances regarding GE's commitment to invest in the Fund. *Id.* at ¶ 17.

In early 2016, Defendant Moehle continued to represent, on numerous occasions, to Plaintiff Daimler that GE had committed to invest $20,000,000.00 in the Fund: during phone calls with Plaintiff Daimler and investors on January 20 and February 12, and in meetings with Plaintiff Daimler and investors on January 5, January 6, January 14, February 15, February 17, February 23, and March 23. *Id.* at ¶¶ 25, 32. As of March 23, 2016, Plaintiff Daimler and Defendant Moehle had co-founded the two new entities, Defendant Robotics Hub and the Fund. *Id.* at ¶ 12. The parties structured the venture such that Defendant Robotics Hub is the General Partner, and Defendant Coal Hill is the Investment Manager, of the Fund. *Id.* at ¶ 12. As a part of the new entities' formation, Defendant Robotics Hub and Defendant Coal Hill each entered into Amended and Restated Operating Agreements, under which Plaintiff Daimler and Defendant Moehle were both made members of each Defendant Robotics Hub and Defendant Coal Hill, and both were the only members of the entities' initial Board of Managers. *Id.* at ¶¶ 36–37, 66.

Additionally, relevant to Plaintiff Daimler's claims, Section 7.2 of the Operating Agreements required that all additional capital contributions beyond members' initial

4

**JA59**

contributions "be made in connection with the issuance of units." *Id.* at ¶ 68. Additionally, Defendant Robotics Hub and Defendant Coal Hill entered into Common Unit Award Agreements with each Plaintiff Daimler and Defendant Moehle. *Id.* at ¶ 54. Pursuant to Defendant Moehle's Award Agreements, Defendant Moehle was awarded forty-two common units in each Robotics Hub and Defendant Coal Hill. *Id.* Twenty percent of Defendant Moehle's units were to vest on March 23, 2017, and 1.6666% of the units were to vest "ratably on the last day of each month thereafter until" March 23, 2021. *Id.* Plaintiff Daimler was similarly awarded forty-two units in each Defendant Robotics Hub and Defendant Coal Hill, though his vesting scheduled differed. *Id.* at ¶¶ 55–56. Twenty percent of Plaintiff Daimler's units were to vest on the date on which he "has provided 12 consecutive and uninterrupted months of Full Time Services to the Company Group, provided that [Daimler] must begin providing such Full Time Services to the Company Group no later than" March 23, 2017. *Id.* at ¶ 56. The remaining eighty percent of the units would vest "on a pro-rata basis on the last day of each month thereafter until" March 23, 2021. *Id.*

While Plaintiff Daimler and Defendant Moehle were in the process of forming Defendant Robotics Hub and the Fund, the White House appointed Plaintiff Daimler as a Presidential Innovation Fellow. *Id.* at ¶ 45. The twelve-month fellowship program ran from January 2016 to the end of President Obama's term in January 2017. *Id.* at ¶ 46. The fellowship pulled Plaintiff Daimler away from Defendant Robotics Hub and Defendant Coal Hill, such that Plaintiff Daimler only worked for the companies part-time during the fellowship. *Id.* at ¶ 74. Defendant Moehle "encouraged Daimler to accept the fellowship because of the value that the Companies and the Fund would derive from it" through positive press coverage and Defendants' promotion of Plaintiff Daimler's fellowship "in connection with their marketing and fundraising efforts."

5

**JA60**

*Id.* at ¶¶ 47, 49.  Plaintiff Daimler and Defendant Moehle agreed that compensation for Plaintiff

Daimler's part-time work in 2016 "would accrue and be paid to Daimler at a later date," *id.* at

¶ 50, and they both "understood that Daimler would return to his full-time position with the

Companies when his fellowship ended," *id.* at ¶ 74.

"In early-mid 2016," however, Plaintiff Daimler's and Defendant Moehle's business

relationship began to erode.  *Id.* at ¶ 77.  Defendant Moehle "began criticizing Daimler as a

business partner," *id.* at ¶ 78, and "became increasingly controlling over access to information

about the Fund's investors and portfolio companies," *id.* at ¶ 79.  Defendant Moehle also

assigned "deliverables" to Plaintiff Daimler, such as asking Plaintiff Daimler to make

introductions to other companies, without consulting Plaintiff Daimler beforehand.  *Id.* at ¶¶ 81,

98.  Plaintiff Daimler hoped that, because the business relationship was new, these issues were

just "growing pains" and would resolve with time.  *Id.* at ¶ 83.  Accordingly, Plaintiff Daimler

remained engaged in the businesses and the Fund, and made several financial contributions to

them.  *Id.* at ¶¶ 82, 84, 86–89.  Some contributions were treated as loans, which were repaid by

Defendant Coal Hill with interest.  *Id.* at ¶¶ 43–44, 84, 87.  Other contributions, totaling more

than $200,000.00, were made to Defendant Coal Hill "with the expectation that they would be

treated as capital contributions."  *Id.* at ¶¶ 89–90.  Plaintiff Daimler made the contributions "with

Moehle's knowledge and approval" and "in late 2016, Moehle agreed that they would be treated

as" capital contributions.  *Id.* at ¶¶ 89, 91.  In spite of Section 7.2 of the Operating Agreement,

however, Plaintiff Daimler "did not receive additional common units in Coal Hill in connection

with his additional financial contributions."  *Id.* at ¶ 94.

The relationship between Defendant Moehle and Plaintiff Daimler continued to

deteriorate during the second half of 2016.  *See id.* at ¶¶ 95, 98.  On January 5, 2017, Defendant

Moehle recommended to the Boards of Defendant Robotics Hub and Defendant Coal Hill—each of which was made up only of Plaintiff Daimler and Defendant Moehle—that Plaintiff Daimler not be allowed to return to a full-time position because (according to Defendant Moehle) the companies lacked sufficient funds to pay him. *Id.* at ¶¶ 104–05. Due to Plaintiff Daimler's vote for, and Defendant Moehle vote against, Plaintiff Daimler's return to a full-time position, the Boards were deadlocked. *Id.* at ¶¶ 106–07. In accordance with Defendant Robotics Hub's and Defendant Coal Hill's Operating Agreements, the matter was then referred to the deadlock advisor, who "broke the deadlock by voting against Daimler returning to a full-time, fully compensated role" on March 22, 2017. *Id.* at ¶¶ 107, 109. This decision resulted in Plaintiff Daimler not returning to a full-time position by the date stated in the vesting clause in each of his Award Agreements, which in turn resulted in Plaintiff Daimler's forfeiture of all his common units. *Id.* at ¶ 111. The Defendants, therefore, "believe that Daimler has no membership or ownership interest in the Companies, thereby making Moehle the Companies' majority member." *Id.* at ¶ 112. As the majority member of both Defendant Robotics Hub and Defendant Coal Hill, Defendant Moehle "purportedly directed the Companies to remove Daimler from their respective Boards and amend and restate the Fund's Limited Partnership Agreement to remove Daimler from the 'Key Person' provision." *Id.* at ¶ 113.

After Plaintiff Daimler was ousted from Defendant Robotics Hub and Defendant Coal Hill, he learned that Defendant Moehle "had lied about GE's commitment to invest $20,000,000.00 in the Fund." *Id.* at ¶ 114. Plaintiff Daimler subsequently filed his initial Complaint in February 2018. (ECF No. 1). Presently, in his Third Amended Complaint, filed in October 2018, Plaintiff Daimler alleges a claim of fraud in the inducement against each Defendant, and two claims of breach of contract against Defendant Coal Hill. Defendants seek

dismissal of all claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. (ECF No. 34).

## II. Legal standard

In deciding a motion to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6), a court must first "accept all factual allegations as true" and "construe the complaint in the light most favorable to the plaintiff." *Eid v. Thompson*, 740 F.3d 118, 122 (3d Cir. 2014) (internal quotations omitted). The court then must "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Id.* A complaint is sufficient only when it is facially plausible, meaning that the court is able "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). To be plausible on its face, the complaint must contain more than "[t]hreadbare recitals of the elements of a cause of action" and "mere conclusory statements." *Id.* The court need not "accept unsupported conclusions and unwarranted inferences." *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013).

## III. Discussion

A. Fraud in the inducement

Defendants move to dismiss, under Rule 12(b)(6), Counts One, Two, and Five of the Third Amended Complaint, in which Plaintiff Daimler alleges claims of fraud in the inducement against Defendants Moehle, Robotics Hub, and Coal Hill, respectively. (ECF Nos. 33, 34). Defendants seek dismissal with prejudice, arguing that Plaintiff Daimler has now made multiple attempts to sufficiently plead his claims and has failed to do so. (ECF No. 34, at 4).

8

**JA63**

To state a claim for fraud in the inducement under Pennsylvania law,[1] "a plaintiff must plead, with particularity, '(1) [a] representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.'" *Chmil v. Arthrex, Inc.*, 2019 U.S. Dist. LEXIS 31024, at *13 (M.D. Pa. Feb. 27, 2019) (quoting *Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999)).

Additionally, under Federal Rule of Civil Procedure 9(b), a party alleging fraud "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Rule 9(b) goes on to provide, however, that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* To satisfy the heightened pleading standard, and thus survive a motion to dismiss, the plaintiff must "'state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which it is charged.'" *Citizens United Reciprocal Exch. v. Meer*, 321 F. Supp. 3d 479, 486 (D.N.J. 2018) (quoting *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007)). Generally, this means that the plaintiff must "allege the 'essential factual background that would accompany the first paragraph of any newspaper story—that is, the "who, what, when, where and how" of the events at issue,'" *Kayal v. Signal Hill Realty Corp.*, 2018 U.S. Dist. LEXIS 146719, at *7 (D.N.J. Aug. 29, 2018) (quoting *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276–

---

[1] Plaintiff Daimler argues in his Brief that Pennsylvania law should apply to all three of his fraud-in-the-inducement claims. (ECF No. 40, at 19 n.5). Defendants do not dispute this or otherwise offer a response to this argument. Based on this Court's reading of the law of both Pennsylvania and Delaware as to fraud-in-the-inducement claims, it appears that choosing one over the other will not change the outcome of this Motion. Therefore, for simplicity's sake, this Court will apply Pennsylvania law here.

77 (3d Cir. 2006)), or otherwise use an "alternative means of injecting precision and some measure of substantiation into their allegations of fraud," *Northeast Revenue Servs., LLC v. Maps Indeed, Inc.*, 685 Fed. App'x. 96, 102 (3d Cir. 2017) (internal quotations omitted).

Of the above six required elements, Defendants only challenge three: Defendants contend that Plaintiff Daimler failed to plead with particularity a representation, Defendants' knowledge of or recklessness as to the falsity of the representation, and justifiable reliance. (ECF No. 34; ECF No. 35, at 10–14). As such, this Court will only address those three elements at this time.

*i. Representation*

First, Defendants argue that Plaintiff Daimler's fraud claims are not based on an actionable representation. (ECF No. 34, at 2; ECF No. 35, at 16). In order to establish a fraud claim, the representation on which the claim is based must be about a past or existing fact. *SSC Manager, LLC v. Venezia FC 1907 LP*, 2017 U.S. Dist. LEXIS 118294, at *16 (E.D. Pa. July 27, 2017). Opinions or predictions generally are not sufficient, nor are promises to do or refrain from future acts. *Eisen v. Horn*, 2009 U.S. Dist. LEXIS 86598, at *43–44 (W.D. Pa. Sept. 2, 2009); *Bennett v. Itochu Int'l, Inc.*, 682 F. Supp. 2d 469, 479 (E.D. Pa. 2010). Nevertheless, "statements about optimistic future predictions may be actionable if the prediction strays from a general expression of hope and 'fosters a belief in a specific and definite outcome.'" *Coleman v. Sears, Roebuck & Co.*, 319 F. Supp. 2d 544, 551 (W.D. Pa. 2003) (quoting *In re Crown American Realty Trust*, 197 U.S. Dist. LEXIS 14609, at *23 (W.D. Pa. Sept. 15, 1997)). Likewise, a statement of intention, such as a promise to do a certain act, "may constitute a fraudulent misrepresentation of fact" if the statement was false at the time it was uttered. *Bennett*, 682 F. Supp. 2d at 479. At bottom, it is well-established that "'[f]raud consists of anything calculated to deceive, whether by single act or combination, or by suppression of truth,

10

**JA65**

or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture.'" *Boardakan Rest. LLC v. Gordon Grp. Holdings, LLC*, 2016 U.S. Dist. LEXIS 147298, at *40–41 (E.D. Pa. Oct. 21, 2016) (quoting *Delahanty v. First Pennsylvania Bank, N.A.*, 464 A.2d 1243, 1252 (Pa. Super. Ct. 1983)).

Here, Plaintiff Daimler's fraud claims are based on Defendant Moehle's statement that GE had committed to invest $20,000,000.00 in the Fund.  (ECF No. 33, at ¶¶ 116, 122, 140). Defendants argue that Defendant Moehle's statements about GE's commitment are promissory and relate to a future, contingent event, and are therefore not actionable as fraud.  (ECF No. 35, at 12–13).  However, to focus solely on the nature of GE's purported intentions is too narrow a view.  The issue is not whether GE's commitment constituted a promise to engage in a future act, because GE is not the speaker alleged to have made a fraudulent misrepresentation; the issue is the nature of Defendant Moehle's statements regarding the *existence* of GE's commitment. Additionally, to the extent that Defendant Moehle's statements about what a third party will do constitute a prediction, Plaintiff Daimler's allegations surrounding the timing and manner of Defendant Moehle's statements take Defendant Moehle's statements from a "general expression of hope" to a prediction that "fosters a belief in a specific and definite outcome." *See Coleman*, 319 F. Supp. 2d at 551.  Plaintiff Daimler alleges that Defendant Moehle stated GE's commitment on at least twenty-one occasions, often in the presence of investors or potential investors, and that Defendant Moehle readily explained away apparent conditions precedent as "merely something that affected the timing of funding," not the eventuality or likelihood of fund. (ECF No. 33, at ¶¶ 20–26, 32).  Accordingly, Plaintiff Daimler sufficiently pleads a statement about a past or existing fact, that is, an actionable representation.

   *ii. Knowledge of or recklessness as to falsity*

11

**JA66**

The next element that Defendants challenge is whether Plaintiff Daimler pleads facts sufficient to show that the representation was "made falsely, with knowledge of its falsity or recklessness as to whether it is true or false." (ECF No. 34, at 2; ECF No. 35, at 14); *Chmil*, 2019 U.S. Dist. LEXIS 31024, at *13. In interpreting Rule 9(b)'s requirements for pleading fraud claims, the Third Circuit has held, "It is not enough for plaintiffs to allege generally that defendants 'knew or recklessly disregarded each of the false and misleading statements for which [they were] sued,'" but rather, "plaintiffs must allege facts that could give rise to a 'strong' inference of scienter." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1422 (3d Cir. 1997). After all, Rule 9(b) "is based on a need to provide a defendant with fair notice of the basis of a plaintiff's claim so as to protect a defendant's reputation from groundless accusations of fraud and to prevent strike suits brought for settlement value." *N. Am. Communs., Inc. v. InfoPrint Solutions Co., LLC*, 817 F. Supp. 2d 642, 650 (W.D. Pa. 2011). The plaintiff is thus "required to reveal the specified information within his control"; however, Rule 9(b) is relaxed "when the plaintiff is not likely to have access to more specific information until after discovery because the information is exclusively within defendant's knowledge." *Id.* (internal quotations omitted).

Accordingly, in this Court's previous Memorandum Opinion on Defendants' Motion to Dismiss the First Amended Complaint, the Court noted that Plaintiff Daimler "[did] not specify dates, location(s), or the manner/medium (in person, by telephone, in writing, etc.) the representations were made," nor did "he provide any context to the allegation." (ECF No. 22, at 12). The Court asked, "Did Moehle have conversation with representatives of GE? Had GE responded to any outreach? Had GE ever expressed interest in the Companies or the Fund? *Or had Moehle simply lied about it all?*" *Id.* (emphasis added). In his Third Amended Complaint,

12

**JA67**

Plaintiff Daimler alleges the dates, locations, and manner/medium of at least twenty-one different instances in which the alleged misrepresentation was made.  (ECF No. 33, at ¶¶ 20–26, 32).  Plaintiff Daimler then alleges that after he was ousted, he "came to understand that, among other things, *Moehle had lied about GE's commitment*."  (ECF No. 33, at ¶ 114) (emphasis added).  Consequently, Plaintiff Daimler has stated with specificity the information within his knowledge and control, and Defendants have been placed on sufficient notice regarding what Defendant Moehle is accused of saying, to whom he said it, where and when he said it, and that he is accused of lying about it all.  Plaintiff Daimler has therefore satisfied the requirements of Rule 9(b), and the questions posed by the Court in its previous Memorandum Opinion, as to the scienter element of his fraud claims.

### iii. Justifiable reliance

Lastly, Defendants argue that Plaintiff Daimler has failed to plausibly allege that his reliance upon Defendant Moehle's representation was justifiable.  (ECF No. 34, at 3; ECF No. 35, at 18).  Under Pennsylvania law, for reliance upon another's representation to be justifiable, it must be reasonable.  *Porreco v. Porreco*, 811 A.2d 566, 571 (Pa. 2002).  A reviewing court thus will consider whether the recipient of the alleged misrepresentation "knew or should have known that the information supplied was false."  *Fort Wash. Res., Inc. v. Tannen*, 858 F. Supp. 455, 460 (E.D. Pa. 1994) (citing *Scaife Co. v. Rockwell-Standard Corp.*, 446 A.2d 280, 286–88 (Pa. 1971)).  However, the law does not impose "a duty to investigate the falsity of the misrepresentations," because "a party who engages in intentional fraud should be made to answer to the party he defrauded, even if the latter was less than diligent in protecting himself in the conduct of his affairs."  *Toy v. Metro. Life Ins. Co.*, 928 A.2d 186, 207 (Pa. 2007).

13

**JA68**

Additionally, courts consider factors such as the relationship of the parties, the degree of the parties' sophistication, the nature of the transaction, and the history of the parties' negotiations in determining whether the plaintiff's reliance was reasonable. *See Fort Wash. Res., Inc.*, 858 F. Supp. at 460; *Huu Nam Tran v. Metro. Life Ins. Co.*, 408 F.3d 130, 135 (3d Cir. 2005). In the same vein, where the parties have unequal access to information, a party may be justified in relying on the representations of the other if the other is "believed to possess superior information." *Fort Wash. Res., Inc.*, 858 F. Supp. at 460 (citing *Siskin v. Cohen*, 70 A.2d 293, 295 (Pa. 1950)).

Here, Plaintiff Daimler alleges that Defendant Moehle "repeatedly and continuously" represented that GE had committed to invest $20,000,000.00 in the Fund, and that this representation was made not just to Plaintiff Daimler, but also in meetings with investors and potential investors. (ECF No. 33, at ¶¶ 20–26, 32, 114). Plaintiff Daimler alleges, plausibly, that he "never imagined that Moehle would lie to potential investors (or to Daimler)." *Id.* at ¶ 34. Plaintiff Daimler also alleges that Defendant Moehle provided an explanation for why GE's money was not yet in hand, and that when Plaintiff Daimler asked for updates on the timing of GE's funding, Defendant Moehle's explanation "remained consistent." *Id.* at ¶¶ 22, 33. Accordingly, the circumstances under which Defendant Moehle represented the status of a significant investment do not appear to be the kind that raise red flags, such that Plaintiff Daimler "should have known" that Defendant Moehle was lying.

Furthermore, Plaintiff Daimler pleads facts surrounding the nature of his business relationship with Defendant Moehle, including that Defendant Moehle often expressed a "desire to maintain control of the relationships he cultivated," *id.* at ¶ 27, and that over time, Defendant Moehle "became increasingly controlling over access to information about the Fund's investors

14

and portfolio companies," *id.* at ¶ 79.  In short, Plaintiff Daimler pleads facts showing that the

nature of his relationship with Defendant Moehle was such that Defendant Moehle had greater

access to relevant investment information.  Defendants argue that Plaintiff Daimler, as "a self-

claimed experienced venture capitalist," should have engaged in further inquiry to determine the

veracity of Defendant Moehle's representations.  (ECF No. 34, at 3).  However, to require what

Defendants ask would be tantamount to imposing a duty to investigate, contrary to current case

law.  It may well be that Plaintiff Daimler was "less than diligent," but that will not excuse

intentional fraud.

In sum, Plaintiff Daimler has sufficiently pleaded that his reliance on Defendant

Moehle's representations was justifiable.

Having determined that Plaintiff Daimler sufficiently pleaded the three challenged

elements of his three fraud-in-the-inducement claims, found in Counts One, Two, and Five of the

Third Amended Complaint, the Motion to Dismiss as to those Counts will be denied.

B. Breach of contract

Defendants also move to dismiss Counts Three and Four of the Third Amended

Complaint, in which Plaintiff Daimler alleges two different breach of contract claims against

Defendant Coal Hill.  (ECF Nos. 33, 34).  Defendants seek dismissal with prejudice of these

claims as well, arguing that Plaintiff Daimler has had multiple opportunities to amend and has

repeatedly failed to state a claim.  (ECF No. 34, at 4).

In order to sufficiently plead a claim for breach of contract under Pennsylvania law, a

plaintiff must allege facts showing "(1) the existence of a contract, including its essential terms,

(2) a breach of a duty imposed by the contract, and (3) resultant damages."  *Haywood v. Univ. of*

15

**JA70**

*Pittsburgh*, 976 F. Supp. 2d 606, 625 (W.D. Pa. 2013). To establish the first element, the

existence of an enforceable contract, the plaintiff must allege that (1) "both parties manifested an

intention to be bound by the agreement," (2) "the terms of the agreement are sufficiently

definite," and (3) there was consideration. *Blair v. Scott Specialty Gases*, 283 F.3d 595, 603 (3d

Cir. 2002). If the claim is based on an oral contract, the court must "assess the parties' conduct

*in light of the surrounding circumstances* to determine the existence of an oral contract,

including its terms." *CPG Int'l LLC v. Shelter Prods.*, 2017 U.S. Dist. LEXIS 15037, at *13

(M.D. Pa. Feb. 3, 2017).

As to the second element, the terms of the agreement "'are reasonably certain if they

provide a basis for determining the existence of a breach and for giving an appropriate remedy.'"

*Ecore Int'l, Inc. v. Downey*, 343 F. Supp. 3d 459, 489 (E.D. Pa. 2018) (quoting Restatement

(Second) of Contracts § 33 (1981)). Accordingly, in order to pass muster under Rule 12(b)(6),

"a complaint must identify the portions of the contract that were allegedly breached." *Churchill*

*Downs, Inc. v. NLR Entm't, LLC*, 2015 U.S. Dist. LEXIS 135334, at *9 (D.N.J. Oct. 5, 2015).

However, the plaintiff does not need to state every term of the contract in complete detail; the

plaintiff only needs to specifically plead each of the aforementioned elements of the claim.

*Quantum Communs., Ltd. v. Eagle Forum*, 2018 U.S. Dist. LEXIS 133647, at *21 (M.D. Pa.

Aug. 8, 2018).

*i. Count Three—failure to issue additional common units*

In Count Three of the Third Amended Complaint, Plaintiff Daimler alleges that under the

relevant Operating Agreement, Defendant Coal Hill "is required to issue units in connection with

members' additional capital contributions." (ECF No. 33, at ¶ 129). Plaintiff Daimler alleges

that he made financial contributions to Defendant Coal Hill totaling more than $200,000.00; that

16

**JA71**

he and Defendant Moehle, as the sole Board members, agreed that the contributions would be treated as capital contributions under the Operating Agreement; and that Plaintiff Daimler did not receive additional units in connection with the capital contributions. *Id.* at ¶¶ 89–91, 94. Plaintiff Daimler previously alleged this claim in his First Amended Complaint, (ECF No. 4, ¶¶ 169–75), and this Court held, in its Memorandum Opinion on Defendants' prior Motion to Dismiss, that although the claim was "thinly pled," it survived Defendants' Motion to Dismiss, (ECF No. 22, at 18).

Defendants argue here that new facts pleaded in the Third Amended Complaint render Count Three implausible and that the Court should revisit the sufficiency of this claim. (ECF No. 35, at 20). Namely, Defendants contend that Defendant Moehle's alleged agreement to issue additional units—which would give Plaintiff Daimler a majority share in Defendant Coal Hill— is incongruous with Defendant Moehle "taking steps to gain sole control" of the companies. *Id.* at 22. Plaintiff Daimler counters by noting that if Defendant Moehle is "the type to lie about a $20 million GE investment, it does not strain credulity to conclude that he is also the type to make agreements, and later breach them without concern." (ECF No. 40, at 18). The pleading standard under Rule 12(b)(6) is that a plaintiff's claims must be plausible, not probable. As noted above, a court need only "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Eid v. Thompson*, 740 F.3d 118, 122 (3d Cir. 2014). Accordingly, the Court finds that Defendants' argument goes to the probability of Plaintiff Daimler's success on the merits of his claim, and does not affect the Court's analysis of Count Three at this juncture. Therefore, the Motion to Dismiss as to Count Three will be denied.

*ii. Count Four—failure to pay accrued compensation*

**JA72**

As to Count Four, Plaintiff Daimler brings a new breach of contract claim, in which he alleges that Defendant Coal Hill failed to compensate him for services provided throughout 2015 and 2016. (ECF No. 33, at ¶¶ 133–38). Defendants argue that Plaintiff Daimler fails to state a claim because he does not plead facts regarding when the parties entered the agreement, what services were the subject of the agreement, the agreed-upon rate, and what services Plaintiff Daimler actually provided. (ECF No. 35, at 24).

As stated above, a plaintiff must specifically plead each element of a breach of contract claim, which includes pleading the essential terms of the contract that are alleged to have been breached. *Quantum Communs., Ltd.*, 2018 U.S. Dist. LEXIS 133647, at *21; *Haywood*, 976 F. Supp. 2d at 625. In the employment contract context, the rate of compensation is an essential term of the contract. *See Param Techs., Inc. v. Intelligent Home Solutions, Inc.*, 2005 U.S. Dist. LEXIS 18097, at *11 (E.D. Pa. Aug. 25, 2005). Here, Plaintiff Daimler alleges that he and Defendant Moehle, the sole Board members for Defendant Coal Hill, agreed that compensation for Plaintiff Daimler's part-time work for the companies would accrue and then be paid at a later date. (ECF No. 33, at ¶ 50). However, Plaintiff Daimler fails to allege the rate of compensation, or any facts regarding the mechanism by which the parties were to determine compensation, that he and Defendant Moehle agreed upon. Therefore, the Motion to Dismiss as to Count Four will be granted. However, because this is the first time Plaintiff Daimler has alleged this particular breach of contract claim, he is allowed leave to amend at to Count Four.

**IV. Conclusion**

THEREFORE, based on the foregoing, Defendants' Motion to Dismiss is hereby DENIED as to Counts One, Two, Three, and Five, and is GRANTED as to Count Four. Plaintiff

18

**JA73**

Daimler shall have twenty days from the date of this Order to amend the Third Amended

Complaint as to Count Four.

IT IS SO ORDERED.

DATE _June 10, 2019_

Marilyn J. Horan
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ERIC DAIMLER,                                    )
                                                 )
                    Plaintiff,                   )
                                                 )        Civil Action No. 18-165
          v.                                     )
                                                 )        Hon. Nora Barry Fischer
CHRIS MOEHLE, ROBOTICS HUB                       )
FUND 1, LLC and COAL HILL                        )
VENTURES LLC                                     )
                                                 )
                    Defendants.                  )

## <u>ORDER</u>

**AND NOW**, this 27th day of July, 2018, upon consideration of Defendants' Motion to Dismiss (Docket No. [16]) and all filings of record related thereto,

**IT IS HEREBY ORDERED**, for the reasons stated in the accompanying Memorandum Opinion, that said motion is **GRANTED IN PART AND DENIED IN PART**:

1.     The motion is <u>GRANTED</u> as to Counts One, Two, Three, Four, Five, Six, Eight, Nine, Ten, Eleven, Twelve, Fourteen, Fifteen, Sixteen, Seventeen, and Eighteen of Plaintiff's First Amended Complaint.  Counts One, Nine, and Fourteen are dismissed with leave to re-plead the allegations regarding GE's potential investment.

2.     As to Counts Seven and Thirteen, the motion is <u>GRANTED</u> insofar as the claims relate to allegations regarding Moehle's relationships with NREC and RI and the statements that the Daimler and Moehle Awards were identical.  The motion is <u>DENIED</u> as to Counts Seven and Thirteen, insofar as those counts relate to Plaintiff's alleged capital contributions.

3.      Plaintiff shall file a Second Amended Complaint in accordance with this Order

and the accompanying Memorandum Opinion on or before **August 24, 2018**.  Defendants'

Response to the Second Amended Complaint shall be due on or before **September 21, 2018**.


                         *s/ Nora Barry Fischer*
                         Nora Barry Fischer
                         United States District Judge


Date:    July 27, 2018

cc/ecf: All counsel of record

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ERIC DAIMLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 18-165 |
| v. | ) | |
| | ) | Hon. Nora Barry Fischer |
| CHRIS MOEHLE, ROBOTICS HUB | ) | |
| FUND 1, LLC and COAL HILL | ) | |
| VENTURES LLC | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Plaintiff Eric Daimler ("Plaintiff" or "Daimler") brought this action alleging that Defendants Chris Moehle ("Moehle"), Robotics Hub Fund 1 LLC ("Robotics Hub"), and Coal Hill Ventures LLC ("Coal Hill") (Robotics Hub and Coal Hill, together, the "Companies") made intentional misrepresentations to Daimler intended to induce him into entering a business partnership with Moehle, which included merging their existing companies and creating new ones. (First Amended Complaint, Docket No. 4 at ¶ 1). He further alleges that the Defendants then forced Daimler out of these companies by preventing him from satisfying conditions precedent to a common unit vesting schedule, resulting in the forfeiture of all of his common units in the Companies. (*Id*. at ¶ 2). In short, Daimler claims that Defendants wrongly forced Daimler out of companies that he helped to create and build. Defendants now move to dismiss Daimler's complaint on the grounds that it fails to state a claim upon which relief may be granted.

The Court has reviewed the Brief in Support of Defendants' Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6) (Docket No. 17), the Memorandum of Law in Opposition to Defendants' Motion to Dismiss the First Amended Complaint (Docket No. 19), and the Reply Brief in Support of Defendants' Motion to Dismiss Under FRCP 12(b)(6) (Docket No. 20). For

the reasons set forth below, Defendants' motion to dismiss (Docket No. [16]) is GRANTED IN PART AND DENIED IN PART.

## I.    <u>STATEMENT OF FACTS</u>

Sometime in 2015, Daimler and Moehle, each of whom operated his own robotics and/or venture finance company, formed a partnership in order to invest in high-growth-potential, early-stage robotics companies. (Docket No. 4 at ¶¶ 10-11).  The two agreed to create an equal partnership by combining Moehle's company, Skilled Science, with Daimler's company, Coal Hill; they also created two new entities, Robotics Hub and Robotics Hub Fund 1 LP (the "Fund"). (*Id.* at ¶¶ at 11-12).  Daimler and Moehle amended and restated Coal Hill's operating agreement to reflect Daimler's and Moehle's equal partnership, began working together on marketing strategies, and merged "expenses accrued through the funding of Skilled Science into the fundraising expenses of Robotics Hub." (*Id.* at ¶ 14).

Before beginning the partnership, Moehle told Daimer that General Electric ("GE") would invest $20 million in the Fund and that he had strong relationships with the National Robotics Engineering Center ("NREC") and the Robotics Institute ("RI"), both of which would create investment opportunities for their venture.  (Docket No. 4 at ¶¶ 15-16).  By early 2016, however, Daimler learned that Moehle had misrepresented his relationships with NREC and RI.  (*Id.* at ¶ 18).  Nevertheless, throughout 2016, Moehle continued to represent that GE would be investing $20 million.  (*Id.* at ¶ 19).

In January 2016, the Obama White House appointed Daimler as a Presidential Innovation fellow.  (Docket No. 4 at ¶ 29).  Daimler, with Moehle's encouragement, accepted the year-long fellowship.  (*Id.* at ¶¶ 30-31).  During the fellowship, Daimler advised the White House on robotics and artificial intelligence, and the fellowship generated positive press coverage for Daimler and

Robotics Hub.  (*Id.* at ¶¶ 32-33).  During the course of the fellowship, Daimler provided unspecified services to the Companies but did not receive any compensation.  (*Id.* at ¶ 34).  Daimler and Moehle agreed that Daimler would be paid at a later date.  (*Id.*)

During public relations and fundraising efforts, as well as joint presentations to potential investors, the Companies and the Fund promoted Daimler and Moehle as equal partners.  (Docket No. 4 at ¶¶ 25-26).  Both were also designated as "key persons" in the Fund's Limited Partnership Agreement.[1]  (*Id.* at ¶ 24).

In the spring of 2016, Daimler and Moehle retained Reed Smith LLP to prepare the formation and governing documents, including the Companies' Amended and Restated Operating Agreements and Common Unit Award Agreements.  (Docket No. 4 at ¶ 36).  Moehle was the main point of contact for the law firm.  (*Id.* at ¶ 37).  The Companies' Amended and Restated Operating Agreements and Coal Hill's and Robotics Hub's Common Unit Award Agreements with both Moehle and Daimler are attached to the complaint as exhibits, (Docket Nos. 4-1 through 4-6), and the Court has considered and relied upon each in deciding this motion.[2]  *See, e.g.*, *Lum v. Bank of America*, 361 F.3d 217, 222 (3d Cir. 2004) (in resolving Rule 12(b)(6) motions, "courts generally consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim") (*citing In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)).

Insofar as relevant here, the Amended and Restated Operating Agreements, both dated March 23, 2016,[3] noted that Daimler and Moehle were members of the Companies, and they

---

[1]        That limited partnership agreement was not attached to the complaint.

[2]        The Court has not relied upon the IRS form submitted by Defendants and therefore does not address Defendants' argument that the document is one that may be considered in this motion to dismiss.  (Docket No. 17 at 12, n.6).

[3]        As noted above, the Amended and Restated Operating Agreements are attached as exhibits to the Complaint, and citations to each in this opinion are made to the assigned docket numbers, Docket No. 4-5 for the Robotics Hub

appointed the two as managers and board members.  (Docket Nos. 4-5 and 4-6 at ¶¶ 5.2).  The

boards of each company were authorized to manage, control and operate each company and had:

> the full and complete power, authority, and discretion for, on behalf
> of and in the name of the Company, to take such action as it may in
> its sole discretion deem necessary or advisable to carry out any and
> all of the objectives and purposes of the Company, subject only to
> [the Operating Agreement and applicable law.]

(Docket Nos. 4-5 and 4-6 at ¶ 5.1).  Each Manager on the board had one vote on matters submitted

to the board, and, in the event of a tie vote, the board would refer the matter to a Deadlock

Arbitrator whose decision would be "final and binding on the Company, the board and the

Members."  (Docket Nos. 4-5 and 4-6 at ¶ 5.5(c)).  Managers were not entitled to receive

compensation for their duties as a manager, nor did the Operating Agreements "confer upon any

Manager any rights with respect to continued employment by the Company."  (Docket Nos. 4-5

and 4-6 at ¶ 5.7).  The Agreements specifically provided, "[N]othing herein should be construed

to have created any employment agreement with any Manager."  (*Id.*)  Officers, however, were

entitled to compensation as determined by the board.  (*Id.* at ¶ 6.10).  The Agreements noted that

neither Moehle nor Daimler had made any capital contributions, and the Agreements provided that

neither would be required to make additional capital contributions.  (*Id.* at ¶ 7.2 ).  If additional

capital contributions were made, those contributions could be made only "with the consent of the

Board and in connection with an issuance of Units."  (*Id.* at ¶ 7.2).  Loans by any member were

not to be considered capital contributions under the Agreements.  (*Id.* at ¶ 7.6).  The holders of a

majority of common units were authorized to determine the size of the boards and the identity of

---

Agreement and Docket No. 4-6 for the Coal Hill Agreement.  The Amended and Restated Operating Agreements are
collectively referred to herein as the "Agreements."  Robotics Hub was created as a Delaware Limited Liability
Company, (Docket No. 4-5 at 7), and Coal Hill was formed as a Pennsylvania limited liability company (Docket No.
4-6 at 7). Robotics Hub was formed on February 17, 2016, and its original Operating Agreement was dated March 11,
2016.  (Docket No. 4-5 at 7).  Coal Hill was formed under Pennsylvania law on April 27, 2015, and its original
Operating Agreement was dated the same day.  (Docket No. 4-6 at 7).  Neither of the original Operating Agreements
are attached to the complaint or otherwise referenced in it.

the members serving the boards.  (Docket Nos. 4-5 and 4-6 at ¶¶ 5.2, 5.3).  Exhibit A to the Operating Agreements noted that both Daimler and Moehle each had 42 common units in each of the Companies, "which may be subject to vesting, pursuant to a restricted unit award agreement." (Docket No. 4-5 at 39; Docket No. 4-6 at 40).

The same day that the Operating Agreements were signed, each Company granted each of Daimler and Moehle the 42 common units referenced above.[4]  (Docket Nos. 4-1, 4-2. 4-3, and 4-4).  The units vested over time.  Moehle's units vested as follows:

▪20% vests on the first anniversary of the Date of the Award;

▪1.6666% vests ratably on the last day of each month thereafter until the fifth anniversary of the Date of the Award.

(Docket No. 4 at ¶ 38; Docket Nos. 4-1 and 4-2 at 2).  In addition, Moehle's units vested only if Moehle was providing Full Time Services to a combination of the Companies, the Fund and the investment manager of the Fund on the Vesting Date.[5]  (Docket Nos. 4-1 at 3, ¶ 2(a); 4-2 at 3, ¶ 2(a)).  If Moehle stopped working full time, he would forfeit any unvested units.  (Docket Nos. 4-1 and 4-2 at 4, ¶ 2(b)).

Daimler's units, however, vested pursuant to a different schedule.  According to the Summaries contained on the first page of the Daimler Awards, 20% of Daimler's units would vest on the date that he had provided twelve consecutive and uninterrupted months of Full Time

---

[4]    The Common Unit Award Agreement awarding Moehle units in Robotics Hub is found at, and is referenced herein as, Docket No. 4-1. The Common Unit Award Agreement awarding Moehle units in Coal Hill is referenced as Docket No. 4-2.  The Court refers to those together as the "Moehle Awards." The Common Unit Award Agreement awarding Daimler units in Robotics Hub is at Docket No. 4-3, and the Common Unit Award Agreement awarding Daimler units in Coal Hill is at Docket No. 4-4.  Docket Nos. 4-3 and 4-4 are collectively referred to herein as the "Daimler Awards." The Court refers to both the Daimler Awards and the Moehle Awards together as the "Awards."

[5]    The Awards define "Full Time Service" to mean that the grantee "was employed by or otherwise providing greater than 95% of his professional activities, as determined in the the sole discretion of the Board . . . to a combination of the Compan[ies], the Fund and the investment manager of the Fund . . . on the applicable Vesting Date."  (Docket Nos. 4-1, 4-2, 4-3, and 4-4 at ¶ 2(a)).

Services, provided that those services began within one year of the Award.  (Docket Nos. 4-3 and 4-4 at 2).  If Daimler met those conditions, the remaining 80% of the units would vest on a *pro-rata* basis on the last day of each month thereafter until the fifth anniversary of the award.  (*Id.*)  Like the Moehle Awards, the Daimler Awards stated that, if he stopped providing Full Time Services, he would forfeit any unvested units.  (Docket No. 4-3 at ¶ 2(b) Docket No. 4-4 at ¶ 2(b)).

Each of the four award agreements otherwise appear to contain identical language, which includes a paragraph addressing employment rights.  Of note, paragraph 10 of each award, entitled "**<u>No Employment Rights</u>**," provides:

> The grant of this Award shall not confer upon the Grantee any right to be retained by or in the employ or service of the Company and shall not interfere in any way with the right of the Company to terminate the Grantee's employment or service at any time.  The right of the Company, as applicable, to terminate at will the Grantee's employment or service at any time for any reason is specifically reserved.

(Docket Nos. 4-1, 4-2, 4-3, and 4-4 at ¶ 10) (underline and bold in original).

Over the course of the partnership, Daimler provided the Companies with financial support.  For example, he loaned $125,000 to the Companies pursuant to a promissory note, which has since been repaid with interest.  (Docket No. 4 at ¶¶ 27-28).  He advanced personal funds to cover unspecified corporate expenses – including $30,000 between May and August 2016 – and has been reimbursed $35,000.  (*Id.* at ¶ 27, 28, 65, and 68).  He also provided $100,000 capital contributions to Robotics Hub and Coal Hill but did not receive units in return, even though he and Moehle (the only two members of the board) had agreed that he would.[6]  (*Id.* at ¶¶ 67, 135, 174).  Moehle, on

---

[6]    The Court does not consider the allegations made in Plaintiff's opposition brief that, "[u]pon further review," he determined that he had advanced in excess of $160,000 for expenses.  (Docket No. 19 at 4, n.1).  *Commonwealth of Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss') (citations and internal quotation marks omitted).  This 'amendment' is, in any event, far from clear and does not specify whether the additional advances were intended as loans or capital contributions and included in the breach of contract claims relating to ¶ 7.2 of the Agreements and discussed *infra*.

the other hand, contributed only $1,000 in capital.  (*Id*. at ¶ 27).  The complaint does not state

whether Moehle received units in return for his capital contribution.

In early to mid-2016, Daimler's and Moehle's relationship began to deteriorate.  (Docket

No. 4 at ¶ 59).  Moehle became critical of Daimler and refused to share information or consult

with him.  (*Id*. at ¶¶ 59-69).  By mid to late-2016, Moehle began taking steps "to gain sole control

of the Companies."  (*Id*. at ¶ 70).  Moehle "thwarted" Daimler's efforts to arrange meetings,

refused Daimler's help with the Fund's first closing, and "actively obstructed Daimler's efforts to

communicate with the Fund's investors and portfolio managers."  (*Id*. at ¶¶ 71-75).  Moehle also

assigned work to Daimler, which Daimler performed, and then claimed that the work was not

necessary and accused Daimler of having failed to complete the work.  (*Id*. at ¶ 73).  All the while,

at least until November 2016, Moehle told investors that he and Daimler were equal partners.  (*Id*.

at ¶ 77).

In January 2017, Daimler and Moehle met to discuss Daimler's full-time role with the

Companies.  (Docket No. 4 at ¶ 78).  However, on or about January 5, 2017, as Daimler's

fellowship was ending, Moehle recommended to the Companies' boards that Daimler not be

permitted to work full-time with the Companies, purportedly because the Companies could not

afford to pay Daimler.  (*Id*. at ¶¶ 79, 80).  Because Daimler and Moehle were the only two board

members, the board was deadlocked on the issue and, pursuant to the Operating Agreements, the

matter was referred to the Deadlock Arbitrator.  (*Id*. at ¶¶ 81, 82).  On March 22, 2017, the

Deadlock Arbitrator voted against Daimler.  (*Id*. at ¶ 84).  As such, Daimler did not provide full

time services to the Companies before the first anniversary of his Awards, and he forfeited the 42

unvested units he had been issued pursuant to the Daimler Awards.  (*Id*. at ¶¶ 85-87).  Moehle then

became the majority member of the Companies and removed Daimler from the boards.  (*Id*. at ¶¶ 88).

## II.    DISCUSSION

### A.    The Legal Standard

When reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must "'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Eid v. Thompson*, 740 F.3d 118, 122 (3d Cir. 2014) (quoting *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). To survive a Rule 12(b)(6) challenge, a plaintiff's "'[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *Id*. (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007).  "Thus, 'only a complaint that states a plausible claim for relief survives a motion to dismiss.'" *Id*. (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

Although the Court must accept the allegations in the complaint as true, "'[it is] not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation.'"  *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (quoting *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (*citing Twombly*, 550 U.S. at 555).  Instead, the plaintiff must plead facts which permit the court to make a reasonable inference that the defendant is liable.  Iqbal, 556 U.S. at 678; *Twombly*, 550 U.S. at 556–57.

Consistent with these principles, the Third Circuit Court of Appeals has prescribed a three-step analysis for purposes of determining whether a claim is plausible. First, the court should

"outline the elements a plaintiff must plead to a state a claim for relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012).  Second, the court should "peel away" legal conclusions that are not entitled to the assumption of truth.  *Id.; see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").  Third, the court should assume the veracity of all well-pled factual allegations and then "'determine whether they plausibly give rise to an entitlement to relief.'" *Bistrian*, 696 F.3d at 365 (quoting *Iqbal*, 556 U.S. at 679).  This third step of the analysis is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id*. (quoting *Iqbal*, 556 U.S. at 679).

**B.     Fraud in the Inducement
        (Counts 1, 9, and 14)**

Plaintiff asserts three "fraud in the inducement claims," one against each of Moehle, Robotics Hub, and Coal Hill.  He has also identified three representations that he alleges misled him and induced him to enter into a business relationship with Moehle:  (1) the representations about Moehle's relationships with NREC and RI; (2) the representations about GE's $20 million investment; and (3) the representations about the Moehle Awards being identical to the Daimler Awards.  Specifically, Daimler asserts that Moehle's misrepresentations, upon which he justifiably relied, induced him to sign both the Daimler Awards and the Agreements.  (Docket No. 4 at ¶¶ 95, 146, 181).  None of these theories survive Defendants' motion to dismiss, but this Court will grant leave to re-plead the claim arising from the alleged misrepresentations about GE's investment.

Under Pennsylvania law, which governs the Coal Hill Agreements, the elements of fraud in the inducement are:  (1) a representation; (2) which is material to the transaction; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation;

and (6) injury proximately caused by the reliance. *McWreath v. Range Resources – Appalachia, LLC*, 81 F. Supp. 3d 448, 470 (W.D. Pa. 2015) (Fischer, J.), *aff'd* 645 Fed. App'x 190 (3d Cir. 2016). *See also Batoff v. Charbonneau*, 130 F. Supp. 3d 957, 969 (E.D. Pa. 2015) ("Fraud in the inducement is found where 'an opposing party made false representations that induced the complaining party to agree to the contract."). *Id.* Similarly, under Delaware law, which governs the Robotic Hub Agreements, a plaintiff alleging fraud in the inducement must plead: "(1) a false representation, usually one of fact, made by the defendant; (2) the Defendants' knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance."[7] *In re Med. Wind Down Holdings III, Inc*., 332 B.R. 98, 102 (Bankr. D. Del. 2005) (citing *Stephenson v. Capano Dev., Inc.,* 462 A.2d 1069, 1074 (Del.1983)). Under both Delaware and Pennsylvania law, fraud in the inducement renders a contract voidable, and a victim of this fraud may either rescind the contract or affirm it and sue for damages. *Connors v. Fawn Mining Corp*., 30 F.3d 483, 490 (3d Cir. 1994); *McWreath*, 81 F. Supp. 3d at 470; *Lincoln Nat. Life Ins. Co. v. Joseph Schlanger 2006 Ins. Trust*, 28 A.3d 436, 441 (Del. 2011). *See also Langley v. Fed. Deposit Ins. Corp*., 484 U.S. 86, 87 (1987) (noting that fraud in the inducement rendered a disputed note "voidable but not void"); Restatement (Second) of Contracts § 164 (1981). Here, Plaintiff has not sought rescission of the contracts at issue.

The first set of alleged misrepresentations, those regarding Moehle's relationships with the NREC and RI, cannot serve as the basis of a fraudulent inducement claim because Plaintiff admits

---

[7]    Although the parties agree that the Coal Hill Agreements are governed by Delaware law and that the Robotics Hub Agreements are governed by Pennsylvania law (Docket No. 17 at 4, n.3; Docket No. 19 at 9, n.3), Daimler asserts that Pennsylvania law should govern his fraud claims (Docket No. 19 at 21, n.8). The Court need not address this dispute because it does not affect the outcome of the motion to dismiss.

that, "during 2015 and early 2016, Daimler came to learn that Moehle misrepresented and overstated the strength of his relationships" with those entities. (Docket No. 4 at ¶ 18). Daimler therefore cannot argue that he justifiably relied to his detriment on those statements which he knew were false (or suspected them to be) when agreeing to form the companies and executing the agreements at issue.[8] *See, e.g., Dunkin' Donuts Franchised Rests., LLC v. Claudia I, LLC*, 998 F. Supp. 2d 383, 389 (E.D. Pa. 2014) ("A person who believes that a representation is false cannot seriously say they reasonably relied on the representation") (citing *In re Thorne's Estate,* 344 Pa. 503, 25 A.2d 811, 816 (1942) ("A person . . . who acquiesces in a proposal which he believes to be wrongful and disadvantageous deprives himself of the plea of fraud when later he finds that he has been hurt.")).

The second set of alleged misrepresentations, the statements about GE's future investment, likewise cannot form the basis of a fraudulent inducement claim because Plaintiff has failed to plead that claim with the particularity required under Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) requires plaintiffs bringing a fraud claim to "plead the who, what, when, where, why, and how: the first paragraph of any newspaper story." *Institutional Inv'rs Grp. v. Avaya, Inc*., 564 F. 3d 242, 253 (3d Cir. 2009). "[P]laintiffs must plead with particularity the circumstances of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Lum v. Bank of America*, 361 F.3d 217, 223-24 (3d Cir. 2004) (citations and internal quotation marks omitted). "Plaintiffs may satisfy this [particularity]

---

[8]      In addition, statements regarding the strength of a relationship, more akin to opinion than to fact, are not the type of misrepresentations upon which a plaintiff may premise a fraud claim. *Lookout Windpower*, 714 F. Supp. 2d at 556 ("Predictions about the future and expressions of opinion cannot support a common law fraud claim.") (*citing Great Lakes Chem. Corp. v. Pharmacia Corp*., 788 A.3d 544, 554 (Del. Ch. 2001); *Metro Communication Corp. BVI v. Advanced Mobilecomm. Techs Inc*., 854 A. 2d 121, 148 (Del. Ch. 2004) ("The law is rightly reluctant to find that mere expressions of opinion about the future can buttress a claim of fraud.").

requirement by pleading the date, place or time of the fraud, or through alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Id.*

Here, Plaintiff alleges that Moehle made the representations about GE both "before their partnership began" and "throughout 2015 and 2016." (Docket No. 4 at ¶¶ 15, 16). He does not, however, provide any more detail. He does not specify dates, location(s), or the manner/medium (in person, by telephone, in writing, *etc.*) the representations were made. Nor does he provide any context to the allegation: Did Moehle have conversations with representatives of GE? Had GE responded to any outreach? Had GE ever expressed interest in the Companies or the Fund? Or had Moehle simply lied about it all? Plaintiff must "allege facts that give rise to an inference that [Moehle] knew or was reckless in not knowing that . . . the statements were misleading," and "[i]t is not enough for [Daimler] to allege generally that defendants "knew or recklessly disregarded each of the false and misleading statements for which they were sued." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1422 (3d Cir. 1997). Rather, Daimler "must allege facts that could give rise to a "strong" inference of scienter." *Id.* (citations and internal quotation marks omitted). Daimler's failure to plead any such facts forecloses his claim of fraud in the inducement arising from these alleged misrepresentations. Although the Court will dismiss the claims of fraudulent inducement based upon this theory, these claims are dismissed with leave to amend. *In re Burlington Coat Factory*, 114 F.3d at 1435 ("Ordinarily where a complaint is dismissed on Rule 9(b) failure to plead with particularity grounds alone, leave to amend is granted."). [9]

---

[9]     Defendants also urge the Court to find that this claim fails because Plaintiff has not alleged a misrepresentation of a past fact. (Docket No. 17 at 14.) Plaintiff's failure to plead fraud with the requisite particularity makes it difficult for the Court to evaluate this argument, and given that the Court has found that Plaintiff's claim fails to meet the requirements of Rule 9(b), the Court need not -- and does not -- resolve this issue. That said, as Defendants argue, in order to successfully plead this claim, "Plaintiff[] must allege a misrepresentation relating to a past or existing fact." *Lookout Windpower*, 714 F. Supp. 2d at 556. *See also supra* n. 8. "A statement as to future plans or intentions will not satisfy the falsity element of fraud unless the speaker knowingly misstates his true state of mind." *Dunkin Donuts*, 998 F. Supp. at 389 (citing *Nat'l Data Payment Sys., Inc. v. Meridian Bank,* 212 F.3d 849, 858 (3d Cir.2000)). Here, Daimler's claims as currently styled are hardly clear. He alleges that GE "would be investing," which may refer

Finally, the claims relating to the assertion that Daimler's and Moehle's awards were identical must fail because Plaintiff cannot allege that he suffered any injury as a result of that misrepresentation. Specifically, Daimler does not allege that he was promised terms different from what the awards actually contained. Instead, he complains that he and Moehle should have had the same terms. (Docket No. 4 at ¶¶ 49, 93, 102, 133, 172, 179, 188). But, regardless whether the terms of Moehle's award mirrored that of Daimler's, or whether Daimler's mirrored those of Moehle's, Plaintiff could not have satisfied the vesting requirements because he had not provided Full Time Services to the Companies by March 23, 2017. (*Compare* the Moehle Awards (Docket Nos. 4-1 and 4-2 at 2, 3 ¶ 2(a)) with the Daimler Awards (Docket Nos. 4-3 and 4-4 at 2)).

### C.  Fraud in the Execution (Counts 2, 10, and 15)

Plaintiff also alleges that the misstatements about the terms of the Awards constitute fraud in the execution. "Fraud in the execution arises when a party executes an agreement with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms." *Red Online Mktg. Grp.*, *LP v. Reviser, Ltd.*, No. 14-1353, 2015 U.S. Dist. LEXIS 11686, at *14 (E.D. Pa. Feb. 2, 2015). Fraud in the execution voids the contract. *Connors v. Fawn Mining Corp.*, 30 F. 3d 483, 490 (3d Cir. 1994) (fraud in the execution renders a contract "void *ab initio*"). *See also Lincoln Nat. Life Ins. Co. v. Joseph Schlanger 2006 Ins. Tr.*, 28 A.3d 436, 441 (Del. 2011).

In addition to the fact that, as set forth above, Plaintiff cannot plausibly allege damages stemming from this alleged misrepresentation, his claim also fails because he has not pled facts

---

to a future, anticipated, event. (Docket No. 4 at ¶¶ 15, 90). However, Daimler also claims that Moehle "vigorously" represented GE's "alleged commitment to invest," a statement that may or may not reflect existing fact. (Docket No. 4 at ¶ 19).

demonstrating excusable neglect. A party claiming fraud in the execution must demonstrate "excusable ignorance of the contents of the writing signed." *Fawn Mining*, 30 F.3d at 491. Daimler, however, does not allege that the contracts' pages were surreptitiously substituted, that there was a significant time pressure that prevented him from reviewing the contracts, or that he was provided only with signature pages. *See Red Online Mktg.*, 2015 U.S. Dist. LEXIS 11686 at *19. Nor does Daimler allege what he thought the terms of the contracts should have been, other than to complain that he thought his awards were identical to Moehle's. In other words, Daimler does not allege that the contracts contained terms different from what was actually there. Rather, and as set forth above, he complains that he thought Moehle had the same deal.

While Daimler argues that he was repeatedly told that the awards were identical, and while he may have thought that the contracts would reflect those discussions, these sentiments simply "did not relieve [Daimler] of the responsibility to read the [agreements] and determine [their] precise contents for [himself] prior to signing [them]." *Red Online Mktg.*, 2015 U.S. Dist. LEXIS 11686, at *16. *Cf. McWreath*, 81 F. Supp. 3d at 471 ("contracting parties are normally bound by their agreements, without regard to whether the terms thereof were read and fully understood."). Plaintiff's citation to *Axalta Coating Systems, LLC v. Midwest II, Inc.*, 217 F. Supp. 3d 813 (E.D. Pa. 2016), for the proposition that the law does not require him to have read the contracts he signed is unavailing. (Docket No. 29 at 23). In that case, the aggrieved party had been presented with redlined documents reflecting that the language he had insisted upon was in the contracts, but the execution copy – which omitted the critical language – had been clandestinely substituted. In other words, that aggrieved party had read the agreement before signing it, but alleged that the counterparty deleted a material term without informing him and re-presented the document without mentioning this edit. *Axalta*, 217 F. Supp. 3d at 816-17, 821, 824. Thus, the court held that

14

**JA90**

aggrieved party was under no obligation to read the document again and had adequately pled facts demonstrating excusable neglect. *Id*. at 824. That, however, is not the case here. Daimler never alleges that he *ever* read the Awards or the Agreements. In sum, Plaintiff has failed to plead any facts that would excuse his failure to read the relevant documents or that otherwise support an allegation of excusable neglect.

      D.    **Breach of Contract and Covenant of Good Faith**
                **(Counts 6, 7, 8, 12, and 13)**

Plaintiff also brings several breach of contract claims. Counts Six and Twelve, against Robotics Hub and Coal Hill respectively, allege that Robotics Hub and Coal Hill breached the terms of the Awards by preventing Daimler from providing full time services. (Docket No. 4 at ¶¶ 125-129, 164-168). Counts Seven and Thirteen allege that Robotics Hub and Coal Hill breached the terms of the Agreements by: (1) misrepresenting the terms of the Awards and wrongly preventing Daimler from working full-time, thereby resulting in the forfeiture of Daimler's unvested units and the loss of his board positions; and (2) failing to issue units in connection with Daimler's capital contributions. (*Id*. at ¶¶ 130-136, 169-175). Count Eight is a claim against Robotics Hub for breach of the Implied Covenant of Good Faith and Fair Dealing and arises from the company having wrongfully prevented Daimler from working full time and thereby satisfying the vesting requirements of his award. (*Id*. at ¶¶ 137-140).

Under both Delaware and Pennsylvania law, a breach of contract claim has three elements: (1) the existence of a contract; (2) a breach of a duty imposed by the contract; and (3) damages resulting from that breach. *Greenstar LLC v. Heller*, 814 F. Supp. 2d 444, 450 (D. Del. 2011); *Rendon v. Ragans*, No. 08-1665, 2009 WL 1514471, at *2 (W.D. Pa. May 29, 2009) (Fischer, J.) (*citing Novinger Group Inc. v. Hartford Insurance, Inc*. 514 F. Supp. 2d 662, 670 (M.D. Pa. 2007)). Daimler has failed to allege a breach of contract related to the Companies' failure to hire him, but

he has pled facts sufficient to establish a breach of ¶ 7.2 of the Operating Agreements for failure to issue him units in connection with his capital contributions.

1.    *The Failure to Employ*

With respect to his claims that he was wrongfully prevented from working full-time, Plaintiff has failed to allege facts reflecting a breach of a duty imposed by the contract.  Although Plaintiff asserts that the parties contemplated his working full-time for the Companies, the contracts state otherwise.  Specifically, both Agreements plainly state that they do not "confer upon any Manager any rights with respect to continued employment by the Company."  (Docket Nos. 4-5 and 4-6 at ¶ 5.7).  Similarly, the Awards provide that Daimler had no "right to be retained by or in the employ or service of the Company" and that the grant of the units could not "interfere in any way with the right of the Company to terminate [Daimler's] employment or service at any time."  (Docket Nos. 4-3, and 4-4 at ¶ 10).  They further provide that the "right of the Company, as applicable, to terminate at will [Daimler's] employment or service at any time for any reason is specifically reserved."  (*Id*.)  Moreover, given Moehle's and Daimler's disagreement, in accordance with ¶ 5.5(c) of the Agreements, the parties called upon the Deadlock Arbitrator to resolve the dispute.  (Docket No. 4 at ¶¶ 82, 84).  The arbitrator – about whom Daimler has made no allegations of wrongful conduct – sided with Moehle.  (*Id*. at ¶ 84).  While Plaintiff may have hoped that he would work for the Companies and that his units would therefore vest, he signed an agreement that clearly and unambiguously provided that he had no such right.  This Court cannot enforce the contract Plaintiff wishes he signed.

The fact that the contracts at issue expressly authorize the complained-of conduct also defeats any claims that Defendants breached the implied covenant of good faith and fair dealing.[10] In order to pursue a claim of breach of the implied covenant, a plaintiff must allege a specific implied contractual obligation, a breach of that obligation, and damages. *Anderson v. Wachovia Mortg. Corp*., 497 F. Supp. 2d 572, 581–82 (D. Del. 2007)*; Kelly v. Blum*, No. 4516-VCP, 2010 WL 629850 (Del. Ch. Feb. 24, 2010). Daimler argues that the contracts implied an obligation to hire him and that the failure to do so constitutes a breach of the covenant of good faith. However, under Delaware law, the implied covenant cannot modify or override express contractual terms. *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010); *Kuroda v. SPJS Holdings, LLC*, 971 A.2d 872, 888 (Del. Ch. 2009). Because the Awards and the Agreements clearly contemplated that Daimler might not work for the Companies, and because they expressly provided that he had no right to employment, Daimler cannot claim a breach of the covenant of good faith based upon the Companies' refusal to employ him. Moreover, the Agreements provided for deadlock arbitration, and the parties availed themselves of this provision. The Deadlock Arbitrator's decision is final and binding. Plaintiff cannot convert his disagreement with the arbitrator's decision into a breach of contract claim against Defendants. Although Daimler undoubtedly regrets entering into these contracts, this Court may not "rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal. Parties have a right to enter into good and bad contracts, the law enforces both." *Nemec*, 991 A.2d at 1126.

---

[10]     According to Daimler, breach of the implied covenant "is asserted only against Robotics Hub under Delaware law (Count Eight), because Pennsylvania law does not recognize this as an independent claim." (Docket No. 19 at 15 n. 6).

2.        *The Failure to Issue Units in Connection with Capital Contributions*

In addition to the forfeited 42 units under the awards, Daimler claims that he is entitled to an unspecified number of additional units in one or both of the Companies.  Specifically, he states that he made capital contributions to the Companies of an additional $100,000 for which he did not receive units.  (Docket No. 4 at ¶¶ 135, 174).  Daimler does not state when this contribution or contributions were made, nor does he specify when and where he and Moehle agreed to the terms. In addition, the claim that Daimler is entitled to an unspecified number of additional units seems to contradict his earlier claims that he and Moehle were equal partners, and he does not explain why Moehle would agree to treat these advances as capital contributions (thereby making Daimler the majority owner) as opposed to treating them as loans.  *See, e.g.* (Docket No. 4-5 at ¶ 14) (defining membership interest by the number of issued and outstanding units).  However, Daimler does allege that he and Moehle (the only two members of the Companies' boards) agreed that Daimler would provide funding to the Companies and that he would receive units in return. Defendants counter that this does not constitute board approval is an overly technical reading of the Agreements.  (Docket No. 20 at 8).  Moehle and Daimler were the only board members, and Daimler has alleged that the two had agreed that his contributions would constitute capital contributions.  Thus, Daimler had the "consent of the board" for the issuance of units in exchange for his $100,000.  Albeit thinly pled, these facts suffice to defeat Defendants' motion to dismiss Plaintiff's breach of contract claim relating to the failure to issue units in connection with his capital contributions.

D.     **Tortious Interference**
       <u>(Counts 3 and 4)</u>

Plaintiff alleges that Moehle tortiously interfered with Daimler's contracts with the Companies.  These claims must be dismissed because, as set forth above, Moehle's actions were authorized by the contracts at issue.  Under Delaware law, a plaintiff claiming tortious interference with contract must plead and prove:  (1) the existence of a contract; (2) about which the defendant knew; (3) an intentional act that was a significant factor in causing a breach of the contract; (4) that was without justification; and (5) which caused injury.  *Kuhn Const. Co. v. Ocean and Coastal Consultants, Inc*., 844 F Supp. 2d 519 (D. Del. 2012).  Similarly, in Pennsylvania, a plaintiff claiming tortious interference must prove: (1) the existence of a contract; (2) purposeful action by the defendant intended to harm the contractual relationship; (3) the absence of privilege or justification; and (4) damages.  *Zurchin v. Ambridge Area School District*, 300 F. Supp. 3d 681, 694 (W.D. Pa. 2018) (Fischer, J.) (*citing Crivelli v. Gen. Motors Corp*., 215, F.3d 386, 394 (3d Cir. 2000).  The Court has set forth above, and will not repeat here, that Moehle was under no obligation to agree to Daimler's full time service, and that the Companies' refusal to employ Daimler was expressly permitted under the terms of the Agreements.  Moreover, in referring the dispute to the Deadlock Arbitrator for resolution, Moehle and the Companies complied with the terms of the Agreements. The claim for tortious interference therefore cannot lie.[11]

---

[11]     Defendants also argue that Moehle could not have tortiously interfered with the Robotics Hub and Coal Hill agreements because, as a manager and board member of the Companies, he was an agent of both entities. (Docket No. 17 at 20).  "[A] party to a contract cannot tortiously interfere with that very same contract," and "[b]y extension, agents of a contracting party are also unable to tortiously interfere." *Kuhn*, 844 F. Supp. 2d at 531.  *See also Zurchin*, 300 F. Supp. 3d at 694.  Plaintiff argues in response that Moehle acted in his personal capacity and not as an agent of the Companies, but the paragraphs cited by Plaintiff do not plead that Moehle was acting in his personal capacity or otherwise set forth facts that might suggest that Moehle was acting *ultra vires*.  (*See* Docket No. 19 at 18 *citing* Docket No. 4 at ¶¶ 29-34, 78-80, and 85-88).  However, because questions of agency often hinge on factual determinations, the Court does not resolve Daimler's tortious interference claims on these grounds.  *See, e.g., Kuhn*, 844 F. Supp. 2d at 531 citing *Jurimex Kommerz Transit G.M.B.h. v. Case Corp*., 65 Fed. App'x 803, 808 (3d Cir. 2003).  *But see Lubold v. Univ. Veterinary Specialists, LLC*, CV-17-507, U.S. Dist. LEXIS 102281, at * 7-8 (W.D. Pa., June 30, 2017) (in a Rule 12(b)(6) motion, dismissing tortious interference claim against officers of corporate defendant, noting that

**F.    Unjust Enrichment**
**(Counts, 5, 11, and 16)**

Unjust enrichment, or *quantum meruit*, is a "quasi-contract claim that allows a party to recover the reasonable value of his or her services if: (i) the party performed the services with the expectation that the recipient would pay for them; and (ii) the recipient should have known that the party expected to be paid." *Lookout Windpower Holding, Co. v. Edison Mission Energy*, 714 F. Supp. 2d 547, 553 (W.D. Pa. 2010) (citations omitted).  "Courts generally dismiss claims for *quantum meruit* on the pleadings when it is clear from the face of the complaint that there exists an express contract that controls." *Id.* (citations and internal quotation marks omitted).  Indeed, "the doctrine of unjust enrichment is inapplicable when the relationship between the parties is founded upon a written agreement or express contract, regardless of how harsh the provisions of such contracts may seem in the light of subsequent happenings." *Batoff*, 130 F. Supp. 3d at 972.  However, a plaintiff may "pursue alternative theories of recovery based on both breach of contract and unjust enrichment" to the extent there "is any question as to the validity of the contract in question." *Id.*  In this case, Daimler admits that he has pled the unjust enrichment claims against the Companies in the alternative, should the Court reject his breach of contract claims.  (Docket No. 19 at 20).  Because the Court finds the existence of valid contracts, and because Plaintiff does not seek rescission of the contracts and instead claims damages pursuant to those contracts (which the parties agree address the at-issue conduct), these claims must be dismissed.

_____

plaintiff had failed to plead that the individual defendants acted in their individual capacities as opposed to on behalf of the corporation).

> **G.    Accounting**
> **(Counts 17 and 18)**

In Pennsylvania, a legal accounting is "merely an incident" to a breach of contract claim.

*McWreath*, 81 F. Supp. 3d at 468.  And, "[u]nder well-accepted Delaware law, an accounting is

an equitable remedy that consists of the adjustment of accounts between parties and a rendering of

a judgment for the amount ascertained to be due to either as a result. In other words, an accounting

reflects a request for a particular type of remedy, rather than an equitable claim in and of itself."

*Garza v. Citigroup Inc.*, 192 F. Supp. 3d 508, 511 (D. Del. 2016) (citations and internal quotation

marks omitted), *reconsideration denied sub nom. Lopez Garza v. Citigroup Inc.*, No. CV 15-537-

SLR, 2016 WL 7197364 (D. Del. Dec. 9, 2016), and *aff'd*, 724 F. App'x 95 (3d Cir. 2018), *cert.*

*denied sub nom. Lopez Garza v. Citigroup Inc.*, No. 17-1388, 2018 WL 1639769 (U.S. June 11,

2018).  Because Daimler's accounting claims are not stand-alone claims and relate, instead, to the

remedy sought, Counts Seventeen and Eighteen are dismissed.  Plaintiff, however, may demand

an accounting as part of the relief sought in the re-pled complaint.  *See, e.g. McWreath*, 81 F. Supp.

3d at 468 (dismissing accounting claim, noting that legal accounting was a remedy, not a stand-

alone claim, and that equitable accounting could not lie when parties had contractual relationship);

*Garza*, 192 F. Supp. 3d at 514 (dismissing accounting claim because it was not a stand-alone claim

and, in any event, plaintiff could not allege requisite elements).

**III.    CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss (Docket No. [16]) is

GRANTED IN PART AND DENIED IN PART.  The motion is GRANTED as to Counts Two,

Three, Four, Five, Six, Eight, Ten, Eleven, Twelve, Fifteen, Sixteen, Seventeen, and Eighteen of

Plaintiff's First Amended Complaint.  Counts Seven and Thirteen are dismissed insofar as they

relate to allegations regarding Moehle's relationships with NREC and RI and the statements that

the Daimler and Moehle Awards were identical.  Counts One, Nine, and Fourteen are dismissed with leave to re-plead the allegations regarding GE's potential investment.  Defendants' motion (Docket No. [16]) is DENIED as to Counts Seven and Thirteen, insofar as those counts relate to Plaintiffs alleged capital contributions.

     An appropriate order follows.


                        _s/ Nora Barry Fischer_
                        Nora Barry Fischer
                        United States District Judge

Date:   July 27, 2018

cc/ecf: All counsel of record

**JA98**