# NO. 23-2611

In The

# United States Court Of Appeals
## For The Third Circuit

## ERIC DAIMLER,

*Appellant,*

v.

## CHRIS MOEHLE; ROBOTICS HUB FUND 1, LLC; COAL HILL VENTURES LLC.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
CASE NO. 2-18-CV-00165 - MARILYN J. HORAN, DISTRICT JUDGE

_____

## JOINT APPENDIX
### Volume II of IX
### (Pages: 99 – 624)

_____

| | | |
|---|---|---|
| **Mitchell G. Mandell**<br>MANDELL PC<br>**211 E 43rd Street**<br>**7th Floor**<br>**New York, NY 10017**<br>**(212) 779-6133** | **Stuart C. Gaul, Jr.**<br>**David A. Jones, Jr.**<br>BERNSTEIN BURKLEY<br>**601 Grant Street**<br>**9th Floor**<br>**Pittsburgh, PA 15219**<br>**(412) 456-8100** | **Patrick J. McElhinny**<br>**Jessica Moran**<br>**Christopher M. Verdini**<br>K&L GATES<br>**210 Sixth Avenue**<br>**Pittsburgh, PA 15222**<br>**(412) 355-6500** |
| *Counsel for Appellant* | *Counsel for Appellees* | *Counsel for Appellees* |

GibsonMoore Appellate Services, LLC
206 East Cary Street ♦ P.O. Box 1460 (23218) ♦ Richmond, VA 23219
804-249-7770 ♦ www.gibsonmoore.net

# <u>TABLE OF CONTENTS</u>
## Joint Appendix – Volume I of IX

**Page:**

**Notice of Appeal**
      **filed September 1, 2023 [DE204]** ...............................................................**1**

**Order**
      **filed August 2, 2023 [DE196]**.....................................................................**3**

**Opinion**
      **filed August 2, 2023 [DE195]**.....................................................................**4**

**Judgment in a Civil Action**
      **filed April 27, 2023 [DE176]** ...................................................................**14**

**Jury Slip**
      **filed April 27, 2023 [DE175]** ...................................................................**15**

**Order**
      **filed July 18, 2022 [DE125]**......................................................................**19**

**Opinion**
      **filed July 18, 2022 [DE124]**......................................................................**20**

**Opinion and Order**
      **filed June 10, 2019 [DE47]**.......................................................................**56**

**Order**
      **filed July 30, 2018 [DE23]**.......................................................................**75**

**Memorandum Opinion**
      **filed July 30, 2018 [DE22]**.......................................................................**77**

## <u>TABLE OF CONTENTS</u>
### Joint Appendix – Volume II of IX

**Page:**

**District Court Docket Sheet [2:18-cv-00165-MJH]** .........................................99

**Complaint Against Coal Hill Ventures LLC,**
**Chris Moehle, Robotics Hub Fund 1, LLC,**
**With Exhibits,**
    **filed February 5, 2018 [DE1]**....................................................................131

    <u>**Exhibits:**</u>

        **A.**    **Moehle/RH Award,**
            **dated March 23, 2016 [DE1-2]**.............................................168

        **B.**    **Moehle/CH Award,**
            **dated March 23, 2016 [DE1-3]**.............................................177

        **C.**    **Daimler/RH Award,**
            **dated March 23, 2016 [DE1-4]**.............................................185

        **D.**    **Daimler/CH Award,**
            **dated March 23, 2016 [DE1-5]**.............................................194

        **E.**    **RH Operating Agreement,**
            **dated March 23, 2016 [DE1-6]**.............................................203

        **F.**    **CH Operating Agreement,**
            **dated March 23, 2016 [DE1-7]**.............................................243

        **G.**    **Summons [DE1-8]**.................................................................284

Order
Dismissing Complaint Without Prejudice,
for Lack of Subject Matter Jurisdiction
     filed February 7, 2018 [DE3].................................................................285

First Amended Complaint
     filed February 14, 2018 [DE4]............................................................287

Defendants' Motion to Dismiss under FRCP 12 (B)(6)
     filed March 30, 2018 [DE16] ..............................................................324

Order
On Motions Practice
     filed March 31, 2018 [DE18] ..............................................................328

Second Amended Complaint
     filed August 24, 2018 [DE24].............................................................330

Defendants' Motion to Dismiss for Failure to State a Claim
     filed September 21, 2018 [DE26] ........................................................354

Order
Denying Motion to Dismiss Without Prejudice
     filed September 24, 2018 [DE28] ........................................................359

Third Amended Complaint
     filed October 16, 2018 [DE33] ...........................................................361

Defendants' Motion to Dismiss for Failure to State a Claim
     filed October 30, 2018 [DE34] ...........................................................389

Fourth Amendment Complaint
     filed June 28, 2019 [DE48]..................................................................395

**Defendants' Answer to Amended Complaint and**
**Counterclaim against Plaintiff**
  filed July 12, 2019 [DE51].........................................................422


**Plaintiff's Reply to Defendants'**
**Answer to Complaint and Counterclaim,**
**With Exhibits,**
  filed August 2, 2019 [DE52]....................................................474


**Unopposed Motion to Amend Fourth Amendment Complaint,**
**With Exhibits,**
  filed October 16, 2020 [DE84] ................................................483


  <u>Exhibits:</u>


  A.  **Proposed Fifth Amended Complaint [DE84-1]** .......................488


  B.  **Redline of Proposed**
    **Fifth Amended Complaint [DE84-2]**.........................................514


**Order**
**Granting Uncontested Motion for Leave to**
**File an Amended Complaint**
  filed October 17, 2020 [DE85] ................................................540


**Fifth Amended Complaint**
  filed October 19, 2020 [DE86] ................................................541


**Defendants' Answer to Amended Complaint, Counterclaim**
  filed October 30, 2020 [DE87] ................................................567


**Defendants' Motion for Summary Judgment**
  filed November 23, 2021 [DE107].........................................619

## TABLE OF CONTENTS
### Joint Appendix – Volume III of IX

Page:

**Defendants' Concise Statement of Material Facts**
**filed November 23, 2021 [DE109]**............................................................625

**Appendix to Defendants' Concise Statement of Material Facts**
**in Support of Motion for Summary Judgment**
**With Attachments,**
**filed November 23, 2021 [DE110]**...........................................................646

**Attachments:**

1.   **Declaration of Christopher Verdini**
**taken November 23, 2021 [DE110-1]** ................................651

**Declaration Exhibits [DE110-2]:**

1.   **Deposition Transcript of Chris Moehle,**
**taken March 4, 2021** ....................................................655

2.   **Pittsburgh Post-Gazette, Carnegie Mellon,**
**GE Ventures Bringing Robotics Accelerator**
**Program to Pittsburgh**
**(last visited Nov. 21, 2021)**......................................704

3.   **Press Release from Carnegie Mellon University**
**Produced by Plaintiff**
**dated August 11, 2015**................................................708

4.   **Curriculum Vitae of Eric Daimler** ....................................710

v

<u>Exhibits</u> to
**Declaration of Mitchell Mandell**
> **taken November 23, 2021 [DE110-1], Continued:**

5.    **Deposition of Eric Daimler**
>    **taken February 24, 2021**..............................................716

6.    **Deposition of James Fee**
>    **taken September 28, 2021** ........................................793

7.    **Unsigned Memorandum of Understanding**
**Produced by Plaintiff** ...........................................826

8.    **Emails between Eric Daimler and Colin Beirne**
>    **dated September 19-29, 2014**..................................830

9.    **Email between Eric Daimler and Adam Fried**
>    **dated September 22-24, 2015**..................................832

10.   **"Skilled Science Sponsorship Agreement"**...................835

11.   **"Skilled Science" Diagram** .................................838

12.   **Curriculum Vitae of James Fee**
>    **dated August 18, 2021**..............................................840

13.   **Plaintiff's Initial Disclosures Pursuant to**
**Fed. R. Civ. P. 26(a)(1)**
>    **dated October 4, 2019** ..............................................843

14.   **Plaintiff's Objections and Responses to**
**Defendants' First Set of Interrogatories**
>    **dated January 15, 2021**..............................................853

<u>Exhibits</u> to

**Declaration of Mitchell Mandell**
       **taken November 23, 2021 [DE110-1], Continued:**

15.    **Email from Talbot to Individuals from**
       **UPMC and Others**
              **dated October 23, 2015** .............................................861

16.    **Email between Eric Daimler, Chris Moehle,**
       **Dave Mawhinney and Don Smith**
              **dated November 30, 2015**.........................................864

17.    **"GE Ventures Conversation"**............................................866

18.    **Redacted Email between Chris Moehle, K. Gray,**
       **Ralph Taylor-Smith and Marni Rutkofsky**
              **December 2016**............................................................868

19.    **Email Chris Moehle to Eric Daimler and**
       **James Fee with Attachment**
              **dated March 14, 2016** ..................................................992

20.    **"Coal Hill Ventures LLC Common**
       **Unit Award Agreement"**....................................................1004

21.    **"Robotics Hub Fund 1, LLC Common**
       **Unit Award Agreement"**....................................................1013

22.    **Chart of Expenses**.............................................................1022

23.    **Email between Eric Daimler and**
       **Dave Mawhinney**
              **dated February - March 2017** .................................1040**

vii

**<u>Exhibits</u> to**
**Declaration of Mitchell Mandell**
        **taken November 23, 2021 [DE110-1], Continued:**

24.    **Plaintiff's Disclosure Pursuant to**
        **Fed. R. Civ. P. 26(a)(2)(C)**
                **dated July 30, 2021 ...................................................1054**

**Plaintiff's Responsive Concise Statement of Material Facts**
**in Opposition to Defendants' Motion for Summary Judgment**
        **filed January 7, 2022 [DE116]..............................................................1060**

## TABLE OF CONTENTS
### Joint Appendix – Volume IV of IX

Page:

Appendix to Plaintiff's Responsive
Concise Statement of Material Facts,
With Attachments,
    filed January 7, 2022 [DE117].................................................................1098

Att.   Declaration of Mitchell G. Mandell
        sworn January 7, 2022 [DE117-1] .....................................1102

A.    Affidavit of Eric Daimler,
        sworn January 7, 2022 [DE117-1] .....................................1105

B.    Email between Chris Moehle and Dave Mawhinney
        dated July 30, 2015 [DE117-2]...........................................1111

C.    Email between H. Herman and Chris Moehle
        dated October 2015 [DE117-2].........................................1113

D.    Email between Eric Daimler and H. Herman
        date May 26, 2016 [DE117-2]............................................1117

E.    Proposal from Plaintiff to Colin Beirne
        undated [DE117-2]...............................................................1119

F.    Email between Colin Beirne and Eric Daimler
        dated September 2014 [DE117-2]....................................1121

G.    Email between Eric Daimler and Keith Furuya
        dated in April 2014 [DE117-2].........................................1123

**<u>Exhibits</u> to**
**Appendix to Plaintiff's Responsive**
**Concise Statement of Material Facts,**
        **filed January 7, 2022 [DE117], Continued:**

H.    **Slack correspondence between Eric Daimler**
      **and Chris Moehle**
              **dated August 2016 [DE117-2] ..........................................1125**

I.    **Email between Craig Markovitz and Chris Moehle**
              **dated February 2015 [DE117-2] .......................................1129**

J.    **Email and between Charles Kennedy,**
      **Chris Moehle and Dave Mawhinney**
              **dated August 2015 [DE117-2] ..........................................1131**

K.    **Partner Agreement**
              **filed under seal under separate cover**

L.    **Robotics Hub Fund I LP Balance Sheet,**
      **As of October 31, 2017**
              **filed under seal under separate cover**

M.    **Document Robotics Hub Fund I LP Balance Sheet,**
      **As of October 31, 2017**
              **filed under seal under separate cover**

N.    **Verified Complaint in**
      ***Terry Friddle, et al. v. Christopher Moehle, et al.,***
      **2021-0306 (Del. Ch, 2021) [DE117-2] .........................................1137**

O.    **Robotics Hub Expenses Back Up [DE117-3& 117-4].............1179**

x

# TABLE OF CONTENTS
### Joint Appendix – Volume V of IX

Page:

**Exhibits to**
**Appendix to Plaintiff's Responsive**
**Concise Statement of Material Facts,**
      **filed January 7, 2022 [DE117], Continued:**

**O.**    **Robotics Hub Expenses Back Up [DE117-5 &117-6]............1780**

# TABLE OF CONTENTS
## Joint Appendix – Volume VI of IX

Page:

**Exhibits to**
**Appendix to Plaintiff's Responsive**
**Concise Statement of Material Facts,**
**filed January 7, 2022 [DE117], Continued:**

**O.    Robotics Hub Expenses Back Up [DE117-7&117-8]..............2380**

# TABLE OF CONTENTS
## Joint Appendix – Volume VII of IX

**Page:**

**Errata Sheet with Attached Exhibit N**
**filed January 11, 2022 [DE120]**.............................................................3059

**Combined Concise Statement of Material Facts on**
**Defendants' Motion for Summary Judgment**
**filed January 21, 2022 [DE123]**.............................................................3109

**Minute Entry for Proceeding Held before**
**Judge Marilyn J. Horan: Final Conference**
**held on April 11, 2023**.............................................................................3167

**Joint Stipulation,**
**With Exhibit,**
**filed April 14, 2023 [DE165]**..................................................................3168

**Exhibit:**

1.    **Patent & Trademark Certificate [DE165-1]**............................3173

**Transcript of Trial Proceedings**
**Before the Honorable Marilyn J. Horan**
**on April 24, 2023 [DE167]**.....................................................................3174

**Transcript of Trial Proceedings**
**Before the Honorable Marilyn J. Horan**
**on April 25, 2023 [DE168]**.....................................................................3347

# TABLE OF CONTENTS
## Joint Appendix – Volume VIII of IX

**Transcript of Trial Proceedings**
**Before the Honorable Marilyn J. Horan**
　　　on April 26, 2023 [DE170] .......................................................3510

**Jury Question #1**
　　　filed April 27, 2023 [DE172] ................................................3535

**Order**
**As to Case Caption**
　　　filed April 27, 2023 [DE173] ................................................3537

### Trial Exhibits:

A　　　Deposition Excerpts of Eric Daimler
　　　　taken April 13, 2023 ......................................................3538

B/1　　Email Chain
　　　　dated September 11-29, 2014 ......................................3567

C/2　　"Skilled Science Sponsorship Agreement" ......................3572

D/3　　"Skilled Science" Diagram.......................................................3575

E/5　　Email
　　　　dated August 13, 2015.................................................3577

F/7　　Eric Daimler Biography and Resume.................................3579

G/15　Email Chain
　　　　dated May 8-9, 2016 & Slide Deck ............................3585

## Trial Exhibits, Continued:

H/18    Email
           dated January 5, 2017.......................................3598

I/20    Email
           dated April 12, 2017...........................................3600

J/21    Unsigned "Action by Written Consent"
           dated March 27, 2017 ....................................3602

K/22    C Squared Capital Screen Captures ....................................3605

L/26    C Squared Capital Slide Deck...............................3608

M/27    Spin Glass Slide Deck............................................3671

N/28    Email Chain
           dated October 13, 2016 to June 26, 2019 ...................3731

O/30    Letter
           dated May 26, 2017 .............................................3734

P/36    Invoices
           dated October 5, 2017 to January 28, 2018................3738

Q/37    Invoices
           dated June 7, 2017 to October 7, 2017 .......................3741

R/40    Coal Hill Ventures LLC Common Unit
         Award Agreement
           dated 3/23/2016.................................................3790

**Trial Exhibits, Continued:**

S/41    Robotics Hub Fund I, LLC
Common Unit Award Agreement
dated March 23, 2016 ....................................................3799

T/44    Stipulations ............................................................3808

**Motion of Cross-Claim Plaintiffs Robotics Hub Fund 1, LLC
and Coal Hill Ventures LLC for Award of Attorneys' Fees,
With Exhibits,**
filed May 11, 2023 [DE177]....................................................3813

**Exhibits:**

1.    Affidavit of Maureen O'Leary,
With Exhibit
sworn May 11, 2023 [DE177-1] ........................................3816

2.    Affidavit of Stuart C. Gaul, Jr.
sworn May 11, 2023 [DE177-2] ........................................3831

3.    Declaration of David G. Oberdick
sworn May 11, 2023 [DE177-3] ........................................3841

**Motion of Plaintiff/Cross-Claim Defendant's**
**Motion for a New Trial on Damages or,**
**in the Alternative, for Remittitur,**
**With Attachments,**
    **filed May 25, 2023 [DE181]**......................................................................3852

    **<u>Attachments:</u>**

    **A.**    **Verdict Slip**
            **dated April 26, 2023 [DE181-1]**........................................3855

**Order**
**On Joint Stipulation**
    **filed November 9, 2023 [DE222]**...........................................................3860

## <u>TABLE OF CONTENTS</u>
### Joint Appendix – Volume IX of IX – Under Seal

Page:

SEAL Exhibits to
Plaintiff's Responsive
Concise Statement of Material Facts,
 filed January 7, 2022 [DE117]:

 K. Partner Agreement
   filed January 11, 2022 [DE121] .........................................3864

 L. Robotics Hub Fund I LP Balance Sheet
  As of October 31, 2017
   filed January 11, 2022 [DE121] .........................................3871

 M. Robotics Hub Fund I LP Balance Sheet
  As of November 30, 2017
   filed January 11, 2022 [DE121] .........................................3873

SEALED Transcript of Trial Proceedings
Before the Honorable Marilyn J. Horan
 on April 24, 2023 [DE167] ....................................................3876

SEALED Transcript of Trial Proceedings
Before the Honorable Marilyn J. Horan
 on April 25, 2023 [DE168] ....................................................3904

**Query    Reports    Utilities    Help    Log Out**

APPEAL,BJL,CLOSED,RTW

# U.S. District Court
## Western District of Pennsylvania (Pittsburgh)
### CIVIL DOCKET FOR CASE #: 2:18-cv-00165-MJH

DAIMLER v. MOEHLE et al                         Date Filed: 02/05/2018
Assigned to: Judge Marilyn J. Horan            Date Terminated: 08/02/2023
Case in other court:  Third Circuit, 22-02492   Jury Demand: Both
                      Third Circuit, 23-02611    Nature of Suit: 190 Contract: Other
Cause: 28:1332 Diversity-Other Contract         Jurisdiction: Diversity

**Plaintiff**

**ERIC DAIMLER**                    represented by   **Brittney M. Edwards**
                                                    Thompson & Knight LLP
                                                    900 Third Avenue
                                                    20th Floor
                                                    New York, NY 10022
                                                    212-751-3615
                                                    Fax: 214-880-3289
                                                    Email: brittney.edwards@tklaw.com
                                                    *TERMINATED: 03/17/2021*
                                                    *LEAD ATTORNEY*
                                                    *PRO HAC VICE*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Christopher Schueller**
                                                    Buchanan Ingersoll & Rooney, P.C.
                                                    Union Trust Building
                                                    501 Grant Street, Suite 200
                                                    Pittsburgh, PA 15219
                                                    412-562-8800
                                                    Fax: 412-562-1041
                                                    Email: christopher.schueller@bipc.com
                                                    *TERMINATED: 04/26/2023*
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Mitchell G. Mandell**
                                                    Mandell LLC
                                                    211 East 43rd Street
                                                    Ste 7th Floor
                                                    New York, NY 10017
                                                    212-779-6133
                                                    Email: mitchell@mandell-us.com
                                                    *LEAD ATTORNEY*
                                                    *PRO HAC VICE*
                                                    *ATTORNEY TO BE NOTICED*

**JA99**

**Hamutal G. Lieberman**
Zumpano Patricios & Popok, PLLC
417 Fifth Avenue
Suite 826
New York, NY 10016
212-542-2564
Email: hlieberman@zplaw.com
*TERMINATED: 03/17/2021*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sydney Rochelle Normil**
Buchanan Ingersoll & Rooney PC
Union Trust Building
501 Grant St, Suite 200
Pittsburgh, PA 15219
412-562-1545
Email: SYDNEY.NORMIL@GMAIL.COM
*TERMINATED: 04/26/2023*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**CHRIS MOEHLE**                    represented by   **Christopher M. Verdini**
K&L Gates LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222
(412) 355-6766
Email: christopher.verdini@klgates.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick J. McElhinny**
K&L Gates LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222-2613
(412) 355-6334
Fax: 412-355-6501
Email: patrick.mcelhinny@klgates.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart C. Gaul , Jr.**
Bernstein-Burkley, P.C.
601 Grant Street
Ste 9th Floor
Pittsburgh, PA 15219
412-456-8139
Fax: 412-456-8135
Email: sgaul@bernsteinlaw.com

**JA100**

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David A. Jones , Jr.**
Bernstein-Burkley, P.C.
601 Grant Street
9th Floor
Pittsburgh, PA 15219
412-456-8110
Fax: 412-456-8135
Email: DJones@bernsteinlaw.com
*ATTORNEY TO BE NOTICED*

**Jake D. Morrison**
Office of the Federal Public Defender
1001 Liberty Avenue
Suite 1500
Pittsburgh, PA 15222
412-894-0755
Fax: 412-644-4594
Email: Jake_Morrison@fd.org
*TERMINATED: 07/12/2019*
*ATTORNEY TO BE NOTICED*

**Jessica Moran**
K&L Gates LLP
210 Sixth Avenue
Pittsburgh, PA 15222
412-355-6344
Email: jessica.moran@klgates.com
*ATTORNEY TO BE NOTICED*

**Defendant**
**ROBOTICS HUB FUND 1, LLC**                represented by   **Christopher M. Verdini**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick J. McElhinny**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart C. Gaul , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David A. Jones , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jake D. Morrison**
(See above for address)

JA101

*TERMINATED: 07/12/2019*
*ATTORNEY TO BE NOTICED*

**Jessica Moran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**COAL HILL VENTURES LLC**　　　　represented by　**Christopher M. Verdini**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick J. McElhinny**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart C. Gaul , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David A. Jones , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jake D. Morrison**
(See above for address)
*TERMINATED: 07/12/2019*
*ATTORNEY TO BE NOTICED*

**Jessica Moran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**ROBOTICS HUB FUND 1, LLC**　　　　represented by　**Christopher M. Verdini**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick J. McElhinny**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart C. Gaul , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David A. Jones , Jr.**
(See above for address)

ECF NextGen 1.7.1.1

*ATTORNEY TO BE NOTICED*

**Jake D. Morrison**
(See above for address)
*TERMINATED: 07/12/2019*
*ATTORNEY TO BE NOTICED*

**Jessica Moran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**CHRIS MOEHLE**                        represented by    **Christopher M. Verdini**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick J. McElhinny**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart C. Gaul , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David A. Jones , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jake D. Morrison**
(See above for address)
*TERMINATED: 07/12/2019*
*ATTORNEY TO BE NOTICED*

**Jessica Moran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**COAL HILL VENTURES LLC**              represented by    **Christopher M. Verdini**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick J. McElhinny**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart C. Gaul , Jr.**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**David A. Jones , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jake D. Morrison**
(See above for address)
*TERMINATED: 07/12/2019*
*ATTORNEY TO BE NOTICED*

**Jessica Moran**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**ERIC DAIMLER**                          represented by  **Brittney M. Edwards**
(See above for address)
*TERMINATED: 03/17/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher Schueller**
(See above for address)
*TERMINATED: 04/26/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mitchell G. Mandell**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hamutal G. Lieberman**
(See above for address)
*TERMINATED: 03/17/2021*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sydney Rochelle Normil**
(See above for address)
*TERMINATED: 04/26/2023*
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**CHRIS MOEHLE**                          represented by  **Christopher M. Verdini**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick J. McElhinny**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart C. Gaul , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David A. Jones , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jake D. Morrison**
(See above for address)
*TERMINATED: 07/12/2019*
*ATTORNEY TO BE NOTICED*

**Jessica Moran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**COAL HILL VENTURES LLC**                 represented by    **Christopher M. Verdini**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick J. McElhinny**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart C. Gaul , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David A. Jones , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jake D. Morrison**
(See above for address)
*TERMINATED: 07/12/2019*
*ATTORNEY TO BE NOTICED*

**Jessica Moran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**JA105**

**ROBOTICS HUB FUND 1, LLC**                    represented by **Christopher M. Verdini**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick J. McElhinny**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart C. Gaul , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David A. Jones , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jake D. Morrison**
(See above for address)
*TERMINATED: 07/12/2019*
*ATTORNEY TO BE NOTICED*

**Jessica Moran**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**ERIC DAIMLER**                    represented by **Brittney M. Edwards**
(See above for address)
*TERMINATED: 03/17/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher Schueller**
(See above for address)
*TERMINATED: 04/26/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mitchell G. Mandell**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hamutal G. Lieberman**
(See above for address)
*TERMINATED: 03/17/2021*
*ATTORNEY TO BE NOTICED*

**Sydney Rochelle Normil**
(See above for address)
*TERMINATED: 04/26/2023*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/05/2018 | 1 | COMPLAINT against COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC (Filing fee, including Administrative fee, $400, receipt number 4613131), filed by ERIC DAIMLER. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Summons) (plh) (Entered: 02/06/2018) |
| 02/06/2018 | 2 | NOTICE that instant civil action has been designated for placement into the United States District Court's Alternative Dispute Resolution program. Parties are directed to fully complete the required 26(f) report, which includes the stipulation of selecting an ADR process. Counsel for plaintiff (or in the case of a removal action, counsel for removing defendant) shall make service of the notice on all parties. (jg) (Entered: 02/06/2018) |
| 02/07/2018 | 3 | ORDER indicating that, for reasons more fully stated within, Plaintiff's Complaint 1 is dismissed, without prejudice, for lack of subject matter jurisdiction; that if Plaintiff does not file an Amended Complaint by 2/20/18 curing the jurisdictional defect, the Clerk of Court shall mark this case closed. Signed by Judge Nora Barry Fischer on 2/7/18. (jg) (Entered: 02/07/2018) |
| 02/14/2018 | 4 | First AMENDED COMPLAINT against COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC, filed by ERIC DAIMLER. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Summons) (Schueller, Christopher) (Entered: 02/14/2018) |
| 02/20/2018 | 5 | PRAECIPE to Issue Summons by ERIC DAIMLER (Attachments: # 1 Summons Moehle, # 2 Summons Robotics Fund LLC, # 3 Summons Coal Hill Ventures LLC) (Schueller, Christopher) (Entered: 02/20/2018) |
| 02/21/2018 | 6 | Summons Issued as to COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC (gmp) (Entered: 02/21/2018) |
| 02/23/2018 | 7 | NOTICE of Appearance by Christopher M. Verdini on behalf of COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Verdini, Christopher) (Entered: 02/23/2018) |
| 02/23/2018 | 8 | NOTICE of Appearance by Patrick J. McElhinny on behalf of COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (McElhinny, Patrick) (Entered: 02/23/2018) |
| 02/26/2018 | 9 | STIPULATION *Accepting Service of Process and Extending Time to Answer* by ERIC DAIMLER. (Schueller, Christopher) (Entered: 02/26/2018) |
| 02/26/2018 | | Update Answer Deadline: Answer due from COAL HILL VENTURES LLC on 3/30/2018; CHRIS MOEHLE on 3/30/2018; ROBOTICS HUB FUND 1, LLC on 3/30/2018 (plh) (Entered: 02/27/2018) |
| 03/23/2018 | 10 | MOTION for attorney Mitchell Mandell to Appear Pro Hac Vice, (Filing fee $70, Receipt # 0315-4667534) by ERIC DAIMLER. (Schueller, Christopher) (Entered: 03/23/2018) |
| 03/23/2018 | 11 | MOTION for attorney Brittney Edwards to Appear Pro Hac Vice, (Filing fee $70, Receipt |

**JA107**

| | | |
|---|---|---|
| | | # 0315-4667552) by ERIC DAIMLER. (Schueller, Christopher) (Entered: 03/23/2018) |
| 03/23/2018 | 12 | ORDER granting 10 Motion for Mitchell Mandell, Esquire to Appear Pro Hac Vice on behalf of Plaintiff. Signed by Judge Nora Barry Fischer on 3/23/18. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jg) (Entered: 03/23/2018) |
| 03/23/2018 | 13 | ORDER granting 11 Motion for Brittney Edwards, Esquire to Appear Pro Hac Vice on behalf of Plaintiff. Signed by Judge Nora Barry Fischer on 3/23/18. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jg) (Entered: 03/23/2018) |
| 03/30/2018 | 14 | Joint MOTION for Leave to File Excess Pages *FOR BRIEFS IN SUPPORT OF AND IN OPPOSITION TO DEFENDANTS MOTION TO DISMISS UNDER FRCP 12(B)(6)* by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Attachments: # 1 Proposed Order) (Verdini, Christopher) (Entered: 03/30/2018) |
| 03/30/2018 | 15 | ORDER granting 14 Joint Motion for Leave to File Excess Pages, Defendants may file a brief in support of their motion to dismissand Plaintiff may file a brief in opposition to Defendants' motion to dismiss in excess of the Court's twenty (20) page limit, consisting of no more than twenty-five (25) pages. Signed by Judge Nora Barry Fischer on 3/30/2018. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (bdk) (Entered: 03/30/2018) |
| 03/30/2018 | 16 | MOTION to Dismiss under FRCP 12 (B)(6) by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Attachments: # 1 Proposed Order) (Verdini, Christopher) Modified on 4/2/2018. (plh) (Entered: 03/30/2018) |
| 03/30/2018 | 17 | BRIEF in Support re 16 Motion to Dismiss under FRCP 12 (B)(6) filed by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Attachments: # 1 Exhibit A) (Verdini, Christopher) (Entered: 03/30/2018) |
| 03/31/2018 | 18 | ORDER ON MOTIONS PRACTICE (details more fully stated in said Order). Signed by Judge Nora Barry Fischer on 3/31/18. (jg) (Entered: 03/31/2018) |
| 04/20/2018 | 19 | BRIEF in Opposition re 16 Motion to Dismiss re: 4 First Amended Complaint filed by ERIC DAIMLER. (Schueller, Christopher) (Entered: 04/20/2018) |
| 05/04/2018 | 20 | REPLY BRIEF to re: 17 Brief in Support of re 16 Motion to Dismiss filed by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Verdini, Christopher) Modified on 5/7/2018. (plh) (Entered: 05/04/2018) |
| 05/04/2018 | | CLERK'S OFFICE QUALITY CONTROL MESSAGE re 20 Reply Brief. ERROR: Document incorrectly linked. CORRECTION: Linked to appropriate document. This message is for informational purposes only. (plh) (Entered: 05/07/2018) |
| 07/19/2018 | 21 | NOTICE of Change of Address by Mitchell G. Mandell (Mandell, Mitchell) (Entered: 07/19/2018) |
| 07/30/2018 | 22 | MEMORANDUM OPINION indicating that, for reasons more fully stated within, Defendants' motion to dismiss (Docket No. 16 ) is granted, in part, and denied, in part; An appropriate Order follows. Signed by Judge Nora Barry Fischer on 7/27/18. (jg) (Entered: 07/30/2018) |
| 07/30/2018 | 23 | ORDER indicating that Defendants' Motion to Dismiss 16 is granted, in part, and denied, in part as follows: 1. The motion is granted as to Counts One, Two, Three, Four, Five, Six, Eight, Nine, Ten, Eleven, Twelve, Fourteen, Fifteen, Sixteen, Seventeen, and Eighteen of Plaintiff's First Amended Complaint. Counts One, Nine, and Fourteen are dismissed with leave to re-plead the allegations regarding GE's potential investment; 2. |

| | | |
|---|---|---|
| | | As to Counts Seven and Thirteen, the motion is granted insofar as the claims relate to allegations regarding Moehle's relationships with NREC and RI and the statements that the Daimler and Moehle Awards were identical. The motion is denied as to Counts Seven and Thirteen, insofar as those counts relate to Plaintiff's alleged capital contributions; 3. Plaintiff shall file a Second Amended Complaint in accordance with this Order and the accompanying Memorandum Opinion by 8/24/18; Defendants' Response to the Second Amended Complaint shall be due by 9/21/18. Signed by Judge Nora Barry Fischer on 7/27/18. (jg) Modified on 7/31/2018. (ept) (Entered: 07/30/2018) |
| 08/24/2018 | 24 | Second AMENDED COMPLAINT against All Defendants, filed by ERIC DAIMLER. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Summons) (Schueller, Christopher) (Entered: 08/24/2018) |
| 08/27/2018 | 25 | Summons Issued as to CHRIS MOEHLE (nll) (Entered: 08/27/2018) |
| 09/21/2018 | 26 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *Under FRCP 12(b)(6)*, and MOTION for More Definite Statement *Under FRCP 12(e)* by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Attachments: # 1 Proposed Order) (Verdini, Christopher) (Entered: 09/21/2018) |
| 09/21/2018 | 27 | BRIEF in Support re 26 Motion to Dismiss for Failure to State a Claim,, Motion for More Definite Statement, filed by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Attachments: # 1 Exhibit 1) (Verdini, Christopher) (Entered: 09/21/2018) |
| 09/24/2018 | 28 | ORDER indicating that upon consideration of Defendants' Motion to Dismiss (Docket No. 26 ), and their Brief in Support, (Docket No. 27 ), said Motion 26 is DENIED, without prejudice; the parties shall meet and confer in an effort to resolve their disputes as to the pleading deficiencies in Plaintiffs Second Amended Complaint and any renewed motion to dismiss shall file a certificate that the moving party made good faith efforts to confer with the non-moving party to determine whether the identified pleading deficiencies may be properly cured by amendment. Failure to file the required certificate will result in summary denial of the motion; and, the parties shall file a Joint Status Report by October 9, 2018 advising as to the status of their good faith negotiations. Signed by Judge Nora Barry Fischer on 9/24/2018. (bdk) (Entered: 09/24/2018) |
| 09/24/2018 | | Parties' Joint Status Report due by 10/9/2018 (see 28 ). (bdk) (Entered: 09/24/2018) |
| 10/09/2018 | 29 | STATUS REPORT *(Joint)* by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Verdini, Christopher) (Entered: 10/09/2018) |
| 10/10/2018 | 30 | ORDER indicating that upon consideration of the parties' 29 Joint Status Report, it is hereby ordered that Plaintiff's Third Amended Complaint is due by 10/16/18 and Defendants' Response thereto is due by 10/30/18. Signed by Judge Nora Barry Fischer on 10/10/18. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jg) (Entered: 10/10/2018) |
| 10/12/2018 | 31 | ORDER re Federal Rule of Civil Procedure 12(b) Motions to Dismiss, more fully stated in said order. Signed by Judge Nora Barry Fischer on 10/12/18. (jg) (Entered: 10/12/2018) |
| 10/16/2018 | 32 | ORDER REASSIGNING CASE. Case reassigned to Judge Marilyn J. Horan for all further proceedings. Judge Nora Barry Fischer no longer assigned to case. All previously scheduled deadlines and proceedings shall remain in effect unless otherwise ordered by the Court. See order at 2:18-mc-1011. Signed by Chief Judge Joy Flowers Conti on 10/12/2018. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (admin1, ) (Entered: 10/16/2018) |

| 10/16/2018 | 33 | Third AMENDED COMPLAINT against COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC, filed by ERIC DAIMLER. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F) (Schueller, Christopher) (Entered: 10/16/2018) |
| --- | --- | --- |
| 10/30/2018 | 34 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Attachments: # 1 Proposed Order) (Verdini, Christopher) (Entered: 10/30/2018) |
| 10/30/2018 | 35 | BRIEF in Support re 34 Motion to Dismiss for Failure to State a Claim filed by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Attachments: # 1 Exhibit 1 - Redline Comparing FAC To TAC) (Verdini, Christopher) (Entered: 10/30/2018) |
| 10/30/2018 | 36 | CERTIFICATE of Compliance re 28 Order on Motion to Dismiss for Failure to State a Claim,,,, Order on Motion for More Definite Statement,,, 31 Order *Dated September 24 and October 12, 2018* by Christopher M. Verdini on behalf of COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC (Verdini, Christopher) (Entered: 10/30/2018) |
| 10/31/2018 | 37 | TEXT ORDER that Plaintiff's Brief in Opposition to Defendant's 34 Motion to Dismiss for Failure to State a Claim with 35 Brief in Support is due by 11/13/2018. Signed by Judge Marilyn J. Horan on 10/31/2018. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (rtw) (Entered: 10/31/2018) |
| 10/31/2018 | 38 | TEXT ORDER VACATING briefing ORDER 37 . Plaintiff's Brief in Opposition to Defendants' 34 Motion to Dismiss for Failure to State a Claim with 35 Brief in Support is due by 11/20/2018. A Reply brief, if any, is due by 11/27/2018. Signed by Judge Marilyn J. Horan on 10/31/2018. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (rtw) (Entered: 10/31/2018) |
| 11/20/2018 | 39 | BRIEF in Opposition re 34 Motion to Dismiss for Failure to State a Claim *with 35 Brief in Support* filed by ERIC DAIMLER. (Schueller, Christopher) Document removed from public view and redocketed at 40 . Modified text on 2/14/2019. (ept) (Entered: 11/20/2018) |
| 11/20/2018 | 40 | BRIEF in Opposition re 34 Motion to Dismiss for Failure to State a Claim *with 35 Brief in Support* filed by ERIC DAIMLER. (Schueller, Christopher) (Entered: 11/20/2018) |
| 11/27/2018 | 41 | REPLY BRIEF re 34 Motion to Dismiss for Failure to State a Claim filed by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Verdini, Christopher) (Entered: 11/27/2018) |
| 01/15/2019 | 42 | TEXT ORDER setting Oral Argument on 34 Motion to Dismiss filed by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC for 2/20/2019 at 10:00 AM in Courtroom 8A before Judge Marilyn J. Horan. Signed by Judge Marilyn J. Horan on 1/15/2019. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jgb) (Entered: 01/15/2019) |
| 02/14/2019 | 43 | NOTICE of Appearance by Sydney Rochelle Normil on behalf of ERIC DAIMLER. (Normil, Sydney) (Entered: 02/14/2019) |
| 02/15/2019 | 44 | NOTICE of Appearance by Jake D. Morrison on behalf of COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Morrison, Jake) (Entered: 02/15/2019) |

| 02/19/2019 | | CLERK'S OFFICE QUALITY CONTROL MESSAGE re 44 Notice of Appearance. ERROR: Party did not file disclosure statement as required pursuant to L.R. 7.1.1. CORRECTION: Attorney advised to file statement within 7 days. Disclosure Statement due by 2/26/2019. (ept) (Entered: 02/19/2019) |
|---|---|---|
| 02/19/2019 | 45 | Disclosure Statement identifying None as corporate parent or other affiliate, by COAL HILL VENTURES LLC, ROBOTICS HUB FUND 1, LLC. (Verdini, Christopher) (Entered: 02/19/2019) |
| 02/20/2019 | 46 | Minute Entry for proceedings held before Judge Marilyn J. Horan: Oral Argument heard on Defendants' 34 Motion to Dismiss Third Amended Complaint, on 2/20/2019. Court takes motion under advisement. (Court Reporter: Deborah Rowe) (rtw) (Entered: 02/20/2019) |
| 06/10/2019 | 47 | ORDER denying in part and granting in part 34 Defendants' Motion to Dismiss for Failure to State a Claim. Defendants' Motion is DENIED as to Counts 1, 2, 3, and 5, and is GRANTED as to Count 4. Plaintiff shall have 20 days to amend his complaint as to Count 4. Signed by Judge Marilyn J. Horan on 6/10/19. (jms) (Entered: 06/10/2019) |
| 06/28/2019 | 48 | AMENDED COMPLAINT against COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC, filed by ERIC DAIMLER. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F) (Mandell, Mitchell) (Entered: 06/28/2019) |
| 07/11/2019 | 49 | MOTION to Withdraw as Attorney by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Attachments: # 1 Proposed Order) (Morrison, Jake) (Entered: 07/11/2019) |
| 07/12/2019 | 50 | ORDER GRANTING 49 Motion to Withdraw as Attorney. Attorney Jake D. Morrison terminated. Signed by Judge Marilyn J. Horan on 7/12/2019. (jgb) (Entered: 07/12/2019) |
| 07/12/2019 | 51 | *Defendants'* ANSWER to 48 Amended Complaint, , COUNTERCLAIM against ERIC DAIMLER by ROBOTICS HUB FUND 1, LLC, CHRIS MOEHLE, COAL HILL VENTURES LLC. (Verdini, Christopher) (Entered: 07/12/2019) |
| 08/02/2019 | 52 | *REPLY* - ANSWER to 51 Answer to Amended Complaint, Counterclaim by ERIC DAIMLER. (Mandell, Mitchell) (Entered: 08/02/2019) |
| 08/05/2019 | 53 | ORDER SETTING INITIAL CASE MANAGEMENT CONFERENCE: Initial Case Management Conference set for 9/17/2019 at 10:00 AM in Courtroom 8A before Judge Marilyn J. Horan. Rule 26 Meeting Report and Stipulation Selecting ADR due by 9/10/2019. Signed by Judge Marilyn J. Horan on 8/5/2019. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (jgb) (Entered: 08/05/2019) |
| 08/05/2019 | 54 | STANDING ORDER AND PROCEDURES ON CIVIL MOTION PRACTICE. Signed by Judge Marilyn J. Horan on 8/5/2019. (jgb) (Entered: 08/05/2019) |
| 08/09/2019 | 55 | NOTICE of Appearance by Jessica Moran on behalf of COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Moran, Jessica) (Entered: 08/09/2019) |
| 08/12/2019 | 56 | TEXT ORDER RESCHEDULING CONFERENCE. The Initial Case Management Conference set for 9/17/2019 at 10:00 AM is hereby RESCHEDULED for 9/16/2019 at 10:00 AM in Courtroom 6B before Judge Marilyn J. Horan. Signed by Judge Marilyn J. Horan on 8/12/2019. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jgb) (Entered: 08/12/2019) |
| 09/09/2019 | 57 | REPORT of Rule 26(f) Planning Meeting. (Attachments: # 1 Proposed Order - Case Management Order, # 2 Proposed Order - Rule 502(d) Order) (Mandell, Mitchell) |

| | | (Entered: 09/09/2019) |
|---|---|---|
| 09/09/2019 | 58 | STIPULATION selecting ADR process by ERIC DAIMLER. (Mandell, Mitchell) (Entered: 09/09/2019) |
| 09/16/2019 | | Text Minute Entry for proceedings held before Judge Marilyn J. Horan: Initial Case Management Conference held on 9/16/2019. Mitchell Mandell appearing for Plaintiff. Christopher Verdini appearing for Defendants. Parties are finalizing decision on mediator and will inform court in 1-2 weeks, after which an Order referring case to mediation will be entered. Court is permitting a pre-mediation period of discovery, and ADR to be completed within 90 days. An Initial Case Management Order and 502(d) order will be entered. ADR order will be entered at a later date. (Court Reporter: none) Text-only entry; no PDF document will issue. This text-only entry constitutes a Minute of the Court or Notice on the matter. (rtw) (Entered: 09/16/2019) |
| 09/16/2019 | 59 | INITIAL CASE MANAGEMENT ORDER: Fact Discovery due by 4/15/2020. Exchange of required Rule 26(a)(1) information due by 10/4/2019. The parties have agreed on mediation, and will provide the mediator's name to the Court within 1 to 2 weeks. The Court will permit a 30-day limited pre-mediation period of discovery. The period within which to complete mediation is enlarged to 90 days. An Order referring this case to mediation will be entered after the mediator is identified. Post-Discovery Status Conference set for 4/22/2020 at 10:00 AM in Courtroom 8A before Judge Marilyn J. Horan. Signed by Judge Marilyn J. Horan on 9/16/19. (rtw) (Entered: 09/16/2019) |
| 09/16/2019 | 60 | ORDER IMPLEMENTING FRCP 502(d). Signed by Judge Marilyn J. Horan on 9/16/19. (rtw) (Entered: 09/16/2019) |
| 10/01/2019 | 61 | STIPULATION selecting ADR process by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Verdini, Christopher) (Entered: 10/01/2019) |
| 10/01/2019 | 62 | ORDER REFERRING CASE to Mediation. Thomas Frampton is appointed as mediator. In accordance with the Initial Case Management Order, Mediation shall be concluded by 12/16/2019. Other details as stated in Order. Signed by Judge Marilyn J. Horan on 10/1/2019. (rtw) (Entered: 10/01/2019) |
| 10/01/2019 | 63 | Notice of Initial ADR Conference by THOMAS T. FRAMPTON. Initial ADR Conference Date 12/12/19 at 9:30 a.m., Goehring, Rutter & Boehm, Frick Building, 437 Grant St., 14th Floor, Pgh., PA 15219 (Frampton, Thomas) (Entered: 10/01/2019) |
| 10/28/2019 | 64 | NOTICE of Change of Address by Christopher Schueller (Schueller, Christopher) (Entered: 10/28/2019) |
| 12/02/2019 | 65 | Unopposed MOTION to Extend Time to 2/7/20 by ERIC DAIMLER. (Attachments: # 1 Scheduling Motion Certificate, # 2 Proposed Amended Order, # 3 Redline of Proposed Amended Order) (Mandell, Mitchell) Modified text on 12/3/2019. (jmm) (Entered: 12/02/2019) |
| 12/03/2019 | 66 | ORDER GRANTING 65 Motion to Extend Time for Mediation. The Court extends the time for completing mediation through 2/7/2020. The Mediation may be conducted at any location agreed to by the parties, counsel, and the assigned neutral. Signed by Judge Marilyn J. Horan on 12/3/2019. (jgb) (Entered: 12/03/2019) |
| 12/11/2019 | 67 | Notice of Mediation by THOMAS T. FRAMPTON. Mediation Date 2/5/20 at 10:00 a.m., Goehring, Rutter & Boehm, 437 Grant St., 14th Floor, Pgh., PA 15219 (Frampton, Thomas) (Entered: 12/11/2019) |
| 01/02/2020 | 68 | STIPULATED PROTECTIVE ORDER by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Verdini, Christopher) (Entered: |

| | | 01/02/2020) |
|---|---|---|
| 01/03/2020 | 69 | STIPULATED PROTECTIVE ORDER. Signed by Judge Marilyn J. Horan on 1/3/20. (rtw) (Entered: 01/03/2020) |
| 02/04/2020 | 70 | Unopposed MOTION to Extend Time to Complete Mediation to March 19, 2020 by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Attachments: # 1 Scheduling Motion Certificate, # 2 Proposed Order) (Verdini, Christopher) (Entered: 02/04/2020) |
| 02/05/2020 | 71 | TEXT ORDER granting 70 Uncontested Motion for Extension of Time to Complete Mediation. The time for completing mediation is extended from 2/7/20 to March 19, 2020. Signed by Judge Marilyn J. Horan on 2/5/20. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (rtw) (Entered: 02/05/2020) |
| 03/05/2020 | 72 | MOTION for attorney Hamutal G. Lieberman to Appear Pro Hac Vice, (Filing fee $70, Receipt # 0315-5497932) by ERIC DAIMLER. (Attachments: # 1 Affidavit of Hamutal G. Lieberman in Support of Motion for Admission Pro Hac Vice) (Lieberman, Hamutal) Modified text on 3/9/2020. (ept) (Entered: 03/05/2020) |
| 03/09/2020 | | CLERK'S OFFICE QUALITY CONTROL MESSAGE re 72 Motion to Appear Pro Hac Vice. ERROR: Proposed Order was not attached. CORRECTION: Attorney is advised to file a proposed order by using the Proposed Order event and linking it to the document in question. This message is for informational purposes only. (ept) (Entered: 03/09/2020) |
| 03/12/2020 | 73 | Proposed Order re 72 Motion to Appear Pro Hac Vice, by ERIC DAIMLER. (Lieberman, Hamutal) (Entered: 03/12/2020) |
| 03/13/2020 | 74 | ORDER granting 72 Motion for Hamutal G. Lieberman to Appear Pro Hac Vice for Eric Daimler. Signed by Judge Marilyn J. Horan on 3/13/2020. (rtw) (Entered: 03/13/2020) |
| 03/16/2020 | 75 | Joint MOTION to Continue *Mediation and Discovery Deadlines* by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Attachments: # 1 Proposed Order) (Verdini, Christopher) (Entered: 03/16/2020) |
| 03/17/2020 | 76 | ORDER granting 75 Motion to CONTINUE DEADLINES FOR MEDIATION AND DISCOVERY. The deadlines of March 18, 2020 and April 15, 2020 for completion of mediation and fact discovery, respectively, are hereby CONTINUED and the Post-Discovery Status Conference set for April 22, 2020 is hereby VACATED. The parties are hereby ORDERED to submit a joint report on or before April 30, 2020 outlining a proposed schedule for completing mediation and discovery. Signed by Judge Marilyn J. Horan on 3/17/2020. (rtw) (Entered: 03/17/2020) |
| 03/28/2020 | | IMPORTANT NOTICE: The United States District Court for the Western District of Pennsylvania (WDPA) will be upgrading its current CM/ECF system to the Next Generation of CM/ECF (NextGen CM/ECF) on Monday, May 26, 2020. Complete information, including a checklist of actions regarding the WDPA NexGen CM/ECF implementation, can be found at here . Currently, multiple attorneys within a firm may share a single PACER account. Shared PACER accounts cannot be used by WDPA e-filing attorneys once the WDPA NextGen CM/ECF system is implemented. Each attorney must have an individual upgraded PACER account that will be linked to the e-filing account. If you have an upgraded PACER account, no action is required until after the WDPA NextGen CM/ECF upgrade on May 26, 2020. You have an upgraded PACER account if you (1) e-file in another NextGen court, or (2) created your PACER account after August 10, 2014. If neither of these are true, you must upgrade your legacy PACER account before you will be able to link your PACER account to your current WDPA CM/ECF account for your new NextGen CM/ECF account. Further informational notices |

| | | will be sent later, but if you have questions about upgrading your PACER account, please contact the PACER Service Center at 800-676-6856. (Administrator, ) (ADI) (Entered: 03/28/2020) |
|---|---|---|
| 04/21/2020 | 77 | Joint MOTION to Continue *and Extend Continuance of Mediation and Discovery Deadlines* by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Attachments: # 1 Proposed Order) (Verdini, Christopher) (Entered: 04/21/2020) |
| 04/22/2020 | 78 | ORDER granting 77 Motion to Continue and Extend Continuance of Mediation and Discovery Deadlines. The parties are hereby ORDERED to submit a joint report on or before June 30, 2020 outlining a proposed schedule for completing mediation and discovery. Signed by Judge Marilyn J. Horan on 4/22/2020. (rtw) (Entered: 04/22/2020) |
| 04/26/2020 | | IMPORTANT NOTICE: The United States District Court for the Western District of Pennsylvania will be upgrading its current CM/ECF system to the Next Generation of CM/ECF on May 26, 2020. Complete information, including a checklist of actions regarding the WDPA NexGen CM/ECF implementation, can be found here. Preparing for NextGen is a two-step process. The first step is to upgrade any legacy PACER accounts. Each attorney must have an individual upgraded PACER account in order to electronically file after our conversion to NextGen. The second step will be to link that upgraded PACER account with your WDPA CM/ECF account after the Court goes live with NextGen. To link your account, you will need your current e-filing credentials from our Court. **If your CM/ECF login contains a special character (such as &, @, $, *), you will need to change it as logins with those characters will be unable to link to PACER accounts. <u>No later than Thursday, May 21, 2020,</u>** you should log into both PACER and the current version of CM/ECF to (1) review and record your current e-filing credentials for both, as you will need to know them in order to e-file after May 23, 2020 and (2) ensure that your primary email address to receive Notices of Electronic Filings (NEF) is accurate. Failure to provide an accurate email address may result in a delay in receiving NEFs after the Court converts to NextGen. (Administrator, ) (ADI) (Entered: 04/26/2020) |
| 05/17/2020 | | FINAL NOTICE: **<u>In preparation of the Court's conversion to NextGen, our Court's CM/ECF system will be unavailable from 12:00 p.m. (Noon) on Friday, May 22, 2020, until 11:59 pm. Monday, May 25, 2020. Please plan accordingly.</u>** Complete information, including a checklist of actions regarding the WDPA NexGen CM/ECF implementation, can be found here. Preparing for NextGen is a two-step process. The first step is to upgrade any legacy PACER accounts. The second step is to link that upgraded PACER account with your WDPA CM/ECF account after the Court goes live with NextGen. To link your account, you will need your current e-filing credentials from our Court. **If your CM/ECF login contains any special characters (anything other than a letter or number), you will need to change it as logins with those characters will be unable to link to PACER accounts. <u>No later than Thursday, May 21, 2020,</u>** you should log into both PACER and the current version of CM/ECF to review and record your current e-filing credentials for both, as you will need to know them in order to e-file after May 23, 2020. Please consult the Court's administrative order for additional information on deadlines and alternative filing options during this period. (Administrator, ) (ADI) (Entered: 05/17/2020) |
| 06/29/2020 | 79 | STATUS REPORT *(Joint)* by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Verdini, Christopher) (Entered: 06/29/2020) |
| 06/30/2020 | 80 | AMENDED CASE MANAGEMENT ORDER: Consistent with the parties' 79 Joint Status Report, the 59 Initial Case Management Order is amended as follows: Fact Discovery is due by 12/31/2020. Parties have set mediation for 9/3/2020. A Post- |

JA114

| | | |
|---|---|---|
| | | Discovery Status Conference is set for 1/12/2021 at 9:30 AM in Courtroom 8A before Judge Marilyn J. Horan. All other matters set forth in the Initial Case Management Order remain in effect. Signed by Judge Marilyn J. Horan on 6/30/2020. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (rtw) (Entered: 06/30/2020) |
| 07/16/2020 | 81 | Notice of Mediation by THOMAS T. FRAMPTON. Mediation Date Thursday, September 3, 2020 at 9:30 a.m. GRB Law, Frick Building, 437 Grant St., 14th Floor, Pgh., PA 15219 (Frampton, Thomas) (Entered: 07/16/2020) |
| 09/03/2020 | 82 | REPORT of Mediation: Case has not been resolved. *The undersigned will stay involved to conduct further mediation sessions as may be appropriate upon the completion of fact discovery.* **the parties are reminded of their obligation to complete the ADR questionnaire and submit within 5 days of the conclusion of the ADR process. The questionnaire can be accessed at www.pawd.uscourts.gov. Click on the ADR icon.** Mediation session was held on 9/3/2020. (Frampton, Thomas) (Entered: 09/03/2020) |
| 10/16/2020 | 83 | MOTION to Amend 48 Amended Complaint, by ERIC DAIMLER. (Attachments: # 1 Exhibit A - Proposed Fifth Amended Complaint, # 2 Exhibit B - Redline of Proposed Fifth Amended Complaint against operative complaint, # 3 Proposed Order) (Mandell, Mitchell) (Entered: 10/16/2020) |
| 10/16/2020 | 84 | Unopposed MOTION to Amend 48 Amended Complaint, *corrected to include visible redlining in Exhibit B* by ERIC DAIMLER. (Attachments: # 1 Exhibit A - Proposed Fifth Amended Complaint, # 2 Exhibit B - Redline of Proposed Fifth Amended Complaint against operative complaint, # 3 Exhibit C - Proposed Order) (Mandell, Mitchell) (Entered: 10/16/2020) |
| 10/17/2020 | 85 | ORDER granting 84 Uncontested Motion for Leave to File an Amended Complaint. Plaintiff is granted leave of court to file the proposed Amended Complaint within 10 days of the entry of this Order. Signed by Judge Marilyn J. Horan on 10/17/2020. (rtw) (Entered: 10/17/2020) |
| 10/19/2020 | 86 | Fifth AMENDED COMPLAINT against COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC, filed by ERIC DAIMLER. (Attachments: # 1 Exhibit A - Moehle RH Award, # 2 Exhibit B - Moehle CH Award, # 3 Exhibit C - Daimler RH Award, # 4 Exhibit D - Daimler CH Award, # 5 Exhibit E - RH Operating Agreement, # 6 Exhibit F - CH Operating Agreement) (Mandell, Mitchell) (Entered: 10/19/2020) |
| 10/20/2020 | | Update Answer Deadline: Answer due from COAL HILL VENTURES LLC on 11/2/2020; CHRIS MOEHLE on 11/2/2020; ROBOTICS HUB FUND 1, LLC on 11/2/2020. (ept) (Entered: 10/20/2020) |
| 10/30/2020 | 87 | ANSWER to 86 Amended Complaint , COUNTERCLAIM against ERIC DAIMLER by CHRIS MOEHLE, COAL HILL VENTURES LLC, ROBOTICS HUB FUND 1, LLC. (Verdini, Christopher) (Entered: 10/30/2020) |
| 12/02/2020 | 88 | Joint MOTION for Extension of Time to Complete Discovery by ERIC DAIMLER. (Attachments: # 1 Proposed Order) (Mandell, Mitchell) (Entered: 12/02/2020) |
| 12/03/2020 | 90 | ORDER granting 88 Motion for Extension of Time to Complete Discovery. Fact Discovery due by 2/26/2021. A Telephonic Post Discovery Conference is set for 3/10/2021 at 11:00 AM before Judge Marilyn J. Horan. Counsel shall dial-in as instructed in ECF No. 89 . Signed by Judge Marilyn J. Horan on 12/3/2020. (rtw) (Entered: 12/03/2020) |

| | | |
|---|---|---|
| 02/09/2021 | 91 | Joint MOTION for Extension of Time to Complete Discovery by ERIC DAIMLER. (Attachments: # 1 Proposed Order) (Mandell, Mitchell) (Entered: 02/09/2021) |
| 02/10/2021 | 92 | ORDER granting 91 Motion for Extension of Time to Complete Discovery. Fact discovery is extended to be completed by 3/5/2021. Signed by Judge Marilyn J. Horan on 2/10/21. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (rtw) (Entered: 02/10/2021) |
| 03/10/2021 | | Text Minute Entry for proceedings held before Judge Marilyn J. Horan: Telephonic Post-Discovery Status Conference held on 3/10/2021. Now that discovery is over Parties would like to mediate case. Parties are to file status report within seven days to report on whether both sides are amendable to judicial mediation. If parties are amendable an order referring the case for mediation will be entered. (Court Reporter: Sharon Siatkowski) Text-only entry; no PDF document will issue. This text-only entry constitutes a Minute of the Court or Notice on the matter. (rtw) (Entered: 03/10/2021) |
| 03/11/2021 | 93 | MOTION to Withdraw as Attorney *Brittney M. Edwards and Hamutal G. Lieberman* by ERIC DAIMLER. (Attachments: # 1 Proposed Order) (Mandell, Mitchell) (Entered: 03/11/2021) |
| 03/17/2021 | 94 | ORDER granting 93 Motion to Withdraw as Attorney. Attorneys Hamutal G. Lieberman and Brittney M. Edwards are withdrawn as counsel for Plaintiff. Signed by Judge Marilyn J. Horan on 3/17/21. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (rtw) (Entered: 03/17/2021) |
| 03/17/2021 | 95 | ORDER re due date of Status Report set in Text Minute Entry on 3/10/21. Parties status report now due Monday, 3/22/2021. Signed by Judge Marilyn J. Horan on 3/17/21. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (rtw) (Entered: 03/17/2021) |
| 03/22/2021 | 96 | STATUS REPORT *(Joint)* by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Verdini, Christopher) (Entered: 03/22/2021) |
| 04/20/2021 | 97 | ORDER that in light of the parties' 96 Status Report indicating that mediation is not a feasible option, a Video Post-Discovery Status Conference is hereby set for 5/12/2021 at 9:30 AM before Judge Marilyn J. Horan. The Parties should come prepared to discuss the possibility of settlement, as well as potential deadlines for expert discovery, dispositive motions, pre-trial statements, motions in limine, a pre-trial conference date and a presumptive trial date. Information on how to attend by video will be provided by email. Signed by Judge Marilyn J. Horan on 4/20/21. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (rtw) (Entered: 04/20/2021) |
| 05/12/2021 | | Text Minute Entry for proceedings held before Judge Marilyn J. Horan: Video Post-Discovery Status Conference held on 5/12/2021. Counsel requested expert discovery to be scheduled followed by briefing on dispositive motions. An appropriate order will be entered setting such deadlines as discussed on the record. (Court Reporter: Amanda Williamson) Text-only entry; no PDF document will issue. This text-only entry constitutes a Minute of the Court or Notice on the matter. (rtw) (Entered: 05/12/2021) |
| 05/12/2021 | 98 | POST-DISCOVERY CONFERENCE CASE MANAGEMENT ORDER: Expert Discovery to be completed by 8/31/2021, Summary Judgment due by 10/1/2021; Response to Summary Judgment due by 10/29/2021; Replies due by 11/12/2021. Signed by Judge Marilyn J. Horan on 5/12/2021. (rtw) (Entered: 05/12/2021) |
| 08/13/2021 | 99 | MOTION to Strike *and Preclude Opinion Testimony from Plaintiff's Non-Retained Expert Jamie Fee* by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB |

| | | |
|---|---|---|
| | | FUND 1, LLC. (Attachments: # 1 Proposed Order, # 2 Meet and Confer Certification) (Verdini, Christopher) (Entered: 08/13/2021) |
| 08/13/2021 | 100 | BRIEF in Support re 99 Motion to Strike, filed by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7) (Verdini, Christopher) (Entered: 08/13/2021) |
| 08/20/2021 | 101 | BRIEF in Opposition re 99 Motion to Strike, *and Preclude Opinion Testimony from Plaintiff's Non-Retained Expert Jamie Fee* filed by ERIC DAIMLER. (Mandell, Mitchell) (Entered: 08/20/2021) |
| 08/20/2021 | 102 | RESPONSE IN OPPOSITION to 99 Motion to Strike,, filed by ERIC DAIMLER. (Attachments: # 1 Exhibit A - Disclosure, # 2 Exhibit B - Emails, # 3 Exhibit C - Subpoena to Fee dated Aug. 18, 2021, # 4 Exhibit D - Friddle v. Moehle (Del. Ch., No. 2021-0306-SG) docket excerpt) (Mandell, Mitchell) (Entered: 08/20/2021) |
| 08/23/2021 | 103 | ORDER denying 99 Motion to Strike and Preclude Opinion Testimony from Plaintiff's Non-Retained Expert Jamie Fee. Expert discovery deadlines are extended. Counsel are directed to meet and confer regarding mutually agreed-upon deadlines to complete expert discovery, and by 9/3/21 report back to the Court by filing a motion to extend expert discovery deadlines with proposed dates OR if unable to agree, counsel shall file a motion to schedule a status conference. Signed by Judge Marilyn J. Horan on 8/23/21. (rtw) (Entered: 08/23/2021) |
| 09/03/2021 | 104 | Joint MOTION to Extend Time to Expert Discovery and Dispositive Motions Deadlines by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Attachments: # 1 Proposed Order) (Verdini, Christopher) (Entered: 09/03/2021) |
| 09/04/2021 | 105 | ORDER granting 104 Joint Motion to Extend Time for expert discovery and Dispositive Motions deadlines. Expert Discovery to close by 10/11/2021, unless Defendants submit a rebuttal report, then expert discovery will close by 11/23/21. Depending on expert discovery close date, Parties will follow the dispositive motions schedule set forth in the Order. Parties shall submit a joint status report by 10/13/2021 to inform the Court whether Defendants are intending to submit a rebuttal expert report.. Signed by Judge Marilyn J. Horan on 9/4/21. (rtw) (Entered: 09/04/2021) |
| 10/12/2021 | 106 | STATUS REPORT *(Joint)* by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Verdini, Christopher) (Entered: 10/12/2021) |
| 11/23/2021 | 107 | MOTION for Summary Judgment by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Attachments: # 1 Proposed Order) (Verdini, Christopher) (Entered: 11/23/2021) |
| 11/23/2021 | 108 | BRIEF in Support re 107 Motion for Summary Judgment filed by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Verdini, Christopher) (Entered: 11/23/2021) |
| 11/23/2021 | 109 | CONCISE STATEMENT OF MATERIAL FACTS re 107 Motion for Summary Judgment by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Verdini, Christopher) (Entered: 11/23/2021) |
| 11/23/2021 | 110 | Appendix to 109 Concise Statement of Material Facts by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Attachments: # 1 Declaration Christopher Verdini, # 2 Exhibit 1-24) (Verdini, Christopher) (Entered: 11/23/2021) |
| 11/23/2021 | 111 | CERTIFICATE of Compliance re 107 MOTION for Summary Judgment *Meet and Confer Certification* by Christopher M. Verdini on behalf of COAL HILL VENTURES |

| | | LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC (Verdini, Christopher) (Entered: 11/23/2021) |
|---|---|---|
| 11/23/2021 | 112 | MOTION for Leave to File Documents Under Seal by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Attachments: # 1 Proposed Order) (Verdini, Christopher) (Entered: 11/23/2021) |
| 11/23/2021 | 113 | ORDER granting 112 MOTION for Leave of Court to File a Portion of Exhibit 18 of Defendants' Appendix to Defendants' Statement of Material Fact Under Seal. **After receiving notice of the order of court, you must provide the sealed document to the Clerk of Courts both on paper and on disk, in pdf format. In the alternative, you may contact the Intake Section and make arrangements to email the pdf to the Clerk of Courts. The party is excused from filing a redacted version of the Robotics Hub Fund I Confidential Private Placement Memorandum that is contained in Exhibit 18. The party shall file the the Portion of Exhibit 18 that is not subject to the under seal order on the docket. You are required to serve the sealed document on counsel using traditional service methods. Document Sealed Permanently**. Signed by Judge Marilyn J. Horan on 11/23/21. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (rtw) (Entered: 11/23/2021) |
| 11/24/2021 | 114 | SEALED DOCUMENT by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. This document Sealed pursuant to 113 Order on Motion for Leave to File Documents Under Seal. (elt) (Entered: 11/24/2021) |
| 01/07/2022 | 115 | BRIEF in Opposition re 107 Motion for Summary Judgment filed by ERIC DAIMLER. (Mandell, Mitchell) (Entered: 01/07/2022) |
| 01/07/2022 | 116 | CONCISE STATEMENT OF MATERIAL FACTS re 115 Brief in Opposition to Motion, 107 Motion for Summary Judgment by ERIC DAIMLER. (Mandell, Mitchell) Modified text on 1/10/2022 to add link to 107 . (ept) (Entered: 01/07/2022) |
| 01/07/2022 | 117 | Appendix to 116 Concise Statement of Material Facts by ERIC DAIMLER. (Attachments: # 1 Declaration Mitchell Mandell, # 2 Exhibit A-N, # 3 Exhibit O Part 1, # 4 Exhibit O Part 2, # 5 Exhibit O Part 3, # 6 Exhibit O Part 4, # 7 Exhibit O Part 5, # 8 Exhibit O Part 6) (Mandell, Mitchell) Errata filed at 120 to add Exhibit N. Modified text on 1/13/2022. (ept) (Entered: 01/07/2022) |
| 01/07/2022 | 118 | MOTION for Leave to File Documents Under Seal by ERIC DAIMLER. (Mandell, Mitchell) (Entered: 01/07/2022) |
| 01/08/2022 | 119 | ORDER granting 118 MOTION for Leave to File Documents Under Seal. **After receiving notice of the order of court, you must provide the sealed document to the Clerk of Courts both on paper and on disk, in pdf format. In the alternative, you may contact the Intake Section and make arrangements to email the pdf to the Clerk of Courts. The sealed version of the document WILL NOT be docketed by the Clerk of Court until the party electronically files the redacted version of the documents (using Redacted Document event located under Other Documents), unless otherwise ordered by the Court. You would be required to serve the sealed document on counsel using traditional service methods. Decision to Unseal Document deferred.**. Signed by Judge Marilyn J. Horan on 1/8/22. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (rtw) (Entered: 01/08/2022) |
| 01/11/2022 | 120 | Errata re 117 Appendix, by ERIC DAIMLER. Reason for Correction: Exhibit N. (Attachments: # 1 Exhibit N) (Mandell, Mitchell) (Entered: 01/11/2022) |

| 01/11/2022 | 121 | SEALED DOCUMENT Exhibits K,L,M by ERIC DAIMLER. This document Sealed pursuant to 119 Order on Motion for Leave to File Documents Under Seal, (elt) (Entered: 01/13/2022) |
| 01/21/2022 | 122 | REPLY BRIEF re 107 Motion for Summary Judgment filed by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Verdini, Christopher) (Entered: 01/21/2022) |
| 01/21/2022 | 123 | Final CONCISE STATEMENT OF MATERIAL FACTS *(Combined)* re 116 Concise Statement of Material Facts, 109 Concise Statement of Material Facts, 107 Motion for Summary Judgment by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Verdini, Christopher) Modified text on 1/22/2022 to add link to 107 . (ept) (Entered: 01/21/2022) |
| 07/18/2022 | 124 | OPINION indicating that the 107 MOTION for Summary Judgment filed by COAL HILL VENTURES LLC, ROBOTICS HUB FUND 1, LLC, and CHRIS MOEHLE will be granted. Signed by Judge Marilyn J. Horan on 7/18/22. (rtw) (Entered: 07/18/2022) |
| 07/18/2022 | 125 | ORDER granting 107 Motion for Summary Judgment filed by Chris Moehle, Robotics Hub Fund 1, LLC, and Coal Hill Ventures LLC is GRANTED. Judgment as a matter of law is entered in favor of Chris Moehle, Robotics Hub Fund 1, LLC, and Coal Hill Ventures LLC and against Eric Daimler on Eric Daimler's fraudulent inducement claims asserted in Counts One, Two, and Four. Judgment as a matter of law is entered in favor of Coal Hill Ventures LLC and against Eric Daimler on Eric Daimler's breach of contract claim asserted in Count Three. The Clerk is to mark this case CLOSED. Signed by Judge Marilyn J. Horan on 7/18/22. (rtw) (Entered: 07/18/2022) |
| 08/11/2022 | 126 | NOTICE OF APPEAL as to 23 Order, Terminate Motions, Set Deadlines, 22 Memorandum Opinion, 47 Order on Motion to Dismiss for Failure to State a Claim, 125 Order on Motion for Summary Judgment, 124 Memorandum Opinion by ERIC DAIMLER. Certificate of Appealability N/A. Court Reporter(s): N/A. The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. The Transcript Purchase Order form will NOT be mailed to the parties. The form is available on the Court's internet site. (Mandell, Mitchell) Modified on 8/11/2022 Receipt #APAWDC-7235915 $505 (elt). Modified on 9/2/2022 (keh). (Entered: 08/11/2022) |
| 08/12/2022 | 127 | USCA Case Number 22-2492 for 126 Notice of Appeal,, filed by ERIC DAIMLER. USCA Case Manager Laurie (DOCUMENT IS RESTRICTED AND CAN ONLY BE VIEWED BY COURT STAFF) (pdb3) (Entered: 08/12/2022) |
| 08/18/2022 | 128 | Unopposed MOTION to Reopen Case by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Attachments: # 1 Proposed Order) (Verdini, Christopher) (Entered: 08/18/2022) |
| 08/24/2022 | 129 | ORDER denying 128 Motion to Reopen Case, without prejudice, due to lack of present jurisdiction. Once jurisdiction is returned to this Court, the Defendants may refile their Motion to Reopen. Signed by Judge Marilyn J. Horan on 8/24/2022. (rtw) (Entered: 08/24/2022) |
| 09/01/2022 | 130 | CERTIFIED ORDER of USCA in lieu of formal MANDATE as to 126 Notice of Appeal,, filed by ERIC DAIMLER dismissing case pursuant to Fed. R. App. P. 42(b) (lr) (Entered: 09/01/2022) |
| 09/09/2022 | 131 | Renewed MOTION to Reopen Case by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Attachments: # 1 Proposed Order) (Verdini, Christopher) (Entered: 09/09/2022) |

| | | |
|---|---|---|
| 09/09/2022 | 132 | ORDER granting 131 Renewed Motion to Reopen Case. The Clerk is directed to mark this matter as Open. Signed by Judge Marilyn J. Horan on 9/9/22. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (rtw) (Entered: 09/09/2022) |
| 09/09/2022 | | TEXT ORDER that a Video Status Conference is set for 10/12/2022 at 9:30 AM before Judge Marilyn J. Horan. Instructions on connecting by video will be emailed to counsel. Signed by Judge Marilyn J. Horan on 9/9/22. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (rtw) (Entered: 09/09/2022) |
| 10/12/2022 | 133 | Text Minute Entry for proceedings held before Judge Marilyn J. Horan: Video Status Conference held on 10/12/2022. Mitchell Mandell for Plaintiff; Chris Verdini for Defendants. Discussion held regarding resolving Defendants' outstanding counterclaims, by jury trial, non-jury trial, mediation, or some other resolution. Parties are directed to confer and report back to the Court by filing a Joint Status Report by October 31, 2022, in which the parties shall inform the Court as to whether mediation is a viable option, whether Trial will be Jury or Non-Jury, and the anticipated length of the trial. (Court Reporter: Barbara Loch) Text-only entry; no PDF document will issue. This text-only entry constitutes a Minute of the Court or Notice on the matter. (rtw) (Entered: 10/12/2022) |
| 10/27/2022 | 134 | STATUS REPORT *(Joint)* by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Verdini, Christopher) (Entered: 10/27/2022) |
| 10/27/2022 | 135 | ORDER that in accord with the parties' 134 Joint Status Report this matter is referred to mediation. The parties will select a mediator and mediation is to be completed by 12/30/2022. The parties shall jointly file notice of the date, time, and location of the Mediation. The parties or the mediator shall file with the Court the outcome of the mediation. If the case is not resolved, a pretrial order will be entered with trial to be tentatively scheduled for 2/20/23 or 3/6/23. Signed by Judge Marilyn J. Horan on 10/27/22. (rtw) (Entered: 10/27/2022) |
| 11/18/2022 | 136 | Notice of Mediation by Mark D. Shepard. Mediation Date December 20, 2022 at 9 a.m. (Shepard, Mark) (Entered: 11/18/2022) |
| 12/05/2022 | 137 | Notice of Mediation by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. Mediation Date January 12, 2023 (Verdini, Christopher) (Entered: 12/05/2022) |
| 12/06/2022 | 138 | ORDER re 137 Notice of Mediation. The Parties' request for an extension of time to complete mediation is granted. It is hereby ORDERED that mediation is to be completed by January 12, 2023, unless extended by order of Court. Signed by Judge Marilyn J. Horan on 12/6/2022. (rtw) (Entered: 12/06/2022) |
| 12/08/2022 | 139 | Notice of Mediation by Mark D. Shepard. Mediation Date January 12, 2023 at 9:00 a.m. (Shepard, Mark) (Entered: 12/08/2022) |
| 01/13/2023 | 140 | REPORT of Mediation: Case has not resolved. **The parties are reminded of their obligation to complete the ADR questionnaire and submit within 5 days of the conclusion of the ADR process. The questionnaire can be accessed here or at www.pawd.uscourts.gov. Click on the ADR icon.** Mediation session was held on 1/12/2023. (Shepard, Mark) (Entered: 01/13/2023) |
| 02/02/2023 | 141 | PRETRIAL ORDER: Jury Selection is set for 4/17/2023 at 9:00 AM in Courtroom 8A before Judge Marilyn J. Horan, with Trial to begin immediately after jury selection. An Initial Video Pretrial Conference is set for 2/16/2023 at 01:00 PM. A Final Pretrial Conference is set for 4/11/2023 at 10:30 AM in Courtroom 8A. Cross-claim |

| | | |
|---|---|---|
| | | Plaintiffs/Defendants' Pretrial Statement is due by 3/20/2023; Cross-claim Defendant/Plaintiffs Pretrial Statement is due by 4/3/2023. Motions in Limine due by 3/7/2023; Response to Motions in Limine due by 3/14/2023; Proposed Voir Dire due by 3/27/2023; Points for Charge due by 4/3/2023; Proposed Verdict Slips due by 4/3/2023; Exhibit List due by 4/17/2023; Pretrial Stipulations due by 4/14/2023. Other details as stated in Order. Signed by Judge Marilyn J. Horan on 2/2/23. (rtw) (Entered: 02/02/2023) |
| 03/09/2023 | 142 | NOTICE of Change of Address by Mitchell G. Mandell (Mandell, Mitchell) (Entered: 03/09/2023) |
| 03/17/2023 | 143 | NOTICE of Appearance by Stuart C. Gaul, Jr on behalf of COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Gaul, Stuart) (Entered: 03/17/2023) |
| 03/17/2023 | 144 | NOTICE of Appearance by David A. Jones, Jr on behalf of COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Jones, David) (Entered: 03/17/2023) |
| 03/20/2023 | 145 | PRETRIAL STATEMENT by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Gaul, Stuart) (Entered: 03/20/2023) |
| 03/24/2023 | 146 | Consent MOTION for Leave to File Documents Under Seal by COAL HILL VENTURES LLC, ROBOTICS HUB FUND 1, LLC. (Attachments: # 1 Proposed Order) (Gaul, Stuart) (Entered: 03/24/2023) |
| 03/27/2023 | 147 | ORDER granting 146 Consented-To Motion of Cross-Claim Plaintiffs Robotics Hub Fund 1, LLC and Coal Hill Ventures LLC for Leave to File Supplemental Pretrial Statement Under Seal. Cross-Claim Plaintiffs may file a supplement to their Pretrial Statement under seal. **DO NOT electronically file the sealed version of the document until you electronically file the redacted version of the document, using the Redacted Document event, unless otherwise ordered by the Court. You are required to serve the sealed document on counsel using traditional service methods. Document Sealed Permanently**. Signed by Judge Marilyn J. Horan on 3/27/23. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (rtw) (Entered: 03/27/2023) |
| 03/27/2023 | 148 | Proposed Voir Dire by COAL HILL VENTURES LLC, ROBOTICS HUB FUND 1, LLC. (Gaul, Stuart) (Entered: 03/27/2023) |
| 03/29/2023 | 149 | REDACTION to 147 Order on Motion for Leave to File Documents Under Seal, *Supplemental Pretrial Statement of Cross-claim Plaintiffs* by COAL HILL VENTURES LLC, ROBOTICS HUB FUND 1, LLC. (Gaul, Stuart) (Entered: 03/29/2023) |
| 03/29/2023 | 150 | SEALED DOCUMENT by COAL HILL VENTURES LLC, ROBOTICS HUB FUND 1, LLC. This document Sealed pursuant to 147 Order on Motion for Leave to File Documents Under Seal. (Gaul, Stuart) (Entered: 03/29/2023) |
| 04/01/2023 | 151 | Consent MOTION to Amend 141 Pretrial Order, by COAL HILL VENTURES LLC, ROBOTICS HUB FUND 1, LLC. (Attachments: # 1 Proposed Order) (Gaul, Stuart) Modified text on 4/3/2023. (elt) (Entered: 04/01/2023) |
| 04/01/2023 | 152 | ORDER granting 151 Consented-To Motion to Amend 141 Pretrial Order. Due dates set forth in paragraphs 8 and 9 of Pretrial Order are amended, dues dates are now 4/7/2023, as fully stated in Order. Signed by Judge Marilyn J. Horan on 4/1/23. (rtw) (Entered: 04/01/2023) |
| 04/03/2023 | 153 | PRETRIAL STATEMENT by ERIC DAIMLER. (Mandell, Mitchell) (Entered: 04/03/2023) |

| 04/04/2023 | 154 | TEXT ORDER: The Jury Selection and Trial currently set for 4/17/2023 is hereby RESET for 4/19/2023 at 09:00 AM in Courtroom 8A. Counsel shall promptly report to chambers at 08:30 AM the day of trial. All remaining deadlines and hearings set forth in the Pretrial Order 141 remain unchanged. Signed by Judge Marilyn J. Horan on 4/4/2023. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jgb) (Entered: 04/04/2023) |
|---|---|---|
| 04/04/2023 |  | ***Edit schedule. (jgb) (Entered: 04/04/2023) |
| 04/05/2023 | 155 | TEXT ORDER. The Final Pretrial Confernece set for 4/11/2023 at 10:30 AM will now be conuccted by video conference. Chambers will email counsel of record a link to connect by video in advance of the conference. Signed by Judge Marilyn J. Horan on 4/5/2023. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jgb) (Entered: 04/05/2023) |
| 04/07/2023 | 156 | PROPOSED VERDICT FORM by COAL HILL VENTURES LLC, ROBOTICS HUB FUND 1, LLC. (Attachments: # 1 Proposed Jury Slip) (Gaul, Stuart) (Entered: 04/07/2023) |
| 04/07/2023 | 157 | PROPOSED VERDICT FORM by ERIC DAIMLER. (Mandell, Mitchell) (Entered: 04/07/2023) |
| 04/07/2023 | 158 | Proposed Jury Instructions by COAL HILL VENTURES LLC, ROBOTICS HUB FUND 1, LLC. (Gaul, Stuart) (Entered: 04/07/2023) |
| 04/10/2023 | 159 | Unopposed MOTION to Continue *Adjourn Trial* by ERIC DAIMLER. (Mandell, Mitchell) (Entered: 04/10/2023) |
| 04/11/2023 | 160 | MOTION to Withdraw as Attorney by ERIC DAIMLER. (Attachments: # 1 Proposed Order) (Schueller, Christopher) (Entered: 04/11/2023) |
| 04/11/2023 | 161 | Minute Entry for proceedings held before Judge Marilyn J. Horan: Final Pretrial Conference held on 4/11/2023. Court addressed Motion to Withdraw as attorneys for Daimler filed by law firm Buchanan. No one from Buchanan appeared. Based on representations from Mr. Mandel the Motion will be taken under advisement pending further communications to the Court. Discussion held re pretrial issues. Handling confidential evidence during trial was discussed. Evidence in support of Daimler's dismissed claim is presumed not relevant, but Daimler may seek ruling to allow such evidence if door is opened. Also discussed: objections to exhibits have been exchanged and parties will seek to resolve and contact Chambers if substantial number of objections need a ruling prior to trial. Parties will meet and confer regarding evidence related to validity of Robotics Hub trademark. Mr. Mandel's Motion to Adjourn addressed. After discussion the Court rules that Jury Selection will take place on April 19. 2023 as originally scheduled and Jury Trial will commence on Monday April 24, 2023. Orders to follow. (Court Reporter: Marsia Balobeck) Text-only entry; no PDF document will issue. This text-only entry constitutes a Minute of the Court or Notice on the matter. (rtw) (Entered: 04/11/2023) |
| 04/11/2023 | 162 | TEXT ORDER taking under advisement 160 Motion for Leave to Withdraw as Counsel filed by Buchanan Ingersoll & Rooney PC. No representative of Buchanan was present at the final pretrial conference on 4/11/23. The Court will take the Motion under advisement pending further communication to the Court based on the representations from Mr. Mandel at the 4/11/23 conference. Signed by Judge Marilyn J. Horan on 4/11/23. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (rtw) (Entered: 04/11/2023) |
| 04/11/2023 | 163 | TEXT ORDER granting in part and denying in part 159 Unopposed Motion to Adjourn Trial. The Motion is denied to the extent that Jury Selection will take place on 4/19/23, as |

| | | |
|---|---|---|
| | | scheduled, and the motion is granted to the extent that Jury Trial, originally set to begin on 4/19/23 and continue through 4/20/23 and 4/21/23, is continued and Jury Trial will commence on 4/24/23. Signed by Judge Marilyn J. Horan on 4/11/23. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (rtw) (Entered: 04/11/2023) |
| 04/11/2023 | 164 | AMENDED PRETRIAL SCHEDULING ORDER that Jury Selection shall be held, as originally scheduled, on 4/19/2023. Counsel shall be in the Courtroom and prepared to discuss outstanding issues at 8:30 AM. Jury Trial will commence on 4/24/2023 at 9:00 AM in Courtroom 8A before Judge Marilyn J. Horan. Signed by Judge Marilyn J. Horan on 4/11/23. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (rtw) (Entered: 04/11/2023) |
| 04/12/2023 | | CLERK'S OFFICE QUALITY CONTROL MESSAGE re 159 Motion to Continue. ERROR: Proposed Order was made part of main document. CORRECTION: Attorney advised that in future proposed orders are to be made attachments to the main document. This message is for informational purposes only. (sdp) (Entered: 04/12/2023) |
| 04/14/2023 | 165 | Pretrial Stipulation by COAL HILL VENTURES LLC, ROBOTICS HUB FUND 1, LLC. (Attachments: # 1 Exhibit 1) (Gaul, Stuart) (Entered: 04/14/2023) |
| 04/19/2023 | 166 | TEXT Minute Entry for proceedings held before Judge Marilyn J. Horan: Jury Selection held on 4/19/2023.Voir Dire conducted. Jury Selection completed 4/19/2023. Jury Trial will begin Monday 4/24/2023 at 9:00 AM in Courtroom 8A. (Court Reporter: M. Balobeck) Text-only entry; no PDF document will issue. This text-only entry constitutes a Minute of the Court or Notice on the matter. (jgb) (Entered: 04/19/2023) |
| 04/24/2023 | 167 | Minute Entry for proceedings held before Judge Marilyn J. Horan: Jury Trial begun on 4/24/2023. Christopher Moehle and Eric Daimler testified. Exhibits admitted. Trial will resume 04/25/23. (Court Reporter: Marcia Balobeck) Text-only entry; no PDF document will issue. This text-only entry constitutes a Minute of the Court or Notice on the matter. (eca) (Entered: 04/24/2023) |
| 04/25/2023 | 168 | TEXT Minute Entry for proceedings held before Judge Marilyn J. Horan: Jury Trial held on 4/25/2023. Witnesses and Evidence submitted. Plaintiff rests. Defense rests. Plaintiff's counsel made closing statement. Defendants' counsel made closing statement. Court gave post-closing instructions. Court will begin with final Jury instructions on 4/26/2023 at 09:00AM in Courtroom 8A. (Court Reporter: M. Balobeck) Text-only entry; no PDF document will issue. This text-only entry constitutes a Minute of the Court or Notice on the matter. (jgb) (Entered: 04/25/2023) |
| 04/26/2023 | | Jury Trial set for 4/26/2023 at 09:00 AM in Courtroom 8A before Judge Marilyn J. Horan. (jgb) (Entered: 04/26/2023) |
| 04/26/2023 | 169 | TEXT ORDER granting 160 Motion to Withdraw as Attorney. Attorney Sydney Rochelle Normil and Christopher Schueller terminated. Signed by Judge Marilyn J. Horan on 4/26/28. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (rtw) (Entered: 04/26/2023) |
| 04/26/2023 | 170 | TEXT Minute Entry for proceedings held before Judge Marilyn J. Horan: Jury Trial completed on 4/26/2023. Court gave final instructions. Jury began deliberations. Jury returned a Verdict. See docket for details. (Court Reporter: M. Balobeck) Text-only entry; no PDF document will issue. This text-only entry constitutes a Minute of the Court or Notice on the matter. (jgb) (Entered: 04/26/2023) |
| 04/27/2023 | 171 | Peremptory Challenges. (jgb) (Entered: 04/27/2023) |
| 04/27/2023 | 172 | Jury Question #1. (jgb) (Entered: 04/27/2023) |

ECF NextGen 1.7.1.1

| | | |
|---|---|---|
| 04/27/2023 | 173 | ORDER. In accordance with the stipulation entered at the commencement of this trial, the verdict in the case is hereby molded to reflect the caption of the case as filed in civil number 18-cv-165. Further detials are more fully dated in the order. Signed by Judge Marilyn J. Horan on 4/26/2023. (jgb) (Entered: 04/27/2023) |
| 04/27/2023 | 174 | Exhibit List and Witness List. (jgb) (Entered: 04/27/2023) |
| 04/27/2023 | 175 | JURY VERDICT in favor of Cross-Claim Plaintiffs COAL HILL VENTURES LLC and ROBOTICS HUB FUND 1, LLC, in the amount of $225,000. (jgb) (Entered: 04/27/2023) |
| 04/27/2023 | 176 | JUDGMENT in favor of Robotics Hub Fund 1 LLC and Coal Hill Ventures LLC against Eric Daimler in the amount of $225,000. Signed by Judge Marilyn J. Horan on 4/26/2023. (jgb) Modified text on 5/2/2023. (elt) (Entered: 04/27/2023) |
| 05/11/2023 | 177 | MOTION for Attorney Fees by COAL HILL VENTURES LLC, ROBOTICS HUB FUND 1, LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Proposed Order) (Jones, David) (Entered: 05/11/2023) |
| 05/12/2023 | 178 | BRIEF in Support re 177 Motion for Attorney Fees filed by COAL HILL VENTURES LLC, ROBOTICS HUB FUND 1, LLC. (Jones, David) (Entered: 05/12/2023) |
| 05/12/2023 | 179 | TEXT ORDER that ERIC DAIMLER shall file a Response to the 177 Motion for Attorney Fees and 178 Brief in Support, filed by Robotics Hub and Coal Hill Ventures, no later than 6/2/2023. Any Reply is due by 6/9/2023. Signed by Judge Marilyn J. Horan on 5/12/23. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (rtw) (Entered: 05/12/2023) |
| 05/15/2023 | 180 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings re Trial Volume III held on 4/25/2023 before Judge Marilyn J. Horan. Court Reporter/Transcriber Marsia Balobeck, Telephone number 412-328-5452. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely, electronically available to the public without redaction after 90 calendar days. For redaction purposes, or otherwise, during this 90 day period a copy of the transcript may be purchased from the court reporter/transcriber or viewed at the clerk's office public terminal. **Any Notice of Intent to Request Redaction and Redaction Request must be separately mailed to the court reporter of said proceedings.** Notice of Intent for Redaction of Personal Data Identifiers due by 5/22/2023. Redaction Request due 6/5/2023. Redacted Transcript Deadline set for 6/15/2023. Release of Transcript Restriction set for 8/14/2023. (Balobeck, Marsia) (Entered: 05/15/2023) |
| 05/25/2023 | 181 | MOTION for Relief of Judgment by ERIC DAIMLER. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B) (Mandell, Mitchell) (Entered: 05/25/2023) |
| 05/25/2023 | 182 | BRIEF in Support re 181 MOTION for Relief of Judgment filed by ERIC DAIMLER. (Mandell, Mitchell) (Entered: 05/25/2023) |
| 05/31/2023 | 183 | TEXT ORDER Upon the parties advising the Court that they will engage in further mediation, the parties shall advise the Court of the date of said mediation. It is further ordered that all responses to pending motions are stayed until further order of Court. Signed by Judge Marilyn J. Horan on 5/31/2023. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (bjl) (Entered: 05/31/2023) |
| 05/31/2023 | 184 | MOTION for Supersedeas Bond by ERIC DAIMLER. (Attachments: # 1 Exhibit A) (Mandell, Mitchell) (Entered: 05/31/2023) |

| 06/01/2023 | 185 | RESPONSE to Motion re 184 MOTION for Supersedeas Bond filed by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Attachments: # 1 Proposed Order) (Gaul, Stuart) (Entered: 06/01/2023) |
|---|---|---|
| 06/01/2023 | 186 | ORDER granting 184 Motion for Supersedeas Bond. Pursuant to Rule 62 of the Federal Rules of Civil Procedure, Daimler may obtain a stay of proceedings to enforce the judgment entered against him in this action at Doc. No. 176 by providing a bond in the form and amount attached to his motion as Exhibit A; andThis Order is entered without prejudice to the ability of any party to seek modification, amendment, or reconsideration of it if the amount of that judgment is altered. Signed by Judge Marilyn J. Horan on 6/1/2023. (bjl) (Entered: 06/01/2023) |
| 06/05/2023 | | CLERK'S OFFICE QUALITY CONTROL MESSAGE re 181 MOTION for Relief of Judgment. ERROR: Proposed Order was not attached. CORRECTION: Attorney is advised to file a proposed order by using the Proposed Order event and linking it to the document in question. (bjw) (Entered: 06/05/2023) |
| 06/28/2023 | 187 | REPORT of Mediation: Case has not resolved. Mark D. Shepard terminated. **The parties are reminded of their obligation to complete the ADR questionnaire and submit within 5 days of the conclusion of the ADR process. The questionnaire can be accessed here or at www.pawd.uscourts.gov. Click on the ADR icon.** Mediation session was held on 6/13/2023. (Shepard, Mark) (Entered: 06/28/2023) |
| 06/28/2023 | 188 | TEXT ORDER Following indication that this matter has not resolved, responsive briefs to the pending motions 177 and 181 shall be filed by July 12, 2023, and any replies shall be filed by July 19, 2023. Signed by Judge Marilyn J. Horan on 6/28/2023. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (bjl) (Entered: 06/28/2023) |
| 07/05/2023 | 189 | Consent MOTION for Leave to File Documents Under Seal *Portion of Transcript* by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC. (Attachments: # 1 Proposed Order) (Gaul, Stuart) (Entered: 07/05/2023) |
| 07/06/2023 | 190 | ORDER granting 189 the Consented-To Motion of Cross-Claim Plaintiffs Robotics Hub Fund 1, LLC and Coal Hill Ventures LLC To Authorize Preparation and Filing of Sealed Portion of Transcript. The seal that this Court placed on portions of the record of the trial in this action held on April 24 and 25, 2023 is lifted to the extent necessary to allow the Court Reporter to prepare the transcripts of those sealed portions; Pursuant to LCvR 5.2.H of this Court, the Clerk is directed to accept the transcripts of those portions of the trial for filing under seal; and the parties are reminded of their obligations under this Courts LCvR 5.2.H if they intend to file any documents under seal. Signed by Judge Marilyn J. Horan on 7/6/2023. (bjl) (Entered: 07/06/2023) |
| 07/12/2023 | 191 | BRIEF in Opposition re 177 Motion for Attorney Fees filed by ERIC DAIMLER. (Attachments: # 1 Exhibit A) (Mandell, Mitchell) (Entered: 07/12/2023) |
| 07/12/2023 | 192 | BRIEF in Opposition re 181 MOTION for Relief of Judgment filed by COAL HILL VENTURES LLC, ROBOTICS HUB FUND 1, LLC. (Attachments: # 1 Exhibit 1) (Gaul, Stuart) (Entered: 07/12/2023) |
| 07/19/2023 | 193 | REPLY BRIEF *On Motion for Remittitur* filed by ERIC DAIMLER. (Mandell, Mitchell) (Entered: 07/19/2023) |
| 07/20/2023 | 194 | REPLY BRIEF re 191 Brief in Opposition to Motion, 177 Motion for Attorney Fees filed by COAL HILL VENTURES LLC, ROBOTICS HUB FUND 1, LLC. (Jones, David) (Entered: 07/20/2023) |

| 08/02/2023 | 195 | OPINION Following Consideration of Mr. Daimler's Motion for New Trial on Damages or Remittitur (ECF No. 181 ), the respective briefs (ECF Nos. 182, 192, and 193), and for the reasons stated, Mr. Daimler's Motion will be denied. Further, following consideration of the Companies' Motion for Attorneys' Fees (ECF No. 177 ), the respective briefs (ECF No. 178, 191, and 194), and for the reasons stated, the Companies' Motion will be granted. A separate order will follow. Signed by Judge Marilyn J. Horan on 8/2/2023. (bjl) (Entered: 08/02/2023) |
| --- | --- | --- |
| 08/02/2023 | 196 | ORDER AND JUDGMENT on Attorney Fees in favor of COAL HILL VENTURES LLC, ROBOTICS HUB FUND 1, LLC against ERIC DAIMLER. Following Consideration of Mr. Daimler's Motion for New Trial on Damages or Remittitur (ECF No. 181), the respective briefs (ECF Nos. 182, 192, and 193), and for the reasons stated in this Court's Opinion (ECF No. 195), Mr. Daimler's Motion is denied. Further, following consideration of the Companies' Motion for Attorneys' Fees (ECF No. 177), the respective briefs (ECF Nos. 178, 191, and 194), and for the reasons stated in this Court's Opinion (ECF No. 195 ), the Companies' Motion is Granted. The Companies are hereby awarded $129,183.00 in attorneys' fees. The Clerk will mark this case closed. Signed by Judge Marilyn J. Horan on 8/2/2023. (bjl) (Entered: 08/02/2023) |
| 08/16/2023 | 197 | Supplemental MOTION for Attorney Fees by COAL HILL VENTURES LLC, ROBOTICS HUB FUND 1, LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Proposed Order, # 4 Certificate of Service) (Jones, David) (Entered: 08/16/2023) |
| 08/16/2023 | 198 | BRIEF in Support re 197 Motion for Attorney Fees filed by COAL HILL VENTURES LLC, ROBOTICS HUB FUND 1, LLC. (Attachments: # 1 Certificate of Service) (Jones, David) (Entered: 08/16/2023) |
| 08/17/2023 | 199 | TEXT ORDER Daimler shall respond to the Supplemental Motion 197 on or before August 24, 2023. Signed by Judge Marilyn J. Horan on 8/17/2023. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (bjl) (Entered: 08/17/2023) |
| 08/24/2023 | 200 | MOTION to Vacate 186 Order on Motion for Bond,, by COAL HILL VENTURES LLC, ROBOTICS HUB FUND 1, LLC. (Attachments: # 1 Proposed Order) (Gaul, Stuart) (Entered: 08/24/2023) |
| 08/24/2023 | 201 | TEXT ORDER Mr. Daimler shall respond to the Motion to Vacate 200 on or before August 31, 2023. Signed by Judge Marilyn J. Horan on 8/24/2023. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (bjl) (Entered: 08/24/2023) |
| 08/24/2023 | 202 | BRIEF in Opposition to 197 Supplemental MOTION for Attorney Fees , filed by ERIC DAIMLER. (Attachments: # 1 Exhibit A) (Mandell, Mitchell) (Entered: 08/24/2023) |
| 08/31/2023 | 203 | BRIEF in Opposition to 200 MOTION to Vacate 186 Order on Motion for Bond, , filed by ERIC DAIMLER. (Mandell, Mitchell) Modified text on 9/1/2023. (elt) (Entered: 08/31/2023) |
| 09/01/2023 | 204 | NOTICE OF APPEAL as to 23 Order, Terminate Motions, Set Deadlines, 175 Jury Verdict, 47 Order on Motion to Dismiss for Failure to State a Claim, 195 Memorandum Opinion, Terminate Motions, 125 Order on Motion for Summary Judgment, 176 Judgment, 124 Memorandum Opinion, 196 Judgment on Attorney Fees, 22 Memorandum Opinion, by ERIC DAIMLER. Filing fee $505, receipt number APAWDC-7862967. The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. The Transcript Purchase Order form will NOT be mailed to the parties. The form is available on the Court's internet site. (Mandell, Mitchell) (Entered: 09/01/2023) |

| | | |
|---|---|---|
| 09/06/2023 | 205 | USCA Case Number 23-2611 for 204 Notice of Appeal, filed by ERIC DAIMLER. USCA Case Manager Caitlyn (CJG) (DOCUMENT IS RESTRICTED AND CAN ONLY BE VIEWED BY COURT STAFF) (cjg3) (Entered: 09/06/2023) |
| 09/06/2023 | 206 | REPLY BRIEF re 200 Motion to Vacate *June 1, 2023 Order of Court Regarding Supersedeas Bond* filed by COAL HILL VENTURES LLC, ROBOTICS HUB FUND 1, LLC. (Gaul, Stuart) (Entered: 09/06/2023) |
| 09/14/2023 | 207 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings re hearing held on 4/24/2023 before Judge Marilyn J. Horan. Court Reporter/Transcriber Marsia Balobeck, Telephone number 412-328-5452. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely, electronically available to the public without redaction after 90 calendar days. For redaction purposes, or otherwise, during this 90 day period a copy of the transcript may be purchased from the court reporter/transcriber or viewed at the clerk's office public terminal. **Any Notice of Intent to Request Redaction and Redaction Request must be separately mailed to the court reporter of said proceedings.** Notice of Intent for Redaction of Personal Data Identifiers due by 9/21/2023. Redaction Request due 10/5/2023. Redacted Transcript Deadline set for 10/16/2023. Release of Transcript Restriction set for 12/13/2023. (Balobeck, Marsia) (Entered: 09/14/2023) |
| 09/14/2023 | 208 | BILL OF COSTS by COAL HILL VENTURES LLC, CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC in the amount of $13283.40 against Eric Daimler. (Attachments: # 1 Itemization, # 2 Exhibit A, # 3 Exhibit B) (Gaul, Stuart) (Entered: 09/14/2023) |
| 09/19/2023 | 209 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings re hearing held on 4/25/2023 before Judge Marilyn J. Horan. Court Reporter/Transcriber Marsia Balobeck, Telephone number 412-328-5452. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely, electronically available to the public without redaction after 90 calendar days. For redaction purposes, or otherwise, during this 90 day period a copy of the transcript may be purchased from the court reporter/transcriber or viewed at the clerk's office public terminal. **Any Notice of Intent to Request Redaction and Redaction Request must be separately mailed to the court reporter of said proceedings.** Notice of Intent for Redaction of Personal Data Identifiers due by 9/26/2023. Redaction Request due 10/10/2023. Redacted Transcript Deadline set for 10/20/2023. Release of Transcript Restriction set for 12/18/2023. (Balobeck, Marsia) (Entered: 09/19/2023) |
| 09/19/2023 | 210 | SEALED TRANSCRIPT of Proceedings held on 4/24/2023 before Judge Marilyn J. Horan. (sms) (Entered: 09/19/2023) |
| 09/19/2023 | 211 | SEALED TRANSCRIPT of Proceedings held on 4/25/2023 before Judge Marilyn J. Horan. (sms) (Entered: 09/19/2023) |
| 10/20/2023 | 212 | ORDER Following consideration of the Companies' Motion to Vacate Order on Motion for Bond 200 and the respective briefs (ECF Nos. 203 and 206 ), the Court denies the request to vacate its June 1, 2023 Order Regarding Supersedeas Bond (ECF No. 186 ). Instead, in light of the additional attorneys' fees the Court awarded on August 2, 2023 (ECF No. 196), this Court's June 1, 2023 Order is amended as follows: 1. Pursuant to Rule 62 of the Federal Rules of Civil Procedure, Mr. Daimler may obtain a stay of proceedings to enforce the judgment entered against him in this action by providing bond(s) in the amount of 120% of the Judgments at (ECF Nos. 176 and 196 ). 2. Mr. Daimler is further ordered to obtain bond(s) in the above amount and provide a record to counsel and the Court of the issued bonds within ten (10) days of this Order. 3. This |

| | | |
|---|---|---|
| | | Order is entered without prejudice to the ability of any party to seek modification, amendment, or reconsideration of it if the amount of the above judgments are altered. 4. The Court further denies any request to vacate any stay of execution; however, should the bond in the new amount not be posted within ten (10) days, the stay shall be lifted on October 31, 2023. Following review of the Companies' Supplemental Motion for Attorneys Fees (ECF No. 197), it is hereby ordered that a hearing to develop a record in support or opposition of the same shall be held in Courtroom 8A on November 17, 2023 at 1:00 p.m. In lieu of a hearing, counsel may confer and stipulate to written evidentiary submissions. Any stipulation shall be filed seven (7) days prior to the hearing date. Following review of any filed stipulation and, if appropriate, the Court will cancel the scheduled hearing and consider the Supplemental Motion on the parties' submissions. Signed by Judge Marilyn J. Horan on 10/20/2023. (bjl) (Entered: 10/20/2023) |
| 10/30/2023 | 213 | MOTION to Extend Time to Post Bond by ERIC DAIMLER. (Mandell, Mitchell) Link added to Errata filed at 216 . Modified text on 11/6/2023. (ept) (Entered: 10/30/2023) |
| 10/30/2023 | 214 | MOTION to Extend Time to Post Bond by ERIC DAIMLER. (Mandell, Mitchell). Link added to Errata field at 216 . Modified text on 11/1/2023. (dmh) (Entered: 10/30/2023) |
| 10/30/2023 | | w/ 213 , 214 and 215 BRIEF in Support re 213 Motion to Extend Time, 214 Motion to Extend Time, 215 Motion to Extend Time filed by ERIC DAIMLER. (ept) (Entered: 11/06/2023) |
| 10/31/2023 | 215 | MOTION to Extend Time to Post Bond (corrected) by ERIC DAIMLER. (Attachments: # 1 Declaration of Eric Daimler) (Mandell, Mitchell) (Entered: 10/31/2023) |
| 10/31/2023 | 216 | Errata re 214 Motion to Extend Time, 215 Motion to Extend Time, 213 Motion to Extend Time *to Post Bond* by ERIC DAIMLER. Reason for Correction: Incorrect version of brief and missing declaration. (Attachments: # 1 Declaration of Eric Daimler) (Mandell, Mitchell) (Entered: 10/31/2023) |
| 10/31/2023 | 217 | TEXT ORDER Cross-Plaintiffs shall file a response to Mr. Daimler's Motion to Extend time to post bond 215 on or before November 7, 2023. Signed by Judge Marilyn J. Horan on 10/31/2023. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (bjl) (Entered: 10/31/2023) |
| 11/03/2023 | 218 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings re Jury Trial held on 4/26/2023 before Judge Marilyn J. Horan. Court Reporter Marsia Balobeck, Telephone number 412-328-5452. Tape Number: marsia.balobeck@gmail.com. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely, electronically available to the public without redaction after 90 calendar days. For redaction purposes, or otherwise, during this 90 day period a copy of the transcript may be purchased from the court reporter or viewed at the clerk's office public terminal. **Any Notice of Intent to Request Redaction and Redaction Request must be separately mailed to the court reporter of said proceedings.** Notice of Intent for Redaction of Personal Data Identifiers due by 11/13/2023. Redaction Request due 11/24/2023. Redacted Transcript Deadline set for 12/4/2023. Release of Transcript Restriction set for 2/1/2024. (Balobeck, Marsia) (Entered: 11/03/2023) |
| 11/06/2023 | | CLERK'S OFFICE QUALITY CONTROL MESSAGE re 213 Motion to Extend Time, 214 Motion to Extend Time, 215 Motion to Extend Time. ERROR: Document should have been filed as two separate documents. CORRECTION: Attorney advised in future that documents of that nature are to be filed as separate documents. Clerk of Court docketed Brief in Support of Motion. This message is for informational purposes only. (ept) Modified text on 11/6/2023. (ept) (Entered: 11/06/2023) |

| | | |
|---|---|---|
| 11/06/2023 | 219 | Consent MOTION for Extension of Time to File Response/Reply as to 217 Order, 216 Errata, by COAL HILL VENTURES LLC, ROBOTICS HUB FUND 1, LLC. (Attachments: # 1 Proposed Order) (Gaul, Stuart) (Entered: 11/06/2023) |
| 11/06/2023 | 220 | ORDER AND NOW, this 6th day of November, 2023, IT IS HEREBY ORDERED that the Consent Motion of Cross-Claim Plaintiffs Robotics Hub Fund 1, LLC and Coal Hill Ventures LLC To Extend Period in Which To Respond to Motion [Doc. No. 219] is GRANTED and that the period in which Cross-Claim Plaintiffs Robotics Hub Fund 1, LLC and Coal Hill Ventures LLC are to respond to Plaintiff Eric Daimler's Motion for an Extension of Time To Post a Supplemental Supersedeas Bond or To Limit Any Enforcement Proceedings to the Award of Attorneys' Fees [Doc. Nos. 213, 215, 216] is extended through November 9, 2023.Signed by Judge Marilyn J. Horan on 11/6/2023. (bjl) (Entered: 11/06/2023) |
| 11/09/2023 | 221 | Consent MOTION of Cross-Claim Plaintiffs Robotics Hub Fund 1, LLC and Coal Hill Ventures LLC For Entry of Order on Stipulation re 197 Supplemental MOTION for Attorney Fees filed by COAL HILL VENTURES LLC, ROBOTICS HUB FUND 1, LLC, 216 Errata, filed by ERIC DAIMLER, 215 MOTION to Extend Time to Post Bond (corrected) filed by ERIC DAIMLER, 220 Order on Motion for Extension of Time to File Response/Reply, 213 MOTION to Extend Time to Post Bond filed by ERIC DAIMLER, 219 Consent MOTION for Extension of Time to File Response/Reply as to 217 Order, 216 Errata, filed by COAL HILL VENTURES LLC, ROBOTICS HUB FUND 1, LLC by COAL HILL VENTURES LLC, ROBOTICS HUB FUND 1, LLC. (Attachments: # 1 Proposed Order) (Gaul, Stuart) (Entered: 11/09/2023) |
| 11/09/2023 | 222 | STIPULATION AND ORDER Regarding Parties' Joint Motion 221 resolving outstanding motions and issues pending appeal. Signed by Judge Marilyn J. Horan on 11/9/2023. (bjl) (Entered: 11/09/2023) |
| 11/30/2023 | 223 | Surety BOND in the amount of $270,000.00, posted by ERIC DAIMLER, SurTec Insurance Company as Surety. (Attachments: # 1 Power of Attorney, # 2 Receipt for POA ($49, no. 200006798)) (sms) (Entered: 11/30/2023) |
| 11/30/2023 | 224 | Surety BOND in the amount of $425,019.60, posted by ERIC DAIMLER, SurTec Insurance Company as Surety. (Attachments: # 1 Power of Attorney, # 2 Receipt for POA ($49, no. 200006798)) (sms) (Entered: 11/30/2023) |
| 12/08/2023 | 225 | MOTION to Compel Payment of Mediation Fees by Mark D. Shepard. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Proposed Order) (Shepard, Mark) (Entered: 12/08/2023) |
| 12/08/2023 | 226 | TEXT ORDER Following review of Mediator Shepards Motion to Compel 225 , Mr. Daimler and Attorney Mandel shall file a response on or before 12/15/2023 to show cause why Mr. Daimler, Attorney Mandel, and/or his firm have not paid Mr. Shepards mediation fees and why he should not be awarded an additional $500 for his time preparing his motion. Signed by Judge Marilyn J. Horan on 12/8/2023. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (bjl) (Entered: 12/08/2023) |
| 12/15/2023 | 227 | RESPONSE to Motion re 225 MOTION to Compel Payment of Mediation Fees filed by ERIC DAIMLER. (Mandell, Mitchell) (Entered: 12/15/2023) |
| 12/18/2023 | 228 | TEXT ORDER granting 225 Motion to Compel Mediation Fees. Mediator Shepard is due $3,971.41 in mediation fees plus $500 for preparation of his motion. Said amounts shall be paid to Mr. Shepard on or before January 15, 2024. Should said sums not be paid in full by January 15, 2024, a Rule to Show Cause for Contempt will be scheduled for an in-person hearing, where both both Counsel for Mr. Daimler and Mr. Daimler will be required to appear. Signed by Judge Marilyn J. Horan on 12/18/2023. Text-only entry; no |

|  |  | PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (bjl) (Entered: 12/18/2023) |
|---|---|---|
| 02/05/2024 | 229 | NOTICE of Change of Address by Mitchell G. Mandell (Mandell, Mitchell) (Entered: 02/05/2024) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 02/22/2024 15:59:31 | | |
| **PACER Login:** | tmstuckey | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:18-cv-00165-MJH |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**
**PITTSBURGH DIVISION**

| | |
|---|---|
| ERIC DAIMLER, <br><br>          Plaintiff, <br><br>    -   v   - <br><br> CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC, and COAL HILL VENTURES LLC, <br><br>          Defendants. | Civil Action No.: <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** <br><br> *Electronically Filed* |

Plaintiff, Eric Daimler ("Daimler"), by his counsel, Thompson & Knight LLP and Buchanan Ingersoll & Rooney PC, as and for his complaint against defendants, Chris Moehle ("Moehle"), Robotics Hub Fund 1, LLC ("Robotics Hub"), and Coal Hill Ventures LLC ("Coal Hill") (collectively, "Defendants"), alleges as follows:

## INTRODUCTION

1.      This lawsuit arises from Defendants' intentional misrepresentations that were designed to mislead and induce Daimler to enter into (i) a business partnership with Moehle and (ii) certain related common unit award agreements that contained different and less favorable vesting schedules than those of Moehle, Daimler's equal partner.

2.      Defendants thereafter took steps to force Daimler out of the companies by intentionally and wrongfully preventing him from satisfying the conditions of his vesting schedules, thereby causing all of his common units in Robotics Hub and Coal Hill—companies in which he was an equal partner and/or co-founded—to be treated as having been forfeited.

1

**JA131**

3.      As a result of such wrongful forfeiture, Moehle became a majority member of Robotics Hub and Coal Hill, and subsequently removed Daimler from the Boards of the companies so that he could obtain majority ownership and control over them.

## PARTIES

4.      Plaintiff, Daimler, is an individual who resides in the State of New York.

5.      Defendant, Moehle, is an individual who resides in the Commonwealth of Pennsylvania.

6.      Defendant, Robotics Hub, is a limited liability company formed under the laws of the State of Delaware, with its principal place of business in Pittsburgh, Pennsylvania.

7.      Defendant, Coal Hill, is a limited liability company formed under the laws of the Commonwealth of Pennsylvania, with its principal place of business in Pittsburgh, Pennsylvania.

## JURISDICTION

8.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum of $75,000, exclusive of costs and interest, and there is complete diversity of citizenship between the parties.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Robotics Hub and Coal Hill maintain their principal place of business in this district, Moehle resides in this district, and a substantial part of the events giving rise to Daimler's claims occurred in this district.

## FACTUAL BACKGROUND

**Daimler Agrees to Form an Equal Partnership Based Upon Moehle's Misrepresentations**

A.    The Formation of the Partnership

10.    Daimler and Moehle formed a business partnership for the purpose of investing in early-stage robotics companies with high growth potential.

11.    Before becoming partners, Daimler and Moehle each maintained and operated their own companies in robotics and venture finance—Skilled Science and Coal Hill[1], respectively.

12.    In 2015, Daimler and Moehle decided to move forward with an equal partnership by combining Skilled Science and Coal Hill through a de-facto merger, and by co-founding two new entities: Robotics Hub and Robotics Hub Fund 1, LP (the "Fund").  (Coal Hill and Robotics Hub are collectively referred to as the "Companies.").  Robotics Hub is the Fund's General Partner, and Coal Hill is the Fund's Investment Manager.

13.    Daimler and Moehle co-edited various documents—including, without limitation, documents entitled "Skilled Science/Coal Hill Merger" and "Combined Skilled Science Coal Hill Pro-Forma"—in connection with their efforts to merge Skilled Science and Coal Hill into a new entity reflecting their equal partnership.

14.    The de-facto merger was accomplished by, among other things: (i) Coal Hill amending and restating its operating agreement to reflect the equal partnership between Daimler and Moehle; (ii) Daimler and Moehle working together on marketing strategies for the partnership, and ultimately amending various Coal Hill marketing materials to add Daimler as a

---

[1] Moehle formed Coal Hill in April 2015.

principal; (iii) Coal Hill engaging Jamie Fee, who previously worked with Daimler at Skilled Science; and (iv) merging expenses accrued through the funding of Skilled Science into the fundraising expenses of Robotics Hub.

15.     Before their partnership began, Moehle represented to Daimler that General Electric ("GE"), among others, would be investing in the Fund, and that he had a strong relationship with the National Robotics Engineering Center ("NREC") and the Robotics Institute ("RI"), which would lead to potential investment opportunities for the partnership.

16.     Specifically, with respect to GE, Moehle represented to Daimler throughout 2015 and 2016 that GE would invest $20,000,000.00 in the Fund, which was a significant portion of the $50,000,000.00 the Fund sought to raise.

17.     Daimler relied on Moehle's representations concerning GE and the strength of his relationships with the NREC and RI when Daimler decided to pursue an equal partnership with Moehle in 2015.

18.     During 2015 and early 2016, Daimler came to learn that Moehle misrepresented and overstated the strength of his relationships with the NREC and RI.

19.     However, throughout 2015 and 2016, Moehle continued to vigorously represent to Daimler GE's alleged commitment to invest $20,000,000.00 in the Fund.

B.     Daimler and Moehle Were Equal Partners in the Companies

20.     As of March 23, 2016, Daimler and Moehle were both members of the Companies.

21.     Pursuant to the Companies' respective Amended and Restated Operating Agreements, both dated March 23, 2016, Daimler and Moehle were the only members of the Companies' initial Boards of Managers.

4

**JA134**

22.     Daimler and Moehle entered into Common Unit Award Agreements, dated March 23, 2016, with each of the Companies pursuant to which Daimler and Moehle were both awarded forty-two common units in each company, which units were subject to certain disparate vesting schedules more fully discussed below.

23.     In contrast, Fee also entered into Common Unit Award Agreements with each of the Companies, dated March 23, 2016, pursuant to which Fee was awarded only two common units in each company.

24.     Further, pursuant to Section 3.08 of the Fund's Limited Partnership Agreement, both Daimler and Moehle are named "key persons," such that if both Daimler and Moehle cease to be actively involved in the Fund's affairs, the Fund's limited partners may elect to terminate the Fund's investment period.

25.     The Companies and the Fund uniformly promoted Daimler and Moehle as equal partners in connection with their public relations and fundraising efforts, including, without limitation, in the Fund's Confidential Private Placement Memorandum and other presentation materials provided to potential investors.

26.     During joint presentations to potential investors, some investors would expressly ask Daimler and Moehle if the two were equal partners, and their response was always "yes."  In fact, Moehle explained their relationship by stating that he and Daimler had combined their efforts, not that Daimler had joined Coal Hill.

27.     Despite having an equal partnership, Daimler personally loaned Coal Hill $125,000.00 pursuant to a promissory note and advanced personal funds to cover corporate expenses.  In contrast, Moehle provided an initial capital contribution of merely $1,000.00.

5

JA135

28.    On or about November 2, 2017, Coal Hill paid the promissory note in full, together with interest.  Coal Hill also reimbursed Daimler for a portion of the expenses he personally advanced to the company, in the amount of $35,000.00.

**Daimler Accepted a Presidential Fellowship that Benefitted the Companies and the Fund**

29.    In January 2016, Daimler was appointed as a Presidential Innovation Fellow for the Barack Obama White House.

30.    Daimler accepted the fellowship, which is a twelve-month program, during Barack Obama's last year in office.  Thus, it was axiomatic that Daimler's fellowship would end in early 2017.

31.    Moehle encouraged Daimler to accept the fellowship because of the value that the Companies and the Fund would derive from it.

32.    Daimler served as a Presidential Innovation Fellow from January 2016 to early 2017, during which time Daimler advised the White House on, among other things, issues relating to robotics and artificial intelligence.

33.    Daimler and Robotics Hub received positive press coverage with respect to Daimler's fellowship, and Defendants promoted Daimler's White House position in connection with their marketing and fundraising efforts.

34.    Because Daimler's fellowship allowed for outside employment, Daimler continued to provide services to the Companies during 2016, but the Companies did not compensate him for such services.  During such time, Daimler and Moehle agreed that Daimler's compensation for such services would accrue and be paid to Daimler at a later date.

35.    As fully explained below, the relationship between Daimler and Moehle began to break down,  in part, because of Daimler's fellowship.

**JA136**

**Defendants' Misrepresentations Caused Daimler to Enter into Common Unit Award Agreements with Different and Less Favorable Vesting Schedules than those of His Equal Partner Moehle**

36.     On or about March 10, 2016, soon after Daimler's fellowship began, the Companies and the Fund engaged Reed Smith LLP to, among other things, prepare various corporate formation and governing documents, including the Common Unit Award Agreements and the Companies' Amended and Restated Operating Agreements.

37.     With respect to the referenced engagement, Reed Smith interacted almost exclusively with Moehle.

A.     <u>Common Unit Awards</u>

38.     The Companies each entered into a Common Unit Award Agreement, dated March 23, 2016, with Moehle, pursuant to which Moehle was awarded forty-two common units in both Robotics Hub and Coal Hill (the "Moehle/RH Award" and the "Moehle/CH Award," respectively, and collectively the "Moehle Awards"), which units vest as follows:

> 20% vests on the first anniversary of Date of Award [March 23, 2017]; 1.6666% vests ratably on the last day of each month thereafter until the fifth anniversary of the Date of Award [March 23, 2021].

Copies of the Moehle/RH Award and the Moehle/CH Award are attached hereto as Exhibits A and B, respectively.

39.     The Companies also entered into Common Unit Award Agreements, dated March 23, 2016, with Daimler, pursuant to which Robotics Hub and Coal Hill each awarded forty-two common units to Daimler (the "Daimler/RH Award" and the "Daimler/CH Award," respectively, and collectively the "Daimler Awards").

**JA137**

40.     Unlike Moehle's common units, however, Daimler's units vest as follows:

20% vests on the date when [Daimler] has provided 12 consecutive and uninterrupted months of Full Time Services to the Company Group, provided that [Daimler] must begin providing such Full Time Services to the Company Group no later than the first anniversary of the Date of Award [March 23, 2017]; and

provided the above conditions are met, the remaining 80% vests on a pro-rata basis on the last day of each month thereafter until the fifth anniversary of the Date of Award [March 23, 2021].

Copies of the Daimler/RH Award and the Daimler/CH Award are attached hereto as Exhibits C and D, respectively.

41.     Pursuant to Section 2(a) of the Daimler Awards, Daimler provides Full Time Services if he is employed by or otherwise provides greater than 95% of his professional activities, as determined in the sole discretion of the respective Boards, to the Company Group.

42.     Section 2(a) of the Daimler Awards defines the Company Group as a combination of Robotics Hub or Coal Hill, respectively, the Fund, and the Fund's investment manager (including services provided to portfolio companies of the Fund and Daimler's capacity as an employee of the Fund's investment manager).

B.     Defendants' Misrepresentations

43.     In multiple conversations during 2015 and 2016, some of which included associates and investors, Moehle intentionally misrepresented to Daimler that: (i) Moehle and Daimler would be treated as equals; (ii) the terms of the Daimler Awards were identical to those of the Moehle Awards; and (iii) the Daimler and Moehle Awards both contained vesting schedules pursuant to which a portion of the units would vest automatically while the remaining units would vest over time.

8

44.    Reed Smith made the same misrepresentations to Daimler during conversations in early 2016.

45.    In early 2016, Daimler made it clear to Moehle and Reed Smith that he would consent to the Daimler Awards only if he and Moehle were treated equally and the terms of the Daimler Awards were identical to those of the Moehle Awards.

46.    At no time did Defendants or Reed Smith inform Daimler that only the Daimler Awards, not the Moehle Awards, contained vesting schedules requiring twelve consecutive and uninterrupted months of Full-Time Services to the Company Group, which services must start within a year of entering into the award agreements, before any common units would begin to vest.

47.    In fact, Moehle and Reed Smith continued to represent to Daimler until in or about July 2016, several months after the awards were executed, that Moehle and Daimler were treated equally and that the Daimler Awards and the Moehle Awards were identical.

48.    It was never Daimler's understanding, based upon representations by Moehle and Reed Smith, and, indeed, was incomprehensible to Daimler, that there could be any circumstance under which his common units in the Companies would be forfeited.

49.    Daimler would not have entered into the Daimler Awards if he had known that: (i) his common units vested differently than Moehle's common units; (ii) he would be required to provide twelve consecutive and uninterrupted months of Full-Time Services to the Company Group, and begin such services within one year of entering into the Daimler Awards, before any portion of his common units would begin to vest; and (iii) there could be any circumstance under which his common units in the Companies would be forfeited.

C.      Amended and Restated Operating Agreements

50.      Also on March 23, 2016, Robotics Hub and Coal Hill, and their respective members, entered into Amended and Restated Operating Agreements (the "RH Operating Agreement" and the "CH Operating Agreement," respectively, and collectively the "Operating Agreements"), which terms are incorporated in the respective Moehle Awards and Daimler Awards. Copies of the RH Operating Agreement and the CH Operating Agreement are attached hereto as Exhibits E and F, respectively.

51.      Section 7.1 of the respective Operating Agreements requires the Companies to record members' initial capital contributions, and Section 7.3 requires the Companies to establish and maintain on their own books and records a separate capital account for each member.

52.      Section 7.2 of the respective Operating Agreements requires all additional capital contributions to be made in connection with the issuance of units.

53.      Pursuant to Section 12.3(b) of the Operating Agreements, Covered Persons (including, among others, members, officers and directors, and managers) who are permitted or required to make a decision in good faith must act under such express standard.

54.      Under Section 12.4 of the Operating Agreements, Covered Persons are entitled to indemnification from the Companies in connection with actions or omissions performed on behalf of the Companies only if such person acts in good faith and in a manner believed by such person to be in, or not opposed to, the best interests of the company, and such person's conduct does not constitute fraud or willful misconduct.

10

**JA140**

**The Relationship Between Daimler and Moehle Breaks Down, But Daimler Remains Engaged in the Companies and the Fund**

55.     As explained above, Daimler and Moehle began their partnership as equal partners—and were promoted as such—and each initially devoted equal time to the Companies.

56.     Although Daimler worked for the Companies only part-time during his Presidential Innovation Fellowship, both Moehle and Daimler understood that Daimler would return to his full-time position with the Companies when his fellowship ended.

57.     Indeed, as previously explained, it was understood that Daimler's fellowship necessarily had a finite end date in early 2017.

58.     Additionally, as of January 2016 when Daimler began his fellowship, the business partnership had budgeted matching salaries for Moehle and Daimler, and the Companies had budgeted another full-time salary which they never paid because the individual for whom it was budgeted did not become a member of the Companies as originally anticipated.

59.     In early-mid 2016, the business relationship between Daimler and Moehle began to break down.

60.     The attention and publicity Daimler received in connection with his Presidential Innovation Fellowship became a point of contention between Daimler and Moehle, and Moehle began criticizing Daimler as a business partner.

61.     Moehle became increasingly controlling over access to information about the Fund's investors and portfolio companies, information Moehle previously freely shared.  Indeed, Moehle unilaterally determined that he would become the "gatekeeper" of the information soon after Daimler accepted his fellowship.

**JA141**

62.    Moehle would criticize Daimler about statements he made during joint presentations to potential investors about the Fund's portfolio companies, but Moehle would refuse to provide Daimler full access to relevant information about said portfolio companies. Moehle even criticized the content on Daimler's LinkedIn page, and directed Daimler to revise his descriptions of the Companies to mirror those on Moehle's LinkedIn page.

63.    Moehle also began to unilaterally assign Daimler "deliverables" without first consulting with Daimler.

64.    Despite rising tensions, Moehle needed Daimler to remain engaged in the Companies and the Fund so that he would continue to make financial contributions to them, and Daimler remained engaged throughout his fellowship.

65.    Daimler also continued to make financial contributions to the Companies throughout 2016 to pay, among other things, corporate expenses.

66.    Moehle used some of Daimler's financial contributions to the Companies to pay for his own personal expenses, such as his mortgage payments and family trips.

67.    Daimler made additional financial contributions to the Companies with the expectation that they would be treated as capital contributions, and Moehle agreed that they would be treated as such.

68.    From May 2016 through August 2016, Daimler wrote several checks to Coal Hill totaling approximately $30,000.00 to cover Coal Hill's operating expenses, as Moehle requested.

69.    Daimler did not receive additional common units in connection with his additional financial contributions, as required by Section 7.2 of the respective Operating Agreements.

12

**JA142**

**Defendants Force Daimler Out of the Companies Despite His Attempts to Remain Actively Involved in Them**

70.      During the second half of 2016, Moehle began taking steps to gain sole control of the Companies.  Indeed, Moehle continued criticizing Daimler as a business partner and increasingly began obstructing efforts by Daimler and Fee to engage in the Companies and the Fund.

71.      During the Fall of 2016, Daimler and Fee made several attempts to arrange meetings with Moehle in Pittsburgh, where the Companies and the Fund are based, but Moehle thwarted all such efforts.  In fact, Moehle told Daimler that the two would have a problem if Daimler scheduled a trip to Pittsburgh.

72.      On numerous occasions, Daimler and Fee offered to help Moehle with the Fund's first closing in December 2016.  But Moehle repeatedly refused their help, stated that he would handle the closing, and directed Daimler and Fee to focus their efforts elsewhere.

73.      Further, Moehle continued to unilaterally assign Daimler "deliverables," including asking Daimler to make introductions to, among others, internet travel companies such as Google Travel.  Daimler made the introductions Moehle requested, but afterwards Moehle would tell Daimler that the introductions were no longer needed.  Moehle would then claim that Daimler failed to complete such "deliverables."

74.      On several occasions in mid-late 2016, Moehle actively obstructed Daimler's efforts to communicate with the Fund's investors and portfolio companies.

75.      Specifically, Daimler explicitly asked Moehle for the contact information for various investors and portfolio companies, including, among others, TravelWits.  Moehle either

ignored Daimler's requests or flatly refused to disclose the information.  In some instances, Moehle even refused to disclose the contact's name.

76.    In late 2016, Moehle began discouraging Daimler from ending his fellowship, which he could have done at any time, because the Companies allegedly had no funds with which to pay him.  Daimler suggested that his salary could continue to accrue and be paid to him at a later date, as had been done in the past, but Moehle opposed such structure.

77.    Despite Moehle's efforts in 2016 to disassociate himself, the Companies, and the Fund from Daimler, he simultaneously represented to investors that Daimler was his equal partner until in or about November 2016.

78.    Daimler and Moehle met in-person on January 5-6, 2017 to discuss the notion that Daimler would not return to his full-time role with the Companies at that time, but that Daimler could still earn some compensation in a non-operating role, and that a full-time operating role for Daimler would occur at a later date.

79.    On or about January 5, 2017, just before Daimler's fellowship would ultimately end, Moehle recommended to the Companies' Boards (which constituted only Daimler and Moehle) that Daimler not be permitted to return to a full-time role with the Companies.

80.    Although Moehle and the Companies had contemplated Daimler's return to full-time employment from the outset and budgeted a full-time salary for Daimler, Moehle purportedly made the above recommendation to the Boards because the Companies allegedly lacked sufficient funds to pay Daimler a full-time salary at that time.  Indeed, Moehle refused to allow Daimler's salary to continue to accrue and be paid at a later date, as it had in the past.

14

**JA144**

81.    At the Companies' respective Board meetings on or about January 5, 2017, Moehle voted against, and Daimler voted in favor of, Daimler returning to a full-time role with the Companies.

82.    Because no other votes were cast, the Boards were deadlocked and the matter was referred to the Deadlock Advisor, David Mawhinney, in accordance with Section 5.5(c) of the Companies' respective Operating Agreements.

83.    Daimler and Moehle met in-person again on January 18, 2017 in Orlando, Florida to resume their January 5-6, 2017 discussions.

84.    On or about March 22, 2017, just before the first anniversary of the date of the Daimler Awards, Mawhinney broke the deadlock by voting against Daimler returning to a full-time, fully compensated role with the Companies at that time due to their financial status, but understood when casting his vote that Daimler's full-time engagement with the Companies would occur at a later date and did not foreclose the possibility that Daimler could, if he so elected, return to work on a full-time basis with some portion of his compensation accrued, but not paid, as had been done in the past.

85.    Despite Defendants' previous representations to the contrary, they never offered Daimler a non-operating role in the Companies, provided any compensation to him, or permitted his full-time engagement with the Companies.  Instead, Defendants took additional steps to ensure that Daimler had no role whatsoever within the Companies.

86.    Because Defendants wrongfully prevented Daimler from returning to his full-time role with the Companies within a year after executing the Daimler Awards, by March 23, 2017, despite Daimler's desire and attempts to do so, the Companies deemed all of Daimler's common units to be forfeited.

87.    As a result of such wrongful forfeiture, Moehle became a Majority Member of the Companies.

88.    After Moehle obtained control of the Companies, to further prevent Daimler from serving the Companies in any capacity, he directed them to remove Daimler from their respective Boards, and, upon information and belief, amend and restate the Fund's Limited Partnership Agreement to remove Daimler from the "Key Person" provision set forth in Section 3.08 of the agreement.

## <u>COUNT ONE</u>

### FRAUD IN THE INDUCEMENT
### (Against Moehle)

89.    Plaintiff repeats all prior allegations as though fully set forth herein.

90.    Moehle intentionally misrepresented to Daimler that GE, among others, would be investing in the Fund, and that he had a strong relationship with the NREC and the RI, which would lead to potential investment opportunities for Moehle and Daimler's business partnership.

91.    Moehle also intentionally misrepresented to Daimler that the terms of the Daimler Awards were identical to those of the Moehle Awards, and that the Daimler Awards and Moehle Awards both contained vesting schedules pursuant to which a portion of common units would vest automatically while the remaining units would vest over time.

92.    Moehle made such misrepresentations knowing they were false or with a reckless disregard as to whether they were true or false.

93.    Such misrepresentations are material because Daimler would not have entered into the business partnership in 2015 if he had known that GE and others had not committed to

investing in the Fund to the degree Moehle represented, and that Moehle had grossly overstated his relationship with the NREC and the RI.

94.    Nor would Daimler have entered into the Daimler Awards if he had known that: (i) the terms of the Daimler Awards and Moehle Awards were not identical; (ii) he would be required to provide twelve consecutive and uninterrupted months of Full-Time Services to the Company Group before his common units would begin to vest, provided that he begin providing such services within one year of executing the awards; and (iii) there could be any circumstance under which his common units in the Companies would be forfeited.

95.    Moehle made such misrepresentations to Daimler with the intention of: (i) misleading Daimler into relying upon said misrepresentations; (ii) using said misrepresentations to induce Daimler into funding the Companies in 2015 and 2016, some of which funds Moehle used for his own benefit; and (iii) later forcing Daimler out of the Companies in early 2017 so that Moehle would have majority ownership and control over them.

96.    Daimler justifiably relied upon Moehle's misrepresentations as being true when he decided to enter into a business partnership with Moehle in 2015 and the Daimler Awards in 2016.

97.    As a direct and proximate result of Moehle's misrepresentations, together with Daimler's justifiable reliance on said misrepresentations, Daimler was wrongfully prevented from satisfying the vesting requirements in the Daimler Awards, thereby causing all of his common units in the Companies to be treated as having been forfeited.  Such wrongful forfeiture resulted in Moehle becoming a Majority Member of the Companies and removing Daimler from their respective Boards.

## <u>COUNT TWO</u>

### FRAUD IN THE EXECUTION
### (Against Moehle)

98.     Plaintiff repeats all prior allegations as though fully set forth herein.

99.     Moehle intentionally misrepresented to Daimler that the terms of the Daimler Awards were the same as those of the Moehle Awards, and that the Daimler Awards and Moehle Awards both contained vesting schedules pursuant to which a portion of common units would vest automatically while the remaining units would vest over time.

100.    Moehle made such misrepresentations knowing they were false or with a reckless disregard as to whether they were true or false.

101.    Moehle made such misrepresentations to Daimler with the intention of misleading Daimler into relying upon said misrepresentations, inducing Daimler into executing the Daimler Awards such that he would continue funding the Companies (some of which funds Moehle used for his own benefit), and using said misrepresentations to later force Daimler out of the company.

102.    Daimler mistakenly believed, due to intentional misrepresentations by Moehle, that the Daimler Awards were identical to the Moehle Awards, and that a portion of Daimler's units would vest automatically while the remaining units would vest over time.

103.    Moehle's misrepresentations are material because Daimler would not have entered into the Daimler Awards if he had known that: (i) the terms of the Daimler Awards and Moehle Awards were not identical; (ii) he would be required to provide twelve consecutive and uninterrupted months of Full-Time Services to the Company Group before his common units would begin to vest, provided that he begin providing such services within a year of executing

18

the awards; and (iii) there could be any circumstance under which his common units in the Companies would be forfeited.

104.    The fact that Daimler was unaware of the contents of the Daimler Awards and the disparity between the Daimler Awards and the Moehle Awards is excusable because Daimler reasonably believed representations repeatedly made to him by his equal business partner Moehle, who was the Companies' counsel's primary point of contact with respect to drafting, among other things, the award agreements.

105.    Daimler justifiably relied upon Moehle's misrepresentations as being true when he executed the signature pages to the Daimler Awards.

106.    As a direct and proximate result of Moehle's misrepresentations, together with Daimler's justifiable reliance on said misrepresentations, Daimler was wrongfully prevented from satisfying the vesting requirements in the Daimler Awards, thereby causing the Companies to treat all of his common units as having been forfeited.  Such wrongful forfeiture resulted in Moehle becoming a Majority Member of the Companies and removing Daimler from their respective Boards.

<u>**COUNT THREE**</u>

**TORTIOUS INTERFERENCE WITH CONTRACT – DAIMLER/RH AWARD**
**(Against Moehle)**

107.    Plaintiff repeats all prior allegations as though fully set forth herein.

108.    The Daimler/RH Award establishes a contractual relationship between Daimler and Robotics Hub, and Moehle was aware of the Daimler/RH Award at all relevant times.

109.    Moehle intentionally misrepresented to Daimler that the terms of the Daimler/RH Award were the same as those of the Moehle/RH Award, and that a portion of Daimler's

common units would vest automatically while the remaining units would vest over time. However, Daimler's award, unlike Moehle's, required him to provide Full-Time Services to the Company Group for twelve consecutive and uninterrupted months before his units would begin to vest, provided that Daimler began providing such services within a year of executing the award.

110.    Thereafter, Moehle purposefully prevented Daimler from providing Full-Time Services to the Company Group in accordance with the Daimler/RH Award, and prevented Robotics Hub from performing its contractual obligations under said award, with the intention of causing Daimler's common units to be forfeited such that Moehle could obtain majority ownership and control over Robotics Hub.

111.    Moehle's conduct was not privileged or justified.

112.    As a direct and proximate result of Moehle's purposeful and wrongful conduct, all of Daimler's common units in Robotics Hub were treated as having been forfeited.  Such wrongful forfeiture resulted in Moehle becoming a Majority Member of the Companies and removing Daimler from their respective Boards.

## <u>COUNT FOUR</u>

**TORTIOUS INTERFERENCE WITH CONTRACT – DAIMLER/CH AWARD**
**(Against Moehle)**

113.    Plaintiff repeats all prior allegations as though fully set forth herein.

114.    The Daimler/CH Award establishes a contractual relationship between Daimler and Coal Hill, and Moehle was aware of the Daimler/CH Award at all relevant times.

115.    Moehle intentionally misrepresented to Daimler that the terms of the Daimler/CH Award were the same as those of the Moehle/CH Award, and that a portion of Daimler's units

**JA150**

would vest automatically while the remaining units would vest over time. However, Daimler's award, unlike Moehle's, required him to provide Full-Time Services to the Company Group for twelve consecutive and uninterrupted months before his units would begin to vest, provided that Daimler began providing such services within a year of executing the award.

116.    Thereafter, Moehle purposefully prevented Daimler from providing Full-Time Services to the Company Group in accordance with the Daimler/CH Award, and prevented Coal Hill from performing its contractual obligations under said award, with the intention of causing Daimler's common units to be forfeited such that Moehle could obtain majority ownership and control over Coal Hill.

117.    Moehle's conduct was not privileged or justified.

118.    As a direct and proximate result of Moehle's purposeful and wrongful conduct, all of Daimler's common units in Coal Hill were treated as having been forfeited. Such wrongful forfeiture resulted in Moehle becoming a Majority Member of the Companies and removing Daimler from their respective Boards.

**<u>COUNT FIVE</u>**

**UNJUST ENRICHMENT**
**(Against Moehle)**

119.    Plaintiff repeats all prior allegations as though fully set forth herein.

120.    No direct contractual relationship exists between Daimler and Moehle.

121.    Daimler provided almost all of the initial capital and other financial contributions to the Companies for their benefit.

122.    Some of Daimler's capital and financial contributions were made at Moehle's request.

123.    Upon information and belief, compared to Daimler, Moehle has made insignificant capital and other financial contributions to the Companies.

124.    Moehle wrongfully used some of Daimler's capital and financial contributions to pay for his personal expenses, including his mortgage payments and family travel expenses, only a small portion of which has been repaid to Daimler.

125.    Additionally, Moehle's intentional and wrongful conduct preventing Daimler from satisfying the vesting requirements in the Daimler Awards caused Daimler's common units in the Companies to be treated as having been forfeited, which units Daimler received in connection with his capital contributions.  Such wrongful forfeiture resulted in Moehle becoming a Majority Member of the Companies and removing Daimler from their respective Boards.

## COUNT SIX

### BREACH OF CONTRACT – DAIMLER/RH AWARD
### (Against Robotics Hub)

126.    Plaintiff repeats all prior allegations as though fully set forth herein.

127.    Daimler and Robotics Hub entered into the Daimler/RH Award, dated March 23, 2016.

128.    Pursuant to Section 2 of the Daimler/RH Award, Robotics Hub agreed to award Daimler forty-two common units, which units were to begin vesting upon Daimler starting to provide Full-Time Services to the Company Group by March 23, 2017.

129.    Robotics Hub intentionally and wrongfully prevented Daimler from beginning to provide such services by March 23, 2017.

130.    As a direct and proximate result of Robotics Hub's intentional and wrongful conduct, Robotics Hub treated all of the forty-two common units it awarded to Daimler as having been forfeited.

## COUNT SEVEN

### BREACH OF CONTRACT – ROBOTICS HUB OPERATING AGREEMENT
### (Against Robotics Hub)

131.    Plaintiff repeats all prior allegations as though fully set forth herein.

132.    Daimler and Robotics Hub entered into the Robotics Hub Operating Agreement, dated March 23, 2016.

133.    Pursuant to Section 12.3(b) of the Robotics Hub Operating Agreement, Moehle, as an officer and member of Robotics Hub, was required to make decisions in good faith.

134.    Moehle, on behalf of Robotics Hub, failed to act in good faith by (i) misrepresenting to Daimler that the terms of the Daimler/RH Award were identical to those of the Moehle/RH Award and that a certain percentage of Daimler's common units would vest automatically while the others would vest over time, and (ii) thereafter using the disparate terms of the awards to wrongfully prevent Daimler from satisfying his vesting requirements, resulting in Moehle becoming a majority member in the company and removing Daimler from the Board.

135.    Pursuant to Section 7.2 of the Robotics Hub Operating Agreement, Robotics Hub is required to issue units in connection with members' additional capital contributions.

136.    Daimler made several additional capital contributions in the amount of approximately $100,000.00, but Robotics Hub did not issue additional units in connection with said contributions.

137.    As a direct and proximate result of Robotics Hub's intentional and wrongful conduct, Robotics Hub treated all of the forty-two common units it initially awarded to Daimler as having been forfeited, and Daimler was issued no additional units in connection with his additional capital contributions.

## COUNT EIGHT

**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING – DAIMLER/RH AWARD**
**(Against Robotics Hub)**

138.    Plaintiff repeats all prior allegations as though fully set forth herein.

139.    Robotics Hub had an implied contractual obligation to act in good faith and to refrain from arbitrary or unreasonable conduct which would have the effect of preventing Daimler from receiving the fruits of the bargain.

140.    Robotics Hub breached such obligations by fraudulently inducing Daimler to enter into and execute the Daimler/RH Award, and thereafter wrongfully preventing Daimler from returning to a full-time position with the company as required by said award for Daimler's units to begin vesting.

141.    As a direct and proximate result of Robotics Hub's intentional and wrongful conduct, Robotics Hub treated all of the forty-two common units it awarded to Daimler as having been forfeited.

## COUNT NINE

**FRAUD IN THE INDUCEMENT**
**(Against Robotics Hub)**

142.    Plaintiff repeats all prior allegations as though fully set forth herein.

24

**JA154**

143.    Robotics Hub intentionally misrepresented to Daimler that the terms of the Daimler/RH Award were identical to those of the Moehle/RH Award, and that the Daimler Awards and Moehle Awards both contained vesting schedules pursuant to which a portion of common units would vest automatically while the remaining units would vest over time.

144.    Robotics Hub made such misrepresentations knowing they were false or with a reckless disregard as to whether they were true or false.

145.    Such misrepresentations are material because Daimler would not have entered into the Daimler/RH Award if he had known that: (i) the terms of the Daimler Awards and Moehle Awards were not identical; (ii) he would be required to provide twelve consecutive and uninterrupted months of Full-Time Services to the Company Group before his common units would begin to vest, provided that he begin providing such services within a year of executing the awards; and (iii) there could be any circumstance under which his common units in Robotics Hub would be forfeited.

146.    Robotics Hub made such misrepresentations to Daimler with the intention of inducing Daimler into entering the Daimler/RH Award, and with the intention of using said misrepresentations to later force Daimler out of the company.

147.    Daimler justifiably relied upon Robotics Hub's misrepresentations as being true when he decided to enter into the Daimler/RH Award.

148.    As a direct and proximate result of Robotics Hub's misrepresentations, together with Daimler's justifiable reliance on said misrepresentations, Daimler was wrongfully prevented from satisfying the vesting requirements in the Daimler/RH Award, thereby causing Robotics Hub to treat all of his common units as having been forfeited.

## COUNT TEN

### FRAUD IN THE EXECUTION
### (Against Robotics Hub)

149.    Plaintiff repeats all prior allegations as though fully set forth herein.

150.    Robotics Hub intentionally misrepresented to Daimler that the terms of the Daimler/RH Award were identical to those of the Moehle/RH Award, and that the Daimler Awards and Moehle Awards both contained vesting schedules pursuant to which a portion of common units would vest automatically while the remaining units would vest over time.

151.    Robotics Hub made such misrepresentations knowing they were false or with a reckless disregard as to whether they were true or false, and with the intention of inducing Daimler into executing the Daimler/RH Award and using said misrepresentations to later force Daimler out of the company.

152.    Daimler mistakenly believed, due to intentional misrepresentations by Moehle (as an officer and/or member of Robotics Hub) and the Companies' counsel, that the Daimler/RH Award was identical to the Moehle/RH Award, and that a portion of Daimler's common units would vest automatically while the remaining units would vest over time.

153.    Robotics Hub's misrepresentations are material because Daimler would not have executed the Daimler/RH Award if he had known that: (i) the terms of the Daimler Awards and Moehle Awards were not identical; (ii) he would be required to provide twelve consecutive and uninterrupted months of Full-Time Services to the Company Group before his common units would begin to vest, provided that he begin providing such services within a year of executing the awards; and (iii) there could be any circumstance under which his common units in Robotics Hub would be forfeited.

154.     The fact that Daimler was unaware of the contents of the Daimler/RH Award and the disparity between the Daimler/RH Award and the Moehle/RH Award is excusable because Daimler reasonably believed representations made to him by the Companies' counsel and repeatedly by his equal business partner Moehle, who was counsel's primary point of contact with respect to drafting, among other things, the award agreements.

155.     Daimler justifiably relied upon Robotics Hub's misrepresentations as being true when he executed the signature pages to the Daimler/RH Award.

156.     As a direct and proximate result of Robotics Hub's misrepresentations, together with Daimler's justifiable reliance on said misrepresentations, Daimler was wrongfully prevented from satisfying the vesting requirements in the Daimler/RH Award, thereby causing Robotics Hub to treat all of his common units as having been forfeited.

## COUNT ELEVEN

### UNJUST ENRICHMENT
### (Alternatively, Against Robotics Hub)

157.     Plaintiff repeats all prior allegations as though fully set forth herein.

158.     Daimler provided capital and other financial contributions to Robotics Hub for its benefit, including, without limitation, to pay company expenses.

159.     Robotics Hub awarded Daimler forty-two common units in connection with some, but not all, of such contributions.

160.     Robotics Hub intentionally and wrongfully misrepresented to Daimler that his common unit award was identical to Moehle's award, and that a certain percentage of the units awarded to both Moehle and Daimler would vest automatically while the others would vest over time.

27

161.    But, unlike Moehle's common unit award, Robotics Hub required Daimler to provide Full-Time Services to the Company Group for twelve consecutive and uninterrupted months before his units would begin to vest, provided that Daimler began providing such services within a year of the date of the award.

162.    Robotics Hub intentionally and wrongfully prevented Daimler from beginning to provide such services, and ultimately treated all of the forty-two common units it awarded to Daimler as having been forfeited.

163.    Robotics Hub has not fully reimbursed Daimler for all of his capital and other financial contributions or for the value of his forty-two common units that were wrongfully forfeited.

164.    As a result of such wrongful forfeiture, Moehle became a Majority Member of Robotics Hub and removed Daimler from the company's Board.

## COUNT TWELVE

### BREACH OF CONTRACT – DAIMLER/CH AWARD
**(Against Coal Hill)**

165.    Plaintiff repeats all prior allegations as though fully set forth herein.

166.    Daimler and Coal Hill entered into the Daimler/CH Award, dated March 23, 2016.

167.    Pursuant to Section 2 of the Daimler/CH Award, Coal Hill agreed to award Daimler forty-two common units, which units were to begin vesting upon Daimler starting to provide Full-Time Services to the Company Group by March 23, 2017.

168.    Coal Hill intentionally and wrongfully prevented Daimler from beginning to provide such services by March 23, 2017.

169.    As a direct and proximate result of Coal Hill's intentional and wrongful conduct, Coal Hill treated all of the forty-two common units it awarded to Daimler as having been forfeited.

## COUNT THIRTEEN

### BREACH OF CONTRACT – COAL HILL OPERATING AGREEMENT
### (Against Coal Hill)

170.    Plaintiff repeats all prior allegations as though fully set forth herein.

171.    Daimler and Coal Hill entered into the Coal Hill Operating Agreement, dated March 23, 2016.

172.    Pursuant to Section 12.3(b) of the Coal Hill Operating Agreement, Moehle, as an officer and member of Coal Hill, was required to make decisions in good faith.

173.    Moehle, on behalf of Coal Hill, failed to act in good faith by (i) misrepresenting to Daimler that the terms of the Daimler/CH Award were identical to those of the Moehle/CH Award and that a certain percentage of Daimler's common units would vest automatically while the others would vest over time, and (ii) thereafter using the disparate terms of the awards to prevent Daimler from satisfying his vesting requirements, resulting in Moehle becoming a majority member in the company and removing Daimler from the Board.

174.    Pursuant to Section 7.2 of the Coal Hill Operating Agreement, Coal Hill is required to issue units in connection with members' additional capital contributions.

175.    Daimler made several additional capital contributions in the amount of approximately $100,000.00, but Coal Hill did not issue additional units in connection with such contributions.

176.    As a direct and proximate result of Coal Hill's intentional and wrongful conduct,

29

Coal Hill treated all of the forty-two common units it awarded to Daimler as having been forfeited, and Daimler was issued no additional units in connection with his additional capital contributions.

## **COUNT FOURTEEN**

### **FRAUD IN THE INDUCEMENT**
### **(Against Coal Hill)**

177.    Plaintiff repeats all prior allegations as though fully set forth herein.

178.    Coal Hill intentionally misrepresented to Daimler that the terms of the Daimler/CH Award were identical to those of the Moehle/CH Award, and that the Daimler Awards and Moehle Awards both contained vesting schedules pursuant to which a portion of common units would vest automatically while the remaining units would vest over time.

179.    Coal Hill made such misrepresentations knowing they were false or with a reckless disregard as to whether they were true or false.

180.    Such misrepresentations are material because Daimler would not have entered into the Daimler/CH Award if he had known that: (i) the terms of the Daimler Awards and Moehle Awards were not identical; (ii) he would be required to provide twelve consecutive and uninterrupted months of Full-Time Services to the Company Group before his common units would begin to vest, provided that he begin providing such services within a year of executing the awards; and (iii) there could be any circumstance under which his common units in Coal Hill would be forfeited.

181.    Coal Hill made such misrepresentations to Daimler with the intention of misleading Daimler into relying upon said misrepresentations, inducing Daimler into entering the

Daimler/CH Award, and using said misrepresentations to later force Daimler out of the company.

182.    Daimler justifiably relied upon Coal Hill's misrepresentations as being true when he decided to enter into the Daimler/CH Award.

183.    As a direct and proximate result of Coal Hill's misrepresentations, together with Daimler's justifiable reliance on said misrepresentations, Daimler was wrongfully prevented from satisfying the vesting requirements in the Daimler/CH Award, thereby causing Coal Hill to treat all of his common units as having been forfeited.

## **COUNT FIFTEEN**

### **FRAUD IN THE EXECUTION**
**(Against Coal Hill)**

184.    Plaintiff repeats all prior allegations as though fully set forth herein.

185.    Coal Hill intentionally misrepresented to Daimler that the terms of the Daimler/CH Award were the same as those of the Moehle/CH Award, and that the Daimler Awards and Moehle Awards both contained vesting schedules pursuant to which a portion of common units would vest automatically while the remaining units would vest over time.

186.    Coal Hill made such misrepresentations knowing they were false or with a reckless disregard as to whether they were true or false.

187.    Coal Hill made such misrepresentations to Daimler with the intention of misleading Daimler into relying upon said misrepresentations, inducing Daimler into executing the Daimler/CH Award, and using said misrepresentations to later force Daimler out of the company.

188.    Daimler mistakenly believed, due to intentional misrepresentations by Moehle (as an officer and/or member of Coal Hill) and the Companies' counsel, that the Daimler/CH Award was identical to the Moehle/CH Award, and that a portion of Daimler's units would vest automatically while the remaining units would vest over time.

189.    Coal Hill's misrepresentations are material because Daimler would not have executed the Daimler/CH Award if he had known that: (i) the terms of the Daimler Awards and Moehle Awards were not identical; (ii) he would be required to provide twelve consecutive and uninterrupted months of Full-Time Services to the Company Group before his common units would begin to vest, provided that he begin providing such services within a year of executing the awards; and (iii) there could be any circumstance under which his common units in Coal Hill would be forfeited.

190.    The fact that Daimler was unaware of the contents of the Daimler/CH Award and the disparity between the Daimler/CH Award and the Moehle/CH Award is excusable because Daimler reasonably believed representations made to him by the Companies' counsel and repeatedly by his equal business partner Moehle, who was counsel's primary point of contact with respect to drafting, among other things, the award agreements.

191.    Daimler justifiably relied upon Coal Hill's misrepresentations as being true when he executed the signature pages to the Daimler/CH Award.

192.    As a direct and proximate result of Coal Hill's misrepresentations, together with Daimler's justifiable reliance on said misrepresentations, Daimler was wrongfully prevented from satisfying the vesting requirements in the Daimler/CH Award, thereby causing Coal Hill to treat all of his common units as having been forfeited.

**COUNT SIXTEEN**

**UNJUST ENRICHMENT**
**(Alternatively, Against Coal Hill)**

193.    Plaintiff repeats all prior allegations as though fully set forth herein.

194.    Daimler provided capital and other financial contributions to Coal Hill for its benefit, including, without limitation, to pay company expenses.

195.    Coal Hill awarded Daimler forty-two common units in connection with some, but not all, of such contributions.

196.    Coal Hill intentionally and wrongfully misrepresented to Daimler that his common unit award was identical to Moehle's award, and that a certain percentage of the units awarded to both Moehle and Daimler would vest automatically while the others would vest over time.

197.    But, unlike Moehle's common unit award, Coal Hill required Daimler to provide Full-Time Services to the Company Group for twelve consecutive and uninterrupted months before his units would begin to vest, provided that Daimler began providing such services within a year of the date of the award.

198.    Coal Hill intentionally and wrongfully prevented Daimler from beginning to provide such services, and ultimately treated all of the forty-two common units it awarded to Daimler as having been forfeited.

199.    Coal Hill has not fully reimbursed Daimler for all of his capital and other financial contributions or for the value of his forty-two common units that were wrongfully forfeited.

200.    As a result of such wrongful forfeiture, Moehle became a Majority Member of

33

**JA163**

Coal Hill and removed Daimler from the company's Board.

## COUNT SEVENTEEN

### ACCOUNTING
### (Against Robotics Hub)

201.    Plaintiff repeats all prior allegations as though fully set forth herein.

202.    Information pertaining to the usage of Daimler's capital and other financial contributions and the value of Robotics Hub's common units is solely within the possession of Robotics Hub, which information is necessary for Daimler to properly calculate any damages due and owing to him.

203.    Robotics Hub has failed to account for its members' capital contributions, to provide account statements for its members' capital accounts, and to account for Robotics Hub's finances.

204.    Daimler has no adequate remedy at law.

## COUNT EIGHTEEN

### LEGAL ACCOUNTING
### (Against Coal Hill)

205.    Plaintiff repeats all prior allegations as though fully set forth herein.

206.    The Daimler/CH Award is a valid contract between Daimler and Coal Hill.

207.    Daimler is entitled to a full and complete accounting from Coal Hill because Coal Hill was responsible for collecting and recording its members' initial and additional capital contributions, and for establishing and maintaining on its own books a records a separate capital account for each member.

**JA164**

208.    Daimler is further entitled to a full and complete accounting from Coal Hill because the company is required to conduct an accounting annually and to maintain its financial statements and tax returns.

209.    Coal Hill has failed to account for the capital contributions of its members, to provide account statements for its members' capital accounts, and to account for Coal Hill's finances.

210.    Coal Hill is solely in possession of this information, which is necessary for Daimler to properly calculate any damages due and owing to him.

## **PRAYER FOR RELIEF**

WHEREFORE, Daimler demands judgment in his favor as follows:

(i)    On Counts One, Two, Three, and Four, awarding Daimler monetary damages in an amount to be determined at trial, but in no event less than $10 Million;

(ii)    On Count Five, awarding Daimler monetary damages in an amount to be determined at trial, but in no event less than $10 Million, and requiring Moehle to account for all transactions between himself and the Companies, the Fund, and Daimler;

(iii)    On Counts Six, Eight, Nine, Ten, and Eleven, awarding Daimler injunctive relief, including, but not limited to, compelling Robotics Hub to reissue Daimler's forty-two common units that it wrongfully treated as having been forfeited; or, alternatively, compensatory damages in an amount to be determined at trial, but in no event less than $10 Million;

(iv)    On Count Seven, awarding Daimler injunctive relief, including, but not limited to, compelling Robotics Hub to reissue Daimler's forty-two common units that it wrongfully treated as having been forfeited and to issue additional units in connection with Daimler's additional capital contributions, and enjoining Robotics Hub from advancing Moehle funds for legal or

35

other expenses as incurred in connection with this action; or, alternatively, compensatory damages in an amount to be determined at trial, but in no event less than $10 Million;

(v)     On Counts Twelve, Fourteen, Fifteen, and Sixteen, awarding Daimler injunctive relief, including, but not limited to, compelling Coal Hill to reissue Daimler's forty-two common units that it wrongfully treated as having been forfeited; or, alternatively, compensatory damages in an amount to be determined at trial, but in no event less than $10 Million;

(vi)    On Count Thirteen, awarding Daimler injunctive relief, including, but not limited to, compelling Coal Hill to reissue Daimler's forty-two common units that it wrongfully treated as having been forfeited and to issue additional units in connection with Daimler's additional capital contributions, and enjoining Coal Hill from advancing Moehle funds for legal or other expenses as incurred in connection with this action; or, alternatively, compensatory damages in an amount to be determined at trial, but in no event less than $10 Million;

(vii)   On Count Seventeen, requiring Robotics Hub to provide a full and complete accounting of its finances and its members' capital contributions and capital accounts;

(viii)  On Count Eighteen, requiring Coal Hill to provide a full and complete accounting of its finances and its members' capital contributions and capital accounts;

(ix)    On all Counts, awarding Daimler reasonable attorneys' fees and expenses, costs, pre- and post-judgment interest, and punitive damages in an amount to be determined at trial; and such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Daimler hereby demands a trial by jury on all issues so triable.

Dated: Pittsburgh, Pennsylvania  Respectfully submitted,
   February 5, 2018

            BUCHANAN INGERSOLL & ROONEY PC

            By:  */s/* Christopher P. Schueller
                Christopher P. Schueller, Esq.
                Pa. I.D. No. 92746
                One Oxford Centre
                301 Grant Street, 20th Floor
                Pittsburgh, PA 15219
                (412) 562-8432
                christopher.schueller@bipc.com


            -and-

            THOMPSON & KNIGHT LLP

            Mitchell G. Mandell, Esq.
            (*pro hac vice* forthcoming)
            NY State Bar Id: 2042828
            900 Third Avenue, 20th Floor
            New York, New York 10022
            (212) 751-3411
            mitchell.mandell@tklaw.com

            *Attorneys for Plaintiff Eric Daimler*

**JA167**

# Exhibit A

Case 2:18-cv-00165-MJH   Document 1-3   Filed 02/05/18   Page 2 of 9

# ROBOTICS HUB FUND 1, LLC

## COMMON UNIT AWARD AGREEMENT

The Board, as defined in the Amended and Restated Operating Agreement of Robotics Hub Fund 1, LLC, a Delaware limited liability company (the "**Company**"), dated as of March 23, 2016, as amended (the "**LLC Agreement**"), has decided to grant to you Common Units in the Company pursuant to Section 3.2 of the LLC Agreement. The terms of the grant (the "**Grant**") are set forth in this Common Unit Award Agreement (the "**Award Agreement**") provided to you. The following provides a summary of the key terms of the Grant; however, you should read the entire Award Agreement, along with the terms of the LLC Agreement to fully understand the Grant.

## SUMMARY OF AWARD AGREEMENT

| | |
|---|---|
| **Grantee:** | Christopher Moehle |
| **Date of Award:** | March 23, 2016 |
| **Vesting Schedule:** | 20% vests on the first anniversary of Date of Award; 1.6666% vests ratably on the last day of each month thereafter until the fifth anniversary of the Date of Award |
| **Common Units Awarded:** | 42 Common Units |

US_ACTIVE-126168249.3

Case 2:18-cv-00165-MJH   Document 1-2   Filed 02/05/18   Page 3 of 9

## ROBOTICS HUB FUND 1, LLC

### COMMON UNIT AWARD AGREEMENT

This Common Unit Award Agreement (this "**Award Agreement**"), dated as of March 23, 2016 (the "**Effective Date**"), is delivered by Robotics Hub Fund 1, LLC, a Delaware limited liability company (the "**Company**"), to Christopher Moehle (the "**Grantee**").

### RECITALS

A.      The Company was duly formed for the primary purpose of serving as the general partner of Robotics Hub Fund 1, LP, a Delaware limited partnership (the "**Fund**"), which invests in early-stage robotics companies.

B.      The Amended and Restated Operating Agreement of Robotics Hub Fund 1, LLC, a Delaware limited liability company (the "**Company**"), made and entered into as of March 23, 2016, as amended (the "**LLC Agreement**"), provides for the grant of Common Units in the Company pursuant to Section 3.2 of the LLC Agreement. The Board (as defined in the LLC Agreement) has granted the Award (as defined below) to encourage the Grantee to contribute materially to the growth of the Company, and to align the economic interests of the Grantee with those of the Company's owners.  A copy of the LLC Agreement is attached hereto as Exhibit A. All capitalized terms not defined herein shall have the meaning given to such terms in the LLC Agreement.

**NOW, THEREFORE**, the parties to this Award Agreement, intending to be legally bound, hereby agree as follows:

1.      **Grant of Management Incentive Award**.  Subject to the terms and conditions set forth in this Award Agreement and the LLC Agreement, the Company hereby grants to the Grantee forty-two (42) Common Units (the "**Award**").  This Award Agreement (which is effective as of the Effective Date upon the parties' exchange of signed counterpart signature pages hereto) and the LLC Agreement govern the terms of the grant of the Award.

2.      **Vesting of Awarded Common Units**.

(a)      Unless otherwise determined by the Board, the Award shall vest in accordance with the following schedule (each date described below, a "**Vesting Date**"), if the Grantee is employed by or otherwise providing greater than 95% of his professional activities, as determined in the sole discretion of the Board (collectively, "**Full Time Services**"), to a combination of the Company, the Fund and the investment manager of the Fund (including services provided to portfolio companies of the Fund in the Grantee's capacity as an employee of the investment manager) (collectively, the "**Company Group**") on the applicable Vesting Date.

2

| Vesting Date | Common Units Vested |
|---|---|
| March 23, 2017 | 20% of the Award |
| On the last day of each month starting April 30, 2017 | 1.6666% of the Award |
| March 23, 2021 | 1.6666% of the Award |

    (b)    Upon termination of providing Full Time Services of the Grantee to the Company Group at any time for Cause (as defined below), any portion of the Award that is vested shall be subject to a repurchase right as set forth in Section 3 of this Award Agreement. Any portion of the Award that is unvested shall be forfeited at the time of the termination of Full Time Services of the Grantee to the Company Group for any reason (including for Cause).

**3.**    **Repurchase Right and Forfeiture.**

    (a)    <u>Termination of Full Time Services – Unvested Common Units</u>. Any and all of a Grantee's unvested Common Units shall be forfeited upon the termination of the Grantee's Full Time Services to the Company Group for any reason (including for Cause).

    (b)    <u>Termination of Employment for Cause</u>. Upon termination of the Grantee's Full Time Services to the Company Group for Cause (as defined below), the Company shall have a right to repurchase any vested Common Units from such Grantee thereafter for an amount equal to the amount that would be allocated to such Grantee's Common Units if the Company were liquidated on the date the Common Units were issued at Fair Market Value (as determined in good faith by the Board). For purposes of this Award Agreement, "Cause" shall have the meaning set forth in the written employment agreement between the Grantee and the Company in effect on the date of the termination of Grantee's Full Time Services, or if no such agreement exists, shall mean any of the following: (i) willful misconduct, intentional failure to perform duties, or fraud, embezzlement or other misappropriation of funds or property of the Company or any of its subsidiaries; (ii) the commission of acts that constitute a felony; (iii) the conviction of a crime involving any financial impropriety or moral turpitude, that would materially interfere with the ability to perform services or that otherwise would be materially injurious to the Company or any of its subsidiaries; or (iv) the material breach of any material obligations or covenants with the Company after notice and a reasonable opportunity to cure with respect to any breach reasonably susceptible to a cure.

    (c)    <u>Repurchase Rights</u>. Upon the determination by the Company to exercise its repurchase right set forth in Section 3(b) of this Award Agreement, the Company shall provide notice to the Grantee within ninety (90) days following the date of termination of employment or the cessation of the provision of services to the Company with a closing on the repurchase to be completed no later than sixty (60) days after the notice is provided to the Grantee.

    (d)    <u>Fair Market Value</u>. For purposes of this repurchase right as set forth in Section 3 of this Award Agreement, "Fair Market Value" means such determination of the valuation of the

<div align="center">3</div>

Company, any Units, or Company property as reasonably determined by the Board. For purposes of clarity, except as otherwise set forth herein, the Fair Market Value of a Unit as of any date shall be the amount that would have been distributed with respect to such Unit upon the consummation of a dissolution and liquidation of the Company pursuant to Article 11 of the LLC Agreement on such date if the proceeds from such liquidation were distributed to the Members.

4. <u>Issuance of Common Units</u>.

(a) The obligation of the Company to deliver the Common Units shall be subject to all applicable laws, rules, and regulations and such approvals by governmental agencies as may be deemed appropriate by the Board, including such actions as Company counsel shall deem necessary or appropriate to comply with relevant securities laws and regulations.

(b) All obligations of the Company under this Agreement shall be subject to the rights of the Company to withhold amounts required to be withheld for any taxes, if applicable.

(c) The Grantee shall receive allocations and distributions of the Company's profits and losses based upon the terms of the LLC Agreement.

(d) The Grantee hereby agrees to make a timely and effective election under Code Section 83(b) with respect to his Common Units and agrees to provide a copy to the Company.

(e) In accordance with the finally promulgated successor rules to Proposed Regulations Section 1.83-3(l) and IRS Notice 2005-43, the Grantee hereby authorizes and directs the Company to elect a safe harbor under which the Fair Market Value of any Common Units issued after the effective date of such Proposed Regulations (or other guidance) will be treated as equal to the liquidation value (within the meaning of the Proposed Regulations or successor rules) of the Common Units as of the date of issuance of such Common Units. In the event that the Company makes a safe harbor election as described in the preceding sentence, the Grantee hereby agrees to comply with all safe harbor requirements with respect to transfers of Membership Interests while the safe harbor election remains effective.

5. <u>Change in Control</u>.

(a) In the event the Company undergoes a Change in Control, all Common Units which are not vested at the time of the Change in Control shall vest in full, effective immediately prior to the consummation of the Change in Control, and a Grantee shall have the right to receive any distributions on account of such vested Common Units as set forth to the LLC Agreement.

(b) For purposes of the Award, "Change in Control" means a change in ownership or control of the Company effected through any of the following transactions: (i) a merger, consolidation or other reorganization approved by the Company's equity holders, unless securities representing more than 50% of the total combined voting power of the voting securities of the successor entity are immediately thereafter beneficially owned, directly or indirectly, and in substantially the same proportion, by the persons who beneficially owned the Company's outstanding voting securities immediately prior to such transaction; (ii) a sale, transfer or other disposition of all or substantially all of the Company's assets in liquidation or dissolution of the Company approved by the Company's equity holders; or (iii) the acquisition,

4

directly or indirectly, by any person or related group of persons (other than the Company or a person that directly or indirectly controls, is controlled by, or is under common control with, the Company), of beneficial ownership (within the meaning of Rule 13d-3 of the Securities Exchange Act of 1934) of securities possessing more than 50% of the total combined voting power of the Company's outstanding securities pursuant to a purchase transaction or a tender or exchange offer made directly to the Company's equity holders.

6.     **Transfer; Repurchase Right**.   As a condition of receiving the Award, the Grantee hereby agrees that any Common Units issued hereby shall be subject to the transfer restrictions and repurchase rights described herein in the LLC Agreement.

7.     **Limited Liability Company Obligations**.   As a condition of receiving the Award, the Grantee hereby agrees to sign all required documents and take any actions as deemed appropriate by the Board to comply with relevant laws, rules, and regulations.

8.     **Restrictions on Transfer**.   Only the Grantee has any rights under this Award.   The Grantee may not transfer those rights, directly or indirectly, except by will or the laws of descent and distribution.

9.     **Award Subject to LLC Agreement Provisions**.   This Award is made pursuant to the LLC Agreement, the terms of which are incorporated herein by reference, and in all respects shall be interpreted in accordance with the LLC Agreement. The Board shall have the full power and authority to administer and interpret this Award Agreement, to make factual determinations, and to adopt or amend such rules, regulations, agreements, and instruments for implementing the LLC Agreement and for the conduct of its business as it deems necessary or advisable.   All powers of the Board shall be executed without the approval or consent of the Grantee.

10.     **No Employment Rights**.   The grant of this Award shall not confer upon the Grantee any right to be retained by or in the employ or service of the Company and shall not interfere in any way with the right of the Company to terminate the Grantee's employment or service at any time.   The right of the Company, as applicable, to terminate at will the Grantee's employment or service at any time for any reason is specifically reserved.

11.     **Notice**.   Any notice, demand or communication required or permitted to be given by any provision of this Award Agreement will be in writing and will be deemed to have been given when actually received. Any such notice, demand or communication may be given by overnight courier, email or certified mail (return receipt requested) and will be addressed to Grantee at the address set forth on the signature page to this Award Agreement, and/or to the Company at its principal office or to such other address as a party may from time to time designate by notice to the other parties.

12.     **Amendment and Termination**.   The Board may amend or terminate this Award Agreement at any time; provided, however, that the Board may not make any amendment to this Award Agreement or to this Award that would materially and adversely affect any Grantee of issued and outstanding Common Units without the express written consent from any such affected Grantee.

<center>5</center>

<center>**JA173**</center>

13.    **Headings.** Section headings in this Award Agreement are for reference only.  In the event of a conflict between a section heading and the content of a section, the content of the section shall control.

14.    **Applicable Law.**  The validity, construction, interpretation and effect of this Award Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the conflicts of laws provisions thereof.

*[Signature page follows]*

6

IN WITNESS WHEREOF, the Company has caused its duly authorized officer to execute this Award Agreement, and the Grantee has executed this Award Agreement, effective as of the Effective Date.

**ROBOTICS HUB FUND 1, LLC**

By: _____

Name: Christopher Moehle

Title: Manager

I hereby accept the Award described in this Award Agreement, and I agree to be bound by the terms of this Award Agreement and the LLC Agreement. I hereby further agree that all of the decisions and determinations of the Board shall be final and binding.

Grantee: _____

Christopher Moehle

Grantee Address:

309 Cola Street
Pittsburgh, PA
15203

**Exhibit A**

**Amended and Restated Operating Agreement of Robotics Hub Fund 1, LLC**

See attached.

# Exhibit B

## COAL HILL VENTURES LLC

### COMMON UNIT AWARD AGREEMENT

The Board, as defined in the Amended and Restated Operating Agreement of Coal Hill Ventures LLC, a Pennsylvania limited liability company (the "**Company**"), dated as of March 23, 2016, as amended (the "**LLC Agreement**"), has decided to grant to you Common Units in the Company pursuant to Section 3.2 of the LLC Agreement. The terms of the grant (the "**Grant**") are set forth in this Common Unit Award Agreement (the "**Award Agreement**") provided to you. The following provides a summary of the key terms of the Grant; however, you should read the entire Award Agreement, along with the terms of the LLC Agreement to fully understand the Grant.

### SUMMARY OF AWARD AGREEMENT

| | |
|---|---|
| Grantee: | Christopher Moehle |
| Date of Award: | March 23, 2016 |
| Vesting Schedule: | 20% vests on the first anniversary of Date of Award; 1.6666% vests ratably on the last day of each month thereafter until the fifth anniversary of the Date of Award |
| Common Units Awarded: | 42 Common Units |

US_ACTIVE-126280060.1

## COAL HILL VENTURES LLC

### COMMON UNIT AWARD AGREEMENT

This Common Unit Award Agreement (this "**Award Agreement**"), dated as of March 23, 2016 (the "**Effective Date**"), is delivered by Coal Hill Ventures LLC, a Pennsylvania limited liability company (the "**Company**"), to Christopher Moehle (the "**Grantee**").

### RECITALS

A.     The Company was duly formed for the primary purpose of serving as the investment manager of Robotics Hub Fund 1, LP, a Delaware limited partnership (the "**Fund**"), which invests in early-stage robotics companies.

B.     The Amended and Restated Operating Agreement of Coal Hill Ventures LLC, a Pennsylvania limited liability company (the "**Company**"), dated as of March 23, 2016, as amended (the "**LLC Agreement**"), provides for the grant of Common Units in the Company pursuant to Section 3.2 of the LLC Agreement. The Board (as defined in the LLC Agreement) has granted the Award (as defined below) to encourage the Grantee to contribute materially to the growth of the Company, and to align the economic interests of the Grantee with those of the Company's owners. A copy of the LLC Agreement is attached hereto as <u>Exhibit A</u>. All capitalized terms not defined herein shall have the meaning given to such terms in the LLC Agreement.

**NOW, THEREFORE,** the parties to this Award Agreement, intending to be legally bound, hereby agree as follows:

**1.**     **Grant of Management Incentive Award**. Subject to the terms and conditions set forth in this Award Agreement and the LLC Agreement, the Company hereby grants to the Grantee forty-two (42) Common Units (the "**Award**"). This Award Agreement (which is effective as of the Effective Date upon the parties' exchange of signed counterpart signature pages hereto) and the LLC Agreement govern the terms of the grant of the Award.

**2.**     **Vesting of Awarded Common Units**.

(a)     Unless otherwise determined by the Board, the Award shall vest in accordance with the following schedule (each date described below, a "**Vesting Date**"), if the Grantee is employed by or otherwise providing greater than 95% of his professional activities, as determined in the sole discretion of the Board (collectively, "**Full Time Services**"), to a combination of the Company, the Fund and the investment manager of the Fund (including services provided to portfolio companies of the Fund in the Grantee's capacity as an employee of the investment manager) (collectively, the "**Company Group**") on the applicable Vesting Date.

2

| **Vesting Date** | **Common Units Vested** |
|---|---|
| March 23, 2017 | 20% of the Award |
| On the last day of each month starting April 30, 2017 | 1.6666% of the Award |
| March 23, 2021 | 1.6666% of the Award |

(b)     Upon termination of providing Full Time Services of the Grantee to the Company Group at any time for Cause (as defined below), any portion of the Award that is vested shall be subject to a repurchase right as set forth in Section 3 of this Award Agreement.  Any portion of the Award that is unvested shall be forfeited at the time of the termination of Full Time Services of the Grantee to the Company Group for any reason (including for Cause).

**3.      Repurchase Right and Forfeiture.**

(a)     Termination of Full Time Services – Unvested Common Units.  Any and all of a Grantee's unvested Common Units shall be forfeited upon the termination of the Grantee's Full Time Services to the Company Group for any reason (including for Cause).

(b)     Termination of Employment for Cause.  Upon termination of the Grantee's Full Time Services to the Company Group for Cause (as defined below), the Company shall have a right to repurchase any vested Common Units from such Grantee thereafter for an amount equal to the amount that would be allocated to such Grantee's Common Units if the Company were liquidated on the date the Common Units were issued at Fair Market Value (as determined in good faith by the Board).  For purposes of this Award Agreement, "Cause" shall have the meaning set forth in the written employment agreement between the Grantee and the Company in effect on the date of the termination of Grantee's Full Time Services, or if no such agreement exists, shall mean any of the following: (i) willful misconduct, intentional failure to perform duties, or fraud, embezzlement or other misappropriation of funds or property of the Company or any of its subsidiaries; (ii) the commission of acts that constitute a felony; (iii) the conviction of a crime involving any financial impropriety or moral turpitude, that would materially interfere with the ability to perform services or that otherwise would be materially injurious to the Company or any of its subsidiaries; or (iv) the material breach of any material obligations or covenants with the Company after notice and a reasonable opportunity to cure with respect to any breach reasonably susceptible to a cure.

(c)     Repurchase Rights.  Upon the determination by the Company to exercise its repurchase right set forth in Section 3(b) of this Award Agreement, the Company shall provide notice to the Grantee within ninety (90) days following the date of termination of employment or the cessation of the provision of services to the Company with a closing on the repurchase to be completed no later than sixty (60) days after the notice is provided to the Grantee.

(d)     Fair Market Value.  For purposes of this repurchase right as set forth in Section 3 of this Award Agreement, "Fair Market Value" means such determination of the valuation of the

3

**JA180**

Company, any Units, or Company property as reasonably determined by the Board. For purposes of clarity, except as otherwise set forth herein, the Fair Market Value of a Unit as of any date shall be the amount that would have been distributed with respect to such Unit upon the consummation of a dissolution and liquidation of the Company pursuant to Article 11 of the LLC Agreement on such date if the proceeds from such liquidation were distributed to the Members.

4.    **Issuance of Common Units**.

(a)    The obligation of the Company to deliver the Common Units shall be subject to all applicable laws, rules, and regulations and such approvals by governmental agencies as may be deemed appropriate by the Board, including such actions as Company counsel shall deem necessary or appropriate to comply with relevant securities laws and regulations.

(b)    All obligations of the Company under this Agreement shall be subject to the rights of the Company to withhold amounts required to be withheld for any taxes, if applicable.

(c)    The Grantee shall receive allocations and distributions of the Company's profits and losses based upon the terms of the LLC Agreement.

(d)    The Grantee hereby agrees to make a timely and effective election under Code Section 83(b) with respect to his Common Units and agrees to provide a copy to the Company.

(e)    In accordance with the finally promulgated successor rules to Proposed Regulations Section 1.83-3(l) and IRS Notice 2005-43, the Grantee hereby authorizes and directs the Company to elect a safe harbor under which the Fair Market Value of any Common Units issued after the effective date of such Proposed Regulations (or other guidance) will be treated as equal to the liquidation value (within the meaning of the Proposed Regulations or successor rules) of the Common Units as of the date of issuance of such Common Units. In the event that the Company makes a safe harbor election as described in the preceding sentence, the Grantee hereby agrees to comply with all safe harbor requirements with respect to transfers of Membership Interests while the safe harbor election remains effective.

5.    **Change in Control**.

(a)    In the event the Company undergoes a Change in Control, all Common Units which are not vested at the time of the Change in Control shall vest in full, effective immediately prior to the consummation of the Change in Control, and a Grantee shall have the right to receive any distributions on account of such vested Common Units as set forth to the LLC Agreement.

(b)    For purposes of the Award, "Change in Control" means a change in ownership or control of the Company effected through any of the following transactions: (i) a merger, consolidation or other reorganization approved by the Company's equity holders, unless securities representing more than 50% of the total combined voting power of the voting securities of the successor entity are immediately thereafter beneficially owned, directly or indirectly, and in substantially the same proportion, by the persons who beneficially owned the Company's outstanding voting securities immediately prior to such transaction; (ii) a sale, transfer or other disposition of all or substantially all of the Company's assets in liquidation or dissolution of the Company approved by the Company's equity holders; or (iii) the acquisition,

4

**JA181**

directly or indirectly, by any person or related group of persons (other than the Company or a person that directly or indirectly controls, is controlled by, or is under common control with, the Company), of beneficial ownership (within the meaning of Rule 13d-3 of the Securities Exchange Act of 1934) of securities possessing more than 50% of the total combined voting power of the Company's outstanding securities pursuant to a purchase transaction or a tender or exchange offer made directly to the Company's equity holders.

6.    **Transfer; Repurchase Right**.  As a condition of receiving the Award, the Grantee hereby agrees that any Common Units issued hereby shall be subject to the transfer restrictions and repurchase rights described herein in the LLC Agreement.

7.    **Limited Liability Company Obligations**.  As a condition of receiving the Award, the Grantee hereby agrees to sign all required documents and take any actions as deemed appropriate by the Board to comply with relevant laws, rules, and regulations.

8.    **Restrictions on Transfer**.  Only the Grantee has any rights under this Award.  The Grantee may not transfer those rights, directly or indirectly, except by will or the laws of descent and distribution.

9.    **Award Subject to LLC Agreement Provisions**.  This Award is made pursuant to the LLC Agreement, the terms of which are incorporated herein by reference, and in all respects shall be interpreted in accordance with the LLC Agreement.  The Board shall have the full power and authority to administer and interpret this Award Agreement, to make factual determinations, and to adopt or amend such rules, regulations, agreements, and instruments for implementing the LLC Agreement and for the conduct of its business as it deems necessary or advisable.  All powers of the Board shall be executed without the approval or consent of the Grantee.

10.    **No Employment Rights**.  The grant of this Award shall not confer upon the Grantee any right to be retained by or in the employ or service of the Company and shall not interfere in any way with the right of the Company to terminate the Grantee's employment or service at any time.  The right of the Company, as applicable, to terminate at will the Grantee's employment or service at any time for any reason is specifically reserved.

11.    **Notice**.  Any notice, demand or communication required or permitted to be given by any provision of this Award Agreement will be in writing and will be deemed to have been given when actually received.  Any such notice, demand or communication may be given by overnight courier, email or certified mail (return receipt requested) and will be addressed to Grantee at the address set forth on the signature page to this Award Agreement, and/or to the Company at its principal office or to such other address as a party may from time to time designate by notice to the other parties.

12.    **Amendment and Termination**.  The Board may amend or terminate this Award Agreement at any time; provided, however, that the Board may not make any amendment to this Award Agreement or to this Award that would materially and adversely affect any Grantee of issued and outstanding Common Units without the express written consent from any such affected Grantee.

5

**JA182**

13.   **Headings.** Section headings in this Award Agreement are for reference only.  In the event of a conflict between a section heading and the content of a section, the content of the section shall control.

14.   **Applicable Law.**  The validity, construction, interpretation and effect of this Award Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania, without giving effect to the conflicts of laws provisions thereof.

*[Signature page follows]*

6

**JA183**

IN WITNESS WHEREOF, the Company has caused its duly authorized officer to execute this Award Agreement, and the Grantee has executed this Award Agreement, effective as of the Effective Date.

COAL HILL VENTURES LLC

By: _____

Name: Christopher Moehle

Title: Manager

I hereby accept the Award described in this Award Agreement, and I agree to be bound by the terms of this Award Agreement and the LLC Agreement. I hereby further agree that all of the decisions and determinations of the Board shall be final and binding.

Grantee: _____

Christopher Moehle

Grantee Address:

309 Cola Street
Pittsburgh, PA
15203

# Exhibit C

ROBOTICS HUB FUND 1, LLC

COMMON UNIT AWARD AGREEMENT

The Board, as defined in the Amended and Restated Operating Agreement of Robotics Hub Fund 1, LLC, a Delaware limited liability company (the "**Company**"), dated as of March 23, 2016, as amended (the "**LLC Agreement**"), has decided to grant to you Common Units in the Company pursuant to Section 3.2 of the LLC Agreement. The terms of the grant (the "**Grant**") are set forth in this Common Unit Award Agreement (the "**Award Agreement**") provided to you. The following provides a summary of the key terms of the Grant; however, you should read the entire Award Agreement, along with the terms of the LLC Agreement to fully understand the Grant.

SUMMARY OF AWARD AGREEMENT

| | |
|---|---|
| **Grantee:** | Eric Daimler |
| **Date of Award:** | March 23, 2016 |
| **Vesting Schedule:** | 20% vests on the date when the Grantee has provided 12 consecutive and uninterrupted months of Full Time Services to the Company Group, provided that Grantee must begin providing such Full Time Services to the Company Group no later than the first anniversary of the Date of Award |
| | Provided the above conditions are met, the remaining 80% vests on a pro-rata basis on the last day of each month thereafter until the fifth anniversary of the Date of Award |
| **Common Units Awarded:** | 42 Common Units |

US_ACTIVE-126168355.4

Case 2:18-cv-00165-MJH   Document 1-4   Filed 02/05/18   Page 3 of 9

### ROBOTICS HUB FUND 1, LLC

### COMMON UNIT AWARD AGREEMENT

This Common Unit Award Agreement (this "**Award Agreement**"), dated as of March 23, 2016 (the "**Effective Date**"), is delivered by Robotics Hub Fund 1, LLC, a Delaware limited liability company (the "**Company**"), to Eric Daimler (the "**Grantee**").

### RECITALS

A.     The Company was duly formed for the primary purpose of serving as the general partner of Robotics Hub Fund 1, LP, a Delaware limited partnership (the "**Fund**"), which invests in early-stage robotics companies.

B.     The Amended and Restated Operating Agreement of Robotics Hub Fund 1, LLC, a Delaware limited liability company (the "**Company**"), dated as of March 23, 2016, as amended (the "**LLC Agreement**"), provides for the grant of Common Units in the Company pursuant to Section 3.2 of the LLC Agreement. The Board (as defined in the LLC Agreement) has granted the Award (as defined below) to encourage the Grantee to contribute materially to the growth of the Company, and to align the economic interests of the Grantee with those of the Company's owners. A copy of the LLC Agreement is attached hereto as <u>Exhibit A</u>. All capitalized terms not defined herein shall have the meaning given to such terms in the LLC Agreement.

**NOW, THEREFORE,** the parties to this Award Agreement, intending to be legally bound, hereby agree as follows:

1.     **Grant of Management Incentive Award.**   Subject to the terms and conditions set forth in this Award Agreement and the LLC Agreement, the Company hereby grants to the Grantee forty-two (42) Common Units (the "**Award**"). This Award Agreement (which is effective as of the Effective Date upon the parties' exchange of signed counterpart signature pages hereto) and the LLC Agreement govern the terms of the grant of the Award.

2.     **Vesting of Awarded Common Units.**

(a)     Unless otherwise determined by the Board, the Award shall vest in accordance with the following schedule (each date described below, a "**Vesting Date**"), if the Grantee is employed by or otherwise providing greater than 95% of his professional activities, as determined in the sole discretion of the Board (collectively, "**Full Time Services**"), to a combination of the Company, the Fund and the investment manager of the Fund (including services provided to portfolio companies of the Fund in the Grantee's capacity as an employee of the investment manager) (collectively, the "**Company Group**") on the applicable Vesting Date.

| Vesting Date | Common Units Vested |
|---|---|
| The date when the Grantee has provided 12 consecutive and uninterrupted months of Full Time Services to the Company Group; provided that the Grantee must begin providing such Full Time | 20% of the Award |

2

**JA187**

| | |
|---|---|
| Services to the Company Group no later than the first anniversary of the Effective Date, otherwise the Award shall be forfeited in its entirety | |
| On the last day of each month following the vesting of the first 20% of the Award, until March 23, 2021 | Pro-rated percentage of the remaining amount of the Award |

(b)    Upon termination of providing Full Time Services of the Grantee to the Company Group at any time for Cause (as defined below), any portion of the Award that is vested shall be subject to a repurchase right as set forth in Section 3 of this Award Agreement. Any portion of the Award that is unvested shall be forfeited at the time of the termination of Full Time Services of the Grantee to the Company Group for any reason (including for Cause).

**3.    Repurchase Right and Forfeiture.**

(a)    <u>Termination of Full Time Services – Unvested Common Units</u>. Any and all of a Grantee's unvested Common Units shall be forfeited upon the termination of the Grantee's Full Time Services to the Company Group for any reason (including for Cause). In the event that the Grantee has not started to provide Full Time Services to the Company Group on the first anniversary of the Effective Date, the entire Award shall be forfeited.

(b)    <u>Termination of Full Time Services – Vested Common Units</u>. Upon termination of the Grantee's Full Time Services to the Company Group for Cause (as defined below), the Company shall have a right to repurchase any vested Common Units from such Grantee thereafter for an amount equal to the amount that would be allocated to such Grantee's Common Units if the Company were liquidated on the date the Common Units were issued at Fair Market Value (as determined in good faith by the Board). For purposes of this Award Agreement, "Cause" shall have the meaning set forth in the written employment agreement between the Grantee and the Company in effect on the date of the termination of Grantee's Full Time Services, or if no such agreement exists, shall mean any of the following: (i) willful misconduct, intentional failure to perform duties, or fraud, embezzlement or other misappropriation of funds or property of the Company or any of its subsidiaries; (ii) the commission of acts that constitute a felony; (iii) the conviction of a crime involving any financial impropriety or moral turpitude, that would materially interfere with the ability to perform services or that otherwise would be materially injurious to the Company or any of its subsidiaries; or (iv) the material breach of any material obligations or covenants with the Company after notice and a reasonable opportunity to cure with respect to any breach reasonably susceptible to a cure.

(c)    <u>Repurchase Rights</u>. Upon the determination by the Company to exercise its repurchase right set forth in Section 3(b) of this Award Agreement, the Company shall provide notice to the Grantee within ninety (90) days following the date of termination of the Grantee's Full Time Services to the Company with a closing on the repurchase to be completed no later than sixty (60) days after the notice is provided to the Grantee.

(d)    <u>Fair Market Value</u>. For purposes of this repurchase right as set forth in Section 3 of this Award Agreement, "Fair Market Value" means such determination of the valuation of the

3

Company, any Units, or Company property as reasonably determined by the Board. For purposes of clarity, except as otherwise set forth herein, the Fair Market Value of a Unit as of any date shall be the amount that would have been distributed with respect to such Unit upon the consummation of a dissolution and liquidation of the Company pursuant to Article 11 of the LLC Agreement on such date if the proceeds from such liquidation were distributed to the Members.

4.    **Issuance of Common Units**.

(a)    The obligation of the Company to deliver the Common Units shall be subject to all applicable laws, rules, and regulations and such approvals by governmental agencies as may be deemed appropriate by the Board, including such actions as Company counsel shall deem necessary or appropriate to comply with relevant securities laws and regulations.

(b)    All obligations of the Company under this Agreement shall be subject to the rights of the Company to withhold amounts required to be withheld for any taxes, if applicable.

(c)    The Grantee shall receive allocations and distributions of the Company's profits and losses based upon the terms of the LLC Agreement.

(d)    The Grantee hereby agrees to make a timely and effective election under Code Section 83(b) with respect to his Common Units and agrees to provide a copy to the Company.

(e)    In accordance with the finally promulgated successor rules to Proposed Regulations Section 1.83-3(l) and IRS Notice 2005-43, the Grantee hereby authorizes and directs the Company to elect a safe harbor under which the Fair Market Value of any Common Units issued after the effective date of such Proposed Regulations (or other guidance) will be treated as equal to the liquidation value (within the meaning of the Proposed Regulations or successor rules) of the Common Units as of the date of issuance of such Common Units. In the event that the Company makes a safe harbor election as described in the preceding sentence, the Grantee hereby agrees to comply with all safe harbor requirements with respect to transfers of Membership Interests while the safe harbor election remains effective.

5.    **Change in Control**.

(a)    In the event the Company undergoes a Change in Control, all Common Units which are not vested at the time of the Change in Control shall vest in full, effective immediately prior to the consummation of the Change in Control, and a Grantee shall have the right to receive any distributions on account of such vested Common Units as set forth to the LLC Agreement.

(b)    For purposes of the Award, "Change in Control" means a change in ownership or control of the Company effected through any of the following transactions: (i) a merger, consolidation or other reorganization approved by the Company's equity holders, unless securities representing more than 50% of the total combined voting power of the voting securities of the successor entity are immediately thereafter beneficially owned, directly or indirectly, and in substantially the same proportion, by the persons who beneficially owned the Company's outstanding voting securities immediately prior to such transaction; (ii) a sale, transfer or other disposition of all or substantially all of the Company's assets in liquidation or dissolution of the Company approved by the Company's equity holders; or (iii) the acquisition,

4

directly or indirectly, by any person or related group of persons (other than the Company or a person that directly or indirectly controls, is controlled by, or is under common control with, the Company), of beneficial ownership (within the meaning of Rule 13d-3 of the Securities Exchange Act of 1934) of securities possessing more than 50% of the total combined voting power of the Company's outstanding securities pursuant to a purchase transaction or a tender or exchange offer made directly to the Company's equity holders.

6.    **Transfer; Repurchase Right**.  As a condition of receiving the Award, the Grantee hereby agrees that any Common Units issued hereby shall be subject to the transfer restrictions and repurchase rights described herein in the LLC Agreement.

7.    **Limited Liability Company Obligations**.  As a condition of receiving the Award, the Grantee hereby agrees to sign all required documents and take any actions as deemed appropriate by the Board to comply with relevant laws, rules, and regulations.

8.    **Restrictions on Transfer**.  Only the Grantee has any rights under this Award.  The Grantee may not transfer those rights, directly or indirectly, except by will or the laws of descent and distribution.

9.    **Award Subject to LLC Agreement Provisions**.  This Award is made pursuant to the LLC Agreement, the terms of which are incorporated herein by reference, and in all respects shall be interpreted in accordance with the LLC Agreement.  The Board shall have the full power and authority to administer and interpret this Award Agreement, to make factual determinations, and to adopt or amend such rules, regulations, agreements, and instruments for implementing the LLC Agreement and for the conduct of its business as it deems necessary or advisable.  All powers of the Board shall be executed without the approval or consent of the Grantee.

10.   **No Employment Rights**.  The grant of this Award shall not confer upon the Grantee any right to be retained by or in the employ or service of the Company and shall not interfere in any way with the right of the Company to terminate the Grantee's employment or service at any time.  The right of the Company, as applicable, to terminate at will the Grantee's employment or service at any time for any reason is specifically reserved.

11.   **Notice**.  Any notice, demand or communication required or permitted to be given by any provision of this Award Agreement will be in writing and will be deemed to have been given when actually received.  Any such notice, demand or communication may be given by overnight courier, email or certified mail (return receipt requested) and will be addressed to Grantee at the address set forth on the signature page to this Award Agreement, and/or to the Company at its principal office or to such other address as a party may from time to time designate by notice to the other parties.

12.   **Amendment and Termination**.  The Board may amend or terminate this Award Agreement at any time; provided, however, that the Board may not make any amendment to this Award Agreement or to this Award that would materially and adversely affect any Grantee of issued and outstanding Common Units without the express written consent from any such affected Grantee.

5

**JA190**

13.     **Headings.**  Section headings in this Award Agreement are for reference only.  In the event of a conflict between a section heading and the content of a section, the content of the section shall control.

14.     **Applicable Law.**  The validity, construction, interpretation and effect of this Award Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the conflicts of laws provisions thereof.

*[Signature page follows]*

6

**IN WITNESS WHEREOF**, the Company has caused its duly authorized officer to execute this Award Agreement, and the Grantee has executed this Award Agreement, effective as of the Effective Date.

**ROBOTICS HUB FUND 1, LLC**

By: _____
Name: Christopher Moehle
Title: Manager

I hereby accept the Award described in this Award Agreement, and I agree to be bound by the terms of this Award Agreement and the LLC Agreement. I hereby further agree that all of the decisions and determinations of the Board shall be final and binding.

Grantee: _____
Eric Daimler

Grantee Address:

461 2nd St. #306c
San Francisco, CA
94107

1592 Union St. #55
San Francisco, CA 94123

<u>Exhibit A</u>

Amended and Restated Operating Agreement of Robotics Hub Fund 1, LLC

See attached.

# Exhibit D

## COAL HILL VENTURES LLC

### COMMON UNIT AWARD AGREEMENT

The Board, as defined in the Amended and Restated Operating Agreement of Coal Hill Ventures LLC, a Pennsylvania limited liability company (the "**Company**"), dated as of March 23, 2016, as amended (the "**LLC Agreement**"), has decided to grant to you Common Units in the Company pursuant to Section 3.2 of the LLC Agreement. The terms of the grant (the "**Grant**") are set forth in this Common Unit Award Agreement (the "**Award Agreement**") provided to you. The following provides a summary of the key terms of the Grant; however, you should read the entire Award Agreement, along with the terms of the LLC Agreement to fully understand the Grant.

### SUMMARY OF AWARD AGREEMENT

| | |
|---|---|
| **Grantee:** | Eric Daimler |
| **Date of Award:** | March 23, 2016 |
| **Vesting Schedule:** | 20% vests on the date when the Grantee has provided 12 consecutive and uninterrupted months of Full Time Services to the Company Group, provided that Grantee must begin providing such Full Time Services to the Company Group no later than the first anniversary of the Date of Award |
| | Provided the above conditions are met, the remaining 80% vests on a pro-rata basis on the last day of each month thereafter until the fifth anniversary of the Date of Award |
| **Common Units Awarded:** | 42 Common Units |

US_ACTIVE-126289023.1

**COAL HILL VENTURES LLC**

**COMMON UNIT AWARD AGREEMENT**

This Common Unit Award Agreement (this "**Award Agreement**"), dated as of March 23, 2016 (the "**Effective Date**"), is delivered by Coal Hill Ventures LLC, a Pennsylvania limited liability company (the "**Company**"), to Eric Daimler (the "**Grantee**").

**RECITALS**

A.     The Company was duly formed for the primary purpose of serving as the investment manager of Robotics Hub Fund 1, LP, a Delaware limited partnership (the "**Fund**"), which invests in early-stage robotics companies.

B.     The Amended and Restated Operating Agreement of Coal Hill Ventures LLC, a Pennsylvania limited liability company (the "**Company**"), dated as of March 23, 2016, as amended (the "**LLC Agreement**"), provides for the grant of Common Units in the Company pursuant to Section 3.2 of the LLC Agreement. The Board (as defined in the LLC Agreement) has granted the Award (as defined below) to encourage the Grantee to contribute materially to the growth of the Company, and to align the economic interests of the Grantee with those of the Company's owners. A copy of the LLC Agreement is attached hereto as Exhibit A. All capitalized terms not defined herein shall have the meaning given to such terms in the LLC Agreement.

**NOW, THEREFORE,** the parties to this Award Agreement, intending to be legally bound, hereby agree as follows:

1.     **Grant of Management Incentive Award.**   Subject to the terms and conditions set forth in this Award Agreement and the LLC Agreement, the Company hereby grants to the Grantee forty-two (42) Common Units (the "**Award**"). This Award Agreement (which is effective as of the Effective Date upon the parties' exchange of signed counterpart signature pages hereto) and the LLC Agreement govern the terms of the grant of the Award.

2.     **Vesting of Awarded Common Units.**

(a)     Unless otherwise determined by the Board, the Award shall vest in accordance with the following schedule (each date described below, a "**Vesting Date**"), if the Grantee is employed by or otherwise providing greater than 95% of his professional activities, as determined in the sole discretion of the Board (collectively, "**Full Time Services**"), to a combination of the Company, the Fund and the investment manager of the Fund (including services provided to portfolio companies of the Fund in the Grantee's capacity as an employee of the investment manager) (collectively, the "**Company Group**") on the applicable Vesting Date.

| Vesting Date | Common Units Vested |
|---|---|
| The date when the Grantee has provided 12 consecutive and uninterrupted months of Full Time Services to the Company Group; provided that the | 20% of the Award |

2

| | |
|---|---|
| Grantee must begin providing such Full Time Services to the Company Group no later than the first anniversary of the Effective Date, otherwise the Award shall be forfeited in its entirety | |
| On the last day of each month following the vesting of the first 20% of the Award, until March 23, 2021 | Pro-rated percentage of the remaining amount of the Award |

(b)     Upon termination of providing Full Time Services of the Grantee to the Company Group at any time for Cause (as defined below), any portion of the Award that is vested shall be subject to a repurchase right as set forth in Section 3 of this Award Agreement.  Any portion of the Award that is unvested shall be forfeited at the time of the termination of Full Time Services of the Grantee to the Company Group for any reason (including for Cause).

3.    **Repurchase Right and Forfeiture**.

(a)     Termination of Full Time Services – Unvested Common Units.  Any and all of a Grantee's unvested Common Units shall be forfeited upon the termination of the Grantee's Full Time Services to the Company Group for any reason (including for Cause). In the event that the Grantee has not started to provide Full Time Services to the Company Group on the first anniversary of the Effective Date, the entire Award shall be forfeited.

(b)     Termination of Full Time Services -- Vested Common Units.  Upon termination of the Grantee's Full Time Services to the Company Group for Cause (as defined below), the Company shall have a right to repurchase any vested Common Units from such Grantee thereafter for an amount equal to the amount that would be allocated to such Grantee's Common Units if the Company were liquidated on the date the Common Units were issued at Fair Market Value (as determined in good faith by the Board). For purposes of this Award Agreement, "Cause" shall have the meaning set forth in the written employment agreement between the Grantee and the Company in effect on the date of the termination of Grantee's Full Time Services, or if no such agreement exists, shall mean any of the following: (i) willful misconduct, intentional failure to perform duties, or fraud, embezzlement or other misappropriation of funds or property of the Company or any of its subsidiaries; (ii) the commission of acts that constitute a felony; (iii) the conviction of a crime involving any financial impropriety or moral turpitude, that would materially interfere with the ability to perform services or that otherwise would be materially injurious to the Company or any of its subsidiaries; or (iv) the material breach of any material obligations or covenants with the Company after notice and a reasonable opportunity to cure with respect to any breach reasonably susceptible to a cure.

(c)     Repurchase Rights.  Upon the determination by the Company to exercise its repurchase right set forth in Section 3(b) of this Award Agreement, the Company shall provide notice to the Grantee within ninety (90) days following the date of termination of the Grantee's Full Time Services to the Company with a closing on the repurchase to be completed no later than sixty (60) days after the notice is provided to the Grantee.

3

(d)     Fair Market Value. For purposes of this repurchase right as set forth in Section 3 of this Award Agreement, "Fair Market Value" means such determination of the valuation of the Company, any Units, or Company property as reasonably determined by the Board. For purposes of clarity, except as otherwise set forth herein, the Fair Market Value of a Unit as of any date shall be the amount that would have been distributed with respect to such Unit upon the consummation of a dissolution and liquidation of the Company pursuant to Article 11 of the LLC Agreement on such date if the proceeds from such liquidation were distributed to the Members.

**4.     Issuance of Common Units.**

(a)     The obligation of the Company to deliver the Common Units shall be subject to all applicable laws, rules, and regulations and such approvals by governmental agencies as may be deemed appropriate by the Board, including such actions as Company counsel shall deem necessary or appropriate to comply with relevant securities laws and regulations.

(b)     All obligations of the Company under this Agreement shall be subject to the rights of the Company to withhold amounts required to be withheld for any taxes, if applicable.

(c)     The Grantee shall receive allocations and distributions of the Company's profits and losses based upon the terms of the LLC Agreement.

(d)     The Grantee hereby agrees to make a timely and effective election under Code Section 83(b) with respect to his Common Units and agrees to provide a copy to the Company.

(e)     In accordance with the finally promulgated successor rules to Proposed Regulations Section 1.83-3(l) and IRS Notice 2005-43, the Grantee hereby authorizes and directs the Company to elect a safe harbor under which the Fair Market Value of any Common Units issued after the effective date of such Proposed Regulations (or other guidance) will be treated as equal to the liquidation value (within the meaning of the Proposed Regulations or successor rules) of the Common Units as of the date of issuance of such Common Units. In the event that the Company makes a safe harbor election as described in the preceding sentence, the Grantee hereby agrees to comply with all safe harbor requirements with respect to transfers of Membership Interests while the safe harbor election remains effective.

**5.     Change in Control.**

(a)     In the event the Company undergoes a Change in Control, all Common Units which are not vested at the time of the Change in Control shall vest in full, effective immediately prior to the consummation of the Change in Control, and a Grantee shall have the right to receive any distributions on account of such vested Common Units as set forth to the LLC Agreement.

(b)     For purposes of the Award, "Change in Control" means a change in ownership or control of the Company effected through any of the following transactions: (i) a merger, consolidation or other reorganization approved by the Company's equity holders, unless securities representing more than 50% of the total combined voting power of the voting securities of the successor entity are immediately thereafter beneficially owned, directly or indirectly, and in substantially the same proportion, by the persons who beneficially owned the Company's outstanding voting securities immediately prior to such transaction; (ii) a sale,

<center>4</center>

<center>**JA198**</center>

transfer or other disposition of all or substantially all of the Company's assets in liquidation or dissolution of the Company approved by the Company's equity holders; or (iii) the acquisition, directly or indirectly, by any person or related group of persons (other than the Company or a person that directly or indirectly controls, is controlled by, or is under common control with, the Company), of beneficial ownership (within the meaning of Rule 13d-3 of the Securities Exchange Act of 1934) of securities possessing more than 50% of the total combined voting power of the Company's outstanding securities pursuant to a purchase transaction or a tender or exchange offer made directly to the Company's equity holders.

6.    **Transfer; Repurchase Right**.  As a condition of receiving the Award, the Grantee hereby agrees that any Common Units issued hereby shall be subject to the transfer restrictions and repurchase rights described herein in the LLC Agreement.

7.    **Limited Liability Company Obligations**.  As a condition of receiving the Award, the Grantee hereby agrees to sign all required documents and take any actions as deemed appropriate by the Board to comply with relevant laws, rules, and regulations.

8.    **Restrictions on Transfer**.  Only the Grantee has any rights under this Award.  The Grantee may not transfer those rights, directly or indirectly, except by will or the laws of descent and distribution.

9.    **Award Subject to LLC Agreement Provisions**.  This Award is made pursuant to the LLC Agreement, the terms of which are incorporated herein by reference, and in all respects shall be interpreted in accordance with the LLC Agreement.  The Board shall have the full power and authority to administer and interpret this Award Agreement, to make factual determinations, and to adopt or amend such rules, regulations, agreements, and instruments for implementing the LLC Agreement and for the conduct of its business as it deems necessary or advisable.  All powers of the Board shall be executed without the approval or consent of the Grantee.

10.    **No Employment Rights**.  The grant of this Award shall not confer upon the Grantee any right to be retained by or in the employ or service of the Company and shall not interfere in any way with the right of the Company to terminate the Grantee's employment or service at any time.  The right of the Company, as applicable, to terminate at will the Grantee's employment or service at any time for any reason is specifically reserved.

11.    **Notice**.  Any notice, demand or communication required or permitted to be given by any provision of this Award Agreement will be in writing and will be deemed to have been given when actually received.  Any such notice, demand or communication may be given by overnight courier, email or certified mail (return receipt requested) and will be addressed to Grantee at the address set forth on the signature page to this Award Agreement, and/or to the Company at its principal office or to such other address as a party may from time to time designate by notice to the other parties.

12.    **Amendment and Termination**.  The Board may amend or terminate this Award Agreement at any time; provided, however, that the Board may not make any amendment to this Award Agreement or to this Award that would materially and adversely affect any Grantee of

5

**JA199**

issued and outstanding Common Units without the express written consent from any such affected Grantee.

**13.**   **Headings.** Section headings in this Award Agreement are for reference only. In the event of a conflict between a section heading and the content of a section, the content of the section shall control.

**14.**   **Applicable Law.** The validity, construction, interpretation and effect of this Award Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania, without giving effect to the conflicts of laws provisions thereof.

*[Signature page follows]*

6

**JA200**

IN WITNESS WHEREOF, the Company has caused its duly authorized officer to execute this Award Agreement, and the Grantee has executed this Award Agreement, effective as of the Effective Date.

COAL HILL VENTURES LLC

By: _____

Name: Christopher Moehle

Title: Manager

I hereby accept the Award described in this Award Agreement, and I agree to be bound by the terms of this Award Agreement and the LLC Agreement. I hereby further agree that all of the decisions and determinations of the Board shall be final and binding.

Grantee: _____

Eric Daimler

Grantee Address:

461 2nd St. #306c
San Francisco, CA
94107

**JA201**

**Exhibit A**

Amended and Restated Operating Agreement of Coal Hill Ventures LLC

See attached.

Exhibit E

Case 2:18-cv-00165-MJH Document 1-6 Filed 02/05/18 Page 2 of 40

AMENDED AND RESTATED OPERATING AGREEMENT

OF

ROBOTICS HUB FUND 1, LLC

THE MEMBERSHIP INTERESTS REPRESENTED BY UNITS EXPRESSED HEREIN HAVE NOT BEEN REGISTERED WITH OR QUALIFIED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION OR ANY SECURITIES REGULATORY AUTHORITY OF ANY JURISDICTION. SUCH UNITS ARE BEING SOLD IN RELIANCE UPON EXEMPTIONS FROM SUCH REGISTRATION OR QUALIFICATION REQUIREMENTS. SUCH UNITS CANNOT BE SOLD, TRANSFERRED, ASSIGNED OR OTHERWISE DISPOSED OF EXCEPT IN COMPLIANCE WITH THE RESTRICTIONS ON TRANSFERABILITY CONTAINED IN THIS OPERATING AGREEMENT AND APPLICABLE U.S. FEDERAL AND STATE SECURITIES LAWS AND THE SECURITIES LAWS OF ANY OTHER APPLICABLE JURISDICTION.

US_ACTIVE-125559578.9-380777.20001

## TABLE OF CONTENTS

**ARTICLE I DEFINITIONS** ................................................................................. 1
    Section 1.1    Definitions............................................................................. 1
**ARTICLE II ORGANIZATION** ......................................................................... 7
    Section 2.1    Formation ............................................................................. 7
    Section 2.2    Name .................................................................................... 7
    Section 2.3    Principal Place of Business ................................................. 7
    Section 2.4    Registered Agent and Office............................................... 7
    Section 2.5    Purpose; Powers.................................................................. 7
    Section 2.6    Term..................................................................................... 7
    Section 2.7    No State-Law Partnership ................................................... 7
**ARTICLE III CAPITALIZATION** ..................................................................... 8
    Section 3.1    Membership Interests.......................................................... 8
    Section 3.2    Authorization of Common Units ......................................... 8
    Section 3.3    Authorization of Carry Units .............................................. 8
    Section 3.4    Unit Certificates.................................................................. 8
**ARTICLE IV MEMBERS** ................................................................................. 9
    Section 4.1    Admission of New Members ............................................... 9
    Section 4.2    Meetings.............................................................................. 9
    Section 4.3    Place of Meetings................................................................ 9
    Section 4.4    Notice of Meeting ............................................................... 9
    Section 4.5    Record Date ........................................................................ 9
    Section 4.6    Quorum ............................................................................. 10
    Section 4.7    Voting ............................................................................... 10
    Section 4.8    Action by Written Consent ............................................... 10
    Section 4.9    Proxies.............................................................................. 10
    Section 4.10    Co-Investment Right ........................................................ 10
    Section 4.11    No Withdrawal.................................................................. 11
    Section 4.12    No Personal Liability of Members.................................... 11
**ARTICLE V MANAGEMENT** ........................................................................ 11
    Section 5.1    Establishment of Board of Managers................................ 12
    Section 5.2    Board Composition ........................................................... 12
    Section 5.3    Removal; Resignation ....................................................... 12
    Section 5.4    Meetings............................................................................ 12

JA205

Section 5.5     Quorum; Manner of Acting ................................................................ 12
Section 5.6     Action by Written Consent .............................................................. 13
Section 5.7     No Compensation or Employment................................................... 13
Section 5.8     No Personal Liability of Managers .................................................. 13
Section 5.9     Binding Effect of Actions ............................................................... 13
**ARTICLE VI OFFICERS** ............................................................................... 13
Section 6.1     Officers of Company........................................................................ 14
Section 6.2     Term of Office ................................................................................. 14
Section 6.3     Removal ........................................................................................... 14
Section 6.4     Vacancies ........................................................................................ 14
Section 6.5     President........................................................................................... 14
Section 6.6     Vice President ................................................................................. 14
Section 6.7     Treasurer ......................................................................................... 14
Section 6.8     Secretary ......................................................................................... 15
Section 6.9     Assistant Treasurers and Assistant Secretaries .............................. 15
Section 6.10    Compensation .................................................................................. 15
**ARTICLE VII CAPITAL CONTRIBUTIONS AND CAPITAL ACCOUNTS** ................... 15
Section 7.1     Initial Capital Contributions .......................................................... 15
Section 7.2     Additional Capital Contributions ................................................... 15
Section 7.3     Capital Accounts............................................................................. 15
Section 7.4     Succession Upon Transfer .............................................................. 16
Section 7.5     Negative Capital Accounts ............................................................. 16
Section 7.6     Treatment of Loans ......................................................................... 16
Section 7.7     No Withdrawal................................................................................. 16
Section 7.8     Compliance with Treasury Regulations .......................................... 16
**ARTICLE VIII ALLOCATIONS, TAX MATTERS AND REPORTS** ............................. 17
Section 8.1     Allocation of Net Income and Net Losses ...................................... 17
Section 8.2     Special Allocations ......................................................................... 17
Section 8.3     Accounting Principles ..................................................................... 19
Section 8.4     Interest on and Return of Capital Contributions ............................ 19
Section 8.5     Loans to Company .......................................................................... 19
Section 8.6     Accounting Period .......................................................................... 19
Section 8.7     Records and Reports ....................................................................... 19
Section 8.8     Returns and Other Elections ........................................................... 19

Section 8.9    Tax Matters Partner ................................................................. 20
**ARTICLE IX DISTRIBUTIONS** ....................................................... 20
Section 9.1    Requirement to Make Distributions ................................... 20
Section 9.2    Distributions to Holders of Carry Units ........................... 20
Section 9.3    Distributions to Holders of Common Units ....................... 21
Section 9.4    Tax Distributions ............................................................... 21
Section 9.5    Distributions in Kind ......................................................... 22
Section 9.6    Distributions to Members Upon Liquidation ................... 22
**ARTICLE X RESTRICTIONS ON TRANSFERABILITY** ............... 22
Section 10.1    General ............................................................................. 22
Section 10.2    Right of First Refusal for Common Unit Holders ........... 22
Section 10.3    Further Requirements for Transfer ................................. 23
Section 10.4    Effectiveness of Transfer ................................................ 24
**ARTICLE XI DISSOLUTION AND LIQUIDATION** ....................... 24
Section 11.1    Dissolution ....................................................................... 24
Section 11.2    Winding Up ...................................................................... 24
Section 11.3    Liquidator ........................................................................ 24
Section 11.4    Distribution of Assets Upon Winding Up ....................... 25
Section 11.5    Certificate of Dissolution ............................................... 25
Section 11.6    Recourse for Claims ........................................................ 25
**ARTICLE XII EXCULPATION AND INDEMNIFICATION** ........... 25
Section 12.1    Covered Persons ............................................................... 25
Section 12.2    Exculpation of Covered Persons ..................................... 25
Section 12.3    Liabilities and Duties of Covered Persons ...................... 26
Section 12.4    Indemnification ............................................................... 26
Section 12.5    Reimbursement ................................................................ 27
Section 12.6    Entitlement to Indemnity ................................................. 27
Section 12.7    Insurance .......................................................................... 27
Section 12.8    Funding of Indemnification ............................................ 28
Section 12.9    Amendment and Survival ................................................ 28
**ARTICLE XIII MISCELLANEOUS PROVISIONS** ......................... 28
Section 13.1    Notices .............................................................................. 28
Section 13.2    Application of Delaware Law .......................................... 29
Section 13.3    Waiver of Action for Partition ........................................ 29

- iii -

**JA207**

Case 2:18-cv-00165-MJH    Document 1-6    Filed 02/05/18    Page 6 of 40

Section 13.4    Amendment .................................................................................. 29

Section 13.5    Execution of Additional Instruments ........................................... 29

Section 13.6    Counsel to the Company .............................................................. 29

Section 13.7    Construction ................................................................................. 29

Section 13.8    Headings ...................................................................................... 29

Section 13.9    Waivers ........................................................................................ 29

Section 13.10    Rights and Remedies Cumulative ............................................. 29

Section 13.11    Severability ............................................................................... 30

Section 13.12    Heirs, Successors and Assigns .................................................. 30

Section 13.13    Creditors ................................................................................... 30

Section 13.14    Counterparts .............................................................................. 30

Section 13.15    Recitals ...................................................................................... 30

Section 13.16    Investment Representations ...................................................... 30

## AMENDED AND RESTATED OPERATING AGREEMENT

THIS AMENDED AND RESTATED OPERATING AGREEMENT (this "*Operating Agreement*"), dated as of March 23, 2016, is made by and among Robotics Hub Fund 1, LLC, a Delaware limited liability company (the "*Company*"), and the Members executing this Operating Agreement on the signature pages hereto or who are admitted as a Member in accordance with Section 10.1 of this Operating Agreement.

## RECITALS

WHEREAS, the Company was duly formed under the Delaware Act (as defined below) on February 17, 2016 (the "*Formation Date*") for the primary purpose of serving as the general partner of Robotics Hub Fund 1, LP, a Delaware limited partnership which invests in early-stage robotics companies (the "*Fund*");

WHEREAS, certain of the Members and the Company entered into an Operating Agreement, dated as of March 11, 2016, governing the operations of the Company (the "*Original Operating Agreement*"); and

WHEREAS, the Members and the Company desire to amend and restate the Original Operating Agreement in its entirety, as of the date set forth above, in order to set forth their respective rights and obligations with respect to the Company in accordance with the terms and subject to the conditions set forth in this Operating Agreement and the Delaware Act.

NOW, THEREFORE, in consideration of the mutual covenants expressed herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and intending to be legally bound hereby, the Company and the Members hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1    Definitions.  The following terms used in this Operating Agreement have the following meanings (unless otherwise expressly provided herein):

"*Accounting Method*" means the cash basis method of accounting.

"*Adjusted Taxable Income*" means, as to any Member for a Fiscal Year (or portion thereof) with respect to the Units held by such Member, the federal taxable income allocated by the Company to the Member with respect to such Units (as adjusted by any final determination in connection with any tax audit or other proceeding) for such Fiscal Year (or portion thereof); provided, that such taxable income shall be computed (a) *minus* any excess taxable loss or excess taxable credits of the Company for any prior period allocable to such Member with respect to such Units that were not previously taken into account for purposes of determining such Member's Adjusted Taxable Income in a prior Fiscal Year to the extent such loss or credit would be available under the Code to offset income of the Member (or, as appropriate, the direct or indirect members of the Member) determined as if the income, loss, and credits from the Company were the only income, loss, and credits of the Member (or, as appropriate, the direct or

indirect members of the Member) in such Fiscal Year and all prior Fiscal Years, and (ii) taking into account any special basis adjustment with respect to such Member resulting from an election by the Company under Code Section 754.

"*Applicable Law*" means all applicable provisions of (a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations or orders of any Governmental Authority; (b) any consents or approvals of any Governmental Authority; and (c) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"*Bankruptcy*" means, with respect to any Member, the occurrence of any of the following: (a) the filing of an application by such Member for, or a consent to, the appointment of a trustee of such Member's assets; (b) the filing by such Member of a voluntary petition in bankruptcy or the filing of a pleading in any court of record admitting in writing such Member's inability to pay its debts as they come due; (c) the making by such Member of a general assignment for the benefit of such Member's creditors; (d) the filing by such Member of an answer admitting the material allegations of, or such Member's consenting to, or defaulting in answering a bankruptcy petition filed against such Member in any bankruptcy proceeding; or (e) the expiration of sixty (60) days following the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating such Member a bankrupt or appointing a trustee of such Member's assets.

"*Bidder*" has the meaning set forth in Section 10.2(a).

"*Board*" has the meaning set forth in Section 5.1.

"*Capital Account*" has the meaning set forth in Section 7.3.

"*Capital Contribution*" means any contribution to the capital of the Company in cash or property by a Member whenever made.

"*Carry Units*" means the Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Carry Units" in this Operating Agreement.

"*Carry Unit Distribution Amount*" has the meaning set forth in Section 9.2.

"*Certificate*" means the Certificate of Formation of the Company as filed by the organizer of the Company with the Secretary of State of the State of Delaware on the Formation Date, as the same may be amended from time to time.

"*Code*" means the Internal Revenue Code of 1986 or corresponding provisions of subsequent superseding federal revenue laws.

"*Common Units*" means the Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Common Units" in this Operating Agreement.

"*Common Unit Holders*" has the meaning set forth in Section 10.2(a).

- 2 -

"*Company*" has the meaning set forth in the introductory paragraph of this Operating Agreement.

"*Company Minimum Gain*" means "partnership minimum gain" as defined in Section 1.704-2(b)(2) of the Treasury Regulations, substituting the term "Company" for the term "partnership" as the context requires.

"*Deadlock Advisor*" means David Mawhinney or, in the event of his death or mental incapacitation, an individual mutually chosen by the Managers.

"*Deficit Capital Account*" means with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the taxable year, after giving effect to the debit to such Capital Account for the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Treasury Regulations. This definition of Deficit Capital Account is intended to comply with the provision of Treasury Regulations Section 1.704-1(b)(2)(ii)(d), and will be interpreted consistently with those provisions.

"*Delaware Act*" means the Delaware Limited Liability Company Act, 6 Del. C. Section 18-101 et seq., as the same may be amended from time to time.

"*Direct Family Member*" means, with respect to any Member, such Member's spouse, sibling, son, daughter, step-son, step-daughter, parent or step-parent. In the event that a Member has no living Direct Family Member, the beneficiaries of such Member's estate will each be treated as a Direct Family Member and will be subject to this Operating Agreement to the same extent as a Direct Family Member.

"*Direct Investment Company*" has the meaning set forth in Section 4.10(a).

"*Direct Investment Materials*" has the meaning set forth in Section 4.10(a).

"*Direct Investment Returns*" means any amount received by the Company as a dividend, distribution or payment on outstanding debt or otherwise from a Direct Investment Company or from the sale of the stock or other interests held by the Company in a Direct Investment Company.

"*Disability*" means, with respect to any Member, that a medical doctor has determined and memorialized in writing that the Member is incapacitated or mentally incompetent and has been such for a period of at least six (6) consecutive months.

"*Estimated Tax Amount*" means, with respect to any Member for a Fiscal Year, such Member's Tax Amount for such Fiscal Year as estimated in good faith from time to time by the Board. In making such estimate, the Board shall take into account amounts shown on Internal Revenue Service Form 1065 filed by the Company and similar state or local forms filed by the Company for the preceding taxable year and such other adjustments as in the reasonable business judgment of the Board are necessary or appropriate to reflect the estimated operations of the Company for the Fiscal Year.

"*Excess Amount*" has the meaning set forth in Section 9.4(c).

- 3 -

"*Fiscal Year*" means January 1 through December 31 of any given year.

"*Formation Date*" has the meaning set forth in the recitals to this Operating Agreement.

"*Fund*" has the meaning set forth in the recitals to this Operating Agreement.

"*Fund Carry Amount*" means any distributions received by the Company from the Fund pursuant to Section 4.05(c)(iii) and/or Section 4.05(c)(iv) of the Fund LPA.

"*Fund LPA*" means that certain Limited Partnership Agreement of the Fund, as amended from time to time.

"*Governmental Authority*" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction.

"*Initial Capital Contribution*" with respect to any Member, means such Member's initial Capital Contribution pursuant to this Operating Agreement, as set forth on Exhibit A, attached hereto.

"*Investment Returns*" means all revenue received by the Company from either the Fund Carry Amount or Direct Investment Returns.

"*Joinder Agreement*" means the joinder agreement in substantially the form attached hereto as Exhibit B.

"*Liquidator*" has the meaning set forth in Section 11.3(a).

"*Losses*" has the meaning set forth in Section 12.4.

"*Manager*" has the meaning set forth in Section 5.1.

"*Member*" means each of the parties who execute a counterpart of this Operating Agreement and each of the parties who are subsequently admitted as a Member in accordance with Section 10.1 of this Operating Agreement.

"*Member Nonrecourse Debt*" means "partner nonrecourse debt" as defined in Treasury Regulation Section 1.704-2(b)(4), substituting the term "Company" for the term "partnership" and the term "Member" for the term "partner" as the context requires.

"*Member Nonrecourse Debt Minimum Gain*" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if the Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulation Section 1.704-2(i)(3).

- 4 -

"*Membership Interest*" means a Member's entire interest and rights in the Company, including such Member's right (based on the class of Unit or Units held by such Member), as applicable, (a) to distributions of income, gain, loss and deduction of the Company; (b) to a distributive share of the assets of the Company; (c) to vote on, consent to or otherwise participate in any decision of the Members as provided in this Operating Agreement; and (d) to any and all other benefits to which such Member may be entitled as provided in this Operating Agreement or the Delaware Act.

"*Members Schedule*" has the meaning set forth in <u>Section 3.1</u>.

"*Net Losses*" means, for each Fiscal Year, the losses and deductions of the Company determined in accordance with accounting principles consistently applied from year to year employed under the Accounting Method and as reported, separately or in the aggregate, as appropriate, on the Company's information tax return filed for federal income tax purposes, plus any expenditures described in Section 705(a)(2)(B) of the Code.

"*Net Income*" means, for each Fiscal Year, the income and gains of the Company determined in accordance with accounting principles consistently applied from year to year employed under the Accounting Method and as reported, separately or in the aggregate, as appropriate, on the Company's information tax return filed for federal income tax purposes, plus any income described in Section 705(a)(1)(B) of the Code.

"*Nonrecourse Liability*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"*Offer Notice*" has the meaning set forth in <u>Section 10.2(a)</u>.

"*Offered Interests*" has the meaning set forth in <u>Section 10.2(a)</u>.

"*Offering Member*" has the meaning set forth in <u>Section 10.2(a)</u>.

"*Operating Agreement*" has the meaning set forth in the recitals to this Operating Agreement.

"*Original Operating Agreement*" has the meaning set forth in the recitals to this Operating Agreement.

"*Person*" means any individual or entity, and their heirs, executors, administrators, legal representatives, successors and assigns where the context so permits.

"*Permitted Transfer*" has the meaning set forth in <u>Section 10.1</u>.

"*Purchasing Member*" has the meaning set forth in <u>Section 10.2(b)</u>.

"*Quarterly Estimated Tax Amount*" of a Member for any calendar quarter of a Fiscal Year means the excess, if any of (a) the product of (i) a quarter (¼) in the case of the first calendar quarter of the Fiscal Year, half (½) in the case of the second calendar quarter of the Fiscal Year, three-quarters (¾) in the case of the third calendar quarter of the Fiscal Year, and

one (1) in the case of the fourth calendar quarter of the Fiscal Year and (ii) the Member's Estimated Tax Amount for such Fiscal Year over (b) all distributions previously made during such Fiscal Year to such Member.

"*Reed Smith*" has the meaning set forth in Section 13.6.

"*ROFR Notice*" has the meaning set forth in Section 10.2(b).

"*ROFR Notice Period*" has the meaning set forth in Section 10.2(b).

"*ROFR Portion*" means, with respect to any Purchasing Member, on the date of the Offer Notice, the number of Common Units equal to the product of: (a) the total number of Offered Interests and (b) a fraction determined by *dividing* (x) the number of Common Units owned by such Purchasing Member *by* (y) the total number of Common Units owned by all of the Purchasing Members.

"*Securities Acts*" has the meaning set forth in Section 13.16.

"*Shortfall Amount*" has the meaning set forth in Section 9.4(b).

"*Subsidiary*" means, with respect to any Person, any other Person of which a majority of the outstanding shares or other equity interests having the power to vote for directors or comparable managers are owned, directly or indirectly, by the first Person.

"*Tax Amount*" of a Member for a Fiscal Year means the product of (a) the Tax Rate for such Fiscal Year and (b) the Adjusted Taxable Income of the Member for such Fiscal Year with respect to its Units.

"*Tax Distributions*" has the meaning set forth in Section 9.1(a).

"*Transferring Member*" means (a) any Member who sells, assigns, pledges, hypothecates, transfers, exchanges or otherwise transfers for consideration all or any portion of his Membership Interest or (b) any Member who gifts, bequeaths or otherwise transfers for no consideration (by operation of law or otherwise, except with respect to Bankruptcy) all or any part of his Membership Interest.

"*Tax Rate*" of a Member, for any period, means the highest marginal blended federal, state and local tax rate applicable to ordinary income, qualified dividend income or capital gains, as appropriate, for such period for an individual residing in Pittsburgh, Pennsylvania, taking into account for federal income tax purposes, the deductibility of state and local taxes and any applicable limitations on such deductions.

"*Treasury Regulations*" means proposed, temporary and final regulations promulgated under the Code in effect as of the date of filing the Certificate and the corresponding sections of any regulations subsequently issued that amend or supersede such regulations.

"*Unit*" means a unit representing a fractional part of the Membership Interests of the Members and shall include all types and classes of Units, including Common Units and Carry

- 6 -

Units; provided, that any type or class of Unit shall have the privileges, preference, duties, liabilities, obligations and rights set forth in this Operating Agreement, and the Membership Interests represented by such type or class of Unit shall be determined in accordance with such privileges, preference, duties, liabilities, obligations and rights.

## ARTICLE II

## ORGANIZATION

Section 2.1    Formation.    The Company has been organized as a Delaware limited liability company by executing and delivering the Certificate to the Delaware Secretary of State in accordance with and pursuant to the Delaware Act.

Section 2.2    Name.    The name of the Company is "Robotics Hub Fund 1, LLC" or such other name or names as the Board may from time to time designate; provided, that the name shall always contain the words "Limited Liability Company" or the abbreviation "LLC."

Section 2.3    Principal Place of Business.    The principal place of business of the Company is 309 Cola Street, Pittsburgh, Pennsylvania 15203.  The Company may locate its place of business at any other place or places as the Board may deem advisable from time to time.

Section 2.4    Registered Agent and Office.    The registered office of the Company shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Board may designate from time to time in the manner provided by the Delaware Act. The registered agent for service of process on the Company in the State of Delaware shall be the initial registered agent named in the Certificate or such other Person or Persons as the Board may designate from time to time in the manner provided by the Delaware Act.

Section 2.5    Purpose; Powers.    The purpose of the Company is to engage in any lawful business or activity, and to have and exercise all of the powers, rights and privileges which a limited liability company organized pursuant to the Delaware Act may have and exercise.

Section 2.6    Term.    The term of the Company commenced on the Formation Date and shall continue in existence perpetually until the Company is dissolved in accordance with the provisions of this Operating Agreement or the Delaware Act.

Section 2.7    No State-Law Partnership.    The Members intend that the Company shall be treated as a partnership for federal and, if applicable, state and local income tax purposes, and, to the extent permissible, the Company shall elect to be treated as a partnership for such purposes. The Company and each Member shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment and no Member shall take any action inconsistent with such treatment. The Members intend that the Company shall not be a partnership (including, without limitation, a limited partnership) or joint venture, and that no Member, Manager or officer of the Company shall be a partner or joint

- 7 -

JA215

venturer of any other Member, Manager or officer of the Company, for any purposes other than as set forth in the first sentence of this Section 2.7.

## ARTICLE III

## CAPITALIZATION

Section 3.1     Membership Interests.  The Membership Interests of the Members shall be represented by issued and outstanding Units. Each of the Units shall have the privileges, preference, duties, liabilities, obligations and rights, including voting rights, if any, set forth in this Operating Agreement. The Board shall maintain a schedule of all Members, their respective mailing addresses and the amount and type of Units held by them (the "*Members Schedule*"), and shall update the Members Schedule upon the issuance or transfer of any Units to any new or existing Member. A copy of the Members Schedule as of the execution of this Operating Agreement is attached hereto as Exhibit A.

Section 3.2     Authorization of Common Units.   The Company is hereby authorized to issue a class of Units designated as Common Units, with the privileges, preference, duties, liabilities, obligations and rights, including voting rights, if any, set forth in this Operating Agreement.

Section 3.3     Authorization of Carry Units.  The Company is hereby authorized to issue a class of Units designated as Carry Units, with the privileges, preference, duties, liabilities, obligations and rights, including voting rights, if any, set forth in this Operating Agreement; provided, however, that Carry Units shall have no rights to vote on any matters of the Company or the Members, unless as otherwise expressly provided in this Operating Agreement or in the Delaware Act.

Section 3.4     Unit Certificates.  The Board in its sole discretion may, but shall not be required to, issue certificates to the Members representing the Units held by such Member. In the event that the Board shall issue certificates representing Units in accordance with this Section 3.4, then in addition to any other legend required by the Securities Acts, all certificates representing issued and outstanding Units shall bear a legend substantially in the following form:

THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO AN OPERATING AGREEMENT AMONG THE COMPANY AND ITS MEMBERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE COMPANY. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE UNITS REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH OPERATING AGREEMENT.

THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED EXCEPT IN COMPLIANCE WITH THE RESTRICTIONS ON TRANSFERABILITY CONTAINED IN SUCH OPERATING AGREEMENT AND APPLICABLE U.S. FEDERAL AND STATE

SECURITIES LAWS AND THE SECURITIES LAWS OF ANY OTHER APPLICABLE JURISDICTION.

### ARTICLE IV

### MEMBERS

Section 4.1    Admission of New Members.

(a)    Any Person may be admitted as a Member from time to time by (i) the affirmative vote of the holders of a majority of Common Units, or (ii) in connection with a transfer of Units from an existing Member in accordance with Article X.

(b)    In order for any Person not already a Member of the Company to be admitted as a Member, whether pursuant to an issuance or transfer of Units, such Person shall have executed and delivered to the Company a written undertaking substantially in the form of the Joinder Agreement. Upon the amendment of the Members Schedule by the Board and the satisfaction of any other applicable conditions, including, if a condition, the receipt by the Company of payment for the issuance of the applicable Units, such Person shall be admitted as a Member and deemed listed as such on the books and records of the Company and thereupon shall be issued his, her or its Units. The Board shall also adjust the Capital Accounts of the Members as necessary in accordance with Article VII.

Section 4.2    Meetings. Meetings of the Members, for any purpose or purposes, may be called by (i) the Board or (ii) by a Member or group of Members holding at least a majority of the then-outstanding Common Units. Meetings of the Members may be held either in person or by means of telephone or video conference or other communications device that permits all Members participating in the meeting to hear each other.

Section 4.3    Place of Meetings. The Members holding at least a majority of the then-outstanding Common Units may designate any place, either within or outside the State of Delaware, as the place of meeting for any meeting of the Members. If no designation is made, the place of meeting will be the principal place of business of the Company.

Section 4.4    Notice of Meeting.

(a)    Except as otherwise provided in Section 4.4(b), notice of each meeting of the Board shall be given to each Member entitled to vote at such meeting at least 24 hours prior to each such meeting.

(b)    Attendance of a Member at any meeting shall constitute a waiver of notice of such meeting by such Member, except where such Member attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any meeting of the Members need be specified in the notice or waiver of notice of such meeting

Section 4.5    Record Date. For the purpose of determining Members entitled to notice of or to vote at any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any distribution, or in order to make a determination of Members for any

- 9 -

**JA217**

other purpose, the date on which notice of the meeting is mailed or the date on which the resolution declaring such distribution is adopted, as the case may be, will be the record date for such determination of Members. When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Section 4.5, such determination will apply to any adjournment thereof.

Section 4.6    Quorum. A majority of the Members entitled to vote at a given meeting of the Members, represented in person or by proxy, will constitute a quorum at any meeting of Members. If a quorum shall not be present at any meeting of the Members, then the Members present at the meeting may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

Section 4.7    Voting.

(a)    Except as otherwise provided in Section 4.7(b) or as otherwise required by the Delaware Act:

(i)    each Member shall be entitled to one vote per Common Unit on all matters upon which the Members have the right to vote under this Operating Agreement; and

(ii)    Carry Units shall not entitle the holders thereof to vote on any matters required or permitted to be voted on by the Members.

(b)    Notwithstanding anything to the contrary contained in this Operating Agreement, at any time that there are any Carry Units outstanding, the Company shall not amend or modify Section 4.10, Section 9.1(a)(i) or Section 9.2 of this Operating Agreement, or defined terms used in Section 4.10, Section 9.1(a)(i) or Section 9.2 of this Operating Agreement, without the prior written approval of the holders of a majority of the outstanding Common Units and the holders of a majority of the outstanding Carry Units, each voting separately as distinct classes.

Section 4.8    Action by Written Consent. Any matter that is to be voted on, consented to or approved by Members may be taken without a meeting, without prior notice and without a vote if consented to in writing, by a Member or Members having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Members entitled to vote thereon were present and voted. The secretary of the Company will maintain a record for each such action taken by written consent of a Member or Members.

Section 4.9    Proxies. At all meetings of Members, a Member may vote in person or by proxy executed in writing by the Member or by a duly authorized attorney-in-fact. Such proxy must be filed with the secretary of the Company before or at the time of the meeting. No proxy will be valid after 12 months from the date of its execution, unless otherwise provided in the proxy.

Section 4.10    Co-Investment Right.

(a)    Each holder of Carry Units, for so long as such holder owns at least one Carry Unit, shall have the right, but not the obligation, to invest up to an amount equal to

- 10 -

$50,000 per Carry Unit held by such holder in all available co-investment opportunities in companies or partnerships (other than the Fund) in which the Company makes a direct investment (each, a "***Direct Investment Company***"), on the same terms and conditions as the Company's investment in such Direct Investment Company (including but not limited to anti-dilution, first refusal, co-sale, drag along, registration, information, preemptive and other rights and transfer and other restrictions); provided, that such holder of Carry Units shall have no right to invest, in the aggregate, in excess of $50,000 per Carry Unit for all investments in Direct Investment Companies by such holder of Carry Units. Reasonably promptly after initially receiving any investment documents from a potential Direct Investment Company, the Company shall distribute such investment documents to each holder of Carry Units along with any due diligence materials utilized by the Company in determining whether to make its investment in such Direct Investment Company (collectively "***Direct Investment Materials***"). Holders of Carry Units shall not have any right to provide comments to any Direct Investment Materials.

(b)     Each holder of Carry Units shall make a final determination of whether it will invest in a Direct Investment Company no later than fourteen (14) days after the Company has provided Direct Investment Materials to such holder of Carry Units. Within such timeframe, each holder of Carry Units shall provide the Company with written notice of its intent to invest in such Direct Investment Company, including the amount it intends to invest in such Direct Investment Company.

(c)     Each holder of Carry Units acknowledges that it is not looking to, or relying upon, the Company to make any investment decision, analysis or recommendation and will make its own independent investment decision regarding whether or not to invest in any Direct Investment Company. The Company shall solely be responsible for asking questions of and receiving answers from representatives of a Direct Investment Company concerning the terms and conditions of an investment in such Direct Investment Company, and to obtain any additional information necessary to evaluate the merits and risks of an investment in a Direct Investment Company. Nothing contained herein constitutes a binding commitment on any holder of Carry Units to invest in any Direct Investment Company.

Section 4.11  No Withdrawal.  A Member shall not cease to be a Member as a result of the Bankruptcy of such Member or as a result of any other events specified in § 18-304 of the Delaware Act. So long as a Member continues to hold any Units, such Member shall not have the ability to withdraw or resign as a Member prior to the dissolution and winding up of the Company and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the dissolution or winding up of the Company shall be null and void. As soon as any Person who is a Member ceases to hold any Units, such Person shall no longer be a Member.

Section 4.12  No Personal Liability of Members.  Except as otherwise provided in the Delaware Act or expressly in this Operating Agreement, no Member will be obligated personally for any debt, obligation or liability of the Company or other Members, whether arising in contract, tort or otherwise, solely by reason of being a Member.

**ARTICLE V**

**MANAGEMENT**

- 11 -

**JA219**

Section 5.1    Establishment of Board of Managers.  A board of managers of the Company (the "*Board*") is hereby established and shall be comprised of natural Persons (each such Person, a "*Manager*") who shall be appointed in accordance with Section 5.2. The business and affairs of the Company shall be managed, operated and controlled by or under the direction of the Board, and the Board shall have, and is hereby granted, the full and complete power, authority and discretion for, on behalf of and in the name of the Company, to take such actions as it may in its sole discretion deem necessary or advisable to carry out any and all of the objectives and purposes of the Company, subject only to the terms of this Operating Agreement and the Delaware Act.

Section 5.2    Board Composition.  The size of the Board and the Managers to serve thereon shall be determined by the vote of the holders of a majority of Common Units; provided, that, the size of the Board shall initially be set at two (2), and the initial Managers shall be Christopher Moehle and Eric Daimler.

Section 5.3    Removal; Resignation.

(a)    A Manager may be removed or replaced at any time, with or without cause, upon, and only upon, the affirmative vote of the holders of a majority of Common Units.

(b)    A Manager may resign at any time from the Board by delivering his or her written resignation to the Board. Any such resignation shall be effective upon receipt thereof by the Board unless it is specified to be effective at some other time or upon the occurrence of some other event. The Board's acceptance of a resignation shall not be necessary to make such resignation effective.

Section 5.4    Meetings.

(a)    The Board shall meet at such time and at such place as the Board may designate. Meetings of the Board may be held either in person or by means of telephone or video conference or other communications device that permits all Managers participating in the meeting to hear each other, at the offices of the Company or such other place (either within or outside the State of Delaware) as may be determined from time to time by the Board. Notice of each meeting of the Board shall be given to each Manager at least 24 hours prior to each such meeting.

(b)    Attendance of a Manager at any meeting shall constitute a waiver of notice of such meeting by such Manager, except where a Manager attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any meeting of the Board need be specified in the notice or waiver of notice of such meeting.

Section 5.5    Quorum; Manner of Acting.

(a)    A majority of the Managers serving on the Board shall constitute a quorum for the transaction of business of the Board. At all times when the Board is conducting business at a meeting of the Board, a quorum of the Board must be present at such meeting. If a quorum shall not be present at any meeting of the Board, then the Managers present at the

- 12 -

meeting may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

(b)    Any Manager may participate in a meeting of the Board by means of telephone or video conference or other communications device that permits all Managers participating in the meeting to hear each other, and participation in a meeting by such means shall constitute presence in person at such meeting.

(c)    Each Manager shall have one vote on all matters submitted to the Board. With respect to any matter before the Board, the act of a majority of the Managers shall be the act of the Board. For so long as the Board is comprised of an even number of Managers, if the Managers are unable to reach a decision on a matter by majority vote, and such deadlock is unresolved for a period of ten (10) days following the date when the deadlocked matter was initially submitted to the Board for decision, the Board shall refer such matter to the Deadlock Advisor, who shall provide a decision on such deadlocked matter within ten (10) days after referral to him or her of the deadlocked matter (or, if mutually agreed by the Managers, within a longer period of time). Any decision by the Deadlock Advisor shall be final and binding on the Company, the Board and the Members.

Section 5.6    <u>Action by Written Consent</u>.  Any matter that is to be voted on, consented to or approved by the Board may be taken without a meeting, without prior notice and without a vote if consented to in writing, by such number of Managers as would be necessary to authorize or take such action at a meeting of the Board at which a quorum was present and voted. The secretary of the Company will maintain a record for each such action taken by written consent of the Managers.

Section 5.7    <u>No Compensation or Employment</u>.    No Manager shall be reimbursed or otherwise receive compensation for performance of his or her duties as a Manager. This Operating Agreement does not, and is not intended to, confer upon any Manager any rights with respect to continued employment by the Company, and nothing herein should be construed to have created any employment agreement with any Manager. Nothing contained in this <u>Article V</u> shall be construed to preclude any Manager from serving the Company in any other capacity and receiving reasonable compensation for such services.

Section 5.8    <u>No Personal Liability of Managers</u>.  Except as otherwise provided in the Delaware Act or expressly in this Operating Agreement, no Manager will be obligated personally for any debt, obligation or liability of the Company or any Member, whether arising in contract, tort or otherwise, solely by reason of being a Manager.

Section 5.9    <u>Binding Effect of Actions</u>.  Each Member will be bound by, and hereby consents to, any and all actions taken and decisions made by the Members in accordance with the terms of this Operating Agreement. Each of the Members agrees that the officers listed in <u>Section 6.2</u> hereof will have the authority to bind the Company.  Except as provided in this <u>Article V</u>, no Member will have authority to bind the Company.

**ARTICLE VI**

**OFFICERS**

- 13 -

**JA221**

Section 6.1   Officers of Company.  The officers of the Company will consist of a president, a treasurer and a secretary, and such vice presidents, assistant vice presidents, assistant treasurers, assistant secretaries or other officers or agents as may be elected and appointed by the Board from time to time.  Any two or more offices may be held by the same person.  The officers will act in the name and on behalf of the Company and will supervise its operation under the direction and management of the Board, as further described below.

Section 6.2   Term of Office.  Each officer will hold office until his or her successor shall have been duly appointed and qualified or until his or her death or until he or she resigns or has been removed in the manner hereinafter provided. Election or appointment of an officer or agent will not of itself create contract rights.

Section 6.3   Removal.  Any officer or agent may be removed, with or without cause, by the Board whenever in their judgment the best interests of the Company would be served thereby.

Section 6.4   Vacancies.  A vacancy in any office because of death, resignation, removal, disqualification or otherwise may be filled for the unexpired portion of the term by the Board.

Section 6.5   President.  The president will be the chief executive officer of the Company and will be in charge of the entire business and all the affairs of the Company and will have the powers and perform the duties incident to that position, including the power to bind the Company in accordance with this Section 6.5.  He or she will have such other powers and perform such duties as are specified in this Operating Agreement and as may from time to time be assigned to him or her by the Board.

The president will have general and active management of the business of the Company and will see that all orders and resolutions of the Board are carried into effect.  The president may execute bonds, mortgages and other contracts, except where required or permitted by law to be otherwise signed and executed and except where the signing and execution thereof is expressly delegated by the Board to some other officer or agent of the Company.  The president will have general powers of supervision and will be the final arbiter of all differences between officers of the Company, and such decision as to any matter affecting the Company will be final and binding as between the officers of the Company subject only the Board.

Section 6.6   Vice President.  In the absence of (or at the request of) the president, or in the event of the president's inability or refusal to act, a vice president (or in the event there be more than one vice president, the vice presidents in the order designated, or in the absence of any designation, then in the order of their election) will perform the duties of the president, and when so acting, will have all the powers of and be subject to all the restrictions upon the president. Any vice president will perform such other duties as from time to time may be assigned to him by the president or by the Board.

Section 6.7   Treasurer.  The treasurer will be the chief financial officer of the Company.  The treasurer will not be required to give a bond for the faithful discharge of his or her duties.  He or she will: (a) have charge and custody of and be responsible for all funds and

- 14 -

securities of the Company; (b) be charged with primary responsibility for dealing with national securities exchanges or other exchanges in which the Company may hold a membership or on which the Company may trade; (c) receive and give receipts for moneys due and payable to the Company from any source whatsoever, and deposit all such moneys in the name of the Company in such banks, trust companies or other depositories as are selected by the Board; and (d) in general perform all the duties incident to the office of treasurer and such other duties as from time to time may be assigned to him by the president or by the Board.

Section 6.8    Secretary.  The secretary will: (a) keep the minutes of the Members' meetings and the Board meetings in one or more books provided for that purpose; (b) see that all notices are duly given in accordance with the provisions of this Operating Agreement or as required by law; (c) be custodian of Company records; (d) keep a register of the post office address of each Member which will be furnished to the secretary by such Member; (e) certify the resolutions of the Members and the Board and other documents to the Company as true and correct thereof; and (f) in general perform all duties incident to the office of secretary and such other duties as from time to time may be assigned to him by the president, a vice president (as designated by the president) or by the Board.

Section 6.9    Assistant Treasurers and Assistant Secretaries.    The assistant treasurers will respectively, if required by the Board, give bonds for the faithful discharge of their duties in such sums and with such sureties as the Board determines.  The assistant treasurers and assistant secretaries, in general, will perform such duties as are assigned to them by the treasurer or the secretary, respectively, or by the president or the Board.

Section 6.10    Compensation.  The compensation of the officers of the Company will be fixed from time to time by the Board, and no officer or employee will be prevented from receiving such compensation by reason of the fact that he or she is also a Member or director of the Company.

## ARTICLE VII

## CAPITAL CONTRIBUTIONS AND CAPITAL ACCOUNTS

Section 7.1    Initial Capital Contributions.  Any amounts contributed by any Member prior to or simultaneously with such Member becoming a party to this Operating Agreement will be recorded by the Company as that Member's Initial Capital Contribution and will be placed in the Member's Capital Account and recorded on the Members Schedule opposite such Member's name.  Whether a prospective Member is required to make an Initial Capital Contribution, and the amount of such Initial Capital Contribution, shall be determined by the Board, in its sole discretion.

Section 7.2    Additional Capital Contributions.  No Member shall be required to make any additional Capital Contributions.  Any future Capital Contributions made by any Member shall only be made with the consent of the Board and in connection with an issuance of Units.

Section 7.3    Capital Accounts.  The Company shall establish and maintain on its books and records a separate capital account (a "*Capital Account*") for each Member.

- 15 -

**JA223**

(a)    Each Member's Capital Account shall be increased by: (i) such Member's Capital Contributions, including such Member's Initial Capital Contribution; (ii) the fair market value of property contributed by the Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code); (iii) allocations of Net Income; and (iv) allocations to such Member of income described in Section 705(a)(1)(B) of the Code in accordance with Section 8.1.

(b)    Each Member's Capital Account shall be decreased by: (i) the cash amount of any distributions to such Member by the Company; (ii) the fair market value of property distributed to the Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code); (iii) allocations of Net Losses; (iv) allocations to such Member of expenditures described in Code Section 705(a)(2)(b) of the Code; and (v) allocations to the account of such Member of losses and deductions as set forth in such Treasury Regulations, taking into account adjustments to reflect book value.

Section 7.4    Succession Upon Transfer.    In the event of a permitted sale or exchange of Units pursuant to Article X hereof, the Capital Account of the Transferring Member will become the Capital Account of the transferee to the extent it relates to the transferred Units in accordance with Section 1.704-1(b)(2)(iv) of the Treasury Regulations.

Section 7.5    Negative Capital Accounts.    In the event that any Member shall have a deficit balance in his, her or its Capital Account, such Member shall have no obligation, during the term of the Company or upon dissolution or liquidation thereof, to restore such negative balance or make any Capital Contributions to the Company by reason thereof, except as may be required by the Delaware Act (and subject to Section 7.1 and Section 7.2) or in respect of any negative balance resulting from a withdrawal of capital or dissolution in contravention of this Operating Agreement.

Section 7.6    Treatment of Loans.    Loans by any Member to the Company shall not be considered Capital Contributions and shall not affect the maintenance of such Member's Capital Account.

Section 7.7    No Withdrawal.    No Member shall be entitled to withdraw any part of his, her or its Capital Account or to receive any distribution from the Company, except as provided in this Operating Agreement. No Member shall receive any interest, salary or drawing with respect to its Capital Contributions or its Capital Account, except as otherwise provided in this Operating Agreement. The Capital Accounts are maintained for the sole purpose of allocating items of income, gain, loss and deduction among the Members and shall have no effect on the amount of any distributions to any Members, in liquidation or otherwise.

Section 7.8    Compliance with Treasury Regulations.    The manner in which Capital Accounts are to be maintained pursuant to this Article VII is intended to comply with the requirements of Section 1.704-1(b) of the Code and the Treasury Regulations and shall be interpreted and applied in a manner consistent therewith. If the Board determines that the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Article VII should be modified in order to comply with Section 1.704-1(b) of the Code and

- 16 -

JA224

the Treasury Regulations, then notwithstanding anything to the contrary contained in the preceding provisions of this Article VII, the Board may authorize such modifications.

## ARTICLE VIII

## ALLOCATIONS, TAX MATTERS AND REPORTS

Section 8.1    Allocation of Net Income and Net Losses.  For each Fiscal Year (or portion thereof), except as otherwise provided in this Agreement, Net Income and Net Loss (and, to the extent necessary, individual items of income, gain, loss or deduction) of the Company shall be allocated among the Members in a manner such that, after giving effect to the special allocations set forth in Section 8.2, the Capital Account balance of each Member, immediately after making such allocations, is, as nearly as possible, equal to (a) the distributions that would be made to such Member pursuant to Section 9.2 and Section 9.3 and if the Company were dissolved, its affairs wound up and its assets sold for cash equal to its fair market value, all Company liabilities were satisfied, and the net assets of the Company were distributed, in accordance with Section 11.4, to the Members immediately after making such allocations, *minus* (ii) such Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of assets.

Section 8.2    Special Allocations.  Notwithstanding Section 8.1 hereof:

(a)    No allocations of loss, deduction and/or expenditures described in Section 705(a)(2)(B) of the Code will be charged to the Capital Account of any Member if such allocation would cause such Member to have a Deficit Capital Account.  The amount of the loss, deduction and/or Code Section 705(a)(2)(B) expenditure which would have caused a Member to have a Deficit Capital Account will instead be charged to the Capital Account of any Members which would not have a Deficit Capital Account as a result of the allocation, in proportion to their respective Capital Contributions, or, if no such Members exist, then to the Members in accordance with their interests in Net Income pursuant to Section 8.1.

(b)    In the event any Member unexpectedly receives any adjustments, allocations, or distributions, described in Sections 1.704-1(b)(2)(ii)(d)(4), (5), (6) of the Treasury Regulations, which create or increase a Deficit Capital Account of such Member as adjusted under those Treasury Regulations, then items of Company income and gain (consisting of a *pro rata* portion of each item of Company income, including gross income, and gain for such year and, if necessary, for subsequent years) will be specially credited to the Capital Account of such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the adjusted Deficit Capital Account so created as quickly as possible.  It is the intent that this Section 8.2(b) be interpreted to comply with the alternate test for economic effect set forth in Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations.

(c)    In the event any Member would have a Deficit Capital Account at the end of any Company taxable year which is in excess of the sum of any amount that such Member is obligated to restore to the Company under Treasury Regulations Section 1.704-1(b)(2)(ii)(c) and such Member's share of minimum gain as defined in Section 1.704-2(g)(1) of the Treasury Regulations (which is also treated as an obligation to restore in accordance with Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations), the Capital Account of such Member will be

- 17 -

specially credited with items of Membership income (including gross income) and gain in the amount of such excess as quickly as possible.

(d)    Notwithstanding any other provision of this Section 8.2, if there is a net decrease in the Company's Minimum Gain as defined in Treasury Regulation Section 1.704-2(d) during a taxable year of the Company, then, the Capital Account of each Member will be allocated items of income (including gross income) and gain for such year (and if necessary for subsequent years) equal to that Member's share of the net decrease in Company minimum gain. This Section 8.2(d) is intended to comply with the minimum gain chargeback requirement of Section 1.704-2 of the Treasury Regulations and will be interpreted consistently therewith.

(e)    Items of Company loss, deduction and expenditures described in Section 705(a)(2)(B) of the Code which are attributable to any nonrecourse debt of the Company and are characterized as partner nonrecourse deductions under Section 1.704-2(i) of the Treasury Regulations will be allocated to the Members' Capital Accounts in accordance with Section 1.704-2(i) of the Treasury Regulations.

(f)    Beginning in the first taxable year in which there are allocations of "nonrecourse deductions" (as described in Section 1.704-2(b) of the Treasury Regulations) such deductions will be allocated to the Members in accordance with, and as part of, the allocations of Company profit or loss for such period.

(g)    In accordance with Code Section 704(c), if a Member contributes property with a fair market value that differs from its adjusted basis at the time of contribution, income, gain, loss and deductions with respect to the property will, solely for federal income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company and its fair market value at the time of contribution.

(h)    Pursuant to Code Section 704(c)(1)(B), if any contributed property is distributed by the Company other than to the contributing Member within seven years of being contributed, then, except as provided in Code Section 704(c)(2), the contributing Member will be treated as recognizing gain or loss from the sale of such property in an amount equal to the gain or loss that would have been allocated to such Member under Section 704(c)(1)(A) of the Code if the property had been sold at its fair market value at the time of the distribution.

(i)    In connection with a Capital Contribution of money or other property (other than a de minimis amount) by a new or existing Member, or in connection with the liquidation of the Company the Capital Accounts of the Members will be adjusted to reflect a revaluation of Company property (including intangible assets) in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(f). If, under Section 1.704-1(b)(2)(iv)(f) of the Treasury Regulations, Company property that has been revalued is properly reflected in the Capital Accounts and on the books of the Company at a book value that differs from the adjusted tax basis of such property, then depreciation, depletion, amortization and gain or loss with respect to such property will be shared among the Members in a manner that takes account of the variation between the adjusted tax basis of such property and its book value, in the same manner as variations between the adjusted tax basis and fair market value of property contributed to the

- 18 -

Company are taken into account in determining the Members' shares of tax items under Section 704(c) of the Code.

(j)    Any credit or charge to the Capital Accounts of the Members pursuant to Section 8.2(b), (c), and/or (d) hereof will be taken into account in computing subsequent allocations of profits and losses pursuant to Section 8.1, so that the net amount of any items charged or credited to Capital Accounts pursuant to Section 8.1 and Section 8.2 will to the extent possible, be equal to the net amount that would have been allocated to the Capital Account of each Member pursuant to the provisions of this Article VIII if the special allocations required by Section 8.2(b), (c) and/or (d) had not occurred.

Section 8.3    Accounting Principles.  The Company's financial statements must be prepared and its profits and losses be determined in accordance with accounting principles applied on a consistent basis under the Accounting Method.

Section 8.4    Interest on and Return of Capital Contributions.  No Member will be entitled to interest on his Capital Contribution or a return of his Capital Contribution.

Section 8.5    Loans to Company.  Nothing in this Operating Agreement will prevent any Member from making secured or unsecured loans to the Company by agreement with the Company.

Section 8.6    Accounting Period.  The Company's accounting period will be the year ending December 31st.

Section 8.7    Records and Reports.  At the expense of the Company, the secretary of the Company will maintain records and accounts of all operations and expenditures of the Company.  At a minimum, the Company will keep at its principal place of business the following records:

(a)    A current list of the full name and last known business residence, or mailing address of each Member;

(b)    A copy of the Certificate and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed;

(c)    Copies of the Company's financial statements and income tax returns and reports, if any, for the three most recent years; and

(d)    Copies of the Company's currently effective written operating agreement.

Section 8.8    Returns and Other Elections.

(a)    The Members will cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business.  The Treasurer will furnish copies of such returns or pertinent information therefrom to the Members within a reasonable time after the end of the Company's Fiscal Year.

- 19 -

JA227

(b)    All elections permitted to be made by the Company under federal or state laws may be made by the Members in their sole discretion.

(c)    In recognition of the fact that the Company expects to be treated as a partnership for federal income tax purposes, the Members agree to treat their Membership Interests as partnership interests for U.S. federal and state income tax reporting purposes.

Section 8.9    Tax Matters Partner.  Christopher Moehle is hereby designated as the "Tax Matters Partner" (as defined in Section 6231 of the Code), and is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including, without limitation, administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith.  The Members agree to cooperate with each other and to do or refrain from doing any and all things reasonably required to conduct such proceedings.

## ARTICLE IX

## DISTRIBUTIONS

Section 9.1    Requirement to Make Distributions.

(a)    Subject to Section 9.1(b) and Section 9.4, the Company shall:

(i)    make distributions, in accordance with Section 9.2, to the holders of Carry Units within thirty (30) days of the Company's receipt of any Investment Returns, and

(ii)    make distributions, in accordance with Section 9.3, to the holders of Common Units at such times and in such amounts as the Board may determine from time to time, in its sole discretion, including deciding to forego payment of distributions to the holders of Common Units in order to provide for the retention and establishment of reserves of, or payment to third parties of, such funds as it deems necessary with respect to the reasonable business needs of the Company (which needs may include the payment or the making of provision for the payment when due of the Company's obligations, including, but not limited to, present and anticipated debts and obligations, capital needs and expenses, the payment of any management or administrative fees and expenses, and reasonable reserves for contingencies); provided, that, the Company shall make distributions, in accordance with Section 9.3, to the holders of Common Units within thirty (30) days of the Company's receipt of any Investment Returns.

(b)    Notwithstanding the foregoing, the Company shall not make any distribution to any Members if such distribution would violate Section 18-607 of the Delaware Act or other Applicable Law.

Section 9.2    Distributions to Holders of Carry Units.  Each Carry Unit shall entitle the holder thereof to one quarter of a percent (0.25%) of the total amount of any Investment Returns (the "*Carry Unit Distribution Amount*").  After making any distributions required under Section 9.4 and subject to the priority of distributions pursuant to Section 11.4, if applicable, when required to make a distribution under Section 9.1(a)(i), the Company shall distribute the Carry Unit Distribution Amount to the Members holding Carry Units, in proportion to the number of Carry Units held by such Members.

- 20 -

Section 9.3   Distributions to Holders of Common Units.   After making any distributions required under Section 9.4 and subject to the priority of distributions pursuant to Section 11.4, if applicable, all distributions made in the discretion of the Board pursuant to Section 9.1(a)(ii) shall be made to the Members holding vested Common Units *pro rata* in proportion to their holdings of vested Common Units; provided that, in the event a distribution is made to the Members holding Common Units as a result of Investment Returns received by the Company, up to fifty percent (50%) of such total amount to be distributed (calculated after deducting any amounts required to be paid to the Members holding Carry Units in accordance with Section 9.2) shall be distributed to the Members holding vested Common Units in such amounts as determined in the discretion of the Board (which, for the avoidance of doubt, need not be in accordance with their holdings of vested Common Units); provided, further, that, in the event that the Company receives any Investment Returns, no distributions shall be made to the Members holding Common Units, other than Tax Distributions, until the full amount of distributions are made to the Members holding Carry Units in accordance with Section 9.2.

Section 9.4   Tax Distributions.

(a)     Subject to any restrictions in any of the Company's then applicable debt-financing arrangements, and subject to the Board's sole discretion to retain any other amounts necessary to satisfy the Company's obligations, at least ten (10) days before each date prescribed by the Code for a calendar-year corporation to pay quarterly installments of estimated tax, the Company shall use commercially reasonable efforts to distribute cash to each Member in proportion to and to the extent of such Member's Quarterly Estimated Tax Amount for the applicable calendar quarter (each such distribution, a "***Tax Distribution***").

(b)     If, at any time after the final Quarterly Estimated Tax Amount has been distributed pursuant to Section 9.4(a) with respect to any Fiscal Year, the aggregate Tax Advances to any Member with respect to such Fiscal Year are less than such Member's Tax Amount for such Fiscal Year (a "***Shortfall Amount***"), the Company shall use commercially reasonable efforts to distribute cash in proportion to and to the extent of each Member's Shortfall Amount. The Company shall use commercially reasonable efforts to distribute Shortfall Amounts with respect to a Fiscal Year before the fiftieth (50th) day of the next succeeding Fiscal Year; provided, that if the Company has made distributions other than pursuant to this Section 9.4, the Board may apply such distributions to reduce any Shortfall Amount.

(c)     If the aggregate Tax Distributions made to any Member pursuant to this Section 9.4 for any Fiscal Year exceed such Member's Tax Amount (an "***Excess Amount***"), such Excess Amount shall reduce subsequent Tax Distributions that would be made to such Member pursuant to this Section 9.4, except to the extent taken into account as an advance pursuant to Section 9.4(d).

(d)     Any distributions made pursuant to this Section 9.4 shall be treated for purposes of this Operating Agreement as advances on distributions pursuant to Section 9.2 and Section 9.3 and shall reduce, dollar-for-dollar, the amount otherwise distributable to such Member pursuant to Section 9.2 and Section 9.3.

- 21 -

Section 9.5   Distributions in Kind.   The Board is hereby authorized, in its sole discretion, to make distributions to the Members in the form of securities or other property held by the Company; provided, that Tax Distributions shall only be made in cash. In any non-cash distribution, the securities or property so distributed will be distributed among the Members in the same proportion and priority as cash equal to the fair market value of such securities or property would be distributed among the Members pursuant to Section 9.2 and Section 9.3. Any distribution of securities shall be subject to such conditions and restrictions as the Board determines are required or advisable to ensure compliance with Applicable Law. In furtherance of the foregoing, the Board may require that the Members execute and deliver such documents as the Board may deem necessary or appropriate to ensure compliance with all federal and state securities laws that apply to such distribution and any further transfer of the distributed securities, and may appropriately legend the certificates that represent such securities to reflect any restriction on transfer with respect to such laws. No Member has a right to demand and receive any distribution in a form other than cash.

Section 9.6   Distributions to Members Upon Liquidation.   Upon liquidation of the Company, after settling accounts of creditors and providing for reserves for unforeseen liabilities in the order described in Section 11.4, liquidating distributions will be made to the Members in the following manner:

(a)   first, to the Members holding Carry Units, *pro rata* in proportion to their holdings of Carry Units, to the extent any distributions are owed pursuant to Section 9.2 but have yet to be distributed by the Company to such holders; and

(b)   second, any remaining amounts to the Members holding Common Units, *pro rata* in proportion to their holdings of Common Units.

## ARTICLE X

### RESTRICTIONS ON TRANSFERABILITY

Section 10.1   General.   No Member may: (a) sell, assign, pledge, hypothecate, transfer, exchange or otherwise transfer for consideration (each, a "sale"), or (b) gift, bequeath or otherwise transfer for no consideration (whether or not by court order, divorce decree, settlement agreement or operation of law, except in the case of Bankruptcy) (each, a "gift"), any Units, without the consent of the Board, provided that, any Member may transfer his, her or its Units to (i) its Subsidiary or (ii) a Direct Family Member upon the occurrence of such Member's death or Disability, without obtaining the consent of the Board (each of (i) and (ii), a "*Permitted Transfer*"). Any sale or gift pursuant to this Section 10.1 shall only be effective to the extent set forth in Section 10.2 (for a sale only), as applicable, and Section 10.3 (for a sale and gift).  Any Permitted Transfer will only be effective to the extent that the Subsidiary or the Direct Family Member who is a recipient of Units delivers a written undertaking substantially in the form of the Joinder Agreement.

Section 10.2   Right of First Refusal for Common Unit Holders.

(a)   At any time, and subject to the terms and conditions specified in this Section 10.2, each Member holding Common Units shall have a right of first refusal if any other

- 22 -

**JA230**

Member (the "*Offering Member*") receives a bona fide offer from an independent third party (the "*Bidder*") to purchase all or any portion of the Common Units owned by the Offering Member (the "*Offered Interests*"), and which the Offering Member desires to accept. Each time the Offering Member receives a bona fide offer for any of his, her or its Common Units, the Offering Member shall first provide written notice to the other Members then currently holding Common Units (the "*Common Unit Holders*") of the proposed offer terms (an "*Offer Notice*") and make an offering of the Offered Interests to the Common Unit Holders in accordance with the following provisions of this Section 10.2 prior to selling or otherwise transferring such Offered Interests to the Bidder. The Offer Notice will constitute the Offering Member's offer to sell the Offered Interests to the other Common Unit Holders, which offer will be irrevocable until the end of the ROFR Notice Period.

(b)     Upon receipt of an Offer Notice, each Common Unit Holder will have fifteen (15) days (the "*ROFR Notice Period*") to elect to purchase all (and not less than all) of the Offered Interests by delivering a written notice (a "*ROFR Notice*") to the Offering Member stating that such Common Unit Holder offers to purchase such Offered Interests on the terms specified in the Offer Notice. Any ROFR Notice will be binding upon delivery and irrevocable by the applicable Common Unit Holder. If more than one Common Unit Holder delivers a ROFR Notice (each a "*Purchasing Member*"), each such Purchasing Member will be allocated and will pay for its ROFR Portion of the Offered Interests, unless otherwise agreed by such Purchasing Members. Each Common Unit Holder that does not deliver a ROFR Notice during the ROFR Notice Period will be deemed to have waived all of such Common Unit Holder's rights to purchase the Offered Interests under this Section 10.2, and the Offering Member is thereafter, subject to the rights of any Purchasing Member, free to sell the Offered Interests to the Bidder specified in the Offer Notice without any further obligation to such Common Unit Holder pursuant to this Section 10.2.

(c)     If no Common Unit Holder delivers a ROFR Notice in accordance with Section 10.2(b), the Offering Member may, during the sixty (60) day period immediately following the expiration of the ROFR Notice Period, sell all of the Offered Interests to the Bidder on terms and conditions no more favorable to the Bidder than those set forth in the Offer Notice. If the Offering Member does not sell the Offered Interests within such period, the rights provided hereunder will be deemed to be revived and the Offered Interests cannot be sold to the Bidder unless the Offering Member sends a new Offer Notice in accordance with, and otherwise complies with, this Section 10.2.

Section 10.3  Further Requirements for Transfer.  If a gift is permitted under Section 10.1 or a sale to a non-Member is permitted under both Section 10.1 and Section 10.2 (as applicable), no Member may sell or gift any of his, her or its Units: (a) without registration under applicable federal and state securities laws, or unless he, she or it delivers an opinion of counsel satisfactory to the Board that registration under such laws is not required; (b) if the Units subject to the sale or gift, when added to the total of all other Units subject to sales or gifts in the preceding twelve (12) consecutive months prior thereto, would result in the termination of the Company under Section 708 of the Code; (c) without any proposed transferee agreeing to be bound by this Operating Agreement and delivering a written undertaking substantially in the form of the Joinder Agreement; (d) without the proposed transferee making all representations and delivering all such certificates, evidences or assurances reasonably requested by the Board;

- 23 -

and (e) without the proposed transferee paying all expenses in connection with his, her or its admission as a Member, unless the Board specifically waives (a), (b), (c),or (e) above.

Section 10.4  Effectiveness of Transfer.  Any sale or gift of any of a Member's Units will take effect on the first day following receipt by Board of written notice that all of the requirements of Section 10.1, Section 10.2 (if applicable) and Section 10.3 have been met.  Any Permitted Transfer will take effect on the date a Manager of the Board executes an acknowledgment to a written undertaking substantially in the form of the Joinder Agreement delivered to the Board by the Subsidiary or the Direct Family Member who is a prospective recipient of Units pursuant to such Permitted Transfer.

**ARTICLE XI**

**DISSOLUTION AND LIQUIDATION**

Section 11.1  Dissolution

(a)      The Company shall be dissolved upon the occurrence of any of the following events:

(i)        the election of the Members in accordance with Section 4.7;

(ii)       the sale, exchange, involuntary conversion, or other disposition or transfer of all or substantially all the assets of the Company; or

(iii)      the entry of a decree of judicial dissolution under Section 18-802 of the Delaware Act.

(b)      Dissolution of the Company will be effective on the day on which an event described in Section 11.1(a) above occurs, but the Company will not terminate until a certificate of dissolution has been filed with the Secretary of State of the State of Delaware and the assets of the Company are distributed as provided in Section 11.4 below.  Notwithstanding the dissolution of the Company, prior to the termination of the Company, the business of the Company and the affairs of the Members will continue to be governed by this Operating Agreement.

Section 11.2  Winding Up.  If the Company is dissolved pursuant to Section 11.1, the Company shall be liquidated and its business and affairs wound up in accordance with the Delaware Act and the provisions of Section 11.4.

Section 11.3  Liquidator.

(a)      The Board, or, if the Board is unable to do so, a Person selected by the holders of a majority of Common Units, shall act as liquidator to wind up the Company (the "*Liquidator*"). The Liquidator shall have full power and authority to sell, assign, and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and business-like manner.

- 24 -

**JA232**

(b)      As promptly as possible after dissolution and again after final liquidation, the Liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable.

Section 11.4  Distribution of Assets Upon Winding Up.  Upon liquidation and winding up of the Company, the Liquidator shall distribute the assets of the Company as follows, unless otherwise required by mandatory provisions of Applicable Law:

(a)      first, to creditors, in the order of priority as provided by law, including all Members who are creditors to the extent otherwise permitted by law, in satisfaction of liabilities of the Company and expenses of liquidation, including sales commissions incident to any sales of assets of the Company, and whether by payment or the making of reasonable provisions for payment thereof;

(b)      second, to the establishment of and additions to reserves that are determined by the Board in its sole discretion to be reasonably necessary for any contingent unforeseen liabilities or obligations of the Company; and

(c)      third, to the Members in accordance with the priority set forth in Section 9.6.

Section 11.5  Certificate of Dissolution.  When all debts, liabilities and obligations have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets have been distributed to the Members, the Liquidator shall execute a certificate of dissolution, which certificate shall set forth the information required by the Delaware Act.  The Liquidator shall file the executed certificate of dissolution with the Delaware Secretary of State to accomplish the cancellation of the Certificate upon the dissolution and completion of the winding up of the Company.

Section 11.6  Recourse for Claims.  Each Member shall look solely to the assets of the Company for all distributions with respect to the Company, such Member's Capital Account, and such Member's share of Net Income, Net Loss and other items of income, gain, loss and deduction, and shall have no recourse therefor (upon dissolution or otherwise) against the Board, the Liquidator or any other Member.

**ARTICLE XII**

**EXCULPATION AND INDEMNIFICATION**

Section 12.1  Covered Persons.  As used herein, the term "**Covered Person**" means (i) each Member, (ii) each officer, director, shareholder, partner, member, Subsidiary, employee, agent or representative of each Member, and each of their Subsidiaries, and (iii) each Manager, officer, employee, agent or representative of the Company.

Section 12.2  Exculpation of Covered Persons.

- 25 -

**JA233**

(a)    No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage or claim incurred by reason of any action taken or omitted to be taken by such Covered Person in good-faith reliance on the provisions of this Operating Agreement, so long as such action or omission does not constitute fraud or willful misconduct by such Covered Person.

(b)    A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements (including financial statements and information, opinions, reports or statements as to the value or amount of the assets, liabilities, Net Income or Net Losses of the Company or any facts pertinent to the existence and amount of assets from which distributions might properly be paid) of the following Persons or groups: (i) another Manager; (ii) one or more officers or employees of the Company; (iii) any attorney, independent accountant, appraiser or other expert or professional employed or engaged by or on behalf of the Company; or (iv) any other Person selected in good faith by or on behalf of the Company, in each case as to matters that such relying Person reasonably believes to be within such other Person's professional or expert competence. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in Section 18-406 of the Delaware Act.

Section 12.3  Liabilities and Duties of Covered Persons.

(a)    This Operating Agreement is not intended to, and does not, create or impose any fiduciary duty on any Covered Person. Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by Applicable Law, and in doing so, acknowledges and agrees that the duties and obligation of each Covered Person to each other and to the Company are only as expressly set forth in this Operating Agreement. The provisions of this Operating Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

(b)    Whenever in this Operating Agreement a Covered Person is permitted or required to make a decision (including a decision that is in such Covered Person's "discretion" or under a grant of similar authority or latitude), the Covered Person shall be entitled to consider only such interests and factors as such Covered Person desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person. Whenever in this Operating Agreement a Covered Person is permitted or required to make a decision in such Covered Person's "good faith," the Covered Person shall act under such express standard and shall not be subject to any other or different standard imposed by this Operating Agreement or any other Applicable Law.

Section 12.4  Indemnification.  To the fullest extent permitted by the Delaware Act, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement only to the extent that such amendment, substitution or replacement permits the Company to provide broader indemnification rights than the Delaware Act permitted the Company to provide prior to such amendment, substitution or replacement), the Company shall indemnify, hold harmless, defend, pay and reimburse any Covered Person against any and all losses, claims, damages, judgments,

- 26 -

fines or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines or liabilities, and any amounts expended in settlement of any claims (collectively, "*Losses*") to which such Covered Person may become subject by reason of:

    (a)    any act or omission or alleged act or omission performed or omitted to be performed on behalf of the Company, any Member or any direct or indirect Subsidiary of the foregoing in connection with the business of the Company; or

    (b)    the fact that such Covered Person is or was acting in connection with the business of the Company as a partner, member, stockholder, Subsidiary, manager, director, officer, employee or agent of the Company, any Member, or any of their respective Subsidiaries, or that such Covered Person is or was serving at the request of the Company as a partner, member, manager, director, officer, employee or agent of any Person including the Company;

provided, that (x) such Covered Person acted in good faith and in a manner believed by such Covered Person to be in, or not opposed to, the best interests of the Company and, with respect to any criminal proceeding, had no reasonable cause to believe his conduct was unlawful, and (y) such Covered Person's conduct did not constitute fraud or willful misconduct, in either case as determined by a final, nonappealable order of a court of competent jurisdiction. In connection with the foregoing, the termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the Covered Person did not act in good faith or, with respect to any criminal proceeding, had reasonable cause to believe that such Covered Person's conduct was unlawful, or that the Covered Person's conduct constituted fraud or willful misconduct.

    Section 12.5    Reimbursement. The Company shall promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend or defending any claim, lawsuit or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to Section 12.4; provided, that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by Section 12.4, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

    Section 12.6    Entitlement to Indemnity. The indemnification provided by Section 12.4 shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise. The provisions of this Article XII shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under Section 12.4 and shall inure to the benefit of the executors, administrators, legatees and distributees of such Covered Person.

    Section 12.7    Insurance. To the extent available on commercially reasonable terms, the Company may purchase, at its expense, insurance to cover Losses covered by the foregoing indemnification provisions and to otherwise cover Losses for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount and with

- 27 -

**JA235**

such deductibles as the Board may determine; provided, that the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person under the indemnification provisions contained herein, including the right to be reimbursed or advanced expenses or otherwise indemnified for Losses hereunder. If any Covered Person recovers any amounts in respect of any Losses from any insurance coverage, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to such Covered Person by the Company in respect of such Losses.

Section 12.8     Funding of Indemnification.     Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this Article XII shall be provided out of and to the extent of Company assets only, and no Member (unless such Member otherwise agrees in writing) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity by the Company.

Section 12.9     Amendment and Survival.

(a)     If any portion of this Article XII shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this Article XII to the fullest extent permitted by any applicable portion of this Article XII that shall not have been invalidated and to the fullest extent permitted by Applicable Law.

(b)     The provisions of this Article XII shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this Article XII is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound. No amendment, modification or repeal of this Article XII that adversely affects the rights of a Covered Person to indemnification for Losses incurred or relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Losses without the Covered Person's prior written consent.

(c)     The provisions of this Article XII shall survive the dissolution, liquidation, winding up and termination of the Company.

## ARTICLE XIII

## MISCELLANEOUS PROVISIONS

Section 13.1     Notices.     Any notice, demand or communication required or permitted to be given by any provision of this Operating Agreement will be in writing and will be deemed to have been given when actually received.     Any such notice, demand or communication may be given by overnight courier, email or certified mail (return receipt requested) and will be addressed to Members at the addresses shown on the Members Schedule, and/or to the Company at its principal office or to such other address as a party may from time to time designate by notice to the other parties.

- 28 -

JA236

Section 13.2  Application of Delaware Law.  This Operating Agreement shall be applied, interpreted and governed subject to its terms and by the laws of the State of Delaware, and specifically the Delaware Act and the Certificate.  In the event of a direct conflict between the provisions of this Operating Agreement and the provisions of the Delaware Act or provisions of the Certificate, such provision of the Delaware Act or the Certificate, as the case may be, will control.

Section 13.3  Waiver of Action for Partition.  Each Member irrevocably waives during the term of the Company any right that he or she may have to maintain any action for partition with respect to the property of the Company.

Section 13.4  Amendment.  Except as otherwise set forth in Section 4.7(b), this Operating Agreement may be amended at any time in writing by the consent of the Company and the Members holding a majority of the Common Units.

Section 13.5  Execution of Additional Instruments.  Each Member hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney and other instruments necessary to comply with any laws, rules or regulations.

Section 13.6  Counsel to the Company.  Reed Smith LLP ("**Reed Smith**") will act as legal counsel to the Company in connection with the offering of Units and its general operations.  In connection with the offering of Units and operations of the Company, Reed Smith will not be representing the Members.  Each Member acknowledges that Reed Smith does not represent any Member in the absence of a clear and explicit agreement to such effect between a given Member and Reed Smith (and then only to the extent specifically set forth in that agreement), and that in the absence of any such agreement Reed Smith shall owe no duties directly to any Member.  Each Member further acknowledges that, whether or not Reed Smith has in the past represented such Member with respect to other matters, Reed Smith has not represented the interests of any Member in the preparation and negotiation of this Operating Agreement.

Section 13.7  Construction.  Whenever the singular number is used in this Operating Agreement and when required by the context, the same will include the plural and vice versa, and the masculine gender will include the feminine and neuter genders and vice versa.

Section 13.8  Headings.  The headings in this Operating Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Operating Agreement or any provision hereof.

Section 13.9  Waivers.  The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Operating Agreement will not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

Section 13.10 Rights and Remedies Cumulative.  The rights and remedies provided by this Operating Agreement are cumulative and the use of any one right or remedy by any party will not preclude or waive the right to use any or all other remedies.  Said rights and

- 29 -

**JA237**

remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

Section 13.11 Severability.  If any provision of this Operating Agreement or the application thereof to any person or circumstance would be invalid, illegal or unenforceable to any extent, the remainder of this Operating Agreement and the application thereof will not be affected and will be enforceable to the fullest extent permitted by law.

Section 13.12 Heirs, Successors and Assigns.  Each and all of the covenants, terms, provisions and agreements herein contained will be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

Section 13.13 Creditors.  None of the provisions of this Operating Agreement will be for the benefit of or enforceable by any creditor of the Company.

Section 13.14 Counterparts.  This Operating Agreement may be executed in counterparts, each of which will be deemed an original but all of which will constitute one and the same instrument.

Section 13.15 Recitals.  The recitals set forth following the pre-amble are hereby incorporated into this Operating Agreement.

Section 13.16 Investment Representations.  The undersigned Members understand (a) that the Units issued pursuant to this Operating Agreement have not been registered under the Securities Act of 1933 or any state securities laws (the "*Securities Acts*") because the Company is issuing such Units in reliance upon the exemptions from the registration requirements of the Securities Acts providing for issuance of securities not involving a public offering, (b) that the Company has relied upon the fact that the Units are to be held by each Member for investment, and (c) that exemption from registration under the Securities Acts would not be available if the Units were acquired by a Member with a view to distribution.

Accordingly, each Member hereby confirms to the Company that such Member is acquiring the Units for such own Member's account, for investment and not with a view to the resale or distribution thereof without complying with an exemption for registration under the Securities Acts. Each Member agrees not to transfer, sell or offer for sale any portion of his, her or its Units unless there is an effective registration or other qualification relating thereto under the Securities Acts or unless the holder of the Units delivers to the Company an opinion of counsel, satisfactory to the Company, that such registration or other qualification under such Securities Acts is not required in connection with such transfer, offer or sale. Each Member understands that the Company is under no obligation to register the Units or to assist such Member in complying with any exemption from registration under the Securities Acts if such Member should at a later date wish to dispose of the Units. Furthermore, each Member realizes that the Units are unlikely to qualify for disposition under Rule 144 of the Securities and Exchange Commission unless such Member is not an "affiliate" of the Company and the Units have been beneficially owned and fully paid for by such Member for at least three (3) years.

*[Signature Page Follows]*

- 30 -

**JA238**

IN WITNESS WHEREOF, the undersigned have executed this Operating Agreement effective as of the date first above written.

COMPANY:

Robotics Hub Fund 1, LLC

Name: Christopher Moehle
Title: Manager

MEMBERS:

Christopher Moehle


Eric Daimler


Jean-Sébastien Valois


Jamie Fee


(See Attached Joinder Agreements)

[Signature Page to Amended and Restated Operating Agreement of Robotics Hub Fund 1, LLC]

IN WITNESS WHEREOF, the undersigned have executed this Operating Agreement effective as of the date first above written.

COMPANY:

Robotics Hub Fund 1, LLC

Name: Christopher Moehle
Title: Manager

MEMBERS:

_____
Christopher Moehle

_____
Eric Daimler

_____
Jean–Sébastien Valois

_____
Jamie Fee

(See Attached Joinder Agreements)

[Signature Page to Amended and Restated Operating Agreement of Robotics Hub Fund 1, LLC]

EXHIBIT A

MEMBERS SCHEDULE

| Name of Member | Address | Email | Initial Capital Contribution | Common Units[1] | Carry Units |
|---|---|---|---|---|---|
| Christopher Moehle | 309 Cola Street, Pittsburgh, PA 15203 | christophermoehle@gmail.com | $0 | 42 | 0 |
| Eric Daimler | 461 2nd St. #306c San Francisco, CA 94107 | edaimler@gmail.com | $0 | 42 | 0 |
| Jamie Fee | 322 Noroton Avenue Darien, CT 06820 | feejamie@gmail.com | $0 | 2 | 0 |

---

[1] Number of Common Units specified may be subject to vesting, pursuant to a restricted unit award agreement.

**EXHIBIT B**

FORM OF JOINDER AGREEMENT

Reference is hereby made to the Amended and Restated Operating Agreement of Robotics Hub Fund 1, LLC, a limited liability company organized under the laws of Delaware (the "*Company*"), dated [DATE], as further amended and restated from time to time (the "*Operating Agreement*"), by and among the current members party thereto. Pursuant to and in accordance with Section 4.1(b) of the Operating Agreement, the undersigned hereby acknowledges that he, she or it has received and reviewed a complete copy of the Operating Agreement, including all exhibits thereto, and agrees that upon execution of this Joinder Agreement, such Person shall become a party to the Operating Agreement and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the Operating Agreement as though an original party thereto and shall be deemed, and is hereby admitted as, a Member for all purposes thereof and entitled to all the rights incidental thereto.

Capitalized terms used herein without definition shall have the meanings ascribed thereto in the Operating Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of _____ _____, 20____.

By: _____
      Name:
      Title:

Capital Contribution: $_____

Type of Units: _____

Number of Units: _____

*Acknowledged and agreed this _____ day of _____, 20____:*

Robotics Hub Fund 1, LLC

By: _____
      Name: Christopher Moehle
      Title: Manager

# Exhibit F

AMENDED AND RESTATED OPERATING AGREEMENT

OF

COAL HILL VENTURES LLC

THE MEMBERSHIP INTERESTS REPRESENTED BY UNITS EXPRESSED HEREIN HAVE NOT BEEN REGISTERED WITH OR QUALIFIED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION OR ANY SECURITIES REGULATORY AUTHORITY OF ANY JURISDICTION. SUCH UNITS ARE BEING SOLD IN RELIANCE UPON EXEMPTIONS FROM SUCH REGISTRATION OR QUALIFICATION REQUIREMENTS. SUCH UNITS CANNOT BE SOLD, TRANSFERRED, ASSIGNED OR OTHERWISE DISPOSED OF EXCEPT IN COMPLIANCE WITH THE RESTRICTIONS ON TRANSFERABILITY CONTAINED IN THIS OPERATING AGREEMENT AND APPLICABLE U.S. FEDERAL AND STATE SECURITIES LAWS AND THE SECURITIES LAWS OF ANY OTHER APPLICABLE JURISDICTION.

US_ACTIVE-126217757.1-999963-20082

## TABLE OF CONTENTS

**ARTICLE I DEFINITIONS** ......................................................................................... 1
   Section 1.1   Definitions.................................................................................. 1
**ARTICLE II ORGANIZATION** .................................................................................. 7
   Section 2.1   Formation................................................................................... 7
   Section 2.2   Name.......................................................................................... 7
   Section 2.3   Principal Place of Business..................................................... 7
   Section 2.4   Purpose; Powers........................................................................ 7
   Section 2.5   Term........................................................................................... 7
   Section 2.6   No State-Law Partnership........................................................ 7
**ARTICLE III CAPITALIZATION** ............................................................................. 7
   Section 3.1   Membership Interests............................................................... 8
   Section 3.2   Authorization of Common Units.............................................. 8
   Section 3.3   Authorization of Management Fee Units.................................. 8
   Section 3.4   Unit Certificates....................................................................... 8
**ARTICLE IV MEMBERS** ........................................................................................... 8
   Section 4.1   Admission of New Members.................................................... 9
   Section 4.2   Meetings.................................................................................... 9
   Section 4.3   Place of Meetings..................................................................... 9
   Section 4.4   Notice of Meeting.................................................................... 9
   Section 4.5   Record Date.............................................................................. 9
   Section 4.6   Quorum................................................................................... 10
   Section 4.7   Voting..................................................................................... 10
   Section 4.8   Action by Written Consent .................................................... 10
   Section 4.9   Proxies................................................................................... 10
   Section 4.10  No Withdrawal........................................................................ 10
   Section 4.11  No Personal Liability of Members......................................... 11
**ARTICLE V MANAGEMENT** ................................................................................. 11
   Section 5.1   Establishment of Board of Managers..................................... 11
   Section 5.2   Board Composition................................................................. 11
   Section 5.3   Removal; Resignation............................................................. 11
   Section 5.4   Meetings.................................................................................. 11
   Section 5.5   Quorum; Manner of Acting .................................................... 12
   Section 5.6   Action by Written Consent .................................................... 12

JA245

Section 5.7      No Compensation or Employment...................................... 12
Section 5.8      No Personal Liability of Managers .................................... 12
Section 5.9      Binding Effect of Actions .................................................. 13
**ARTICLE VI OFFICERS**.................................................................. 13
Section 6.1      Officers of Company........................................................... 13
Section 6.2      Term of Office ..................................................................... 13
Section 6.3      Removal ................................................................................ 13
Section 6.4      Vacancies ............................................................................. 13
Section 6.5      President............................................................................... 13
Section 6.6      Vice President ..................................................................... 13
Section 6.7      Treasurer .............................................................................. 14
Section 6.8      Secretary .............................................................................. 14
Section 6.9      Assistant Treasurers and Assistant Secretaries ............ 14
Section 6.10    Compensation ...................................................................... 14
**ARTICLE VII CAPITAL CONTRIBUTIONS AND CAPITAL ACCOUNTS** ................. 14
Section 7.1      Initial Capital Contributions .......................................... 14
Section 7.2      Additional Capital Contributions................................... 15
Section 7.3      Capital Accounts ................................................................ 15
Section 7.4      Succession Upon Transfer ............................................... 15
Section 7.5      Negative Capital Accounts .............................................. 15
Section 7.6      Treatment of Loans............................................................ 15
Section 7.7      No Withdrawal..................................................................... 15
Section 7.8      Compliance with Treasury Regulations......................... 16
**ARTICLE VIII ALLOCATIONS, TAX MATTERS AND REPORTS** ............. 16
Section 8.1      Allocation of Net Income and Net Losses ..................... 16
Section 8.2      Special Allocations ............................................................ 16
Section 8.3      Accounting Principles ....................................................... 18
Section 8.4      Interest on and Return of Capital Contributions .......... 18
Section 8.5      Loans to Company .............................................................. 18
Section 8.6      Accounting Period .............................................................. 18
Section 8.7      Records and Reports ......................................................... 18
Section 8.8      Returns and Other Elections ........................................... 19
Section 8.9      Tax Matters Partner .......................................................... 19
**ARTICLE IX DISTRIBUTIONS** ..................................................... 19

- ii -

**JA246**

Section 9.1    Requirement to Make Distributions ..................................................... 19
Section 9.2    Distributions to Holders of Management Fee Units ......................... 20
Section 9.3    Distributions to Holders of Common Units ...................................... 20
Section 9.4    Tax Distributions .............................................................................. 20
Section 9.5    Distributions in Kind ........................................................................ 21
Section 9.6    Distributions to Members Upon Liquidation .................................... 21
**ARTICLE X RESTRICTIONS ON TRANSFERABILITY** ................................. 21
Section 10.1   General .............................................................................................. 22
Section 10.2   Right of First Refusal for Common Unit Holders ........................... 22
Section 10.3   Further Requirements for Transfer .................................................. 23
Section 10.4   Effectiveness of Transfer ................................................................. 23
**ARTICLE XI DISSOLUTION AND LIQUIDATION** ....................................... 23
Section 11.1   Dissolution ....................................................................................... 23
Section 11.2   Winding Up ...................................................................................... 24
Section 11.3   Liquidator ......................................................................................... 24
Section 11.4   Distribution of Assets Upon Winding Up ....................................... 24
Section 11.5   Certificate of Dissolution ................................................................ 24
Section 11.6   Recourse for Claims ......................................................................... 25
**ARTICLE XII EXCULPATION AND INDEMNIFICATION** ........................... 25
Section 12.1   Covered Persons ............................................................................... 25
Section 12.2   Exculpation of Covered Persons ...................................................... 25
Section 12.3   Liabilities and Duties of Covered Persons ...................................... 25
Section 12.4   Indemnification ................................................................................ 26
Section 12.5   Reimbursement ................................................................................ 26
Section 12.6   Entitlement to Indemnity ................................................................. 27
Section 12.7   Insurance .......................................................................................... 27
Section 12.8   Funding of Indemnification ............................................................. 27
Section 12.9   Amendment and Survival ................................................................ 27
**ARTICLE XIII MISCELLANEOUS PROVISIONS** ........................................ 28
Section 13.1   Notices .............................................................................................. 28
Section 13.2   Application of Pennsylvania Law .................................................... 28
Section 13.3   Waiver of Action for Partition ......................................................... 28
Section 13.4   Amendment ...................................................................................... 28
Section 13.5   Execution of Additional Instruments ............................................... 28

- iii -

**JA247**

Section 13.6    Counsel to the Company ....................................................... 28

Section 13.7    Construction ........................................................................ 29

Section 13.8    Headings .............................................................................. 29

Section 13.9    Waivers ............................................................................... 29

Section 13.10   Rights and Remedies Cumulative ........................................ 29

Section 13.11   Severability ......................................................................... 29

Section 13.12   Heirs, Successors and Assigns ............................................ 29

Section 13.13   Creditors ............................................................................. 29

Section 13.14   Counterparts ........................................................................ 29

Section 13.15   Recitals ................................................................................ 29

Section 13.16   Investment Representations ................................................. 29

JA248

## AMENDED AND RESTATED OPERATING AGREEMENT

THIS AMENDED AND RESTATED OPERATING AGREEMENT (this "*Operating Agreement*"), dated as of March 23, 2016, is made by and among Coal Hill Ventures LLC, a Pennsylvania limited liability company (the "*Company*"), and the Members executing this Operating Agreement on the signature pages hereto or who are admitted as a Member in accordance with Section 10.1 of this Operating Agreement.

## RECITALS

WHEREAS, the Company was duly formed under the Pennsylvania Act (as defined below) on April 27, 2015 (the "*Formation Date*") for the primary purpose of serving as the investment manager of Robotics Hub Fund 1, LP, a Delaware limited partnership which invests in early-stage robotics companies (the "*First Fund*");

WHEREAS, certain of the Members and the Company entered into an Operating Agreement, dated as of April 27, 2015, governing the operations of the Company (the "*Original Operating Agreement*"); and

WHEREAS, the Members and the Company desire to amend and restate the Original Operating Agreement in its entirety, as of the date set forth above, in order to set forth their respective rights and obligations with respect to the Company in accordance with the terms and subject to the conditions set forth in this Operating Agreement and the Pennsylvania Act.

NOW, THEREFORE, in consideration of the mutual covenants expressed herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and intending to be legally bound hereby, the Company and the Members hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1 <u>Definitions</u>. The following terms used in this Operating Agreement have the following meanings (unless otherwise expressly provided herein):

"*Accounting Method*" means the cash basis method of accounting.

"*Adjusted Taxable Income*" means, as to any Member for a Fiscal Year (or portion thereof) with respect to the Units held by such Member, the federal taxable income allocated by the Company to the Member with respect to such Units (as adjusted by any final determination in connection with any tax audit or other proceeding) for such Fiscal Year (or portion thereof); provided, that such taxable income shall be computed (a) *minus* any excess taxable loss or excess taxable credits of the Company for any prior period allocable to such Member with respect to such Units that were not previously taken into account for purposes of determining such Member's Adjusted Taxable Income in a prior Fiscal Year to the extent such loss or credit would be available under the Code to offset income of the Member (or, as appropriate, the direct or indirect members of the Member) determined as if the income, loss, and credits from the Company were the only income, loss, and credits of the Member (or, as appropriate, the direct or

indirect members of the Member) in such Fiscal Year and all prior Fiscal Years, and (ii) taking into account any special basis adjustment with respect to such Member resulting from an election by the Company under Code Section 754.

"*Applicable Law*" means all applicable provisions of (a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations or orders of any Governmental Authority; (b) any consents or approvals of any Governmental Authority; and (c) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"*Bankruptcy*" means, with respect to any Member, the occurrence of any of the following: (a) the filing of an application by such Member for, or a consent to, the appointment of a trustee of such Member's assets; (b) the filing by such Member of a voluntary petition in bankruptcy or the filing of a pleading in any court of record admitting in writing such Member's inability to pay its debts as they come due; (c) the making by such Member of a general assignment for the benefit of such Member's creditors; (d) the filing by such Member of an answer admitting the material allegations of, or such Member's consenting to, or defaulting in answering a bankruptcy petition filed against such Member in any bankruptcy proceeding; or (e) the expiration of sixty (60) days following the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating such Member a bankrupt or appointing a trustee of such Member's assets.

"*Bidder*" has the meaning set forth in Section 10.2(a).

"*Board*" has the meaning set forth in Section 5.1.

"*Capital Account*" has the meaning set forth in Section 7.3.

"*Capital Contribution*" means any contribution to the capital of the Company in cash or property by a Member whenever made.

"*Certificate*" means the Certificate of Organization of the Company as filed by the organizer of the Company with the Secretary of State of the Commonwealth of Pennsylvania on the Formation Date, as the same may be amended from time to time.

"*Code*" means the Internal Revenue Code of 1986 or corresponding provisions of subsequent superseding federal revenue laws.

"*Common Units*" means the Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Common Units" in this Operating Agreement.

"*Common Unit Holders*" has the meaning set forth in Section 10.2(a).

"*Company*" has the meaning set forth in the introductory paragraph of this Operating Agreement.

- 2 -

**JA250**

"*Company Minimum Gain*" means "partnership minimum gain" as defined in Section 1.704-2(b)(2) of the Treasury Regulations, substituting the term "Company" for the term "partnership" as the context requires.

"*Deadlock Advisor*" means David Mawhinney or, in the event of his death or mental incapacitation, an individual mutually chosen by the Managers.

"*Deficit Capital Account*" means with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the taxable year, after giving effect to the debit to such Capital Account for the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Treasury Regulations. This definition of Deficit Capital Account is intended to comply with the provision of Treasury Regulations Section 1.704-1(b)(2)(ii)(d), and will be interpreted consistently with those provisions.

"*Direct Family Member*" means, with respect to any Member, such Member's spouse, sibling, son, daughter, step-son, step-daughter, parent or step-parent. In the event that a Member has no living Direct Family Member, the beneficiaries of such Member's estate will each be treated as a Direct Family Member and will be subject to this Operating Agreement to the same extent as a Direct Family Member.

"*Disability*" means, with respect to any Member, that a medical doctor has determined and memorialized in writing that the Member is incapacitated or mentally incompetent and has been such for a period of at least six (6) consecutive months.

"*Estimated Tax Amount*" means, with respect to any Member for a Fiscal Year, such Member's Tax Amount for such Fiscal Year as estimated in good faith from time to time by the Board. In making such estimate, the Board shall take into account amounts shown on Internal Revenue Service Form 1065 filed by the Company and similar state or local forms filed by the Company for the preceding taxable year and such other adjustments as in the reasonable business judgment of the Board are necessary or appropriate to reflect the estimated operations of the Company for the Fiscal Year.

"*Excess Amount*" has the meaning set forth in Section 9.4(c).

"*First Fund*" has the meaning set forth in the recitals to this Operating Agreement.

"*Fiscal Year*" means January 1 through December 31 of any given year.

"*Formation Date*" has the meaning set forth in the recitals to this Operating Agreement.

"*Governmental Authority*" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction.

"*Initial Capital Contribution*" with respect to any Member, means such Member's initial Capital Contribution pursuant to this Operating Agreement, as set forth on Exhibit A, attached hereto.

"*Joinder Agreement*" means the joinder agreement in substantially the form attached hereto as Exhibit B.

"*Liquidator*" has the meaning set forth in Section 11.3(a).

"*Losses*" has the meaning set forth in Section 12.4.

"*Manager*" has the meaning set forth in Section 5.1.

"*Management Agreement*" means that certain investment management agreement, by and between the Company and the First Fund, as amended from time to time.

"*Management Fees*" means any payment received by the Company from (i) the First Fund as a "management fee" paid pursuant to the Management Agreement, subject to reduction for any "advisory fees" or other similar fees received by the Company from any portfolio companies of the First Fund, or any taxable income resulting from any equity interest issued to the Company by any portfolio companies of the First Fund in lieu of any such "advisory fees" or similar fees, as further provided in Section 8(f) the Management Agreement, and (ii) any portfolio company of the First Fund as an "advisory fee" or other payment for services provided by the Company to such portfolio company; provided, that, "Management Fees" expressly excludes any fees received by the Company from any fund(s) managed by the Company other than the First Fund, or any portfolio company of such fund(s).

"*Management Fee Units*" means the Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Management Fee Units" in this Operating Agreement.

"*Management Fee Distribution Amount*" has the meaning set forth in Section 9.2.

"*Member*" means each of the parties who execute a counterpart of this Operating Agreement and each of the parties who are subsequently admitted as a Member in accordance with Section 10.1 of this Operating Agreement.

"*Member Nonrecourse Debt*" means "partner nonrecourse debt" as defined in Treasury Regulation Section 1.704-2(b)(4), substituting the term "Company" for the term "partnership" and the term "Member" for the term "partner" as the context requires.

"*Member Nonrecourse Debt Minimum Gain*" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if the Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulation Section 1.704-2(i)(3).

"*Membership Interest*" means a Member's entire interest and rights in the Company, including such Member's right (based on the class of Unit or Units held by such Member), as

- 4 -

**JA252**

applicable, (a) to distributions of income, gain, loss and deduction of the Company; (b) to a distributive share of the assets of the Company; (c) to vote on, consent to or otherwise participate in any decision of the Members as provided in this Operating Agreement; and (d) to any and all other benefits to which such Member may be entitled as provided in this Operating Agreement or the Pennsylvania Act.

"*Members Schedule*" has the meaning set forth in Section 3.1.

"*Net Losses*" means, for each Fiscal Year, the losses and deductions of the Company determined in accordance with accounting principles consistently applied from year to year employed under the Accounting Method and as reported, separately or in the aggregate, as appropriate, on the Company's information tax return filed for federal income tax purposes, plus any expenditures described in Section 705(a)(2)(B) of the Code.

"*Net Income*" means, for each Fiscal Year, the income and gains of the Company determined in accordance with accounting principles consistently applied from year to year employed under the Accounting Method and as reported, separately or in the aggregate, as appropriate, on the Company's information tax return filed for federal income tax purposes, plus any income described in Section 705(a)(1)(B) of the Code.

"*Nonrecourse Liability*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"*Offer Notice*" has the meaning set forth in Section 10.2(a).

"*Offered Interests*" has the meaning set forth in Section 10.2(a).

"*Offering Member*" has the meaning set forth in Section 10.2(a).

"*Operating Agreement*" has the meaning set forth in the recitals to this Operating Agreement.

"*Original Operating Agreement*" has the meaning set forth in the recitals to this Operating Agreement.

"*Pennsylvania Act*" means the Pennsylvania Limited Liability Company Act of 1994, as the same may be amended from time to time.

"*Person*" means any individual or entity, and their heirs, executors, administrators, legal representatives, successors and assigns where the context so permits.

"*Permitted Transfer*" has the meaning set forth in Section 10.1.

"*Purchasing Member*" has the meaning set forth in Section 10.2(b).

"*Quarterly Estimated Tax Amount*" of a Member for any calendar quarter of a Fiscal Year means the excess, if any of (a) the product of (i) a quarter (¼) in the case of the first calendar quarter of the Fiscal Year, half (½) in the case of the second calendar quarter of the

- 5 -

Fiscal Year, three-quarters (¾) in the case of the third calendar quarter of the Fiscal Year, and one (1) in the case of the fourth calendar quarter of the Fiscal Year and (ii) the Member's Estimated Tax Amount for such Fiscal Year over (b) all distributions previously made during such Fiscal Year to such Member.

"*Reed Smith*" has the meaning set forth in Section 13.6.

"*ROFR Notice*" has the meaning set forth in Section 10.2(b).

"*ROFR Notice Period*" has the meaning set forth in Section 10.2(b).

"*ROFR Portion*" means, with respect to any Purchasing Member, on the date of the Offer Notice, the number of Common Units equal to the product of: (a) the total number of Offered Interests and (b) a fraction determined by *dividing* (x) the number of Common Units owned by such Purchasing Member *by* (y) the total number of Common Units owned by all of the Purchasing Members.

"*Securities Acts*" has the meaning set forth in Section 13.16.

"*Shortfall Amount*" has the meaning set forth in Section 9.4(b).

"*Subsidiary*" means, with respect to any Person, any other Person of which a majority of the outstanding shares or other equity interests having the power to vote for directors or comparable managers are owned, directly or indirectly, by the first Person.

"*Tax Amount*" of a Member for a Fiscal Year means the product of (a) the Tax Rate for such Fiscal Year and (b) the Adjusted Taxable Income of the Member for such Fiscal Year with respect to its Units.

"*Tax Distributions*" has the meaning set forth in Section 9.1(a).

"*Transferring Member*" means (a) any Member who sells, assigns, pledges, hypothecates, transfers, exchanges or otherwise transfers for consideration all or any portion of his Membership Interest or (b) any Member who gifts, bequeaths or otherwise transfers for no consideration (by operation of law or otherwise, except with respect to Bankruptcy) all or any part of his Membership Interest.

"*Tax Rate*" of a Member, for any period, means the highest marginal blended federal, state and local tax rate applicable to ordinary income, qualified dividend income or capital gains, as appropriate, for such period for an individual residing in Pittsburgh, Pennsylvania, taking into account for federal income tax purposes, the deductibility of state and local taxes and any applicable limitations on such deductions.

"*Treasury Regulations*" means proposed, temporary and final regulations promulgated under the Code in effect as of the date of filing the Certificate and the corresponding sections of any regulations subsequently issued that amend or supersede such regulations.

- 6 -

"*Unit*" means a unit representing a fractional part of the Membership Interests of the Members and shall include all types and classes of Units, including Common Units and Management Fee Units; provided, that any type or class of Unit shall have the privileges, preference, duties, liabilities, obligations and rights set forth in this Operating Agreement, and the Membership Interests represented by such type or class of Unit shall be determined in accordance with such privileges, preference, duties, liabilities, obligations and rights.

## ARTICLE II

## ORGANIZATION

Section 2.1    Formation.    The Company has been organized as a Pennsylvania limited liability company by executing and delivering the Certificate to the Pennsylvania Secretary of State in accordance with and pursuant to the Pennsylvania Act.

Section 2.2    Name.    The name of the Company is "Coal Hill Ventures LLC" or such other name or names as the Board may from time to time designate; provided, that the name shall always contain the words "Limited Liability Company" or the abbreviation "LLC."

Section 2.3    Principal Place of Business.    The principal place of business of the Company is 309 Cola Street, Pittsburgh, Pennsylvania 15203. The Company may locate its place of business at any other place or places as the Board may deem advisable from time to time.

Section 2.4    Purpose; Powers.    The purpose of the Company is to engage in any lawful business or activity, and to have and exercise all of the powers, rights and privileges which a limited liability company organized pursuant to the Pennsylvania Act may have and exercise.

Section 2.5    Term.    The term of the Company commenced on the Formation Date and shall continue in existence perpetually until the Company is dissolved in accordance with the provisions of this Operating Agreement or the Pennsylvania Act.

Section 2.6    No State-Law Partnership.    The Members intend that the Company shall be treated as a partnership for federal and, if applicable, state and local income tax purposes, and, to the extent permissible, the Company shall elect to be treated as a partnership for such purposes. The Company and each Member shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment and no Member shall take any action inconsistent with such treatment. The Members intend that the Company shall not be a partnership (including, without limitation, a limited partnership) or joint venture, and that no Member, Manager or officer of the Company shall be a partner or joint venturer of any other Member, Manager or officer of the Company, for any purposes other than as set forth in the first sentence of this Section 2.6.

## ARTICLE III

## CAPITALIZATION

- 7 -

Section 3.1   <u>Membership Interests</u>. The Membership Interests of the Members shall be represented by issued and outstanding Units. Each of the Units shall have the privileges, preference, duties, liabilities, obligations and rights, including voting rights, if any, set forth in this Operating Agreement. The Board shall maintain a schedule of all Members, their respective mailing addresses and the amount and type of Units held by them (the "***Members Schedule***"), and shall update the Members Schedule upon the issuance or transfer of any Units to any new or existing Member. A copy of the Members Schedule as of the execution of this Operating Agreement is attached hereto as <u>Exhibit A</u>.

Section 3.2   <u>Authorization of Common Units</u>.   The Company is hereby authorized to issue a class of Units designated as Common Units, with the privileges, preference, duties, liabilities, obligations and rights, including voting rights, if any, set forth in this Operating Agreement.

Section 3.3   <u>Authorization of Management Fee Units</u>. The Company is hereby authorized to issue a class of Units designated as Management Fee Units, with the privileges, preference, duties, liabilities, obligations and rights, including voting rights, if any, set forth in this Operating Agreement; <u>provided</u>, <u>however</u>, that Management Fee Units shall have no rights to vote on any matters of the Company or the Members, unless as otherwise expressly provided in this Operating Agreement or in the Pennsylvania Act.

Section 3.4   <u>Unit Certificates</u>. The Board in its sole discretion may, but shall not be required to, issue certificates to the Members representing the Units held by such Member. In the event that the Board shall issue certificates representing Units in accordance with this <u>Section 3.4</u>, then in addition to any other legend required by the Securities Acts, all certificates representing issued and outstanding Units shall bear a legend substantially in the following form:

THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO AN OPERATING AGREEMENT AMONG THE COMPANY AND ITS MEMBERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE COMPANY. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE UNITS REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH OPERATING AGREEMENT.

THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED EXCEPT IN COMPLIANCE WITH THE RESTRICTIONS ON TRANSFERABILITY CONTAINED IN SUCH OPERATING AGREEMENT AND APPLICABLE U.S. FEDERAL AND STATE SECURITIES LAWS AND THE SECURITIES LAWS OF ANY OTHER APPLICABLE JURISDICTION.

<div align="center">

**ARTICLE IV**

**<u>MEMBERS</u>**

</div>

<div align="center">- 8 -</div>

Section 4.1    Admission of New Members.

(a)    Any Person may be admitted as a Member from time to time by (i) the affirmative vote of the holders of a majority of Common Units, or (ii) in connection with a transfer of Units from an existing Member in accordance with Article X.

(b)    In order for any Person not already a Member of the Company to be admitted as a Member, whether pursuant to an issuance or transfer of Units, such Person shall have executed and delivered to the Company a written undertaking substantially in the form of the Joinder Agreement. Upon the amendment of the Members Schedule by the Board and the satisfaction of any other applicable conditions, including, if a condition, the receipt by the Company of payment for the issuance of the applicable Units, such Person shall be admitted as a Member and deemed listed as such on the books and records of the Company and thereupon shall be issued his, her or its Units. The Board shall also adjust the Capital Accounts of the Members as necessary in accordance with Article VII.

Section 4.2    Meetings. Meetings of the Members, for any purpose or purposes, may be called by (i) the Board or (ii) by a Member or group of Members holding at least a majority of the then-outstanding Common Units. Meetings of the Members may be held either in person or by means of telephone or video conference or other communications device that permits all Members participating in the meeting to hear each other.

Section 4.3    Place of Meetings. The Members holding at least a majority of the then-outstanding Common Units may designate any place, either within or outside the Commonwealth of Pennsylvania, as the place of meeting for any meeting of the Members. If no designation is made, the place of meeting will be the principal place of business of the Company.

Section 4.4    Notice of Meeting.

(a)    Except as otherwise provided in Section 4.4(b), notice of each meeting of the Board shall be given to each Member entitled to vote at such meeting at least 24 hours prior to each such meeting.

(b)    Attendance of a Member at any meeting shall constitute a waiver of notice of such meeting by such Member, except where such Member attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any meeting of the Members need be specified in the notice or waiver of notice of such meeting

Section 4.5    Record Date. For the purpose of determining Members entitled to notice of or to vote at any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any distribution, or in order to make a determination of Members for any other purpose, the date on which notice of the meeting is mailed or the date on which the resolution declaring such distribution is adopted, as the case may be, will be the record date for such determination of Members. When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Section 4.5, such determination will apply to any adjournment thereof.

- 9 -

Section 4.6    Quorum.  A majority of the Members entitled to vote at a given meeting of the Members, represented in person or by proxy, will constitute a quorum at any meeting of Members.  If a quorum shall not be present at any meeting of the Members, then the Members present at the meeting may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

Section 4.7    Voting.

(a)    Except as otherwise provided in Section 4.7(b) or as otherwise required by the Pennsylvania Act:

(i)    each Member shall be entitled to one vote per Common Unit on all matters upon which the Members have the right to vote under this Operating Agreement; and

(ii)    Management Fee Units shall not entitle the holders thereof to vote on any matters required or permitted to be voted on by the Members.

(b)    Notwithstanding anything to the contrary contained in this Operating Agreement, at any time that there are any Management Fee Units outstanding, the Company shall not amend or modify Section 9.1(a)(i) or Section 9.2 of this Operating Agreement, or any defined terms used in Section 9.1(a)(i) or Section 9.2 of this Operating Agreement, without the prior written approval of the holders of a majority of the outstanding Common Units and the holders of a majority of the outstanding Management Fee Units, each voting separately as distinct classes.

Section 4.8    Action by Written Consent.  Any matter that is to be voted on, consented to or approved by Members may be taken without a meeting, without prior notice and without a vote if consented to in writing, by a Member or Members having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Members entitled to vote thereon were present and voted. The secretary of the Company will maintain a record for each such action taken by written consent of a Member or Members.

Section 4.9    Proxies.  At all meetings of Members, a Member may vote in person or by proxy executed in writing by the Member or by a duly authorized attorney-in-fact. Such proxy must be filed with the secretary of the Company before or at the time of the meeting. No proxy will be valid after 12 months from the date of its execution, unless otherwise provided in the proxy.

Section 4.10    No Withdrawal.  A Member shall not cease to be a Member as a result of the Bankruptcy of such Member. So long as a Member continues to hold any Units, such Member shall not have the ability to withdraw or resign as a Member prior to the dissolution and winding up of the Company and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the dissolution or winding up of the Company shall be null and void. As soon as any Person who is a Member ceases to hold any Units, such Person shall no longer be a Member.

- 10 -

Section 4.11   No Personal Liability of Members.   Except as otherwise provided in the Pennsylvania Act or expressly in this Operating Agreement, no Member will be obligated personally for any debt, obligation or liability of the Company or other Members, whether arising in contract, tort or otherwise, solely by reason of being a Member.

<div align="center">

**ARTICLE V**

**MANAGEMENT**

</div>

Section 5.1   Establishment of Board of Managers.   A board of managers of the Company (the "***Board***") is hereby established and shall be comprised of natural Persons (each such Person, a "***Manager***") who shall be appointed in accordance with Section 5.2. The business and affairs of the Company shall be managed, operated and controlled by or under the direction of the Board, and the Board shall have, and is hereby granted, the full and complete power, authority and discretion for, on behalf of and in the name of the Company, to take such actions as it may in its sole discretion deem necessary or advisable to carry out any and all of the objectives and purposes of the Company, subject only to the terms of this Operating Agreement and the Pennsylvania Act.

Section 5.2   Board Composition.   The size of the Board and the Managers to serve thereon shall be determined by the vote of the holders of a majority of Common Units; provided, that, the size of the Board shall initially be set at two (2), and the initial Managers shall be Christopher Moehle and Eric Daimler

Section 5.3   Removal; Resignation.

(a)   A Manager may be removed or replaced at any time, with or without cause, upon, and only upon, the affirmative vote of the holders of a majority of Common Units.

(b)   A Manager may resign at any time from the Board by delivering his or her written resignation to the Board. Any such resignation shall be effective upon receipt thereof by the Board unless it is specified to be effective at some other time or upon the occurrence of some other event. The Board's acceptance of a resignation shall not be necessary to make such resignation effective.

Section 5.4   Meetings.

(a)   The Board shall meet at such time and at such place as the Board may designate. Meetings of the Board may be held either in person or by means of telephone or video conference or other communications device that permits all Managers participating in the meeting to hear each other, at the offices of the Company or such other place (either within or outside the Commonwealth of Pennsylvania) as may be determined from time to time by the Board. Notice of each meeting of the Board shall be given to each Manager at least 24 hours prior to each such meeting.

(b)   Attendance of a Manager at any meeting shall constitute a waiver of notice of such meeting by such Manager, except where a Manager attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not

<div align="center">- 11 -</div>

lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any meeting of the Board need be specified in the notice or waiver of notice of such meeting.

Section 5.5    Quorum; Manner of Acting.

(a)    A majority of the Managers serving on the Board shall constitute a quorum for the transaction of business of the Board. At all times when the Board is conducting business at a meeting of the Board, a quorum of the Board must be present at such meeting. If a quorum shall not be present at any meeting of the Board, then the Managers present at the meeting may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

(b)    Any Manager may participate in a meeting of the Board by means of telephone or video conference or other communications device that permits all Managers participating in the meeting to hear each other, and participation in a meeting by such means shall constitute presence in person at such meeting.

(c)    Each Manager shall have one vote on all matters submitted to the Board. With respect to any matter before the Board, the act of a majority of the Managers shall be the act of the Board. For so long as the Board is comprised of an even number of Managers, if the Managers are unable to reach a decision on a matter by majority vote, and such deadlock is unresolved for a period of ten (10) days following the date when the deadlocked matter was initially submitted to the Board for decision, the Board shall refer such matter to the Deadlock Advisor, who shall provide a decision on such deadlocked matter within ten (10) days after referral to him or her of the deadlocked matter (or, if mutually agreed by the Managers, within a longer period of time). Any decision by the Deadlock Advisor shall be final and binding on the Company, the Board and the Members.

Section 5.6    Action by Written Consent.    Any matter that is to be voted on, consented to or approved by the Board may be taken without a meeting, without prior notice and without a vote if consented to in writing, by such number of Managers as would be necessary to authorize or take such action at a meeting of the Board at which a quorum was present and voted. The secretary of the Company will maintain a record for each such action taken by written consent of the Managers.

Section 5.7    No Compensation or Employment.    No Manager shall be reimbursed or otherwise receive compensation for performance of his or her duties as a Manager. This Operating Agreement does not, and is not intended to, confer upon any Manager any rights with respect to continued employment by the Company, and nothing herein should be construed to have created any employment agreement with any Manager. Nothing contained in this Article V shall be construed to preclude any Manager from serving the Company in any other capacity and receiving reasonable compensation for such services.

Section 5.8    No Personal Liability of Managers.    Except as otherwise provided in the Pennsylvania Act or expressly in this Operating Agreement, no Manager will be obligated personally for any debt, obligation or liability of the Company or any Member, whether arising in contract, tort or otherwise, solely by reason of being a Manager.

- 12 -

Section 5.9     Binding Effect of Actions. Each Member will be bound by, and hereby consents to, any and all actions taken and decisions made by the Members in accordance with the terms of this Operating Agreement. Each of the Members agrees that the officers listed in Section 6.2 hereof will have the authority to bind the Company. Except as provided in this Article V, no Member will have authority to bind the Company.

### ARTICLE VI

### OFFICERS

Section 6.1     Officers of Company. The officers of the Company will consist of a president, a treasurer and a secretary, and such vice presidents, assistant vice presidents, assistant treasurers, assistant secretaries or other officers or agents as may be elected and appointed by the Board from time to time. Any two or more offices may be held by the same person. The officers will act in the name and on behalf of the Company and will supervise its operation under the direction and management of the Board, as further described below.

Section 6.2     Term of Office. Each officer will hold office until his or her successor shall have been duly appointed and qualified or until his or her death or until he or she resigns or has been removed in the manner hereinafter provided. Election or appointment of an officer or agent will not of itself create contract rights.

Section 6.3     Removal. Any officer or agent may be removed, with or without cause, by the Board whenever in their judgment the best interests of the Company would be served thereby.

Section 6.4     Vacancies. A vacancy in any office because of death, resignation, removal, disqualification or otherwise may be filled for the unexpired portion of the term by the Board.

Section 6.5     President. The president will be the chief executive officer of the Company and will be in charge of the entire business and all the affairs of the Company and will have the powers and perform the duties incident to that position, including the power to bind the Company in accordance with this Section 6.5. He or she will have such other powers and perform such duties as are specified in this Operating Agreement and as may from time to time be assigned to him or her by the Board.

The president will have general and active management of the business of the Company and will see that all orders and resolutions of the Board are carried into effect. The president may execute bonds, mortgages and other contracts, except where required or permitted by law to be otherwise signed and executed and except where the signing and execution thereof is expressly delegated by the Board to some other officer or agent of the Company. The president will have general powers of supervision and will be the final arbiter of all differences between officers of the Company, and such decision as to any matter affecting the Company will be final and binding as between the officers of the Company subject only the Board.

Section 6.6     Vice President. In the absence of (or at the request of) the president, or in the event of the president's inability or refusal to act, a vice president (or in the

- 13 -

**JA261**

event there be more than one vice president, the vice presidents in the order designated, or in the absence of any designation, then in the order of their election) will perform the duties of the president, and when so acting, will have all the powers of and be subject to all the restrictions upon the president. Any vice president will perform such other duties as from time to time may be assigned to him by the president or by the Board.

Section 6.7    Treasurer.   The treasurer will be the chief financial officer of the Company. The treasurer will not be required to give a bond for the faithful discharge of his or her duties. He or she will: (a) have charge and custody of and be responsible for all funds and securities of the Company; (b) be charged with primary responsibility for dealing with national securities exchanges or other exchanges in which the Company may hold a membership or on which the Company may trade; (c) receive and give receipts for moneys due and payable to the Company from any source whatsoever, and deposit all such moneys in the name of the Company in such banks, trust companies or other depositories as are selected by the Board; and (d) in general perform all the duties incident to the office of treasurer and such other duties as from time to time may be assigned to him by the president or by the Board.

Section 6.8    Secretary.   The secretary will: (a) keep the minutes of the Members' meetings and the Board meetings in one or more books provided for that purpose; (b) see that all notices are duly given in accordance with the provisions of this Operating Agreement or as required by law; (c) be custodian of Company records; (d) keep a register of the post office address of each Member which will be furnished to the secretary by such Member; (e) certify the resolutions of the Members and the Board and other documents to the Company as true and correct thereof; and (f) in general perform all duties incident to the office of secretary and such other duties as from time to time may be assigned to him by the president, a vice president (as designated by the president) or by the Board.

Section 6.9    Assistant Treasurers and Assistant Secretaries.    The assistant treasurers will respectively, if required by the Board, give bonds for the faithful discharge of their duties in such sums and with such sureties as the Board determines. The assistant treasurers and assistant secretaries, in general, will perform such duties as are assigned to them by the treasurer or the secretary, respectively, or by the president or the Board.

Section 6.10  Compensation.  The compensation of the officers of the Company will be fixed from time to time by the Board, and no officer or employee will be prevented from receiving such compensation by reason of the fact that he or she is also a Member or director of the Company.

<div align="center">

**ARTICLE VII**

**CAPITAL CONTRIBUTIONS AND CAPITAL ACCOUNTS**

</div>

Section 7.1    Initial Capital Contributions.   Any amounts contributed by any Member prior to or simultaneously with such Member becoming a party to this Operating Agreement will be recorded by the Company as that Member's Initial Capital Contribution and will be placed in the Member's Capital Account and recorded on the Members Schedule opposite such Member's name. Whether a prospective Member is required to make an Initial Capital

- 14 -

Contribution, and the amount of such Initial Capital Contribution, shall be determined by the Board, in its sole discretion.

Section 7.2    Additional Capital Contributions.  No Member shall be required to make any additional Capital Contributions.  Any future Capital Contributions made by any Member shall only be made with the consent of the Board and in connection with an issuance of Units.

Section 7.3    Capital Accounts.  The Company shall establish and maintain on its books and records a separate capital account (a "*Capital Account*") for each Member.

(a)    Each Member's Capital Account shall be increased by: (i) such Member's Capital Contributions, including such Member's Initial Capital Contribution; (ii) the fair market value of property contributed by the Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code); (iii) allocations of Net Income; and (iv) allocations to such Member of income described in Section 705(a)(1)(B) of the Code in accordance with Section 8.1.

(b)    Each Member's Capital Account shall be decreased by: (i) the cash amount of any distributions to such Member by the Company; (ii) the fair market value of property distributed to the Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code); (iii) allocations of Net Losses; (iv) allocations to such Member of expenditures described in Code Section 705(a)(2)(b) of the Code; and (v) allocations to the account of such Member of losses and deductions as set forth in such Treasury Regulations, taking into account adjustments to reflect book value.

Section 7.4    Succession Upon Transfer.  In the event of a permitted sale or exchange of Units pursuant to Article X hereof, the Capital Account of the Transferring Member will become the Capital Account of the transferee to the extent it relates to the transferred Units in accordance with Section 1.704-1(b)(2)(iv) of the Treasury Regulations.

Section 7.5    Negative Capital Accounts.  In the event that any Member shall have a deficit balance in his, her or its Capital Account, such Member shall have no obligation, during the term of the Company or upon dissolution or liquidation thereof, to restore such negative balance or make any Capital Contributions to the Company by reason thereof, except as may be required by the Pennsylvania Act (and subject to Section 7.1 and Section 7.2) or in respect of any negative balance resulting from a withdrawal of capital or dissolution in contravention of this Operating Agreement.

Section 7.6    Treatment of Loans.  Loans by any Member to the Company shall not be considered Capital Contributions and shall not affect the maintenance of such Member's Capital Account.

Section 7.7    No Withdrawal.  No Member shall be entitled to withdraw any part of his, her or its Capital Account or to receive any distribution from the Company, except as provided in this Operating Agreement. No Member shall receive any interest, salary or drawing with respect to its Capital Contributions or its Capital Account, except as otherwise provided in

- 15 -

this Operating Agreement. The Capital Accounts are maintained for the sole purpose of allocating items of income, gain, loss and deduction among the Members and shall have no effect on the amount of any distributions to any Members, in liquidation or otherwise.

Section 7.8    Compliance with Treasury Regulations.    The manner in which Capital Accounts are to be maintained pursuant to this Article VII is intended to comply with the requirements of Section 1.704-1(b) of the Code and the Treasury Regulations and shall be interpreted and applied in a manner consistent therewith. If the Board determines that the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Article VII should be modified in order to comply with Section 1.704-1(b) of the Code and the Treasury Regulations, then notwithstanding anything to the contrary contained in the preceding provisions of this Article VII, the Board may authorize such modifications.

## ARTICLE VIII

### ALLOCATIONS, TAX MATTERS AND REPORTS

Section 8.1    Allocation of Net Income and Net Losses.    For each Fiscal Year (or portion thereof), except as otherwise provided in this Agreement, Net Income and Net Loss (and, to the extent necessary, individual items of income, gain, loss or deduction) of the Company shall be allocated among the Members in a manner such that, after giving effect to the special allocations set forth in Section 8.2, the Capital Account balance of each Member, immediately after making such allocations, is, as nearly as possible, equal to (a) the distributions that would be made to such Member pursuant to Section 9.2 and Section 9.3 and if the Company were dissolved, its affairs wound up and its assets sold for cash equal to its fair market value, all Company liabilities were satisfied, and the net assets of the Company were distributed, in accordance with Section 11.4, to the Members immediately after making such allocations, *minus* (ii) such Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of assets.

Section 8.2    Special Allocations. Notwithstanding Section 8.1 hereof:

(a)    No allocations of loss, deduction and/or expenditures described in Section 705(a)(2)(B) of the Code will be charged to the Capital Account of any Member if such allocation would cause such Member to have a Deficit Capital Account. The amount of the loss, deduction and/or Code Section 705(a)(2)(B) expenditure which would have caused a Member to have a Deficit Capital Account will instead be charged to the Capital Account of any Members which would not have a Deficit Capital Account as a result of the allocation, in proportion to their respective Capital Contributions, or, if no such Members exist, then to the Members in accordance with their interests in Net Income pursuant to Section 8.1.

(b)    In the event any Member unexpectedly receives any adjustments, allocations, or distributions, described in Sections 1.704-1(b)(2)(ii)(d)(4), (5), (6) of the Treasury Regulations, which create or increase a Deficit Capital Account of such Member as adjusted under those Treasury Regulations, then items of Company income and gain (consisting of a *pro rata* portion of each item of Company income, including gross income, and gain for such year and, if necessary, for subsequent years) will be specially credited to the Capital Account of such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury

- 16 -

Regulations, the adjusted Deficit Capital Account so created as quickly as possible.  It is the intent that this Section 8.2(b) be interpreted to comply with the alternate test for economic effect set forth in Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations.

(c)    In the event any Member would have a Deficit Capital Account at the end of any Company taxable year which is in excess of the sum of any amount that such Member is obligated to restore to the Company under Treasury Regulations Section 1.704-1(b)(2)(ii)(c) and such Member's share of minimum gain as defined in Section 1.704-2(g)(1) of the Treasury Regulations (which is also treated as an obligation to restore in accordance with Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations), the Capital Account of such Member will be specially credited with items of Membership income (including gross income) and gain in the amount of such excess as quickly as possible.

(d)    Notwithstanding any other provision of this Section 8.2, if there is a net decrease in the Company's Minimum Gain as defined in Treasury Regulation Section 1.704-2(d) during a taxable year of the Company, then, the Capital Account of each Member will be allocated items of income (including gross income) and gain for such year (and if necessary for subsequent years) equal to that Member's share of the net decrease in Company minimum gain. This Section 8.2(d) is intended to comply with the minimum gain chargeback requirement of Section 1.704-2 of the Treasury Regulations and will be interpreted consistently therewith.

(e)    Items of Company loss, deduction and expenditures described in Section 705(a)(2)(B) of the Code which are attributable to any nonrecourse debt of the Company and are characterized as partner nonrecourse deductions under Section 1.704-2(i) of the Treasury Regulations will be allocated to the Members' Capital Accounts in accordance with Section 1.704-2(i) of the Treasury Regulations.

(f)    Beginning in the first taxable year in which there are allocations of "nonrecourse deductions" (as described in Section 1.704-2(b) of the Treasury Regulations) such deductions will be allocated to the Members in accordance with, and as part of, the allocations of Company profit or loss for such period.

(g)    In accordance with Code Section 704(c), if a Member contributes property with a fair market value that differs from its adjusted basis at the time of contribution, income, gain, loss and deductions with respect to the property will, solely for federal income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company and its fair market value at the time of contribution.

(h)    Pursuant to Code Section 704(c)(1)(B), if any contributed property is distributed by the Company other than to the contributing Member within seven years of being contributed, then, except as provided in Code Section 704(c)(2), the contributing Member will be treated as recognizing gain or loss from the sale of such property in an amount equal to the gain or loss that would have been allocated to such Member under Section 704(c)(1)(A) of the Code if the property had been sold at its fair market value at the time of the distribution.

- 17 -

JA265

(i)    In connection with a Capital Contribution of money or other property (other than a de minimis amount) by a new or existing Member, or in connection with the liquidation of the Company the Capital Accounts of the Members will be adjusted to reflect a revaluation of Company property (including intangible assets) in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(f).  If, under Section 1.704-1(b)(2)(iv)(f) of the Treasury Regulations, Company property that has been revalued is properly reflected in the Capital Accounts and on the books of the Company at a book value that differs from the adjusted tax basis of such property, then depreciation, depletion, amortization and gain or loss with respect to such property will be shared among the Members in a manner that takes account of the variation between the adjusted tax basis of such property and its book value, in the same manner as variations between the adjusted tax basis and fair market value of property contributed to the Company are taken into account in determining the Members' shares of tax items under Section 704(c) of the Code.

(j)    Any credit or charge to the Capital Accounts of the Members pursuant to Section 8.2(b), (c), and/or (d) hereof will be taken into account in computing subsequent allocations of profits and losses pursuant to Section 8.1, so that the net amount of any items charged or credited to Capital Accounts pursuant to Section 8.1 and Section 8.2 will to the extent possible, be equal to the net amount that would have been allocated to the Capital Account of each Member pursuant to the provisions of this Article VIII if the special allocations required by Section 8.2(b), (c) and/or (d) had not occurred.

Section 8.3    Accounting Principles.  The Company's financial statements must be prepared and its profits and losses be determined in accordance with accounting principles applied on a consistent basis under the Accounting Method.

Section 8.4    Interest on and Return of Capital Contributions.  No Member will be entitled to interest on his Capital Contribution or a return of his Capital Contribution.

Section 8.5    Loans to Company.  Nothing in this Operating Agreement will prevent any Member from making secured or unsecured loans to the Company by agreement with the Company.

Section 8.6    Accounting Period.  The Company's accounting period will be the year ending December 31st.

Section 8.7    Records and Reports.  At the expense of the Company, the secretary of the Company will maintain records and accounts of all operations and expenditures of the Company.  At a minimum, the Company will keep at its principal place of business the following records:

(a)    A current list of the full name and last known business residence, or mailing address of each Member;

(b)    A copy of the Certificate and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed;

- 18 -

**JA266**

(c)     Copies of the Company's financial statements and income tax returns and reports, if any, for the three most recent years; and

(d)     Copies of the Company's currently effective written operating agreement.

Section 8.8    Returns and Other Elections.

(a)     The Members will cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business. The Treasurer will furnish copies of such returns or pertinent information therefrom to the Members within a reasonable time after the end of the Company's Fiscal Year.

(b)     All elections permitted to be made by the Company under federal or state laws may be made by the Members in their sole discretion.

(c)     In recognition of the fact that the Company expects to be treated as a partnership for federal income tax purposes, the Members agree to treat their Membership Interests as partnership interests for U.S. federal and state income tax reporting purposes.

Section 8.9    Tax Matters Partner.   Christopher Moehle is hereby designated as the "Tax Matters Partner" (as defined in Section 6231 of the Code), and is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including, without limitation, administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. The Members agree to cooperate with each other and to do or refrain from doing any and all things reasonably required to conduct such proceedings.

**ARTICLE IX**

**DISTRIBUTIONS**

Section 9.1    Requirement to Make Distributions.

(a)     Subject to Section 9.1(b) and Section 9.4, the Company shall:

(i)     make distributions, in accordance with Section 9.2, to the holders of Management Fee Units within thirty (30) days of the Company's receipt of any Management Fees, and

(ii)     make distributions, in accordance with Section 9.3, to the holders of Common Units at such times and in such amounts as the Board may determine from time to time, in its sole discretion, including deciding to forego payment of distributions to the holders of Common Units in order to provide for the retention and establishment of reserves of, or payment to third parties of, such funds as it deems necessary with respect to the reasonable business needs of the Company (which needs may include the payment or the making of provision for the payment when due of the Company's obligations, including, but not limited to, present and anticipated debts and obligations, capital needs and expenses, the payment of any management or administrative fees and expenses, and reasonable reserves for contingencies).

- 19 -

(b)     Notwithstanding the foregoing, the Company shall not make any distribution to any Members if such distribution would violate the Pennsylvania Act or other Applicable Law.

Section 9.2    Distributions to Holders of Management Fee Units.     Each Management Fee Unit shall entitle the holder thereof to one quarter of a percent (0.25%) of the total amount of each Management Fee (the "***Management Fee Distribution Amount***"). After making any distributions required under Section 9.4 and subject to the priority of distributions pursuant to Section 11.4, if applicable, when required to make a distribution under Section 9.1(a)(i), the Company shall distribute the Management Fee Distribution Amount to the Members holding Management Fee Units, in proportion to the number of Management Fee Units held by such Members. Management Fee Units shall have limited economic rights to the Company's assets and revenue, as expressly provided in this Section 9.2 and Section 11.4. For the avoidance of doubt, Management Fee Units shall only entitle the holder thereof to the above specified percentage of each Management Fee, and shall have no right whatsoever to any management fees, advisory fees or other cash flows from any other fund managed by the Company or any portfolio company of such fund(s).

Section 9.3    Distributions to Holders of Common Units.     After making any distributions required under Section 9.4 and subject to the priority of distributions pursuant to Section 11.4, if applicable, all distributions made in the discretion of the Board pursuant to Section 9.1(a)(ii) shall be made to the Members holding vested Common Units *pro rata* in proportion to their holdings of vested Common Units; provided, that, in the event any distribution is made to the Members holding Common Units, up to fifty percent (50%) of such total amount to be distributed (calculated after deducting any amounts required to be paid to the Members holding Management Fee Units in accordance with Section 9.2) shall be distributed to the Members holding vested Common Units in such amounts as determined in the discretion of the Board (which, for the avoidance of doubt, need not be in accordance with their holdings of vested Common Units); provided, further, that, in the event that the Company receives any Management Fees, no distributions shall be made to the Members holding Common Units, other than Tax Distributions, until the full amount of distributions are made to the Members holding Management Fee Units in accordance with Section 9.2.

Section 9.4    Tax Distributions.

(a)     Subject to any restrictions in any of the Company's then applicable debt-financing arrangements, and subject to the Board's sole discretion to retain any other amounts necessary to satisfy the Company's obligations, at least ten (10) days before each date prescribed by the Code for a calendar-year corporation to pay quarterly installments of estimated tax, the Company shall use commercially reasonable efforts to distribute cash to each Member in proportion to and to the extent of such Member's Quarterly Estimated Tax Amount for the applicable calendar quarter (each such distribution, a "***Tax Distribution***").

(b)     If, at any time after the final Quarterly Estimated Tax Amount has been distributed pursuant to Section 9.4(a) with respect to any Fiscal Year, the aggregate Tax Advances to any Member with respect to such Fiscal Year are less than such Member's Tax Amount for such Fiscal Year (a "***Shortfall Amount***"), the Company shall use commercially

- 20 -

reasonable efforts to distribute cash in proportion to and to the extent of each Member's Shortfall Amount. The Company shall use commercially reasonable efforts to distribute Shortfall Amounts with respect to a Fiscal Year before the fiftieth (50th) day of the next succeeding Fiscal Year; provided, that if the Company has made distributions other than pursuant to this Section 9.4, the Board may apply such distributions to reduce any Shortfall Amount.

(c)      If the aggregate Tax Distributions made to any Member pursuant to this Section 9.4 for any Fiscal Year exceed such Member's Tax Amount (an "*Excess Amount*"), such Excess Amount shall reduce subsequent Tax Distributions that would be made to such Member pursuant to this Section 9.4, except to the extent taken into account as an advance pursuant to Section 9.4(d).

(d)      Any distributions made pursuant to this Section 9.4 shall be treated for purposes of this Operating Agreement as advances on distributions pursuant to Section 9.2 and Section 9.3 and shall reduce, dollar-for-dollar, the amount otherwise distributable to such Member pursuant to Section 9.2 and Section 9.3.

Section 9.5   Distributions in Kind.  The Board is hereby authorized, in its sole discretion, to make distributions to the Members in the form of securities or other property held by the Company; provided, that Tax Distributions shall only be made in cash. In any non-cash distribution, the securities or property so distributed will be distributed among the Members in the same proportion and priority as cash equal to the fair market value of such securities or property would be distributed among the Members pursuant to Section 9.2 and Section 9.3. Any distribution of securities shall be subject to such conditions and restrictions as the Board determines are required or advisable to ensure compliance with Applicable Law. In furtherance of the foregoing, the Board may require that the Members execute and deliver such documents as the Board may deem necessary or appropriate to ensure compliance with all federal and state securities laws that apply to such distribution and any further transfer of the distributed securities, and may appropriately legend the certificates that represent such securities to reflect any restriction on transfer with respect to such laws. No Member has a right to demand and receive any distribution in a form other than cash.

Section 9.6   Distributions to Members Upon Liquidation.  Upon liquidation of the Company, after settling accounts of creditors and providing for reserves for unforeseen liabilities in the order described in Section 11.4, liquidating distributions will be made to the Members in the following manner:

(a)      first, to the Members holding Management Fee Units, *pro rata* in proportion to their holdings of Management Fee Units, to the extent any distributions are owed pursuant to Section 9.2 but have yet to be distributed by the Company to such holders; and

(b)      second, any remaining amounts to the Members holding Common Units, *pro rata* in proportion to their holdings of Common Units.

## ARTICLE X

## RESTRICTIONS ON TRANSFERABILITY

- 21 -

**JA269**

Section 10.1  General.  No Member may: (a) sell, assign, pledge, hypothecate, transfer, exchange or otherwise transfer for consideration (each, a "sale"), or (b) gift, bequeath or otherwise transfer for no consideration (whether or not by court order, divorce decree, settlement agreement or operation of law, except in the case of Bankruptcy) (each, a "gift"), any Units, without the consent of the Board, provided that, any Member may transfer his, her or its Units to (i) its Subsidiary or (ii) a Direct Family Member upon the occurrence of such Member's death or Disability, without obtaining the consent of the Board (each of (i) and (ii), a "*Permitted Transfer*").  Any sale or gift pursuant to this Section 10.1 shall only be effective to the extent set forth in Section 10.2 (for a sale only), as applicable, and Section 10.3 (for a sale and gift).  Any Permitted Transfer will only be effective to the extent that the Subsidiary or the Direct Family Member who is a recipient of Units delivers a written undertaking substantially in the form of the Joinder Agreement.

Section 10.2  Right of First Refusal for Common Unit Holders.

(a)     At any time, and subject to the terms and conditions specified in this Section 10.2, each Member holding Common Units shall have a right of first refusal if any other Member (the "*Offering Member*") receives a bona fide offer from an independent third party (the "*Bidder*") to purchase all or any portion of the Common Units owned by the Offering Member (the "*Offered Interests*"), and which the Offering Member desires to accept. Each time the Offering Member receives a bona fide offer for any of his, her or its Common Units, the Offering Member shall first provide written notice to the other Members then currently holding Common Units (the "*Common Unit Holders*") of the proposed offer terms (an "*Offer Notice*") and make an offering of the Offered Interests to the Common Unit Holders in accordance with the following provisions of this Section 10.2 prior to selling or otherwise transferring such Offered Interests to the Bidder.  The Offer Notice will constitute the Offering Member's offer to sell the Offered Interests to the other Common Unit Holders, which offer will be irrevocable until the end of the ROFR Notice Period.

(b)     Upon receipt of an Offer Notice, each Common Unit Holder will have fifteen (15) days (the "*ROFR Notice Period*") to elect to purchase all (and not less than all) of the Offered Interests by delivering a written notice (a "*ROFR Notice*") to the Offering Member stating that such Common Unit Holder offers to purchase such Offered Interests on the terms specified in the Offer Notice. Any ROFR Notice will be binding upon delivery and irrevocable by the applicable Common Unit Holder. If more than one Common Unit Holder delivers a ROFR Notice (each a "*Purchasing Member*"), each such Purchasing Member will be allocated and will pay for its ROFR Portion of the Offered Interests, unless otherwise agreed by such Purchasing Members. Each Common Unit Holder that does not deliver a ROFR Notice during the ROFR Notice Period will be deemed to have waived all of such Common Unit Holder's rights to purchase the Offered Interests under this Section 10.2, and the Offering Member is thereafter, subject to the rights of any Purchasing Member, free to sell the Offered Interests to the Bidder specified in the Offer Notice without any further obligation to such Common Unit Holder pursuant to this Section 10.2.

(c)     If no Common Unit Holder delivers a ROFR Notice in accordance with Section 10.2(b), the Offering Member may, during the sixty (60) day period immediately following the expiration of the ROFR Notice Period, sell all of the Offered Interests to the

- 22 -

**JA270**

Bidder on terms and conditions no more favorable to the Bidder than those set forth in the Offer Notice. If the Offering Member does not sell the Offered Interests within such period, the rights provided hereunder will be deemed to be revived and the Offered Interests cannot be sold to the Bidder unless the Offering Member sends a new Offer Notice in accordance with, and otherwise complies with, this Section 10.2.

Section 10.3 Further Requirements for Transfer.  If a gift is permitted under Section 10.1 or a sale to a non-Member is permitted under both Section 10.1 and Section 10.2 (as applicable), no Member may sell or gift any of his, her or its Units: (a) without registration under applicable federal and state securities laws, or unless he, she or it delivers an opinion of counsel satisfactory to the Board that registration under such laws is not required; (b) if the Units subject to the sale or gift, when added to the total of all other Units subject to sales or gifts in the preceding twelve (12) consecutive months prior thereto, would result in the termination of the Company under Section 708 of the Code; (c) without any proposed transferee agreeing to be bound by this Operating Agreement and delivering a written undertaking substantially in the form of the Joinder Agreement; (d) without the proposed transferee making all representations and delivering all such certificates, evidences or assurances reasonably requested by the Board; and (e) without the proposed transferee paying all expenses in connection with his, her or its admission as a Member, unless the Board specifically waives (a), (b), (c),or (e) above.

Section 10.4 Effectiveness of Transfer.  Any sale or gift of any of a Member's Units will take effect on the first day following receipt by Board of written notice that all of the requirements of Section 10.1, Section 10.2 (if applicable) and Section 10.3 have been met.  Any Permitted Transfer will take effect on the date a Manager of the Board executes an acknowledgment to a written undertaking substantially in the form of the Joinder Agreement delivered to the Board by the Subsidiary or the Direct Family Member who is a prospective recipient of Units pursuant to such Permitted Transfer.

**ARTICLE XI**

**DISSOLUTION AND LIQUIDATION**

Section 11.1 Dissolution

(a)    The Company shall be dissolved upon the occurrence of any of the following events:

(i)    the election of the Members in accordance with Section 4.7;

(ii)    the sale, exchange, involuntary conversion, or other disposition or transfer of all or substantially all the assets of the Company; or

(iii)    the entry of a decree of judicial dissolution under Section 8972 of the Pennsylvania Act.

(b)    Dissolution of the Company will be effective on the day on which an event described in Section 11.1(a) above occurs, but the Company will not terminate until a certificate of dissolution has been filed with the Commonwealth of Pennsylvania and the assets of the Company are distributed as provided in Section 11.4 below.  Notwithstanding the

- 23 -

dissolution of the Company, prior to the termination of the Company, the business of the Company and the affairs of the Members will continue to be governed by this Operating Agreement.

Section 11.2  Winding Up.  If the Company is dissolved pursuant to Section 11.1, the Company shall be liquidated and its business and affairs wound up in accordance with the Pennsylvania Act and the provisions of Section 11.4.

Section 11.3  Liquidator.

(a)     The Board, or, if the Board is unable to do so, a Person selected by the holders of a majority of Common Units, shall act as liquidator to wind up the Company (the "*Liquidator*"). The Liquidator shall have full power and authority to sell, assign, and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and business-like manner.

(b)     As promptly as possible after dissolution and again after final liquidation, the Liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable.

Section 11.4  Distribution of Assets Upon Winding Up.  Upon liquidation and winding up of the Company, the Liquidator shall distribute the assets of the Company as follows, unless otherwise required by mandatory provisions of Applicable Law:

(a)     first, to creditors, in the order of priority as provided by law, including all Members who are creditors to the extent otherwise permitted by law, in satisfaction of liabilities of the Company and expenses of liquidation, including sales commissions incident to any sales of assets of the Company, and whether by payment or the making of reasonable provisions for payment thereof;

(b)     second, to the establishment of and additions to reserves that are determined by the Board in its sole discretion to be reasonably necessary for any contingent unforeseen liabilities or obligations of the Company; and

(c)     third, to the Members in accordance with the priority set forth in Section 9.6.

Section 11.5  Certificate of Dissolution.     When all debts, liabilities and obligations have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets have been distributed to the Members, the Liquidator shall execute a certificate of dissolution, which certificate shall set forth the information required by the Pennsylvania Act. The Liquidator shall file the executed certificate of dissolution with the Commonwealth of Pennsylvania to accomplish the cancellation of the Certificate upon the dissolution and completion of the winding up of the Company.

- 24 -

Section 11.6 <u>Recourse for Claims</u>. Each Member shall look solely to the assets of the Company for all distributions with respect to the Company, such Member's Capital Account, and such Member's share of Net Income, Net Loss and other items of income, gain, loss and deduction, and shall have no recourse therefor (upon dissolution or otherwise) against the Board, the Liquidator or any other Member.

<div align="center">

**ARTICLE XII**

**EXCULPATION AND INDEMNIFICATION**

</div>

Section 12.1 <u>Covered Persons</u>. As used herein, the term *"Covered Person"* means (i) each Member, (ii) each officer, director, shareholder, partner, member, Subsidiary, employee, agent or representative of each Member, and each of their Subsidiaries, and (iii) each Manager, officer, employee, agent or representative of the Company.

Section 12.2 <u>Exculpation of Covered Persons</u>.

(a)    No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage or claim incurred by reason of any action taken or omitted to be taken by such Covered Person in good-faith reliance on the provisions of this Operating Agreement, so long as such action or omission does not constitute fraud or willful misconduct by such Covered Person.

(b)    A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements (including financial statements and information, opinions, reports or statements as to the value or amount of the assets, liabilities, Net Income or Net Losses of the Company or any facts pertinent to the existence and amount of assets from which distributions might properly be paid) of the following Persons or groups: (i) another Manager; (ii) one or more officers or employees of the Company; (iii) any attorney, independent accountant, appraiser or other expert or professional employed or engaged by or on behalf of the Company; or (iv) any other Person selected in good faith by or on behalf of the Company, in each case as to matters that such relying Person reasonably believes to be within such other Person's professional or expert competence. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in the Pennsylvania Act.

Section 12.3 <u>Liabilities and Duties of Covered Persons</u>.

(a)    This Operating Agreement is not intended to, and does not, create or impose any fiduciary duty on any Covered Person. Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by Applicable Law, and in doing so, acknowledges and agrees that the duties and obligation of each Covered Person to each other and to the Company are only as expressly set forth in this Operating Agreement. The provisions of this Operating Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

<div align="center">- 25 -</div>

  (b) Whenever in this Operating Agreement a Covered Person is permitted or required to make a decision (including a decision that is in such Covered Person's "discretion" or under a grant of similar authority or latitude), the Covered Person shall be entitled to consider only such interests and factors as such Covered Person desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person. Whenever in this Operating Agreement a Covered Person is permitted or required to make a decision in such Covered Person's "good faith," the Covered Person shall act under such express standard and shall not be subject to any other or different standard imposed by this Operating Agreement or any other Applicable Law.

  Section 12.4 <u>Indemnification</u>. To the fullest extent permitted by the Pennsylvania Act, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement only to the extent that such amendment, substitution or replacement permits the Company to provide broader indemnification rights than the Pennsylvania Act permitted the Company to provide prior to such amendment, substitution or replacement), the Company shall indemnify, hold harmless, defend, pay and reimburse any Covered Person against any and all losses, claims, damages, judgments, fines or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines or liabilities, and any amounts expended in settlement of any claims (collectively, "*Losses*") to which such Covered Person may become subject by reason of:

  (a) any act or omission or alleged act or omission performed or omitted to be performed on behalf of the Company, any Member or any direct or indirect Subsidiary of the foregoing in connection with the business of the Company; or

  (b) the fact that such Covered Person is or was acting in connection with the business of the Company as a partner, member, stockholder, Subsidiary, manager, director, officer, employee or agent of the Company, any Member, or any of their respective Subsidiaries, or that such Covered Person is or was serving at the request of the Company as a partner, member, manager, director, officer, employee or agent of any Person including the Company;

<u>provided</u>, that (x) such Covered Person acted in good faith and in a manner believed by such Covered Person to be in, or not opposed to, the best interests of the Company and, with respect to any criminal proceeding, had no reasonable cause to believe his conduct was unlawful, and (y) such Covered Person's conduct did not constitute fraud or willful misconduct, in either case as determined by a final, nonappealable order of a court of competent jurisdiction. In connection with the foregoing, the termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the Covered Person did not act in good faith or, with respect to any criminal proceeding, had reasonable cause to believe that such Covered Person's conduct was unlawful, or that the Covered Person's conduct constituted fraud or willful misconduct.

  Section 12.5 <u>Reimbursement</u>. The Company shall promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend or defending any claim, lawsuit or other proceeding relating to any Losses for which

- 26 -

such Covered Person may be indemnified pursuant to <u>Section 12.4</u>; <u>provided</u>, that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by <u>Section 12.4</u>, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

Section 12.6     <u>Entitlement to Indemnity</u>.  The indemnification provided by <u>Section 12.4</u> shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise. The provisions of this <u>Article XII</u> shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under <u>Section 12.4</u> and shall inure to the benefit of the executors, administrators, legatees and distributees of such Covered Person.

Section 12.7     <u>Insurance</u>.    To the extent available on commercially reasonable terms, the Company may purchase, at its expense, insurance to cover Losses covered by the foregoing indemnification provisions and to otherwise cover Losses for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount and with such deductibles as the Board may determine; <u>provided</u>, that the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person under the indemnification provisions contained herein, including the right to be reimbursed or advanced expenses or otherwise indemnified for Losses hereunder. If any Covered Person recovers any amounts in respect of any Losses from any insurance coverage, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to such Covered Person by the Company in respect of such Losses.

Section 12.8     <u>Funding of Indemnification</u>.    Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this <u>Article XII</u> shall be provided out of and to the extent of Company assets only, and no Member (unless such Member otherwise agrees in writing) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity by the Company.

Section 12.9     <u>Amendment and Survival</u>.

(a)     If any portion of this <u>Article XII</u> shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this <u>Article XII</u> to the fullest extent permitted by any applicable portion of this <u>Article XII</u> that shall not have been invalidated and to the fullest extent permitted by Applicable Law.

(b)     The provisions of this <u>Article XII</u> shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this <u>Article XII</u> is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound. No amendment, modification or repeal of this <u>Article XII</u> that adversely affects the rights of a Covered Person to indemnification for Losses incurred or relating to a state of facts existing prior to such amendment, modification or repeal

- 27 -

shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Losses without the Covered Person's prior written consent.

        (c)    The provisions of this <u>Article XII</u> shall survive the dissolution, liquidation, winding up and termination of the Company.

<div align="center">

**ARTICLE XIII**

**<u>MISCELLANEOUS PROVISIONS</u>**

</div>

        Section 13.1  <u>Notices</u>.  Any notice, demand or communication required or permitted to be given by any provision of this Operating Agreement will be in writing and will be deemed to have been given when actually received.  Any such notice, demand or communication may be given by overnight courier, email or certified mail (return receipt requested) and will be addressed to Members at the addresses shown on the Members Schedule, and/or to the Company at its principal office or to such other address as a party may from time to time designate by notice to the other parties.

        Section 13.2  <u>Application of Pennsylvania Law</u>.  This Operating Agreement shall be applied, interpreted and governed subject to its terms and by the laws of the Commonwealth of Pennsylvania, and specifically the Pennsylvania Act and the Certificate.  In the event of a direct conflict between the provisions of this Operating Agreement and the provisions of the Pennsylvania Act or provisions of the Certificate, such provision of the Pennsylvania Act or the Certificate, as the case may be, will control.

        Section 13.3  <u>Waiver of Action for Partition</u>.  Each Member irrevocably waives during the term of the Company any right that he or she may have to maintain any action for partition with respect to the property of the Company.

        Section 13.4  <u>Amendment</u>.  Except as otherwise set forth in <u>Section 4.7(b)</u>, this Operating Agreement may be amended at any time in writing by the consent of the Company and the Members holding a majority of the Common Units.

        Section 13.5  <u>Execution of Additional Instruments</u>.  Each Member hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney and other instruments necessary to comply with any laws, rules or regulations.

        Section 13.6  <u>Counsel to the Company</u>.  Reed Smith LLP ("***Reed Smith***") will act as legal counsel to the Company in connection with the offering of Units and its general operations. In connection with the offering of Units and operations of the Company, Reed Smith will not be representing the Members. Each Member acknowledges that Reed Smith does not represent any Member in the absence of a clear and explicit agreement to such effect between a given Member and Reed Smith (and then only to the extent specifically set forth in that agreement), and that in the absence of any such agreement Reed Smith shall owe no duties directly to any Member. Each Member further acknowledges that, whether or not Reed Smith has in the past represented such Member with respect to other matters, Reed Smith has not represented the interests of any Member in the preparation and negotiation of this Operating Agreement.

<div align="center">

- 28 -

**JA276**

</div>

Section 13.7 <u>Construction</u>.  Whenever the singular number is used in this Operating Agreement and when required by the context, the same will include the plural and vice versa, and the masculine gender will include the feminine and neuter genders and vice versa.

Section 13.8 <u>Headings</u>.  The headings in this Operating Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Operating Agreement or any provision hereof.

Section 13.9 <u>Waivers</u>.  The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Operating Agreement will not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

Section 13.10 <u>Rights and Remedies Cumulative</u>.  The rights and remedies provided by this Operating Agreement are cumulative and the use of any one right or remedy by any party will not preclude or waive the right to use any or all other remedies. Said rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

Section 13.11 <u>Severability</u>.  If any provision of this Operating Agreement or the application thereof to any person or circumstance would be invalid, illegal or unenforceable to any extent, the remainder of this Operating Agreement and the application thereof will not be affected and will be enforceable to the fullest extent permitted by law.

Section 13.12 <u>Heirs, Successors and Assigns</u>.  Each and all of the covenants, terms, provisions and agreements herein contained will be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

Section 13.13 <u>Creditors</u>.  None of the provisions of this Operating Agreement will be for the benefit of or enforceable by any creditor of the Company.

Section 13.14 <u>Counterparts</u>.  This Operating Agreement may be executed in counterparts, each of which will be deemed an original but all of which will constitute one and the same instrument.

Section 13.15 <u>Recitals</u>.  The recitals set forth following the pre-amble are hereby incorporated into this Operating Agreement.

Section 13.16 <u>Investment Representations</u>.  The undersigned Members understand (a) that the Units issued pursuant to this Operating Agreement have not been registered under the Securities Act of 1933 or any state securities laws (the "*Securities Acts*") because the Company is issuing such Units in reliance upon the exemptions from the registration requirements of the Securities Acts providing for issuance of securities not involving a public offering, (b) that the Company has relied upon the fact that the Units are to be held by each Member for investment, and (c) that exemption from registration under the Securities Acts would not be available if the Units were acquired by a Member with a view to distribution.

- 29 -

Accordingly, each Member hereby confirms to the Company that such Member is acquiring the Units for such own Member's account, for investment and not with a view to the resale or distribution thereof without complying with an exemption for registration under the Securities Acts. Each Member agrees not to transfer, sell or offer for sale any portion of his, her or its Units unless there is an effective registration or other qualification relating thereto under the Securities Acts or unless the holder of the Units delivers to the Company an opinion of counsel, satisfactory to the Company, that such registration or other qualification under such Securities Acts is not required in connection with such transfer, offer or sale. Each Member understands that the Company is under no obligation to register the Units or to assist such Member in complying with any exemption from registration under the Securities Acts if such Member should at a later date wish to dispose of the Units. Furthermore, each Member realizes that the Units are unlikely to qualify for disposition under Rule 144 of the Securities and Exchange Commission unless such Member is not an "affiliate" of the Company and the Units have been beneficially owned and fully paid for by such Member for at least three (3) years.

*[Signature Page Follows]*

- 30 -

IN WITNESS WHEREOF, the undersigned have executed this Operating Agreement effective as of the date first above written.

COMPANY:

Coal Hill Ventures LLC

_____

Name: Christopher Moehle
Title: Manager

MEMBERS:

_____

Christopher Moehle

_____

Eric Daimler

_____

Jean-Sébastien Valois

_____

Jamie Fee

(See Attached Joinder Agreements)

[Signature Page to Amended and Restated Operating Agreement of Coal Hill Ventures LLC]

IN WITNESS WHEREOF, the undersigned have executed this Operating Agreement effective as of the date first above written.

COMPANY:

Coal Hill Ventures LLC

Name: Christopher Moehle
Title: Manager

MEMBERS:

_____
Christopher Moehle

_____
Eric Daimler

_____
Jean-Sébastien Valois

_____
Jamie Fee

(See Attached Joinder Agreements)

[Signature Page to Amended and Restated Operating Agreement of Coal Hill Ventures LLC]

IN WITNESS WHEREOF, the undersigned have executed this Operating Agreement effective as of the date first above written.

COMPANY:

Coal Hill Ventures LLC

Name: Christopher Moehle
Title: Manager

MEMBERS:

_____

Christopher Moehle

_____

Eric Daimler

_____

Jean-Sébastien Valois

Jamie Fee                3 / 23 / 2016

(See Attached Joinder Agreements)

[Signature Page to Amended and Restated Operating Agreement of Coal Hill Ventures LLC]

**EXHIBIT A**

MEMBERS SCHEDULE

| Name of Member | Address | Email | Initial Capital Contribution | Common Units[1] | Management Fee Units |
|---|---|---|---|---|---|
| Christopher Moehle | 309 Cola Street, Pittsburgh, PA 15203 | christophermoehle@gmail.com | $0 | 42 | 0 |
| Eric Daimler | 461 2nd St. #306c San Francisco, CA 94107 | edaimler@gmail.com | $0 | 42 | 0 |
| Jamie Fee | 322 Noroton Avenue Darien, CT 06820 | feejamie@gmail.com | $0 | 2 | 0 |

---

[1] Number of Common Units specified may be subject to vesting, pursuant to a restricted unit award agreement.

**EXHIBIT B**

FORM OF JOINDER AGREEMENT

Reference is hereby made to the Amended and Restated Operating Agreement of Coal Hill Ventures LLC, a limited liability company organized under the laws of Pennsylvania (the "**Company**"), dated [DATE], as further amended and restated from time to time (the "**Operating Agreement**"), by and among the current members party thereto. Pursuant to and in accordance with Section 4.1(b) of the Operating Agreement, the undersigned hereby acknowledges that he, she or it has received and reviewed a complete copy of the Operating Agreement, including all exhibits thereto, and agrees that upon execution of this Joinder Agreement, such Person shall become a party to the Operating Agreement and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the Operating Agreement as though an original party thereto and shall be deemed, and is hereby admitted as, a Member for all purposes thereof and entitled to all the rights incidental thereto.

Capitalized terms used herein without definition shall have the meanings ascribed thereto in the Operating Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of _____ _____, 20___.

By: _____
    Name:
    Title:

Capital Contribution: $_____

Type of Units: _____

Number of Units: _____

*Acknowledged and agreed this _____ day of _____, 20___:*

Coal Hill Ventures LLC


By: _____
    Name: Christopher Moehle
    Title: Manager

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Western District of Pennsylvania

| | |
|---|---|
| Eric Daimler | ) |
| | ) |
| | ) |
| | ) |
| *Plaintiff(s)* | ) |
| v. | ) |
| | ) Civil Action No. |
| Chris Moehle, Robotics Hub Fund 1, LLC and Coal | ) |
| Hill Ventures LLC, | ) |
| | ) |
| | ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   Chris Moehle,
Robotics Hub Fund 1, LLC,
and Coal Hill Ventures LLC
309 Cola Street
Pittsburgh, Allegheny County, PA 15203

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Christopher P. Schueller, Esq.
Buchanan Ingersoll & Rooney PC
One Oxford Centre, 301 Grant St, 20th Floor Pittsburgh, PA 15219
Mitchell G. Mandell, Esq.
Thompson & Knight LLP
900 Third Avenue, 20th Floor, New York, NY 10022

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____                    _____

*Signature of Clerk or Deputy Clerk*

**JA284**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERIC DAIMLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 18-165 |
| | ) | Judge Nora Barry Fischer |
| CHRIS MOEHLE, ROBOTICS HUBFUND | ) | |
| 1, LLC and COAL HILL VENTURES LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>ORDER OF COURT</u>

AND NOW, this 7th day of February, 2018, upon consideration of the Complaint and

attachments, (Docket No. 1), filed by New York citizen Plaintiff Eric Daimler, wherein he alleges

that this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 over his state law causes of

action against a former partner, Pennsylvania citizen Defendant Chris Moehler and two limited

liability companies, i.e., Defendants Robotics Hubfund 1, LLC and Coal Hill Ventures, LLC, the

citizenship of which he has averred utilizing the traditional corporate citizenship test, (*see* Docket

No. 1 at ¶ 6 ("Defendant, Robotics Hub, is a limited liability company formed under the laws of

the State of Delaware, with its principal place of business in Pittsburgh, Pennsylvania.") *id.* at ¶ 7

("Defendant, Coal Hill, is a limited liability company formed under the laws of the Commonwealth

of Pennsylvania, with its principal place of business in Pittsburgh, Pennsylvania.")), and prevailing

Third Circuit jurisprudence, namely, *Zambelli Fireworks Mfg. Co., Inc. v. Wood*, 592 F.3d 412,

419-20 (3d Cir. 2010), holding that a limited liability company is deemed a citizen of the states of

all of its members, and it further appearing that Plaintiff's Complaint must be dismissed because

1

he pleads that he is a member of both Robotics Hubfund 1, LLC and Coal Hill Ventures, LLC, and has attached Operating Agreements for such entities specifically identifying himself as a member, (Pl. Exs. E, F), among other things, he claims that the Operating Agreements were breached and seeks accountings from the entities based on his membership shares, such that it appears the parties are not completely diverse given that these entities are deemed to be citizens of New York based on Plaintiff's own citizenship,

IT IS HEREBY ORDERED that Plaintiff's Complaint [1] is DISMISSED, without prejudice, for lack of subject matter jurisdiction, *see* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); and,

IT IS FURTHER ORDERED that if Plaintiff does not file an Amended Complaint by February 20, 2018 curing the jurisdictional defect, the Clerk of Court shall mark this case CLOSED.

*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

cc/ecf: Counsel of record

2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ERIC DAIMLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:18-cv-00165-NBF |
| | ) | |
| CHRIS MOEHLE, ROBOTICS HUB | ) | **JURY TRIAL DEMANDED** |
| FUND 1, LLC, and COAL HILL | ) | |
| VENTURES LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**FIRST AMENDED COMPLAINT**

Plaintiff, Eric Daimler ("Daimler"), by his counsel, Thompson & Knight LLP and

Buchanan Ingersoll & Rooney PC, as and for his first amended complaint against defendants,

Chris Moehle ("Moehle"), Robotics Hub Fund 1, LLC ("Robotics Hub"), and Coal Hill Ventures

LLC ("Coal Hill") (collectively, "Defendants"), alleges as follows:

**INTRODUCTION**

1.      This lawsuit arises from Defendants' intentional misrepresentations that were

designed to mislead and induce Daimler to enter into: (i) a business partnership with Moehle, in

connection with which Daimler made significant financial contributions; and (ii) certain related

common unit award agreements that contained different and less favorable vesting schedules

than those of Moehle, Daimler's equal partner.

2.      Defendants thereafter took steps to force Daimler out of Robotics Hub and Coal

Hill (collectively, the "Companies")—companies in which Daimler was an equal partner and/or

co-founded—by intentionally and wrongfully preventing him from satisfying the conditions of

his vesting schedules, thereby causing all of his common units in the Companies to be treated as having been forfeited.

3.      Defendants believe that, because of such wrongful forfeiture, Daimler has no membership or ownership interest in the Companies, thereby making Moehle the Companies' majority member. After allegedly becoming a majority member of the Companies, Moehle purportedly removed Daimler from the Boards of the Companies so that he could obtain majority ownership and control over them.

### PARTIES

4.      Plaintiff, Daimler, is an individual who resides in the State of New York. Defendants believe that Daimler has no membership or ownership interest in Robotics Hub or Coal Hill.

5.      Defendant, Moehle, is an individual who resides in the Commonwealth of Pennsylvania.  Moehle is a member of Robotics Hub and Coal Hill.

6.      Defendant, Robotics Hub, is a limited liability company formed under the laws of the State of Delaware, with its principal place of business in Pittsburgh, Pennsylvania.

7.      Defendant, Coal Hill, is a limited liability company formed under the laws of the Commonwealth of Pennsylvania, with its principal place of business in Pittsburgh, Pennsylvania.

### JURISDICTION

8.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum of $75,000, exclusive of costs and interest, and there is complete diversity of citizenship between the parties.[1]

---

[1]  Upon information and belief, Jamie Fee, a non-party member of Robotics Hub and Coal Hill, is an individual who resides in the State of Connecticut.

524488.000004 20365301.3

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Robotics Hub and Coal Hill maintain their principal place of business in this district, Moehle resides in this district, and a substantial part of the events giving rise to Daimler's claims occurred in this district.

## FACTUAL BACKGROUND

I.      **Daimler Agrees to Form an Equal Partnership Based Upon Moehle's Misrepresentations**

    A.      The Formation of the Partnership

10.     Daimler and Moehle formed a business partnership for the purpose of investing in early-stage robotics companies with high growth potential.

11.     Before becoming partners, Daimler and Moehle each maintained and operated their own companies in robotics and venture finance—Skilled Science and Coal Hill[2], respectively.

12.     In 2015, Daimler and Moehle decided to move forward with an equal partnership by combining Skilled Science and Coal Hill through a de-facto merger, and by co-founding two new entities: Robotics Hub and Robotics Hub Fund 1, LP (the "Fund"). Robotics Hub is the Fund's General Partner, and Coal Hill is the Fund's Investment Manager.

13.     Daimler and Moehle co-edited various documents—including, without limitation, documents entitled "Skilled Science/Coal Hill Merger" and "Combined Skilled Science Coal Hill Pro-Forma"—in connection with their efforts to merge Skilled Science and Coal Hill into a new entity reflecting their equal partnership.

14.     The de-facto merger was accomplished by, among other things: (i) Coal Hill amending and restating its operating agreement to reflect the equal partnership between Daimler

---

[2] Moehle formed Coal Hill in April 2015.

and Moehle; (ii) Daimler and Moehle working together on marketing strategies for the partnership, and ultimately amending various Coal Hill marketing materials to add Daimler as a principal; (iii) Coal Hill engaging Jamie Fee, who previously worked with Daimler at Skilled Science; and (iv) merging expenses accrued through the funding of Skilled Science into the fundraising expenses of Robotics Hub.

15.    Before their partnership began, Moehle represented to Daimler that General Electric ("GE"), among others, would be investing in the Fund, and that he had a strong relationship with the National Robotics Engineering Center ("NREC") and the Robotics Institute ("RI"), which would lead to potential investment opportunities for the partnership.

16.    Specifically, with respect to GE, Moehle represented to Daimler throughout 2015 and 2016 that GE would invest $20,000,000.00 in the Fund, which was a significant portion of the $50,000,000.00 the Fund sought to raise.

17.    Daimler relied on Moehle's representations concerning GE and the strength of his relationships with the NREC and RI when Daimler decided to pursue an equal partnership with Moehle in 2015.

18.    During 2015 and early 2016, Daimler came to learn that Moehle misrepresented and overstated the strength of his relationships with the NREC and RI.

19.    However, throughout 2015 and 2016, Moehle continued to vigorously represent to Daimler GE's alleged commitment to invest $20,000,000.00 in the Fund.

B.    Daimler and Moehle Were Equal Partners in the Companies

20.    As of March 23, 2016, Daimler and Moehle were both members of the Companies.

524488.000004 20365301.3

**JA290**

21.    Pursuant to the Companies' respective Amended and Restated Operating Agreements, both dated March 23, 2016, Daimler and Moehle were the only members of the Companies' initial Boards of Managers.

22.    Daimler and Moehle entered into Common Unit Award Agreements, dated March 23, 2016, with each of the Companies pursuant to which Daimler and Moehle were both awarded forty-two common units in each company, which units were subject to certain disparate vesting schedules more fully discussed below.

23.    In contrast, Fee also entered into Common Unit Award Agreements with each of the Companies, dated March 23, 2016, pursuant to which Fee was awarded only two common units in each company.

24.    Further, pursuant to Section 3.08 of the Fund's Limited Partnership Agreement, both Daimler and Moehle are named "key persons," such that if both Daimler and Moehle cease to be actively involved in the Fund's affairs, the Fund's limited partners may elect to terminate the Fund's investment period.

25.    The Companies and the Fund uniformly promoted Daimler and Moehle as equal partners in connection with their public relations and fundraising efforts, including, without limitation, in the Fund's Confidential Private Placement Memorandum and other presentation materials provided to potential investors.

26.    During joint presentations to potential investors, some investors would expressly ask Daimler and Moehle if the two were equal partners, and their response was always "yes." In fact, Moehle explained their relationship by stating that he and Daimler had combined their efforts, not that Daimler had joined Coal Hill.

27.     Despite having an equal partnership, Daimler personally loaned Coal Hill $125,000.00 pursuant to a promissory note and advanced personal funds to cover corporate expenses. In contrast, Moehle provided an initial capital contribution of merely $1,000.00.

28.     On or about November 2, 2017, Coal Hill paid the promissory note in full, together with interest. Coal Hill also reimbursed Daimler for a portion of the expenses he personally advanced to the company, in the amount of $35,000.00.

## II.     Daimler Accepted a Presidential Fellowship that Benefitted the Companies and the Fund

29.     In January 2016, Daimler was appointed as a Presidential Innovation Fellow for the Barack Obama White House.

30.     Daimler accepted the fellowship, which is a twelve-month program, during Barack Obama's last year in office. Thus, it was axiomatic that Daimler's fellowship would end in early 2017.

31.     Moehle encouraged Daimler to accept the fellowship because of the value that the Companies and the Fund would derive from it.

32.     Daimler served as a Presidential Innovation Fellow from January 2016 to early 2017, during which time Daimler advised the White House on, among other things, issues relating to robotics and artificial intelligence.

33.     Daimler and Robotics Hub received positive press coverage with respect to Daimler's fellowship, and Defendants promoted Daimler's White House position in connection with their marketing and fundraising efforts.

34.     Because Daimler's fellowship allowed for outside employment, Daimler continued to provide services to the Companies during 2016, but the Companies did not

compensate him for such services. During such time, Daimler and Moehle agreed that Daimler's compensation for such services would accrue and be paid to Daimler at a later date.

35.     As fully explained below, the relationship between Daimler and Moehle began to break down, in part, because of Daimler's fellowship.

### III.     Defendants' Misrepresentations Caused Daimler to Enter into Common Unit Award Agreements with Different and Less Favorable Vesting Schedules than those of His Equal Partner Moehle

36.     On or about March 10, 2016, soon after Daimler's fellowship began, the Companies and the Fund engaged Reed Smith LLP to, among other things, prepare various corporate formation and governing documents, including the Common Unit Award Agreements and the Companies' Amended and Restated Operating Agreements.

37.     With respect to the referenced engagement, Reed Smith interacted almost exclusively with Moehle.

A.     Common Unit Awards

38.     The Companies each entered into a Common Unit Award Agreement, dated March 23, 2016, with Moehle, pursuant to which Moehle was awarded forty-two common units in both Robotics Hub and Coal Hill (the "Moehle/RH Award" and the "Moehle/CH Award," respectively, and collectively the "Moehle Awards"), which units vest as follows:

20% vests on the first anniversary of Date of Award [March 23, 2017]; 1.6666% vests ratably on the last day of each month thereafter until the fifth anniversary of the Date of Award [March 23, 2021].

Copies of the Moehle/RH Award and the Moehle/CH Award are attached hereto as Exhibits A and B, respectively.

39.     The Companies also entered into Common Unit Award Agreements, dated March 23, 2016, with Daimler, pursuant to which Robotics Hub and Coal Hill each awarded

forty-two common units to Daimler (the "Daimler/RH Award" and the "Daimler/CH Award," respectively, and collectively the "Daimler Awards").

40.    Unlike Moehle's common units, however, Daimler's units vest as follows:

20% vests on the date when [Daimler] has provided 12 consecutive and uninterrupted months of Full Time Services to the Company Group, provided that [Daimler] must begin providing such Full Time Services to the Company Group no later than the first anniversary of the Date of Award [March 23, 2017]; and

provided the above conditions are met, the remaining 80% vests on a pro-rata basis on the last day of each month thereafter until the fifth anniversary of the Date of Award [March 23, 2021].

Copies of the Daimler/RH Award and the Daimler/CH Award are attached hereto as Exhibits C and D, respectively.

41.    Pursuant to Section 2(a) of the Daimler Awards, Daimler provides Full Time Services if he is employed by or otherwise provides greater than 95% of his professional activities, as determined in the sole discretion of the respective Boards, to the Company Group.

42.    Section 2(a) of the Daimler Awards defines the Company Group as a combination of Robotics Hub or Coal Hill, respectively, the Fund, and the Fund's investment manager (including services provided to portfolio companies of the Fund and Daimler's capacity as an employee of the Fund's investment manager).

B.    Defendants' Misrepresentations

43.    In multiple conversations during 2015 and 2016, some of which included associates and investors, Moehle intentionally misrepresented to Daimler that: (i) Moehle and Daimler would be treated as equals; (ii) the terms of the Daimler Awards were identical to those of the Moehle Awards; and (iii) the Daimler and Moehle Awards both contained vesting schedules pursuant to which a portion of the units would vest automatically while the remaining units would vest over time.

44.     Reed Smith made the same misrepresentations to Daimler during conversations in early 2016.

45.     In early 2016, Daimler made it clear to Moehle and Reed Smith that he would consent to the Daimler Awards only if he and Moehle were treated equally and the terms of the Daimler Awards were identical to those of the Moehle Awards.

46.     At no time did Defendants or Reed Smith inform Daimler that only the Daimler Awards, not the Moehle Awards, contained vesting schedules requiring twelve consecutive and uninterrupted months of Full-Time Services to the Company Group, which services must start within a year of entering into the award agreements, before any common units would begin to vest.

47.     In fact, Moehle and Reed Smith continued to represent to Daimler until in or about July 2016, several months after the awards were executed, that Moehle and Daimler were treated equally and that the Daimler Awards and the Moehle Awards were identical.

48.     It was never Daimler's understanding, based upon representations by Moehle and Reed Smith, and, indeed, was incomprehensible to Daimler, that there could be any circumstance under which his common units in the Companies would be forfeited.

49.     Daimler would not have entered into the Daimler Awards if he had known that: (i) his common units vested differently than Moehle's common units; (ii) he would be required to provide twelve consecutive and uninterrupted months of Full-Time Services to the Company Group, and begin such services within one year of entering into the Daimler Awards, before any portion of his common units would begin to vest; and (iii) there could be any circumstance under which his common units in the Companies would be forfeited.

524488.000004 20365301.3

C.    Amended and Restated Operating Agreements

50.    Also on March 23, 2016, Robotics Hub and Coal Hill, and their respective members, entered into Amended and Restated Operating Agreements (the "RH Operating Agreement" and the "CH Operating Agreement," respectively, and collectively the "Operating Agreements"), which terms are incorporated in the respective Moehle Awards and Daimler Awards. Copies of the RH Operating Agreement and the CH Operating Agreement are attached hereto as Exhibits E and F, respectively.

51.    Section 7.1 of the respective Operating Agreements requires the Companies to record members' initial capital contributions, and Section 7.3 requires the Companies to establish and maintain on their own books and records a separate capital account for each member.

52.    Section 7.2 of the respective Operating Agreements requires all additional capital contributions to be made in connection with the issuance of units.

53.    Pursuant to Section 12.3(b) of the Operating Agreements, Covered Persons (including, among others, members, officers and directors, and managers) who are permitted or required to make a decision in good faith must act under such express standard.

54.    Under Section 12.4 of the Operating Agreements, Covered Persons are entitled to indemnification from the Companies in connection with actions or omissions performed on behalf of the Companies only if such person acts in good faith and in a manner believed by such person to be in, or not opposed to, the best interests of the company, and such person's conduct does not constitute fraud or willful misconduct.

IV.    **The Relationship Between Daimler and Moehle Breaks Down, But Daimler Remains Engaged in the Companies and the Fund**

55.    As explained above, Daimler and Moehle began their partnership as equal partners—and were promoted as such—and each initially devoted equal time to the Companies.

56.     Although Daimler worked for the Companies only part-time during his Presidential Innovation Fellowship, both Moehle and Daimler understood that Daimler would return to his full-time position with the Companies when his fellowship ended.

57.     Indeed, as previously explained, it was understood that Daimler's fellowship necessarily had a finite end date in early 2017.

58.     Additionally, as of January 2016 when Daimler began his fellowship, the business partnership had budgeted matching salaries for Moehle and Daimler, and the Companies had budgeted another full-time salary which they never paid because the individual for whom it was budgeted did not become a member of the Companies as originally anticipated.

59.     In early-mid 2016, the business relationship between Daimler and Moehle began to break down.

60.     The attention and publicity Daimler received in connection with his Presidential Innovation Fellowship became a point of contention between Daimler and Moehle, and Moehle began criticizing Daimler as a business partner.

61.     Moehle became increasingly controlling over access to information about the Fund's investors and portfolio companies, information Moehle previously freely shared. Indeed, Moehle unilaterally determined that he would become the "gatekeeper" of the information soon after Daimler accepted his fellowship.

62.     Moehle would criticize Daimler about statements he made during joint presentations to potential investors about the Fund's portfolio companies, but Moehle would refuse to provide Daimler full access to relevant information about said portfolio companies. Moehle even criticized the content on Daimler's LinkedIn page, and directed Daimler to revise his descriptions of the Companies to mirror those on Moehle's LinkedIn page.

524488.000004 20365301.3

63.     Moehle also began to unilaterally assign Daimler "deliverables" without first consulting with Daimler.

64.     Despite rising tensions, Moehle needed Daimler to remain engaged in the Companies and the Fund so that he would continue to make financial contributions to them, and Daimler remained engaged throughout his fellowship.

65.     Daimler also continued to make financial contributions to the Companies throughout 2016 to pay, among other things, corporate expenses.

66.     Moehle used some of Daimler's financial contributions to the Companies to pay for his own personal expenses, such as his mortgage payments and family trips.

67.     Daimler made additional financial contributions to the Companies with the expectation that they would be treated as capital contributions, and Moehle agreed that they would be treated as such.

68.     From May 2016 through August 2016, Daimler wrote several checks to Coal Hill totaling approximately $30,000.00 to cover Coal Hill's operating expenses, as Moehle requested.

69.     Daimler did not receive additional common units in connection with his additional financial contributions, as required by Section 7.2 of the respective Operating Agreements.

**V.    Defendants Force Daimler Out of the Companies Despite His Attempts to Remain Actively Involved in Them**

70.     During the second half of 2016, Moehle began taking steps to gain sole control of the Companies. Indeed, Moehle continued criticizing Daimler as a business partner and increasingly began obstructing efforts by Daimler and Fee to engage in the Companies and the Fund.

71.    During the Fall of 2016, Daimler and Fee made several attempts to arrange meetings with Moehle in Pittsburgh, where the Companies and the Fund are based, but Moehle thwarted all such efforts. In fact, Moehle told Daimler that the two would have a problem if Daimler scheduled a trip to Pittsburgh.

72.    On numerous occasions, Daimler and Fee offered to help Moehle with the Fund's first closing in December 2016. But Moehle repeatedly refused their help, stated that he would handle the closing, and directed Daimler and Fee to focus their efforts elsewhere.

73.    Further, Moehle continued to unilaterally assign Daimler "deliverables," including asking Daimler to make introductions to, among others, internet travel companies such as Google Travel. Daimler made the introductions Moehle requested, but afterwards Moehle would tell Daimler that the introductions were no longer needed. Moehle would then claim that Daimler failed to complete such "deliverables."

74.    On several occasions in mid-late 2016, Moehle actively obstructed Daimler's efforts to communicate with the Fund's investors and portfolio companies.

75.    Specifically, Daimler explicitly asked Moehle for the contact information for various investors and portfolio companies, including, among others, TravelWits. Moehle either ignored Daimler's requests or flatly refused to disclose the information. In some instances, Moehle even refused to disclose the contact's name.

76.    In late 2016, Moehle began discouraging Daimler from ending his fellowship, which he could have done at any time, because the Companies allegedly had no funds with which to pay him. Daimler suggested that his salary could continue to accrue and be paid to him at a later date, as had been done in the past, but Moehle opposed such structure.

77.    Despite Moehle's efforts in 2016 to disassociate himself, the Companies, and the Fund from Daimler, he simultaneously represented to investors that Daimler was his equal partner until in or about November 2016.

78.    Daimler and Moehle met in-person on January 5-6, 2017 to discuss the notion that Daimler would not return to his full-time role with the Companies at that time, but that Daimler could still earn some compensation in a non-operating role, and that a full-time operating role for Daimler would occur at a later date.

79.    On or about January 5, 2017, just before Daimler's fellowship would ultimately end, Moehle recommended to the Companies' Boards (which constituted only Daimler and Moehle) that Daimler not be permitted to return to a full-time role with the Companies.

80.    Although Moehle and the Companies had contemplated Daimler's return to full-time employment from the outset and budgeted a full-time salary for Daimler, Moehle purportedly made the above recommendation to the Boards because the Companies allegedly lacked sufficient funds to pay Daimler a full-time salary at that time. Indeed, Moehle refused to allow Daimler's salary to continue to accrue and be paid at a later date, as it had in the past.

81.    At the Companies' respective Board meetings on or about January 5, 2017, Moehle voted against, and Daimler voted in favor of, Daimler returning to a full-time role with the Companies.

82.    Because no other votes were cast, the Boards were deadlocked and the matter was referred to the Deadlock Advisor, David Mawhinney, in accordance with Section 5.5(c) of the Companies' respective Operating Agreements.

83.    Daimler and Moehle met in-person again on January 18, 2017 in Orlando, Florida to resume their January 5-6, 2017 discussions.

524488.000004 20365301.3

84.     On or about March 22, 2017, just before the first anniversary of the date of the Daimler Awards, Mawhinney broke the deadlock by voting against Daimler returning to a full-time, fully compensated role with the Companies at that time due to their financial status, but understood when casting his vote that Daimler's full-time engagement with the Companies would occur at a later date and did not foreclose the possibility that Daimler could, if he so elected, return to work on a full-time basis with some portion of his compensation accrued, but not paid, as had been done in the past.

85.     Despite Defendants' previous representations to the contrary, they never offered Daimler a non-operating role in the Companies, provided any compensation to him, or permitted his full-time engagement with the Companies. Instead, Defendants took additional steps to ensure that Daimler had no role whatsoever within the Companies.

86.     Because Defendants wrongfully prevented Daimler from returning to his full-time role with the Companies within a year after executing the Daimler Awards, by March 23, 2017, despite Daimler's desire and attempts to do so, the Companies deemed all of Daimler's common units to be forfeited.

87.     As a result of such wrongful forfeiture, Defendants believe that Daimler has no membership or ownership interest in the Companies, thereby making Moehle the Companies' majority member.

88.     After obtaining a majority membership interest, to further prevent Daimler from serving the Companies in any capacity, Moehle purportedly directed the Companies to remove Daimler from their respective Boards and amend and restate the Fund's Limited Partnership Agreement to remove Daimler from the "Key Person" provision set forth in Section 3.08 of the agreement.

524488.000004 20365301.3

## COUNT ONE

## FRAUD IN THE INDUCEMENT
### (Against Moehle)

89.     Plaintiff repeats all prior allegations as though fully set forth herein.

90.     Moehle intentionally misrepresented to Daimler that GE, among others, would be investing in the Fund, and that he had a strong relationship with the NREC and the RI, which would lead to potential investment opportunities for Moehle and Daimler's business partnership.

91.     Moehle also intentionally misrepresented to Daimler that the terms of the Daimler Awards were identical to those of the Moehle Awards, and that the Daimler Awards and Moehle Awards both contained vesting schedules pursuant to which a portion of common units would vest automatically while the remaining units would vest over time.

92.     Moehle made such misrepresentations knowing they were false or with a reckless disregard as to whether they were true or false.  Such misrepresentations are material because Daimler would not have entered into the business partnership in 2015 if he had known that GE and others had not committed to investing in the Fund to the degree Moehle represented, and that Moehle had grossly overstated his relationship with the NREC and the RI.

93.     Nor would Daimler have entered into the Daimler Awards if he had known that: (i) the terms of the Daimler Awards and Moehle Awards were not identical; (ii) he would be required to provide twelve consecutive and uninterrupted months of Full-Time Services to the Company Group before his common units would begin to vest, provided that he begin providing such services within one year of executing the awards; and (iii) there could be any circumstance under which his common units in the Companies would be forfeited.

94.     Moehle made such misrepresentations to Daimler with the intention of: (i) misleading Daimler into relying upon said misrepresentations; (ii) using said misrepresentations

524488.000004 20365301.3

to induce Daimler into funding the Companies in 2015 and 2016, some of which funds Moehle

used for his own benefit; and (iii) later forcing Daimler out of the Companies in early 2017 so

that Moehle would have majority ownership and control over them.

95.    Daimler justifiably relied upon Moehle's misrepresentations as being true when

he decided to enter into a business partnership with Moehle in 2015 and the Daimler Awards in

2016.

96.    As a direct and proximate result of Moehle's misrepresentations, together with

Daimler's justifiable reliance on said misrepresentations, Daimler was wrongfully prevented

from satisfying the vesting requirements in the Daimler Awards, thereby causing all of his

common units in the Companies to be treated as having been forfeited (and thus as though

Daimler has no membership or ownership interest in the Companies). Such wrongful forfeiture

resulted in Moehle becoming a majority member of the Companies and removing Daimler from

their respective Boards.

**COUNT TWO**

**FRAUD IN THE EXECUTION**
**(Against Moehle)**

97.    Plaintiff repeats all prior allegations as though fully set forth herein.

98.    Moehle intentionally misrepresented to Daimler that the terms of the Daimler

Awards were the same as those of the Moehle Awards, and that the Daimler Awards and Moehle

Awards both contained vesting schedules pursuant to which a portion of common units would

vest automatically while the remaining units would vest over time.

99.    Moehle made such misrepresentations knowing they were false or with a reckless

disregard as to whether they were true or false.

524488.000004 20365301.3

100.    Moehle made such misrepresentations to Daimler with the intention of misleading Daimler into relying upon said misrepresentations, inducing Daimler into executing the Daimler Awards such that he would continue funding the Companies (some of which funds Moehle used for his own benefit), and using said misrepresentations to later force Daimler out of the company.

101.    Daimler mistakenly believed, due to intentional misrepresentations by Moehle, that the Daimler Awards were identical to the Moehle Awards, and that a portion of Daimler's units would vest automatically while the remaining units would vest over time.

102.    Moehle's misrepresentations are material because Daimler would not have entered into the Daimler Awards if he had known that: (i) the terms of the Daimler Awards and Moehle Awards were not identical; (ii) he would be required to provide twelve consecutive and uninterrupted months of Full-Time Services to the Company Group before his common units would begin to vest, provided that he begin providing such services within a year of executing the awards; and (iii) there could be any circumstance under which his common units in the Companies would be forfeited.

103.    The fact that Daimler was unaware of the contents of the Daimler Awards and the disparity between the Daimler Awards and the Moehle Awards is excusable because Daimler reasonably believed representations repeatedly made to him by his equal business partner Moehle, who was the Companies' counsel's primary point of contact with respect to drafting, among other things, the award agreements.

104.    Daimler justifiably relied upon Moehle's misrepresentations as being true when he executed the signature pages to the Daimler Awards.

524488.000004 20365301.3

105.    As a direct and proximate result of Moehle's misrepresentations, together with Daimler's justifiable reliance on said misrepresentations, Daimler was wrongfully prevented from satisfying the vesting requirements in the Daimler Awards, thereby causing the Companies to treat all of his common units as having been forfeited (and thus as though Daimler has no membership or ownership interest in the Companies). Such wrongful forfeiture resulted in Moehle becoming a majority member of the Companies and removing Daimler from their respective Boards.

**COUNT THREE**

**TORTIOUS INTERFERENCE WITH CONTRACT – DAIMLER/RH AWARD**
**(Against Moehle)**

106.    Plaintiff repeats all prior allegations as though fully set forth herein.

107.    The Daimler/RH Award establishes a contractual relationship between Daimler and Robotics Hub, and Moehle was aware of the Daimler/RH Award at all relevant times.

108.    Moehle intentionally misrepresented to Daimler that the terms of the Daimler/RH Award were the same as those of the Moehle/RH Award, and that a portion of Daimler's common units would vest automatically while the remaining units would vest over time. However, Daimler's award, unlike Moehle's, required him to provide Full-Time Services to the Company Group for twelve consecutive and uninterrupted months before his units would begin to vest, provided that Daimler began providing such services within a year of executing the award.

109.    Thereafter, Moehle purposefully prevented Daimler from providing Full-Time Services to the Company Group in accordance with the Daimler/RH Award, and prevented Robotics Hub from performing its contractual obligations under said award, with the intention of

524488.000004 20365301.3

causing Daimler's common units to be forfeited such that Moehle could obtain majority ownership and control over Robotics Hub.

110.    Moehle's conduct was not privileged or justified.

111.    As a direct and proximate result of Moehle's purposeful and wrongful conduct, all of Daimler's common units in Robotics Hub were treated as having been forfeited. Such wrongful forfeiture resulted in: (i) Robotics Hub treating Daimler as having no membership or ownership interest in the company; and (ii) Moehle thereby becoming a majority member of Robotics Hub and removing Daimler from the Board.

<div align="center">

**COUNT FOUR**

**TORTIOUS INTERFERENCE WITH CONTRACT – DAIMLER/CH AWARD**
**(Against Moehle)**

</div>

112.    Plaintiff repeats all prior allegations as though fully set forth herein.

113.    The Daimler/CH Award establishes a contractual relationship between Daimler and Coal Hill, and Moehle was aware of the Daimler/CH Award at all relevant times.

114.    Moehle intentionally misrepresented to Daimler that the terms of the Daimler/CH Award were the same as those of the Moehle/CH Award, and that a portion of Daimler's units would vest automatically while the remaining units would vest over time. However, Daimler's award, unlike Moehle's, required him to provide Full-Time Services to the Company Group for twelve consecutive and uninterrupted months before his units would begin to vest, provided that Daimler began providing such services within a year of executing the award.

115.    Thereafter, Moehle purposefully prevented Daimler from providing Full-Time Services to the Company Group in accordance with the Daimler/CH Award, and prevented Coal Hill from performing its contractual obligations under said award, with the intention of causing

Daimler's common units to be forfeited such that Moehle could obtain majority ownership and control over Coal Hill.

116.    Moehle's conduct was not privileged or justified.

117.    As a direct and proximate result of Moehle's purposeful and wrongful conduct, all of Daimler's common units in Coal Hill were treated as having been forfeited. Such wrongful forfeiture resulted in: (i) Coal Hill treating Daimler as having no membership or ownership interest in the company; and (ii) Moehle thereby becoming a majority member of Coal Hill and removing Daimler from the Board.

## COUNT FIVE

### UNJUST ENRICHMENT
### (Against Moehle)

118.    Plaintiff repeats all prior allegations as though fully set forth herein.

119.    No direct contractual relationship exists between Daimler and Moehle.

120.    Daimler provided almost all of the initial capital and other financial contributions to the Companies for their benefit.

121.    Some of Daimler's capital and financial contributions were made at Moehle's request.

122.    Upon information and belief, compared to Daimler, Moehle has made insignificant capital and other financial contributions to the Companies.

123.    Moehle wrongfully used some of Daimler's capital and financial contributions to pay for his personal expenses, including his mortgage payments and family travel expenses, only a small portion of which has been repaid to Daimler.

124.    Additionally, Moehle's intentional and wrongful conduct preventing Daimler from satisfying the vesting requirements in the Daimler Awards caused Daimler's common units

524488.000004 20365301.3

in the Companies to be treated as having been forfeited, which units Daimler received in connection with his capital contributions. Such wrongful forfeiture resulted in: (i) the Companies treating Daimler as having no membership or ownership interest in the Companies; and (ii) Moehle thereby becoming a majority member of the Companies and removing Daimler from their respective Boards.

### COUNT SIX

### BREACH OF CONTRACT – DAIMLER/RH AWARD
### (Against Robotics Hub)

125.    Plaintiff repeats all prior allegations as though fully set forth herein.

126.    Daimler and Robotics Hub entered into the Daimler/RH Award, dated March 23, 2016.

127.    Pursuant to Section 2 of the Daimler/RH Award, Robotics Hub agreed to award Daimler forty-two common units, which units were to begin vesting upon Daimler starting to provide Full-Time Services to the Company Group by March 23, 2017.

128.    Robotics Hub intentionally and wrongfully prevented Daimler from beginning to provide such services by March 23, 2017.

129.    As a direct and proximate result of Robotics Hub's intentional and wrongful conduct, Robotics Hub treated all of the forty-two common units it awarded to Daimler as having been forfeited. As a result of such wrongful forfeiture, Robotics Hub believes Daimler has no membership or ownership interest in the company.

### COUNT SEVEN

### BREACH OF CONTRACT – ROBOTICS HUB OPERATING AGREEMENT
### (Against Robotics Hub)

130.    Plaintiff repeats all prior allegations as though fully set forth herein.

524488.000004 20365301.3

**JA308**

131.    Daimler and Robotics Hub entered into the Robotics Hub Operating Agreement, dated March 23, 2016.

132.    Pursuant to Section 12.3(b) of the Robotics Hub Operating Agreement, Moehle, as an officer and member of Robotics Hub, was required to make decisions in good faith.

133.    Moehle, on behalf of Robotics Hub, failed to act in good faith by: (i) misrepresenting to Daimler that the terms of the Daimler/RH Award were identical to those of the Moehle/RH Award and that a certain percentage of Daimler's common units would vest automatically while the others would vest over time; and (ii) thereafter using the disparate terms of the awards to wrongfully prevent Daimler from satisfying his vesting requirements, resulting in (a) Robotics Hub treating Daimler as having no membership or ownership interest in the company, and (b) Moehle thereby becoming a majority member of Robotics Hub and removing Daimler from the Board.

134.    Pursuant to Section 7.2 of the Robotics Hub Operating Agreement, Robotics Hub is required to issue units in connection with members' additional capital contributions.

135.    Daimler made several additional capital contributions in the amount of approximately $100,000.00, but Robotics Hub did not issue additional units in connection with said contributions.

136.    As a direct and proximate result of Robotics Hub's intentional and wrongful conduct, Robotics Hub treated all of the forty-two common units it initially awarded to Daimler as having been forfeited, and Daimler was issued no additional units in connection with his additional capital contributions.

524488.000004 20365301.3

## COUNT EIGHT

### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING – DAIMLER/RH AWARD
### (Against Robotics Hub)

137.    Plaintiff repeats all prior allegations as though fully set forth herein.

138.    Robotics Hub had an implied contractual obligation to act in good faith and to refrain from arbitrary or unreasonable conduct which would have the effect of preventing Daimler from receiving the fruits of the bargain.

139.    Robotics Hub breached such obligations by fraudulently inducing Daimler to enter into and execute the Daimler/RH Award, and thereafter wrongfully preventing Daimler from returning to a full-time position with the company as required by said award for Daimler's units to begin vesting.

140.    As a direct and proximate result of Robotics Hub's intentional and wrongful conduct, Robotics Hub treated all of the forty-two common units it awarded to Daimler as having been forfeited. As a result of such wrongful forfeiture, Robotics Hub believes Daimler has no membership or ownership interest in the company.

## COUNT NINE

### FRAUD IN THE INDUCEMENT
### (Against Robotics Hub)

141.    Plaintiff repeats all prior allegations as though fully set forth herein.

142.    Robotics Hub intentionally misrepresented to Daimler that the terms of the Daimler/RH Award were identical to those of the Moehle/RH Award, and that the Daimler Awards and Moehle Awards both contained vesting schedules pursuant to which a portion of common units would vest automatically while the remaining units would vest over time.

143.   Robotics Hub made such misrepresentations knowing they were false or with a reckless disregard as to whether they were true or false.

144.   Such misrepresentations are material because Daimler would not have entered into the Daimler/RH Award if he had known that: (i) the terms of the Daimler Awards and Moehle Awards were not identical; (ii) he would be required to provide twelve consecutive and uninterrupted months of Full-Time Services to the Company Group before his common units would begin to vest, provided that he begin providing such services within a year of executing the awards; and (iii) there could be any circumstance under which his common units in Robotics Hub would be forfeited.

145.   Robotics Hub made such misrepresentations to Daimler with the intention of inducing Daimler into entering the Daimler/RH Award, and with the intention of using said misrepresentations to later force Daimler out of the company.

146.   Daimler justifiably relied upon Robotics Hub's misrepresentations as being true when he decided to enter into the Daimler/RH Award.

147.   As a direct and proximate result of Robotics Hub's misrepresentations, together with Daimler's justifiable reliance on said misrepresentations, Daimler was wrongfully prevented from satisfying the vesting requirements in the Daimler/RH Award, thereby causing Robotics Hub to treat all of his common units as having been forfeited. As a result of such wrongful forfeiture, Robotics Hub believes Daimler has no membership or ownership interest in the company.

**COUNT TEN**

**FRAUD IN THE EXECUTION**
**(Against Robotics Hub)**

148.   Plaintiff repeats all prior allegations as though fully set forth herein.

149.    Robotics Hub intentionally misrepresented to Daimler that the terms of the Daimler/RH Award were identical to those of the Moehle/RH Award, and that the Daimler Awards and Moehle Awards both contained vesting schedules pursuant to which a portion of common units would vest automatically while the remaining units would vest over time.

150.    Robotics Hub made such misrepresentations knowing they were false or with a reckless disregard as to whether they were true or false, and with the intention of inducing Daimler into executing the Daimler/RH Award and using said misrepresentations to later force Daimler out of the company.

151.    Daimler mistakenly believed, due to intentional misrepresentations by Moehle (as an officer and/or member of Robotics Hub) and the Companies' counsel, that the Daimler/RH Award was identical to the Moehle/RH Award, and that a portion of Daimler's common units would vest automatically while the remaining units would vest over time.

152.    Robotics Hub's misrepresentations are material because Daimler would not have executed the Daimler/RH Award if he had known that: (i) the terms of the Daimler Awards and Moehle Awards were not identical; (ii) he would be required to provide twelve consecutive and uninterrupted months of Full-Time Services to the Company Group before his common units would begin to vest, provided that he begin providing such services within a year of executing the awards; and (iii) there could be any circumstance under which his common units in Robotics Hub would be forfeited.

153.    The fact that Daimler was unaware of the contents of the Daimler/RH Award and the disparity between the Daimler/RH Award and the Moehle/RH Award is excusable because Daimler reasonably believed representations made to him by the Companies' counsel and

repeatedly by his equal business partner Moehle, who was counsel's primary point of contact with respect to drafting, among other things, the award agreements.

154.    Daimler justifiably relied upon Robotics Hub's misrepresentations as being true when he executed the signature pages to the Daimler/RH Award.

155.    As a direct and proximate result of Robotics Hub's misrepresentations, together with Daimler's justifiable reliance on said misrepresentations, Daimler was wrongfully prevented from satisfying the vesting requirements in the Daimler/RH Award, thereby causing Robotics Hub to treat all of his common units as having been forfeited. As a result of such wrongful forfeiture, Robotics Hub believes Daimler has no membership or ownership interest in the company.

<div align="center">

**COUNT ELEVEN**

**UNJUST ENRICHMENT**
**(Alternatively, Against Robotics Hub)**

</div>

156.    Plaintiff repeats all prior allegations as though fully set forth herein.

157.    Daimler provided capital and other financial contributions to Robotics Hub for its benefit, including, without limitation, to pay company expenses.

158.    Robotics Hub awarded Daimler forty-two common units in connection with some, but not all, of such contributions.

159.    Robotics Hub intentionally and wrongfully misrepresented to Daimler that his common unit award was identical to Moehle's award, and that a certain percentage of the units awarded to both Moehle and Daimler would vest automatically while the others would vest over time.

160.    But, unlike Moehle's common unit award, Robotics Hub required Daimler to provide Full-Time Services to the Company Group for twelve consecutive and uninterrupted

<div align="center">27</div>

months before his units would begin to vest, provided that Daimler began providing such services within a year of the date of the award.

161.    Robotics Hub intentionally and wrongfully prevented Daimler from beginning to provide such services, and ultimately treated all of the forty-two common units it awarded to Daimler as having been forfeited.

162.    Robotics Hub has not fully reimbursed Daimler for all of his capital and other financial contributions or for the value of his forty-two common units that were wrongfully forfeited.

163.    Such wrongful forfeiture resulted in Robotics Hub treating Daimler as having no membership or ownership interest in the company, and Moehle thereby becoming a majority member of Robotics Hub and removing Daimler from the Board.

## COUNT TWELVE

### BREACH OF CONTRACT – DAIMLER/CH AWARD
### (Against Coal Hill)

164.    Plaintiff repeats all prior allegations as though fully set forth herein.

165.    Daimler and Coal Hill entered into the Daimler/CH Award, dated March 23, 2016.

166.    Pursuant to Section 2 of the Daimler/CH Award, Coal Hill agreed to award Daimler forty-two common units, which units were to begin vesting upon Daimler starting to provide Full-Time Services to the Company Group by March 23, 2017.

167.    Coal Hill intentionally and wrongfully prevented Daimler from beginning to provide such services by March 23, 2017.

168.    As a direct and proximate result of Coal Hill's intentional and wrongful conduct, Coal Hill treated all of the forty-two common units it awarded to Daimler as having been

forfeited. As a result of such wrongful forfeiture, Coal Hill believes Daimler has no membership or ownership interest in the company.

### COUNT THIRTEEN

### BREACH OF CONTRACT – COAL HILL OPERATING AGREEMENT
### (Against Coal Hill)

169.    Plaintiff repeats all prior allegations as though fully set forth herein.

170.    Daimler and Coal Hill entered into the Coal Hill Operating Agreement, dated March 23, 2016.

171.    Pursuant to Section 12.3(b) of the Coal Hill Operating Agreement, Moehle, as an officer and member of Coal Hill, was required to make decisions in good faith.

172.    Moehle, on behalf of Coal Hill, failed to act in good faith by: (i) misrepresenting to Daimler that the terms of the Daimler/CH Award were identical to those of the Moehle/CH Award and that a certain percentage of Daimler's common units would vest automatically while the others would vest over time; and (ii) thereafter using the disparate terms of the awards to prevent Daimler from satisfying his vesting requirements, resulting in (a) Coal Hill treating Daimler as having no membership or ownership interest in the company and (b) Moehle thereby becoming a majority member of Coal Hill and removing Daimler from the Board.

173.    Pursuant to Section 7.2 of the Coal Hill Operating Agreement, Coal Hill is required to issue units in connection with members' additional capital contributions.

174.    Daimler made several additional capital contributions in the amount of approximately $100,000.00, but Coal Hill did not issue additional units in connection with such contributions.

175.    As a direct and proximate result of Coal Hill's intentional and wrongful conduct, Coal Hill treated all of the forty-two common units it awarded to Daimler as having been

524488.000004 20365301.3

forfeited, and Daimler was issued no additional units in connection with his additional capital contributions.

## COUNT FOURTEEN

### FRAUD IN THE INDUCEMENT
### (Against Coal Hill)

176.    Plaintiff repeats all prior allegations as though fully set forth herein.

177.    Coal Hill intentionally misrepresented to Daimler that the terms of the Daimler/CH Award were identical to those of the Moehle/CH Award, and that the Daimler Awards and Moehle Awards both contained vesting schedules pursuant to which a portion of common units would vest automatically while the remaining units would vest over time.

178.    Coal Hill made such misrepresentations knowing they were false or with a reckless disregard as to whether they were true or false.

179.    Such misrepresentations are material because Daimler would not have entered into the Daimler/CH Award if he had known that: (i) the terms of the Daimler Awards and Moehle Awards were not identical; (ii) he would be required to provide twelve consecutive and uninterrupted months of Full-Time Services to the Company Group before his common units would begin to vest, provided that he begin providing such services within a year of executing the awards; and (iii) there could be any circumstance under which his common units in Coal Hill would be forfeited.

180.    Coal Hill made such misrepresentations to Daimler with the intention of misleading Daimler into relying upon said misrepresentations, inducing Daimler into entering the Daimler/CH Award, and using said misrepresentations to later force Daimler out of the company.

181.    Daimler justifiably relied upon Coal Hill's misrepresentations as being true when he decided to enter into the Daimler/CH Award.

182.    As a direct and proximate result of Coal Hill's misrepresentations, together with Daimler's justifiable reliance on said misrepresentations, Daimler was wrongfully prevented from satisfying the vesting requirements in the Daimler/CH Award, thereby causing Coal Hill to treat all of his common units as having been forfeited. As a result of such wrongful forfeiture, Coal Hill believes Daimler has no membership or ownership interest in the company.

### COUNT FIFTEEN

### FRAUD IN THE EXECUTION
### (Against Coal Hill)

183.    Plaintiff repeats all prior allegations as though fully set forth herein.

184.    Coal Hill intentionally misrepresented to Daimler that the terms of the Daimler/CH Award were the same as those of the Moehle/CH Award, and that the Daimler Awards and Moehle Awards both contained vesting schedules pursuant to which a portion of common units would vest automatically while the remaining units would vest over time.

185.    Coal Hill made such misrepresentations knowing they were false or with a reckless disregard as to whether they were true or false.

186.    Coal Hill made such misrepresentations to Daimler with the intention of misleading Daimler into relying upon said misrepresentations, inducing Daimler into executing the Daimler/CH Award, and using said misrepresentations to later force Daimler out of the company.

187.    Daimler mistakenly believed, due to intentional misrepresentations by Moehle (as an officer and/or member of Coal Hill) and the Companies' counsel, that the Daimler/CH Award

was identical to the Moehle/CH Award, and that a portion of Daimler's units would vest automatically while the remaining units would vest over time.

188.    Coal Hill's misrepresentations are material because Daimler would not have executed the Daimler/CH Award if he had known that: (i) the terms of the Daimler Awards and Moehle Awards were not identical; (ii) he would be required to provide twelve consecutive and uninterrupted months of Full-Time Services to the Company Group before his common units would begin to vest, provided that he begin providing such services within a year of executing the awards; and (iii) there could be any circumstance under which his common units in Coal Hill would be forfeited.

189.    The fact that Daimler was unaware of the contents of the Daimler/CH Award and the disparity between the Daimler/CH Award and the Moehle/CH Award is excusable because Daimler reasonably believed representations made to him by the Companies' counsel and repeatedly by his equal business partner Moehle, who was counsel's primary point of contact with respect to drafting, among other things, the award agreements.

190.    Daimler justifiably relied upon Coal Hill's misrepresentations as being true when he executed the signature pages to the Daimler/CH Award.

191.    As a direct and proximate result of Coal Hill's misrepresentations, together with Daimler's justifiable reliance on said misrepresentations, Daimler was wrongfully prevented from satisfying the vesting requirements in the Daimler/CH Award, thereby causing Coal Hill to treat all of his common units as having been forfeited. As a result of such wrongful forfeiture, Coal Hill believes Daimler has no membership or ownership interest in the company.

## COUNT SIXTEEN

### UNJUST ENRICHMENT
### (Alternatively, Against Coal Hill)

192.    Plaintiff repeats all prior allegations as though fully set forth herein.

193.    Daimler provided capital and other financial contributions to Coal Hill for its benefit, including, without limitation, to pay company expenses.

194.    Coal Hill awarded Daimler forty-two common units in connection with some, but not all, of such contributions.

195.    Coal Hill intentionally and wrongfully misrepresented to Daimler that his common unit award was identical to Moehle's award, and that a certain percentage of the units awarded to both Moehle and Daimler would vest automatically while the others would vest over time.

196.    But, unlike Moehle's common unit award, Coal Hill required Daimler to provide Full-Time Services to the Company Group for twelve consecutive and uninterrupted months before his units would begin to vest, provided that Daimler began providing such services within a year of the date of the award.

197.    Coal Hill intentionally and wrongfully prevented Daimler from beginning to provide such services, and ultimately treated all of the forty-two common units it awarded to Daimler as having been forfeited.

198.    Coal Hill has not fully reimbursed Daimler for all of his capital and other financial contributions or for the value of his forty-two common units that were wrongfully forfeited.

199.     Such wrongful forfeiture resulted in Coal Hill treating Daimler as having no membership or ownership interest in the company, and Moehle thereby becoming a majority member of Coal Hill and removing Daimler from the Board.

## COUNT SEVENTEEN

### ACCOUNTING
### (Against Robotics Hub)

200.     Plaintiff repeats all prior allegations as though fully set forth herein.

201.     Information pertaining to the usage of Daimler's capital and other financial contributions and the value of Robotics Hub's common units is solely within the possession of Robotics Hub, which information is necessary for Daimler to properly calculate any damages due and owing to him.

202.     Robotics Hub has failed to account for its members' capital contributions, to provide account statements for its members' capital accounts, and to account for Robotics Hub's finances.

203.     Daimler has no adequate remedy at law.

## COUNT EIGHTEEN

### LEGAL ACCOUNTING
### (Against Coal Hill)

204.     Plaintiff repeats all prior allegations as though fully set forth herein.

205.     The Daimler/CH Award is a valid contract between Daimler and Coal Hill.

206.     Daimler is entitled to a full and complete accounting from Coal Hill because Coal Hill was responsible for collecting and recording its members' initial and additional capital contributions, and for establishing and maintaining on its own books a records a separate capital account for each member.

524488.000004 20365301.3

207.    Daimler is further entitled to a full and complete accounting from Coal Hill because the company is required to conduct an accounting annually and to maintain its financial statements and tax returns.

208.    Coal Hill has failed to account for the capital contributions of its members, to provide account statements for its members' capital accounts, and to account for Coal Hill's finances.

209.    Coal Hill is solely in possession of this information, which is necessary for Daimler to properly calculate any damages due and owing to him.

## PRAYER FOR RELIEF

WHEREFORE, Daimler demands judgment in his favor as follows:

(i)    On Counts One, Two, Three, and Four, awarding Daimler monetary damages in an amount to be determined at trial, but in no event less than $10 Million;

(ii)    On Count Five, awarding Daimler monetary damages in an amount to be determined at trial, but in no event less than $10 Million, and requiring Moehle to account for all transactions between himself and the Companies, the Fund, and Daimler;

(iii)    On Counts Six, Eight, Nine, Ten, and Eleven, awarding Daimler injunctive relief, including, but not limited to, compelling Robotics Hub to reissue Daimler's forty-two common units that it wrongfully treated as having been forfeited; or, alternatively, compensatory damages in an amount to be determined at trial, but in no event less than $10 Million;

(iv)    On Count Seven, awarding Daimler injunctive relief, including, but not limited to, compelling Robotics Hub to reissue Daimler's forty-two common units that it wrongfully treated as having been forfeited and to issue additional units in connection with Daimler's additional capital contributions, and enjoining Robotics Hub from advancing Moehle funds for legal or

other expenses as incurred in connection with this action; or, alternatively, compensatory damages in an amount to be determined at trial, but in no event less than $10 Million;

(v)    On Counts Twelve, Fourteen, Fifteen, and Sixteen, awarding Daimler injunctive relief, including, but not limited to, compelling Coal Hill to reissue Daimler's forty-two common units that it wrongfully treated as having been forfeited; or, alternatively, compensatory damages in an amount to be determined at trial, but in no event less than $10 Million;

(vi)    On Count Thirteen, awarding Daimler injunctive relief, including, but not limited to, compelling Coal Hill to reissue Daimler's forty-two common units that it wrongfully treated as having been forfeited and to issue additional units in connection with Daimler's additional capital contributions, and enjoining Coal Hill from advancing Moehle funds for legal or other expenses as incurred in connection with this action; or, alternatively, compensatory damages in an amount to be determined at trial, but in no event less than $10 Million;

(vii)    On Count Seventeen, requiring Robotics Hub to provide a full and complete accounting of its finances and its members' capital contributions and capital accounts;

(viii)    On Count Eighteen, requiring Coal Hill to provide a full and complete accounting of its finances and its members' capital contributions and capital accounts;

(ix)    On all Counts, awarding Daimler reasonable attorneys' fees and expenses, costs, pre- and post-judgment interest, and punitive damages in an amount to be determined at trial; and such other and further relief as the Court deems just and proper.

524488.000004 20365301.3

**JURY TRIAL DEMANDED**

Pursuant to Fed. R. Civ. P. 38(b), Daimler hereby demands a trial by jury on all issues so triable.

Dated:  Pittsburgh, Pennsylvania          Respectfully submitted,
        February 14, 2018

                                          BUCHANAN INGERSOLL & ROONEY PC

                                          By:    /s/ Christopher P. Schueller
                                                 Christopher P. Schueller, Esq.
                                                 Pa. I.D. No. 92746
                                                 One Oxford Centre
                                                 301 Grant Street, 20th Floor
                                                 Pittsburgh, PA 15219
                                                 (412) 562-8432
                                                 christopher.schueller@bipc.com


                                          -and-

                                          THOMPSON & KNIGHT LLP

                                          Mitchell G. Mandell, Esq.
                                          (*pro hac vice* forthcoming)
                                          NY State Bar Id: 2042828
                                          900 Third Avenue, 20th Floor
                                          New York, New York 10022
                                          (212) 751-3411
                                          mitchell.mandell@tklaw.com

                                          *Attorneys for Plaintiff Eric Daimler*

524488.000004 20365301.3

**JA323**

### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERIC DAIMLER, | ) | |
| | ) | Civil Action No. 18-165 |
| Plaintiff, | ) | Judge Nora Barry Fischer |
| | ) | |
| v. | ) | |
| | ) | |
| CHRIS MOEHLE, ROBOTICS | ) | |
| HUB FUND 1 LLC, and COAL HILL | ) | Electronically Filed |
| VENTURES LLC, | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANTS' MOTION TO DISMISS UNDER FRCP 12(B)(6)

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants Chris Moehle ("Moehle"), Robotics Hub Fund 1 LLC ("Robotics Hub"), and Coal Hill Ventures LLC ("Coal Hill") (collectively, the "Defendants"), through their undersigned counsel, hereby move to dismiss the Plaintiff Eric Daimler's ("Daimler") First Amended Complaint.  In support of their motion, Defendants state:

1.     In the First Amended Complaint, Daimler alleges *eighteen* separate causes of action covering a hodge-podge of contract, fraud, tort and equitable causes of action related to agreements he signed with Robotics Hub and Coal Hill.

2.     For the following reasons and as explained more fully in the Brief contemporaneously filed in support of this Motion, Daimler has failed to allege any plausible claims, and the Court should dismiss the First Amended Complaint in its entirety.

3.     All of Daimler's fraud claims (Counts 1, 2, 9, 10, 14 and 15) should be dismissed because he has not alleged facts plausibly establishing that he suffered any actionable injury.

4.     Daimler's claims for fraud in the execution (Counts 2, 10 and 15) fail for the additional reason that Daimler has not alleged facts plausibly establishing "excusable ignorance."

5.    Daimler's claim for fraud in the inducement against Moehle (Count 1) should be dismissed for the additional reason that he has not pled the pertinent allegations with the particularity required by Rule 9(b).

6.    Daimler's breach of contract claims against Robotics Hub and Coal Hill (collectively, the "Companies") (Counts 6, 7, 12 and 13) should be dismissed because he fails to allege facts that would plausibly establish the fundamental elements of a breach of contract claim, namely the specific obligations that the Companies supposedly breached and/or that he satisfied the terms of the agreements.

7.    Daimler's tortious interference claims against Moehle (Counts 3 and 4) fail because Moehle's alleged conduct was undertaken as agent of the Companies, and because (i) Daimler does not allege any underlying breach of contract (as required by Delaware law); and (ii) Moehle's conduct was proper and/or privileged (as required by Pennsylvania law).

8.    Daimler cannot maintain any claim for unjust enrichment (Counts 5, 11 and 16) because (i) the parties' relationship is founded on a written contract; and (ii) he has not alleged facts to plausibly establish that he conferred any benefit upon Defendants or that Defendants' unjustly retained any benefit.

9.    Daimler's claim for breach of the implied covenant of good faith and fair dealing (Count 8) against Robotics Hub should be dismissed because the alleged conduct is addressed and/or authorized by Daimler's agreement with Robotics Hub.

10.    Daimler's demands for an accounting (Counts 17 and 18) are not standalone claims upon which relief can be granted.

WHEREFORE, for these reasons and as more fully explained in the Brief contemporaneously filed in support of this Motion, which is incorporated by reference herein,

2

**JA325**

Defendants respectfully request that this Motion be granted and that the First Amended

Complaint be dismissed in its entirety, with prejudice.

<div style="margin-left:40%">

Respectfully submitted,

**K&L GATES, LLP**

/s/ *Christopher M. Verdini*
Patrick J. McElhinny, PA Bar No. 53510
Christopher M. Verdini, PA Bar No. 93245
K&L GATES LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, Pennsylvania 15222-2613
Tel:  412-355-6500
Fax:  412-355-6501
Email: patrick.mcelhinny@klgates.com
Email: christopher.verdini@klgates.com

*Counsel for Defendants Chris Moehle,
Robotics Hub Fund 1 LLC, and Coal Hill
Ventures LLC*

</div>

Dated: March 30, 2018

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 30, 2018 the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

<u>/s/ *Christopher M. Verdini*</u>

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERIC DAIMLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| CHRIS MOEHLE, ROBOTICS HUBFUND 1, | ) | Civil Action No. 18-165 |
| LLC and COAL HILL VENTURES LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON MOTIONS PRACTICE

The parties shall submit to the following rules in making and responding to motions

on any case assigned to this member of the Court:

1.    A motion shall state the factual and legal grounds for said motion, and shall be

accompanied by a brief in support.  A brief in support of a motion shall not exceed twenty

(20) pages in length.   No briefs are required for discovery motions, motions for extension

of time and motions for continuance.

2.    Responses to non-dispositive motions shall be filed within fourteen (14) days,

not to exceed five (5) pages.  No reply briefs to non-dispositive motions are permitted

without leave of court.  Responses to dispositive motions shall be filed within twenty-one

(21) days.  Responsive briefs are limited to twenty (20) pages in length.  Reply briefs are

permitted to dispositive motions, and must be submitted within fourteen (14) days of

service of the response and are not to exceed ten (10) pages.   Sur reply briefs are not

to be filed without leave of Court, and will be limited to five (5) pages, if leave is granted.

 No briefing schedule will issue.

3.    Oral argument will not be scheduled unless the Court determines that it is

necessary.

An order will be issued should the Court deem oral argument necessary.

4.    Counsel should be familiar with this Court's Practices and Procedures (See

Court Practices and Procedures at www.pawd.uscourts.gov, link "court practice".)

SO ORDERED this 31st day of March, 2018.

s/Nora Barry Fischer
_____
Nora Barry Fischer
United States District Judge

cc/ecf: counsel of record

**JA329**

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH DIVISION**

|  |  |
|---|---|
| ERIC DAIMLER,<br><br>                    Plaintiff,<br><br>        -   v   -<br><br>CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC, and COAL HILL VENTURES LLC,<br><br>                    Defendants. | Civil Action No.: 2:18-cv-00165-NBF<br><br>**JURY TRIAL DEMANDED**<br><br>*Electronically Filed* |

## SECOND AMENDED COMPLAINT

Plaintiff, Eric Daimler ("Daimler"), by his counsel, Herrick, Feinstein LLP and Buchanan Ingersoll & Rooney PC, as and for his second amended complaint against defendants, Chris Moehle ("Moehle"), Robotics Hub Fund 1, LLC ("Robotics Hub"), and Coal Hill Ventures LLC ("Coal Hill") (collectively, "Defendants"), alleges as follows:

## INTRODUCTION

1.      This lawsuit arises from Defendants' intentional misrepresentations that were designed to mislead and induce Daimler to enter into: (i) a business partnership with Moehle, in connection with which Daimler made significant financial contributions; and (ii) certain related common unit award agreements that contained different and less favorable vesting schedules than those of Moehle, Daimler's equal partner.

2.      Defendants thereafter took steps to force Daimler out of Robotics Hub and Coal Hill (collectively, the "Companies")—companies in which Daimler was an equal partner and/or co-founded—by intentionally and wrongfully preventing him from satisfying the conditions of his vesting schedules, thereby causing all of his common units in the Companies to be treated as having been forfeited.

1

**JA330**

3.      Defendants believe that, because of such wrongful forfeiture, Daimler has no membership or ownership interest in the Companies, thereby making Moehle the Companies' majority member. After allegedly becoming a majority member of the Companies, Moehle purportedly removed Daimler from the Boards of the Companies so that he could obtain majority ownership and control over them.

## PARTIES

4.      Plaintiff, Daimler, is an individual who resides in the State of New York. Defendants believe that Daimler has no membership or ownership interest in Robotics Hub or Coal Hill.

5.      Defendant, Moehle, is an individual who resides in the Commonwealth of Pennsylvania.  Moehle is a member of Robotics Hub and Coal Hill.

6.      Defendant, Robotics Hub, is a limited liability company formed under the laws of the State of Delaware, with its principal place of business in Pittsburgh, Pennsylvania.

7.      Defendant, Coal Hill, is a limited liability company formed under the laws of the Commonwealth of Pennsylvania, with its principal place of business in Pittsburgh, Pennsylvania.

## JURISDICTION

8.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum of $75,000, exclusive of costs and interest, and there is complete diversity of citizenship between the parties.[1]

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Robotics Hub and Coal Hill maintain their principal place of business in this district, Moehle resides in

---

[1]  Upon information and belief, Jamie Fee, a non-party member of Robotics Hub and Coal Hill, is an individual who resides in the State of Connecticut.

this district, and a substantial part of the events giving rise to Daimler's claims occurred in this district.

**FACTUAL BACKGROUND**

I.    **Daimler Agrees to Form an Equal Partnership Based Upon Moehle's Misrepresentations**

A.    The Formation of the Partnership

10.    Daimler and Moehle formed a business partnership for the purpose of investing in early-stage robotics companies with high growth potential.

11.    Before becoming partners, Daimler and Moehle each maintained and operated their own companies in robotics and venture finance—Skilled Science and Coal Hill[2], respectively.

12.    In 2015, Daimler and Moehle decided to move forward with an equal partnership by combining Skilled Science and Coal Hill through a de-facto merger, and by co-founding two new entities: Robotics Hub and Robotics Hub Fund 1, LP (the "Fund"). Robotics Hub is the Fund's General Partner, and Coal Hill is the Fund's Investment Manager.

13.    Daimler and Moehle co-edited various documents—including, without limitation, documents entitled "Skilled Science/Coal Hill Merger" and "Combined Skilled Science Coal Hill Pro-Forma"—in connection with their efforts to merge Skilled Science and Coal Hill into a new entity reflecting their equal partnership.

14.    The de-facto merger was accomplished by, among other things: (i) Coal Hill amending and restating its operating agreement to reflect the equal partnership between Daimler and Moehle; (ii) Daimler and Moehle working together on marketing strategies for the partnership, and ultimately amending various Coal Hill marketing materials to add Daimler as a

---

[2] Moehle formed Coal Hill in April 2015.

principal; (iii) Coal Hill engaging Jamie Fee, who previously worked with Daimler at Skilled Science; and (iv) merging expenses accrued through the funding of Skilled Science into the fundraising expenses of Robotics Hub.

15.    Before their partnership began, Moehle represented to Daimler that General Electric ("GE"), among others, would be investing in the Fund, and that he had a strong relationship with the National Robotics Engineering Center ("NREC") and the Robotics Institute ("RI"), which would lead to potential investment opportunities for the partnership.

16.    Specifically, with respect to GE, Moehle represented to Daimler throughout 2015 and 2016 that GE had committed to invest $20,000,000.00 in the Fund, which was a significant portion of the $50,000,000.00 the Fund sought to raise.

17.    Moehle first made this representation during the very first introductory phone call with Daimler on or about August 18, 2015:  Moehle stated that GE had already invested in Coal Hill, and had committed to invest another $20,000,000.00 in the Fund.

18.    Moehle repeated his claim that GE had committed to invest $20,000,000.00 in the Fund during a phone call with Daimler the very next day, and during nearly every subsequent communication with Daimler, including phone calls on or about September 15 and 24, November 3 and December 8, 2015.

19.    Further, Moehle repeated this representation – that GE had committed to invest $20,000,000.00 in the Fund – in communications with both Daimler and potential investors before Daimler executed the Daimler Awards and other corporate documents in 2016.  For example, on or about October 16, 2015, during an in-person meeting at which Daimler was present, Moehle told representatives of the University of Pittsburgh Medical Center ("UPMC") –

specifically Talbot "Tal" Heppenstall, Charles Hendrix, Matthew Cunningham, and Brenton Burns – that GE was a sponsor of the Fund and had committed to invest $20,000,000.00.

20.    Moehle again repeated this representation during another in-person meeting with representatives of UPMC and Daimler in Pittsburgh on or about November 10, 2015.

21.    Indeed, Moehle continued to represent, during meetings in Pittsburgh with Daimler and potential investors (and other entities potentially beneficial to the Fund), that GE was a Fund sponsor, and had committed to invest $20,000,000.00 in the Fund, including on or about:

- November 1, 2015, in a meeting with Randy Castleman of Court Square Ventures;

- November 3, 2015, in a meeting with Don Smith and Tim White, representatives of the Regional Industrial Development Corporation of Southwestern Pennsylvania ("RIDC");

- November 18, 2015, in a meeting with Paul O'Reilly of OCP Capital LLC;

- December 15, 2015, and January 5 and 14, 2016, in meetings with Martial Hebert, of RI;

- January 6, 2016, in a meeting with Herman Herman of the NREC;

- and January 6, 2016, in a meeting with Fee.

22.    In order to further prop up his representation, Moehle brought Daimler to an in-person meeting with GE in New York on or about November 18, 2015. Moehle and Daimler met with Alex Tepper, a Managing Director of GE Ventures, and discussed the progress of the Fund.

23.    Daimler relied on Moehle's representations concerning GE and the strength of his relationships with the NREC and RI when Daimler decided to pursue an equal partnership with Moehle in 2015.

24.     During 2015 and early 2016, Daimler came to learn that Moehle misrepresented and overstated the strength of his relationships with the NREC and RI.

25.     However, throughout 2015 and 2016, Moehle continued to vigorously represent to Daimler that GE had committed to invest $20,000,000.00 in the Fund.

26.     In the months, and weeks, leading up to Daimler's execution of the Daimler Awards and other necessary corporate documents, Moehle continued to repeat his representations concerning GE's $20,000,000.00 commitment to the Fund in private calls with Daimler, as well as in joint phone calls and in-person meetings between Moehle, Daimler and potential investors, including those on or about:

- January 20, 2016, with Brian Gerkey, the CEO and Founder of the Open Source Robotics Foundation ("OSRF") by phone;

- February 12, 2016, with David Katzman, Senior Financial Analyst at the Yale Investment Office (which manages Yale's Endowment) by phone;

- February 15, 2016, in a meeting with Arnold Kwong of the investment firm Extra Intelligence in New York;

- February 17, 2016, in a meeting with Tom Juterbock, Laura Pekari, Nisanth Reddy and Jon Rotolo, of the investment group Woodcreek, a division of Mass Mutual in Connecticut;

- February 23, 2016, in a meeting with Cliff Friedman, Tracy O'Leary and Jim Pallotta, of the investment firm Raptor Group Holdings in New York;

- and March 23, 2016 – the day the Daimler Awards were signed – in a meeting with Bill Scalzulli and other representatives of the Kraft family office outside of Boston.

B.     Daimler and Moehle Were Equal Partners in the Companies

27.     As of March 23, 2016, Daimler and Moehle were both members of the Companies.

28.    Pursuant to the Companies' respective Amended and Restated Operating Agreements, both dated March 23, 2016, Daimler and Moehle were the only members of the Companies' initial Boards of Managers.

29.    Daimler and Moehle entered into Common Unit Award Agreements, dated March 23, 2016, with each of the Companies pursuant to which Daimler and Moehle were both awarded forty-two common units in each company, which units were subject to certain disparate vesting schedules more fully discussed below.

30.    In contrast, Fee also entered into Common Unit Award Agreements with each of the Companies, dated March 23, 2016, pursuant to which Fee was awarded only two common units in each company.

31.    Further, pursuant to Section 3.08 of the Fund's Limited Partnership Agreement, both Daimler and Moehle are named "key persons," such that if both Daimler and Moehle cease to be actively involved in the Fund's affairs, the Fund's limited partners may elect to terminate the Fund's investment period.

32.    The Companies and the Fund uniformly promoted Daimler and Moehle as equal partners in connection with their public relations and fundraising efforts, including, without limitation, in the Fund's Confidential Private Placement Memorandum and other presentation materials provided to potential investors.

33.    During joint presentations to potential investors, some investors would expressly ask Daimler and Moehle if the two were equal partners, and their response was always "yes." In fact, Moehle explained their relationship by stating that he and Daimler had combined their efforts, not that Daimler had joined Coal Hill.

34.     Despite having an equal partnership, Daimler personally loaned Coal Hill $125,000.00 pursuant to a promissory note and advanced personal funds to cover corporate expenses. In contrast, Moehle provided an initial capital contribution of merely $1,000.00.

35.     On or about November 2, 2017, Coal Hill paid the promissory note in full, together with interest. Coal Hill also reimbursed Daimler for a portion of the expenses he personally advanced to the company, in the amount of $35,000.00.

**II.     Daimler Accepted a Presidential Fellowship that Benefitted the Companies and the Fund**

36.     In January 2016, Daimler was appointed as a Presidential Innovation Fellow for the Barack Obama White House.

37.     Daimler accepted the fellowship, which is a twelve-month program, during Barack Obama's last year in office. Thus, it was axiomatic that Daimler's fellowship would end in early 2017.

38.     Moehle encouraged Daimler to accept the fellowship because of the value that the Companies and the Fund would derive from it.

39.     Daimler served as a Presidential Innovation Fellow from January 2016 to early 2017, during which time Daimler advised the White House on, among other things, issues relating to robotics and artificial intelligence.

40.     Daimler and Robotics Hub received positive press coverage with respect to Daimler's fellowship, and Defendants promoted Daimler's White House position in connection with their marketing and fundraising efforts.

41.     Because Daimler's fellowship allowed for outside employment, Daimler continued to provide services to the Companies during 2016, but the Companies did not

compensate him for such services. During such time, Daimler and Moehle agreed that Daimler's compensation for such services would accrue and be paid to Daimler at a later date.

42.    As fully explained below, the relationship between Daimler and Moehle began to break down, in part, because of Daimler's fellowship.

### III.    Defendants' Misrepresentations Caused Daimler to Enter into Common Unit Award Agreements with Different and Less Favorable Vesting Schedules than those of His Equal Partner Moehle

43.    On or about March 10, 2016, soon after Daimler's fellowship began, the Companies and the Fund engaged Reed Smith LLP to, among other things, prepare various corporate formation and governing documents, including the Common Unit Award Agreements and the Companies' Amended and Restated Operating Agreements.

44.    With respect to the referenced engagement, Reed Smith interacted almost exclusively with Moehle.

A.    <u>Common Unit Awards</u>

45.    The Companies each entered into a Common Unit Award Agreement, dated March 23, 2016, with Moehle, pursuant to which Moehle was awarded forty-two common units in both Robotics Hub and Coal Hill (the "Moehle/RH Award" and the "Moehle/CH Award," respectively, and collectively the "Moehle Awards"), which units vest as follows:

> 20% vests on the first anniversary of Date of Award [March 23, 2017]; 1.6666% vests ratably on the last day of each month thereafter until the fifth anniversary of the Date of Award [March 23, 2021].

Copies of the Moehle/RH Award and the Moehle/CH Award are attached hereto as Exhibits A and B, respectively.

46.    The Companies also entered into Common Unit Award Agreements, dated March 23, 2016, with Daimler, pursuant to which Robotics Hub and Coal Hill each awarded

forty-two common units to Daimler (the "Daimler/RH Award" and the "Daimler/CH Award," respectively, and collectively the "Daimler Awards").

47.     Unlike Moehle's common units, however, Daimler's units vest as follows:

20% vests on the date when [Daimler] has provided 12 consecutive and uninterrupted months of Full Time Services to the Company Group, provided that [Daimler] must begin providing such Full Time Services to the Company Group no later than the first anniversary of the Date of Award [March 23, 2017]; and

provided the above conditions are met, the remaining 80% vests on a pro-rata basis on the last day of each month thereafter until the fifth anniversary of the Date of Award [March 23, 2021].

Copies of the Daimler/RH Award and the Daimler/CH Award are attached hereto as Exhibits C and D, respectively.

48.     Pursuant to Section 2(a) of the Daimler Awards, Daimler provides Full Time Services if he is employed by or otherwise provides greater than 95% of his professional activities, as determined in the sole discretion of the respective Boards, to the Company Group.

49.     Section 2(a) of the Daimler Awards defines the Company Group as a combination of Robotics Hub or Coal Hill, respectively, the Fund, and the Fund's investment manager (including services provided to portfolio companies of the Fund and Daimler's capacity as an employee of the Fund's investment manager).

B.     Defendants' Misrepresentations

50.     In multiple conversations during 2015 and 2016, some of which included associates and investors, Moehle intentionally misrepresented to Daimler that: (i) Moehle and Daimler would be treated as equals; (ii) the terms of the Daimler Awards were identical to those of the Moehle Awards; and (iii) the Daimler and Moehle Awards both contained vesting schedules pursuant to which a portion of the units would vest automatically while the remaining units would vest over time.

51.     Reed Smith made the same misrepresentations to Daimler during conversations in early 2016.

52.     In early 2016, Daimler made it clear to Moehle and Reed Smith that he would consent to the Daimler Awards only if he and Moehle were treated equally and the terms of the Daimler Awards were identical to those of the Moehle Awards.

53.     At no time did Defendants or Reed Smith inform Daimler that only the Daimler Awards, not the Moehle Awards, contained vesting schedules requiring twelve consecutive and uninterrupted months of Full-Time Services to the Company Group, which services must start within a year of entering into the award agreements, before any common units would begin to vest.

54.     In fact, Moehle and Reed Smith continued to represent to Daimler until in or about July 2016, several months after the awards were executed, that Moehle and Daimler were treated equally and that the Daimler Awards and the Moehle Awards were identical.

55.     It was never Daimler's understanding, based upon representations by Moehle and Reed Smith, and, indeed, was incomprehensible to Daimler, that there could be any circumstance under which his common units in the Companies would be forfeited.

56.     Daimler would not have entered into the Daimler Awards if he had known that: (i) his common units vested differently than Moehle's common units; (ii) he would be required to provide twelve consecutive and uninterrupted months of Full-Time Services to the Company Group, and begin such services within one year of entering into the Daimler Awards, before any portion of his common units would begin to vest; and (iii) there could be any circumstance under which his common units in the Companies would be forfeited.

C.    Amended and Restated Operating Agreements

57.    Also on March 23, 2016, Robotics Hub and Coal Hill, and their respective members, entered into Amended and Restated Operating Agreements (the "RH Operating Agreement" and the "CH Operating Agreement," respectively, and collectively the "Operating Agreements"), which terms are incorporated in the respective Moehle Awards and Daimler Awards. Copies of the RH Operating Agreement and the CH Operating Agreement are attached hereto as Exhibits E and F, respectively.

58.    Section 7.1 of the respective Operating Agreements requires the Companies to record members' initial capital contributions, and Section 7.3 requires the Companies to establish and maintain on their own books and records a separate capital account for each member.

59.    Section 7.2 of the respective Operating Agreements requires all additional capital contributions to be made in connection with the issuance of units.

60.    Pursuant to Section 12.3(b) of the Operating Agreements, Covered Persons (including, among others, members, officers and directors, and managers) who are permitted or required to make a decision in good faith must act under such express standard.

61.    Under Section 12.4 of the Operating Agreements, Covered Persons are entitled to indemnification from the Companies in connection with actions or omissions performed on behalf of the Companies only if such person acts in good faith and in a manner believed by such person to be in, or not opposed to, the best interests of the company, and such person's conduct does not constitute fraud or willful misconduct.

**IV.    The Relationship Between Daimler and Moehle Breaks Down, But Daimler Remains Engaged in the Companies and the Fund**

62.    As explained above, Daimler and Moehle began their partnership as equal partners—and were promoted as such—and each initially devoted equal time to the Companies.

63.     Although Daimler worked for the Companies only part-time during his Presidential Innovation Fellowship, both Moehle and Daimler understood that Daimler would return to his full-time position with the Companies when his fellowship ended.

64.     Indeed, as previously explained, it was understood that Daimler's fellowship necessarily had a finite end date in early 2017.

65.     Additionally, as of January 2016 when Daimler began his fellowship, the business partnership had budgeted matching salaries for Moehle and Daimler, and the Companies had budgeted another full-time salary which they never paid because the individual for whom it was budgeted did not become a member of the Companies as originally anticipated.

66.     In early-mid 2016, the business relationship between Daimler and Moehle began to break down.

67.     The attention and publicity Daimler received in connection with his Presidential Innovation Fellowship became a point of contention between Daimler and Moehle, and Moehle began criticizing Daimler as a business partner.

68.     Moehle became increasingly controlling over access to information about the Fund's investors and portfolio companies, information Moehle previously freely shared. Indeed, Moehle unilaterally determined that he would become the "gatekeeper" of the information soon after Daimler accepted his fellowship.

69.     Moehle would criticize Daimler about statements he made during joint presentations to potential investors about the Fund's portfolio companies, but Moehle would refuse to provide Daimler full access to relevant information about said portfolio companies. Moehle even criticized the content on Daimler's LinkedIn page, and directed Daimler to revise his descriptions of the Companies to mirror those on Moehle's LinkedIn page.

70.    Moehle also began to unilaterally assign Daimler "deliverables" without first consulting with Daimler.

71.    Despite rising tensions, Moehle needed Daimler to remain engaged in the Companies and the Fund so that he would continue to make financial contributions to them, and Daimler remained engaged throughout his fellowship.

72.    Daimler also continued to make financial contributions to the Companies throughout 2016 to pay, among other things, corporate expenses.

73.    Moehle used some of Daimler's financial contributions to the Companies to pay for his own personal expenses, such as his mortgage payments and family trips.

74.    Daimler made additional financial contributions to the Companies with the expectation that they would be treated as capital contributions, and Moehle agreed that they would be treated as such.

75.    From May 2016 through August 2016, Daimler wrote several checks to Coal Hill totaling approximately $30,000.00 to cover Coal Hill's operating expenses, as Moehle requested.

76.    Daimler did not receive additional common units in connection with his additional financial contributions, as required by Section 7.2 of the respective Operating Agreements.

**V.    Defendants Force Daimler Out of the Companies Despite His Attempts to Remain Actively Involved in Them**

77.    During the second half of 2016, Moehle began taking steps to gain sole control of the Companies. Indeed, Moehle continued criticizing Daimler as a business partner and increasingly began obstructing efforts by Daimler and Fee to engage in the Companies and the Fund.

78.    During the Fall of 2016, Daimler and Fee made several attempts to arrange meetings with Moehle in Pittsburgh, where the Companies and the Fund are based, but Moehle thwarted all such efforts. In fact, Moehle told Daimler that the two would have a problem if Daimler scheduled a trip to Pittsburgh.

79.    On numerous occasions, Daimler and Fee offered to help Moehle with the Fund's first closing in December 2016. But Moehle repeatedly refused their help, stated that he would handle the closing, and directed Daimler and Fee to focus their efforts elsewhere.

80.    Further, Moehle continued to unilaterally assign Daimler "deliverables," including asking Daimler to make introductions to, among others, internet travel companies such as Google Travel. Daimler made the introductions Moehle requested, but afterwards Moehle would tell Daimler that the introductions were no longer needed. Moehle would then claim that Daimler failed to complete such "deliverables."

81.    On several occasions in mid-late 2016, Moehle actively obstructed Daimler's efforts to communicate with the Fund's investors and portfolio companies.

82.    Specifically, Daimler explicitly asked Moehle for the contact information for various investors and portfolio companies, including, among others, TravelWits. Moehle either ignored Daimler's requests or flatly refused to disclose the information. In some instances, Moehle even refused to disclose the contact's name.

83.    In late 2016, Moehle began discouraging Daimler from ending his fellowship, which he could have done at any time, because the Companies allegedly had no funds with which to pay him. Daimler suggested that his salary could continue to accrue and be paid to him at a later date, as had been done in the past, but Moehle opposed such structure.

84.     Despite Moehle's efforts in 2016 to disassociate himself, the Companies, and the Fund from Daimler, he simultaneously represented to investors that Daimler was his equal partner until in or about November 2016.

85.     Daimler and Moehle met in-person on January 5-6, 2017 to discuss the notion that Daimler would not return to his full-time role with the Companies at that time, but that Daimler could still earn some compensation in a non-operating role, and that a full-time operating role for Daimler would occur at a later date.

86.     On or about January 5, 2017, just before Daimler's fellowship would ultimately end, Moehle recommended to the Companies' Boards (which constituted only Daimler and Moehle) that Daimler not be permitted to return to a full-time role with the Companies.

87.     Although Moehle and the Companies had contemplated Daimler's return to full-time employment from the outset and budgeted a full-time salary for Daimler, Moehle purportedly made the above recommendation to the Boards because the Companies allegedly lacked sufficient funds to pay Daimler a full-time salary at that time. Indeed, Moehle refused to allow Daimler's salary to continue to accrue and be paid at a later date, as it had in the past.

88.     At the Companies' respective Board meetings on or about January 5, 2017, Moehle voted against, and Daimler voted in favor of, Daimler returning to a full-time role with the Companies.

89.     Because no other votes were cast, the Boards were deadlocked and the matter was referred to the Deadlock Advisor, David Mawhinney, in accordance with Section 5.5(c) of the Companies' respective Operating Agreements.

90.     Daimler and Moehle met in-person again on January 18, 2017 in Orlando, Florida to resume their January 5-6, 2017 discussions.

91.    On or about March 22, 2017, just before the first anniversary of the date of the Daimler Awards, Mawhinney broke the deadlock by voting against Daimler returning to a full-time, fully compensated role with the Companies at that time due to their financial status, but understood when casting his vote that Daimler's full-time engagement with the Companies would occur at a later date and did not foreclose the possibility that Daimler could, if he so elected, return to work on a full-time basis with some portion of his compensation accrued, but not paid, as had been done in the past.

92.    Despite Defendants' previous representations to the contrary, they never offered Daimler a non-operating role in the Companies, provided any compensation to him, or permitted his full-time engagement with the Companies. Instead, Defendants took additional steps to ensure that Daimler had no role whatsoever within the Companies.

93.    Because Defendants wrongfully prevented Daimler from returning to his full-time role with the Companies within a year after executing the Daimler Awards, by March 23, 2017, despite Daimler's desire and attempts to do so, the Companies deemed all of Daimler's common units to be forfeited.

94.    As a result of such wrongful forfeiture, Defendants believe that Daimler has no membership or ownership interest in the Companies, thereby making Moehle the Companies' majority member.

95.    After obtaining a majority membership interest, to further prevent Daimler from serving the Companies in any capacity, Moehle purportedly directed the Companies to remove Daimler from their respective Boards and amend and restate the Fund's Limited Partnership Agreement to remove Daimler from the "Key Person" provision set forth in Section 3.08 of the agreement.

## COUNT ONE

### FRAUD IN THE INDUCEMENT
### (Against Moehle)

96.     Plaintiff repeats all prior allegations as though fully set forth herein.

97.     Moehle intentionally misrepresented to Daimler that GE had committed to invest $20,000,000.00 in the Fund, which was a significant portion of the $50,000,000.00 the Fund sought to raise, and would lead to potential investment opportunities for Moehle and Daimler's business partnership.

98.     Moehle made such misrepresentations knowing they were false or with a reckless disregard as to whether they were true or false.  Such misrepresentations are material because Daimler would not have entered into the business partnership in 2015 or the Daimler Awards in 2016 if he had known that GE had not committed to investing in the Fund to the degree Moehle represented.

99.     Moehle made such misrepresentations to Daimler with the intention of: (i) misleading Daimler into relying upon said misrepresentations; (ii) using said misrepresentations to induce Daimler into funding the Companies in 2015 and 2016, some of which funds Moehle used for his own benefit; and (iii) using said misrepresentations to induce Daimler into entering the Daimler Awards, and with the intention of later forcing Daimler out of the Companies in early 2017 so that Moehle would have majority ownership and control over them.

100.    Daimler justifiably relied upon Moehle's misrepresentations as being true when he decided to enter into a business partnership with Moehle in 2015 and the Daimler Awards in 2016.

101.    As a direct and proximate result of Moehle's misrepresentations, together with Daimler's justifiable reliance on said misrepresentations, Daimler was wrongfully induced to enter into a business partnership with Moehle in 2015 and the Daimler Awards in 2016.

## COUNT TWO

### BREACH OF CONTRACT – ROBOTICS HUB OPERATING AGREEMENT
### (Against Robotics Hub)

102.    Plaintiff repeats all prior allegations as though fully set forth herein.

103.    Daimler and Robotics Hub entered into the Robotics Hub Operating Agreement, dated March 23, 2016.

104.    Pursuant to Section 7.2 of the Robotics Hub Operating Agreement, Robotics Hub is required to issue units in connection with members' additional capital contributions.

105.    Daimler made several additional capital contributions in the amount of approximately $100,000.00, but Robotics Hub did not issue additional units in connection with said contributions.

106.    As a direct and proximate result of Robotics Hub's intentional and wrongful conduct, Daimler was issued no additional units in connection with his additional capital contributions, and Robotics Hub has treated Daimler as having no membership or ownership interest in the company.

## COUNT THREE

### FRAUD IN THE INDUCEMENT
### (Against Robotics Hub)

107.    Plaintiff repeats all prior allegations as though fully set forth herein.

108.    Robotics Hub intentionally misrepresented to Daimler that GE had committed to invest $20,000,000.00 in the Fund, which was a significant portion of the $50,000,000.00 the

Fund sought to raise, and would lead to potential investment opportunities for Moehle and Daimler's business partnership and Robotics Hub.

109.    Robotics Hub made such misrepresentations knowing they were false or with a reckless disregard as to whether they were true or false.  Such misrepresentations are material because Daimler would not have entered into the Daimler/RH Award if he had known that GE had not committed to investing in the Fund to the degree represented.

110.    Robotics Hub made such misrepresentations to Daimler with the intention of (i) misleading Daimler into relying upon said misrepresentations; (ii) using said misrepresentations to induce Daimler into funding the Companies in 2015 and 2016; and (iii) using said misrepresentations to induce Daimler into entering the Daimler/RH Award, and with the intention of later forcing Daimler out of the company.

111.    Daimler justifiably relied upon Robotics Hub's misrepresentations as being true when he decided to enter into the Daimler/RH Award.

112.    As a direct and proximate result of Robotics Hub's misrepresentations, together with Daimler's justifiable reliance on said misrepresentations, Daimler was wrongfully induced to enter into the Daimler/RH Award.

**COUNT FOUR**

**BREACH OF CONTRACT – COAL HILL OPERATING AGREEMENT**
**(Against Coal Hill)**

113.    Plaintiff repeats all prior allegations as though fully set forth herein.

114.    Daimler and Coal Hill entered into the Coal Hill Operating Agreement, dated March 23, 2016.

115.    Pursuant to Section 7.2 of the Coal Hill Operating Agreement, Coal Hill is required to issue units in connection with members' additional capital contributions.

116.    Daimler made several additional capital contributions in the amount of approximately $100,000.00, but Coal Hill did not issue additional units in connection with such contributions.

117.    As a direct and proximate result of Coal Hill's intentional and wrongful conduct, Daimler was issued no additional units in connection with his additional capital contributions, and Coal Hill has treated Daimler as having no membership or ownership interest in the company.

### COUNT FIVE

### FRAUD IN THE INDUCEMENT
### (Against Coal Hill)

118.    Plaintiff repeats all prior allegations as though fully set forth herein.

119.    Coal Hill intentionally misrepresented to Daimler that GE had committed to invest $20,000,000.00 in the Fund, which was a significant portion of the $50,000,000.00 the Fund sought to raise, and would lead to potential investment opportunities for Moehle and Daimler's business partnership and Coal Hill.

120.    Coal Hill made such misrepresentations knowing they were false or with a reckless disregard as to whether they were true or false.  Such misrepresentations are material because Daimler would not have entered into the business partnership in 2015 or the Daimler/CH Award if he had known that GE had not committed to investing in the Fund to the degree represented.

121.    Coal Hill made such misrepresentations to Daimler with the intention of (i) misleading Daimler into relying upon said misrepresentations; (ii) using said misrepresentations to induce Daimler into funding the Companies in 2015 and 2016; and (iii) using said

misrepresentations to induce Daimler into entering the Daimler/CH Award, and with the intention of later forcing Daimler out of the company.

122.    Daimler justifiably relied upon Coal Hill's misrepresentations as being true when he decided to enter into the business partnership in 2015 and the Daimler/CH Award.

123.    As a direct and proximate result of Coal Hill's misrepresentations, together with Daimler's justifiable reliance on said misrepresentations, Daimler was wrongfully induced to enter into a business partnership with Moehle in 2015 and the Daimler/CH Award.

<div align="center">

**PRAYER FOR RELIEF**

</div>

WHEREFORE, Daimler demands judgment in his favor as follows:

(i)    On Count One, awarding Daimler monetary damages in an amount to be determined at trial, but in no event less than $10 Million;

(ii)    On Count Two, awarding Daimler injunctive relief, including, but not limited to, compelling Robotics Hub to provide a full and complete accounting of its finances and its members' capital contributions and capital accounts, compelling Robotics Hub to issue additional units in connection with Daimler's additional capital contributions, and enjoining Robotics Hub from advancing Moehle funds for legal or other expenses as incurred in connection with this action; or, alternatively, compensatory damages in an amount to be determined at trial, but in no event less than $10 Million;

(iii)    On Count Three, awarding Daimler compensatory damages in an amount to be determined at trial, but in no event less than $10 Million;

(iv)    On Count Four, awarding Daimler injunctive relief, including, but not limited to, compelling Coal Hill to provide a full and complete accounting of its finances and its members' capital contributions and capital accounts, compelling Coal Hill to issue additional units in connection with Daimler's additional capital contributions, and enjoining Coal Hill from

advancing Moehle funds for legal or other expenses as incurred in connection with this action; or, alternatively, compensatory damages in an amount to be determined at trial, but in no event less than $10 Million;

(v)      On Count Five, awarding Daimler compensatory damages in an amount to be determined at trial, but in no event less than $10 Million; and

(vi)      On all Counts, awarding Daimler reasonable attorneys' fees and expenses, costs, pre- and post-judgment interest, and punitive damages in an amount to be determined at trial; and such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Pursuant to Fed. R. Civ. P. 38(b), Daimler hereby demands a trial by jury on all issues so

triable.

Dated:  Pittsburgh, Pennsylvania                 Respectfully submitted,
        August 24, 2018

                                                 BUCHANAN INGERSOLL & ROONEY PC
                                                 One Oxford Centre
                                                 301 Grant Street, 20th Floor
                                                 Pittsburgh, PA 15219
                                                 (412) 562-8432
                                                 christopher.schueller@bipc.com


                                                 By:___/s/ Christopher P. Schueller___
                                                 Christopher P. Schueller, Esq.

                                                 -and-

                                                 HERRICK, FEINSTEIN LLP

                                                 Mitchell G. Mandell, Esq.
                                                 Meaghan Millan, Esq.
                                                 Two Park Avenue
                                                 New York, NY 10016
                                                 (212) 592-1400
                                                 mmandell@herrick.com
                                                 mmillan@herrick.com


                                                 *Attorneys for Plaintiff Eric Daimler*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERIC DAIMLER, | ) | |
| | ) | Civil Action No. 18-165 |
| Plaintiff, | ) | Judge Nora Barry Fischer |
| | ) | |
| v. | ) | |
| | ) | |
| CHRIS MOEHLE, ROBOTICS | ) | |
| HUB FUND 1 LLC, and COAL HILL | ) | Electronically Filed |
| VENTURES LLC, | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANTS' MOTION TO DISMISS UNDER FRCP 12(B)(6)
### AND MOTION FOR A MORE DEFINITE STATEMENT UNDER FRCP 12(E)

Pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(e), Defendants Chris Moehle ("Moehle"), Robotics Hub Fund 1 LLC ("Robotics Hub"), and Coal Hill Ventures LLC ("Coal Hill") (collectively, "Defendants"), through their undersigned counsel, hereby move to dismiss Counts 1, 3, and 5 of Plaintiff Eric Daimler's ("Daimler") Second Amended Complaint ("SAC"), and move to require Daimler to provide a more definite statement of Counts 2 and 4.  In addition, if the Court grants Defendants' Motion to Dismiss Counts 1, 3 and 5, Defendants respectfully request the Court to order that if Daimler files a third amended complaint, the amended complaint name only the proper parties and contain only allegations pertinent to Counts 2 and 4.  As grounds for this motion, Defendants state as follows:

1.      On July 30, 2018, the Court granted Defendants' motion to dismiss Daimler's First Amended Complaint ("FAC") as to all claims except for Daimler's breach of contract claims against Robotics Hub and Coal Hill.  Dkt. 22-23.  The Court also granted Daimler leave to re-plead "the allegations regarding GE's potential investment" that formed the basis for certain of his fraud claims.  *Id.*

2. In his SAC, Daimler now re-pleads his claims for fraud in the inducement against all three Defendants (Counts 1, 3, and 5) and his breach of contract claims against Robotics Hub and Coal Hill (Counts 2 and 4).

3. For the following reasons and as explained more fully in the Brief contemporaneously filed in support of this Motion, Daimler has failed to allege any plausible fraud claims, and has failed to plead his breach of contract claims with sufficient definiteness to allow Defendants to fairly respond. Accordingly, the Court should dismiss Counts 1, 3, and 5 of Daimler's SAC and require Daimler to provide a more definite statement of Counts 2 and 4.

4. Daimler's claims for fraud in the inducement (Counts 1, 3, and 5) should be dismissed for the following three reasons.

5. *First*, Daimler fails to allege facts to plausibly establish the following required elements of fraud: (a) Defendants knew or were reckless in not knowing that the alleged statements were false or misleading; (b) Defendants intended to defraud Daimler; and (c) Daimler justifiably relied on the supposed misleading statements.

6. Indeed, although the Court previously dismissed Daimler's fraud claims for lacking sufficient factual support, Daimler has done nothing more than (1) identify a smattering of meetings and phone calls during which Moehle allegedly "repeated" the statements; and (2) assert, without any factual enhancement, that Moehle made the representations "knowing [them] to be false." The Federal Rules require more to state a claim for fraud.

7. *Second*, Daimler's fraud claims fail because Daimler fails to allege facts to plausibly establish that the Defendants made any actionable misrepresentation of a past or existing fact.

8. *Finally*, Daimler's fraud claims fail because Daimler fails to allege facts to plausibly establish that he suffered any actionable injury.

9.      As to Daimler's breach of contract claims (Counts 2 and 4), the Court should require Daimler to provide a more definite statement because the facts alleged are so vaguely pled that Coal Hill and Robotics Hub (collectively, the "Companies") would be prejudiced if required to respond with a simple denial rather than a fact-specific defense.

10.     In particular, Daimler fails to identify either (1) the specific financial contributions he made and the company (Robotics Hub or Coal Hill) that allegedly received those contributions, or (2) the type of "additional units" the Companies allegedly agreed to issue for the alleged contributions.  As detailed in Defendants' Brief, in the absence of these basic facts, the Companies will be prejudiced in their ability to raise fact-specific defenses and/or to identify appropriate affirmative defenses available to one or both Companies.

11.     Finally, if the Court dismisses Daimler's fraud claims, Defendants respectfully request the Court order that if Daimler files a third amended complaint, the amended complaint name only the proper parties and contain only allegations pertinent to those counts.  Many of Daimler's factual allegations are already irrelevant because of the Court's prior dismissal of most of his claims. The dismissal of his fraud claims would further moot all allegations not related to his breach of contract claims.

WHEREFORE, for these reasons and those explained in the Brief contemporaneously filed in support of this Motion, which are incorporated by reference herein, Defendants respectfully request that this Motion be granted and that the Court (1) dismiss Counts 1, 3, and 5 of the SAC in their entirety, with prejudice, and; (2) require Daimler to provide a more definite statement of Counts 2 and 4 of the SAC.

A proposed Order is attached.

Respectfully submitted,

**K&L GATES, LLP**

/s/ *Christopher M. Verdini*
Patrick J. McElhinny, PA Bar No. 53510
Christopher M. Verdini, PA Bar No. 93245
K&L GATES LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, Pennsylvania 15222-2613
Tel:  412-355-6500
Fax:  412-355-6501
Email: patrick.mcelhinny@klgates.com
Email: christopher.verdini@klgates.com

*Counsel for Defendants Chris Moehle,*
*Robotics Hub Fund 1 LLC, and Coal Hill*
*Ventures LLC*

Dated: September 21, 2018

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 21, 2018 the foregoing was filed electronically.

Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

Parties may access this filing through the Court's system.

<u>/s/ *Christopher M. Verdini*        </u>

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ERIC DAIMLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. A. No. 18-165 |
| | ) | Judge Nora Barry Fischer |
| CHRIS MOEHLE, ROBOTICS HUB | ) | |
| FUND 1, LLC and COAL HILL | ) | |
| VENTURES LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

AND NOW, this 24th day of September, 2018, upon consideration of Defendants' Motion to Dismiss (Docket No. [26]), and their Brief in Support, (Docket No. [27]), which challenge the sufficiency of the factual allegations set forth in Plaintiff's Second Amended Complaint under *Twombly* and *Iqbal* and alternatively seeks a more definitive statement of Plaintiff's causes of action, and the Court having previously written extensively on this matter, (Docket No. [22]), holding that leave to amend should be permitted as to certain of Plaintiff's causes of action and as the Court's colleague the Hon. Cathy J. Bissoon has observed, "motions pursuant to Federal Rule of Civil Procedure 12(b) are discouraged if the pleading defect is curable by amendment," *see Practices and Procedures of Hon. Cathy J. Bissoon*, § II.A., *available at:* http://www.pawd.uscourts.gov/sites/ pawd/files/Bissoon_Chamber_Rules_2018.pdf  (last visited 9/24/18),

IT IS HEREBY ORDERED that Defendants' Motion to Dismiss [26] is DENIED, without prejudice;

IT IS FURTHER ORDERED that the parties shall meet and confer in an effort to resolve their disputes as to the pleading deficiencies in Plaintiff's Second Amended Complaint and any

renewed motion to dismiss shall file a certificate that the moving party made good faith efforts to

confer with the non-moving party to determine whether the identified pleading deficiencies may

be properly cured by amendment.  Failure to file the required certificate will result in summary

denial of the motion; and,

IT IS FURTHER ORDERED that the parties shall file a Joint Status Report by **October 9,**

**2018** advising as to the status of their good faith negotiations.


*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge


cc/ecf: All counsel of record

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ERIC DAIMLER,<br><br>      Plaintiff,<br><br>      vs.<br><br>CHRIS MOEHLE, ROBOTICS HUB<br>FUND 1, LLC, and COAL HILL<br>VENTURES LLC,<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 2:18-cv-165-NBF

**JURY TRIAL DEMANDED**

### THIRD AMENDED COMPLAINT

Plaintiff, Eric Daimler ("Daimler"), by his counsel, Herrick, Feinstein LLP and Buchanan Ingersoll & Rooney PC, as and for his third amended complaint against defendants, Chris Moehle ("Moehle"), Robotics Hub Fund 1, LLC ("Robotics Hub"), and Coal Hill Ventures LLC ("Coal Hill") (collectively, "Defendants"), alleges as follows:

### INTRODUCTION

1.     This lawsuit arises from Defendants' intentional misrepresentations that were designed to mislead and induce Daimler to enter into: (i) a business partnership with Moehle, in connection with which Daimler made significant financial contributions; and (ii) certain related common unit award agreements that contained different and less favorable vesting schedules than those of Moehle, Daimler's equal partner.

2.     Defendants thereafter took steps to force Daimler out of Robotics Hub and Coal Hill (collectively, the "Companies")—companies in which Daimler joined as an equal partner and/or co-founded—by intentionally and wrongfully preventing him from satisfying the

conditions of his vesting schedules, thereby causing all of his common units in the Companies to be treated as having been forfeited.

3.      Defendants believe that, because of such wrongful forfeiture, Daimler has no membership or ownership interest in the Companies, thereby making Moehle the Companies' majority member. After allegedly becoming a majority member of the Companies, Moehle purportedly removed Daimler from the Boards of the Companies so that he could obtain majority ownership and control over them.

## PARTIES

4.      Plaintiff, Daimler, is an individual who resides in the State of New York. Defendants believe that Daimler has no membership or ownership interest in Robotics Hub or Coal Hill.

5.      Defendant, Moehle, is an individual who resides in the Commonwealth of Pennsylvania.  Moehle is a member of Robotics Hub and Coal Hill.

6.      Defendant, Robotics Hub, is a limited liability company formed under the laws of the State of Delaware, with its principal place of business in Pittsburgh, Pennsylvania.

7.      Defendant, Coal Hill, is a limited liability company formed under the laws of the Commonwealth of Pennsylvania, with its principal place of business in Pittsburgh, Pennsylvania.

## JURISDICTION

8.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum of $75,000, exclusive of costs and interest, and there is complete diversity of citizenship between the parties.[1]

---

[1] Upon information and belief, Jamie Fee, a non-party member of Robotics Hub and Coal Hill, is an individual who resides in the State of Connecticut.

2

**JA362**

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Robotics Hub and Coal Hill maintain their principal place of business in this district, Moehle resides in this district, and a substantial part of the events giving rise to Daimler's claims occurred in this district.

## FACTUAL BACKGROUND

I.     **Daimler Agrees to Form an Equal Partnership Based Upon Moehle's Misrepresentations**

A.     The Formation of the Partnership

10.     Daimler and Moehle formed a business partnership for the purpose of investing in early-stage robotics companies with high growth potential.

11.     Before becoming partners, Daimler and Moehle each maintained and operated their own companies in robotics and venture finance—Skilled Science and Coal Hill[2], respectively.

12.     In 2015, Daimler and Moehle decided to move forward with an equal partnership by combining Skilled Science and Coal Hill through a de-facto merger, and by co-founding two new entities: Robotics Hub and Robotics Hub Fund 1, LP (the "Fund"). Robotics Hub is the Fund's General Partner, and Coal Hill is the Fund's Investment Manager.

13.     Daimler and Moehle co-edited various documents—including, without limitation, documents entitled "Skilled Science/Coal Hill Merger" and "Combined Skilled Science Coal Hill Pro-Forma"—in connection with their efforts to merge Skilled Science and Coal Hill into a new entity reflecting their equal partnership.

14.     The de-facto merger was accomplished by, among other things: (i) Coal Hill amending and restating its operating agreement to reflect the equal partnership between Daimler

---

[2]  Moehle formed Coal Hill in April 2015.

3

and Moehle; (ii) Daimler and Moehle working together on marketing strategies for the partnership, and ultimately amending various Coal Hill marketing materials to add Daimler as a principal; (iii) Coal Hill engaging Jamie Fee, who previously worked with Daimler at Skilled Science; and (iv) merging expenses accrued through the funding of Skilled Science into the fundraising expenses of Robotics Hub.

15.    Before their partnership began, Moehle represented to Daimler that General Electric ("GE") had already committed to invest in the Fund, and that he had a strong relationship with the National Robotics Engineering Center ("NREC") and the Robotics Institute ("RI"), which would lead to potential investment opportunities for the partnership.

16.    Specifically, with respect to GE, Moehle represented to Daimler throughout 2015 and 2016 that GE had committed to invest $20,000,000.00 in the Fund, which was a significant portion of the $50,000,000.00 the Fund sought to raise.

17.    Before entering into this partnership with Moehle, Daimler had been raising funds through Skilled Science, and was planning to close on investments from two investors, totaling $10,000,000.00. Daimler ultimately elected to walk away from his existing, successful venture (Skilled Science) and these soon-to-close investments in Skilled Science in late 2015 because Moehle assured him that GE had *already committed* to invest $20,000,000.00 in the Fund.

18.    Aside from the GE investment being twice as large as the two soon-to-close investments in Skilled Science, Daimler understood that the GE investment gave the new venture instant credibility that many other investors could not. The GE investment immediately catapulted the Fund into a "different league." Daimler saw great, intangible value to this investment in addition to the amount itself.

4

19.    Because Skilled Science had a different structure than that contemplated (and ultimately adopted) for Robotics Hub and the Fund, these two investors could not simply "shift" their investments to the new, joint venture.

20.    Moehle first made the representation concerning GE's commitment during the very first introductory phone call with Daimler on or about August 18, 2015: Moehle stated that GE had already invested in Coal Hill, and had committed to invest another $20,000,000.00 in the Fund.

21.    Moehle repeated his claim that GE had committed to invest $20,000,000.00 in the Fund during a phone call with Daimler the very next day, and during nearly every subsequent communication with Daimler, including phone calls on or about September 15 and 24, November 3 and December 8, 2015.

22.    According to Moehle, GE had already committed to invest $20,000,000.00, but the sole reason the funds were not yet in hand was because of a particular regulatory process that was being completed in connection with the spin out of GE's financial arm.  Moehle explained this was *not* a condition on GE's funding of its committed investment, but merely something that affected the timing of the funding.  Moehle represented that it was an "inevitability" that GE would spin out the financial arm and fund its committed investment – this was not Moehle's opinion, but rather something he presented as fact, based on purported conversations with GE.  It was expected that the process would be completed in early or mid 2016.

23.    Further, Moehle repeated this representation – that GE had committed to invest $20,000,000.00 in the Fund – in communications with both Daimler and potential investors before Daimler executed the Daimler Awards and other corporate documents in 2016.  For example, on or about October 16, 2015, during an in-person meeting at which Daimler was

present, Moehle told representatives of the University of Pittsburgh Medical Center ("UPMC") – specifically Talbot "Tal" Heppenstall, Charles Hendrix, Matthew Cunningham, and Brenton Burns – that GE was a sponsor of the Fund and had already committed to invest $20,000,000.00.

24.    Moehle again repeated this representation during another in-person meeting with representatives of UPMC and Daimler in Pittsburgh on or about November 10, 2015.

25.    Indeed, Moehle continued to represent, during meetings in Pittsburgh with Daimler and potential investors (and other entities potentially beneficial to the Fund), that GE was a Fund sponsor, and had committed to invest $20,000,000.00 in the Fund, including on or about:

- November 1, 2015, in a meeting with Randy Castleman of Court Square Ventures;

- November 3, 2015, in a meeting with Don Smith and Tim White, representatives of the Regional Industrial Development Corporation of Southwestern Pennsylvania ("RIDC");

- November 18, 2015, in a meeting with Paul O'Reilly of OCP Capital LLC;

- December 15, 2015, and January 5 and 14, 2016, in meetings with Martial Hebert, of RI;

- January 6, 2016, in a meeting with Herman Herman of the NREC;

- and January 6, 2016, in a meeting with Fee.

26.    In order to further prop up the illusion that the Fund had a solid relationship with GE (via a committed $20,000,000.00 investment), Moehle brought Daimler to an in-person meeting with GE in New York on or about November 18, 2015. Moehle and Daimler met with Alex Tepper, a Managing Director of GE Ventures, and discussed the progress of the Fund, specifically robotics companies in which the Fund planned to invest.

27.    Although Tepper was *a* contact at GE, according to Moehle, Tepper was not involved in GE's decision to invest in the Fund. Moehle had specifically directed Daimler to not

6

**JA366**

discuss the investment, as Tepper had not been involved in the decision process, and Moehle wanted to remain GE's "single point person" regarding the investment.  Daimler did not view this as unusual, but rather consistent with Moehle's personality and oft-expressed desire to maintain control of the relationships he cultivated.

28.    Moreover, it was Daimler's understanding, based on representations from Moehle, that Tepper was responsible for GE's direct investments in robotics *companies* (versus an entity like the Fund), which is why Daimler and Moehle spoke to Tepper about the specific robotics companies in which the Fund sought to invest.

29.    Daimler relied on Moehle's representations concerning GE when he decided to walk away from $10,000,000.00 in promised investment in Skilled Science, cease meeting with other potential investors in Skilled Science, and pursue an equal partnership with Moehle in 2015.

30.    During 2015 and early 2016, Daimler came to learn that Moehle misrepresented and overstated the strength of his relationships with the NREC and RI.

31.    However, throughout 2015 and 2016, Moehle continued to vigorously represent to Daimler that GE had committed to invest $20,000,000.00 in the Fund.

32.    In the months, and weeks, leading up to Daimler's execution of the Daimler Awards and other necessary corporate documents, Moehle continued to repeat his representations concerning GE's $20,000,000.00 commitment to the Fund in private calls with Daimler, as well as in joint phone calls and in-person meetings between Moehle, Daimler and potential investors, including those on or about:

- January 20, 2016, with Brian Gerkey, the CEO and Founder of the Open Source Robotics Foundation ("OSRF") by phone;

7

**JA367**

- February 12, 2016, with David Katzman, Senior Financial Analyst at the Yale Investment Office (which manages Yale's Endowment) by phone;

- February 15, 2016, in a meeting with Arnold Kwong of the investment firm Extra Intelligence in New York;

- February 17, 2016, in a meeting with Tom Juterbock, Laura Pekari, Nisanth Reddy and Jon Rotolo, of the investment group Woodcreek, a division of Mass Mutual in Connecticut;

- February 23, 2016, in a meeting with Cliff Friedman, Tracy O'Leary and Jim Pallotta, of the investment firm Raptor Group Holdings in New York;

- and March 23, 2016 – the day the Daimler Awards were signed – in a meeting with Bill Scalzulli and other representatives of the Kraft family office outside of Boston.

33.    Daimler would periodically request updates from Moehle regarding the timing of the funding of GE's committed investment, and Moehle's answer remained consistent. As Moehle had explained that GE had already committed to invest $20,000,000.00, and potential investors had moved forward with the Fund based on, among other things, their understanding that GE had committed these funds, Daimler did not see this timing as an issue.

34.    Daimler never imagined that Moehle would lie to potential investors (or to Daimler). Each time Daimler participated (telephonically or in-person) in a meeting with a potential investor, during which Moehle would discuss the committed $20,000,000.00 GE investment, Daimler was assured that the commitment had already been made.

35.    Coupled with the momentum of walking away from Skilled Science, hiring Jamie Fee to work with the Companies, the Fund's progress in garnering potential investors and robotics businesses in which to invest, all of which was induced by Moehle's representation that GE had made a $20,000,000.00 commitment to the Fund, Daimler felt assured that Moehle's representation was in fact true.

8

B.    Daimler and Moehle Began As Equal Partners in the Companies

36.    As of March 23, 2016, Daimler and Moehle were both members of the Companies.

37.    Pursuant to the Companies' respective Amended and Restated Operating Agreements, both dated March 23, 2016, Daimler and Moehle were the only members of the Companies' initial Boards of Managers.

38.    Daimler and Moehle entered into Common Unit Award Agreements, dated March 23, 2016, with each of the Companies pursuant to which Daimler and Moehle were both awarded forty-two common units in each company, which units were subject to certain disparate vesting schedules more fully discussed below.

39.    In contrast, Fee also entered into Common Unit Award Agreements with each of the Companies, dated March 23, 2016, pursuant to which Fee was awarded only two common units in each company.

40.    Further, pursuant to Section 3.08 of the Fund's Limited Partnership Agreement, both Daimler and Moehle are named "key persons," such that if both Daimler and Moehle cease to be actively involved in the Fund's affairs, the Fund's limited partners may elect to terminate the Fund's investment period.

41.    The Companies and the Fund uniformly promoted Daimler and Moehle as equal partners in connection with their public relations and fundraising efforts, including, without limitation, in the Fund's Confidential Private Placement Memorandum and other presentation materials provided to potential investors.

42.    During joint presentations to potential investors, some investors would expressly ask Daimler and Moehle if the two were equal partners, and their response was always "yes." In

9

fact, Moehle explained their relationship by stating that he and Daimler had combined their efforts, not that Daimler had joined Coal Hill.

43.    Despite having an equal partnership, Daimler personally loaned Coal Hill $125,000.00 pursuant to a promissory note and advanced personal funds to cover corporate expenses. In contrast, Moehle provided an initial capital contribution of merely $1,000.00.

44.    On or about November 2, 2017, Coal Hill paid the promissory note in full, together with interest. Coal Hill also reimbursed Daimler for a portion of the expenses he personally advanced to the company, in the amount of $35,000.00.

## II.    Daimler Accepted a Presidential Fellowship that Benefitted the Companies and the Fund

45.    In January 2016, Daimler was appointed as a Presidential Innovation Fellow for the Barack Obama White House.

46.    Daimler accepted the fellowship, which is a twelve-month program, during Barack Obama's last year in office. Thus, it was axiomatic that Daimler's fellowship would end in early 2017.

47.    Moehle encouraged Daimler to accept the fellowship because of the value that the Companies and the Fund would derive from it.

48.    Daimler served as a Presidential Innovation Fellow from January 2016 to early 2017, during which time Daimler advised the White House on, among other things, issues relating to robotics and artificial intelligence.

49.    Daimler and Robotics Hub received positive press coverage with respect to Daimler's fellowship, and Defendants promoted Daimler's White House position in connection with their marketing and fundraising efforts.

50.    Because Daimler's fellowship allowed for outside employment, Daimler continued to provide services to the Companies during 2016, but the Companies did not compensate him for such services. During such time, Daimler and Moehle agreed that Daimler's compensation for such services would accrue and be paid to Daimler at a later date.

51.    As fully explained below, the relationship between Daimler and Moehle began to break down, in part, because of Daimler's fellowship.

### III. Defendants' Misrepresentations Caused Daimler to Enter into Common Unit Award Agreements with Different and Less Favorable Vesting Schedules than those of His Equal Partner Moehle

52.    On or about March 10, 2016, soon after Daimler's fellowship began, the Companies and the Fund engaged Reed Smith LLP to, among other things, prepare various corporate formation and governing documents, including the Common Unit Award Agreements and the Companies' Amended and Restated Operating Agreements.

53.    With respect to the referenced engagement, Reed Smith interacted almost exclusively with Moehle.

### A.    Common Unit Awards

54.    The Companies each entered into a Common Unit Award Agreement, dated March 23, 2016, with Moehle, pursuant to which Moehle was awarded forty-two common units in both Robotics Hub and Coal Hill (the "Moehle/RH Award" and the "Moehle/CH Award," respectively, and collectively the "Moehle Awards"), which units vest as follows:

> 20% vests on the first anniversary of Date of Award [March 23, 2017]; 1.6666% vests ratably on the last day of each month thereafter until the fifth anniversary of the Date of Award [March 23, 2021].

Copies of the Moehle/RH Award and the Moehle/CH Award are attached hereto as Exhibits A and B, respectively.

11

**JA371**

55.     The Companies also entered into Common Unit Award Agreements, dated March 23, 2016, with Daimler, pursuant to which Robotics Hub and Coal Hill each awarded forty-two common units to Daimler (the "Daimler/RH Award" and the "Daimler/CH Award," respectively, and collectively the "Daimler Awards").

56.     Unlike Moehle's common units, however, Daimler's units vest as follows:

20% vests on the date when [Daimler] has provided 12 consecutive and uninterrupted months of Full Time Services to the Company Group, provided that [Daimler] must begin providing such Full Time Services to the Company Group no later than the first anniversary of the Date of Award [March 23, 2017]; and

provided the above conditions are met, the remaining 80% vests on a pro-rata basis on the last day of each month thereafter until the fifth anniversary of the Date of Award [March 23, 2021].

Copies of the Daimler/RH Award and the Daimler/CH Award are attached hereto as Exhibits C and D, respectively.

57.     Pursuant to Section 2(a) of the Daimler Awards, Daimler provides Full Time Services if he is employed by or otherwise provides greater than 95% of his professional activities, as determined in the sole discretion of the respective Boards, to the Company Group.

58.     Section 2(a) of the Daimler Awards defines the Company Group as a combination of Robotics Hub or Coal Hill, respectively, the Fund, and the Fund's investment manager (including services provided to portfolio companies of the Fund and Daimler's capacity as an employee of the Fund's investment manager).

B.     <u>Defendants' Misrepresentations</u>

59.     In multiple conversations during 2015 and 2016, some of which included associates and investors, Moehle intentionally misrepresented to Daimler that: (i) Moehle and Daimler would be treated as equals; (ii) the terms of the Daimler Awards were identical to those of the Moehle Awards; and (iii) the Daimler and Moehle Awards both contained vesting

12

**JA372**

schedules pursuant to which a portion of the units would vest automatically while the remaining units would vest over time.

60.     Reed Smith made the same misrepresentations to Daimler during conversations in early 2016.

61.     In early 2016, Daimler made it clear to Moehle and Reed Smith that he would consent to the Daimler Awards only if he and Moehle were treated equally and the terms of the Daimler Awards were identical to those of the Moehle Awards.

62.     At no time did Defendants or Reed Smith inform Daimler that only the Daimler Awards, not the Moehle Awards, contained vesting schedules requiring twelve consecutive and uninterrupted months of Full-Time Services to the Company Group, which services must start within a year of entering into the award agreements, before any common units would begin to vest.

63.     In fact, Moehle and Reed Smith continued to represent to Daimler until in or about July 2016, several months after the awards were executed, that Moehle and Daimler were treated equally and that the Daimler Awards and the Moehle Awards were identical.

64.     It was never Daimler's understanding, based upon representations by Moehle and Reed Smith, and, indeed, was incomprehensible to Daimler, that there could be any circumstance under which his common units in the Companies would be forfeited.

65.     Daimler would not have entered into the Daimler Awards if he had known that: (i) his common units vested differently than Moehle's common units; (ii) he would be required to provide twelve consecutive and uninterrupted months of Full-Time Services to the Company Group, and begin such services within one year of entering into the Daimler Awards, before any

JA373

portion of his common units would begin to vest; and (iii) there could be any circumstance under which his common units in the Companies would be forfeited.

 C. <u>Amended and Restated Operating Agreements</u>

 66. Also on March 23, 2016, Robotics Hub and Coal Hill, and their respective members, entered into Amended and Restated Operating Agreements (the "RH Operating Agreement" and the "CH Operating Agreement," respectively, and collectively the "Operating Agreements"), which terms are incorporated in the respective Moehle Awards and Daimler Awards. Copies of the RH Operating Agreement and the CH Operating Agreement are attached hereto as Exhibits E and F, respectively.

 67. Section 7.1 of the respective Operating Agreements requires the Companies to record members' initial capital contributions, and Section 7.3 requires the Companies to establish and maintain on their own books and records a separate capital account for each member.

 68. Section 7.2 of the respective Operating Agreements requires all additional capital contributions to be made in connection with the issuance of units.

 69. Pursuant to Section 12.3(b) of the Operating Agreements, Covered Persons (including, among others, members, officers and directors, and managers) who are permitted or required to make a decision in good faith must act under such express standard.

 70. Under Section 12.4 of the Operating Agreements, Covered Persons are entitled to indemnification from the Companies in connection with actions or omissions performed on behalf of the Companies <u>only</u> if such person acts in good faith and in a manner believed by such person to be in, or not opposed to, the best interests of the company, and such person's conduct does not constitute fraud or willful misconduct.

 71. At the time Daimler entered into the Operating Agreements, based on Moehle's representations, Daimler believed that GE had already committed to invest $20,000,000.00 in the

14

**JA374**

Fund. Indeed, the initial timeline of funding this committed investment in early to mid 2016 had not yet passed, and Moehle continued to discuss this commitment with both Daimler individually and with potential investors, both on a regular basis.

72.    At the time Daimler entered into the Operating Agreements, Daimler was working full-time as a Presidential Innovation Fellow, and, as discussed below, his primary insight into the operations of the Companies was communications with Moehle and joint meetings with potential investors.

**IV.    The Relationship Between Daimler and Moehle Breaks Down, But Daimler Remains Engaged in the Companies and the Fund**

73.    As explained above, Daimler and Moehle began their partnership as equal partners—and were promoted as such—and each initially devoted equal time to the Companies.

74.    Although Daimler worked for the Companies only part-time during his Presidential Innovation Fellowship, both Moehle and Daimler understood that Daimler would return to his full-time position with the Companies when his fellowship ended.

75.    Indeed, as previously explained, it was understood that Daimler's fellowship necessarily had a finite end date in early 2017.

76.    Additionally, as of January 2016 when Daimler began his fellowship, the business partnership had budgeted matching salaries for Moehle and Daimler, and the Companies had budgeted another full-time salary which they never paid because the individual for whom it was budgeted did not become a member of the Companies as originally anticipated.

77.    In early-mid 2016, the business relationship between Daimler and Moehle began to break down.

15

JA375

78.    The attention and publicity Daimler received in connection with his Presidential Innovation Fellowship became a point of contention between Daimler and Moehle, and Moehle began criticizing Daimler as a business partner.

79.    Moehle became increasingly controlling over access to information about the Fund's investors and portfolio companies, information Moehle previously freely shared. Indeed, compounding on his previously-expressed desire to maintain control over particular relationships, Moehle unilaterally determined that he would become the "gatekeeper" of this information soon after Daimler accepted his fellowship.

80.    Moehle would criticize Daimler about statements he made during joint presentations to potential investors about the Fund's portfolio companies, but Moehle would refuse to provide Daimler full access to relevant information about said portfolio companies. Moehle even criticized the content on Daimler's LinkedIn page, and directed Daimler to revise his descriptions of the Companies to mirror those on Moehle's LinkedIn page.

81.    Moehle also began to unilaterally assign Daimler "deliverables" without first consulting with Daimler.

82.    Despite rising tensions, Moehle needed Daimler to remain engaged in the Companies and the Fund so that he would continue to make financial contributions to them, and Daimler remained engaged throughout his fellowship.

83.    For his part, because the business relationship was still relatively new, Daimler hoped these issues were simply "growing pains," and could be resolved with time.

84.    From May 2016 through August 2016, Daimler wrote several checks to Coal Hill totaling approximately $30,000.00 to cover Coal Hill's operating expenses, and even some of Moehle's personal expenses, as Moehle requested. Specifically, Moehle used some of Daimler's

financial contributions to Coal Hill to pay for personal expenses such as his mortgage payments and family trips.

85.     Throughout this period, Moehle continued to represent to Daimler (and potential investors) that GE had committed to invest $20,000,000.00 in the Fund.

86.     Daimler also continued to make financial contributions to Coal Hill from late 2015 through early 2017 to pay, among other things, third-party expenses.

87.     Although, as discussed above, Daimler had extended a loan directly to Coal Hill to pay operating expenses, Coal Hill constantly needed additional funds to pay third-party expenses, and was not in a position to pay back further debt in the foreseeable future.

88.     Accordingly, Daimler made additional financial contributions in the form of payments to third parties, which payments were primarily attributable to company-related travel (for both Daimler and Moehle), operations, and investor meeting expenses.

89.     Daimler continued to make these additional financial contributions to Coal Hill with the expectation that they would be treated as capital contributions, and in late 2016, Moehle agreed that they would be treated as such.

90.     In total, Daimler made in excess of $200,000.00 in financial contributions that were to be treated as capital contributions.

91.     These financial contributions were made by Daimler on behalf of Coal Hill, and were made with Moehle's knowledge and approval.

92.     These financial contributions provided benefit and value to Coal Hill, which was a cash-strapped entity that could not have done business without Daimler's regular, indeed almost daily, infusions of cash and payment of expenses.   Without Daimler's financial contributions, the Companies would not have been able to operate or court necessary investors.

17

**JA377**

93.    Despite this arrangement, Daimler and Moehle continued to represent themselves to investors as "equal" partners, because, despite the fact that Daimler was entitled to additional common units in Coal Hill, Daimler and Moehle continued to be equally important to the venture.

94.    Daimler did not receive additional common units in Coal Hill in connection with his additional financial contributions, as required by Section 7.2 of the Operating Agreement.

**V.    Defendants Force Daimler Out of the Companies Despite His Attempts to Remain Actively Involved in Them**

95.    During the second half of 2016, Moehle began taking steps to gain sole control of the Companies. Indeed, Moehle continued criticizing Daimler as a business partner and increasingly began obstructing efforts by Daimler and Fee to engage in the Companies and the Fund.

96.    During the Fall of 2016, Daimler and Fee made several attempts to arrange meetings with Moehle in Pittsburgh, where the Companies and the Fund are based, but Moehle thwarted all such efforts. In fact, Moehle told Daimler that the two would have a problem if Daimler scheduled a trip to Pittsburgh.

97.    On numerous occasions, Daimler and Fee offered to help Moehle with the Fund's first closing in December 2016. But Moehle repeatedly refused their help, stated that he would handle the closing, and directed Daimler and Fee to focus their efforts elsewhere.

98.    Further, Moehle continued to unilaterally assign Daimler "deliverables," including asking Daimler to make introductions to, among others, internet travel companies such as Google Travel. Daimler made the introductions Moehle requested, but afterwards Moehle would tell Daimler that the introductions were no longer needed. Moehle would then claim that Daimler failed to complete such "deliverables."

18

**JA378**

99.    On several occasions in mid-late 2016, Moehle actively obstructed Daimler's efforts to communicate with the Fund's investors and portfolio companies.

100.    Specifically, Daimler explicitly asked Moehle for the contact information for various investors and portfolio companies, including, among others, TravelWits. Moehle either ignored Daimler's requests or flatly refused to disclose the information. In some instances, Moehle even refused to disclose the contact's name.

101.    In late 2016, Moehle began discouraging Daimler from ending his fellowship, which he could have done at any time, because the Companies allegedly had no funds with which to pay him. Daimler suggested that his salary could continue to accrue and be paid to him at a later date, as had been done in the past, but Moehle opposed such structure.

102.    Despite Moehle's efforts in 2016 to disassociate himself, the Companies, and the Fund from Daimler, he simultaneously represented to investors that Daimler was his equal partner until in or about November 2016.

103.    Daimler and Moehle met in-person on January 5-6, 2017 to discuss the notion that Daimler would not return to his full-time role with the Companies at that time, but that Daimler could still earn some compensation in a non-operating role, and that a full-time operating role for Daimler would occur at a later date.

104.    On or about January 5, 2017, just before Daimler's fellowship would ultimately end, Moehle recommended to the Companies' Boards (which constituted only Daimler and Moehle) that Daimler not be permitted to return to a full-time role with the Companies.

105.    Although Moehle and the Companies had contemplated Daimler's return to full-time employment from the outset and budgeted a full-time salary for Daimler, Moehle purportedly made the above recommendation to the Boards because the Companies allegedly

19

**JA379**

lacked sufficient funds to pay Daimler a full-time salary at that time. Indeed, Moehle refused to allow Daimler's salary to continue to accrue and be paid at a later date, as it had in the past.

106.    At the Companies' respective Board meetings on or about January 5, 2017, Moehle voted against, and Daimler voted in favor of, Daimler returning to a full-time role with the Companies.

107.    Because no other votes were cast, the Boards were deadlocked and the matter was referred to the Deadlock Advisor, David Mawhinney, in accordance with Section 5.5(c) of the Companies' respective Operating Agreements.

108.    Daimler and Moehle met in-person again on January 18, 2017 in Orlando, Florida to resume their January 5-6, 2017 discussions.

109.    On or about March 22, 2017, just before the first anniversary of the date of the Daimler Awards, Mawhinney broke the deadlock by voting against Daimler returning to a full-time, fully compensated role with the Companies at that time due to their financial status, but understood when casting his vote that Daimler's full-time engagement with the Companies would occur at a later date and did not foreclose the possibility that Daimler could, if he so elected, return to work on a full-time basis with some portion of his compensation accrued, but not paid, as had been done in the past.

110.    Despite Defendants' previous representations to the contrary, they never offered Daimler a non-operating role in the Companies, provided any compensation to him, or permitted his full-time engagement with the Companies. Instead, Defendants took additional steps to ensure that Daimler had no role whatsoever within the Companies.

111.    Because Defendants wrongfully prevented Daimler from returning to his full-time role with the Companies within a year after executing the Daimler Awards, by March 23, 2017,

despite Daimler's desire and attempts to do so, the Companies deemed all of Daimler's common units to be forfeited.

112.    As a result of such wrongful forfeiture, Defendants believe that Daimler has no membership or ownership interest in the Companies, thereby making Moehle the Companies' majority member.

113.    After obtaining a majority membership interest, to further prevent Daimler from serving the Companies in any capacity, Moehle purportedly directed the Companies to remove Daimler from their respective Boards and amend and restate the Fund's Limited Partnership Agreement to remove Daimler from the "Key Person" provision set forth in Section 3.08 of the agreement.

114.    It was not until after Daimler's ouster from the Companies that Daimler came to understand that, among other things, Moehle had lied about GE's commitment to invest $20,000,000.00 in the Fund.  As is now clear, Moehle repeatedly and continuously made this misrepresentation to Daimler in order to induce Daimler to walk away from a successful venture (Skilled Science) and instead partner with Moehle, so Moehle could benefit from Daimler's credibility and experience to boost the profile of the Companies and entice potential investors, and have Daimler fund company operations and expenses during its start-up phase, only to later oust Daimler from the Companies and reap the benefits for himself.

<div align="center">

**COUNT ONE**

**FRAUD IN THE INDUCEMENT**
**(Against Moehle)**

</div>

115.    Plaintiff repeats all prior allegations as though fully set forth herein.

116.    Moehle intentionally misrepresented to Daimler that GE had committed to invest $20,000,000.00 in the Fund, which was a significant portion of the $50,000,000.00 the Fund

<div align="center">

**JA381**

</div>

sought to raise, and would lead to other potential investment opportunities for Moehle and Daimler's business partnership.

117. Moehle made such misrepresentations knowing they were false or with a reckless disregard as to whether they were true or false. Such misrepresentations are material because Daimler would not have walked away from Skilled Science, walked away from existing parties willing to invest $10,000,000.00 in Skilled Science, and would not have entered into the business partnership in 2015 or the Daimler Awards in 2016 if he had known that GE had not committed to invest $20,000,000.00 in the Fund as Moehle had represented.

118. Moehle made such misrepresentations to Daimler with the intention of: (i) misleading Daimler into relying upon said misrepresentations; (ii) using said misrepresentations to induce Daimler into funding the Companies in 2015 and 2016, some of which funds Moehle used for his own benefit; and (iii) using said misrepresentations to induce Daimler into entering the Daimler Awards, and with the intention of later forcing Daimler out of the Companies in early 2017 so that Moehle would have majority ownership and control over them.

119. Daimler justifiably relied upon Moehle's misrepresentations as being true when he decided to enter into a business partnership with Moehle in 2015 and the Daimler Awards in 2016, and fund the Companies.

120. As a direct and proximate result of Moehle's misrepresentations, together with Daimler's justifiable reliance on said misrepresentations, Daimler was wrongfully induced to walk away from Skilled Science, walk away from parties willing to invest $10,000,000.00 in Skilled Science, and instead enter into a business partnership with Moehle in 2015 and the Daimler Awards in 2016, agree to accept deferred compensation for work performed for the

Companies, in excess of $130,000.00 and which has not been paid, and ultimately contribute in excess of $200,000.00 to Coal Hill.

## COUNT TWO

### FRAUD IN THE INDUCEMENT
### (Against Robotics Hub)

121.   Plaintiff repeats all prior allegations as though fully set forth herein.

122.   Robotics Hub intentionally misrepresented to Daimler that GE had committed to invest $20,000,000.00 in the Fund, which was a significant portion of the $50,000,000.00 the Fund sought to raise, and would lead to other potential investment opportunities for Moehle and Daimler's business partnership and Robotics Hub.

123.   Robotics Hub made such misrepresentations knowing they were false or with a reckless disregard as to whether they were true or false.  Such misrepresentations are material because Daimler would not have walked away from Skilled Science, walked away from existing parties willing to invest $10,000,000.00 in Skilled Science, and would not have entered into the Daimler/RH Award if he had known that GE had not committed to invest $20,000,000.00 in the Fund as Moehle had represented.

124.   Robotics Hub made such misrepresentations to Daimler with the intention of (i) misleading Daimler into relying upon said misrepresentations; (ii) using said misrepresentations to induce Daimler into funding the Companies in 2015 and 2016; and (iii) using said misrepresentations to induce Daimler into entering the Daimler/RH Award, and with the intention of later forcing Daimler out of the company.

125.   Daimler justifiably relied upon Robotics Hub's misrepresentations as being true when he decided to enter into the Daimler/RH Award and fund the Companies.

126.   As a direct and proximate result of Robotics Hub's misrepresentations, together with Daimler's justifiable reliance on said misrepresentations, Daimler was wrongfully induced to walk away from Skilled Science, walk away from parties willing to invest $10,000,000.00 in Skilled Science, and instead enter into the Daimler/RH Award, agree to accept deferred compensation for work performed for the Companies, in excess of $130,000.00 and which has not been paid, and ultimately contribute in excess of $200,000.00 to Coal Hill.

<div align="center">

**COUNT THREE**

**BREACH OF CONTRACT – COAL HILL OPERATING AGREEMENT**
**(Against Coal Hill)**

</div>

127.   Plaintiff repeats all prior allegations as though fully set forth herein.

128.   Daimler and Coal Hill entered into the Coal Hill Operating Agreement, dated March 23, 2016.

129.   Pursuant to Section 7.2 of the Coal Hill Operating Agreement, Coal Hill is required to issue units in connection with members' additional capital contributions.

130.   Daimler made additional capital contributions in excess of $200,000.00, which contributions provided benefit to Coal Hill, but Coal Hill did not issue additional units in connection with such contributions.

131.   As a direct and proximate result of Coal Hill's intentional and wrongful conduct, Daimler was issued no additional units in connection with his additional capital contributions, and Coal Hill has treated Daimler as having no membership or ownership interest in the company.

132.   Alternatively, if Daimler's financial contributions are not treated as capital contributions and Daimler is not entitled to additional units in Coal Hill, these financial

contributions must be treated as loans to Coal Hill.  Therefore, in the alternative, Coal Hill breached the Operating Agreement by failing to repay Daimler for these financial contributions.

## COUNT FOUR

### BREACH OF CONTRACT
### (Against Coal Hill)

133.    Plaintiff repeats all prior allegations as though fully set forth herein.

134.    Coal Hill agreed to compensate Daimler for providing services to Coal Hill, and the Companies generally, throughout 2015 and 2016.  As Coal Hill did not have sufficient cash to pay Daimler at the time, Coal Hill agreed that Daimler's compensation for his services would accrue, and be paid at a later date.

135.    Daimler performed under the agreement by performing services for Coal Hill and the Companies.

136.    Coal Hill breached the parties' agreement by failing to pay Daimler for his accrued compensation.

137.    As a result of the foregoing, Daimler has been damaged by not receiving his accrued compensation for work performed for Coal Hill and the Companies, which is in excess of $130,000.00.

138.    Therefore, Coal Hill breached the parties' agreement by failing to repay Daimler for his accrued compensation, in the amount of at least $130,000.00.

## COUNT FIVE

### FRAUD IN THE INDUCEMENT
### (Against Coal Hill)

139.    Plaintiff repeats all prior allegations as though fully set forth herein.

140.    Coal Hill intentionally misrepresented to Daimler that GE had committed to invest $20,000,000.00 in the Fund, which was a significant portion of the $50,000,000.00 the

Fund sought to raise, and would lead to other potential investment opportunities for Moehle and Daimler's business partnership and Coal Hill.

141.    Coal Hill made such misrepresentations knowing they were false or with a reckless disregard as to whether they were true or false.  Such misrepresentations are material because Daimler would not have walked away from Skilled Science, walked away from existing parties willing to invest $10,000,000.00 in Skilled Science, and would not have entered into the business partnership in 2015 or the Daimler/CH Award if he had known that GE had not committed to invest $20,000,000.00 in the Fund as Moehle had represented.

142.    Coal Hill made such misrepresentations to Daimler with the intention of (i) misleading Daimler into relying upon said misrepresentations; (ii) using said misrepresentations to induce Daimler into funding the Companies in 2015 and 2016; and (iii) using said misrepresentations to induce Daimler into entering the Daimler/CH Award, and with the intention of later forcing Daimler out of the company.

143.    Daimler justifiably relied upon Coal Hill's misrepresentations as being true when he decided to enter into the business partnership in 2015 and the Daimler/CH Award, and fund the Companies.

144.    As a direct and proximate result of Coal Hill's misrepresentations, together with Daimler's justifiable reliance on said misrepresentations, Daimler was wrongfully induced to walk away from parties willing to invest $10,000,000.00 in Skilled Science, and instead enter into a business partnership with Moehle in 2015 and the Daimler/CH Award, agree to accept deferred compensation for work performed for the Companies, in excess of $130,000.00 and which has not been paid, and ultimately contribute in excess of $200,000.00 to Coal Hill.

## PRAYER FOR RELIEF

WHEREFORE, Daimler demands judgment in his favor as follows:

(i)    On Count One, awarding Daimler monetary damages in an amount to be determined at trial, but in no event less than $10 Million;

(ii)    On Count Two, awarding Daimler compensatory damages in an amount to be determined at trial, but in no event less than $10 Million;

(iii)    On Count Three, awarding Daimler injunctive relief, including, but not limited to, compelling Coal Hill to provide a full and complete accounting of its finances and its members' capital contributions and capital accounts, compelling Coal Hill to issue additional units in connection with Daimler's additional capital contributions, and enjoining Coal Hill from advancing Moehle funds for legal or other expenses as incurred in connection with this action; or, alternatively, compensatory damages in an amount to be determined at trial, but in no event less than $10 Million;

(iv)    On Court Four, awarding Daimler compensatory damages in an amount to be determined at trial, but in no event less than $130,000.00;

(v)    On Count Five, awarding Daimler compensatory damages in an amount to be determined at trial, but in no event less than $10 Million; and

(vi)    On all Counts, awarding Daimler reasonable attorneys' fees and expenses, costs, pre- and post-judgment interest, and punitive damages in an amount to be determined at trial; and such other and further relief as the Court deems just and proper.

27

**JA387**

JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Daimler hereby demands a trial by jury on all issues so

triable.

Dated:  Pittsburgh, Pennsylvania                    Respectfully submitted,
        October 16, 2018

                                                     BUCHANAN INGERSOLL & ROONEY PC

                                                     By:    /s/ Christopher P. Schueller
                                                            Christopher P. Schueller, Esq.
                                                            Pa. I.D. No. 92746
                                                            One Oxford Centre
                                                            301 Grant Street, 20th Floor
                                                            Pittsburgh, PA 15219
                                                            (412) 562-8432
                                                            christopher.schueller@bipc.com

                                                            -and-

                                                     HERRICK, FEINSTEIN LLP

                                                            Mitchell G. Mandell, Esq.
                                                            NY State Bar ID: 2042828
                                                            Two Park Avenue
                                                            New York, NY 10016
                                                            (212) 592-1400
                                                            mmandell@herrick.com
                                                            admitted pro hac vice

                                                            Attorneys for Plaintiff Eric Daimler

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ERIC DAIMLER, | ) | |
| | ) | Civil Action No. 18-165-MJH |
| Plaintiff, | ) | The Honorable Marilyn J. Horan |
| | ) | |
| v. | ) | |
| | ) | |
| CHRIS MOEHLE, ROBOTICS | ) | |
| HUB FUND 1 LLC, and COAL HILL | ) | Electronically Filed |
| VENTURES LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## **DEFENDANTS' MOTION TO DISMISS UNDER FRCP 12(B)(6)**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants Chris Moehle ("Moehle"),

Robotics Hub Fund 1 LLC ("Robotics Hub"), and Coal Hill Ventures LLC ("Coal Hill")

(collectively, "Defendants"), through their undersigned counsel, hereby move to dismiss Plaintiff

Eric Daimler's ("Daimler") Third Amended Complaint ("TAC") with prejudice. As grounds for this

motion, Defendants state as follows:

1.     On July 30, 2018, the Court granted Defendants' motion to dismiss Daimler's First

Amended Complaint ("FAC") as to all claims except for Daimler's "thinly pled" breach of contract

claims against Robotics Hub and Coal Hill. Dkt. 22-23. The Court also granted Daimler leave to

re-plead "the allegations regarding GE's potential investment" that formed the basis for certain of

his fraud claims. *Id.*

2.     Daimler then filed a Second Amended Complaint ("SAC"), in which he re-pled his

claims for fraud in the inducement against all three Defendants and his breach of contract claims

against Robotics Hub and Coal Hill. Defendants moved to dismiss the fraud claims, and moved for

a more definite statement of Daimler's contract claims.

3.     Before Daimler could respond, the Court ordered the parties to meet and confer

regarding Defendants' motion. As reflected in the concurrently filed certification, counsel for the

parties met and conferred resulting in Daimler filing his TAC.

4.       Daimler's TAC asserts fraud claims against all three Defendants (Counts 1, 2, and 5) and breach of contract claims against Coal Hill *only* (Counts 3 and 4).  For the following reasons, and as explained more fully in the Brief contemporaneously filed in support of this Motion, Daimler's TAC should be dismissed with prejudice for failure to state a claim on which relief could be granted.

5.       Daimler's claims for fraud in the inducement (Counts 1, 2, and 5) should be dismissed for the following three reasons.

6.       *First*, Daimler fails to allege facts to plausibly establish that Defendants intended to defraud Daimler and/or knew or were reckless in not knowing that the alleged statements were false or misleading.

7.       Indeed, although the Court previously dismissed Daimler's fraud claims for lacking sufficient factual support, a comparison between the FAC and TAC (*see* Ex. 1 to Brief) shows Daimler identified instances where Moehle supposedly repeated the representation, but that he proffers no facts demonstrating that Moehle knew those representations were false.  The Federal Rules, and the Court's Order, require more to state a claim for fraud.

8.       *Second*, the Court also warned in its July 30 Order that Daimler "must allege a misrepresentation of past or existing fact," not a future, anticipated event, to state a plausible claim for fraud.  Daimler has not made such allegations.  Dkt. 22 at 12, n.9.  To the contrary, Daimler's new "factual" allegations make even clearer that the supposed misrepresentations relate to a future, anticipated event.  Specifically, Daimler admits that predicates to GE's "commitment" included (1) the completion of an unidentified "regulatory process," (2) a "spin out" of GE's multibillion dollar "financial arm," and (3) GE's continued interest in investing after that process was complete in "early or mid 2016."  Those allegations belie any present "commitment" or binding agreement and instead reflect a contingent, future action by a third-party, which is not actionable as fraud.

2

**JA390**

9.      **_Finally_**, Daimler has not plausibly alleged justifiable reliance upon Moehle's supposed GE representation.  Daimler does not allege he performed any diligence into GE's alleged commitment during the nearly eight months between Moehle's alleged initial representation and Daimler joining the Companies.  For example, Daimler does not allege that he (1) requested documentation reflecting GE's alleged "commitment," (2) attempted to speak to anyone at GE regarding the status of the commitment, or (3) otherwise inquired about the terms or conditions of GE's commitment.  Remarkably, Daimler failed to undertake such action even as he sat through a meeting with a GE Managing Director to discuss the Fund.  Even more remarkably, Daimler asserts that he "came to learn," before joining the Companies, that Moehle supposedly "misrepresented" the strength of **_other_** relationships with **_other_** potential investors in the Companies, but apparently accepted Moehle's representations to him on faith.  It is implausible that Daimler, a self-claimed experienced venture capitalist, would blindly rely on any representation under those circumstances. The law does not permit Daimler to bury his head in the sand and claim fraud years later.

10.     As to Daimler's breach of contract claims in the TAC, the Court previously denied Defendants' motion to dismiss Daimler's "thinly pled" contract claim relating to Coal Hill's alleged failure to issue units in connection with Daimler's alleged capital contributions.  In the TAC, however, Daimler changed the allegations relating to that claim (now Count 3). Daimler's amended allegations render this claim implausible, and thus warrant dismissal, for at least the following reasons:

    (i)    Daimler's changing allegations, including the amount of the contribution, establish the lack of an agreement on the material terms of the supposed oral contract;

    (ii)    Daimler's allegation that Moehle was "taking steps to gain sole control" of the Companies is irreconcilable with Daimler's new claim that Moehle agreed to grant Daimler what amounts to a majority share of common units in Coal Hill;

    (iii)    Daimler never raised any alleged right to additional units when Moehle declined to offer Daimler full-time employment with the Companies, and thereafter engaged in and acquiesced to a three month deadlock process which resulted in

3

**JA391**

Daimler forfeiting all units in the Companies, and;

(iv)    Daimler suffered no injury due to the alleged "breach," because Daimler's additional units would also have been forfeited as a result of the deadlock vote.

11.    Finally, Daimler also now alleges a new breach of contract claim (Count 4) against Coal Hill.  In the new claim, based upon another supposed oral agreement, Daimler baldly asserts Coal Hill agreed to pay him accrued compensation for unspecified "services" that Daimler performed.  The Court should dismiss Daimler's new claim because he fails to allege even the basic terms of the alleged oral agreement including: (1) when the "agreement" occurred; (2) what services Coal Hill agree to compensate Daimler for; (3) the rate; and (4) the services Daimler actually provided.

WHEREFORE, for these reasons and those explained in the Brief contemporaneously filed in support of this Motion, which are incorporated by reference herein, Defendants respectfully request that this Motion be granted and that the Court dismiss Daimler's TAC. Additionally, because Daimler has now had multiple opportunities to plead his claims and has again failed to state a plausible claim for relief, the Court should now dismiss his claims with prejudice.

A proposed Order is attached.

Respectfully submitted,

**K&L GATES, LLP**

/s/ *Christopher M. Verdini*
Patrick J. McElhinny, PA Bar No. 53510
Christopher M. Verdini, PA Bar No. 93245
K&L GATES LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, Pennsylvania 15222-2613
Tel:  412-355-6500
Fax:  412-355-6501
Email: patrick.mcelhinny@klgates.com
Email: christopher.verdini@klgates.com

*Counsel for Defendants Chris Moehle,
Robotics Hub Fund 1 LLC, and Coal Hill
Ventures LLC*

Dated: October 30, 2018

## CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2018 the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Christopher M. Verdini*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| ERIC DAIMLER,<br><br>                Plaintiff,<br><br>    v.<br><br>CHRIS MOEHLE, ROBOTICS HUB<br>FUND 1, LLC, and COAL HILL<br>VENTURES LLC,<br><br>                Defendants. | Case No.: 2:18-cv-00165-MJH<br><br>**JURY TRIAL DEMANDED** |

## FOURTH AMENDED COMPLAINT

Plaintiff, Eric Daimler ("Daimler"), by his counsel, Herrick, Feinstein LLP and Buchanan Ingersoll & Rooney PC, as and for his fourth amended complaint against defendants, Chris Moehle ("Moehle"), Robotics Hub Fund 1, LLC ("Robotics Hub"), and Coal Hill Ventures LLC ("Coal Hill") (collectively, "Defendants"), alleges as follows:

## INTRODUCTION

1.     This lawsuit arises from Defendants' intentional misrepresentations that were designed to mislead and induce Daimler to enter into: (i) a business partnership with Moehle, in connection with which Daimler made significant financial contributions; and (ii) certain related common unit award agreements that contained different and less favorable vesting schedules than those of Moehle, Daimler's equal partner.

2.     Defendants thereafter took steps to force Daimler out of Robotics Hub and Coal Hill (collectively, the "Companies")—companies in which Daimler joined as an equal partner and/or co-founded—by intentionally and wrongfully preventing him from satisfying the

conditions of his vesting schedules, thereby causing all of his common units in the Companies to be treated as having been forfeited.

3.      Defendants believe that, because of such wrongful forfeiture, Daimler has no membership or ownership interest in the Companies, thereby making Moehle the Companies' majority member. After allegedly becoming a majority member of the Companies, Moehle purportedly removed Daimler from the Boards of the Companies so that he could obtain majority ownership and control over them.

## **PARTIES**

4.      Plaintiff, Daimler, is an individual who resides in the State of New York. Defendants believe that Daimler has no membership or ownership interest in Robotics Hub or Coal Hill.

5.      Defendant, Moehle, is an individual who resides in the Commonwealth of Pennsylvania.  Moehle is a member of Robotics Hub and Coal Hill.

6.      Defendant, Robotics Hub, is a limited liability company formed under the laws of the State of Delaware, with its principal place of business in Pittsburgh, Pennsylvania.

7.      Defendant, Coal Hill, is a limited liability company formed under the laws of the Commonwealth of Pennsylvania, with its principal place of business in Pittsburgh, Pennsylvania.

## **JURISDICTION**

8.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum of $75,000, exclusive of costs and interest, and there is complete diversity of citizenship between the parties.[1]

---

[1]  Upon information and belief, Jamie Fee, a non-party member of Robotics Hub and Coal Hill, is an individual who resides in the State of Connecticut.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Robotics Hub and Coal Hill maintain their principal place of business in this district, Moehle resides in this district, and a substantial part of the events giving rise to Daimler's claims occurred in this district.

## FACTUAL BACKGROUND

**I.      Daimler Agrees to Form an Equal Partnership Based Upon Moehle's Misrepresentations**

A.      The Formation of the Partnership

10.     Daimler and Moehle formed a business partnership for the purpose of investing in early-stage robotics companies with high growth potential.

11.     Before becoming partners, Daimler and Moehle each maintained and operated their own companies in robotics and venture finance—Skilled Science and Coal Hill[2], respectively.

12.     In 2015, Daimler and Moehle decided to move forward with an equal partnership by combining Skilled Science and Coal Hill through a de-facto merger, and by co-founding two new entities: Robotics Hub and Robotics Hub Fund 1, LP (the "Fund"). Robotics Hub is the Fund's General Partner, and Coal Hill is the Fund's Investment Manager.

13.     Daimler and Moehle co-edited various documents—including, without limitation, documents entitled "Skilled Science/Coal Hill Merger" and "Combined Skilled Science Coal Hill Pro-Forma"—in connection with their efforts to merge Skilled Science and Coal Hill into a new entity reflecting their equal partnership.

14.     The de-facto merger was accomplished by, among other things: (i) Coal Hill amending and restating its operating agreement to reflect the equal partnership between Daimler

---

[2]  Moehle formed Coal Hill in April 2015.

and Moehle; (ii) Daimler and Moehle working together on marketing strategies for the partnership, and ultimately amending various Coal Hill marketing materials to add Daimler as a principal; (iii) Coal Hill engaging Jamie Fee, who previously worked with Daimler at Skilled Science; and (iv) merging expenses accrued through the funding of Skilled Science into the fundraising expenses of Robotics Hub.

15.    Before their partnership began, Moehle represented to Daimler that General Electric ("GE") had already committed to invest in the Fund, and that he had a strong relationship with the National Robotics Engineering Center ("NREC") and the Robotics Institute ("RI"), which would lead to potential investment opportunities for the partnership.

16.    Specifically, with respect to GE, Moehle represented to Daimler throughout 2015 and 2016 that GE had committed to invest $20,000,000.00 in the Fund, which was a significant portion of the $50,000,000.00 the Fund sought to raise.

17.    Before entering into this partnership with Moehle, Daimler had been raising funds through Skilled Science, and was planning to close on investments from two investors, totaling $10,000,000.00.  Daimler ultimately elected to walk away from his existing, successful venture (Skilled Science) and these soon-to-close investments in Skilled Science in late 2015 because Moehle assured him that GE had *already committed* to invest $20,000,000.00 in the Fund.

18.    Aside from the GE investment being twice as large as the two soon-to-close investments in Skilled Science, Daimler understood that the GE investment gave the new venture instant credibility that many other investors could not.  The GE investment immediately catapulted the Fund into a "different league."  Daimler saw great, intangible value to this investment in addition to the amount itself.

19.    Because Skilled Science had a different structure than that contemplated (and ultimately adopted) for Robotics Hub and the Fund, these two investors could not simply "shift" their investments to the new, joint venture.

20.    Moehle first made the representation concerning GE's commitment during the very first introductory phone call with Daimler on or about August 18, 2015:  Moehle stated that GE had already invested in Coal Hill, and had committed to invest another $20,000,000.00 in the Fund.

21.    Moehle repeated his claim that GE had committed to invest $20,000,000.00 in the Fund during a phone call with Daimler the very next day, and during nearly every subsequent communication with Daimler, including phone calls on or about September 15 and 24, November 3 and December 8, 2015.

22.    According to Moehle, GE had already committed to invest $20,000,000.00, but the sole reason the funds were not yet in hand was because of a particular regulatory process that was being completed in connection with the spin out of GE's financial arm.  Moehle explained this was *not* a condition on GE's funding of its committed investment, but merely something that affected the timing of the funding.  Moehle represented that it was an "inevitability" that GE would spin out the financial arm and fund its committed investment – this was not Moehle's opinion, but rather something he presented as fact, based on purported conversations with GE.  It was expected that the process would be completed in early or mid 2016.

23.    Further, Moehle repeated this representation – that GE had committed to invest $20,000,000.00 in the Fund – in communications with both Daimler and potential investors before Daimler executed the Daimler Awards and other corporate documents in 2016.  For example, on or about October 16, 2015, during an in-person meeting at which Daimler was

present, Moehle told representatives of the University of Pittsburgh Medical Center ("UPMC") –
specifically Talbot "Tal" Heppenstall, Charles Hendrix, Matthew Cunningham, and Brenton
Burns – that GE was a sponsor of the Fund and had already committed to invest $20,000,000.00.

24.     Moehle again repeated this representation during another in-person meeting with
representatives of UPMC and Daimler in Pittsburgh on or about November 10, 2015.

25.     Indeed, Moehle continued to represent, during meetings in Pittsburgh with
Daimler and potential investors (and other entities potentially beneficial to the Fund), that GE
was a Fund sponsor, and had committed to invest $20,000,000.00 in the Fund, including on or
about:

- November 1, 2015, in a meeting with Randy Castleman of Court Square
  Ventures;

- November 3, 2015, in a meeting with Don Smith and Tim White,
  representatives of the Regional Industrial Development Corporation of
  Southwestern Pennsylvania ("RIDC");

- November 18, 2015, in a meeting with Paul O'Reilly of OCP Capital LLC;

- December 15, 2015, and January 5 and 14, 2016, in meetings with Martial
  Hebert, of RI;

- January 6, 2016, in a meeting with Herman Herman of the NREC;

- and January 6, 2016, in a meeting with Fee.

26.     In order to further prop up the illusion that the Fund had a solid relationship with
GE (via a committed $20,000,000.00 investment), Moehle brought Daimler to an in-person
meeting with GE in New York on or about November 18, 2015.  Moehle and Daimler met with
Alex Tepper, a Managing Director of GE Ventures, and discussed the progress of the Fund,
specifically robotics companies in which the Fund planned to invest.

27.     Although Tepper was *a* contact at GE, according to Moehle, Tepper was not
involved in GE's decision to invest in the Fund.  Moehle had specifically directed Daimler to not

discuss the investment, as Tepper had not been involved in the decision process, and Moehle wanted to remain GE's "single point person" regarding the investment.  Daimler did not view this as unusual, but rather consistent with Moehle's personality and oft-expressed desire to maintain control of the relationships he cultivated.

28.     Moreover, it was Daimler's understanding, based on representations from Moehle, that Tepper was responsible for GE's direct investments in robotics *companies* (versus an entity like the Fund), which is why Daimler and Moehle spoke to Tepper about the specific robotics companies in which the Fund sought to invest.

29.     Daimler relied on Moehle's representations concerning GE when he decided to walk away from $10,000,000.00 in promised investment in Skilled Science, cease meeting with other potential investors in Skilled Science, and pursue an equal partnership with Moehle in 2015.

30.     During 2015 and early 2016, Daimler came to learn that Moehle misrepresented and overstated the strength of his relationships with the NREC and RI.

31.     However, throughout 2015 and 2016, Moehle continued to vigorously represent to Daimler that GE had committed to invest $20,000,000.00 in the Fund.

32.     In the months, and weeks, leading up to Daimler's execution of the Daimler Awards and other necessary corporate documents, Moehle continued to repeat his representations concerning GE's $20,000,000.00 commitment to the Fund in private calls with Daimler, as well as in joint phone calls and in-person meetings between Moehle, Daimler and potential investors, including those on or about:

- January 20, 2016, with Brian Gerkey, the CEO and Founder of the Open Source Robotics Foundation ("OSRF") by phone;

- February 12, 2016, with David Katzman, Senior Financial Analyst at the Yale Investment Office (which manages Yale's Endowment) by phone;

- February 15, 2016, in a meeting with Arnold Kwong of the investment firm Extra Intelligence in New York;

- February 17, 2016, in a meeting with Tom Juterbock, Laura Pekari, Nisanth Reddy and Jon Rotolo, of the investment group Woodcreek, a division of Mass Mutual in Connecticut;

- February 23, 2016, in a meeting with Cliff Friedman, Tracy O'Leary and Jim Pallotta, of the investment firm Raptor Group Holdings in New York;

- and March 23, 2016 – the day the Daimler Awards were signed – in a meeting with Bill Scalzulli and other representatives of the Kraft family office outside of Boston.

33.    Daimler would periodically request updates from Moehle regarding the timing of the funding of GE's committed investment, and Moehle's answer remained consistent.  As Moehle had explained that GE had already committed to invest $20,000,000.00, and potential investors had moved forward with the Fund based on, among other things, their understanding that GE had committed these funds, Daimler did not see this timing as an issue.

34.    Daimler never imagined that Moehle would lie to potential investors (or to Daimler).  Each time Daimler participated (telephonically or in-person) in a meeting with a potential investor, during which Moehle would discuss the committed $20,000,000.00 GE investment, Daimler was assured that the commitment had already been made.

35.    Coupled with the momentum of walking away from Skilled Science, hiring Jamie Fee to work with the Companies, the Fund's progress in garnering potential investors and robotics businesses in which to invest, all of which was induced by Moehle's representation that GE had made a $20,000,000.00 commitment to the Fund, Daimler felt assured that Moehle's representation was in fact true.

B.  Daimler and Moehle Began As Equal Partners in the Companies

36.  As of March 23, 2016, Daimler and Moehle were both members of the Companies.

37.  Pursuant to the Companies' respective Amended and Restated Operating Agreements, both dated March 23, 2016, Daimler and Moehle were the only members of the Companies' initial Boards of Managers.

38.  Daimler and Moehle entered into Common Unit Award Agreements, dated March 23, 2016, with each of the Companies pursuant to which Daimler and Moehle were both awarded forty-two common units in each company, which units were subject to certain disparate vesting schedules more fully discussed below.

39.  In contrast, Fee also entered into Common Unit Award Agreements with each of the Companies, dated March 23, 2016, pursuant to which Fee was awarded only two common units in each company.

40.  Further, pursuant to Section 3.08 of the Fund's Limited Partnership Agreement, both Daimler and Moehle are named "key persons," such that if both Daimler and Moehle cease to be actively involved in the Fund's affairs, the Fund's limited partners may elect to terminate the Fund's investment period.

41.  The Companies and the Fund uniformly promoted Daimler and Moehle as equal partners in connection with their public relations and fundraising efforts, including, without limitation, in the Fund's Confidential Private Placement Memorandum and other presentation materials provided to potential investors.

42.  During joint presentations to potential investors, some investors would expressly ask Daimler and Moehle if the two were equal partners, and their response was always "yes." In

fact, Moehle explained their relationship by stating that he and Daimler had combined their efforts, not that Daimler had joined Coal Hill.

43.    Despite having an equal partnership, Daimler personally loaned Coal Hill $125,000.00 pursuant to a promissory note and advanced personal funds to cover corporate expenses. In contrast, Moehle provided an initial capital contribution of merely $1,000.00.

44.    On or about November 2, 2017, Coal Hill paid the promissory note in full, together with interest. Coal Hill also reimbursed Daimler for a portion of the expenses he personally advanced to the company, in the amount of $35,000.00.

## II.    Daimler Accepted a Presidential Fellowship that Benefitted the Companies and the Fund

45.    In January 2016, Daimler was appointed as a Presidential Innovation Fellow for the Barack Obama White House.

46.    Daimler accepted the fellowship, which is a twelve-month program, during Barack Obama's last year in office. Thus, it was axiomatic that Daimler's fellowship would end in early 2017.

47.    Moehle encouraged Daimler to accept the fellowship because of the value that the Companies and the Fund would derive from it.

48.    Daimler served as a Presidential Innovation Fellow from January 2016 to early 2017, during which time Daimler advised the White House on, among other things, issues relating to robotics and artificial intelligence.

49.    Daimler and Robotics Hub received positive press coverage with respect to Daimler's fellowship, and Defendants promoted Daimler's White House position in connection with their marketing and fundraising efforts.

50.     Because Daimler's fellowship allowed for outside employment, Daimler continued to provide services to the Companies during 2016, but the Companies did not compensate him for such services. During such time, Daimler and Moehle agreed that Daimler's compensation for such services would accrue and be paid to Daimler at a later date.

51.     As fully explained below, the relationship between Daimler and Moehle began to break down, in part, because of Daimler's fellowship.

**III.    Defendants' Misrepresentations Caused Daimler to Enter into Common Unit Award Agreements with Different and Less Favorable Vesting Schedules than those of His Equal Partner Moehle**

52.     On or about March 10, 2016, soon after Daimler's fellowship began, the Companies and the Fund engaged Reed Smith LLP to, among other things, prepare various corporate formation and governing documents, including the Common Unit Award Agreements and the Companies' Amended and Restated Operating Agreements.

53.     With respect to the referenced engagement, Reed Smith interacted almost exclusively with Moehle.

A.     <u>Common Unit Awards</u>

54.     The Companies each entered into a Common Unit Award Agreement, dated March 23, 2016, with Moehle, pursuant to which Moehle was awarded forty-two common units in both Robotics Hub and Coal Hill (the "Moehle/RH Award" and the "Moehle/CH Award," respectively, and collectively the "Moehle Awards"), which units vest as follows:

> 20% vests on the first anniversary of Date of Award [March 23, 2017]; 1.6666% vests ratably on the last day of each month thereafter until the fifth anniversary of the Date of Award [March 23, 2021].

Copies of the Moehle/RH Award and the Moehle/CH Award are attached hereto as Exhibits A and B, respectively.

55.     The Companies also entered into Common Unit Award Agreements, dated March 23, 2016, with Daimler, pursuant to which Robotics Hub and Coal Hill each awarded forty-two common units to Daimler (the "Daimler/RH Award" and the "Daimler/CH Award," respectively, and collectively the "Daimler Awards").

56.     Unlike Moehle's common units, however, Daimler's units vest as follows:

> 20% vests on the date when [Daimler] has provided 12 consecutive and uninterrupted months of Full Time Services to the Company Group, provided that [Daimler] must begin providing such Full Time Services to the Company Group no later than the first anniversary of the Date of Award [March 23, 2017]; and

> provided the above conditions are met, the remaining 80% vests on a pro-rata basis on the last day of each month thereafter until the fifth anniversary of the Date of Award [March 23, 2021].

Copies of the Daimler/RH Award and the Daimler/CH Award are attached hereto as Exhibits C and D, respectively.

57.     Pursuant to Section 2(a) of the Daimler Awards, Daimler provides Full Time Services if he is employed by or otherwise provides greater than 95% of his professional activities, as determined in the sole discretion of the respective Boards, to the Company Group.

58.     Section 2(a) of the Daimler Awards defines the Company Group as a combination of Robotics Hub or Coal Hill, respectively, the Fund, and the Fund's investment manager (including services provided to portfolio companies of the Fund and Daimler's capacity as an employee of the Fund's investment manager).

B.     Defendants' Misrepresentations

59.     In multiple conversations during 2015 and 2016, some of which included associates and investors, Moehle intentionally misrepresented to Daimler that: (i) Moehle and Daimler would be treated as equals; (ii) the terms of the Daimler Awards were identical to those of the Moehle Awards; and (iii) the Daimler and Moehle Awards both contained vesting

schedules pursuant to which a portion of the units would vest automatically while the remaining units would vest over time.

60.     Reed Smith made the same misrepresentations to Daimler during conversations in early 2016.

61.     In early 2016, Daimler made it clear to Moehle and Reed Smith that he would consent to the Daimler Awards only if he and Moehle were treated equally and the terms of the Daimler Awards were identical to those of the Moehle Awards.

62.     At no time did Defendants or Reed Smith inform Daimler that only the Daimler Awards, not the Moehle Awards, contained vesting schedules requiring twelve consecutive and uninterrupted months of Full-Time Services to the Company Group, which services must start within a year of entering into the award agreements, before any common units would begin to vest.

63.     In fact, Moehle and Reed Smith continued to represent to Daimler until in or about July 2016, several months after the awards were executed, that Moehle and Daimler were treated equally and that the Daimler Awards and the Moehle Awards were identical.

64.     It was never Daimler's understanding, based upon representations by Moehle and Reed Smith, and, indeed, was incomprehensible to Daimler, that there could be any circumstance under which his common units in the Companies would be forfeited.

65.     Daimler would not have entered into the Daimler Awards if he had known that: (i) his common units vested differently than Moehle's common units; (ii) he would be required to provide twelve consecutive and uninterrupted months of Full-Time Services to the Company Group, and begin such services within one year of entering into the Daimler Awards, before any

13

**JA407**

portion of his common units would begin to vest; and (iii) there could be any circumstance under which his common units in the Companies would be forfeited.

     C.     <u>Amended and Restated Operating Agreements</u>

66.     Also on March 23, 2016, Robotics Hub and Coal Hill, and their respective members, entered into Amended and Restated Operating Agreements (the "RH Operating Agreement" and the "CH Operating Agreement," respectively, and collectively the "Operating Agreements"), which terms are incorporated in the respective Moehle Awards and Daimler Awards. Copies of the RH Operating Agreement and the CH Operating Agreement are attached hereto as Exhibits E and F, respectively.

67.     Section 7.1 of the respective Operating Agreements requires the Companies to record members' initial capital contributions, and Section 7.3 requires the Companies to establish and maintain on their own books and records a separate capital account for each member.

68.     Section 7.2 of the respective Operating Agreements requires all additional capital contributions to be made in connection with the issuance of units.

69.     Pursuant to Section 12.3(b) of the Operating Agreements, Covered Persons (including, among others, members, officers and directors, and managers) who are permitted or required to make a decision in good faith must act under such express standard.

70.     Under Section 12.4 of the Operating Agreements, Covered Persons are entitled to indemnification from the Companies in connection with actions or omissions performed on behalf of the Companies <u>only</u> if such person acts in good faith and in a manner believed by such person to be in, or not opposed to, the best interests of the company, and such person's conduct does not constitute fraud or willful misconduct.

71.     At the time Daimler entered into the Operating Agreements, based on Moehle's representations, Daimler believed that GE had already committed to invest $20,000,000.00 in the

Fund. Indeed, the initial timeline of funding this committed investment in early to mid 2016 had not yet passed, and Moehle continued to discuss this commitment with both Daimler individually and with potential investors, both on a regular basis.

72.     At the time Daimler entered into the Operating Agreements, Daimler was working full-time as a Presidential Innovation Fellow, and, as discussed below, his primary insight into the operations of the Companies was communications with Moehle and joint meetings with potential investors.

**IV.     The Relationship Between Daimler and Moehle Breaks Down, But Daimler Remains Engaged in the Companies and the Fund**

73.     As explained above, Daimler and Moehle began their partnership as equal partners—and were promoted as such—and each initially devoted equal time to the Companies.

74.     Although Daimler worked for the Companies only part-time during his Presidential Innovation Fellowship, both Moehle and Daimler understood that Daimler would return to his full-time position with the Companies when his fellowship ended.

75.     Indeed, as previously explained, it was understood that Daimler's fellowship necessarily had a finite end date in early 2017.

76.     Additionally, as of January 2016 when Daimler began his fellowship, the business partnership had budgeted matching salaries for Moehle and Daimler, and the Companies had budgeted another full-time salary which they never paid because the individual for whom it was budgeted did not become a member of the Companies as originally anticipated.

77.     In early-mid 2016, the business relationship between Daimler and Moehle began to break down.

78.     The attention and publicity Daimler received in connection with his Presidential Innovation Fellowship became a point of contention between Daimler and Moehle, and Moehle began criticizing Daimler as a business partner.

79.     Moehle became increasingly controlling over access to information about the Fund's investors and portfolio companies, information Moehle previously freely shared. Indeed, compounding on his previously-expressed desire to maintain control over particular relationships, Moehle unilaterally determined that he would become the "gatekeeper" of this information soon after Daimler accepted his fellowship.

80.     Moehle would criticize Daimler about statements he made during joint presentations to potential investors about the Fund's portfolio companies, but Moehle would refuse to provide Daimler full access to relevant information about said portfolio companies. Moehle even criticized the content on Daimler's LinkedIn page, and directed Daimler to revise his descriptions of the Companies to mirror those on Moehle's LinkedIn page.

81.     Moehle also began to unilaterally assign Daimler "deliverables" without first consulting with Daimler.

82.     Despite rising tensions, Moehle needed Daimler to remain engaged in the Companies and the Fund so that he would continue to make financial contributions to them, and Daimler remained engaged throughout his fellowship.

83.     For his part, because the business relationship was still relatively new, Daimler hoped these issues were simply "growing pains," and could be resolved with time.

84.     From May 2016 through August 2016, Daimler wrote several checks to Coal Hill totaling approximately $30,000.00 to cover Coal Hill's operating expenses, and even some of Moehle's personal expenses, as Moehle requested.  Specifically, Moehle used some of Daimler's

financial contributions to Coal Hill to pay for personal expenses such as his mortgage payments and family trips.

85.    Throughout this period, Moehle continued to represent to Daimler (and potential investors) that GE had committed to invest $20,000,000.00 in the Fund.

86.    Daimler also continued to make financial contributions to Coal Hill from late 2015 through early 2017 to pay, among other things, third-party expenses.

87.    Although, as discussed above, Daimler had extended a loan directly to Coal Hill to pay operating expenses, Coal Hill constantly needed additional funds to pay third-party expenses, and was not in a position to pay back further debt in the foreseeable future.

88.    Accordingly, Daimler made additional financial contributions in the form of payments to third parties, which payments were primarily attributable to company-related travel (for both Daimler and Moehle), operations, and investor meeting expenses.

89.    Daimler continued to make these additional financial contributions to Coal Hill with the expectation that they would be treated as capital contributions, and in late 2016, Moehle agreed that they would be treated as such.

90.    In total, Daimler made in excess of $200,000.00 in financial contributions that were to be treated as capital contributions.

91.    These financial contributions were made by Daimler on behalf of Coal Hill, and were made with Moehle's knowledge and approval.

92.    These financial contributions provided benefit and value to Coal Hill, which was a cash-strapped entity that could not have done business without Daimler's regular, indeed almost daily, infusions of cash and payment of expenses.  Without Daimler's financial contributions, the Companies would not have been able to operate or court necessary investors.

93.      Despite this arrangement, Daimler and Moehle continued to represent themselves to investors as "equal" partners, because, despite the fact that Daimler was entitled to additional common units in Coal Hill, Daimler and Moehle continued to be equally important to the venture.

94.      Daimler did not receive additional common units in Coal Hill in connection with his additional financial contributions, as required by Section 7.2 of the Operating Agreement.

**V.      Defendants Force Daimler Out of the Companies Despite His Attempts to Remain Actively Involved in Them**

95.      During the second half of 2016, Moehle began taking steps to gain sole control of the Companies. Indeed, Moehle continued criticizing Daimler as a business partner and increasingly began obstructing efforts by Daimler and Fee to engage in the Companies and the Fund.

96.      During the Fall of 2016, Daimler and Fee made several attempts to arrange meetings with Moehle in Pittsburgh, where the Companies and the Fund are based, but Moehle thwarted all such efforts. In fact, Moehle told Daimler that the two would have a problem if Daimler scheduled a trip to Pittsburgh.

97.      On numerous occasions, Daimler and Fee offered to help Moehle with the Fund's first closing in December 2016. But Moehle repeatedly refused their help, stated that he would handle the closing, and directed Daimler and Fee to focus their efforts elsewhere.

98.      Further, Moehle continued to unilaterally assign Daimler "deliverables," including asking Daimler to make introductions to, among others, internet travel companies such as Google Travel. Daimler made the introductions Moehle requested, but afterwards Moehle would tell Daimler that the introductions were no longer needed. Moehle would then claim that Daimler failed to complete such "deliverables."

99.     On several occasions in mid-late 2016, Moehle actively obstructed Daimler's efforts to communicate with the Fund's investors and portfolio companies.

100.    Specifically, Daimler explicitly asked Moehle for the contact information for various investors and portfolio companies, including, among others, TravelWits. Moehle either ignored Daimler's requests or flatly refused to disclose the information. In some instances, Moehle even refused to disclose the contact's name.

101.    In late 2016, Moehle began discouraging Daimler from ending his fellowship, which he could have done at any time, because the Companies allegedly had no funds with which to pay him. Daimler suggested that his salary could continue to accrue and be paid to him at a later date, as had been done in the past, but Moehle opposed such structure.

102.    Despite Moehle's efforts in 2016 to disassociate himself, the Companies, and the Fund from Daimler, he simultaneously represented to investors that Daimler was his equal partner until in or about November 2016.

103.    Daimler and Moehle met in-person on January 5-6, 2017 to discuss the notion that Daimler would not return to his full-time role with the Companies at that time, but that Daimler could still earn some compensation in a non-operating role, and that a full-time operating role for Daimler would occur at a later date.

104.    On or about January 5, 2017, just before Daimler's fellowship would ultimately end, Moehle recommended to the Companies' Boards (which constituted only Daimler and Moehle) that Daimler not be permitted to return to a full-time role with the Companies.

105.    Although Moehle and the Companies had contemplated Daimler's return to full-time employment from the outset and budgeted a full-time salary for Daimler, Moehle purportedly made the above recommendation to the Boards because the Companies allegedly

lacked sufficient funds to pay Daimler a full-time salary at that time. Indeed, Moehle refused to allow Daimler's salary to continue to accrue and be paid at a later date, as it had in the past.

106.   At the Companies' respective Board meetings on or about January 5, 2017, Moehle voted against, and Daimler voted in favor of, Daimler returning to a full-time role with the Companies.

107.   Because no other votes were cast, the Boards were deadlocked and the matter was referred to the Deadlock Advisor, David Mawhinney, in accordance with Section 5.5(c) of the Companies' respective Operating Agreements.

108.   Daimler and Moehle met in-person again on January 18, 2017 in Orlando, Florida to resume their January 5-6, 2017 discussions.

109.   On or about March 22, 2017, just before the first anniversary of the date of the Daimler Awards, Mawhinney broke the deadlock by voting against Daimler returning to a full-time, fully compensated role with the Companies at that time due to their financial status, but understood when casting his vote that Daimler's full-time engagement with the Companies would occur at a later date and did not foreclose the possibility that Daimler could, if he so elected, return to work on a full-time basis with some portion of his compensation accrued, but not paid, as had been done in the past.

110.   Despite Defendants' previous representations to the contrary, they never offered Daimler a non-operating role in the Companies, provided any compensation to him, or permitted his full-time engagement with the Companies. Instead, Defendants took additional steps to ensure that Daimler had no role whatsoever within the Companies.

111.   Because Defendants wrongfully prevented Daimler from returning to his full-time role with the Companies within a year after executing the Daimler Awards, by March 23, 2017,

despite Daimler's desire and attempts to do so, the Companies deemed all of Daimler's common units to be forfeited.

112.    As a result of such wrongful forfeiture, Defendants believe that Daimler has no membership or ownership interest in the Companies, thereby making Moehle the Companies' majority member.

113.    After obtaining a majority membership interest, to further prevent Daimler from serving the Companies in any capacity, Moehle purportedly directed the Companies to remove Daimler from their respective Boards and amend and restate the Fund's Limited Partnership Agreement to remove Daimler from the "Key Person" provision set forth in Section 3.08 of the agreement.

114.    It was not until after Daimler's ouster from the Companies that Daimler came to understand that, among other things, Moehle had lied about GE's commitment to invest $20,000,000.00 in the Fund.  As is now clear, Moehle repeatedly and continuously made this misrepresentation to Daimler in order to induce Daimler to walk away from a successful venture (Skilled Science) and instead partner with Moehle, so Moehle could benefit from Daimler's credibility and experience to boost the profile of the Companies and entice potential investors, and have Daimler fund company operations and expenses during its start-up phase, only to later oust Daimler from the Companies and reap the benefits for himself.

## COUNT ONE

### FRAUD IN THE INDUCEMENT
**(Against Moehle)**

115.    Plaintiff repeats all prior allegations as though fully set forth herein.

116.    Moehle intentionally misrepresented to Daimler that GE had committed to invest $20,000,000.00 in the Fund, which was a significant portion of the $50,000,000.00 the Fund

sought to raise, and would lead to other potential investment opportunities for Moehle and Daimler's business partnership.

117.    Moehle made such misrepresentations knowing they were false or with a reckless disregard as to whether they were true or false.  Such misrepresentations are material because Daimler would not have walked away from Skilled Science, walked away from existing parties willing to invest $10,000,000.00 in Skilled Science, and would not have entered into the business partnership in 2015 or the Daimler Awards in 2016 if he had known that GE had not committed to invest $20,000,000.00 in the Fund as Moehle had represented.

118.    Moehle made such misrepresentations to Daimler with the intention of: (i) misleading Daimler into relying upon said misrepresentations; (ii) using said misrepresentations to induce Daimler into funding the Companies in 2015 and 2016, some of which funds Moehle used for his own benefit; and (iii) using said misrepresentations to induce Daimler into entering the Daimler Awards, and with the intention of later forcing Daimler out of the Companies in early 2017 so that Moehle would have majority ownership and control over them.

119.    Daimler justifiably relied upon Moehle's misrepresentations as being true when he decided to enter into a business partnership with Moehle in 2015 and the Daimler Awards in 2016, and fund the Companies.

120.    As a direct and proximate result of Moehle's misrepresentations, together with Daimler's justifiable reliance on said misrepresentations, Daimler was wrongfully induced to walk away from Skilled Science, walk away from parties willing to invest $10,000,000.00 in Skilled Science, and instead enter into a business partnership with Moehle in 2015 and the Daimler Awards in 2016, agree to accept deferred compensation for work performed for the

Companies, in excess of $130,000.00 and which has not been paid, and ultimately contribute in excess of $200,000.00 to Coal Hill.

## COUNT TWO

### FRAUD IN THE INDUCEMENT
### (Against Robotics Hub)

121.    Plaintiff repeats all prior allegations as though fully set forth herein.

122.    Robotics Hub intentionally misrepresented to Daimler that GE had committed to invest $20,000,000.00 in the Fund, which was a significant portion of the $50,000,000.00 the Fund sought to raise, and would lead to other potential investment opportunities for Moehle and Daimler's business partnership and Robotics Hub.

123.    Robotics Hub made such misrepresentations knowing they were false or with a reckless disregard as to whether they were true or false.  Such misrepresentations are material because Daimler would not have walked away from Skilled Science, walked away from existing parties willing to invest $10,000,000.00 in Skilled Science, and would not have entered into the Daimler/RH Award if he had known that GE had not committed to invest $20,000,000.00 in the Fund as Moehle had represented.

124.    Robotics Hub made such misrepresentations to Daimler with the intention of (i) misleading Daimler into relying upon said misrepresentations; (ii) using said misrepresentations to induce Daimler into funding the Companies in 2015 and 2016; and (iii) using said misrepresentations to induce Daimler into entering the Daimler/RH Award, and with the intention of later forcing Daimler out of the company.

125.    Daimler justifiably relied upon Robotics Hub's misrepresentations as being true when he decided to enter into the Daimler/RH Award and fund the Companies.

**JA417**

126.   As a direct and proximate result of Robotics Hub's misrepresentations, together with Daimler's justifiable reliance on said misrepresentations, Daimler was wrongfully induced to walk away from Skilled Science, walk away from parties willing to invest $10,000,000.00 in Skilled Science, and instead enter into the Daimler/RH Award, agree to accept deferred compensation for work performed for the Companies, in excess of $130,000.00 and which has not been paid, and ultimately contribute in excess of $200,000.00 to Coal Hill.

## COUNT THREE

### BREACH OF CONTRACT – COAL HILL OPERATING AGREEMENT
### (Against Coal Hill)

127.   Plaintiff repeats all prior allegations as though fully set forth herein.

128.   Daimler and Coal Hill entered into the Coal Hill Operating Agreement, dated March 23, 2016.

129.   Pursuant to Section 7.2 of the Coal Hill Operating Agreement, Coal Hill is required to issue units in connection with members' additional capital contributions.

130.   Daimler made additional capital contributions in excess of $200,000.00, which contributions provided benefit to Coal Hill, but Coal Hill did not issue additional units in connection with such contributions.

131.   As a direct and proximate result of Coal Hill's intentional and wrongful conduct, Daimler was issued no additional units in connection with his additional capital contributions, and Coal Hill has treated Daimler as having no membership or ownership interest in the company.

132.   Alternatively, if Daimler's financial contributions are not treated as capital contributions and Daimler is not entitled to additional units in Coal Hill, these financial

contributions must be treated as loans to Coal Hill.  Therefore, in the alternative, Coal Hill breached the Operating Agreement by failing to repay Daimler for these financial contributions.

## COUNT FOUR

### FRAUD IN THE INDUCEMENT
**(Against Coal Hill)**

133.   Plaintiff repeats all prior allegations as though fully set forth herein.

134.   Coal Hill intentionally misrepresented to Daimler that GE had committed to invest $20,000,000.00 in the Fund, which was a significant portion of the $50,000,000.00 the Fund sought to raise, and would lead to other potential investment opportunities for Moehle and Daimler's business partnership and Coal Hill.

135.   Coal Hill made such misrepresentations knowing they were false or with a reckless disregard as to whether they were true or false.  Such misrepresentations are material because Daimler would not have walked away from Skilled Science, walked away from existing parties willing to invest $10,000,000.00 in Skilled Science, and would not have entered into the business partnership in 2015 or the Daimler/CH Award if he had known that GE had not committed to invest $20,000,000.00 in the Fund as Moehle had represented.

136.   Coal Hill made such misrepresentations to Daimler with the intention of (i) misleading Daimler into relying upon said misrepresentations; (ii) using said misrepresentations to induce Daimler into funding the Companies in 2015 and 2016; and (iii) using said misrepresentations to induce Daimler into entering the Daimler/CH Award, and with the intention of later forcing Daimler out of the company.

137.   Daimler justifiably relied upon Coal Hill's misrepresentations as being true when he decided to enter into the business partnership in 2015 and the Daimler/CH Award, and fund the Companies.

138.    As a direct and proximate result of Coal Hill's misrepresentations, together with Daimler's justifiable reliance on said misrepresentations, Daimler was wrongfully induced to walk away from parties willing to invest $10,000,000.00 in Skilled Science, and instead enter into a business partnership with Moehle in 2015 and the Daimler/CH Award, agree to accept deferred compensation for work performed for the Companies, in excess of $130,000.00 and which has not been paid, and ultimately contribute in excess of $200,000.00 to Coal Hill.

### PRAYER FOR RELIEF

WHEREFORE, Daimler demands judgment in his favor as follows:

(i)    On Count One, awarding Daimler monetary damages in an amount to be determined at trial, but in no event less than $10 Million;

(ii)    On Count Two, awarding Daimler compensatory damages in an amount to be determined at trial, but in no event less than $10 Million;

(iii)    On Count Three, awarding Daimler injunctive relief, including, but not limited to, compelling Coal Hill to provide a full and complete accounting of its finances and its members' capital contributions and capital accounts, compelling Coal Hill to issue additional units in connection with Daimler's additional capital contributions, and enjoining Coal Hill from advancing Moehle funds for legal or other expenses as incurred in connection with this action; or, alternatively, compensatory damages in an amount to be determined at trial, but in no event less than $10 Million;

(iv)    On Court Four, awarding Daimler compensatory damages in an amount to be determined at trial, but in no event less than $10 Million; and

(v)    On all Counts, awarding Daimler reasonable attorneys' fees and expenses, costs, pre- and post-judgment interest, and punitive damages in an amount to be determined at trial; and such other and further relief as the Court deems just and proper.

JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Daimler hereby demands a trial by jury on all issues so triable.

Dated:  June 28, 2019

Respectfully submitted,

HERRICK, FEINSTEIN LLP

By:    /s/ Mitchell G. Mandell
       Mitchell G. Mandell, Esq.
       NY State Bar ID: 2042828
       Two Park Avenue
       New York, NY 10016
       (212) 592-1400
       mmandell@herrick.com
       *admitted pro hac vice*

-and-

BUCHANAN INGERSOLL & ROONEY PC

       Christopher P. Schueller, Esq.
       Pa. I.D. No. 92746
       Sydney Rochelle Normil, Esq.
       Pa. I.D. 320989
       One Oxford Centre
       301 Grant Street, 20th Floor
       Pittsburgh, PA 15219
       (412) 562-8432
       christopher.schueller@bipc.com
       sydney.normil@bipc.com

*Attorneys for Plaintiff Eric Daimler*

**JA421**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ERIC DAIMLER,                          )
                                       )      Civil Action No. 18-165-MJH
             Plaintiff,                )      The Honorable Marilyn J. Horan
                                       )
      v.                               )      **JURY TRIAL DEMANDED**
                                       )
CHRIS MOEHLE, ROBOTICS                 )
HUB FUND 1 LLC, and COAL HILL          )      Electronically Filed
VENTURES LLC,                          )
                                       )
             Defendants.               )

### DEFENDANTS' ANSWER TO PLAINTIFF'S
### FOURTH AMENDED COMPLAINT AND COUNTERCLAIMS

Defendants Chris Moehle, Robotics Hub Fund 1 LLC ("Robotics Hub"), and Coal Hill Ventures LLC ("Coal Hill") (collectively, "Defendants"), by and through their counsel, K&L Gates LLP, hereby file this Answer to the Fourth Amended Complaint of Plaintiff Eric Daimler and Counterclaims, and state as follows:

### INTRODUCTION

1.    The allegations of Paragraph 1 are conclusions of law that do not require a response. To the extent a response is required, Defendants deny the allegations.

2.    The allegations of Paragraph 2 do not require a response, as they relate exclusively to claims that have been dismissed by the Court. ECF No. 22. To the extent a response is deemed necessary, Defendants deny the allegations of Paragraph 2.

By way of further response, the Court has already held that Daimler's common units were properly deemed forfeited by Robotics Hub and Coal Hill (collectively, the "Companies"), and also that "regardless of whether the terms of Moehle's award mirrored that of Daimler's … [Daimler] could not have satisfied the vesting requirements because he had not provided Full

1

**JA422**

Time Services to the Companies by March 23, 2017." ECF No. 22 at 13.

     3.    The allegations of Paragraph 3 do not require a response, as they relate exclusively to claims that have been dismissed by the Court.  ECF No. 22.  To the extent a response is required, the allegations of Paragraph 3 are admitted in part and denied in part.

     Defendants admit that Daimler's common units were properly deemed forfeited by the Companies due to Daimler's failure to satisfy the express vesting conditions applicable to his common units within the specified time period.  Defendants further admit that Daimler was not offered employment, and that he was removed from the Companies' Boards of Managers in accordance with the terms of the Companies' Amended and Restated Operating Agreements.

     The remaining allegations of Paragraph 3 are denied.  Defendants specifically deny Daimler's characterization of his unit forfeiture as "wrongful." The Court has already held that Daimler's common units were properly deemed forfeited by the Companies.  ECF No. 22.

     By way of further response, the Companies properly exercised their discretion not to offer Daimler full-time employment, and ultimately to terminate any relationship with Daimler, after he routinely failed to meet performance milestones and deliverable deadlines, devoted only minimal time and effort to the Companies' business, became increasingly difficult to work with, and proved unable to secure any significant investments (including investments he represented he could secure) or otherwise contribute to the growth Robotics Hub Fund 1, LP (the "Fund"), the vehicle through which the Companies would invest in early-stage robotics companies, at or near the level expected of a member of the Companies.

     By way of further response, Moehle agreed to begin working with Daimler, and provided him with a potential path to vested units in the Companies that Moehle had founded, based on Daimler's representation that he was an experienced venture capitalist with an extensive

**JA423**

investment management track record (including claimed experience co-managing upwards of

$1.5 billion in relevant venture capital funds) who could leverage that track record to help the

Companies secure upwards of $20,000,000.00 in investments by early 2016.  The business

relationship between Daimler and Defendants deteriorated over the course of 2016 for the simple

reason that Daimler failed to deliver on his promises.  Defendants have since learned that

Daimler's representations regarding his past track record were false.

## PARTIES

4.      The allegations of Paragraph 4 are admitted in part and denied in part.

Defendants admit only that Daimler has no membership or ownership interest in the Companies.

By way of further response, this Court previously held that Daimler's common units were

properly deemed forfeit by the Companies after Daimler failed to satisfy the vesting conditions

applicable to those units.  ECF No. 22.  After reasonable investigation, Defendants are without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

of Paragraph 4 and, therefore, deny those allegations.

5.      Defendants admit the allegations of Paragraph 5.  By way of further response,

Moehle is the founder and sole officer of both Coal Hill and Robotics Hub.  Moehle and Coal

Hill publicly announced plans to launch Robotics Hub in August of 2015, backed by a founding

sponsorship from GE's venture capital and investment arm, GE Ventures LLC ("GE Ventures").

6.      Defendants admit the allegations of Paragraph 6.

7.      Defendants admit the allegations of Paragraph 7.

## JURISDICTION

8.      The allegations of Paragraph 8 are conclusions of law that do not require a response.

Defendants deny that Daimler is entitled to any damages, let alone in an amount that exceeds

**JA424**

$75,000. With respect to the allegations in Footnote 1 to Paragraph 8, after reasonable investigation, Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Footnote 1 and, therefore, deny those allegations.

9.     The allegations of Paragraph 9 are conclusions of law that do not require a response. To the extent a response is required, Defendants admit only that Robotics Hub and Coal Hill have a place of business in this district and that Moehle resides in this district.

## FACTUAL BACKGROUND

10.     Defendants admit only that Moehle invited Daimler to join the Companies to be a meaningfully contributing member after Daimler falsely represented his qualifications. Daimler failed to contribute at or near the level expected of a member of the Companies. Defendants deny that Daimler and Moehle formed a business "partnership."

11.     The allegations of Paragraph 11 are admitted in part and denied in part. Defendants admit that Moehle formed Coal Hill on April 28, 2015, without any involvement by Daimler, and prior to being introduced to Daimler for the first time in or around August 2015. After reasonable investigation, Defendants are without sufficient information to form a belief as to the truth of the remaining allegations of Paragraph 11 and, therefore, deny the allegations.

12.     The allegations of Paragraph 12 are admitted in part and denied in part. Defendants admit that Robotics Hub is the Fund's General Partner while Coal Hill is the Fund's Investment Manager. The remaining allegations of Paragraph 12 are denied. Defendants specifically deny that Daimler and Moehle "decided to move forward with an equal partnership." By way of further response, the nature of Daimler and Moehle's relationship was defined in writing by the terms of the Companies' Amended and Restated Operating Agreements and Common Unit Award Agreements. Defendants respectfully refer the Court to the documents for

4

the full contents thereof. The Companies further expounded on the expected roles, contributions and responsibilities of Daimler, Moehle and other individuals employed or retained by the Companies in company documents to which Daimler had access and/or possessed before he joined the Companies and while he was a member of the Companies.

13.     The allegations of Paragraph 13 are admitted in part and denied in part. Defendants admit that Moehle and Daimler co-edited various documents related to the transaction by which Daimler ultimately became a holder of unvested common units in the Companies. The remaining allegations of Paragraph 13 are denied. Defendants specifically deny that any such document reflected an intent to merge Skilled Science and Coal Hill or to form an equal "partnership." By way of further response, the nature of Daimler and Moehle's relationship was defined in writing by the terms of the Companies' Amended and Restated Operating Agreements and Common Unit Award Agreements. Defendants respectfully refer the Court to the documents for the full contents thereof.

14.     The allegations of Paragraph 14 are admitted in part and denied in part. Defendants admit that Coal Hill amended and restated its operating agreement. Defendants respectfully refer the Court to the document for the full contents thereof. Defendants further admit that Coal Hill engaged Jamie Fee. The remaining allegations of Paragraph 14 are denied.

15.     Defendants deny the allegations of Paragraph 15.

16.     Defendants deny the allegations of Paragraph 16. Defendants specifically deny that Moehle ever represented to Daimler that GE Ventures made any commitment to the Companies or the Fund, other than the founding sponsorship gift that GE Ventures awarded to Coal Hill pursuant to a Partner Agreement executed on May 20, 2015 and which was publicly announced in a press release authored by GE Ventures in August 2015. By way of further

5

**JA426**

response, before meeting with Alex Tepper of GE Ventures in November 2015, Daimler was aware that the Companies were planning on a "pitch" to GE Ventures that was centered on **convincing** GE Ventures to agree to making an initial commitment of $500,000 of investment (as opposed to operational) capital.

17.     Defendants deny the allegation of Paragraph 17 that Moehle ever represented to Daimler that GE Ventures made any commitment to the Companies or the Fund, other than the founding sponsorship gift that GE Ventures awarded to Coal Hill pursuant to a Partner Agreement executed on May 20, 2015 and which was publicly announced in a press release authored by GE Ventures in August 2015.  After reasonable investigation, Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 17 and, therefore, deny those allegations.

18.     Defendants deny the allegation of Paragraph 18 that Moehle ever represented to Daimler that GE Ventures made any commitment to the Companies or the Fund, other than the founding sponsorship gift that GE Ventures awarded to Coal Hill pursuant to a Partner Agreement executed on May 20, 2015 and which was publicly announced in a press release authored by GE Ventures in August 2015.  After reasonable investigation, Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 18 and, therefore, deny those allegations.

19.     After reasonable investigation, Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 19 and, therefore, deny those allegations.

20.     The allegations of Paragraph 20 are admitted in part and denied in part. Defendants admit only that Moehle may well have mentioned, during discussions of the Fund,

6

**JA427**

that GE Ventures was a sponsor of the Fund, which is true.  The remaining allegations of Paragraph 20 are denied.

     21.     Defendants deny the allegations of Paragraph 21.

     22.     Defendants deny the allegations of Paragraph 22.

     23.     The allegations of Paragraph 23 are admitted in part and denied in part.

Defendants admit only that Moehle may well have mentioned, during discussions of the Fund, that GE Ventures was a sponsor of the Fund, which is true.  The remaining allegations of Paragraph 23 are denied.  Defendants specifically deny that Moehle ever represented, either to Daimler or to any "potential investors," that GE Ventures made any commitment to the Companies or the Fund, other than the founding sponsorship gift that GE Ventures awarded to Coal Hill pursuant to a Partner Agreement executed on May 20, 2015 and which was publicly announced in a press release authored by GE Ventures in August 2015.

     24.     Defendants deny the allegations of Paragraph 24.

     25.     The allegations of Paragraph 25 are admitted in part and denied in part.

Defendants admit only that Moehle may well have mentioned, during discussions of the Fund, that GE Ventures was a sponsor of the Fund, which is true.  The remaining allegations of Paragraph 25 are denied.

     26.     The allegations of Paragraph 26 are admitted in part and denied in part.

Defendants admit only that Moehle and Daimler both attended a meeting with Alex Tepper, then the managing director of GE Ventures, on November 18, 2015 specifically to discuss the Fund and the possibility of GE Ventures making an initial commitment of $500,000 in investment (as opposed to operational) capital.  The remaining allegations of Paragraph 26 are denied.

     27.     Defendants deny the allegations of Paragraph 27 that Moehle (1) "directed

**JA428**

Daimler to not discuss the investment"; (2) ever suggested to Daimler that Tepper "had not been involved in the decision process" regarding the purported $20,000,000.00 investment, or; (3) ever suggested to Daimler that he "wanted to remain GE's 'single point person' regarding the investment."   To the contrary, Moehle introduced Daimler to many of the individuals on the GE Ventures team after the initial meeting with Mr. Tepper, where Daimler performed terribly. After reasonable investigation, Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 27 and, therefore, deny those allegations.

28.    Defendants specifically deny that Moehle made the representations alleged in Paragraph 28.  After reasonable investigation, Defendants are without sufficient information to form a belief as to the truth of the allegations of Paragraph 28 regarding Daimler's subjective "understanding."

29.    Defendants deny the allegation of Paragraph 29 that Moehle ever represented to Daimler that GE Ventures made any commitment to the Companies or the Fund, other than the founding sponsorship gift that GE Ventures awarded to Coal Hill pursuant to a Partner Agreement executed on May 20, 2015 and which was publicly announced in a press release authored by GE Ventures in August 2015. After reasonable investigation, Defendants are without sufficient information to form a belief as to the truth of the remaining allegations of Paragraph 29.

30.    The allegations of Paragraph 30 do not require a response, as they relate exclusively to claims that have been dismissed by the Court.  ECF No. 22.  To the extent a response is deemed necessary, Defendants deny the allegations of Paragraph 30.

Defendants specifically deny the vague allegation that Moehle "misrepresented and

**JA429**

overstated the strength of his relationships with NREC and RI."  By way of further response,

prior to July 2015, Moehle was the Associate Director for New Ventures at the National

Robotics Engineering Center ("NREC"), an operating unit of the Robotics Institute ("RI") at

Carnegie Mellon University ("CMU").  All current Robotics Hub lead investments were either

the direct result of introductions from NREC/RI or CMU to Moehle or formed via NREC/RI

personnel Moehle met through preexisting relationships and contacts.

      31.     Defendants deny the allegations of Paragraph 31.

      32.     Defendants deny the allegations of Paragraph 32.  Defendants specifically deny

that Moehle ever represented, either to Daimler or to "potential investors," that GE Ventures

made any commitment to the Companies or the Fund, other than the founding sponsorship gift

that GE Ventures awarded to Coal Hill pursuant to a Partner Agreement executed on May 20,

2015 and which was publicly announced in a press release authored by GE Ventures in August

2015.

      Defendants also specifically deny that Daimler signed the Common Unit Award

Agreements on March 23, 2016.  By way of further response, while the Common Unit Award

Agreements are *dated* March 23, 2016 but Daimler did not sign them until later in April.

Daimler's delay in signing the awards damaged the Companies' attempts to attract investments

in the Companies and the Fund.

      33.     Defendants deny the allegations of Paragraph 33.

      34.     Defendants deny the allegation of Paragraph 34 that Moehle lied to potential

investors or to Daimler with respect the Fund's relationship with GE Ventures or that Moehle

represented that GE Ventures made any commitment to the Companies or the Fund, other than

the founding sponsorship gift that GE Ventures awarded to Coal Hill pursuant to a Partner

**JA430**

Agreement executed on May 20, 2015.  By way of further response, written presentations provided in advance of some or all of the meetings specifically identified by Daimler in the Complaint directly refute the four-year old, undocumented oral statements Daimler alleges.

After reasonable investigation, Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 34, which concern the subjective contents of Daimler's imagination. Therefore, Defendants deny those allegations.

35.     Defendants deny the allegation of Paragraph 35 that Moehle ever represented, either to Daimler or to "potential investors," that GE Ventures made any commitment to the Companies or the Fund, other than the founding sponsorship gift that GE Ventures awarded to Coal Hill pursuant to a Partner Agreement executed on May 20, 2015 and which was publicly announced in a press release authored by GE Ventures in August 2015.  After reasonable investigation, Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 35 and, therefore, deny the allegations.

36.     Defendants deny the allegations of Paragraph 36.  By way of further response, although the Amended and Restated Operating Agreements and Common Unit Award Agreements were dated March 23, 2016, Daimler did not sign the Agreements until later in April.

37.     The allegations of Paragraph 37 are admitted in part and denied in part. Defendants admit that, upon execution of the Companies' Amended and Restated Operating Agreements and Common Unit Award Agreements, Daimler obtained an unvested membership interest in the Companies and corresponding position on the Companies' Boards of Managers. Defendants further admit that both Moehle and Daimler collectively constituted the Companies'

Boards of Managers after the dates on which they signed and executed the Amended and

Restated Operating Agreements and Common Unit Award Agreements.

The remaining allegations of Paragraph 37 are denied. Defendants specifically deny that

Daimler was a member of the Companies' "initial" Boards of Managers.  By way of further

response, pursuant to the Companies' original Operating Agreements, Daimler was not a

member of the Companies' "initial" Board of Managers.  Instead, Daimler became a member of

the Companies' Board following his execution of the Amended and Restated Operating

Agreements and Common Unit Award Agreements.  He remained a member of the Companies'

Board until March 27, 2017, when Daimler was properly removed from the Companies' Board

of Managers.

38.     The allegations of Paragraph 38 are admitted in part and denied in part.

Defendants deny only that Daimler entered into his Common Unit Award Agreements on March

23, 2016.  By way of further response, Daimler did not sign the Common Unit Award

Agreements until later in April.  Defendants admit the remaining allegations of Paragraph 38.

39.     Defendants admit the allegations of Paragraph 39.

40.     The allegations of Paragraph 40 are conclusions of law that do not require a

response.  To the extent a response is required, Defendants deny the allegations of Paragraph 40,

because they refer to, and purport to characterize or interpret, the Fund's Limited Partnership

Agreement.  Defendants respectfully refer the Court to the document for the full contents thereof.

41.     Defendants deny the allegations of Paragraph 41.  Defendants further specifically

deny the allegations of Paragraph 41 to the extent that they refer to, and purport to characterize

or interpret, the Fund's Private Placement Memorandum and any "other presentation materials"

allegedly provided to investors.  Defendants respectfully refer the Court to those documents for

the full contents thereof.

42.    Defendants deny the allegations of Paragraph 42.  After reasonable investigation,

Defendants are not aware of any instance in which "investors would expressly ask Daimler and

Moehle if [they] were equal partners" and, therefore, Defendants deny the allegation.  By way of

further response, the nature of Daimler and Moehle's relationship was defined in writing by the

terms of the Companies' Amended and Restated Operating Agreements and Common Unit

Award Agreements.  Defendants respectfully refer the Court to the documents for the full

contents thereof.  The Companies further expounded on the expected roles, contributions and

responsibilities of Daimler, Moehle and other individuals employed or retained in company

documents to which Daimler had access and/or possessed before he joined the Companies and

while he was a member of the Companies.

43.    The allegations of Paragraph 43 are admitted in part and denied in part.

Defendants admit that, on August 23, 2016, Daimler provided a loan of $125,000.00 to Coal

Hill, which was evidenced by a promissory note issued by Coal Hill to Daimler on the same date.

The note was subsequently repaid in full with interest.  Defendants further admit that that

Daimler provided money to cover corporate expenses, which included expenses Daimler

incurred in connection with his minimal and unsuccessful fundraising attempts.  By way of

further response, Moehle did not "merely" contribute $1,000 in initial capital but also advanced

funds to cover corporate expenses by foregoing a salary for his full-time work and charging

corporate expenses to his personal credit card.  At the same time, Daimler, upon information and

belief, was receiving a salary in connection with his full-time work for the Office of Science and

Technology Policy -- a subdivision of the executive branch located across the street from the

White House.  Finally, Defendants further admit that Moehle provided an initial capital

**JA433**

contribution of $1,000.00 and that Daimler did not make any initial capital contribution.

By way of further response, the organizational resolutions of Coal Hill, executed approximately six months before Moehle was introduced to Daimler, approved an initial capital contribution by Moehle in the amount of $1,000.00 together with the founding sponsorship gift from GE Ventures prior to Daimler's involvement.

The remaining allegations of Paragraph 43 are denied. Defendants specifically deny that Daimler and Moehle had an "equal partnership." Rather, the nature of Daimler and Moehle's relationship was defined in writing by the terms of the Companies' Amended and Restated Operating Agreements and Common Unit Award Agreements. Defendants respectfully refer the Court to the documents for the full contents thereof. The Companies further expounded on the expected roles, contributions and responsibilities of Daimler, Moehle and other individuals employed or retained in company documents to which Daimler had access and/or possessed before he joined the Companies and while he was a member of the Companies.

44.    The allegations of Paragraph 44 are admitted in part and denied in part. Defendants admit that Coal Hill repaid the promissory note issued to Daimler in full, together with interest, on or about November 2, 2017. Defendants further admit that Coal Hill reimbursed Daimler for $35,000.00 that Daimler agreed to pay to match the $35,000 Moehle advanced to Coal Hill by virtue of working without being paid a salary and covering corporate expenses.

The remaining allegations of Paragraph 44 are denied. Defendants specifically deny that the $35,000.00 reimbursed to Daimler represented only a "portion" of funds Daimler provided to Coal Hill. By way of further response, after reasonable investigation, Defendants are unaware of any money provided to Coal Hill by Daimler that have not been reimbursed in full. Indeed, Daimler has repeatedly refused requests by Moehle to provide Defendants with documents that

**JA434**

reflect any amount of money Daimler paid and that has not been reimbursed.

45.     The allegations of Paragraph 45 are admitted in part and denied in part as stated.

Defendants admit only that in January 2016, Daimler was appointed as a Presidential Innovation

Fellow for the Office of Science and Technology Policy and otherwise deny the allegations of

Paragraph 45.

46.     The allegations of Paragraph 46 are admitted in part and denied in part as stated.

Defendants admit that Daimler informed Defendants that his fellowship would be a twelve-

month program.  After reasonable investigation, Defendants are without knowledge or

information sufficient to form a belief as to the truth of Daimler's assertion that it is "axiomatic"

that such fellowships must end upon the transition to a new presidential administration and,

therefore, Defendants deny the allegation as stated.  In fact, Daimler worked for the Trump

administration for at least two months before his position was terminated.

47.     Defendants deny the allegations of Paragraph 47 as stated.  By way of further

response, Defendants admit that Moehle agreed to support Daimler's pursuit of the fellowship

based on Daimler's express assurances that he could continue devoting approximately thirty

hours a week to the Companies and the Fund.  Defendants admit only that, based on Daimler's

assurances, Moehle perceived some benefit to the Companies and the Fund in allowing Daimler

to pursue to the fellowship, as it would provide Daimler with a salary until such time as Daimler

had secured sufficient investments for the Fund to justify his full-time employment.

48.     The allegations of Paragraph 48 are admitted in part and denied in part.

Defendants admit that Daimler's fellowship lasted from approximately January 2016 until early

2017.  Defendants further admit that Daimler's stated role as an "Innovation Fellow" was to

"advise" the Office of Science and Technology Policy on various matters.  Defendants are

without information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 48 and, therefore, deny them.

49.    Defendants deny the allegation of Paragraph 49 that Moehle "promoted" Daimler's fellowship in connection with any marketing or fundraising efforts.  After reasonable investigation, Defendants are without knowledge or information sufficient to form a belief as to whether any other individual affiliated with the Companies, such as Daimler himself, might have "promoted Daimler's White House position" in connection with the Companies' marketing or fundraising efforts.  Therefore, the allegation is denied. By way of further response, Daimler's fellowship was not mentioned anywhere in the Fund's Private Placement Memorandum, which was the primary marketing document for the Fund.

After reasonable investigation, Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegation that Robotics Hub received any "positive press coverage" related to Daimler's fellowship, and, therefore, the allegation is denied. By way of further response, Defendants are unaware of any such coverage and specifically advised Daimler, as did other Robotics Hub affiliates, that attempting to self-aggrandize his public service would reflect poorly on him and the Companies.

50.    The allegations of Paragraph 50 do not require a response, as they relate exclusively to claims that have been dismissed by the Court.  ECF No. 47.  To the extent a response is deemed necessary, the allegations of Paragraph 50 are denied.  After reasonable investigation, Defendants are not aware of any "services" rendered to the Companies by Daimler for which Daimler was entitled to receive compensation. Therefore, Defendants deny the allegation. Any remaining allegations of Paragraph 50 are denied.

51.    The allegations of Paragraph 51 are admitted in part and denied in part.

Defendants admit only that, at some point in 2016, the relationship between Daimler and Moehle began to break down. Defendants deny that the relationship broke down "because of Daimler's fellowship," except insofar as it broke down, in part, because Daimler devoted only minimal time to the Companies and Fund for the duration of his fellowship rather than the approximately thirty hours per week that Daimler had promised to devote notwithstanding that fellowship.

By way of further response, the deterioration of Moehle and Daimler's business relationship was attributable to Daimler's routine failure to meet performance milestones and deliverable deadlines, devotion of only minimal time and effort to the Companies' business, and inability to secure any significant investments or otherwise contribute to the Fund's growth at or near the level expected of a member of the Companies.

52.    Defendants admit the allegations of Paragraph 52.

53.    The allegations of Paragraph 53 do not require a response, as they relate exclusively to claims that have been dismissed by the Court.  ECF No. 22.  To the extent a response is deemed necessary, the allegations of Paragraph 53 are admitted in part and denied in part. Defendants admit only that Moehle served as the primary point of direct contact with Reed Smith but, as Daimler concedes in his Complaint, Daimler also interacted with Reed Smith. Any remaining allegations of Paragraph 53 are denied.

54.    The allegations of Paragraph 54 do not require a response, as they relate exclusively to claims that have been dismissed by the Court.  ECF No. 22.  Further, the allegations of Paragraph 54 are conclusions of law that do not require a response.  To the extent a response is deemed necessary, the allegations are admitted in part and denied in part. Defendants admit that the Companies entered into Common Unit Award Agreements with Moehle on March 23, 2016.  By way of further response, the Companies also entered into

Common Unit Award Agreements with Jamie Fee, who worked for the Companies full-time.

Mr. Fee's Common Unit Award Agreements had the same vesting terms as Moehle's awards.

Defendants deny the allegations of Paragraph 54 insofar as they refer to and purport to

characterize or interpret the Common Unit Award Agreements. Defendants respectfully refer the

Court to the documents for the full contents thereof.

55.     The allegations of Paragraph 55 do not require a response, as they relate

exclusively to claims that have been dismissed by the Court. ECF No. 22. Further, the

allegations of Paragraph 55 are conclusions of law that do not require a response. To the extent a

response is deemed necessary, the allegations of Paragraph 55 are admitted in part and denied in

part. Defendants admit only that the Companies entered into the Common Unit Award

Agreements with Daimler. Defendants specifically deny that Daimler's Common Unit Award

Agreements were entered into on March 23, 2016. By way of further response, Daimler did not

sign the Common Unit Award Agreements until later in April. Defendants deny the remaining

allegations of Paragraph 55 insofar as they refer to and purport to characterize or interpret the

Common Unit Award Agreements. Defendants respectfully refer the Court to the documents for

the full contents thereof.

56.     The allegations of Paragraph 56 do not require a response, as they relate

exclusively to claims that have been dismissed by the Court. ECF No. 22. Further, the

allegations of Paragraph 56 are conclusions of law that do not require a response. To the extent a

response is required, Defendants deny the allegations of Paragraph 56 insofar as they refer to and

purport to characterize or interpret the Common Unit Award Agreements. Defendants

respectfully refer the Court to the documents for the full contents thereof. Defendants further

respond that the vesting schedule of the Common Unit Award Agreements for Daimler were the

**JA438**

same that were offered to other individuals who, like Daimler, were not engaged full-time in the Companies.

57.     The allegations of Paragraph 57 do not require a response, as they relate exclusively to claims that have been dismissed by the Court.  ECF No. 22.  Further, the allegations of Paragraph 57 are conclusions of law that do not require a response. To the extent a response is required, Defendants deny the allegations of Paragraph 57 insofar as they refer to and purport to characterize or interpret the Common Unit Award Agreements.  Defendants respectfully refer the Court to the documents for the full contents thereof.

58.     The allegations of Paragraph 58 do not require a response, as they relate exclusively to claims that have been dismissed by the Court.  ECF No. 22.  Further, the allegations of Paragraph 58 are conclusions of law that do not require a response. To the extent a response is required, Defendants deny the allegations of Paragraph 58 insofar as they refer to and purport to characterize or interpret the Common Unit Award Agreements.  Defendants respectfully refer the Court to the documents for the full contents thereof.

59.     The allegations of Paragraph 59 do not require a response, as they relate exclusively to claims that have been dismissed by the Court.  ECF No. 22.  To the extent a response is required, the allegations of Paragraph 59 are denied.  Defendants specifically deny that Moehle ever made any of the alleged representations.  Defendants further deny the allegations of Paragraph 59 insofar as they refer to and purport to characterize or interpret the Common Unit Award Agreements, which are written agreements that speak for themselves.  By way of further response, Moehle sent Daimler redline versions of the Daimler Awards that expressly identified the differences between the Moehle Awards and Daimler Awards.  Moehle also had a telephone call with Daimler about the redlines before Daimler signed Daimler

Awards.

60.     The allegations of Paragraph 60 do not require a response, as they relate exclusively to claims that have been dismissed by the Court.  ECF No. 22.  To the extent a response is required, the allegations of Paragraph 60 are denied.

61.     The allegations of Paragraph 61 do not require a response, as they relate exclusively to claims that have been dismissed by the Court.  ECF No. 22.  To the extent a response is required, the allegations of Paragraph 61 are denied.

62.     The allegations of Paragraph 62 do not require a response, as they relate exclusively to claims that have been dismissed by the Court.  ECF No. 22.  To the extent a response is required, the allegations of Paragraph 62 are denied.  By way of further response, Moehle sent Daimler redline versions of the Daimler Awards that expressly identified the differences between the Moehle Awards and Daimler Awards and Moehle had a telephone call with Daimler about the redlines before Daimler signed Daimler Awards.

63.     The allegations of Paragraph 63 do not require a response, as they relate exclusively to claims that have been dismissed by the Court.  ECF No. 22.  To the extent a response is required, the allegations of Paragraph 63 are denied.

64.     The allegations of Paragraph 64 do not require a response, as they relate exclusively to claims that have been dismissed by the Court.  ECF No. 22.  To the extent a response is required, Defendants deny the allegations of Paragraph 64 that Moehle or Reed Smith ever made the representations alleged.  After reasonable investigation, Defendants are without sufficient information to form a belief as to the truth of the allegations of Paragraph 64 regarding Daimler's subjective "understanding" of the terms of the Common Unit Award Agreements and, therefore, those allegations are denied.

19

**JA440**

65.    The allegations of Paragraph 65 do not require a response, as they relate exclusively to claims that have been dismissed by the Court.  ECF No. 22.  To the extent a response is required, Defendants are without sufficient information to form a belief as to the truth of the allegations of Paragraph 65 regarding Daimler's subjective knowledge of the express terms of the Common Unit Award Agreements, which Daimler signed, and, therefore, those allegations are denied.

66.    The allegations of Paragraph 66 are admitted in part and denied in part. Defendants admit that Robotics Hub, Coal Hill, and their prospective members entered into Amended and Restated Operating Agreements. Defendants deny that Daimler signed the Amended and Restated Operating Agreements on March 23, 2016.  By way of further response, Daimler did not sign the Amended and Restated Operating Agreements until later in April. Defendants further deny the allegations of Paragraph 66, insofar as they purport to characterize or interpret the Amended and Restated Operating Agreements. Defendants respectfully refer the Court to the documents for the full contents thereof.

67.    The allegations of Paragraph 67 are conclusions of law that do not require a response. To the extent a response is required, Defendants deny the allegations of Paragraph 67 insofar as they refer to, and purport to characterize or interpret the Amended and Restated Operating Agreements.  Defendants respectfully refer the Court to the documents for the full contents thereof.

68.    The allegations of Paragraph 68 are conclusions of law that do not require a response. To the extent a response is required, Defendants deny the allegations of Paragraph 68 insofar as they refer to, and purport to characterize or interpret the Amended and Restated Operating Agreements.  Defendants respectfully refer the Court to the documents for the full

**JA441**

contents thereof.

69.     The allegations of Paragraph 69 are conclusions of law that do not require a response. To the extent a response is required, Defendants deny the allegations of Paragraph 69 insofar as they refer to, and purport to characterize or interpret the Amended and Restated Operating Agreements.  Defendants respectfully refer the Court to the documents for the full contents thereof.

70.     The allegations of Paragraph 70 are conclusions of law that do not require a response. To the extent a response is required, Defendants deny the allegations of Paragraph 70 insofar as they refer to, and purport to characterize or interpret the Amended and Restated Operating Agreements.  Defendants respectfully refer the Court to the documents for the full contents thereof.

71.     Defendants deny the allegations of Paragraph 71. Defendants specifically deny that Moehle ever represented to Daimler that GE Ventures made any commitment to the Companies or the Fund, other than the founding sponsorship gift that GE Ventures awarded to Coal Hill pursuant to a Partner Agreement executed on May 20, 2015 and which was publicly announced in a press release authored by GE Ventures in August 2015.  By way of further response, at the time Daimler signed the Awards in April 2016, Daimler himself provided prospective investors with documents that fully disclosed the Companies' third party relationship with GE Ventures and, importantly, did not disclose a "commitment" by GE Ventures to invest $20,000,000.00 in the Fund.  As a member of the Companies, Daimler had duties and obligations to ensure those disclosures were accurate before sending them.

72.     The allegations of Paragraph 72 are admitted in part and denied in part. Defendants admit that when Daimler signed the Operating Agreements he had begun his full-

21

**JA442**

time employment with the Office of Science and Technology Policy.  Defendants deny the

remaining allegations in the Paragraph 72.  By way of further response, Daimler had access to all

company documents on the shared Google Drive which he unlawfully accessed and attempted to

manipulate after he was removed as a Board Member from the Companies.

73.     Defendants deny the allegations of Paragraph 73.  Defendants specifically deny

that Daimler and Moehle "began their partnership as equal partners."  The nature of Daimler and

Moehle's relationship was defined in writing by the terms of the Companies' Amended and

Restated Operating Agreements and Common Unit Award Agreements.  Defendants respectfully

refer the Court to the documents for the full contents thereof. The Companies further expounded

on the expected roles, contributions and responsibilities of Daimler, Moehle and other

individuals employed or retained in company documents to which Daimler had access and/or

possessed before he joined the Companies and while he was a member of the Companies.

Defendants further deny that Daimler and Moehle "were promoted as such" by any of the

Defendants.  Daimler's participation in the Companies was limited to his minimal, unsuccessful

fundraising efforts.  Daimler had little to no involvement in the broad business aspects of the

Companies and the Fund.

74.     The allegations of Paragraph 74 are denied. Defendants specifically deny that

Daimler ever had a "full-time position" with the Companies to "return" to, as evidenced by the

Amended and Restated Operating Agreements and Common Unit Award Agreements that

Daimler signed.  Defendants further deny that Moehle "understood" that Daimler would be

offered a full-time position "when his fellowship ended."  By way of further response, prior to

starting his fellowship, Daimler had assured Moehle and the Companies that he would be able to

devote approximately thirty hours a week to the Companies *during* his fellowship, but

**JA443**

subsequently failed to do so.

In addition, as Moehle had communicated to Daimler at the beginning of their relationship, Defendants' only "understanding" regarding the possibility of full-time employment for Daimler was that the Companies would consider offering such a position *if* Daimler was able to make good on his promises to secure sufficient investments for the Fund to justify and support bringing him on full-time and that would show Daimler could make significant, positive impact on the Companies and the Fund.  The Companies ultimately elected not to offer Daimler full-time employment after he routinely failed to meet performance milestones and deliverable deadlines, devoted only minimal time and effort to the Companies' business, became increasingly difficult to work with, and proved unable to secure any significant investments (as he represented) or otherwise contribute to the Fund's growth at or near the level expected of a member of the Companies.

75.    Defendants deny the allegations of Paragraph 75.

76.    Defendants deny the allegations of Paragraph 76.  Defendants do not have sufficient information to interpret what Daimler means by "budgeted" but Defendants specifically deny that the Companies had agreed to pay any salary to Daimler, let alone a "full-time salary" or "matching salaries for Moehle and Daimler."  Defendants further respond that "individual" referenced in the allegations of Paragraph 76 did not join the Companies, in part, because Daimler failed to secure any significant investments as he represented he would.

77.    Defendants admit the allegations of Paragraph 77.  By way of further response, the business relationship between Daimler and Moehle began to deteriorate in early to mid 2016 after he routinely failed to meet performance milestones and deliverable deadlines, devoted only minimal time and effort to the Companies' business, became increasingly difficult to work with,

**JA444**

and proved unable to secure any significant investments (as he represented) or otherwise

contribute to the Fund's growth at or near the level expected of a member of the Companies.

78.    Defendants deny the allegations of Paragraph 78. Defendants specifically deny

that "attention and publicity Daimler received" from his fellowship, if any, became a "point of

contention between Daimler and Moehle" or led Moehle to begin "criticizing Daimler as a

business partner."  There was a "point of contention" with regard to Daimler's attempts to self-

aggrandize his public service because it reflected poorly on the Companies.  In addition, there

was a "point of contention" or source of criticism between Daimler and Moehle because Daimler

routinely failed to meet performance milestones and deliverable deadlines, devoted only minimal

time and effort to the Companies' business, became increasingly difficult to work with, and

proved unable to secure any significant investments (as he represented) or otherwise contribute

to the Fund's growth at or near the level expected of a member of the Companies.

79.    Defendants deny the allegations of Paragraph 79. Defendants specifically deny

that Moehle controlled or restricted Daimler's access to information about the Fund's investors

and portfolio companies in any way.  By way of further response, Daimler had unrestricted

access to the Fund's Google Drive, where documentation regarding the Fund's investors and

portfolio companies was stored.  In fact, Daimler unlawfully accessed this information

immediately following his removal from the Companies, and used it in an effort to solicit the

Fund's investors and portfolio companies for his own benefit.

80.    The allegations of Paragraph 80 are admitted in part and denied in part.

Defendants deny the allegation that Moehle restricted Daimler's access to information about the

Fund's portfolio companies in any way.  By way of further response, Daimler had unrestricted

access to the Fund's Google Drive, where documentation regarding the Fund's investors and

portfolio companies was stored.  Defendants admit that Moehle had to correct Daimler's inconsistent and inaccurate presentation of deal facts to potential investors and portfolio companies.  Defendants also admit that Moehle asked Daimler to revise his LinkedIn page so as to describe Robotics Hub in a manner consistent with Moehle's LinkedIn page because Moehle reasonably believed that to have drastically different texts describing Robotics Hub would be detrimental to attracting potential investors.

81.    Defendants deny the allegations of Paragraph 81.  By way of further response, Daimler wrote his own "deliverables" and presented them to Moehle.  Tellingly, Daimler failed to complete the non-ministerial deliverables he promised.

82.    Defendants deny the allegations of Paragraph 82.  By way of further response, Daimler was not "engaged" in the Companies other than his minimal, sporadic, and unsuccessful fundraising efforts and occasionally attending meetings in connection therewith.  In addition, because Moehle was foregoing a salary despite his full-time efforts and was covering corporate expenses, Daimler had already committed to paying his share of corporate expenses incurred by the Companies.  Daimler on multiple occasions attempted to renege on his express agreements to share in the corporate expenses.

83.    After reasonable investigation, Defendants are without information sufficient to form a belief as to the truth of the allegations of Paragraph 83 and, therefore, deny the allegations.

84.    Defendants deny the allegations of Paragraph 84.  By way of further response, both Moehle and Daimler contributed $30,000 (Moehle by way of, among other things, foregoing salary payments) to cover six months of Coal Hill's operating expenses.  Both also contributed an additional $5,000 for a seventh month of operation although Daimler attempted to

renege on his agreement.

85.     Defendants deny the allegations of Paragraph 85.

86.     Defendants deny the allegations of Paragraph 86.

87.     Defendants deny the allegations of Paragraph 87.

88.     Defendants deny the allegations of Paragraph 88.

89.     Defendants deny the allegations of Paragraph 89.

90.     Defendants deny the allegations of Paragraph 90.

91.     Defendants deny the allegations of Paragraph 91.  Defendants never agreed to treat any payments by Daimler as "capital contributions."

92.     Defendants deny the allegations of Paragraph 92.  By way of further response, to the best of Defendants' knowledge and belief, Daimler's alleged "financial contributions" were not related to essential operating expenses which were covered by the $35,000 Moehle advanced to Coal Hill by virtue of working without being paid a salary and covering corporate expenses and $35,000.00 that Daimler loaned to Coal Hill and for which he was repaid.  In fact, despite multiple requests from Defendants, Daimler has refused to document his alleged "financial contributions" and the expenses they allegedly covered.

93.     Defendants deny the allegations of Paragraph 93. The allegation that Daimler was entitled to additional common units in Coal Hill is a conclusion of law that does not require a response. To the extent a response is required, Defendants deny that Daimler was entitled to any additional common units in the Companies for any reason.

Defendants deny the allegation related to "equal partners" as it is unclear what Daimler means by that term.  Defendants further specifically deny that "Daimler and Moehle continued to be equally important to the venture," which is a subjective statement of opinion that does not

**JA447**

require a response and, therefore, is denied.  To the extent a response is required, throughout 2016, Daimler devoted minimal time to the Companies and the Fund, secured no significant investments for the Fund, and routinely failed to meet performance milestones and deliverable deadlines.  Therefore, Defendants deny that Daimler was "equally important to the venture."

94.    The allegations of Paragraph 94 are admitted in part and denied in part. Defendants admit only that Daimler did not receive any additional common units in Coal Hill. By way of further response, Daimler was not entitled to any such units.

The remaining allegations of Paragraph 94 are denied.  Defendants specifically deny that Daimler made any "additional financial contributions" to the Companies.  The allegations regarding the requirements of Section 7.2 of Coal Hill's Amended and Restated Operating Agreement are conclusions of law that do not require a response. To the extent a response is required, Defendants deny the allegations insofar as they refer to, and purport to characterize or interpret the Amended and Restated Operating Agreement.  Defendants respectfully refer the Court to the document for the full contents thereof.

95.    Defendants deny the allegations of Paragraph 95.

96.    Defendants deny the allegations of Paragraph 96.  By way of further response, Daimler and Moehle did in fact meet in Pittsburgh in late 2016 where they discussed the necessity for Daimler to meet his fundraising milestone of $15,000,000 to which Daimler agreed. Rather than work to secure the investments, Daimler went on vacation for three weeks.

97.    Defendants deny the allegations of Paragraph 97.  By way of further response, Daimler actually scheduled and went on a three-week vacation during the Fund's first closing in December 2016.  On several prior occasions, Daimler also scheduled and went on vacations when the Fund was trying to close on investments.  On one such occasion, while the Fund was

attempting to arrange the close of the Fund's initial Special Purpose Vehicle ("SPV"), Daimler was on vacation and posting on his public social media profiles pictures from that vacation.  The investors involved in that initial SPV negatively reacted to Daimler's behavior, a purported "partner," and his unavailability at such a critical time for the Fund.

98.    Defendants deny the allegations of Paragraph 98.  Defendants specifically deny that Moehle "unilaterally assign[ed] Daimler 'deliverables.'" By way of further response, Daimler presented Moehle with his own proposed "Milestones" and subsequently failed to complete the required milestones and deliverables that he himself had proposed. The specific "deliverable" requiring Daimler to make introductions to internet travel companies, such as Google Travel, had been proposed to Moehle by Daimler more than six months prior and, by the time Daimler finally "completed" the deliverable, it was no longer needed or beneficial.

99.    Defendants deny the allegations of Paragraph 99.

100.    Defendants deny the allegations of Paragraph 100.  Defendants specifically deny that Moehle refused to disclose or somehow prevented Daimler from obtaining contact information for any investor or portfolio company.  By way of further response, contact information for the Fund's investors and portfolio companies was freely available to Daimler on the Fund's Google Drive.

Defendants further deny that Moehle refused to provide Daimler with contact information for TravelWits in particular. In fact, Daimler met with TravelWits in person in a meeting that Moehle set up.  Moreover, TravelWits was located in the same office as Daimler and Moehle.  Thus, Daimler could have contacted TravelWits at any time by simply taking the stairs.

101.    Defendants deny the allegations of Paragraph 101.

102.    Defendants deny the allegations of Paragraph 102.

103.    The allegations of Paragraph 103 are admitted in part and denied in part. Defendants admit that Daimler and Moehle met in-person on January 5-6, 2017 and that Moehle presented Daimler with written document setting forth a potential non-operating role for Daimler.  The remaining allegations of Paragraph 103 are denied.  Defendants specifically deny ever discussing "the notion" that a "full-time operating role for Daimler *would* occur at a later date."  Rather, Moehle consistently informed Daimler that a full-time operating role *could* still be a possibility *if* Daimler's performance improved and he managed to secure sufficient investments in the Fund to justify his hiring.  Daimler never secured any such investments but instead demanded a full-time salary independent of any performance milestones.

104.    The allegations of Paragraph 104 are admitted in part and denied in part. Defendants admit that, on or about January 5, 2017, Moehle recommended to the Companies' Boards, which consisted of Daimler and Moehle, that Daimler not be offered full-time employment by the Companies.  The remaining allegations of Paragraph 104 are denied. Defendants specifically deny that Daimler ever held a "full-time role with the Companies" to which he could "return."

105.    Defendants deny the allegations of Paragraph 105. Defendants specifically deny that Daimler ever held "full-time employment" with the Companies to which he could "return." Defendants further specifically deny that the Companies had "contemplated" that Daimler would necessarily be offered full-time employment at any point, irrespective of his performance or ability to secure sufficient investments in the Fund.  Defendants further specifically deny that the Companies had "budgeted a full-time salary for Daimler" or that Daimler ever had a salary that was "accru[ing]" or would be paid at a later date.

106.    The allegations of Paragraph 106 are admitted in part and denied in part.

**JA450**

Defendants specifically deny that Daimler ever held a "full-time role with the Companies" to which he could "return." Defendants otherwise admit the allegations of Paragraph 106.

107.    Defendants admit the allegations of Paragraph 107.

108.    Defendants admit the allegations of Paragraph 108.

109.    The allegations of Paragraph 109 are admitted in part and denied in part. Defendants admit that the Companies' neutral deadlock advisor, David Mahwinney, broke the deadlock by voting against offering Daimler a full-time role with the Companies. Defendants further admit that the Companies' financial status was one of the bases, but not the sole basis, for Mahwinney's decision. The remaining allegations of Paragraph 109 are denied. Defendants specifically deny that Mahwinney "understood when casting his vote that Daimler's full-time engagement with the Companies would occur at a later date."

110.    The allegations of Paragraph 110 are admitted in part and denied in part. Defendants deny that Daimler was not offered a non-operating role in the Companies. To the contrary, Daimler rejected that offer and insisted on being paid a full-time salary regardless of performance. Defendants admit that Daimler was not provided and was not entitled to compensation, and Defendants admit that Daimler was not offered a "full-time position" in the Companies. By way of further response, Defendants had no obligation to provide Daimler with compensation, or a role of any kind. Indeed, the Court has already held that Daimler "signed an agreement that clearly and unambiguously provided that he had no such right." ECF No. 22 at 16. The remaining allegations of Paragraph 110 are denied.

111.    The allegations of Paragraph 111 do not require a response, as they relate exclusively to claims that have been dismissed by the Court. ECF No. 22. To the extent a response is required, Defendants admit only that Daimler's common units in the Companies were

properly deemed forfeited after he failed to satisfy the express vesting conditions applicable to those units within the specified time period.

The remaining allegations of Paragraph 111 are conclusions of law to which no response is required. To the extent a response is required, the remaining allegations of Paragraph 111 are denied. Defendants specifically deny that the Companies had any obligation to offer Daimler a full-time position "within a year after executing the Daimler Awards." ECF No. 22 at 16.

112.    The allegations of Paragraph 112 do not require a response, as they relate exclusively to claims that have been dismissed by the Court. ECF No. 22. Further, the allegations of Paragraph 112 are conclusions of law that do not require a response. To the extent a response is deemed necessary, Defendants admit that Daimler has no membership or ownership interest in the Companies, thereby making Moehle the Companies' majority member.

113.    Defendants deny the allegations of Paragraph 113. By way of further response, the Companies, in an officially held meeting, voted to remove Daimler from their respective Boards. In addition, the Fund's Limited Partnership Agreement was amended and restated to remove Daimler from the "Key Person" provision by affirmative vote of 100% of the limited partners, which includes individuals and entities other than Moehle. In fact, one limited partner in December 2016 unilaterally approached Moehle to request that Daimler be removed from the "Key Person" provision.

114.    Defendants deny the allegations of Paragraph 114.

## COUNT ONE
## FRAUD IN THE INDUCEMENT
### (Against Moehle)

115.    Defendants incorporate by reference Paragraphs 1 to 114 of this Answer.

116.    Defendants deny the allegations of Paragraph 116.

117.    The allegations of Paragraph 117 are conclusions of law that do not require a response. To the extent a response is required, Defendants deny the allegations of Paragraph 117.

118.    The allegations of Paragraph 118 are conclusions of law that do not require a response. To the extent a response is required, Defendants deny the allegations of Paragraph 118.

119.    The allegations of Paragraph 119 are conclusions of law that do not require a response. To the extent a response is required, Defendants deny the allegations of Paragraph 119.

120.    The allegations of Paragraph 120 are conclusions of law that do not require a response. To the extent a response is required, Defendants deny the allegations of Paragraph 120.

**COUNT TWO**
**FRAUD IN THE INDUCEMENT**
**(Against Robotics Hub)**

121.    Defendants incorporate by reference Paragraphs 1 to 120 of this Answer.

122.    Defendants deny the allegations of Paragraph 122.

123.    The allegations of Paragraph 123 are conclusions of law that do not require a response. To the extent a response is required, Defendants deny the allegations of Paragraph 123.

124.    The allegations of Paragraph 124 are conclusions of law that do not require a response. To the extent a response is required, Defendants deny the allegations of Paragraph 124.

125.    The allegations of Paragraph 125 are conclusions of law that do not require a response. To the extent a response is required, Defendants deny the allegations of Paragraph 125.

126.    The allegations of Paragraph 126 are conclusions of law that do not require a response. To the extent a response is required, Defendants deny the allegations of Paragraph 126.

**COUNT THREE**
**BREACH OF CONTRACT -- COAL HILL OPERATING AGREEMENT**
**(Against Coal Hill)**

127.    Defendants incorporate by reference Paragraphs 1 to 126 of this Answer.

**JA453**

128.    The allegations of Paragraph 128 are admitted in part and denied in part. Defendants admit that Daimler and Coal Hill entered into the Coal Hill Amended and Restated Operating Agreement. Defendants deny that Daimler signed the Coal Hill Amended and Restated Operating Agreement on March 23, 2016.  By way of further response, Daimler failed to sign the Amended and Restated Operating Agreements until later in April.

129.    The allegations of Paragraph 129 are conclusions of law that do not require a response.  To the extent a response is required, Defendants deny the allegations of Paragraph 129 insofar as they refer to and purport to characterize or interpret the Coal Hill Amended and Restated Operating Agreement.  Defendants respectfully refer the Court to the document for the full contents thereof.

130.    The allegations of Paragraph 130 are conclusions of law that do not require a response.  To the extent a response is required, Defendants deny the allegations of Paragraph 130.

131.    The allegations of Paragraph 131 are conclusions of law that do not require a response.  To the extent a response is required, Defendants admit in part and deny in part the allegations of Paragraph 131.  Defendants admit only that Daimler was issued no additional units in Coal Hill.  The remaining allegations of Paragraph 131 are denied.  Defendants specifically deny that Coal Hill agreed to treat any expenditure by Daimler as an "additional capital contribution."

132.    The allegations of Paragraph 132 are conclusions of law that do not require a response. To the extent a response is required, Defendants deny that Daimler extended any loan to Coal Hill for which he has not yet been repaid in full.

**JA454**

**COUNT FOUR**
**FRAUD IN THE INDUCEMENT**
**(Against Coal Hill)**

133.    Defendants incorporate by reference Paragraphs 1 to 132 of this Answer.

134.    Defendants deny the allegations of Paragraph 134.

135.    The allegations of Paragraph 135 are conclusions of law that do not require a response. To the extent a response is required, Defendants deny the allegations of Paragraph 135.

136.    The allegations of Paragraph 136 are conclusions of law that do not require a response. To the extent a response is required, Defendants deny the allegations of Paragraph 136.

137.    The allegations of Paragraph 137 are conclusions of law that do not require a response. To the extent a response is required, Defendants deny the allegations of Paragraph 137.

138.    The allegations of Paragraph 138 are conclusions of law that do not require a response. To the extent a response is required, Defendants deny the allegations of Paragraph 138.

**PRAYER FOR RELIEF**

WHEREFORE, Defendants deny all liability to Daimler and demand judgment in their favor, and against Daimler, together with interest, costs, attorneys' fees and such further relief as the Court deems just and appropriate.

**AFFIRMATIVE DEFENSES**

Pursuant to Rule 8(c) of the Federal Rules of Civil Procedure, Defendants assert the following Affirmative Defenses to Daimler's Fourth Amended Complaint:

**FIRST DEFENSE**

Daimler's claims are barred, in whole or in part, for failure to state a claim against Defendants for which relief can be granted.

**JA455**

## SECOND DEFENSE

Daimler's claims are barred, in whole or in part, by the applicable statute of limitations.

## THIRD DEFENSE

Daimler's claims are barred, in whole or in part, by the equitable doctrines of laches, unclean hands, waiver, and/or estoppel.

## FOURTH DEFENSE

Daimler's claims are barred, in whole or in part, by payment, setoff, settlement, release, and/or accord and satisfaction.

## FIFTH DEFENSE

Daimler's claims are barred, in whole or in part, because Daimler has not suffered any damages as a result of any act or omission taken by Defendants.

## SIXTH DEFENSE

Daimler's claims are barred, in whole or in part, because Daimler is not entitled, in whole or in part, to the damages sought in the Fourth Amended Complaint.

## SEVENTH DEFENSE

Daimler's claims are barred, in whole or in part, by Daimler's failure to mitigate damages.

## EIGHTH DEFENSE

Defendants reserve the right to assert any additional defenses based on information obtained throughout the course of this litigation.

WHEREFORE, Defendants deny all liability to Daimler and demand judgment in their favor, and against Daimler, together with interest, costs, attorneys' fees and such further relief as the Court deems just and appropriate.

**JA456**

## COUNTERCLAIMS

Counterclaim-plaintiffs Robotics Hub Fund 1, LLC ("Robotics Hub") and Coal Hill Ventures LLC ("Coal Hill") (collectively hereafter the "Companies"), by and through their undersigned counsel, hereby files these Counterclaims against counterclaim-defendant Eric Daimler ("Daimler"), alleging as follows:

## NATURE OF THE CASE

1.    The Companies hereby incorporate by reference the foregoing responses, and state the following counterclaims against Daimler for fraudulent misrepresentation, unfair competition and cybersquatting in violation of the Lanham Act as a result of Daimler's unauthorized and misleading use of Coal Hill's Robotics Hub trademark, and Daimler's unlawful, unauthorized access to Coal Hill's protected computer in violation of 18 U.S.C. § 1030.

## PARTIES

2.    Counterclaim-plaintiff Robotics Hub is a Delaware limited liability company with a principal place of business in Pittsburgh, Pennsylvania.

3.    Counterclaim-plaintiff Coal Hill is a Pennsylvania limited liability company with a principal place of business in Pittsburgh, Pennsylvania.

4.    Counterclaim-defendant Daimler states he is an individual who resides in New York.

5.    This Court has subject matter jurisdiction of the Companies' Counterclaims pursuant to 15 U.S.C. §1121 and 28 U.S.C. §§ 1331 and 1338.

6.    This Court has personal jurisdiction over Daimler for purposes of the Companies' Counterclaims because Daimler filed suit in this Court.

**JA457**

7.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

**A.  Daimler Misrepresents His Credentials**

8.      Chris Moehle ("Moehle") formed Coal Hill on April 28, 2015.

9.      In August of 2015, Moehle and Coal Hill announced plans to launch the Robotics Hub, a business accelerator focused on identifying, building, and guiding promising startup companies in the field of advanced robotics.  In connection therewith, Moehle formed the Robotics Hub Fund 1, LP (the "Fund") which was the vehicle to invest in early-stage robotics companies.

10.      The founding sponsor of the Fund was GE Ventures, General Electric's venture capital and investment arm, which provided Coal Hill with a one-time sponsorship gift to subsidize the Fund's startup and initial activities. The sponsor gift was provided pursuant to the terms of a Partner Agreement executed between Coal Hill and GE Ventures on May 20, 2015.

11.      In or around August of 2015, approximately six months after starting Coal Hill and soon after beginning planning for the Fund, Moehle was introduced to Daimler.

12.      Following their initial introduction, Moehle and Daimler had several phone conversations, during which they discussed their work and, eventually, the possibility of working together on the Fund.

13.      During those conversations, Daimler portrayed himself as an experienced venture capitalist with the pedigree necessary to raise investments on a scale that would potentially make the relationship worthwhile.

14.      To bolster his false portrayal, and thereby convince the Companies of his value as a potential partner, Daimler represented to Moehle that he had previously served as a "Principal"

**JA458**

for Comdisco Ventures, a venture capital firm focused on early/mid-stage technology firms, and, in that capacity, co-"managed" approximately $1.5 *billion* in investments in start-up technology companies with his "partners" at the firm. By representing that he "managed" those investments, Daimler was representing that he had deal attribution for those investments and that he would be able to deliver an audited track record of those investments to provide to potential investors in the Companies.

15.   Daimler first made this representation during his initial phone conversations with Moehle in late 2015, and repeated it in subsequent conversations over the course of their relationship, both before and after the Companies executed the Amended and Restated Operating Agreements and Common Unit Award Agreements.  This particular representation also appeared on Daimler's LinkedIn page, where it remains to this day.

16.   Daimler subsequently repeated his representations regarding his role at Comdisco Ventures in multiple conversations with Moehle over the course of their relationship including when Moehle asked for an audited track record to present to potential investors as a necessary predicate for those investors to commit to provide funds to the Companies.  Daimler never could provide the Companies with such an audited track record.

17.   In addition to his representations regarding his role at Comdisco, Daimler also represented to Moehle that investors had already committed $10,000,000.00 to Daimler's existing venture, Skilled Science, which would be carried over to the Companies if Daimler became a member of the Companies.  Indeed, Daimler stated that he was interested in joining the Companies in large part because they would provide him with the "operating model" he needed for those allegedly existing commitments.

18.   The Companies justifiably relied on Daimler's representations regarding his track

38

**JA459**

record and existing investor commitments, and Daimler's representations were material to the Companies' decision to begin working with Daimler, as opposed to other potential members, with real track records, to whom the Companies were also talking at that time.

19.     Daimler's representations also were material to the Companies ultimately amending and restating their operating agreements to add Daimler as a member and to sign agreements by which Daimler was awarded common units in the Companies, subject to an express vesting schedule.

20.     Daimler's repeated representations to the Companies that he was a skilled venture capitalist with an impressive track record—based on his claimed past experience co-managing *$1.5 billion* in venture capital investments and *$10,000,000.00* in previously committed investments that could be transferred to the Fund—gave the Companies' confidence that Daimler had the pedigree and track record necessary to raise funds that would justify bringing Daimler on as a member of the Companies.

21.     Daimler's representation regarding his investment management track record was particularly significant to the Companies' decision because the role intended for Daimler as explained by Moehle was to attract "institutional" type investors (e.g., companies with fiduciary duties to those whose money they manage and structured approval processes to invest) as opposed to the high worth individuals and less structured entities that Moehle was to target given his experience and connections.

22.     The Companies believed that having someone with the management track record Daimler represented he had would be a significant value add for the Companies by enhancing their ability to attract those institutional type investors.  Indeed, the Companies were considering others who actually had a real track record for the role Daimler ultimately wrongfully gained.

**JA460**

23.     Unbeknownst to Moehle at the time, Daimler had misrepresented—indeed, fabricated—both his claimed track record and the existence of any $10,000,000.00 investment commitment in Skilled Science.  Indeed, the supposed "investors" never even presented the opportunity to their investment committee.

24.     Daimler was never listed as a "Principal" and did not have any investment management or decision-making responsibility at Comdisco Ventures.  In particular, while Daimler had previously **worked** for Comdisco Ventures, his experience involved working as part of a multi-person diligence team that collectively gave recommendations to the principals.  Thus, Daimler's representations to the contrary were false and Daimler knew that his "diligence" work would not provide the track record necessary to convince institutional investors to invest in the Companies.

25.     Upon information and belief, Daimler never had a $10,000,000.00 commitment from investors in Skilled Science.  Over the course of relationship with the Companies, Daimler could not even secure a meeting with the investment committee that allegedly made this commitment to present or recommend investment in the Companies, let alone to obtain the funds that they had supposedly "committed" to provide.

26.     Indeed, during the course of his relationship with the Companies, Daimler proved unable to secure significant investment commitments *at all*, let alone investments on a scale consistent with his claimed track record.  In fact, the only investments that were directly attributable to the minimal work Daimler performed for the Companies were small dollar loans to the Fund (approximately $50,000.00/each) obtained from Daimler's elderly family members and friends, which the Companies repaid with interest when due.

27.     Daimler's failure to perform in this respect contributed heavily to the

**JA461**

deterioration of Moehle and Daimler's business relationship over the course of 2016.

28.     The Companies would never have begun working with Daimler, or entered into the Amended and Restated Operating Agreements and Common Unit Award Agreements, if Daimler had not falsely represented to Moehle that he had an extensive venture capital management track record and a substantial committed investment that could be carried over to the Companies and the Fund.

29.     Indeed, much of the Companies' fundraising strategy—i.e. the types of investors they chose to target to the exclusion of others—was based upon their misguided belief that Daimler had an extensive, and thus presumably auditable, venture capital management track record that could be marketed to institutional-type investors.  If not for Daimler's misrepresentation of his track record, Defendants would have hired someone with the credentials that Daimler misrepresented he had and/or would have focused more heavily on high net worth individuals and families and smaller investors, where Moehle succeeded in attracting investments into the Companies, without Daimler's assistance.

30.     Upon information and belief, Daimler's repeated misrepresentations were intentional, willful and calculated to induce the Companies to enter into a business relationship with Daimler, execute the Amended and Restated Operating Agreements and Common Unit Award Agreements with Daimler.

31.     Indeed, upon information and belief, Daimler was well-aware of his own track record and experience, and specifically made the above-discussed misrepresentations in order to persuade Defendants that Daimler had the pedigree to make the business relationship worthwhile.

41

**JA462**

**B. Daimler Removed From the Board of Managers of the Companies**

32.    On January 5 and 6, 2017, Daimler and Moehle met in-person to discuss, among other things, Daimler's future role, if any, in the Companies and to hold the respective Board meetings for the Companies.

33.    During the Board meetings, Moehle voted against offering Daimler full-time employment with the Companies and Daimler voted in favor of the offer, resulting in a deadlock under the respective Operating Agreements.

34.    As part of the further discussions of Daimler's future role, if any, in the Companies, Moehle offered Daimler a part-time non-operating role that included an option for Daimler to earn some upside and/or move into a full-time operating role *if* Daimler's performance improved and he managed to secure sufficient investments in the Fund to justify that upside or full-time operating role.

35.    Daimler refused that offer and, instead, demanded the Companies agree to pay him a full-time salary independent of any performance milestones.

36.    In light of the deadlock, the issue of offering Daimler full-time employment was referred to the Companies' neutral deadlock advisor, David Mahwinney.  Mr. Mahwinney broke the deadlock on March 22, 2017 by voting against offering Daimler a full-time role with the Companies.

37.    On March 27, 2017, in the best interest of the Companies, Daimler was removed from the Board of Managers of the Companies.

**C. The ROBOTICS HUB Mark**

38.    Since April 2015, Coal Hill has used the ROBOTICS HUB trademark (the "Mark") to advertise and promoted its business which is focused on identifying, building, and

42

**JA463**

guiding promising startup companies in the field of advanced robotics.

39.     Coal Hill has spent significant resources in advertising and promoting its business using the Mark and has received numerous accolades for its business under the Mark.

40.     As a result of Coal Hill's use, marketing, branding and promotion, Coal Hill has established strong trademark rights in the Mark in indelible association with Coal Hill and its business.

41.     In connection with these activities, Coal Hill is the exclusive owner of common law rights in the Mark.  Coal Hill also all right, title, and interest in and to U.S. Trademark Registration No. 5,597,703 for the Mark (the "Registration").

42.     The Registration is valid and subsisting.

**D.  Daimler's Unauthorized Use of Coal Hill Property**

43.     After March 27, 2017, Daimler had no right to use the Companies' property, which included, but is not limited to, the Companies' information, documents, data, computers and intellectual property.

44.     Yet, after March 27, 2017, without authorization from Coal Hill, Daimler transferred control of the roboticshub.io domain name (the "RH Domain Name") from Coal Hill to his private "GoDaddy" account, and caused all attempts to access the roboticsub.io website to be redirected to the website of Daimler's new ventures: c2.capital and, later, SpinGlass.

45.     By causing the roboticshub.io website to re-direct to Daimler's own venture, Daimler deliberately sought to trade on the goodwill associated with the Mark and create the false impression that Daimler's new services somehow originated from or were related to Coal Hill, thereby deceiving the relevant consumers and causing confusion or mistake as to the origin or affiliation of Daimler's and Coal Hill's services.

**JA464**

46.     Daimler further unlawfully exploited the Mark by using his Robotics Hub e-mail address, and, upon information and belief, the Robotics Hub name and logo found in his e-mail signature, to contact several of the Fund's portfolio companies and suggest that they leave the Fund and instead join c2.capital or SpinGlass.

47.     Despite requests from Coal Hill, Daimler refused to transfer the RH Domain Name and email addresses to Coal Hill.

48.     In addition, Daimler's unlawful use of the Mark as alleged herein caused the relevant consumers to be confused as to the relationship between Coal Hill and Moehle in light of the fact that the Robotics Hub website redirected to Daimler's companies, not Coal Hill, and Moehle's Robotics Hub email address was deactivated as a result of Daimler's actions.

49.     At no time did Coal Hill authorize Daimler or his agents to use the Mark in connection with advertising and promoting Daimler's c2.capital and SpinGlass businesses.

50.     Daimler has used and/or continues to use the Mark to advertise and promote his business so as to trade on the goodwill and recognition that Coal Hill has developed in the Mark.

51.     In addition to unlawfully using the Mark after he was removed as a Member, Daimler also unlawfully accessed and copied information from Coal Hill's Google Drive.

52.     Specifically, after March 27, 2017, Daimler used his credentials to access Coal Hill's protected computer and network systems—namely, the Google Drive which was used in and affected the Companies' interstate commerce, and attempted to remove Moehle's access to the same.

53.     After March 27, 2017, Daimler was not authorized to access Coal Hill's protected computer and network system, including related software, programs, and computers.

54.     Daimler used his unauthorized access to download and obtain confidential

information from Coal Hill's protected computer and network system, including investor documents and confidential information about the portfolio.

55.    Daimler subsequently exploited the confidential information he had unlawfully obtained from the Companies' protected computer and network system for profit.  Specifically, Daimler used those materials in public speeches, public presentations and, upon information and belief, in support of forming c2.capital and SpinGlass businesses.

56.    Daimler did not request or receive permission to use the information on the Coal Hill Google Drive in any fashion.  Nor did Daimler pay or offer to pay Coal Hill any royalty before exploiting the information on the Coal Hill Google Drive for his own benefit.

<u>**COUNT I**</u>
**(Fraudulent Misrepresentation)**

57.    The Companies repeat and re-allege the allegations set forth of Paragraphs 1-56 above as if full set forth herein.

58.    Daimler intentionally misrepresented to the Companies his venture capital management track record.  Daimler also intentionally misrepresented that he had secured a commitment of $10,000,000.00 of investment to Daimler's Skilled Science company which would be carried over to the Companies if the Companies made Daimler a member.

59.    Daimler made such representations knowing they were false or with a reckless disregard as to whether they were true or false.  Such misrepresentations were material because the Companies would not have agreed to make Daimler a member of the Companies and grant him common units in the Companies if they had known Daimler never had any investment management or decision-making responsibility at Comdisco Ventures, could not produce an audited track record, and had no investment commitment in Skilled Science to bring over to the Companies.

45

**JA466**

60.     Daimler made those misrepresentations to the Companies with the intention of misleading the Companies to rely upon them and agree to make Daimler a member of the Companies and grant him units in the Companies.

61.     The Companies justifiably relied on Daimler's representations regarding his track record and existing investor commitments, and Daimler's representations were material to the Companies' decision to begin working with Daimler, as opposed to other potential members, with real track records, that the Companies were also talking to at that time.  Daimler's misrepresentations were also material to the Companies' decision to develop a fundraising strategy to target institutional-type investors likely to require an auditable track record of the kind Daimler falsely claimed to have rather than to target more heavily the high net worth individuals and families and smaller investors that Moehle succeeded in attracting to invest in the Companies, without any assistance from Daimler.

62.     As a direct and proximate result of the Companies' reliance on Daimler's misrepresentations regarding his venture capital management track record and supposed committed investors, Defendants suffered substantial damages directly attributable to Daimler's misrepresentations, including inability to close investments from interested investors at the time of the final close of the Fund and costs incurred to cover for Daimler being a non-contributing member of the Companies, in an amount to be determined at trial but that is greater than $1,000,000.

## COUNT II
### (Unfair Competition and False Designation of Origin in Violation of 15 U.S.C. § 1125(a))

63.     Coal Hill repeats and re-allege the allegations set forth of Paragraphs 1-56 above as if full set forth herein.

64.     Coal Hill is the owner of federally-registered and common law rights in the Mark

**JA467**

as described herein.

65.    Coal Hill has established substantial goodwill in the Mark through, among other things, its exclusive marketing, promotion and branding of the Mark for over four years in connection with its successful business of identifying, building, and guiding promising startup companies in the field of advanced robotics.

66.    As described herein, Daimler, without consent or authorization of Coal Hill and in violation of 15 U.S.C. § 1125(a)(1)(A), intentionally and willfully has made use of the Mark and/or other words, terms, names, symbols or devices, or any combination thereof, false designations of origin, and false or misleading representations of fact which are likely to cause confusion and mistake among the relevant consumers that (a) Daimler is still part of or runs Coal Hill and/or the Robotics Hub; and/or (b) there is some affiliation, connection or association between Daimler and Coal Hill and/or the Robotics Hub.

67.    As described herein, Daimler, without consent or authorization of Coal Hill and in violation of 15 U.S.C. § 1125(a)(1)(B), intentionally and willfully has made use of the Mark and/or other words, terms, names, symbols or devices, or any combination thereof, false designations of origin, and false or misleading representations of fact in commercial advertising and promotion which misrepresents the nature, characteristics and qualities of his services, namely giving the false impression that Daimler has some affiliation, connection or association with Coal Hill and/or the Robotics Hub

68.    As described herein, Daimler intentionally and willfully has made us of the Mark to unfairly and improperly trade on the goodwill Coal Hill has developed in the Mark to attract attention to his business efforts.

69.    As a direct and proximate result of Daimler's intentional and willful conduct and

pursuant to 15 U.S.C. § 1117, Coal Hill is entitled to recover its actual damages, Daimler's ill-gotten profits, enhanced damages, costs and reasonable attorneys' fees in an amount to be proven at trial.

## COUNT III
### (Unauthorized Computer Access in Violation of 18 U.S.C. § 1030)

70.    Coal Hill repeats and re-allege the allegations set forth of Paragraphs 1-56 above as if full set forth herein.

71.    As alleged herein, after March 27, 2017 Daimler intentionally used his credentials to access Coal Hill's Google Drive.

72.    Coal Hill's Google Drive is a protected computer under 18 U.S.C. §1030.

73.    As alleged herein, after March 27, 2017, Daimler had no right to access Coal Hill's Google Drive or obtain information from that Google Drive.

74.    After accessing and obtaining information from Coal Hill's Google Drive, Daimler exploited the unlawfully obtained information for his own personal gain to the detriment of Coal Hill.

75.    As a direct and proximate result of Daimler's unauthorized access of the Companies' computer system, Defendants suffered losses in excess of $5,000.00.  Coal Hill is, therefore, entitled to recover its actual damages, costs and reasonable attorneys' fees in an amount to be proven at trial.

## COUNT IV
### (Cybersquatting under 15 U.S.C. § 1125(d))

76.    Coal Hill repeats and re-allege the allegations set forth of Paragraphs 1-56 above as if full set forth herein.

77.    The Mark was distinctive at the time that Daimler registered the RH Domain

**JA469**

Name for Coal Hill.

78.   The RH Domain Name is identical to or confusingly similar to the Mark.

79.   After March 27, 2017, Daimler transferred, used and continues to use the RH Domain Name without authorization from Coal Hill and with a bad faith intent to profit from the Mark by, among other things, redirecting the relevant consumers for his own commercial gain.

80.   As a result of Daimler's wrongful conduct, Daimler is liable to Coal Hill for violation of the Anticybersquatting Consumer Protection Act.

81.   Daimler's unlawful transfer and use of the RH Domain Name has caused and will continue to cause damage to Coal Hill, in an amount to be proven at trial.

82.   Coal Hill is entitled to recover its actual damages, Daimler's ill-gotten profits and costs in an amount to be proven at trial, or statutory damages of up to $100,000, as well as treble damages, attorneys' fees and transfer of the RH Domain Name to Coal Hill.

## JURY DEMAND

83.   Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, the Companies hereby demand a trial by jury on all issues triable of right by a jury.

## PRAYER FOR RELIEF

WHEREFORE, the Companies respectfully request that this Court enter judgment against Daimler on their Counterclaims, and respectfully requests that this Court award the following relief:

(a)   Actual damages suffered by the Companies as a result of Daimler's fraudulent conduct as alleged herein;

(b)   Actual damages suffered by Coal Hill as a result of Daimler's violation of 18 U.S.C. §1030;

(c)     Coal Hill's actual damages and Daimler's profits pursuant to 15 U.S.C. § 1117(a),

trebled pursuant to 15 U.S.C. § 1117(b) and/or an award of statutory damages at the election of

Coal Hill pursuant to 15 U.S.C. 1117(d);

(d)     Forfeiture of the RH Domain Name and transfer of the RH Domain Name to Coal

Hill;

(e)     An order enjoining Daimler from using or exploiting the Mark, or any colorable

imitation of the Mark, in connection with advertising and promoting his business;

(f)     Coal Hill's costs, expenses and reasonable attorneys' fees, pre- and post-judgment

interest and punitive damages in an amount to be determined at trial; and

(g)     All such other and further relief as this Court deems just and appropriate.

Respectfully submitted,

**K&L GATES, LLP**

/s/ *Christopher M. Verdini*
Patrick J. McElhinny, PA Bar No. 53510
Christopher M. Verdini, PA Bar No. 93245
K&L GATES LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, Pennsylvania 15222-2613
Tel:  412-355-6500
Fax:  412-355-6501
Email: patrick.mcelhinny@klgates.com
Email: christopher.verdini@klgates.com

*Counsel for Defendants Chris Moehle,*
*Robotics Hub Fund 1 LLC, and Coal Hill*
*Ventures LLC*

Dated: July 12, 2019

**JA472**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 12, 2019 the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

<u>/s/ Christopher M. Verdini</u>
K&L Gates LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222-2613
412.355.6500

**JA473**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| ERIC DAIMLER, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 2:18-cv-00165-MJH |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| CHRIS MOEHLE, ROBOTICS HUB | ) | |
| FUND 1, LLC, and COAL HILL | ) | |
| VENTURES LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## REPLY TO COUNTERCLAIMS

Plaintiff, Eric Daimler ("Daimler"), by his counsel, Herrick, Feinstein LLP and Buchanan Ingersoll & Rooney PC, as and for his reply to counterclaims (the "Counterclaims") filed by defendants Robotics Hub Fund 1, LLC ("Robotics Hub"), and Coal Hill Ventures LLC ("Coal Hill") (collectively, the "Companies"), states as follows:

## NATURE OF THE CASE

1.      The allegations contained in paragraph 1 of the Counterclaims are conclusions of law that do not require a response.  To the extent a response is required, Daimler denies the allegations contained in paragraph 1 of the Counterclaims.

## PARTIES

2.      Admits the allegations contained in paragraph 2 of the Counterclaims.

3.      Admits the allegations contained in paragraph 3 of the Counterclaims.

4.      Admits the allegations contained in paragraph 4 of the Counterclaims.

5.      The allegations contained in paragraph 5 of the Counterclaims are conclusions of law that do not require a response.  To the extent a response is required, Daimler admits the allegations contained in paragraph 5 of the Counterclaims.

6.      Admits the allegations contained in paragraph 6 of the Counterclaims.

7.      Admits the allegations contained in paragraph 7 of the Counterclaims.

## FACTUAL BACKGROUND

8.      Admits the allegations contained in paragraph 8 of the Counterclaims.

9.      Denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 9 of the Counterclaims, except admits that Chris Moehle formed Robotics Hub Fund 1, LP.

10.     Denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 10 of the Counterclaims, and states that the Companies, along with Chris Moehle, had represented that GE already invested in Coal Hill, and had committed to invest another $20,000,000.00 in the Fund.

11.     Admits the allegations contained in paragraph 11 of the Counterclaims.

12.     Admits the allegations contained in paragraph 12 of the Counterclaims.

13.     Admits the allegations contained in paragraph 13 of the Counterclaims.

14.     Denies the allegations contained in paragraph 14 of the Counterclaims, except admits that Daimler had previously served as a principal for Comdisco Ventures.

15.     Denies the allegations contained in paragraph 15 of the Counterclaims, and refers to Daimler's LinkedIn page for a complete and accurate recitation of its content.

16.     Denies the allegations contained in paragraph 16 of the Counterclaims.

17.     Denies the allegations contained in paragraph 17 of the Counterclaims.

18.     Denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 18 of the Counterclaims.

19.     Denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 19 of the Counterclaims.

20.     Denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 20 of the Counterclaims, except denies the characterizations of representations allegedly made by Daimler.

21.     Denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 21 of the Counterclaims.

22.     Denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 22 of the Counterclaims, except denies that Daimler wrongfully gained any role.

23.     Denies the allegations contained in paragraph 23 of the Counterclaims.

24.     Denies the allegations contained in paragraph 24 of the Counterclaims.

25.     Denies the allegations contained in paragraph 25 of the Counterclaims.

26.     Denies the allegations contained in paragraph 26 of the Counterclaims.

27.     Denies the allegations contained in paragraph 27 of the Counterclaims.

28.     Denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 28 of the Counterclaims, except denies the allegations that Daimler made any false representations.

29.     Denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 29 of the Counterclaims, except denies the allegations that Daimler made any false representations.

3
JA476

30.     Denies the allegations contained in paragraph 30 of the Counterclaims.

31.     Denies the allegations contained in paragraph 31 of the Counterclaims, except admits that Daimler is well-aware of his own track record and experience.

32.     Admits the allegations contained in paragraph 32 of the Counterclaims.

33.     Admits the allegations contained in paragraph 33 of the Counterclaims.

34.     Denies the allegations contained in paragraph 34 of the Counterclaims.

35.     Denies the allegations contained in paragraph 35 of the Counterclaims.

36.     Admits the allegations contained in paragraph 36 of the Counterclaims.

37.     Denies the allegations contained in paragraph 37 of the Counterclaims.

38.     Denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 38 of the Counterclaims.

39.     Denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 39 of the Counterclaims.

40.     Denies the allegations contained in paragraph 40 of the Counterclaims.

41.     Denies the allegations contained in paragraph 41 of the Counterclaims, and refers to the Registration for a complete and accurate recitation of its content.

42.     The allegations contained in paragraph 42 of the Counterclaims are conclusions of law that do not require a response.  To the extent a response is required, Daimler denies the allegations contained in paragraph 42 of the Counterclaims, and refers to the Registration for a complete and accurate recitation of its content.

43.     Denies the allegations contained in paragraph 43 of the Counterclaims.

44.     Denies the allegations contained in paragraph 44 of the Counterclaims, and further states that Coal Hill did not own the roboticshub.io domain name, and that Daimler did

not require authorization from Coal Hill to take any actions with respect to the roboticshub.io domain name.

45.     Denies the allegations contained in paragraph 45 of the Counterclaims.

46.     Denies the allegations contained in paragraph 46 of the Counterclaims.

47.     Admits the allegations contained in paragraph 47 of the Counterclaims.

48.     Denies the allegations contained in paragraph 48 of the Counterclaims.

49.     Denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 49 of the Counterclaims.

50.     Denies the allegations contained in paragraph 50 of the Counterclaims.

51.     Denies the allegations contained in paragraph 51 of the Counterclaims.

52.     Denies the allegations contained in paragraph 52 of the Counterclaims, except admits that Daimler accessed the Google Drive account, to which he had continued access.

53.     Denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 53 of the Counterclaims.

54.     Denies the allegations contained in paragraph 54 of the Counterclaims.

55.     Denies the allegations contained in paragraph 55 of the Counterclaims.

56.     Admits the allegations contained in paragraph 56 of the Counterclaims, excepts rejects the Companies description of Daimler's activities as "exploiting" particular information.

## COUNT I
### (Fraudulent Misrepresentation)

57.     Daimler repeats and realleges his responses to paragraphs 1 through 56 of the Counterclaims as though fully set forth herein.

58.     Denies the allegations contained in paragraph 58 of the Counterclaims.

59.     Denies the allegations contained in paragraph 59 of the Counterclaims.

60.     Denies the allegations contained in paragraph 60 of the Counterclaims.

61.     Denies the allegations contained in paragraph 61 of the Counterclaims.

62.     Denies the allegations contained in paragraph 62 of the Counterclaims.

## COUNT II
### (Unfair Competition and False Designation of Origin in Violation of 15 U.S.C. § 1125(a))

63.     Daimler repeats and realleges his responses to paragraphs 1 through 62 of the Counterclaims as though fully set forth herein.

64.     Denies the allegations contained in paragraph 64 of the Counterclaims.

65.     Denies the allegations contained in paragraph 65 of the Counterclaims.

66.     Denies the allegations contained in paragraph 66 of the Counterclaims.

67.     Denies the allegations contained in paragraph 67 of the Counterclaims.

68.     Denies the allegations contained in paragraph 68 of the Counterclaims.

69.     Denies the allegations contained in paragraph 69 of the Counterclaims.

## COUNT III
### (Unauthorized Computer Access in Violation of 18 U.S.C. § 1030)

70.     Daimler repeats and realleges his responses to paragraphs 1 through 69 of the Counterclaims as though fully set forth herein.

71.     Admits the allegations contained in paragraph 71 of the Counterclaims.

72.     Denies the allegations contained in paragraph 72 of the Counterclaims.

73.     Denies the allegations contained in paragraph 73 of the Counterclaims.

74.     Denies the allegations contained in paragraph 74 of the Counterclaims.

75.     Denies the allegations contained in paragraph 75 of the Counterclaims.

## COUNT IV
## (Cybersquatting under 15 U.S.C. § 1125(d))

76.    Daimler repeats and realleges his responses to paragraphs 1 through 75 of the Counterclaims as though fully set forth herein.

77.    Denies the allegations contained in paragraph 77 of the Counterclaims.

78.    Denies the allegations contained in paragraph 78 of the Counterclaims.

79.    Denies the allegations contained in paragraph 79 of the Counterclaims.

80.    Denies the allegations contained in paragraph 80 of the Counterclaims.

81.    Denies the allegations contained in paragraph 81 of the Counterclaims.

82.    Denies the allegations contained in paragraph 82 of the Counterclaims.

## JURY DEMAND

83.    The allegations contained in paragraph 83 of the Counterclaims are conclusions of law that do not require a response.  To the extent a response is required, Daimler refers to Rule 38(b) of the Federal Rules of Civil Procedure for a complete and accurate recitation of its content.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

84.    The Counterclaims are barred, in whole or in part, because the Counterclaims fail to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

85.    The Counterclaims are barred, in whole or in part, by the applicable statutes of limitation.

## THIRD AFFIRMATIVE DEFENSE

86.    The Counterclaims are barred, in whole or in part, by the equitable doctrines of laches, unclean hands, waiver, and/or estoppel.

## FOURTH AFFIRMATIVE DEFENSE

87.    The Counterclaims are barred, in whole or in part, due to defendants' acquiescence.

## FIFTH AFFIRMATIVE DEFENSE

88.    The Counterclaims are barred, in whole or in part, because Daimler believed and had reasonable grounds to believe that the use of the roboticshub.io domain name was a fair use or otherwise lawful.

## SIXTH AFFIRMATIVE DEFENSE

89.    The Counterclaims are barred, in whole or in part, because Daimler's conduct was justified.

## SEVENTH AFFIRMATIVE DEFENSE

90.    The Counterclaims are barred, in whole or in part, due to the Companies' and/or Moehle's consent.

## EIGHTH AFFIRMATIVE DEFENSE

91.    The Counterclaims are barred, in whole or in part, by the Companies' and/or Moehle's fraudulent conduct.

## PRAYER FOR RELIEF

WHEREFORE, Daimler demands judgment in his favor as follows:

(i)     Awarding Daimler monetary damages, injunctive relief, and reasonable attorneys'

fees and expenses, costs, pre- and post-judgment interest, and punitive damages, as demanded in

his Fourth Amended Complaint;

(ii)    Dismissing the Companies' Counterclaims in their entirety; and

(iii)   Granting Daimler such other and further relief as the Court deems just and proper.


Dated:   August 2, 2019                    Respectfully submitted,

                                           HERRICK, FEINSTEIN LLP

                                           By:    /s/ Mitchell G. Mandell
                                                  Mitchell G. Mandell, Esq.
                                                  NY State Bar ID: 2042828
                                                  Two Park Avenue
                                                  New York, NY 10016
                                                  (212) 592-1400
                                                  mmandell@herrick.com
                                                  *admitted pro hac vice*

                                           -and-

                                           BUCHANAN INGERSOLL & ROONEY PC

                                                  Christopher P. Schueller, Esq.
                                                  Pa. I.D. No. 92746
                                                  Sydney Rochelle Normil, Esq.
                                                  Pa. I.D. 320989
                                                  One Oxford Centre
                                                  301 Grant Street, 20th Floor
                                                  Pittsburgh, PA 15219
                                                  (412) 562-8432
                                                  christopher.schueller@bipc.com
                                                  sydney.normil@bipc.com


                                           *Attorneys for Plaintiff Eric Daimler*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

---

ERIC DAIMLER,

                              Plaintiff,

            v.

CHRIS MOEHLE, ROBOTICS HUB FUND 1,
LLC, and COAL HILL VENTURES LLC,

                              Defendants.

Case No.: 2:18-cv-00165-MJH

Honorable Marilyn J. Horan

---

**UNCONTESTED MOTION FOR**
**LEAVE TO FILE AMENDED COMPLAINT**

Plaintiff, Eric Daimler ("Daimler"), by his counsel, Zumpano Patricios & Popok, PLLC and Buchanan Ingersoll & Rooney PC, respectfully submits the within motion for leave to file a Fifth Amended Complaint ("FAC"), and states as follows:

1.      In accordance with Fed. R. Civ. P. 15(a)(2), a party may amend its pleadings upon leave of court, and the Court should freely grant leave when justice requires.

2.      Daimler seeks leave of Court, on consent, to file a modest amendment of the Prayer for Relief in the operative Complaint to formally add alternative remedies to monetary damages in order to protect Daimler's rights in the event he is unable enforce a monetary judgment.  A copy of the proposed Amended Complaint is attached as **Exhibit A** hereto and a comparison or "redline" of the proposed amendments against the operative complaint is attached as **Exhibit B** hereto.  A proposed order is attached as **Exhibit C** hereto.

3.      Among other things, Plaintiff Daimler seeks equitable relief as against Defendants in the form of restitution by compelling issuance of additional units in Robotics Hub Fund 1, LLC and Coal Hill Ventures LLC and/or a constructive trust as relief for Defendants' wrongful conduct.

4.      The minor amendments in the proposed FAC reflect customary procedural features in disputes between partners of closely held companies such as these and are necessary here to ensure a meaningful recovery exists should Plaintiff prevail at trial in this matter.  *See, e.g., Liu v. Securities and Exchange Commission,* 140 S. Ct. 1936, 1942-45 (2020) (Sotomayor, J.) (detailing history and propriety of equitable remedies to prevent rewarding wrongdoers)*; see also Glick v. Campagna*, 613 F.2d 31, 37 (3d Cir. 1979).

5.      In addition, Defendants will not be prejudiced by the filing of the FAC.  Plaintiff is not seeking provisional injunctive relief and seeks only to preserve these remedies for trial.  Indeed, discovery in this matter has yet to commence in earnest.  The parties have not exchanged significant discovery requests, primarily as a result of challenges caused by the COVID-19 pandemic, which has rendered this litigation largely "on pause" for some time.  Depositions have not yet been scheduled.  In addition, the parties only recently conducted their mediation session on September 3, 2020.

6.      Indeed, the discovery deadline was recently extended to December 31, 2020 in light of these challenges and others.  Dkt. 80 (Amended Case Management Order).

7.      The minor modifications proposed in the FAC will not broaden discovery in any meaningful way.  Further, the current discovery schedule allows ample time for the parties to address any additional discovery items, to the extent there are any, and to conclude discovery events by the Court-ordered deadline.

8.      There is no current dispositive motion deadline, or schedule for expert disclosure or succeeding case events.  Such matters are to be addressed at a conference on January 12, 2021, after fact discovery has concluded.

**JA484**

**COMPLIANCE WITH STANDING ORDER 1(A)**

9.      By e-mail dated September 25, 2020, Plaintiff's counsel sent Defendants' counsel an earlier draft of the FAC requesting Defendants' consent by close of business on September 29, 2020 to the proposed amendment.

10.     After three weeks of further correspondence, by e-mail on October 13, 2020, Defendants' counsel agreed not to oppose the instant motion for leave to file the FAC.

11.     Accordingly, Plaintiff's instant motion, which does not seek to add any new causes of action, but seeks only to add equitable remedies in the event Plaintiff is unable to collect on a money judgment in this case, is reasonable, made in good faith, and appropriate under the circumstances.

WHEREFORE, Plaintiff respectfully requests that this Court grant him leave to file the attached Fifth Amended Complaint.

3

**JA485**

Dated: October 16, 2020                    Respectfully submitted,

                                           ZUMPANO PATRICIOS & POPOK, PLLC

                                           By:    */s/ Mitchell G. Mandell*
                                                  Mitchell G. Mandell, Esq.
                                                  New York Bar ID: 2042828
                                                  Senior Partner
                                                  417 Fifth Avenue
                                                  Suite 826
                                                  New York, New York 10016
                                                  (212) 542-8125
                                                  mmandell@zplaw.com
                                                  *Admitted pro hac vice*

                                           -and-

                                           BUCHANAN INGERSOLL & ROONEY PC

                                                  Christopher P. Schueller, Esq.
                                                  Pa. I.D. No. 92746
                                                  Sydney Rochelle Normil, Esq.
                                                  Pa. I.D. 320989
                                                  One Oxford Centre
                                                  301 Grant Street, 20th Floor
                                                  Pittsburgh, PA 15219
                                                  (412) 562-8432
                                                  christopher.schueller@bipc.com
                                                  sydney.normil@bipc.com

                                           *Attorneys for Plaintiff Eric Daimler*

4

**JA486**

**CERTIFICATE OF SERVICE**

I hereby certify that on October 16, 2020 the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Mitchell G. Mandell*_____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| ERIC DAIMLER,<br><br>　　　　　　　　　　　　Plaintiff,<br><br>　　　v.<br><br>CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC, and COAL HILL VENTURES LLC,<br><br>　　　　　　　　　　　　Defendants. | Case No.: 2:18-cv-00165-MJH<br><br>Honorable Marilyn J. Horan<br><br>**JURY TRIAL DEMANDED** |

### [PROPOSED] FIFTH AMENDED COMPLAINT

Plaintiff, Eric Daimler ("Daimler"), by his counsel, Zumpano Patricios & Popok, PLLC and Buchanan Ingersoll & Rooney PC, as and for his fifth amended complaint against defendants, Chris Moehle ("Moehle"), Robotics Hub Fund 1, LLC ("Robotics Hub"), and Coal Hill Ventures LLC ("Coal Hill") (collectively, "Defendants"), alleges as follows:

### INTRODUCTION

1.　　　This lawsuit arises from Defendants' intentional misrepresentations that were designed to mislead and induce Daimler to enter into: (i) a business partnership with Moehle, in connection with which Daimler made significant financial contributions; and (ii) certain related common unit award agreements that contained different and less favorable vesting schedules than those of Moehle, Daimler's equal partner.

2.　　　Defendants thereafter took steps to force Daimler out of Robotics Hub and Coal Hill (collectively, the "Companies")—companies in which Daimler joined as an equal partner and/or co-founded—by intentionally and wrongfully preventing him from satisfying the conditions of his vesting schedules, thereby causing all of his common units in the Companies to be treated as having been forfeited.

**JA488**

3.     Defendants believe that, because of such wrongful forfeiture, Daimler has no membership or ownership interest in the Companies, thereby making Moehle the Companies' majority member. After allegedly becoming a majority member of the Companies, Moehle purportedly removed Daimler from the Boards of the Companies so that he could obtain majority ownership and control over them.

**PARTIES**

4.     Plaintiff, Daimler, is an individual who resides in the State of New York. Defendants believe that Daimler has no membership or ownership interest in Robotics Hub or Coal Hill.

5.     Defendant, Moehle, is an individual who resides in the Commonwealth of Pennsylvania. Moehle is a member of Robotics Hub and Coal Hill.

6.     Defendant, Robotics Hub, is a limited liability company formed under the laws of the State of Delaware, with its principal place of business in Pittsburgh, Pennsylvania.

7.     Defendant, Coal Hill, is a limited liability company formed under the laws of the Commonwealth of Pennsylvania, with its principal place of business in Pittsburgh, Pennsylvania.

**JURISDICTION**

8.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum of $75,000, exclusive of costs and interest, and there is complete diversity of citizenship between the parties.[1]

9.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Robotics Hub and Coal Hill maintain their principal place of business in this district, Moehle resides in this district, and a substantial part of the events giving rise to Daimler's claims occurred in this district.

---

[1] Upon information and belief, Jamie Fee, a non-party member of Robotics Hub and Coal Hill, is an individual who resides in the State of Connecticut.

**JA489**

**FACTUAL BACKGROUND**

I.    **Daimler Agrees to Form an Equal Partnership Based Upon Moehle's Misrepresentations**

      A.    <u>The Formation of the Partnership</u>

10.    Daimler and Moehle formed a business partnership for the purpose of investing in early-stage robotics companies with high growth potential.

11.    Before becoming partners, Daimler and Moehle each maintained and operated their own companies in robotics and venture finance—Skilled Science and Coal Hill[2], respectively.

12.    In 2015, Daimler and Moehle decided to move forward with an equal partnership by combining Skilled Science and Coal Hill through a de-facto merger, and by co-founding two new entities: Robotics Hub and Robotics Hub Fund 1, LP (the "Fund"). Robotics Hub is the Fund's General Partner, and Coal Hill is the Fund's Investment Manager.

13.    Daimler and Moehle co-edited various documents—including, without limitation, documents entitled "Skilled Science/Coal Hill Merger" and "Combined Skilled Science Coal Hill Pro-Forma"—in connection with their efforts to merge Skilled Science and Coal Hill into a new entity reflecting their equal partnership.

14.    The de-facto merger was accomplished by, among other things: (i) Coal Hill amending and restating its operating agreement to reflect the equal partnership between Daimler and Moehle; (ii) Daimler and Moehle working together on marketing strategies for the partnership, and ultimately amending various Coal Hill marketing materials to add Daimler as a principal; (iii) Coal Hill engaging Jamie Fee, who previously worked with Daimler at Skilled Science; and (iv) merging expenses accrued through the funding of Skilled Science into the fundraising expenses of Robotics Hub.

---

[2] Moehle formed Coal Hill in April 2015.

15.    Before their partnership began, Moehle represented to Daimler that General Electric ("GE") had already committed to invest in the Fund, and that he had a strong relationship with the National Robotics Engineering Center ("NREC") and the Robotics Institute ("RI"), which would lead to potential investment opportunities for the partnership.

16.    Specifically, with respect to GE, Moehle represented to Daimler throughout 2015 and 2016 that GE had committed to invest $20,000,000.00 in the Fund, which was a significant portion of the $50,000,000.00 the Fund sought to raise.

17.    Before entering into this partnership with Moehle, Daimler had been raising funds through Skilled Science, and was planning to close on investments from two investors, totaling $10,000,000.00. Daimler ultimately elected to walk away from his existing, successful venture (Skilled Science) and these soon-to-close investments in Skilled Science in late 2015 because Moehle assured him that GE had already committed to invest $20,000,000.00 in the Fund.

18.    Aside from the GE investment being twice as large as the two soon-to-close investments in Skilled Science, Daimler understood that the GE investment gave the new venture instant credibility that many other investors could not. The GE investment immediately catapulted the Fund into a "different league." Daimler saw great, intangible value to this investment in addition to the amount itself.

19.    Because Skilled Science had a different structure than that contemplated (and ultimately adopted) for Robotics Hub and the Fund, these two investors could not simply "shift" their investments to the new, joint venture.

20.    Moehle first made the representation concerning GE's commitment during the very first introductory phone call with Daimler on or about August 18, 2015: Moehle stated that GE had already invested in Coal Hill, and had committed to invest another $20,000,000.00 in the Fund.

21.     Moehle repeated his claim that GE had committed to invest $20,000,000.00 in the Fund during a phone call with Daimler the very next day, and during nearly every subsequent communication with Daimler, including phone calls on or about September 15 and 24, November 3 and December 8, 2015.

22.     According to Moehle, GE had already committed to invest $20,000,000.00, but the sole reason the funds were not yet in hand was because of a particular regulatory process that was being completed in connection with the spin out of GE's financial arm. Moehle explained this was not a condition on GE's funding of its committed investment, but merely something that affected the timing of the funding. Moehle represented that it was an "inevitability" that GE would spin out the financial arm and fund its committed investment – this was not Moehle's opinion, but rather something he presented as fact, based on purported conversations with GE. It was expected that the process would be completed in early or mid 2016.

23.     Further, Moehle repeated this representation – that GE had committed to invest $20,000,000.00 in the Fund – in communications with both Daimler and potential investors before Daimler executed the Daimler Awards and other corporate documents in 2016. For example, on or about October 16, 2015, during an in-person meeting at which Daimler was present, Moehle told representatives of the University of Pittsburgh Medical Center ("UPMC") – specifically Talbot "Tal" Heppenstall, Charles Hendrix, Matthew Cunningham, and Brenton Burns – that GE was a sponsor of the Fund and had already committed to invest $20,000,000.00.

24.     Moehle again repeated this representation during another in-person meeting with representatives of UPMC and Daimler in Pittsburgh on or about November 10, 2015.

25.     Indeed, Moehle continued to represent, during meetings in Pittsburgh with Daimler and potential investors (and other entities potentially beneficial to the Fund), that GE

**JA492**

was a Fund sponsor, and had committed to invest $20,000,000.00 in the Fund, including on or

about:

- November 1, 2015, in a meeting with Randy Castleman of Court Square Ventures;

- November 3, 2015, in a meeting with Don Smith and Tim White, representatives of the Regional Industrial Development Corporation of Southwestern Pennsylvania ("RIDC");

- November 18, 2015, in a meeting with Paul O'Reilly of OCP Capital LLC;

- December 15, 2015, and January 5 and 14, 2016, in meetings with Martial Hebert, of RI;

- January 6, 2016, in a meeting with Herman Herman [sic] of the NREC;

- and January 6, 2016, in a meeting with Fee.

26.      In order to further prop up the illusion that the Fund had a solid relationship

with GE (via a committed $20,000,000.00 investment), Moehle brought Daimler to an in-

person meeting with GE in New York on or about November 18, 2015. Moehle and Daimler

met with Alex Tepper, a Managing Director of GE Ventures, and discussed the progress of the

Fund, specifically robotics companies in which the Fund planned to invest.

27.      Although Tepper was a contact at GE, according to Moehle, Tepper was not

involved in GE's decision to invest in the Fund. Moehle had specifically directed Daimler to

not discuss the investment, as Tepper had not been involved in the decision process, and

Moehle wanted to remain GE's "single point person" regarding the investment. Daimler did

not view this as unusual, but rather consistent with Moehle's personality and oft-expressed

desire to maintain control of the relationships he cultivated.

28.      Moreover, it was Daimler's understanding, based on representations from

Moehle, that Tepper was responsible for GE's direct investments in robotics companies (versus

an entity like the Fund), which is why Daimler and Moehle spoke to Tepper about the specific

robotics companies in which the Fund sought to invest.

**JA493**

29.     Daimler relied on Moehle's representations concerning GE when he decided to walk away from $10,000,000.00 in promised investment in Skilled Science, cease meeting with other potential investors in Skilled Science, and pursue an equal partnership with Moehle in 2015.

30.     During 2015 and early 2016, Daimler came to learn that Moehle misrepresented and overstated the strength of his relationships with the NREC and RI.

31.     However, throughout 2015 and 2016, Moehle continued to vigorously represent to Daimler that GE had committed to invest $20,000,000.00 in the Fund.

32.     In the months, and weeks, leading up to Daimler's execution of the Daimler Awards and other necessary corporate documents, Moehle continued to repeat his representations concerning GE's $20,000,000.00 commitment to the Fund in private calls with Daimler, as well as in joint phone calls and in-person meetings between Moehle, Daimler and potential investors, including those on or about:

- January 20, 2016, with Brian Gerkey, the CEO and Founder of the Open Source Robotics Foundation ("OSRF") by phone;

- February 12, 2016, with David Katzman, Senior Financial Analyst at the Yale Investment Office (which manages Yale's Endowment) by phone;

- February 15, 2016, in a meeting with Arnold Kwong of the investment firm Extra Intelligence in New York;

- February 17, 2016, in a meeting with Tom Juterbock, Laura Pekari, Nisanth Reddy and Jon Rotolo, of the investment group Woodcreek, a division of Mass Mutual in Connecticut;

- February 23, 2016, in a meeting with Cliff Friedman, Tracy O'Leary and Jim Pallotta, of the investment firm Raptor Group Holdings in New York;

- and March 23, 2016 – the day the Daimler Awards were signed – in a meeting with Bill Scalzulli and other representatives of the Kraft family office outside of Boston.

33.     Daimler would periodically request updates from Moehle regarding the timing of the funding of GE's committed investment, and Moehle's answer remained consistent. As

Moehle had explained that GE had already committed to invest $20,000,000.00, and potential investors had moved forward with the Fund based on, among other things, their understanding that GE had committed these funds, Daimler did not see this timing as an issue.

34.     Daimler never imagined that Moehle would lie to potential investors (or to Daimler). Each time Daimler participated (telephonically or in-person) in a meeting with a potential investor, during which Moehle would discuss the committed $20,000,000.00 GE investment, Daimler was assured that the commitment had already been made.

35.     Coupled with the momentum of walking away from Skilled Science, hiring Jamie Fee to work with the Companies, the Fund's progress in garnering potential investors and robotics businesses in which to invest, all of which was induced by Moehle's representation that GE had made a $20,000,000.00 commitment to the Fund, Daimler felt assured that Moehle's representation was in fact true.

B.     Daimler and Moehle Began As Equal Partners in the Companies

36.     As of March 23, 2016, Daimler and Moehle were both members of the Companies.

37.     Pursuant to the Companies' respective Amended and Restated Operating Agreements, both dated March 23, 2016, Daimler and Moehle were the only members of the Companies' initial Boards of Managers.

38.     Daimler and Moehle entered into Common Unit Award Agreements, dated March 23, 2016, with each of the Companies pursuant to which Daimler and Moehle were both awarded forty-two common units in each company, which units were subject to certain disparate vesting schedules more fully discussed below.

39.     In contrast, Fee also entered into Common Unit Award Agreements with each of the Companies, dated March 23, 2016, pursuant to which Fee was awarded only two common units in each company.

**JA495**

40.     Further, pursuant to Section 3.08 of the Fund's Limited Partnership Agreement, both Daimler and Moehle are named "key persons," such that if both Daimler and Moehle cease to be actively involved in the Fund's affairs, the Fund's limited partners may elect to terminate the Fund's investment period.

41.     The Companies and the Fund uniformly promoted Daimler and Moehle as equal partners in connection with their public relations and fundraising efforts, including, without limitation, in the Fund's Confidential Private Placement Memorandum and other presentation materials provided to potential investors.

42.     During joint presentations to potential investors, some investors would expressly ask Daimler and Moehle if the two were equal partners, and their response was always "yes." In fact, Moehle explained their relationship by stating that he and Daimler had combined their efforts, not that Daimler had joined Coal Hill.

43.     Despite having an equal partnership, Daimler personally loaned Coal Hill $125,000.00 pursuant to a promissory note and advanced personal funds to cover corporate expenses. In contrast, Moehle provided an initial capital contribution of merely $1,000.00.

44.     On or about November 2, 2017, Coal Hill paid the promissory note in full, together with interest. Coal Hill also reimbursed Daimler for a portion of the expenses he personally advanced to the company, in the amount of $35,000.00.

## II.     Daimler Accepted a Presidential Fellowship that Benefitted the Companies and the Fund

45.     In January 2016, Daimler was appointed as a Presidential Innovation Fellow for the Barack Obama White House.

46.     Daimler accepted the fellowship, which is a twelve-month program, during Barack Obama's last year in office. Thus, it was axiomatic that Daimler's fellowship would end in early 2017.

47.    Moehle encouraged Daimler to accept the fellowship because of the value that the Companies and the Fund would derive from it.

48.    Daimler served as a Presidential Innovation Fellow from January 2016 to early 2017, during which time Daimler advised the White House on, among other things, issues relating to robotics and artificial intelligence.

49.    Daimler and Robotics Hub received positive press coverage with respect to Daimler's fellowship, and Defendants promoted Daimler's White House position in connection with their marketing and fundraising efforts.

50.    Because Daimler's fellowship allowed for outside employment, Daimler continued to provide services to the Companies during 2016, but the Companies did not compensate him for such services. During such time, Daimler and Moehle agreed that Daimler's compensation for such services would accrue and be paid to Daimler at a later date.

51.    As fully explained below, the relationship between Daimler and Moehle began to break down, in part, because of Daimler's fellowship.

**III.    Defendants' Misrepresentations Caused Daimler to Enter into Common Unit Award Agreements with Different and Less Favorable Vesting Schedules than those of His Equal Partner Moehle**

52.    On or about March 10, 2016, soon after Daimler's fellowship began, the Companies and the Fund engaged Reed Smith LLP to, among other things, prepare various corporate formation and governing documents, including the Common Unit Award Agreements and the Companies' Amended and Restated Operating Agreements.

53.    With respect to the referenced engagement, Reed Smith interacted almost exclusively with Moehle.

A.    <u>Common Unit Awards</u>

54.    The Companies each entered into a Common Unit Award Agreement, dated March 23, 2016, with Moehle, pursuant to which Moehle was awarded forty-two common units

in both Robotics Hub and Coal Hill (the "Moehle/RH Award" and the "Moehle/CH Award,"

respectively, and collectively the "Moehle Awards"), which units vest as follows:

20% vests on the first anniversary of Date of Award [March 23, 2017]; 1.6666% vests ratably
on the last day of each month thereafter until the fifth anniversary of the Date of Award
[March 23, 2021].

Copies of the Moehle/RH Award and the Moehle/CH Award are attached hereto as Exhibits A

and B, respectively.

55.     The Companies also entered into Common Unit Award Agreements, dated

March 23, 2016, with Daimler, pursuant to which Robotics Hub and Coal Hill each awarded

forty-two common units to Daimler (the "Daimler/RH Award" and the "Daimler/CH Award,"

respectively, and collectively the "Daimler Awards").

56.     Unlike Moehle's common units, however, Daimler's units vest as follows:

20% vests on the date when [Daimler] has provided 12 consecutive and uninterrupted
months of Full Time Services to the Company Group, provided that [Daimler] must
begin providing such Full Time Services to the Company Group no later than the first
anniversary of the Date of Award [March 23, 2017]; and

provided the above conditions are met, the remaining 80% vests on a pro-rata basis on
the last day of each month thereafter until the fifth anniversary of the Date of Award
[March 23, 2021].

Copies of the Daimler/RH Award and the Daimler/CH Award are attached hereto as Exhibits

C and D, respectively.

57.     Pursuant to Section 2(a) of the Daimler Awards, Daimler provides Full Time

Services if he is employed by or otherwise provides greater than 95% of his professional

activities, as determined in the sole discretion of the respective Boards, to the Company Group.

58.     Section 2(a) of the Daimler Awards defines the Company Group as a

combination of Robotics Hub or Coal Hill, respectively, the Fund, and the Fund's investment

manager (including services provided to portfolio companies of the Fund and Daimler's

capacity as an employee of the Fund's investment manager).

**JA498**

B.    Defendants' Misrepresentations

59.    In multiple conversations during 2015 and 2016, some of which included associates and investors, Moehle intentionally misrepresented to Daimler that: (i) Moehle and Daimler would be treated as equals; (ii) the terms of the Daimler Awards were identical to those of the Moehle Awards; and (iii) the Daimler and Moehle Awards both contained vesting schedules pursuant to which a portion of the units would vest automatically while the remaining units would vest over time.

60.    Reed Smith made the same misrepresentations to Daimler during conversations in early 2016.

61.    In early 2016, Daimler made it clear to Moehle and Reed Smith that he would consent to the Daimler Awards only if he and Moehle were treated equally and the terms of the Daimler Awards were identical to those of the Moehle Awards.

62.    At no time did Defendants or Reed Smith inform Daimler that only the Daimler Awards, not the Moehle Awards, contained vesting schedules requiring twelve consecutive and uninterrupted months of Full-Time Services to the Company Group, which services must start within a year of entering into the award agreements, before any common units would begin to vest.

63.    In fact, Moehle and Reed Smith continued to represent to Daimler until in or about July 2016, several months after the awards were executed, that Moehle and Daimler were treated equally and that the Daimler Awards and the Moehle Awards were identical.

64.    It was never Daimler's understanding, based upon representations by Moehle and Reed Smith, and, indeed, was incomprehensible to Daimler, that there could be any circumstance under which his common units in the Companies would be forfeited.

65.    Daimler would not have entered into the Daimler Awards if he had known that: (i) his common units vested differently than Moehle's common units; (ii) he would be required

**JA499**

to provide twelve consecutive and uninterrupted months of Full-Time Services to the Company Group, and begin such services within one year of entering into the Daimler Awards, before any portion of his common units would begin to vest; and (iii) there could be any circumstance under which his common units in the Companies would be forfeited.

   C.  <u>Amended and Restated Operating Agreements</u>

  66.  Also on March 23, 2016, Robotics Hub and Coal Hill, and their respective members, entered into Amended and Restated Operating Agreements (the "RH Operating Agreement" and the "CH Operating Agreement," respectively, and collectively the "Operating Agreements"), which terms are incorporated in the respective Moehle Awards and Daimler Awards. Copies of the RH Operating Agreement and the CH Operating Agreement are attached hereto as Exhibits E and F, respectively.

  67.  Section 7.1 of the respective Operating Agreements requires the Companies to record members' initial capital contributions, and Section 7.3 requires the Companies to establish and maintain on their own books and records a separate capital account for each member.

  68.  Section 7.2 of the respective Operating Agreements requires all additional capital contributions to be made in connection with the issuance of units.

  69.  Pursuant to Section 12.3(b) of the Operating Agreements, Covered Persons (including, among others, members, officers and directors, and managers) who are permitted or required to make a decision in good faith must act under such express standard.

  70.  Under Section 12.4 of the Operating Agreements, Covered Persons are entitled to indemnification from the Companies in connection with actions or omissions performed on behalf of the Companies only if such person acts in good faith and in a manner believed by such person to be in, or not opposed to, the best interests of the company, and such person's conduct does not constitute fraud or willful misconduct.

71.    At the time Daimler entered into the Operating Agreements, based on Moehle's representations, Daimler believed that GE had already committed to invest $20,000,000.00 in the Fund. Indeed, the initial timeline of funding this committed investment in early to mid 2016 had not yet passed, and Moehle continued to discuss this commitment with both Daimler individually and with potential investors, both on a regular basis.

72.    At the time Daimler entered into the Operating Agreements, Daimler was working full-time as a Presidential Innovation Fellow, and, as discussed below, his primary insight into the operations of the Companies was communications with Moehle and joint meetings with potential investors.

### IV.    The Relationship Between Daimler and Moehle Breaks Down, But Daimler Remains Engaged in the Companies and the Fund

73.    As explained above, Daimler and Moehle began their partnership as equal partners—and were promoted as such—and each initially devoted equal time to the Companies.

74.    Although Daimler worked for the Companies only part-time during his Presidential Innovation Fellowship, both Moehle and Daimler understood that Daimler would return to his full-time position with the Companies when his fellowship ended.

75.    Indeed, as previously explained, it was understood that Daimler's fellowship necessarily had a finite end date in early 2017.

76.    Additionally, as of January 2016 when Daimler began his fellowship, the business partnership had budgeted matching salaries for Moehle and Daimler, and the Companies had budgeted another full-time salary which they never paid because the individual for whom it was budgeted did not become a member of the Companies as originally anticipated.

77.    In early-mid 2016, the business relationship between Daimler and Moehle began to break down.

78.    The attention and publicity Daimler received in connection with his Presidential Innovation Fellowship became a point of contention between Daimler and Moehle, and Moehle began criticizing Daimler as a business partner.

79.    Moehle became increasingly controlling over access to information about the Fund's investors and portfolio companies, information Moehle previously freely shared. Indeed, compounding on his previously-expressed desire to maintain control over particular relationships, Moehle unilaterally determined that he would become the "gatekeeper" of this information soon after Daimler accepted his fellowship.

80.    Moehle would criticize Daimler about statements he made during joint presentations to potential investors about the Fund's portfolio companies, but Moehle would refuse to provide Daimler full access to relevant information about said portfolio companies. Moehle even criticized the content on Daimler's LinkedIn page, and directed Daimler to revise his descriptions of the Companies to mirror those on Moehle's LinkedIn page.

81.    Moehle also began to unilaterally assign Daimler "deliverables" without first consulting with Daimler.

82.    Despite rising tensions, Moehle needed Daimler to remain engaged in the Companies and the Fund so that he would continue to make financial contributions to them, and Daimler remained engaged throughout his fellowship.

83.    For his part, because the business relationship was still relatively new, Daimler hoped these issues were simply "growing pains," and could be resolved with time.

84.    From May 2016 through August 2016, Daimler wrote several checks to Coal Hill totaling approximately $30,000.00 to cover Coal Hill's operating expenses, and even some of Moehle's personal expenses, as Moehle requested. Specifically, Moehle used some of Daimler's financial contributions to Coal Hill to pay for personal expenses such as his mortgage payments and family trips.

**JA502**

85.    Throughout this period, Moehle continued to represent to Daimler (and potential investors) that GE had committed to invest $20,000,000.00 in the Fund.

86.    Daimler also continued to make financial contributions to Coal Hill from late 2015 through early 2017 to pay, among other things, third-party expenses.

87.    Although, as discussed above, Daimler had extended a loan directly to Coal Hill to pay operating expenses, Coal Hill constantly needed additional funds to pay third-party expenses, and was not in a position to pay back further debt in the foreseeable future.

88.    Accordingly, Daimler made additional financial contributions in the form of payments to third parties, which payments were primarily attributable to company-related travel (for both Daimler and Moehle), operations, and investor meeting expenses.

89.    Daimler continued to make these additional financial contributions to Coal Hill with the expectation that they would be treated as capital contributions, and in late 2016, Moehle agreed that they would be treated as such.

90.    In total, Daimler made in excess of $200,000.00 in financial contributions that were to be treated as capital contributions.

91.    These financial contributions were made by Daimler on behalf of Coal Hill, and were made with Moehle's knowledge and approval.

92.    These financial contributions provided benefit and value to Coal Hill, which was a cash-strapped entity that could not have done business without Daimler's regular, indeed almost daily, infusions of cash and payment of expenses. Without Daimler's financial contributions, the Companies would not have been able to operate or court necessary investors.

93.    Despite this arrangement, Daimler and Moehle continued to represent themselves to investors as "equal" partners, because, despite the fact that Daimler was entitled to additional common units in Coal Hill, Daimler and Moehle continued to be equally important to the venture.

**JA503**

94.    Daimler did not receive additional common units in Coal Hill in connection with his additional financial contributions, as required by Section 7.2 of the Operating Agreement.

## V.    Defendants Force Daimler Out of the Companies Despite His Attempts to Remain Actively Involved in Them

95.    During the second half of 2016, Moehle began taking steps to gain sole control of the Companies. Indeed, Moehle continued criticizing Daimler as a business partner and increasingly began obstructing efforts by Daimler and Fee to engage in the Companies and the Fund.

96.    During the Fall of 2016, Daimler and Fee made several attempts to arrange meetings with Moehle in Pittsburgh, where the Companies and the Fund are based, but Moehle thwarted all such efforts. In fact, Moehle told Daimler that the two would have a problem if Daimler scheduled a trip to Pittsburgh.

97.    On numerous occasions, Daimler and Fee offered to help Moehle with the Fund's first closing in December 2016. But Moehle repeatedly refused their help, stated that he would handle the closing, and directed Daimler and Fee to focus their efforts elsewhere.

98.    Further, Moehle continued to unilaterally assign Daimler "deliverables," including asking Daimler to make introductions to, among others, internet travel companies such as Google Travel. Daimler made the introductions Moehle requested, but afterwards Moehle would tell Daimler that the introductions were no longer needed. Moehle would then claim that Daimler failed to complete such "deliverables."

99.    On several occasions in mid-late 2016, Moehle actively obstructed Daimler's efforts to communicate with the Fund's investors and portfolio companies.

100.    Specifically, Daimler explicitly asked Moehle for the contact information for various investors and portfolio companies, including, among others, TravelWits. Moehle either

ignored Daimler's requests or flatly refused to disclose the information. In some instances, Moehle even refused to disclose the contact's name.

101.    In late 2016, Moehle began discouraging Daimler from ending his fellowship, which he could have done at any time, because the Companies allegedly had no funds with which to pay him. Daimler suggested that his salary could continue to accrue and be paid to him at a later date, as had been done in the past, but Moehle opposed such structure.

102.    Despite Moehle's efforts in 2016 to disassociate himself, the Companies, and the Fund from Daimler, he simultaneously represented to investors that Daimler was his equal partner until in or about November 2016.

103.    Daimler and Moehle met in-person on January 5-6, 2017 to discuss the notion that Daimler would not return to his full-time role with the Companies at that time, but that Daimler could still earn some compensation in a non-operating role, and that a full-time operating role for Daimler would occur at a later date.

104.    On or about January 5, 2017, just before Daimler's fellowship would ultimately end, Moehle recommended to the Companies' Boards (which constituted only Daimler and Moehle) that Daimler not be permitted to return to a full-time role with the Companies.

105.    Although Moehle and the Companies had contemplated Daimler's return to full-time employment from the outset and budgeted a full-time salary for Daimler, Moehle purportedly made the above recommendation to the Boards because the Companies allegedly lacked sufficient funds to pay Daimler a full-time salary at that time. Indeed, Moehle refused to allow Daimler's salary to continue to accrue and be paid at a later date, as it had in the past.

106.    At the Companies' respective Board meetings on or about January 5, 2017, Moehle voted against, and Daimler voted in favor of, Daimler returning to a full-time role with the Companies.

**JA505**

107.    Because no other votes were cast, the Boards were deadlocked and the matter was referred to the Deadlock Advisor, David Mawhinney, in accordance with Section 5.5(c) of the Companies' respective Operating Agreements.

108.    Daimler and Moehle met in-person again on January 18, 2017 in Orlando, Florida to resume their January 5-6, 2017 discussions.

109.    On or about March 22, 2017, just before the first anniversary of the date of the Daimler Awards, Mawhinney broke the deadlock by voting against Daimler returning to a full-time, fully compensated role with the Companies at that time due to their financial status, but understood when casting his vote that Daimler's full-time engagement with the Companies would occur at a later date and did not foreclose the possibility that Daimler could, if he so elected, return to work on a full-time basis with some portion of his compensation accrued, but not paid, as had been done in the past.

110.    Despite Defendants' previous representations to the contrary, they never offered Daimler a non-operating role in the Companies, provided any compensation to him, or permitted his full-time engagement with the Companies. Instead, Defendants took additional steps to ensure that Daimler had no role whatsoever within the Companies.

111.    Because Defendants wrongfully prevented Daimler from returning to his full-time role with the Companies within a year after executing the Daimler Awards, by March 23, 2017, despite Daimler's desire and attempts to do so, the Companies deemed all of Daimler's common units to be forfeited.

112.    As a result of such wrongful forfeiture, Defendants believe that Daimler has no membership or ownership interest in the Companies, thereby making Moehle the Companies' majority member.

113.    After obtaining a majority membership interest, to further prevent Daimler from serving the Companies in any capacity, Moehle purportedly directed the Companies to remove

Daimler from their respective Boards and amend and restate the Fund's Limited Partnership Agreement to remove Daimler from the "Key Person" provision set forth in Section 3.08 of the agreement.

114.    It was not until after Daimler's ouster from the Companies that Daimler came to understand that, among other things, Moehle had lied about GE's commitment to invest $20,000,000.00 in the Fund. As is now clear, Moehle repeatedly and continuously made this misrepresentation to Daimler in order to induce Daimler to walk away from a successful venture (Skilled Science) and instead partner with Moehle, so Moehle could benefit from Daimler's credibility and experience to boost the profile of the Companies and entice potential investors, and have Daimler fund company operations and expenses during its start-up phase, only to later oust Daimler from the Companies and reap the benefits for himself.

**COUNT ONE**

**FRAUD IN THE INDUCEMENT**
**(Against Moehle)**

115.    Plaintiff repeats all prior allegations as though fully set forth herein.

116.    Moehle intentionally misrepresented to Daimler that GE had committed to invest $20,000,000.00 in the Fund, which was a significant portion of the $50,000,000.00 the Fund sought to raise, and would lead to other potential investment opportunities for Moehle and Daimler's business partnership.

117.    Moehle made such misrepresentations knowing they were false or with a reckless disregard as to whether they were true or false. Such misrepresentations are material because Daimler would not have walked away from Skilled Science, walked away from existing parties willing to invest $10,000,000.00 in Skilled Science, and would not have entered into the business partnership in 2015 or the Daimler Awards in 2016 if he had known that GE had not committed to invest $20,000,000.00 in the Fund as Moehle had represented.

**JA507**

118.    Moehle made such misrepresentations to Daimler with the intention of: (i) misleading Daimler into relying upon said misrepresentations; (ii) using said misrepresentations to induce Daimler into funding the Companies in 2015 and 2016, some of which funds Moehle used for his own benefit; and (iii) using said misrepresentations to induce Daimler into entering the Daimler Awards, and with the intention of later forcing Daimler out of the Companies in early 2017 so that Moehle would have majority ownership and control over them.

119.    Daimler justifiably relied upon Moehle's misrepresentations as being true when he decided to enter into a business partnership with Moehle in 2015 and the Daimler Awards in 2016, and fund the Companies.

120.    As a direct and proximate result of Moehle's misrepresentations, together with Daimler's justifiable reliance on said misrepresentations, Daimler was wrongfully induced to walk away from Skilled Science, walk away from parties willing to invest $10,000,000.00 in Skilled Science, and instead enter into a business partnership with Moehle in 2015 and the Daimler Awards in 2016, agree to accept deferred compensation for work performed for the Companies, in excess of $130,000.00 and which has not been paid, and ultimately contribute in excess of $200,000.00 to Coal Hill.

### COUNT TWO

### FRAUD IN THE INDUCEMENT
### (Against Robotics Hub)

121.    Plaintiff repeats all prior allegations as though fully set forth herein.

122.    Robotics Hub intentionally misrepresented to Daimler that GE had committed to invest $20,000,000.00 in the Fund, which was a significant portion of the $50,000,000.00 the Fund sought to raise, and would lead to other potential investment opportunities for Moehle and Daimler's business partnership and Robotics Hub.

123.    Robotics Hub made such misrepresentations knowing they were false or with a reckless disregard as to whether they were true or false. Such misrepresentations are material because Daimler would not have walked away from Skilled Science, walked away from existing parties willing to invest $10,000,000.00 in Skilled Science, and would not have entered into the Daimler/RH Award if he had known that GE had not committed to invest $20,000,000.00 in the Fund as Moehle had represented.

124.    Robotics Hub made such misrepresentations to Daimler with the intention of (i) misleading Daimler into relying upon said misrepresentations; (ii) using said misrepresentations to induce Daimler into funding the Companies in 2015 and 2016; and (iii) using said misrepresentations to induce Daimler into entering the Daimler/RH Award, and with the intention of later forcing Daimler out of the company.

125.    Daimler justifiably relied upon Robotics Hub's misrepresentations as being true when he decided to enter into the Daimler/RH Award and fund the Companies.

126.    As a direct and proximate result of Robotics Hub's misrepresentations, together with Daimler's justifiable reliance on said misrepresentations, Daimler was wrongfully induced to walk away from Skilled Science, walk away from parties willing to invest $10,000,000.00 in Skilled Science, and instead enter into the Daimler/RH Award, agree to accept deferred compensation for work performed for the Companies, in excess of $130,000.00 and which has not been paid, and ultimately contribute in excess of $200,000.00 to Coal Hill.

**COUNT THREE**

**BREACH OF CONTRACT – COAL HILL OPERATING AGREEMENT**
**(Against Coal Hill)**

127.    Plaintiff repeats all prior allegations as though fully set forth herein.

128.    Daimler and Coal Hill entered into the Coal Hill Operating Agreement, dated March 23, 2016.

129.    Pursuant to Section 7.2 of the Coal Hill Operating Agreement, Coal Hill is required to issue units in connection with members' additional capital contributions.

130.    Daimler made additional capital contributions in excess of $200,000.00, which contributions provided benefit to Coal Hill, but Coal Hill did not issue additional units in connection with such contributions.

131.    As a direct and proximate result of Coal Hill's intentional and wrongful conduct, Daimler was issued no additional units in connection with his additional capital contributions, and Coal Hill has treated Daimler as having no membership or ownership interest in the company.

132.    Alternatively, if Daimler's financial contributions are not treated as capital contributions and Daimler is not entitled to additional units in Coal Hill, these financial contributions must be treated as loans to Coal Hill. Therefore, in the alternative, Coal Hill breached the Operating Agreement by failing to repay Daimler for these financial contributions.

### COUNT FOUR

### FRAUD IN THE INDUCEMENT
### (Against Coal Hill)

133.    Plaintiff repeats all prior allegations as though fully set forth herein.

134.    Coal Hill intentionally misrepresented to Daimler that GE had committed to invest $20,000,000.00 in the Fund, which was a significant portion of the $50,000,000.00 the Fund sought to raise, and would lead to other potential investment opportunities for Moehle and Daimler's business partnership and Coal Hill.

135.    Coal Hill made such misrepresentations knowing they were false or with a reckless disregard as to whether they were true or false. Such misrepresentations are material because Daimler would not have walked away from Skilled Science, walked away from existing parties willing to invest $10,000,000.00 in Skilled Science, and would not have entered

**JA510**

into the business partnership in 2015 or the Daimler/CH Award if he had known that GE had not committed to invest $20,000,000.00 in the Fund as Moehle had represented.

136.    Coal Hill made such misrepresentations to Daimler with the intention of (i) misleading Daimler into relying upon said misrepresentations; (ii) using said misrepresentations to induce Daimler into funding the Companies in 2015 and 2016; and (iii) using said misrepresentations to induce Daimler into entering the Daimler/CH Award, and with the intention of later forcing Daimler out of the company.

137.    Daimler justifiably relied upon Coal Hill's misrepresentations as being true when he decided to enter into the business partnership in 2015 and the Daimler/CH Award, and fund the Companies.

138.    As a direct and proximate result of Coal Hill's misrepresentations, together with Daimler's justifiable reliance on said misrepresentations, Daimler was wrongfully induced to walk away from parties willing to invest $10,000,000.00 in Skilled Science, and instead enter into a business partnership with Moehle in 2015 and the Daimler/CH Award, agree to accept deferred compensation for work performed for the Companies, in excess of $130,000.00 and which has not been paid, and ultimately contribute in excess of $200,000.00 to Coal Hill.

## PRAYER FOR RELIEF

WHEREFORE, Daimler demands judgment in his favor as follows:

(i)    On Count One, awarding Daimler monetary damages in an amount to be determined at trial, but in no event less than $10 Million; or, in the alternative, a constructive trust on Moehle's membership interests in Coal Hill and Robotics Hub;

(ii)    On Count Two, awarding Daimler compensatory damages in an amount to be determined at trial, but in no event less than $10 Million; or, in the alternative, awarding Daimler injunctive relief, including, but not limited to, compelling Robotics Hub to re-issue

additional units to Daimler as restitution for the fraud; and/or a constructive trust over membership units in Robotics Hub;

(iii)    On Count Three, awarding Daimler injunctive relief, including, but not limited to, compelling Coal Hill to provide a full and complete accounting of its finances and its members' capital contributions and capital accounts, compelling Coal Hill to issue additional units in connection with Daimler's additional capital contributions, and enjoining Coal Hill from advancing Moehle funds for legal or other expenses as incurred in connection with this action; or, alternatively, compensatory damages in an amount to be determined at trial, but in no event less than $10 Million;

(iv)    On Court Four, awarding Daimler compensatory damages in an amount to be determined at trial, but in no event less than $10 Million; and

(v)    On all Counts, awarding Daimler reasonable attorneys' fees and expenses, costs, pre- and post-judgment interest, and punitive damages in an amount to be determined at trial; and such other and further relief as the Court deems just and proper.

JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Daimler hereby demands a trial by jury on all issues so triable.

Dated: October 16, 2020                          Respectfully submitted,

                                                 ZUMPANO PATRICIOS & POPOK, PLLC

                                                 By:   /s/ Mitchell G. Mandell
                                                       Mitchell G. Mandell, Esq.
                                                       NY State Bar ID: 2042828
                                                       417 Fifth Avenue
                                                       Suite 826
                                                       New York, New York 10016
                                                       (212) 542-8125
                                                       mmandell@zplaw.com
                                                       *admitted pro hac vice*

                                                 -and-

                                                 BUCHANAN INGERSOLL & ROONEY
                                                 PC

                                                       Christopher P. Schueller, Esq.
                                                       Pa. I.D. No. 92746
                                                       Sydney Rochelle Normil, Esq.
                                                       Pa. I.D. 320989
                                                       One Oxford Centre
                                                       301 Grant Street, 20th Floor
                                                       Pittsburgh, PA 15219
                                                       (412) 562-8432
                                                       christopher.schueller@bipc.com
                                                       sydney.normil@bipc.com

                                                 *Attorneys for Plaintiff Eric Daimler*

**JA513**

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ERIC DAIMLER,<br><br>                           Plaintiff,<br><br>         v.<br><br>CHRIS MOEHLE, ROBOTICS HUB FUND<br>1, LLC, and COAL HILL VENTURES LLC,<br><br>                           Defendants. | Case No.: 2:18-cv-00165-MJH<br><br>Honorable Marilyn J. Horan<br><br>**JURY TRIAL DEMANDED** |

### ~~FOURTH~~ **[PROPOSED] FIFTH** AMENDED COMPLAINT

Plaintiff, Eric Daimler ("Daimler"), by his counsel, ~~Herrick, Feinstein~~Zumpano Patricios & Popok, PLLC~~LLP~~ and Buchanan Ingersoll & Rooney PC, as and for his ~~fourth~~fifth amended complaint against defendants, Chris Moehle ("Moehle"), Robotics Hub Fund 1, LLC ("Robotics Hub"), and Coal Hill Ventures LLC ("Coal Hill") (collectively, "Defendants"), alleges as follows:

### INTRODUCTION

1.      This lawsuit arises from Defendants' intentional misrepresentations that were designed to mislead and induce Daimler to enter into: (i) a business partnership with Moehle, in connection with which Daimler made significant financial contributions; and (ii) certain related common unit award agreements that contained different and less favorable vesting schedules than those of Moehle, Daimler's equal partner.

2.      Defendants thereafter took steps to force Daimler out of Robotics Hub and Coal Hill (collectively, the "Companies")—companies in which Daimler joined as an equal partner and/or co-founded—by intentionally and wrongfully preventing him from satisfying the conditions of his vesting schedules, thereby causing all of his common units in the Companies to be treated as having been forfeited.

3.     Defendants believe that, because of such wrongful forfeiture, Daimler has no membership or ownership interest in the Companies, thereby making Moehle the Companies' majority member. After allegedly becoming a majority member of the Companies, Moehle purportedly removed Daimler from the Boards of the Companies so that he could obtain majority ownership and control over them.

**PARTIES**

4.     Plaintiff, Daimler, is an individual who resides in the State of New York. Defendants believe that Daimler has no membership or ownership interest in Robotics Hub or Coal Hill.

5.     Defendant, Moehle, is an individual who resides in the Commonwealth of Pennsylvania. Moehle is a member of Robotics Hub and Coal Hill.

6.     Defendant, Robotics Hub, is a limited liability company formed under the laws of the State of Delaware, with its principal place of business in Pittsburgh, Pennsylvania.

7.     Defendant, Coal Hill, is a limited liability company formed under the laws of the Commonwealth of Pennsylvania, with its principal place of business in Pittsburgh, Pennsylvania.

**JURISDICTION**

8.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum of $75,000, exclusive of costs and interest, and there is complete diversity of citizenship between the parties.[1]

9.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Robotics Hub and Coal Hill maintain their principal place of business in this district, Moehle resides in this district, and a substantial part of the events giving rise to Daimler's claims occurred in this district.

---

[1] Upon information and belief, Jamie Fee, a non-party member of Robotics Hub and Coal Hill, is an individual who resides in the State of Connecticut.

**FACTUAL BACKGROUND**

**I.    Daimler Agrees to Form an Equal Partnership Based Upon Moehle's Misrepresentations**

     A.    The Formation of the Partnership

    10.    Daimler and Moehle formed a business partnership for the purpose of investing in early-stage robotics companies with high growth potential.

    11.    Before becoming partners, Daimler and Moehle each maintained and operated their own companies in robotics and venture finance—Skilled Science and Coal Hill[2], respectively.

    12.    In 2015, Daimler and Moehle decided to move forward with an equal partnership by combining Skilled Science and Coal Hill through a de-facto merger, and by co-founding two new entities: Robotics Hub and Robotics Hub Fund 1, LP (the "Fund"). Robotics Hub is the Fund's General Partner, and Coal Hill is the Fund's Investment Manager.

    13.    Daimler and Moehle co-edited various documents—including, without limitation, documents entitled "Skilled Science/Coal Hill Merger" and "Combined Skilled Science Coal Hill Pro-Forma"—in connection with their efforts to merge Skilled Science and Coal Hill into a new entity reflecting their equal partnership.

    14.    The de-facto merger was accomplished by, among other things: (i) Coal Hill amending and restating its operating agreement to reflect the equal partnership between Daimler and Moehle; (ii) Daimler and Moehle working together on marketing strategies for the partnership, and ultimately amending various Coal Hill marketing materials to add Daimler as a principal; (iii) Coal Hill engaging Jamie Fee, who previously worked with Daimler at Skilled Science; and (iv) merging expenses accrued through the funding of Skilled Science into the fundraising expenses of Robotics Hub.

---

[2] Moehle formed Coal Hill in April 2015.

15.    Before their partnership began, Moehle represented to Daimler that General Electric ("GE") had already committed to invest in the Fund, and that he had a strong relationship with the National Robotics Engineering Center ("NREC") and the Robotics Institute ("RI"), which would lead to potential investment opportunities for the partnership.

16.    Specifically, with respect to GE, Moehle represented to Daimler throughout 2015 and 2016 that GE had committed to invest $20,000,000.00 in the Fund, which was a significant portion of the $50,000,000.00 the Fund sought to raise.

17.    Before entering into this partnership with Moehle, Daimler had been raising funds through Skilled Science, and was planning to close on investments from two investors, totaling $10,000,000.00. Daimler ultimately elected to walk away from his existing, successful venture (Skilled Science) and these soon-to-close investments in Skilled Science in late 2015 because Moehle assured him that GE had already committed to invest $20,000,000.00 in the Fund.

18.    Aside from the GE investment being twice as large as the two soon-to-close investments in Skilled Science, Daimler understood that the GE investment gave the new venture instant credibility that many other investors could not. The GE investment immediately catapulted the Fund into a "different league." Daimler saw great, intangible value to this investment in addition to the amount itself.

19.    Because Skilled Science had a different structure than that contemplated (and ultimately adopted) for Robotics Hub and the Fund, these two investors could not simply "shift" their investments to the new, joint venture.

20.    Moehle first made the representation concerning GE's commitment during the very first introductory phone call with Daimler on or about August 18, 2015: Moehle stated that GE had already invested in Coal Hill, and had committed to invest another $20,000,000.00 in the Fund.

21.     Moehle repeated his claim that GE had committed to invest $20,000,000.00 in the Fund during a phone call with Daimler the very next day, and during nearly every subsequent communication with Daimler, including phone calls on or about September 15 and 24, November 3 and December 8, 2015.

22.     According to Moehle, GE had already committed to invest $20,000,000.00, but the sole reason the funds were not yet in hand was because of a particular regulatory process that was being completed in connection with the spin out of GE's financial arm. Moehle explained this was not a condition on GE's funding of its committed investment, but merely something that affected the timing of the funding. Moehle represented that it was an "inevitability" that GE would spin out the financial arm and fund its committed investment – this was not Moehle's opinion, but rather something he presented as fact, based on purported conversations with GE. It was expected that the process would be completed in early or mid 2016.

23.     Further, Moehle repeated this representation – that GE had committed to invest $20,000,000.00 in the Fund – in communications with both Daimler and potential investors before Daimler executed the Daimler Awards and other corporate documents in 2016. For example, on or about October 16, 2015, during an in-person meeting at which Daimler was present, Moehle told representatives of the University of Pittsburgh Medical Center ("UPMC") – specifically Talbot "Tal" Heppenstall, Charles Hendrix, Matthew Cunningham, and Brenton Burns – that GE was a sponsor of the Fund and had already committed to invest $20,000,000.00.

24.     Moehle again repeated this representation during another in-person meeting with representatives of UPMC and Daimler in Pittsburgh on or about November 10, 2015.

25.     Indeed, Moehle continued to represent, during meetings in Pittsburgh with Daimler and potential investors (and other entities potentially beneficial to the Fund), that GE

was a Fund sponsor, and had committed to invest $20,000,000.00 in the Fund, including on or about:

- November 1, 2015, in a meeting with Randy Castleman of Court Square Ventures;

- November 3, 2015, in a meeting with Don Smith and Tim White, representatives of the Regional Industrial Development Corporation of Southwestern Pennsylvania ("RIDC");

- November 18, 2015, in a meeting with Paul O'Reilly of OCP Capital LLC;

- December 15, 2015, and January 5 and 14, 2016, in meetings with Martial Hebert, of RI;

- January 6, 2016, in a meeting with Herman Herman [sic] of the NREC;

- and January 6, 2016, in a meeting with Fee.

26.    In order to further prop up the illusion that the Fund had a solid relationship with GE (via a committed $20,000,000.00 investment), Moehle brought Daimler to an in-person meeting with GE in New York on or about November 18, 2015. Moehle and Daimler met with Alex Tepper, a Managing Director of GE Ventures, and discussed the progress of the Fund, specifically robotics companies in which the Fund planned to invest.

27.    Although Tepper was a contact at GE, according to Moehle, Tepper was not involved in GE's decision to invest in the Fund. Moehle had specifically directed Daimler to not discuss the investment, as Tepper had not been involved in the decision process, and Moehle wanted to remain GE's "single point person" regarding the investment. Daimler did not view this as unusual, but rather consistent with Moehle's personality and oft-expressed desire to maintain control of the relationships he cultivated.

28.    Moreover, it was Daimler's understanding, based on representations from Moehle, that Tepper was responsible for GE's direct investments in robotics companies (versus an entity like the Fund), which is why Daimler and Moehle spoke to Tepper about the specific robotics companies in which the Fund sought to invest.

**JA519**

29.     Daimler relied on Moehle's representations concerning GE when he decided to walk away from $10,000,000.00 in promised investment in Skilled Science, cease meeting with other potential investors in Skilled Science, and pursue an equal partnership with Moehle in 2015.

30.     During 2015 and early 2016, Daimler came to learn that Moehle misrepresented and overstated the strength of his relationships with the NREC and RI.

31.     However, throughout 2015 and 2016, Moehle continued to vigorously represent to Daimler that GE had committed to invest $20,000,000.00 in the Fund.

32.     In the months, and weeks, leading up to Daimler's execution of the Daimler Awards and other necessary corporate documents, Moehle continued to repeat his representations concerning GE's $20,000,000.00 commitment to the Fund in private calls with Daimler, as well as in joint phone calls and in-person meetings between Moehle, Daimler and potential investors, including those on or about:

- January 20, 2016, with Brian Gerkey, the CEO and Founder of the Open Source Robotics Foundation ("OSRF") by phone;

- February 12, 2016, with David Katzman, Senior Financial Analyst at the Yale Investment Office (which manages Yale's Endowment) by phone;

- February 15, 2016, in a meeting with Arnold Kwong of the investment firm Extra Intelligence in New York;

- February 17, 2016, in a meeting with Tom Juterbock, Laura Pekari, Nisanth Reddy and Jon Rotolo, of the investment group Woodcreek, a division of Mass Mutual in Connecticut;

- February 23, 2016, in a meeting with Cliff Friedman, Tracy O'Leary and Jim Pallotta, of the investment firm Raptor Group Holdings in New York;

- and March 23, 2016 – the day the Daimler Awards were signed – in a meeting with Bill Scalzulli and other representatives of the Kraft family office outside of Boston.

33.     Daimler would periodically request updates from Moehle regarding the timing of the funding of GE's committed investment, and Moehle's answer remained consistent. As

Moehle had explained that GE had already committed to invest $20,000,000.00, and potential investors had moved forward with the Fund based on, among other things, their understanding that GE had committed these funds, Daimler did not see this timing as an issue.

34.    Daimler never imagined that Moehle would lie to potential investors (or to Daimler). Each time Daimler participated (telephonically or in-person) in a meeting with a potential investor, during which Moehle would discuss the committed $20,000,000.00 GE investment, Daimler was assured that the commitment had already been made.

35.    Coupled with the momentum of walking away from Skilled Science, hiring Jamie Fee to work with the Companies, the Fund's progress in garnering potential investors and robotics businesses in which to invest, all of which was induced by Moehle's representation that GE had made a $20,000,000.00 commitment to the Fund, Daimler felt assured that Moehle's representation was in fact true.

B.    Daimler and Moehle Began As Equal Partners in the Companies

36.    As of March 23, 2016, Daimler and Moehle were both members of the Companies.

37.    Pursuant to the Companies' respective Amended and Restated Operating Agreements, both dated March 23, 2016, Daimler and Moehle were the only members of the Companies' initial Boards of Managers.

38.    Daimler and Moehle entered into Common Unit Award Agreements, dated March 23, 2016, with each of the Companies pursuant to which Daimler and Moehle were both awarded forty-two common units in each company, which units were subject to certain disparate vesting schedules more fully discussed below.

39.    In contrast, Fee also entered into Common Unit Award Agreements with each of the Companies, dated March 23, 2016, pursuant to which Fee was awarded only two common units in each company.

40.    Further, pursuant to Section 3.08 of the Fund's Limited Partnership Agreement, both Daimler and Moehle are named "key persons," such that if both Daimler and Moehle cease to be actively involved in the Fund's affairs, the Fund's limited partners may elect to terminate the Fund's investment period.

41.    The Companies and the Fund uniformly promoted Daimler and Moehle as equal partners in connection with their public relations and fundraising efforts, including, without limitation, in the Fund's Confidential Private Placement Memorandum and other presentation materials provided to potential investors.

42.    During joint presentations to potential investors, some investors would expressly ask Daimler and Moehle if the two were equal partners, and their response was always "yes." In fact, Moehle explained their relationship by stating that he and Daimler had combined their efforts, not that Daimler had joined Coal Hill.

43.    Despite having an equal partnership, Daimler personally loaned Coal Hill $125,000.00 pursuant to a promissory note and advanced personal funds to cover corporate expenses. In contrast, Moehle provided an initial capital contribution of merely $1,000.00.

44.    On or about November 2, 2017, Coal Hill paid the promissory note in full, together with interest. Coal Hill also reimbursed Daimler for a portion of the expenses he personally advanced to the company, in the amount of $35,000.00.

## II.    Daimler Accepted a Presidential Fellowship that Benefitted the Companies and the Fund

45.    In January 2016, Daimler was appointed as a Presidential Innovation Fellow for the Barack Obama White House.

46.    Daimler accepted the fellowship, which is a twelve-month program, during Barack Obama's last year in office. Thus, it was axiomatic that Daimler's fellowship would end in early 2017.

**JA522**

47.    Moehle encouraged Daimler to accept the fellowship because of the value that the Companies and the Fund would derive from it.

48.    Daimler served as a Presidential Innovation Fellow from January 2016 to early 2017, during which time Daimler advised the White House on, among other things, issues relating to robotics and artificial intelligence.

49.    Daimler and Robotics Hub received positive press coverage with respect to Daimler's fellowship, and Defendants promoted Daimler's White House position in connection with their marketing and fundraising efforts.

50.    Because Daimler's fellowship allowed for outside employment, Daimler continued to provide services to the Companies during 2016, but the Companies did not compensate him for such services. During such time, Daimler and Moehle agreed that Daimler's compensation for such services would accrue and be paid to Daimler at a later date.

51.    As fully explained below, the relationship between Daimler and Moehle began to break down, in part, because of Daimler's fellowship.

## III.   Defendants' Misrepresentations Caused Daimler to Enter into Common Unit Award Agreements with Different and Less Favorable Vesting Schedules than those of His Equal Partner Moehle

52.    On or about March 10, 2016, soon after Daimler's fellowship began, the Companies and the Fund engaged Reed Smith LLP to, among other things, prepare various corporate formation and governing documents, including the Common Unit Award Agreements and the Companies' Amended and Restated Operating Agreements.

53.    With respect to the referenced engagement, Reed Smith interacted almost exclusively with Moehle.

### A.    Common Unit Awards

54.    The Companies each entered into a Common Unit Award Agreement, dated March 23, 2016, with Moehle, pursuant to which Moehle was awarded forty-two common units

in both Robotics Hub and Coal Hill (the "Moehle/RH Award" and the "Moehle/CH Award,"

respectively, and collectively the "Moehle Awards"), which units vest as follows:

20% vests on the first anniversary of Date of Award [March 23, 2017]; 1.6666% vests ratably
on the last day of each month thereafter until the fifth anniversary of the Date of Award
[March 23, 2021].

Copies of the Moehle/RH Award and the Moehle/CH Award are attached hereto as Exhibits A

and B, respectively.

55.     The Companies also entered into Common Unit Award Agreements, dated

March 23, 2016, with Daimler, pursuant to which Robotics Hub and Coal Hill each awarded

forty-two common units to Daimler (the "Daimler/RH Award" and the "Daimler/CH Award,"

respectively, and collectively the "Daimler Awards").

56.     Unlike Moehle's common units, however, Daimler's units vest as follows:

20% vests on the date when [Daimler] has provided 12 consecutive and uninterrupted months
of Full Time Services to the Company Group, provided that [Daimler] must begin providing
such Full Time Services to the Company Group no later than the first anniversary of the Date
of Award [March 23, 2017]; and

provided the above conditions are met, the remaining 80% vests on a pro-rata basis on the
last day of each month thereafter until the fifth anniversary of the Date of Award [March 23,
2021].

Copies of the Daimler/RH Award and the Daimler/CH Award are attached hereto as Exhibits

C and D, respectively.

57.     Pursuant to Section 2(a) of the Daimler Awards, Daimler provides Full Time

Services if he is employed by or otherwise provides greater than 95% of his professional

activities, as determined in the sole discretion of the respective Boards, to the Company Group.

58.     Section 2(a) of the Daimler Awards defines the Company Group as a

combination of Robotics Hub or Coal Hill, respectively, the Fund, and the Fund's investment

manager (including services provided to portfolio companies of the Fund and Daimler's

capacity as an employee of the Fund's investment manager).

B.      Defendants' Misrepresentations

59.     In multiple conversations during 2015 and 2016, some of which included associates and investors, Moehle intentionally misrepresented to Daimler that: (i) Moehle and Daimler would be treated as equals; (ii) the terms of the Daimler Awards were identical to those of the Moehle Awards; and (iii) the Daimler and Moehle Awards both contained vesting schedules pursuant to which a portion of the units would vest automatically while the remaining units would vest over time.

60.     Reed Smith made the same misrepresentations to Daimler during conversations in early 2016.

61.     In early 2016, Daimler made it clear to Moehle and Reed Smith that he would consent to the Daimler Awards only if he and Moehle were treated equally and the terms of the Daimler Awards were identical to those of the Moehle Awards.

62.     At no time did Defendants or Reed Smith inform Daimler that only the Daimler Awards, not the Moehle Awards, contained vesting schedules requiring twelve consecutive and uninterrupted months of Full-Time Services to the Company Group, which services must start within a year of entering into the award agreements, before any common units would begin to vest.

63.     In fact, Moehle and Reed Smith continued to represent to Daimler until in or about July 2016, several months after the awards were executed, that Moehle and Daimler were treated equally and that the Daimler Awards and the Moehle Awards were identical.

64.     It was never Daimler's understanding, based upon representations by Moehle and Reed Smith, and, indeed, was incomprehensible to Daimler, that there could be any circumstance under which his common units in the Companies would be forfeited.

65.     Daimler would not have entered into the Daimler Awards if he had known that: (i) his common units vested differently than Moehle's common units; (ii) he would be required

to provide twelve consecutive and uninterrupted months of Full-Time Services to the Company Group, and begin such services within one year of entering into the Daimler Awards, before any portion of his common units would begin to vest; and (iii) there could be any circumstance under which his common units in the Companies would be forfeited.

     C.    <u>Amended and Restated Operating Agreements</u>

66.    Also on March 23, 2016, Robotics Hub and Coal Hill, and their respective members, entered into Amended and Restated Operating Agreements (the "RH Operating Agreement" and the "CH Operating Agreement," respectively, and collectively the "Operating Agreements"), which terms are incorporated in the respective Moehle Awards and Daimler Awards. Copies of the RH Operating Agreement and the CH Operating Agreement are attached hereto as Exhibits E and F, respectively.

67.    Section 7.1 of the respective Operating Agreements requires the Companies to record members' initial capital contributions, and Section 7.3 requires the Companies to establish and maintain on their own books and records a separate capital account for each member.

68.    Section 7.2 of the respective Operating Agreements requires all additional capital contributions to be made in connection with the issuance of units.

69.    Pursuant to Section 12.3(b) of the Operating Agreements, Covered Persons (including, among others, members, officers and directors, and managers) who are permitted or required to make a decision in good faith must act under such express standard.

70.    Under Section 12.4 of the Operating Agreements, Covered Persons are entitled to indemnification from the Companies in connection with actions or omissions performed on behalf of the Companies only if such person acts in good faith and in a manner believed by such person to be in, or not opposed to, the best interests of the company, and such person's conduct does not constitute fraud or willful misconduct.

71.    At the time Daimler entered into the Operating Agreements, based on Moehle's representations, Daimler believed that GE had already committed to invest $20,000,000.00 in the Fund. Indeed, the initial timeline of funding this committed investment in early to mid 2016 had not yet passed, and Moehle continued to discuss this commitment with both Daimler individually and with potential investors, both on a regular basis.

72.    At the time Daimler entered into the Operating Agreements, Daimler was working full-time as a Presidential Innovation Fellow, and, as discussed below, his primary insight into the operations of the Companies was communications with Moehle and joint meetings with potential investors.

## IV.    The Relationship Between Daimler and Moehle Breaks Down, But Daimler Remains Engaged in the Companies and the Fund

73.    As explained above, Daimler and Moehle began their partnership as equal partners—and were promoted as such—and each initially devoted equal time to the Companies.

74.    Although Daimler worked for the Companies only part-time during his Presidential Innovation Fellowship, both Moehle and Daimler understood that Daimler would return to his full-time position with the Companies when his fellowship ended.

75.    Indeed, as previously explained, it was understood that Daimler's fellowship necessarily had a finite end date in early 2017.

76.    Additionally, as of January 2016 when Daimler began his fellowship, the business partnership had budgeted matching salaries for Moehle and Daimler, and the Companies had budgeted another full-time salary which they never paid because the individual for whom it was budgeted did not become a member of the Companies as originally anticipated.

77.    In early-mid 2016, the business relationship between Daimler and Moehle began to break down.

78.    The attention and publicity Daimler received in connection with his Presidential Innovation Fellowship became a point of contention between Daimler and Moehle, and Moehle began criticizing Daimler as a business partner.

79.    Moehle became increasingly controlling over access to information about the Fund's investors and portfolio companies, information Moehle previously freely shared. Indeed, compounding on his previously-expressed desire to maintain control over particular relationships, Moehle unilaterally determined that he would become the "gatekeeper" of this information soon after Daimler accepted his fellowship.

80.    Moehle would criticize Daimler about statements he made during joint presentations to potential investors about the Fund's portfolio companies, but Moehle would refuse to provide Daimler full access to relevant information about said portfolio companies. Moehle even criticized the content on Daimler's LinkedIn page, and directed Daimler to revise his descriptions of the Companies to mirror those on Moehle's LinkedIn page.

81.    Moehle also began to unilaterally assign Daimler "deliverables" without first consulting with Daimler.

82.    Despite rising tensions, Moehle needed Daimler to remain engaged in the Companies and the Fund so that he would continue to make financial contributions to them, and Daimler remained engaged throughout his fellowship.

83.    For his part, because the business relationship was still relatively new, Daimler hoped these issues were simply "growing pains," and could be resolved with time.

84.    From May 2016 through August 2016, Daimler wrote several checks to Coal Hill totaling approximately $30,000.00 to cover Coal Hill's operating expenses, and even some of Moehle's personal expenses, as Moehle requested. Specifically, Moehle used some of Daimler's financial contributions to Coal Hill to pay for personal expenses such as his mortgage payments and family trips.

85.     Throughout this period, Moehle continued to represent to Daimler (and potential investors) that GE had committed to invest $20,000,000.00 in the Fund.

86.     Daimler also continued to make financial contributions to Coal Hill from late 2015 through early 2017 to pay, among other things, third-party expenses.

87.     Although, as discussed above, Daimler had extended a loan directly to Coal Hill to pay operating expenses, Coal Hill constantly needed additional funds to pay third-party expenses, and was not in a position to pay back further debt in the foreseeable future.

88.     Accordingly, Daimler made additional financial contributions in the form of payments to third parties, which payments were primarily attributable to company-related travel (for both Daimler and Moehle), operations, and investor meeting expenses.

89.     Daimler continued to make these additional financial contributions to Coal Hill with the expectation that they would be treated as capital contributions, and in late 2016, Moehle agreed that they would be treated as such.

90.     In total, Daimler made in excess of $200,000.00 in financial contributions that were to be treated as capital contributions.

91.     These financial contributions were made by Daimler on behalf of Coal Hill, and were made with Moehle's knowledge and approval.

92.     These financial contributions provided benefit and value to Coal Hill, which was a cash-strapped entity that could not have done business without Daimler's regular, indeed almost daily, infusions of cash and payment of expenses. Without Daimler's financial contributions, the Companies would not have been able to operate or court necessary investors.

93.     Despite this arrangement, Daimler and Moehle continued to represent themselves to investors as "equal" partners, because, despite the fact that Daimler was entitled to additional common units in Coal Hill, Daimler and Moehle continued to be equally important to the venture.

94.     Daimler did not receive additional common units in Coal Hill in connection with his additional financial contributions, as required by Section 7.2 of the Operating Agreement.

**V.     Defendants Force Daimler Out of the Companies Despite His Attempts to Remain Actively Involved in Them**

95.     During the second half of 2016, Moehle began taking steps to gain sole control of the Companies. Indeed, Moehle continued criticizing Daimler as a business partner and increasingly began obstructing efforts by Daimler and Fee to engage in the Companies and the Fund.

96.     During the Fall of 2016, Daimler and Fee made several attempts to arrange meetings with Moehle in Pittsburgh, where the Companies and the Fund are based, but Moehle thwarted all such efforts. In fact, Moehle told Daimler that the two would have a problem if Daimler scheduled a trip to Pittsburgh.

97.     On numerous occasions, Daimler and Fee offered to help Moehle with the Fund's first closing in December 2016. But Moehle repeatedly refused their help, stated that he would handle the closing, and directed Daimler and Fee to focus their efforts elsewhere.

98.     Further, Moehle continued to unilaterally assign Daimler "deliverables," including asking Daimler to make introductions to, among others, internet travel companies such as Google Travel. Daimler made the introductions Moehle requested, but afterwards Moehle would tell Daimler that the introductions were no longer needed. Moehle would then claim that Daimler failed to complete such "deliverables."

99.     On several occasions in mid-late 2016, Moehle actively obstructed Daimler's efforts to communicate with the Fund's investors and portfolio companies.

100.     Specifically, Daimler explicitly asked Moehle for the contact information for various investors and portfolio companies, including, among others, TravelWits. Moehle either

ignored Daimler's requests or flatly refused to disclose the information. In some instances, Moehle even refused to disclose the contact's name.

101.    In late 2016, Moehle began discouraging Daimler from ending his fellowship, which he could have done at any time, because the Companies allegedly had no funds with which to pay him. Daimler suggested that his salary could continue to accrue and be paid to him at a later date, as had been done in the past, but Moehle opposed such structure.

102.    Despite Moehle's efforts in 2016 to disassociate himself, the Companies, and the Fund from Daimler, he simultaneously represented to investors that Daimler was his equal partner until in or about November 2016.

103.    Daimler and Moehle met in-person on January 5-6, 2017 to discuss the notion that Daimler would not return to his full-time role with the Companies at that time, but that Daimler could still earn some compensation in a non-operating role, and that a full-time operating role for Daimler would occur at a later date.

104.    On or about January 5, 2017, just before Daimler's fellowship would ultimately end, Moehle recommended to the Companies' Boards (which constituted only Daimler and Moehle) that Daimler not be permitted to return to a full-time role with the Companies.

105.    Although Moehle and the Companies had contemplated Daimler's return to full-time employment from the outset and budgeted a full-time salary for Daimler, Moehle purportedly made the above recommendation to the Boards because the Companies allegedly lacked sufficient funds to pay Daimler a full-time salary at that time. Indeed, Moehle refused to allow Daimler's salary to continue to accrue and be paid at a later date, as it had in the past.

106.    At the Companies' respective Board meetings on or about January 5, 2017, Moehle voted against, and Daimler voted in favor of, Daimler returning to a full-time role with the Companies.

107.    Because no other votes were cast, the Boards were deadlocked and the matter was referred to the Deadlock Advisor, David Mawhinney, in accordance with Section 5.5(c) of the Companies' respective Operating Agreements.

108.    Daimler and Moehle met in-person again on January 18, 2017 in Orlando, Florida to resume their January 5-6, 2017 discussions.

109.    On or about March 22, 2017, just before the first anniversary of the date of the Daimler Awards, Mawhinney broke the deadlock by voting against Daimler returning to a full-time, fully compensated role with the Companies at that time due to their financial status, but understood when casting his vote that Daimler's full-time engagement with the Companies would occur at a later date and did not foreclose the possibility that Daimler could, if he so elected, return to work on a full-time basis with some portion of his compensation accrued, but not paid, as had been done in the past.

110.    Despite Defendants' previous representations to the contrary, they never offered Daimler a non-operating role in the Companies, provided any compensation to him, or permitted his full-time engagement with the Companies. Instead, Defendants took additional steps to ensure that Daimler had no role whatsoever within the Companies.

111.    Because Defendants wrongfully prevented Daimler from returning to his full-time role with the Companies within a year after executing the Daimler Awards, by March 23, 2017, despite Daimler's desire and attempts to do so, the Companies deemed all of Daimler's common units to be forfeited.

112.    As a result of such wrongful forfeiture, Defendants believe that Daimler has no membership or ownership interest in the Companies, thereby making Moehle the Companies' majority member.

113.    After obtaining a majority membership interest, to further prevent Daimler from serving the Companies in any capacity, Moehle purportedly directed the Companies to remove

Daimler from their respective Boards and amend and restate the Fund's Limited Partnership Agreement to remove Daimler from the "Key Person" provision set forth in Section 3.08 of the agreement.

114.    It was not until after Daimler's ouster from the Companies that Daimler came to understand that, among other things, Moehle had lied about GE's commitment to invest $20,000,000.00 in the Fund. As is now clear, Moehle repeatedly and continuously made this misrepresentation to Daimler in order to induce Daimler to walk away from a successful venture (Skilled Science) and instead partner with Moehle, so Moehle could benefit from Daimler's credibility and experience to boost the profile of the Companies and entice potential investors, and have Daimler fund company operations and expenses during its start-up phase, only to later oust Daimler from the Companies and reap the benefits for himself.

**COUNT ONE**

**FRAUD IN THE INDUCEMENT**
**(Against Moehle)**

115.    Plaintiff repeats all prior allegations as though fully set forth herein.

116.    Moehle intentionally misrepresented to Daimler that GE had committed to invest $20,000,000.00 in the Fund, which was a significant portion of the $50,000,000.00 the Fund sought to raise, and would lead to other potential investment opportunities for Moehle and Daimler's business partnership.

117.    Moehle made such misrepresentations knowing they were false or with a reckless disregard as to whether they were true or false. Such misrepresentations are material because Daimler would not have walked away from Skilled Science, walked away from existing parties willing to invest $10,000,000.00 in Skilled Science, and would not have entered into the business partnership in 2015 or the Daimler Awards in 2016 if he had known that GE had not committed to invest $20,000,000.00 in the Fund as Moehle had represented.

**JA533**

118.    Moehle made such misrepresentations to Daimler with the intention of: (i) misleading Daimler into relying upon said misrepresentations; (ii) using said misrepresentations to induce Daimler into funding the Companies in 2015 and 2016, some of which funds Moehle used for his own benefit; and (iii) using said misrepresentations to induce Daimler into entering the Daimler Awards, and with the intention of later forcing Daimler out of the Companies in early 2017 so that Moehle would have majority ownership and control over them.

119.    Daimler justifiably relied upon Moehle's misrepresentations as being true when he decided to enter into a business partnership with Moehle in 2015 and the Daimler Awards in 2016, and fund the Companies.

120.    As a direct and proximate result of Moehle's misrepresentations, together with Daimler's justifiable reliance on said misrepresentations, Daimler was wrongfully induced to walk away from Skilled Science, walk away from parties willing to invest $10,000,000.00 in Skilled Science, and instead enter into a business partnership with Moehle in 2015 and the Daimler Awards in 2016, agree to accept deferred compensation for work performed for the Companies, in excess of $130,000.00 and which has not been paid, and ultimately contribute in excess of $200,000.00 to Coal Hill.

**COUNT TWO**

**FRAUD IN THE INDUCEMENT**
**(Against Robotics Hub)**

121.    Plaintiff repeats all prior allegations as though fully set forth herein.

122.    Robotics Hub intentionally misrepresented to Daimler that GE had committed to invest $20,000,000.00 in the Fund, which was a significant portion of the $50,000,000.00 the Fund sought to raise, and would lead to other potential investment opportunities for Moehle and Daimler's business partnership and Robotics Hub.

123.    Robotics Hub made such misrepresentations knowing they were false or with a reckless disregard as to whether they were true or false. Such misrepresentations are material because Daimler would not have walked away from Skilled Science, walked away from existing parties willing to invest $10,000,000.00 in Skilled Science, and would not have entered into the Daimler/RH Award if he had known that GE had not committed to invest $20,000,000.00 in the Fund as Moehle had represented.

124.    Robotics Hub made such misrepresentations to Daimler with the intention of (i) misleading Daimler into relying upon said misrepresentations; (ii) using said misrepresentations to induce Daimler into funding the Companies in 2015 and 2016; and (iii) using said misrepresentations to induce Daimler into entering the Daimler/RH Award, and with the intention of later forcing Daimler out of the company.

125.    Daimler justifiably relied upon Robotics Hub's misrepresentations as being true when he decided to enter into the Daimler/RH Award and fund the Companies.

126.    As a direct and proximate result of Robotics Hub's misrepresentations, together with Daimler's justifiable reliance on said misrepresentations, Daimler was wrongfully induced to walk away from Skilled Science, walk away from parties willing to invest $10,000,000.00 in Skilled Science, and instead enter into the Daimler/RH Award, agree to accept deferred compensation for work performed for the Companies, in excess of $130,000.00 and which has not been paid, and ultimately contribute in excess of $200,000.00 to Coal Hill.

## COUNT THREE

### BREACH OF CONTRACT – COAL HILL OPERATING AGREEMENT
### (Against Coal Hill)

127.    Plaintiff repeats all prior allegations as though fully set forth herein.

128.    Daimler and Coal Hill entered into the Coal Hill Operating Agreement, dated March 23, 2016.

129.    Pursuant to Section 7.2 of the Coal Hill Operating Agreement, Coal Hill is required to issue units in connection with members' additional capital contributions.

130.    Daimler made additional capital contributions in excess of $200,000.00, which contributions provided benefit to Coal Hill, but Coal Hill did not issue additional units in connection with such contributions.

131.    As a direct and proximate result of Coal Hill's intentional and wrongful conduct, Daimler was issued no additional units in connection with his additional capital contributions, and Coal Hill has treated Daimler as having no membership or ownership interest in the company.

132.    Alternatively, if Daimler's financial contributions are not treated as capital contributions and Daimler is not entitled to additional units in Coal Hill, these financial contributions must be treated as loans to Coal Hill. Therefore, in the alternative, Coal Hill breached the Operating Agreement by failing to repay Daimler for these financial contributions.

**COUNT FOUR**

**FRAUD IN THE INDUCEMENT**
**(Against Coal Hill)**

133.    Plaintiff repeats all prior allegations as though fully set forth herein.

134.    Coal Hill intentionally misrepresented to Daimler that GE had committed to invest $20,000,000.00 in the Fund, which was a significant portion of the $50,000,000.00 the Fund sought to raise, and would lead to other potential investment opportunities for Moehle and Daimler's business partnership and Coal Hill.

135.    Coal Hill made such misrepresentations knowing they were false or with a reckless disregard as to whether they were true or false. Such misrepresentations are material because Daimler would not have walked away from Skilled Science, walked away from existing parties willing to invest $10,000,000.00 in Skilled Science, and would not have entered

**JA536**

into the business partnership in 2015 or the Daimler/CH Award if he had known that GE had

not committed to invest $20,000,000.00 in the Fund as Moehle had represented.

136.    Coal Hill made such misrepresentations to Daimler with the intention of (i)

misleading Daimler into relying upon said misrepresentations; (ii) using said

misrepresentations to induce Daimler into funding the Companies in 2015 and 2016; and (iii)

using said misrepresentations to induce Daimler into entering the Daimler/CH Award, and with

the intention of later forcing Daimler out of the company.

137.    Daimler justifiably relied upon Coal Hill's misrepresentations as being true

when he decided to enter into the business partnership in 2015 and the Daimler/CH Award,

and fund the Companies.

138.    As a direct and proximate result of Coal Hill's misrepresentations, together with

Daimler's justifiable reliance on said misrepresentations, Daimler was wrongfully induced to

walk away from parties willing to invest $10,000,000.00 in Skilled Science, and instead enter

into a business partnership with Moehle in 2015 and the Daimler/CH Award, agree to accept

deferred compensation for work performed for the Companies, in excess of $130,000.00 and

which has not been paid, and ultimately contribute in excess of $200,000.00 to Coal Hill.

**PRAYER FOR RELIEF**

WHEREFORE, Daimler demands judgment in his favor as follows:

(i)    On Count One, awarding Daimler monetary damages in an amount to be

determined at trial, but in no event less than $10 Million; or, in the alternative, a constructive

trust on Moehle's membership interests in Coal Hill and Robotics Hub;

(ii)    On Count Two, awarding Daimler compensatory damages in an amount to be

determined at trial, but in no event less than $10 Million; or, in the alternative, awarding

Daimler injunctive relief, including, but not limited to, compelling Robotics Hub to re-issue

additional units to Daimler as restitution for the fraud; and/or a constructive trust over membership units in Robotics Hub;

(iii)    On Count Three, awarding Daimler injunctive relief, including, but not limited to, compelling Coal Hill to provide a full and complete accounting of its finances and its members' capital contributions and capital accounts, compelling Coal Hill to issue additional units in connection with Daimler's additional capital contributions, and enjoining Coal Hill from advancing Moehle funds for legal or other expenses as incurred in connection with this action; or, alternatively, compensatory damages in an amount to be determined at trial, but in no event less than $10 Million;

(iv)    On Court Four, awarding Daimler compensatory damages in an amount to be determined at trial, but in no event less than $10 Million; and

(v)    On all Counts, awarding Daimler reasonable attorneys' fees and expenses, costs, pre- and post-judgment interest, and punitive damages in an amount to be determined at trial; and such other and further relief as the Court deems just and proper.

JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Daimler hereby demands a trial by jury on all issues so triable.

Dated: ~~June 28, 2019~~_____October 16, 2020

Respectfully submitted,

~~HERRICK, FEINSTEIN~~ZUMPANO PATRICIOS & POPOK, PLLC~~LLP~~

By:    /s/ Mitchell G. Mandell
Mitchell G. Mandell, Esq.
NY State Bar ID: 2042828
~~Two Park~~417 Fifth Avenue
Suite 826
New York, ~~NY~~New York 10016
(212) ~~592-1400~~542-8125
~~mmandell@herrick.com~~
mmandell@zplaw.com
*admitted pro hac vice*

-and-

BUCHANAN INGERSOLL & ROONEY PC

Christopher P. Schueller, Esq.
Pa. I.D. No. 92746
Sydney Rochelle Normil, Esq.
Pa. I.D. 320989
One Oxford Centre
301 Grant Street, 20th Floor
Pittsburgh, PA 15219
(412) 562-8428
christopher.schueller@bipc.com
sydney.normil@bipc.com

*Attorneys for Plaintiff Eric Daimler*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ERIC DAIMLER,

*Plaintiff,*

v.                                    Case No.: 2:18-cv-00165-MJH

CHRIS MOEHLE, ROBOTICS HUB FUND 1,        Honorable Marilyn J. Horan
LLC, and COAL HILL VENTURES LLC,

*Defendants.*

### ORDER

AND NOW this ___17th___ day of ___October___, 2020, upon consideration of Plaintiff's

Uncontested Motion for Leave to File an Amended Complaint and the proposed Amended

Complaint attached thereto, it is hereby ORDERED that said Motion is GRANTED. Plaintiff is

granted leave of court to file the proposed Amended Complaint within 10 days of the entry of this

Order.

BY THE COURT:

_____
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| ERIC DAIMLER,<br><br>                              Plaintiff,<br><br>              v.<br><br>CHRIS MOEHLE, ROBOTICS HUB FUND 1, LLC, and COAL HILL VENTURES LLC,<br><br>                              Defendants. | Case No.: 2:18-cv-00165-MJH<br><br>Honorable Marilyn J. Horan<br><br>**JURY TRIAL DEMANDED** |

## FIFTH AMENDED COMPLAINT

Plaintiff, Eric Daimler ("Daimler"), by his counsel, Zumpano Patricios & Popok, PLLC and Buchanan Ingersoll & Rooney PC, as and for his fifth amended complaint against defendants, Chris Moehle ("Moehle"), Robotics Hub Fund 1, LLC ("Robotics Hub"), and Coal Hill Ventures LLC ("Coal Hill") (collectively, "Defendants"), alleges as follows:

## INTRODUCTION

1.      This lawsuit arises from Defendants' intentional misrepresentations that were designed to mislead and induce Daimler to enter into: (i) a business partnership with Moehle, in connection with which Daimler made significant financial contributions; and (ii) certain related common unit award agreements that contained different and less favorable vesting schedules than those of Moehle, Daimler's equal partner.

2.      Defendants thereafter took steps to force Daimler out of Robotics Hub and Coal Hill (collectively, the "Companies")—companies in which Daimler joined as an equal partner and/or co-founded—by intentionally and wrongfully preventing him from satisfying the conditions of his vesting schedules, thereby causing all of his common units in the Companies to be treated as having been forfeited.

**JA541**

3.      Defendants believe that, because of such wrongful forfeiture, Daimler has no membership or ownership interest in the Companies, thereby making Moehle the Companies' majority member. After allegedly becoming a majority member of the Companies, Moehle purportedly removed Daimler from the Boards of the Companies so that he could obtain majority ownership and control over them.

**PARTIES**

4.      Plaintiff, Daimler, is an individual who resides in the State of New York. Defendants believe that Daimler has no membership or ownership interest in Robotics Hub or Coal Hill.

5.      Defendant, Moehle, is an individual who resides in the Commonwealth of Pennsylvania. Moehle is a member of Robotics Hub and Coal Hill.

6.      Defendant, Robotics Hub, is a limited liability company formed under the laws of the State of Delaware, with its principal place of business in Pittsburgh, Pennsylvania.

7.      Defendant, Coal Hill, is a limited liability company formed under the laws of the Commonwealth of Pennsylvania, with its principal place of business in Pittsburgh, Pennsylvania.

**JURISDICTION**

8.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum of $75,000, exclusive of costs and interest, and there is complete diversity of citizenship between the parties.[1]

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Robotics Hub and Coal Hill maintain their principal place of business in this district, Moehle resides in this district, and a substantial part of the events giving rise to Daimler's claims occurred in this district.

---

[1] Upon information and belief, Jamie Fee, a non-party member of Robotics Hub and Coal Hill, is an individual who resides in the State of Connecticut.

**FACTUAL BACKGROUND**

I.    **Daimler Agrees to Form an Equal Partnership Based Upon Moehle's Misrepresentations**

      A.    The Formation of the Partnership

      10.    Daimler and Moehle formed a business partnership for the purpose of investing in early-stage robotics companies with high growth potential.

      11.    Before becoming partners, Daimler and Moehle each maintained and operated their own companies in robotics and venture finance—Skilled Science and Coal Hill[2], respectively.

      12.    In 2015, Daimler and Moehle decided to move forward with an equal partnership by combining Skilled Science and Coal Hill through a de-facto merger, and by co-founding two new entities: Robotics Hub and Robotics Hub Fund 1, LP (the "Fund"). Robotics Hub is the Fund's General Partner, and Coal Hill is the Fund's Investment Manager.

      13.    Daimler and Moehle co-edited various documents—including, without limitation, documents entitled "Skilled Science/Coal Hill Merger" and "Combined Skilled Science Coal Hill Pro-Forma"—in connection with their efforts to merge Skilled Science and Coal Hill into a new entity reflecting their equal partnership.

      14.    The de-facto merger was accomplished by, among other things: (i) Coal Hill amending and restating its operating agreement to reflect the equal partnership between Daimler and Moehle; (ii) Daimler and Moehle working together on marketing strategies for the partnership, and ultimately amending various Coal Hill marketing materials to add Daimler as a principal; (iii) Coal Hill engaging Jamie Fee, who previously worked with Daimler at Skilled Science; and (iv) merging expenses accrued through the funding of Skilled Science into the fundraising expenses of Robotics Hub.

---

[2] Moehle formed Coal Hill in April 2015.

15.     Before their partnership began, Moehle represented to Daimler that General Electric ("GE") had already committed to invest in the Fund, and that he had a strong relationship with the National Robotics Engineering Center ("NREC") and the Robotics Institute ("RI"), which would lead to potential investment opportunities for the partnership.

16.     Specifically, with respect to GE, Moehle represented to Daimler throughout 2015 and 2016 that GE had committed to invest $20,000,000.00 in the Fund, which was a significant portion of the $50,000,000.00 the Fund sought to raise.

17.     Before entering into this partnership with Moehle, Daimler had been raising funds through Skilled Science, and was planning to close on investments from two investors, totaling $10,000,000.00. Daimler ultimately elected to walk away from his existing, successful venture (Skilled Science) and these soon-to-close investments in Skilled Science in late 2015 because Moehle assured him that GE had already committed to invest $20,000,000.00 in the Fund.

18.     Aside from the GE investment being twice as large as the two soon-to-close investments in Skilled Science, Daimler understood that the GE investment gave the new venture instant credibility that many other investors could not. The GE investment immediately catapulted the Fund into a "different league." Daimler saw great, intangible value to this investment in addition to the amount itself.

19.     Because Skilled Science had a different structure than that contemplated (and ultimately adopted) for Robotics Hub and the Fund, these two investors could not simply "shift" their investments to the new, joint venture.

20.     Moehle first made the representation concerning GE's commitment during the very first introductory phone call with Daimler on or about August 18, 2015: Moehle stated that GE had already invested in Coal Hill, and had committed to invest another $20,000,000.00 in the Fund.

**JA544**

21.     Moehle repeated his claim that GE had committed to invest $20,000,000.00 in the Fund during a phone call with Daimler the very next day, and during nearly every subsequent communication with Daimler, including phone calls on or about September 15 and 24, November 3 and December 8, 2015.

22.     According to Moehle, GE had already committed to invest $20,000,000.00, but the sole reason the funds were not yet in hand was because of a particular regulatory process that was being completed in connection with the spin out of GE's financial arm. Moehle explained this was not a condition on GE's funding of its committed investment, but merely something that affected the timing of the funding. Moehle represented that it was an "inevitability" that GE would spin out the financial arm and fund its committed investment – this was not Moehle's opinion, but rather something he presented as fact, based on purported conversations with GE. It was expected that the process would be completed in early or mid 2016.

23.     Further, Moehle repeated this representation – that GE had committed to invest $20,000,000.00 in the Fund – in communications with both Daimler and potential investors before Daimler executed the Daimler Awards and other corporate documents in 2016. For example, on or about October 16, 2015, during an in-person meeting at which Daimler was present, Moehle told representatives of the University of Pittsburgh Medical Center ("UPMC") – specifically Talbot "Tal" Heppenstall, Charles Hendrix, Matthew Cunningham, and Brenton Burns – that GE was a sponsor of the Fund and had already committed to invest $20,000,000.00.

24.     Moehle again repeated this representation during another in-person meeting with representatives of UPMC and Daimler in Pittsburgh on or about November 10, 2015.

25.     Indeed, Moehle continued to represent, during meetings in Pittsburgh with Daimler and potential investors (and other entities potentially beneficial to the Fund), that GE

**JA545**

was a Fund sponsor, and had committed to invest $20,000,000.00 in the Fund, including on or about:

- November 1, 2015, in a meeting with Randy Castleman of Court Square Ventures;

- November 3, 2015, in a meeting with Don Smith and Tim White, representatives of the Regional Industrial Development Corporation of Southwestern Pennsylvania ("RIDC");

- November 18, 2015, in a meeting with Paul O'Reilly of OCP Capital LLC;

- December 15, 2015, and January 5 and 14, 2016, in meetings with Martial Hebert, of RI;

- January 6, 2016, in a meeting with Herman Herman [sic] of the NREC;

- and January 6, 2016, in a meeting with Fee.

26.    In order to further prop up the illusion that the Fund had a solid relationship with GE (via a committed $20,000,000.00 investment), Moehle brought Daimler to an in-person meeting with GE in New York on or about November 18, 2015. Moehle and Daimler met with Alex Tepper, a Managing Director of GE Ventures, and discussed the progress of the Fund, specifically robotics companies in which the Fund planned to invest.

27.    Although Tepper was a contact at GE, according to Moehle, Tepper was not involved in GE's decision to invest in the Fund. Moehle had specifically directed Daimler to not discuss the investment, as Tepper had not been involved in the decision process, and Moehle wanted to remain GE's "single point person" regarding the investment. Daimler did not view this as unusual, but rather consistent with Moehle's personality and oft-expressed desire to maintain control of the relationships he cultivated.

28.    Moreover, it was Daimler's understanding, based on representations from Moehle, that Tepper was responsible for GE's direct investments in robotics companies (versus an entity like the Fund), which is why Daimler and Moehle spoke to Tepper about the specific robotics companies in which the Fund sought to invest.

**JA546**

29.    Daimler relied on Moehle's representations concerning GE when he decided to walk away from $10,000,000.00 in promised investment in Skilled Science, cease meeting with other potential investors in Skilled Science, and pursue an equal partnership with Moehle in 2015.

30.    During 2015 and early 2016, Daimler came to learn that Moehle misrepresented and overstated the strength of his relationships with the NREC and RI.

31.    However, throughout 2015 and 2016, Moehle continued to vigorously represent to Daimler that GE had committed to invest $20,000,000.00 in the Fund.

32.    In the months, and weeks, leading up to Daimler's execution of the Daimler Awards and other necessary corporate documents, Moehle continued to repeat his representations concerning GE's $20,000,000.00 commitment to the Fund in private calls with Daimler, as well as in joint phone calls and in-person meetings between Moehle, Daimler and potential investors, including those on or about:

- January 20, 2016, with Brian Gerkey, the CEO and Founder of the Open Source Robotics Foundation ("OSRF") by phone;

- February 12, 2016, with David Katzman, Senior Financial Analyst at the Yale Investment Office (which manages Yale's Endowment) by phone;

- February 15, 2016, in a meeting with Arnold Kwong of the investment firm Extra Intelligence in New York;

- February 17, 2016, in a meeting with Tom Juterbock, Laura Pekari, Nisanth Reddy and Jon Rotolo, of the investment group Woodcreek, a division of Mass Mutual in Connecticut;

- February 23, 2016, in a meeting with Cliff Friedman, Tracy O'Leary and Jim Pallotta, of the investment firm Raptor Group Holdings in New York;

- and March 23, 2016 – the day the Daimler Awards were signed – in a meeting with Bill Scalzulli and other representatives of the Kraft family office outside of Boston.

33.    Daimler would periodically request updates from Moehle regarding the timing of the funding of GE's committed investment, and Moehle's answer remained consistent. As

Moehle had explained that GE had already committed to invest $20,000,000.00, and potential investors had moved forward with the Fund based on, among other things, their understanding that GE had committed these funds, Daimler did not see this timing as an issue.

34.    Daimler never imagined that Moehle would lie to potential investors (or to Daimler). Each time Daimler participated (telephonically or in-person) in a meeting with a potential investor, during which Moehle would discuss the committed $20,000,000.00 GE investment, Daimler was assured that the commitment had already been made.

35.    Coupled with the momentum of walking away from Skilled Science, hiring Jamie Fee to work with the Companies, the Fund's progress in garnering potential investors and robotics businesses in which to invest, all of which was induced by Moehle's representation that GE had made a $20,000,000.00 commitment to the Fund, Daimler felt assured that Moehle's representation was in fact true.

B.    Daimler and Moehle Began As Equal Partners in the Companies

36.    As of March 23, 2016, Daimler and Moehle were both members of the Companies.

37.    Pursuant to the Companies' respective Amended and Restated Operating Agreements, both dated March 23, 2016, Daimler and Moehle were the only members of the Companies' initial Boards of Managers.

38.    Daimler and Moehle entered into Common Unit Award Agreements, dated March 23, 2016, with each of the Companies pursuant to which Daimler and Moehle were both awarded forty-two common units in each company, which units were subject to certain disparate vesting schedules more fully discussed below.

39.    In contrast, Fee also entered into Common Unit Award Agreements with each of the Companies, dated March 23, 2016, pursuant to which Fee was awarded only two common units in each company.

**JA548**

40.    Further, pursuant to Section 3.08 of the Fund's Limited Partnership Agreement, both Daimler and Moehle are named "key persons," such that if both Daimler and Moehle cease to be actively involved in the Fund's affairs, the Fund's limited partners may elect to terminate the Fund's investment period.

41.    The Companies and the Fund uniformly promoted Daimler and Moehle as equal partners in connection with their public relations and fundraising efforts, including, without limitation, in the Fund's Confidential Private Placement Memorandum and other presentation materials provided to potential investors.

42.    During joint presentations to potential investors, some investors would expressly ask Daimler and Moehle if the two were equal partners, and their response was always "yes." In fact, Moehle explained their relationship by stating that he and Daimler had combined their efforts, not that Daimler had joined Coal Hill.

43.    Despite having an equal partnership, Daimler personally loaned Coal Hill $125,000.00 pursuant to a promissory note and advanced personal funds to cover corporate expenses. In contrast, Moehle provided an initial capital contribution of merely $1,000.00.

44.    On or about November 2, 2017, Coal Hill paid the promissory note in full, together with interest. Coal Hill also reimbursed Daimler for a portion of the expenses he personally advanced to the company, in the amount of $35,000.00.

## II.    Daimler Accepted a Presidential Fellowship that Benefitted the Companies and the Fund

45.    In January 2016, Daimler was appointed as a Presidential Innovation Fellow for the Barack Obama White House.

46.    Daimler accepted the fellowship, which is a twelve-month program, during Barack Obama's last year in office. Thus, it was axiomatic that Daimler's fellowship would end in early 2017.

**JA549**

47.    Moehle encouraged Daimler to accept the fellowship because of the value that the Companies and the Fund would derive from it.

48.    Daimler served as a Presidential Innovation Fellow from January 2016 to early 2017, during which time Daimler advised the White House on, among other things, issues relating to robotics and artificial intelligence.

49.    Daimler and Robotics Hub received positive press coverage with respect to Daimler's fellowship, and Defendants promoted Daimler's White House position in connection with their marketing and fundraising efforts.

50.    Because Daimler's fellowship allowed for outside employment, Daimler continued to provide services to the Companies during 2016, but the Companies did not compensate him for such services. During such time, Daimler and Moehle agreed that Daimler's compensation for such services would accrue and be paid to Daimler at a later date.

51.    As fully explained below, the relationship between Daimler and Moehle began to break down, in part, because of Daimler's fellowship.

**III.   Defendants' Misrepresentations Caused Daimler to Enter into Common Unit Award Agreements with Different and Less Favorable Vesting Schedules than those of His Equal Partner Moehle**

52.    On or about March 10, 2016, soon after Daimler's fellowship began, the Companies and the Fund engaged Reed Smith LLP to, among other things, prepare various corporate formation and governing documents, including the Common Unit Award Agreements and the Companies' Amended and Restated Operating Agreements.

53.    With respect to the referenced engagement, Reed Smith interacted almost exclusively with Moehle.

A.    <u>Common Unit Awards</u>

54.    The Companies each entered into a Common Unit Award Agreement, dated March 23, 2016, with Moehle, pursuant to which Moehle was awarded forty-two common units

**JA550**

in both Robotics Hub and Coal Hill (the "Moehle/RH Award" and the "Moehle/CH Award,"

respectively, and collectively the "Moehle Awards"), which units vest as follows:

20% vests on the first anniversary of Date of Award [March 23, 2017]; 1.6666% vests ratably
on the last day of each month thereafter until the fifth anniversary of the Date of Award
[March 23, 2021].

Copies of the Moehle/RH Award and the Moehle/CH Award are attached hereto as Exhibits A

and B, respectively.

  55.  The Companies also entered into Common Unit Award Agreements, dated

March 23, 2016, with Daimler, pursuant to which Robotics Hub and Coal Hill each awarded

forty-two common units to Daimler (the "Daimler/RH Award" and the "Daimler/CH Award,"

respectively, and collectively the "Daimler Awards").

  56.  Unlike Moehle's common units, however, Daimler's units vest as follows:

20% vests on the date when [Daimler] has provided 12 consecutive and uninterrupted
months of Full Time Services to the Company Group, provided that [Daimler] must
begin providing such Full Time Services to the Company Group no later than the first
anniversary of the Date of Award [March 23, 2017]; and

provided the above conditions are met, the remaining 80% vests on a pro-rata basis on
the last day of each month thereafter until the fifth anniversary of the Date of Award
[March 23, 2021].

Copies of the Daimler/RH Award and the Daimler/CH Award are attached hereto as Exhibits

C and D, respectively.

  57.  Pursuant to Section 2(a) of the Daimler Awards, Daimler provides Full Time

Services if he is employed by or otherwise provides greater than 95% of his professional

activities, as determined in the sole discretion of the respective Boards, to the Company Group.

  58.  Section 2(a) of the Daimler Awards defines the Company Group as a

combination of Robotics Hub or Coal Hill, respectively, the Fund, and the Fund's investment

manager (including services provided to portfolio companies of the Fund and Daimler's

capacity as an employee of the Fund's investment manager).

**JA551**

B.    Defendants' Misrepresentations

59.    In multiple conversations during 2015 and 2016, some of which included associates and investors, Moehle intentionally misrepresented to Daimler that: (i) Moehle and Daimler would be treated as equals; (ii) the terms of the Daimler Awards were identical to those of the Moehle Awards; and (iii) the Daimler and Moehle Awards both contained vesting schedules pursuant to which a portion of the units would vest automatically while the remaining units would vest over time.

60.    Reed Smith made the same misrepresentations to Daimler during conversations in early 2016.

61.    In early 2016, Daimler made it clear to Moehle and Reed Smith that he would consent to the Daimler Awards only if he and Moehle were treated equally and the terms of the Daimler Awards were identical to those of the Moehle Awards.

62.    At no time did Defendants or Reed Smith inform Daimler that only the Daimler Awards, not the Moehle Awards, contained vesting schedules requiring twelve consecutive and uninterrupted months of Full-Time Services to the Company Group, which services must start within a year of entering into the award agreements, before any common units would begin to vest.

63.    In fact, Moehle and Reed Smith continued to represent to Daimler until in or about July 2016, several months after the awards were executed, that Moehle and Daimler were treated equally and that the Daimler Awards and the Moehle Awards were identical.

64.    It was never Daimler's understanding, based upon representations by Moehle and Reed Smith, and, indeed, was incomprehensible to Daimler, that there could be any circumstance under which his common units in the Companies would be forfeited.

65.    Daimler would not have entered into the Daimler Awards if he had known that: (i) his common units vested differently than Moehle's common units; (ii) he would be required

**JA552**

to provide twelve consecutive and uninterrupted months of Full-Time Services to the Company Group, and begin such services within one year of entering into the Daimler Awards, before any portion of his common units would begin to vest; and (iii) there could be any circumstance under which his common units in the Companies would be forfeited.

      C.    <u>Amended and Restated Operating Agreements</u>

66.    Also on March 23, 2016, Robotics Hub and Coal Hill, and their respective members, entered into Amended and Restated Operating Agreements (the "RH Operating Agreement" and the "CH Operating Agreement," respectively, and collectively the "Operating Agreements"), which terms are incorporated in the respective Moehle Awards and Daimler Awards. Copies of the RH Operating Agreement and the CH Operating Agreement are attached hereto as Exhibits E and F, respectively.

67.    Section 7.1 of the respective Operating Agreements requires the Companies to record members' initial capital contributions, and Section 7.3 requires the Companies to establish and maintain on their own books and records a separate capital account for each member.

68.    Section 7.2 of the respective Operating Agreements requires all additional capital contributions to be made in connection with the issuance of units.

69.    Pursuant to Section 12.3(b) of the Operating Agreements, Covered Persons (including, among others, members, officers and directors, and managers) who are permitted or required to make a decision in good faith must act under such express standard.

70.    Under Section 12.4 of the Operating Agreements, Covered Persons are entitled to indemnification from the Companies in connection with actions or omissions performed on behalf of the Companies only if such person acts in good faith and in a manner believed by such person to be in, or not opposed to, the best interests of the company, and such person's conduct does not constitute fraud or willful misconduct.

**JA553**

71.    At the time Daimler entered into the Operating Agreements, based on Moehle's representations, Daimler believed that GE had already committed to invest $20,000,000.00 in the Fund. Indeed, the initial timeline of funding this committed investment in early to mid 2016 had not yet passed, and Moehle continued to discuss this commitment with both Daimler individually and with potential investors, both on a regular basis.

72.    At the time Daimler entered into the Operating Agreements, Daimler was working full-time as a Presidential Innovation Fellow, and, as discussed below, his primary insight into the operations of the Companies was communications with Moehle and joint meetings with potential investors.

IV.    **The Relationship Between Daimler and Moehle Breaks Down, But Daimler Remains Engaged in the Companies and the Fund**

73.    As explained above, Daimler and Moehle began their partnership as equal partners—and were promoted as such—and each initially devoted equal time to the Companies.

74.    Although Daimler worked for the Companies only part-time during his Presidential Innovation Fellowship, both Moehle and Daimler understood that Daimler would return to his full-time position with the Companies when his fellowship ended.

75.    Indeed, as previously explained, it was understood that Daimler's fellowship necessarily had a finite end date in early 2017.

76.    Additionally, as of January 2016 when Daimler began his fellowship, the business partnership had budgeted matching salaries for Moehle and Daimler, and the Companies had budgeted another full-time salary which they never paid because the individual for whom it was budgeted did not become a member of the Companies as originally anticipated.

77.    In early-mid 2016, the business relationship between Daimler and Moehle began to break down.

78.     The attention and publicity Daimler received in connection with his Presidential Innovation Fellowship became a point of contention between Daimler and Moehle, and Moehle began criticizing Daimler as a business partner.

79.     Moehle became increasingly controlling over access to information about the Fund's investors and portfolio companies, information Moehle previously freely shared. Indeed, compounding on his previously-expressed desire to maintain control over particular relationships, Moehle unilaterally determined that he would become the "gatekeeper" of this information soon after Daimler accepted his fellowship.

80.     Moehle would criticize Daimler about statements he made during joint presentations to potential investors about the Fund's portfolio companies, but Moehle would refuse to provide Daimler full access to relevant information about said portfolio companies. Moehle even criticized the content on Daimler's LinkedIn page, and directed Daimler to revise his descriptions of the Companies to mirror those on Moehle's LinkedIn page.

81.     Moehle also began to unilaterally assign Daimler "deliverables" without first consulting with Daimler.

82.     Despite rising tensions, Moehle needed Daimler to remain engaged in the Companies and the Fund so that he would continue to make financial contributions to them, and Daimler remained engaged throughout his fellowship.

83.     For his part, because the business relationship was still relatively new, Daimler hoped these issues were simply "growing pains," and could be resolved with time.

84.     From May 2016 through August 2016, Daimler wrote several checks to Coal Hill totaling approximately $30,000.00 to cover Coal Hill's operating expenses, and even some of Moehle's personal expenses, as Moehle requested. Specifically, Moehle used some of Daimler's financial contributions to Coal Hill to pay for personal expenses such as his mortgage payments and family trips.

**JA555**

85.    Throughout this period, Moehle continued to represent to Daimler (and potential investors) that GE had committed to invest $20,000,000.00 in the Fund.

86.    Daimler also continued to make financial contributions to Coal Hill from late 2015 through early 2017 to pay, among other things, third-party expenses.

87.    Although, as discussed above, Daimler had extended a loan directly to Coal Hill to pay operating expenses, Coal Hill constantly needed additional funds to pay third-party expenses, and was not in a position to pay back further debt in the foreseeable future.

88.    Accordingly, Daimler made additional financial contributions in the form of payments to third parties, which payments were primarily attributable to company-related travel (for both Daimler and Moehle), operations, and investor meeting expenses.

89.    Daimler continued to make these additional financial contributions to Coal Hill with the expectation that they would be treated as capital contributions, and in late 2016, Moehle agreed that they would be treated as such.

90.    In total, Daimler made in excess of $200,000.00 in financial contributions that were to be treated as capital contributions.

91.    These financial contributions were made by Daimler on behalf of Coal Hill, and were made with Moehle's knowledge and approval.

92.    These financial contributions provided benefit and value to Coal Hill, which was a cash-strapped entity that could not have done business without Daimler's regular, indeed almost daily, infusions of cash and payment of expenses. Without Daimler's financial contributions, the Companies would not have been able to operate or court necessary investors.

93.    Despite this arrangement, Daimler and Moehle continued to represent themselves to investors as "equal" partners, because, despite the fact that Daimler was entitled to additional common units in Coal Hill, Daimler and Moehle continued to be equally important to the venture.

**JA556**

94.     Daimler did not receive additional common units in Coal Hill in connection with his additional financial contributions, as required by Section 7.2 of the Operating Agreement.

**V.    Defendants Force Daimler Out of the Companies Despite His Attempts to Remain Actively Involved in Them**

95.     During the second half of 2016, Moehle began taking steps to gain sole control of the Companies. Indeed, Moehle continued criticizing Daimler as a business partner and increasingly began obstructing efforts by Daimler and Fee to engage in the Companies and the Fund.

96.     During the Fall of 2016, Daimler and Fee made several attempts to arrange meetings with Moehle in Pittsburgh, where the Companies and the Fund are based, but Moehle thwarted all such efforts. In fact, Moehle told Daimler that the two would have a problem if Daimler scheduled a trip to Pittsburgh.

97.     On numerous occasions, Daimler and Fee offered to help Moehle with the Fund's first closing in December 2016. But Moehle repeatedly refused their help, stated that he would handle the closing, and directed Daimler and Fee to focus their efforts elsewhere.

98.     Further, Moehle continued to unilaterally assign Daimler "deliverables," including asking Daimler to make introductions to, among others, internet travel companies such as Google Travel. Daimler made the introductions Moehle requested, but afterwards Moehle would tell Daimler that the introductions were no longer needed. Moehle would then claim that Daimler failed to complete such "deliverables."

99.     On several occasions in mid-late 2016, Moehle actively obstructed Daimler's efforts to communicate with the Fund's investors and portfolio companies.

100.     Specifically, Daimler explicitly asked Moehle for the contact information for various investors and portfolio companies, including, among others, TravelWits. Moehle either

ignored Daimler's requests or flatly refused to disclose the information. In some instances, Moehle even refused to disclose the contact's name.

101.    In late 2016, Moehle began discouraging Daimler from ending his fellowship, which he could have done at any time, because the Companies allegedly had no funds with which to pay him. Daimler suggested that his salary could continue to accrue and be paid to him at a later date, as had been done in the past, but Moehle opposed such structure.

102.    Despite Moehle's efforts in 2016 to disassociate himself, the Companies, and the Fund from Daimler, he simultaneously represented to investors that Daimler was his equal partner until in or about November 2016.

103.    Daimler and Moehle met in-person on January 5-6, 2017 to discuss the notion that Daimler would not return to his full-time role with the Companies at that time, but that Daimler could still earn some compensation in a non-operating role, and that a full-time operating role for Daimler would occur at a later date.

104.    On or about January 5, 2017, just before Daimler's fellowship would ultimately end, Moehle recommended to the Companies' Boards (which constituted only Daimler and Moehle) that Daimler not be permitted to return to a full-time role with the Companies.

105.    Although Moehle and the Companies had contemplated Daimler's return to full-time employment from the outset and budgeted a full-time salary for Daimler, Moehle purportedly made the above recommendation to the Boards because the Companies allegedly lacked sufficient funds to pay Daimler a full-time salary at that time. Indeed, Moehle refused to allow Daimler's salary to continue to accrue and be paid at a later date, as it had in the past.

106.    At the Companies' respective Board meetings on or about January 5, 2017, Moehle voted against, and Daimler voted in favor of, Daimler returning to a full-time role with the Companies.

107.    Because no other votes were cast, the Boards were deadlocked and the matter was referred to the Deadlock Advisor, David Mawhinney, in accordance with Section 5.5(c) of the Companies' respective Operating Agreements.

108.    Daimler and Moehle met in-person again on January 18, 2017 in Orlando, Florida to resume their January 5-6, 2017 discussions.

109.    On or about March 22, 2017, just before the first anniversary of the date of the Daimler Awards, Mawhinney broke the deadlock by voting against Daimler returning to a full-time, fully compensated role with the Companies at that time due to their financial status, but understood when casting his vote that Daimler's full-time engagement with the Companies would occur at a later date and did not foreclose the possibility that Daimler could, if he so elected, return to work on a full-time basis with some portion of his compensation accrued, but not paid, as had been done in the past.

110.    Despite Defendants' previous representations to the contrary, they never offered Daimler a non-operating role in the Companies, provided any compensation to him, or permitted his full-time engagement with the Companies. Instead, Defendants took additional steps to ensure that Daimler had no role whatsoever within the Companies.

111.    Because Defendants wrongfully prevented Daimler from returning to his full-time role with the Companies within a year after executing the Daimler Awards, by March 23, 2017, despite Daimler's desire and attempts to do so, the Companies deemed all of Daimler's common units to be forfeited.

112.    As a result of such wrongful forfeiture, Defendants believe that Daimler has no membership or ownership interest in the Companies, thereby making Moehle the Companies' majority member.

113.    After obtaining a majority membership interest, to further prevent Daimler from serving the Companies in any capacity, Moehle purportedly directed the Companies to remove

Daimler from their respective Boards and amend and restate the Fund's Limited Partnership Agreement to remove Daimler from the "Key Person" provision set forth in Section 3.08 of the agreement.

114.    It was not until after Daimler's ouster from the Companies that Daimler came to understand that, among other things, Moehle had lied about GE's commitment to invest $20,000,000.00 in the Fund. As is now clear, Moehle repeatedly and continuously made this misrepresentation to Daimler in order to induce Daimler to walk away from a successful venture (Skilled Science) and instead partner with Moehle, so Moehle could benefit from Daimler's credibility and experience to boost the profile of the Companies and entice potential investors, and have Daimler fund company operations and expenses during its start-up phase, only to later oust Daimler from the Companies and reap the benefits for himself.

### COUNT ONE

### FRAUD IN THE INDUCEMENT
**(Against Moehle)**

115.    Plaintiff repeats all prior allegations as though fully set forth herein.

116.    Moehle intentionally misrepresented to Daimler that GE had committed to invest $20,000,000.00 in the Fund, which was a significant portion of the $50,000,000.00 the Fund sought to raise, and would lead to other potential investment opportunities for Moehle and Daimler's business partnership.

117.    Moehle made such misrepresentations knowing they were false or with a reckless disregard as to whether they were true or false. Such misrepresentations are material because Daimler would not have walked away from Skilled Science, walked away from existing parties willing to invest $10,000,000.00 in Skilled Science, and would not have entered into the business partnership in 2015 or the Daimler Awards in 2016 if he had known that GE had not committed to invest $20,000,000.00 in the Fund as Moehle had represented.

**JA560**

118.    Moehle made such misrepresentations to Daimler with the intention of: (i) misleading Daimler into relying upon said misrepresentations; (ii) using said misrepresentations to induce Daimler into funding the Companies in 2015 and 2016, some of which funds Moehle used for his own benefit; and (iii) using said misrepresentations to induce Daimler into entering the Daimler Awards, and with the intention of later forcing Daimler out of the Companies in early 2017 so that Moehle would have majority ownership and control over them.

119.    Daimler justifiably relied upon Moehle's misrepresentations as being true when he decided to enter into a business partnership with Moehle in 2015 and the Daimler Awards in 2016, and fund the Companies.

120.    As a direct and proximate result of Moehle's misrepresentations, together with Daimler's justifiable reliance on said misrepresentations, Daimler was wrongfully induced to walk away from Skilled Science, walk away from parties willing to invest $10,000,000.00 in Skilled Science, and instead enter into a business partnership with Moehle in 2015 and the Daimler Awards in 2016, agree to accept deferred compensation for work performed for the Companies, in excess of $130,000.00 and which has not been paid, and ultimately contribute in excess of $200,000.00 to Coal Hill.

## COUNT TWO

### FRAUD IN THE INDUCEMENT
### (Against Robotics Hub)

121.    Plaintiff repeats all prior allegations as though fully set forth herein.

122.    Robotics Hub intentionally misrepresented to Daimler that GE had committed to invest $20,000,000.00 in the Fund, which was a significant portion of the $50,000,000.00 the Fund sought to raise, and would lead to other potential investment opportunities for Moehle and Daimler's business partnership and Robotics Hub.

123.    Robotics Hub made such misrepresentations knowing they were false or with a reckless disregard as to whether they were true or false. Such misrepresentations are material because Daimler would not have walked away from Skilled Science, walked away from existing parties willing to invest $10,000,000.00 in Skilled Science, and would not have entered into the Daimler/RH Award if he had known that GE had not committed to invest $20,000,000.00 in the Fund as Moehle had represented.

124.    Robotics Hub made such misrepresentations to Daimler with the intention of (i) misleading Daimler into relying upon said misrepresentations; (ii) using said misrepresentations to induce Daimler into funding the Companies in 2015 and 2016; and (iii) using said misrepresentations to induce Daimler into entering the Daimler/RH Award, and with the intention of later forcing Daimler out of the company.

125.    Daimler justifiably relied upon Robotics Hub's misrepresentations as being true when he decided to enter into the Daimler/RH Award and fund the Companies.

126.    As a direct and proximate result of Robotics Hub's misrepresentations, together with Daimler's justifiable reliance on said misrepresentations, Daimler was wrongfully induced to walk away from Skilled Science, walk away from parties willing to invest $10,000,000.00 in Skilled Science, and instead enter into the Daimler/RH Award, agree to accept deferred compensation for work performed for the Companies, in excess of $130,000.00 and which has not been paid, and ultimately contribute in excess of $200,000.00 to Coal Hill.

## COUNT THREE

### BREACH OF CONTRACT – COAL HILL OPERATING AGREEMENT
#### (Against Coal Hill)

127.    Plaintiff repeats all prior allegations as though fully set forth herein.

128.    Daimler and Coal Hill entered into the Coal Hill Operating Agreement, dated March 23, 2016.

**JA562**

129.    Pursuant to Section 7.2 of the Coal Hill Operating Agreement, Coal Hill is required to issue units in connection with members' additional capital contributions.

130.    Daimler made additional capital contributions in excess of $200,000.00, which contributions provided benefit to Coal Hill, but Coal Hill did not issue additional units in connection with such contributions.

131.    As a direct and proximate result of Coal Hill's intentional and wrongful conduct, Daimler was issued no additional units in connection with his additional capital contributions, and Coal Hill has treated Daimler as having no membership or ownership interest in the company.

132.    Alternatively, if Daimler's financial contributions are not treated as capital contributions and Daimler is not entitled to additional units in Coal Hill, these financial contributions must be treated as loans to Coal Hill. Therefore, in the alternative, Coal Hill breached the Operating Agreement by failing to repay Daimler for these financial contributions.

## COUNT FOUR

### FRAUD IN THE INDUCEMENT
### (Against Coal Hill)

133.    Plaintiff repeats all prior allegations as though fully set forth herein.

134.    Coal Hill intentionally misrepresented to Daimler that GE had committed to invest $20,000,000.00 in the Fund, which was a significant portion of the $50,000,000.00 the Fund sought to raise, and would lead to other potential investment opportunities for Moehle and Daimler's business partnership and Coal Hill.

135.    Coal Hill made such misrepresentations knowing they were false or with a reckless disregard as to whether they were true or false. Such misrepresentations are material because Daimler would not have walked away from Skilled Science, walked away from existing parties willing to invest $10,000,000.00 in Skilled Science, and would not have entered

into the business partnership in 2015 or the Daimler/CH Award if he had known that GE had not committed to invest $20,000,000.00 in the Fund as Moehle had represented.

136.    Coal Hill made such misrepresentations to Daimler with the intention of (i) misleading Daimler into relying upon said misrepresentations; (ii) using said misrepresentations to induce Daimler into funding the Companies in 2015 and 2016; and (iii) using said misrepresentations to induce Daimler into entering the Daimler/CH Award, and with the intention of later forcing Daimler out of the company.

137.    Daimler justifiably relied upon Coal Hill's misrepresentations as being true when he decided to enter into the business partnership in 2015 and the Daimler/CH Award, and fund the Companies.

138.    As a direct and proximate result of Coal Hill's misrepresentations, together with Daimler's justifiable reliance on said misrepresentations, Daimler was wrongfully induced to walk away from parties willing to invest $10,000,000.00 in Skilled Science, and instead enter into a business partnership with Moehle in 2015 and the Daimler/CH Award, agree to accept deferred compensation for work performed for the Companies, in excess of $130,000.00 and which has not been paid, and ultimately contribute in excess of $200,000.00 to Coal Hill.

### PRAYER FOR RELIEF

WHEREFORE, Daimler demands judgment in his favor as follows:

(i)    On Count One, awarding Daimler monetary damages in an amount to be determined at trial, but in no event less than $10 Million; or, in the alternative, a constructive trust on Moehle's membership interests in Coal Hill and Robotics Hub;

(ii)    On Count Two, awarding Daimler compensatory damages in an amount to be determined at trial, but in no event less than $10 Million; or, in the alternative, awarding Daimler injunctive relief, including, but not limited to, compelling Robotics Hub to re-issue

additional units to Daimler as restitution for the fraud; and/or a constructive trust over membership units in Robotics Hub;

(iii)    On Count Three, awarding Daimler injunctive relief, including, but not limited to, compelling Coal Hill to provide a full and complete accounting of its finances and its members' capital contributions and capital accounts, compelling Coal Hill to issue additional units in connection with Daimler's additional capital contributions, and enjoining Coal Hill from advancing Moehle funds for legal or other expenses as incurred in connection with this action; or, alternatively, compensatory damages in an amount to be determined at trial, but in no event less than $10 Million;

(iv)    On Court Four, awarding Daimler compensatory damages in an amount to be determined at trial, but in no event less than $10 Million; and

(v)    On all Counts, awarding Daimler reasonable attorneys' fees and expenses, costs, pre- and post-judgment interest, and punitive damages in an amount to be determined at trial; and such other and further relief as the Court deems just and proper.

JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Daimler hereby demands a trial by jury on all issues so triable.

Dated: October 19, 2020                     Respectfully submitted,

                                            ZUMPANO PATRICIOS & POPOK, PLLC

                                            By:   /s/ Mitchell G. Mandell
                                                  Mitchell G. Mandell, Esq.
                                                  NY State Bar ID: 2042828
                                                  417 Fifth Avenue
                                                  Suite 826
                                                  New York, New York 10016
                                                  (212) 542-8125
                                                  mmandell@zplaw.com
                                                  *admitted pro hac vice*

                                            -and-

                                            BUCHANAN INGERSOLL & ROONEY PC

                                                  Christopher P. Schueller, Esq.
                                                  Pa. I.D. No. 92746
                                                  Sydney Rochelle Normil, Esq.
                                                  Pa. I.D. 320989
                                                  One Oxford Centre
                                                  301 Grant Street, 20th Floor
                                                  Pittsburgh, PA 15219
                                                  (412) 562-8432
                                                  christopher.schueller@bipc.com
                                                  sydney.normil@bipc.com

                                                  *Attorneys for Plaintiff Eric Daimler*

**JA566**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| ERIC DAIMLER, | ) | |
| | ) | Civil Action No. 18-165-MJH |
| Plaintiff, | ) | The Honorable Marilyn J. Horan |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| CHRIS MOEHLE, ROBOTICS | ) | |
| HUB FUND 1 LLC, and COAL HILL | ) | Electronically Filed |
| VENTURES LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' ANSWER TO PLAINTIFF'S**
**FIFTH AMENDED COMPLAINT AND COUNTERCLAIMS**

Defendants Chris Moehle, Robotics Hub Fund 1 LLC ("Robotics Hub"), and Coal Hill

Ventures LLC ("Coal Hill") (collectively, "Defendants"), by and through their counsel, K&L

Gates LLP, hereby file this Answer to the Fifth Amended Complaint of Plaintiff Eric Daimler

and Counterclaims, and state as follows:

**INTRODUCTION**

1.      The allegations of Paragraph 1 are conclusions of law that do not require a

response.  To the extent a response is required, Defendants deny the allegations.

2.      The allegations of Paragraph 2 do not require a response, as they relate

exclusively to claims that have been dismissed by the Court.  ECF No. 22.  To the extent a

response is deemed necessary, Defendants deny the allegations of Paragraph 2.

By way of further response, the Court has already held that Daimler's common units

were properly deemed forfeited by Robotics Hub and Coal Hill (collectively, the "Companies"),

and also that "regardless of whether the terms of Moehle's award mirrored that of Daimler's …

[Daimler] could not have satisfied the vesting requirements because he had not provided Full

1

**JA567**

Time Services to the Companies by March 23, 2017." ECF No. 22 at 13.

     3.     The allegations of Paragraph 3 do not require a response, as they relate exclusively to claims that have been dismissed by the Court. ECF No. 22. To the extent a response is required, the allegations of Paragraph 3 are admitted in part and denied in part.

     Defendants admit that Daimler's common units were properly deemed forfeited by the Companies due to Daimler's failure to satisfy the express vesting conditions applicable to his common units within the specified time period. Defendants further admit that Daimler was not offered employment, and that he was removed from the Companies' Boards of Managers in accordance with the terms of the Companies' Amended and Restated Operating Agreements.

     The remaining allegations of Paragraph 3 are denied. Defendants specifically deny Daimler's characterization of his unit forfeiture as "wrongful." The Court has already held that Daimler's common units were properly deemed forfeited by the Companies. ECF No. 22.

     By way of further response, the Companies properly exercised their discretion not to offer Daimler full-time employment, and ultimately to terminate any relationship with Daimler, after he routinely failed to meet performance milestones and deliverable deadlines, devoted only minimal time and effort to the Companies' business, became increasingly difficult to work with, and proved unable to secure any significant investments (including investments he represented he could secure) or otherwise contribute to the growth Robotics Hub Fund 1, LP (the "Fund"), the vehicle through which the Companies would invest in early-stage robotics companies, at or near the level expected of a member of the Companies.

     By way of further response, Moehle agreed to begin working with Daimler, and provided him with a potential path to vested units in the Companies that Moehle had founded, based on Daimler's representation that he was an experienced venture capitalist with an extensive

investment management track record (including claimed experience co-managing upwards of

$1.5 billion in relevant venture capital funds) who could leverage that track record to help the

Companies secure upwards of $20,000,000.00 in investments by early 2016. The business

relationship between Daimler and Defendants deteriorated over the course of 2016 for the simple

reason that Daimler failed to deliver on his promises. Defendants have since learned that

Daimler's representations regarding his past track record were false.

## **PARTIES**

4.      The allegations of Paragraph 4 are admitted in part and denied in part.

Defendants admit only that Daimler has no membership or ownership interest in the Companies.

By way of further response, this Court previously held that Daimler's common units were

properly deemed forfeit by the Companies after Daimler failed to satisfy the vesting conditions

applicable to those units. ECF No. 22. After reasonable investigation, Defendants are without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

of Paragraph 4 and, therefore, deny those allegations.

5.      Defendants admit the allegations of Paragraph 5. By way of further response,

Moehle is the founder and sole officer of both Coal Hill and Robotics Hub. Moehle and Coal

Hill publicly announced plans to launch Robotics Hub in August of 2015, backed by a founding

sponsorship from GE's venture capital and investment arm, GE Ventures LLC ("GE Ventures").

6.      Defendants admit the allegations of Paragraph 6.

7.      Defendants admit the allegations of Paragraph 7.

## **JURISDICTION**

8.      The allegations of Paragraph 8 are conclusions of law that do not require a response.

Defendants deny that Daimler is entitled to any damages, let alone in an amount that exceeds

$75,000. With respect to the allegations in Footnote 1 to Paragraph 8, after reasonable investigation, Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Footnote 1 and, therefore, deny those allegations.

9.      The allegations of Paragraph 9 are conclusions of law that do not require a response. To the extent a response is required, Defendants admit only that Robotics Hub and Coal Hill have a place of business in this district and that Moehle resides in this district.

## FACTUAL BACKGROUND

10.      Defendants admit only that Moehle invited Daimler to join the Companies to be a meaningfully contributing member after Daimler falsely represented his qualifications. Daimler failed to contribute at or near the level expected of a member of the Companies. Defendants deny that Daimler and Moehle formed a business "partnership."

11.      The allegations of Paragraph 11 are admitted in part and denied in part. Defendants admit that Moehle formed Coal Hill on April 28, 2015, without any involvement by Daimler, and prior to being introduced to Daimler for the first time in or around August 2015. After reasonable investigation, Defendants are without sufficient information to form a belief as to the truth of the remaining allegations of Paragraph 11 and, therefore, deny the allegations.

12.      The allegations of Paragraph 12 are admitted in part and denied in part. Defendants admit that Robotics Hub is the Fund's General Partner while Coal Hill is the Fund's Investment Manager. The remaining allegations of Paragraph 12 are denied. Defendants specifically deny that Daimler and Moehle "decided to move forward with an equal partnership." By way of further response, the nature of Daimler and Moehle's relationship was defined in writing by the terms of the Companies' Amended and Restated Operating Agreements and Common Unit Award Agreements. Defendants respectfully refer the Court to the documents for

the full contents thereof.  The Companies further expounded on the expected roles, contributions and responsibilities of Daimler, Moehle and other individuals employed or retained by the Companies in company documents to which Daimler had access and/or possessed before he joined the Companies and while he was a member of the Companies.

13.    The allegations of Paragraph 13 are admitted in part and denied in part. Defendants admit that Moehle and Daimler co-edited various documents related to the transaction by which Daimler ultimately became a holder of unvested common units in the Companies.  The remaining allegations of Paragraph 13 are denied.  Defendants specifically deny that any such document reflected an intent to merge Skilled Science and Coal Hill or to form an equal "partnership."  By way of further response, the nature of Daimler and Moehle's relationship was defined in writing by the terms of the Companies' Amended and Restated Operating Agreements and Common Unit Award Agreements.  Defendants respectfully refer the Court to the documents for the full contents thereof.

14.    The allegations of Paragraph 14 are admitted in part and denied in part. Defendants admit that Coal Hill amended and restated its operating agreement.  Defendants respectfully refer the Court to the document for the full contents thereof.  Defendants further admit that Coal Hill engaged Jamie Fee. The remaining allegations of Paragraph 14 are denied.

15.    Defendants deny the allegations of Paragraph 15.

16.    Defendants deny the allegations of Paragraph 16. Defendants specifically deny that Moehle ever represented to Daimler that GE Ventures made any commitment to the Companies or the Fund, other than the founding sponsorship gift that GE Ventures awarded to Coal Hill pursuant to a Partner Agreement executed on May 20, 2015 and which was publicly announced in a press release authored by GE Ventures in August 2015.  By way of further

response, before meeting with Alex Tepper of GE Ventures in November 2015, Daimler was aware that the Companies were planning on a "pitch" to GE Ventures that was centered on **convincing** GE Ventures to agree to making an initial commitment of $500,000 of investment (as opposed to operational) capital.

17.     Defendants deny the allegation of Paragraph 17 that Moehle ever represented to Daimler that GE Ventures made any commitment to the Companies or the Fund, other than the founding sponsorship gift that GE Ventures awarded to Coal Hill pursuant to a Partner Agreement executed on May 20, 2015 and which was publicly announced in a press release authored by GE Ventures in August 2015.  After reasonable investigation, Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 17 and, therefore, deny those allegations.

18.     Defendants deny the allegation of Paragraph 18 that Moehle ever represented to Daimler that GE Ventures made any commitment to the Companies or the Fund, other than the founding sponsorship gift that GE Ventures awarded to Coal Hill pursuant to a Partner Agreement executed on May 20, 2015 and which was publicly announced in a press release authored by GE Ventures in August 2015.  After reasonable investigation, Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 18 and, therefore, deny those allegations.

19.     After reasonable investigation, Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 19 and, therefore, deny those allegations.

20.     The allegations of Paragraph 20 are admitted in part and denied in part. Defendants admit only that Moehle may well have mentioned, during discussions of the Fund,

that GE Ventures was a sponsor of the Fund, which is true.  The remaining allegations of

Paragraph 20 are denied.

21.     Defendants deny the allegations of Paragraph 21.

22.     Defendants deny the allegations of Paragraph 22.

23.     The allegations of Paragraph 23 are admitted in part and denied in part.

Defendants admit only that Moehle may well have mentioned, during discussions of the Fund,

that GE Ventures was a sponsor of the Fund, which is true.  The remaining allegations of

Paragraph 23 are denied.  Defendants specifically deny that Moehle ever represented, either to

Daimler or to any "potential investors," that GE Ventures made any commitment to the

Companies or the Fund, other than the founding sponsorship gift that GE Ventures awarded to

Coal Hill pursuant to a Partner Agreement executed on May 20, 2015 and which was publicly

announced in a press release authored by GE Ventures in August 2015.

24.     Defendants deny the allegations of Paragraph 24.

25.     The allegations of Paragraph 25 are admitted in part and denied in part.

Defendants admit only that Moehle may well have mentioned, during discussions of the Fund,

that GE Ventures was a sponsor of the Fund, which is true.  The remaining allegations of

Paragraph 25 are denied.

26.     The allegations of Paragraph 26 are admitted in part and denied in part.

Defendants admit only that Moehle and Daimler both attended a meeting with Alex Tepper, then

the managing director of GE Ventures, on November 18, 2015 specifically to discuss the Fund

and the possibility of GE Ventures making an initial commitment of $500,000 in investment (as

opposed to operational) capital.  The remaining allegations of Paragraph 26 are denied.

27.     Defendants deny the allegations of Paragraph 27 that Moehle (1) "directed

Daimler to not discuss the investment"; (2) ever suggested to Daimler that Tepper "had not been involved in the decision process" regarding the purported $20,000,000.00 investment, or; (3) ever suggested to Daimler that he "wanted to remain GE's 'single point person' regarding the investment." To the contrary, Moehle introduced Daimler to many of the individuals on the GE Ventures team after the initial meeting with Mr. Tepper, where Daimler performed terribly. After reasonable investigation, Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 27 and, therefore, deny those allegations.

28. Defendants specifically deny that Moehle made the representations alleged in Paragraph 28. After reasonable investigation, Defendants are without sufficient information to form a belief as to the truth of the allegations of Paragraph 28 regarding Daimler's subjective "understanding."

29. Defendants deny the allegation of Paragraph 29 that Moehle ever represented to Daimler that GE Ventures made any commitment to the Companies or the Fund, other than the founding sponsorship gift that GE Ventures awarded to Coal Hill pursuant to a Partner Agreement executed on May 20, 2015 and which was publicly announced in a press release authored by GE Ventures in August 2015. After reasonable investigation, Defendants are without sufficient information to form a belief as to the truth of the remaining allegations of Paragraph 29.

30. The allegations of Paragraph 30 do not require a response, as they relate exclusively to claims that have been dismissed by the Court. ECF No. 22. To the extent a response is deemed necessary, Defendants deny the allegations of Paragraph 30.

Defendants specifically deny the vague allegation that Moehle "misrepresented and

overstated the strength of his relationships with NREC and RI." By way of further response, prior to July 2015, Moehle was the Associate Director for New Ventures at the National Robotics Engineering Center ("NREC"), an operating unit of the Robotics Institute ("RI") at Carnegie Mellon University ("CMU"). All current Robotics Hub lead investments were either the direct result of introductions from NREC/RI or CMU to Moehle or formed via NREC/RI personnel Moehle met through preexisting relationships and contacts.

31.     Defendants deny the allegations of Paragraph 31.

32.     Defendants deny the allegations of Paragraph 32. Defendants specifically deny that Moehle ever represented, either to Daimler or to "potential investors," that GE Ventures made any commitment to the Companies or the Fund, other than the founding sponsorship gift that GE Ventures awarded to Coal Hill pursuant to a Partner Agreement executed on May 20, 2015 and which was publicly announced in a press release authored by GE Ventures in August 2015.

Defendants also specifically deny that Daimler signed the Common Unit Award Agreements on March 23, 2016. By way of further response, while the Common Unit Award Agreements are ***dated*** March 23, 2016 but Daimler did not sign them until later in April. Daimler's delay in signing the awards damaged the Companies' attempts to attract investments in the Companies and the Fund.

33.     Defendants deny the allegations of Paragraph 33.

34.     Defendants deny the allegation of Paragraph 34 that Moehle lied to potential investors or to Daimler with respect the Fund's relationship with GE Ventures or that Moehle represented that GE Ventures made any commitment to the Companies or the Fund, other than the founding sponsorship gift that GE Ventures awarded to Coal Hill pursuant to a Partner

Agreement executed on May 20, 2015.  By way of further response, written presentations provided in advance of some or all of the meetings specifically identified by Daimler in the Complaint directly refute the four-year old, undocumented oral statements Daimler alleges.

After reasonable investigation, Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 34, which concern the subjective contents of Daimler's imagination.  Therefore, Defendants deny those allegations.

35.    Defendants deny the allegation of Paragraph 35 that Moehle ever represented, either to Daimler or to "potential investors," that GE Ventures made any commitment to the Companies or the Fund, other than the founding sponsorship gift that GE Ventures awarded to Coal Hill pursuant to a Partner Agreement executed on May 20, 2015 and which was publicly announced in a press release authored by GE Ventures in August 2015.  After reasonable investigation, Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 35 and, therefore, deny the allegations.

36.    Defendants deny the allegations of Paragraph 36.  By way of further response, although the Amended and Restated Operating Agreements and Common Unit Award Agreements were dated March 23, 2016, Daimler did not sign the Agreements until later in April.

37.    The allegations of Paragraph 37 are admitted in part and denied in part. Defendants admit that, upon execution of the Companies' Amended and Restated Operating Agreements and Common Unit Award Agreements, Daimler obtained an unvested membership interest in the Companies and corresponding position on the Companies' Boards of Managers. Defendants further admit that both Moehle and Daimler collectively constituted the Companies'

Boards of Managers after the dates on which they signed and executed the Amended and

Restated Operating Agreements and Common Unit Award Agreements.

The remaining allegations of Paragraph 37 are denied. Defendants specifically deny that

Daimler was a member of the Companies' "initial" Boards of Managers.  By way of further

response, pursuant to the Companies' original Operating Agreements, Daimler was not a

member of the Companies' "initial" Board of Managers.  Instead, Daimler became a member of

the Companies' Board following his execution of the Amended and Restated Operating

Agreements and Common Unit Award Agreements.  He remained a member of the Companies'

Board until March 27, 2017, when Daimler was properly removed from the Companies' Board

of Managers.

38.    The allegations of Paragraph 38 are admitted in part and denied in part.

Defendants deny only that Daimler entered into his Common Unit Award Agreements on March

23, 2016.  By way of further response, Daimler did not sign the Common Unit Award

Agreements until later in April.  Defendants admit the remaining allegations of Paragraph 38.

39.    Defendants admit the allegations of Paragraph 39.

40.    The allegations of Paragraph 40 are conclusions of law that do not require a

response.  To the extent a response is required, Defendants deny the allegations of Paragraph 40,

because they refer to, and purport to characterize or interpret, the Fund's Limited Partnership

Agreement.  Defendants respectfully refer the Court to the document for the full contents thereof.

41.    Defendants deny the allegations of Paragraph 41.  Defendants further specifically

deny the allegations of Paragraph 41 to the extent that they refer to, and purport to characterize

or interpret, the Fund's Private Placement Memorandum and any "other presentation materials"

allegedly provided to investors.  Defendants respectfully refer the Court to those documents for

the full contents thereof.

42.    Defendants deny the allegations of Paragraph 42.  After reasonable investigation, Defendants are not aware of any instance in which "investors would expressly ask Daimler and Moehle if [they] were equal partners" and, therefore, Defendants deny the allegation.  By way of further response, the nature of Daimler and Moehle's relationship was defined in writing by the terms of the Companies' Amended and Restated Operating Agreements and Common Unit Award Agreements.  Defendants respectfully refer the Court to the documents for the full contents thereof.  The Companies further expounded on the expected roles, contributions and responsibilities of Daimler, Moehle and other individuals employed or retained in company documents to which Daimler had access and/or possessed before he joined the Companies and while he was a member of the Companies.

43.    The allegations of Paragraph 43 are admitted in part and denied in part. Defendants admit that, on August 23, 2016, Daimler provided a loan of $125,000.00 to Coal Hill, which was evidenced by a promissory note issued by Coal Hill to Daimler on the same date. The note was subsequently repaid in full with interest.  Defendants further admit that that Daimler provided money to cover corporate expenses, which included expenses Daimler incurred in connection with his minimal and unsuccessful fundraising attempts.  By way of further response, Moehle did not "merely" contribute $1,000 in initial capital but also advanced funds to cover corporate expenses by foregoing a salary for his full-time work and charging corporate expenses to his personal credit card.  At the same time, Daimler, upon information and belief, was receiving a salary in connection with his full-time work for the Office of Science and Technology Policy -- a subdivision of the executive branch located across the street from the White House.  Finally, Defendants further admit that Moehle provided an initial capital

contribution of $1,000.00 and that Daimler did not make any initial capital contribution.

By way of further response, the organizational resolutions of Coal Hill, executed approximately six months before Moehle was introduced to Daimler, approved an initial capital contribution by Moehle in the amount of $1,000.00 together with the founding sponsorship gift from GE Ventures prior to Daimler's involvement.

The remaining allegations of Paragraph 43 are denied. Defendants specifically deny that Daimler and Moehle had an "equal partnership." Rather, the nature of Daimler and Moehle's relationship was defined in writing by the terms of the Companies' Amended and Restated Operating Agreements and Common Unit Award Agreements. Defendants respectfully refer the Court to the documents for the full contents thereof. The Companies further expounded on the expected roles, contributions and responsibilities of Daimler, Moehle and other individuals employed or retained in company documents to which Daimler had access and/or possessed before he joined the Companies and while he was a member of the Companies.

44.    The allegations of Paragraph 44 are admitted in part and denied in part. Defendants admit that Coal Hill repaid the promissory note issued to Daimler in full, together with interest, on or about November 2, 2017. Defendants further admit that Coal Hill reimbursed Daimler for $35,000.00 that Daimler agreed to pay to match the $35,000 Moehle advanced to Coal Hill by virtue of working without being paid a salary and covering corporate expenses.

The remaining allegations of Paragraph 44 are denied. Defendants specifically deny that the $35,000.00 reimbursed to Daimler represented only a "portion" of funds Daimler provided to Coal Hill. By way of further response, after reasonable investigation, Defendants are unaware of any money provided to Coal Hill by Daimler that have not been reimbursed in full. Indeed, Daimler has repeatedly refused requests by Moehle to provide Defendants with documents that

reflect any amount of money Daimler paid and that has not been reimbursed.

45.     The allegations of Paragraph 45 are admitted in part and denied in part as stated. Defendants admit only that in January 2016, Daimler was appointed as a Presidential Innovation Fellow for the Office of Science and Technology Policy and otherwise deny the allegations of Paragraph 45.

46.     The allegations of Paragraph 46 are admitted in part and denied in part as stated. Defendants admit that Daimler informed Defendants that his fellowship would be a twelve-month program.  After reasonable investigation, Defendants are without knowledge or information sufficient to form a belief as to the truth of Daimler's assertion that it is "axiomatic" that such fellowships must end upon the transition to a new presidential administration and, therefore, Defendants deny the allegation as stated.  In fact, Daimler worked for the Trump administration for at least two months before his position was terminated.

47.     Defendants deny the allegations of Paragraph 47 as stated.  By way of further response, Defendants admit that Moehle agreed to support Daimler's pursuit of the fellowship based on Daimler's express assurances that he could continue devoting approximately thirty hours a week to the Companies and the Fund.  Defendants admit only that, based on Daimler's assurances, Moehle perceived some benefit to the Companies and the Fund in allowing Daimler to pursue to the fellowship, as it would provide Daimler with a salary until such time as Daimler had secured sufficient investments for the Fund to justify his full-time employment.

48.     The allegations of Paragraph 48 are admitted in part and denied in part. Defendants admit that Daimler's fellowship lasted from approximately January 2016 until early 2017.  Defendants further admit that Daimler's stated role as an "Innovation Fellow" was to "advise" the Office of Science and Technology Policy on various matters.  Defendants are

without information sufficient to form a belief as to the truth of the remaining allegations of

Paragraph 48 and, therefore, deny them.

49.     Defendants deny the allegation of Paragraph 49 that Moehle "promoted"

Daimler's fellowship in connection with any marketing or fundraising efforts.  After reasonable

investigation, Defendants are without knowledge or information sufficient to form a belief as to

whether any other individual affiliated with the Companies, such as Daimler himself, might have

"promoted Daimler's White House position" in connection with the Companies' marketing or

fundraising efforts.  Therefore, the allegation is denied.  By way of further response, Daimler's

fellowship was not mentioned anywhere in the Fund's Private Placement Memorandum, which

was the primary marketing document for the Fund.

After reasonable investigation, Defendants are without knowledge or information

sufficient to form a belief as to the truth of the allegation that Robotics Hub received any

"positive press coverage" related to Daimler's fellowship, and, therefore, the allegation is denied.

By way of further response, Defendants are unaware of any such coverage and specifically

advised Daimler, as did other Robotics Hub affiliates, that attempting to self-aggrandize his

public service would reflect poorly on him and the Companies.

50.     The allegations of Paragraph 50 do not require a response, as they relate

exclusively to claims that have been dismissed by the Court.  ECF No. 47.  To the extent a

response is deemed necessary, the allegations of Paragraph 50 are denied.  After reasonable

investigation, Defendants are not aware of any "services" rendered to the Companies by Daimler

for which Daimler was entitled to receive compensation.  Therefore, Defendants deny the

allegation.  Any remaining allegations of Paragraph 50 are denied.

51.     The allegations of Paragraph 51 are admitted in part and denied in part.

Defendants admit only that, at some point in 2016, the relationship between Daimler and Moehle began to break down.  Defendants deny that the relationship broke down "because of Daimler's fellowship," except insofar as it broke down, in part, because Daimler devoted only minimal time to the Companies and Fund for the duration of his fellowship rather than the approximately thirty hours per week that Daimler had promised to devote notwithstanding that fellowship.

By way of further response, the deterioration of Moehle and Daimler's business relationship was attributable to Daimler's routine failure to meet performance milestones and deliverable deadlines, devotion of only minimal time and effort to the Companies' business, and inability to secure any significant investments or otherwise contribute to the Fund's growth at or near the level expected of a member of the Companies.

52.    Defendants admit the allegations of Paragraph 52.

53.    The allegations of Paragraph 53 do not require a response, as they relate exclusively to claims that have been dismissed by the Court.  ECF No. 22.  To the extent a response is deemed necessary, the allegations of Paragraph 53 are admitted in part and denied in part. Defendants admit only that Moehle served as the primary point of direct contact with Reed Smith but, as Daimler concedes in his Complaint, Daimler also interacted with Reed Smith.  Any remaining allegations of Paragraph 53 are denied.

54.    The allegations of Paragraph 54 do not require a response, as they relate exclusively to claims that have been dismissed by the Court.  ECF No. 22.  Further, the allegations of Paragraph 54 are conclusions of law that do not require a response.  To the extent a response is deemed necessary, the allegations are admitted in part and denied in part. Defendants admit that the Companies entered into Common Unit Award Agreements with Moehle on March 23, 2016.  By way of further response, the Companies also entered into

Common Unit Award Agreements with Jamie Fee, who worked for the Companies full-time.

Mr. Fee's Common Unit Award Agreements had the same vesting terms as Moehle's awards.

Defendants deny the allegations of Paragraph 54 insofar as they refer to and purport to

characterize or interpret the Common Unit Award Agreements. Defendants respectfully refer the

Court to the documents for the full contents thereof.

55.      The allegations of Paragraph 55 do not require a response, as they relate

exclusively to claims that have been dismissed by the Court.  ECF No. 22.  Further, the

allegations of Paragraph 55 are conclusions of law that do not require a response. To the extent a

response is deemed necessary, the allegations of Paragraph 55 are admitted in part and denied in

part.  Defendants admit only that the Companies entered into the Common Unit Award

Agreements with Daimler.  Defendants specifically deny that Daimler's Common Unit Award

Agreements were entered into on March 23, 2016.  By way of further response, Daimler did not

sign the Common Unit Award Agreements until later in April.  Defendants deny the remaining

allegations of Paragraph 55 insofar as they refer to and purport to characterize or interpret the

Common Unit Award Agreements.  Defendants respectfully refer the Court to the documents for

the full contents thereof.

56.      The allegations of Paragraph 56 do not require a response, as they relate

exclusively to claims that have been dismissed by the Court.  ECF No. 22.  Further, the

allegations of Paragraph 56 are conclusions of law that do not require a response.  To the extent a

response is required, Defendants deny the allegations of Paragraph 56 insofar as they refer to and

purport to characterize or interpret the Common Unit Award Agreements.  Defendants

respectfully refer the Court to the documents for the full contents thereof.  Defendants further

respond that the vesting schedule of the Common Unit Award Agreements for Daimler were the

same that were offered to other individuals who, like Daimler, were not engaged full-time in the Companies.

57.     The allegations of Paragraph 57 do not require a response, as they relate exclusively to claims that have been dismissed by the Court.  ECF No. 22.  Further, the allegations of Paragraph 57 are conclusions of law that do not require a response.  To the extent a response is required, Defendants deny the allegations of Paragraph 57 insofar as they refer to and purport to characterize or interpret the Common Unit Award Agreements.  Defendants respectfully refer the Court to the documents for the full contents thereof.

58.     The allegations of Paragraph 58 do not require a response, as they relate exclusively to claims that have been dismissed by the Court.  ECF No. 22.  Further, the allegations of Paragraph 58 are conclusions of law that do not require a response.  To the extent a response is required, Defendants deny the allegations of Paragraph 58 insofar as they refer to and purport to characterize or interpret the Common Unit Award Agreements.  Defendants respectfully refer the Court to the documents for the full contents thereof.

59.     The allegations of Paragraph 59 do not require a response, as they relate exclusively to claims that have been dismissed by the Court.  ECF No. 22.  To the extent a response is required, the allegations of Paragraph 59 are denied.  Defendants specifically deny that Moehle ever made any of the alleged representations.  Defendants further deny the allegations of Paragraph 59 insofar as they refer to and purport to characterize or interpret the Common Unit Award Agreements, which are written agreements that speak for themselves.  By way of further response, Moehle sent Daimler redline versions of the Daimler Awards that expressly identified the differences between the Moehle Awards and Daimler Awards.  Moehle also had a telephone call with Daimler about the redlines before Daimler signed Daimler

Awards.

60.     The allegations of Paragraph 60 do not require a response, as they relate exclusively to claims that have been dismissed by the Court. ECF No. 22. To the extent a response is required, the allegations of Paragraph 60 are denied.

61.     The allegations of Paragraph 61 do not require a response, as they relate exclusively to claims that have been dismissed by the Court. ECF No. 22. To the extent a response is required, the allegations of Paragraph 61 are denied.

62.     The allegations of Paragraph 62 do not require a response, as they relate exclusively to claims that have been dismissed by the Court. ECF No. 22. To the extent a response is required, the allegations of Paragraph 62 are denied. By way of further response, Moehle sent Daimler redline versions of the Daimler Awards that expressly identified the differences between the Moehle Awards and Daimler Awards and Moehle had a telephone call with Daimler about the redlines before Daimler signed Daimler Awards.

63.     The allegations of Paragraph 63 do not require a response, as they relate exclusively to claims that have been dismissed by the Court. ECF No. 22. To the extent a response is required, the allegations of Paragraph 63 are denied.

64.     The allegations of Paragraph 64 do not require a response, as they relate exclusively to claims that have been dismissed by the Court. ECF No. 22. To the extent a response is required, Defendants deny the allegations of Paragraph 64 that Moehle or Reed Smith ever made the representations alleged. After reasonable investigation, Defendants are without sufficient information to form a belief as to the truth of the allegations of Paragraph 64 regarding Daimler's subjective "understanding" of the terms of the Common Unit Award Agreements and, therefore, those allegations are denied.

65.     The allegations of Paragraph 65 do not require a response, as they relate

exclusively to claims that have been dismissed by the Court.  ECF No. 22.  To the extent a

response is required, Defendants are without sufficient information to form a belief as to the truth

of the allegations of Paragraph 65 regarding Daimler's subjective knowledge of the express

terms of the Common Unit Award Agreements, which Daimler signed, and, therefore, those

allegations are denied.

66.     The allegations of Paragraph 66 are admitted in part and denied in part.

Defendants admit that Robotics Hub, Coal Hill, and their prospective members entered into

Amended and Restated Operating Agreements. Defendants deny that Daimler signed the

Amended and Restated Operating Agreements on March 23, 2016.  By way of further response,

Daimler did not sign the Amended and Restated Operating Agreements until later in April.

Defendants further deny the allegations of Paragraph 66, insofar as they purport to characterize

or interpret the Amended and Restated Operating Agreements. Defendants respectfully refer the

Court to the documents for the full contents thereof.

67.     The allegations of Paragraph 67 are conclusions of law that do not require a

response. To the extent a response is required, Defendants deny the allegations of Paragraph 67

insofar as they refer to, and purport to characterize or interpret the Amended and Restated

Operating Agreements.  Defendants respectfully refer the Court to the documents for the full

contents thereof.

68.     The allegations of Paragraph 68 are conclusions of law that do not require a

response. To the extent a response is required, Defendants deny the allegations of Paragraph 68

insofar as they refer to, and purport to characterize or interpret the Amended and Restated

Operating Agreements.  Defendants respectfully refer the Court to the documents for the full

contents thereof.

69.     The allegations of Paragraph 69 are conclusions of law that do not require a response.  To the extent a response is required, Defendants deny the allegations of Paragraph 69 insofar as they refer to, and purport to characterize or interpret the Amended and Restated Operating Agreements.  Defendants respectfully refer the Court to the documents for the full contents thereof.

70.     The allegations of Paragraph 70 are conclusions of law that do not require a response.  To the extent a response is required, Defendants deny the allegations of Paragraph 70 insofar as they refer to, and purport to characterize or interpret the Amended and Restated Operating Agreements.  Defendants respectfully refer the Court to the documents for the full contents thereof.

71.     Defendants deny the allegations of Paragraph 71. Defendants specifically deny that Moehle ever represented to Daimler that GE Ventures made any commitment to the Companies or the Fund, other than the founding sponsorship gift that GE Ventures awarded to Coal Hill pursuant to a Partner Agreement executed on May 20, 2015 and which was publicly announced in a press release authored by GE Ventures in August 2015.  By way of further response, at the time Daimler signed the Awards in April 2016, Daimler himself provided prospective investors with documents that fully disclosed the Companies' third party relationship with GE Ventures and, importantly, did not disclose a "commitment" by GE Ventures to invest $20,000,000.00 in the Fund.  As a member of the Companies, Daimler had duties and obligations to ensure those disclosures were accurate before sending them.

72.     The allegations of Paragraph 72 are admitted in part and denied in part. Defendants admit that when Daimler signed the Operating Agreements he had begun his full-

time employment with the Office of Science and Technology Policy. Defendants deny the

remaining allegations in the Paragraph 72. By way of further response, Daimler had access to all

company documents on the shared Google Drive which he unlawfully accessed and attempted to

manipulate after he was removed as a Board Member from the Companies.

     73.     Defendants deny the allegations of Paragraph 73. Defendants specifically deny

that Daimler and Moehle "began their partnership as equal partners." The nature of Daimler and

Moehle's relationship was defined in writing by the terms of the Companies' Amended and

Restated Operating Agreements and Common Unit Award Agreements. Defendants respectfully

refer the Court to the documents for the full contents thereof. The Companies further expounded

on the expected roles, contributions and responsibilities of Daimler, Moehle and other

individuals employed or retained in company documents to which Daimler had access and/or

possessed before he joined the Companies and while he was a member of the Companies.

Defendants further deny that Daimler and Moehle "were promoted as such" by any of the

Defendants. Daimler's participation in the Companies was limited to his minimal, unsuccessful

fundraising efforts. Daimler had little to no involvement in the broad business aspects of the

Companies and the Fund.

     74.     The allegations of Paragraph 74 are denied. Defendants specifically deny that

Daimler ever had a "full-time position" with the Companies to "return" to, as evidenced by the

Amended and Restated Operating Agreements and Common Unit Award Agreements that

Daimler signed. Defendants further deny that Moehle "understood" that Daimler would be

offered a full-time position "when his fellowship ended." By way of further response, prior to

starting his fellowship, Daimler had assured Moehle and the Companies that he would be able to

devote approximately thirty hours a week to the Companies *during* his fellowship, but

22

JA588

subsequently failed to do so.

In addition, as Moehle had communicated to Daimler at the beginning of their relationship, Defendants' only "understanding" regarding the possibility of full-time employment for Daimler was that the Companies would consider offering such a position *if* Daimler was able to make good on his promises to secure sufficient investments for the Fund to justify and support bringing him on full-time and that would show Daimler could make significant, positive impact on the Companies and the Fund.  The Companies ultimately elected not to offer Daimler full-time employment after he routinely failed to meet performance milestones and deliverable deadlines, devoted only minimal time and effort to the Companies' business, became increasingly difficult to work with, and proved unable to secure any significant investments (as he represented) or otherwise contribute to the Fund's growth at or near the level expected of a member of the Companies.

75.     Defendants deny the allegations of Paragraph 75.

76.     Defendants deny the allegations of Paragraph 76.  Defendants do not have sufficient information to interpret what Daimler means by "budgeted" but Defendants specifically deny that the Companies had agreed to pay any salary to Daimler, let alone a "full-time salary" or "matching salaries for Moehle and Daimler."  Defendants further respond that "individual" referenced in the allegations of Paragraph 76 did not join the Companies, in part, because Daimler failed to secure any significant investments as he represented he would.

77.     Defendants admit the allegations of Paragraph 77.  By way of further response, the business relationship between Daimler and Moehle began to deteriorate in early to mid 2016 after he routinely failed to meet performance milestones and deliverable deadlines, devoted only minimal time and effort to the Companies' business, became increasingly difficult to work with,

and proved unable to secure any significant investments (as he represented) or otherwise

contribute to the Fund's growth at or near the level expected of a member of the Companies.

78.    Defendants deny the allegations of Paragraph 78.  Defendants specifically deny

that "attention and publicity Daimler received" from his fellowship, if any, became a "point of

contention between Daimler and Moehle" or led Moehle to begin "criticizing Daimler as a

business partner."  There was a "point of contention" with regard to Daimler's attempts to self-

aggrandize his public service because it reflected poorly on the Companies.  In addition, there

was a "point of contention" or source of criticism between Daimler and Moehle because Daimler

routinely failed to meet performance milestones and deliverable deadlines, devoted only minimal

time and effort to the Companies' business, became increasingly difficult to work with, and

proved unable to secure any significant investments (as he represented) or otherwise contribute

to the Fund's growth at or near the level expected of a member of the Companies.

79.    Defendants deny the allegations of Paragraph 79.  Defendants specifically deny

that Moehle controlled or restricted Daimler's access to information about the Fund's investors

and portfolio companies in any way.  By way of further response, Daimler had unrestricted

access to the Fund's Google Drive, where documentation regarding the Fund's investors and

portfolio companies was stored.  In fact, Daimler unlawfully accessed this information

immediately following his removal from the Companies, and used it in an effort to solicit the

Fund's investors and portfolio companies for his own benefit.

80.    The allegations of Paragraph 80 are admitted in part and denied in part.

Defendants deny the allegation that Moehle restricted Daimler's access to information about the

Fund's portfolio companies in any way.  By way of further response, Daimler had unrestricted

access to the Fund's Google Drive, where documentation regarding the Fund's investors and

portfolio companies was stored.  Defendants admit that Moehle had to correct Daimler's inconsistent and inaccurate presentation of deal facts to potential investors and portfolio companies.  Defendants also admit that Moehle asked Daimler to revise his LinkedIn page so as to describe Robotics Hub in a manner consistent with Moehle's LinkedIn page because Moehle reasonably believed that to have drastically different texts describing Robotics Hub would be detrimental to attracting potential investors.

81.     Defendants deny the allegations of Paragraph 81.  By way of further response, Daimler wrote his own "deliverables" and presented them to Moehle.  Tellingly, Daimler failed to complete the non-ministerial deliverables he promised.

82.     Defendants deny the allegations of Paragraph 82.  By way of further response, Daimler was not "engaged" in the Companies other than his minimal, sporadic, and unsuccessful fundraising efforts and occasionally attending meetings in connection therewith.  In addition, because Moehle was foregoing a salary despite his full-time efforts and was covering corporate expenses, Daimler had already committed to paying his share of corporate expenses incurred by the Companies.  Daimler on multiple occasions attempted to renege on his express agreements to share in the corporate expenses.

83.     After reasonable investigation, Defendants are without information sufficient to form a belief as to the truth of the allegations of Paragraph 83 and, therefore, deny the allegations.

84.     Defendants deny the allegations of Paragraph 84.  By way of further response, both Moehle and Daimler contributed $30,000 (Moehle by way of, among other things, foregoing salary payments) to cover six months of Coal Hill's operating expenses.  Both also contributed an additional $5,000 for a seventh month of operation although Daimler attempted to

renege on his agreement.

85.     Defendants deny the allegations of Paragraph 85.

86.     Defendants deny the allegations of Paragraph 86.

87.     Defendants deny the allegations of Paragraph 87.

88.     Defendants deny the allegations of Paragraph 88.

89.     Defendants deny the allegations of Paragraph 89.

90.     Defendants deny the allegations of Paragraph 90.

91.     Defendants deny the allegations of Paragraph 91.  Defendants never agreed to treat any payments by Daimler as "capital contributions."

92.     Defendants deny the allegations of Paragraph 92.  By way of further response, to the best of Defendants' knowledge and belief, Daimler's alleged "financial contributions" were not related to essential operating expenses which were covered by the $35,000 Moehle advanced to Coal Hill by virtue of working without being paid a salary and covering corporate expenses and $35,000.00 that Daimler loaned to Coal Hill and for which he was repaid.  In fact, despite multiple requests from Defendants, Daimler has refused to document his alleged "financial contributions" and the expenses they allegedly covered.

93.     Defendants deny the allegations of Paragraph 93. The allegation that Daimler was entitled to additional common units in Coal Hill is a conclusion of law that does not require a response. To the extent a response is required, Defendants deny that Daimler was entitled to any additional common units in the Companies for any reason.

Defendants deny the allegation related to "equal partners" as it is unclear what Daimler means by that term.  Defendants further specifically deny that "Daimler and Moehle continued to be equally important to the venture," which is a subjective statement of opinion that does not

require a response and, therefore, is denied. To the extent a response is required, throughout

2016, Daimler devoted minimal time to the Companies and the Fund, secured no significant

investments for the Fund, and routinely failed to meet performance milestones and deliverable

deadlines. Therefore, Defendants deny that Daimler was "equally important to the venture."

94.     The allegations of Paragraph 94 are admitted in part and denied in part.

Defendants admit only that Daimler did not receive any additional common units in Coal Hill.

By way of further response, Daimler was not entitled to any such units.

The remaining allegations of Paragraph 94 are denied. Defendants specifically deny that

Daimler made any "additional financial contributions" to the Companies. The allegations

regarding the requirements of Section 7.2 of Coal Hill's Amended and Restated Operating

Agreement are conclusions of law that do not require a response. To the extent a response is

required, Defendants deny the allegations insofar as they refer to, and purport to characterize or

interpret the Amended and Restated Operating Agreement. Defendants respectfully refer the

Court to the document for the full contents thereof.

95.     Defendants deny the allegations of Paragraph 95.

96.     Defendants deny the allegations of Paragraph 96. By way of further response,

Daimler and Moehle did in fact meet in Pittsburgh in late 2016 where they discussed the

necessity for Daimler to meet his fundraising milestone of $15,000,000 to which Daimler agreed.

Rather than work to secure the investments, Daimler went on vacation for three weeks.

97.     Defendants deny the allegations of Paragraph 97. By way of further response,

Daimler actually scheduled and went on a three-week vacation during the Fund's first closing in

December 2016. On several prior occasions, Daimler also scheduled and went on vacations

when the Fund was trying to close on investments. On one such occasion, while the Fund was

attempting to arrange the close of the Fund's initial Special Purpose Vehicle ("SPV"), Daimler was on vacation and posting on his public social media profiles pictures from that vacation. The investors involved in that initial SPV negatively reacted to Daimler's behavior, a purported "partner," and his unavailability at such a critical time for the Fund.

98.     Defendants deny the allegations of Paragraph 98. Defendants specifically deny that Moehle "unilaterally assign[ed] Daimler 'deliverables.'" By way of further response, Daimler presented Moehle with his own proposed "Milestones" and subsequently failed to complete the required milestones and deliverables that he himself had proposed. The specific "deliverable" requiring Daimler to make introductions to internet travel companies, such as Google Travel, had been proposed to Moehle by Daimler more than six months prior and, by the time Daimler finally "completed" the deliverable, it was no longer needed or beneficial.

99.     Defendants deny the allegations of Paragraph 99.

100.     Defendants deny the allegations of Paragraph 100. Defendants specifically deny that Moehle refused to disclose or somehow prevented Daimler from obtaining contact information for any investor or portfolio company. By way of further response, contact information for the Fund's investors and portfolio companies was freely available to Daimler on the Fund's Google Drive.

Defendants further deny that Moehle refused to provide Daimler with contact information for TravelWits in particular. In fact, Daimler met with TravelWits in person in a meeting that Moehle set up. Moreover, TravelWits was located in the same office as Daimler and Moehle. Thus, Daimler could have contacted TravelWits at any time by simply taking the stairs.

101.     Defendants deny the allegations of Paragraph 101.

102.     Defendants deny the allegations of Paragraph 102.

103.     The allegations of Paragraph 103 are admitted in part and denied in part.

Defendants admit that Daimler and Moehle met in-person on January 5-6, 2017 and that Moehle

presented Daimler with written document setting forth a potential non-operating role for

Daimler.  The remaining allegations of Paragraph 103 are denied.  Defendants specifically deny

ever discussing "the notion" that a "full-time operating role for Daimler *would* occur at a later

date."  Rather, Moehle consistently informed Daimler that a full-time operating role *could* still be

a possibility *if* Daimler's performance improved and he managed to secure sufficient investments

in the Fund to justify his hiring.  Daimler never secured any such investments but instead

demanded a full-time salary independent of any performance milestones.

104.     The allegations of Paragraph 104 are admitted in part and denied in part.

Defendants admit that, on or about January 5, 2017, Moehle recommended to the Companies'

Boards, which consisted of Daimler and Moehle, that Daimler not be offered full-time

employment by the Companies.  The remaining allegations of Paragraph 104 are denied.

Defendants specifically deny that Daimler ever held a "full-time role with the Companies" to

which he could "return."

105.     Defendants deny the allegations of Paragraph 105. Defendants specifically deny

that Daimler ever held "full-time employment" with the Companies to which he could "return."

Defendants further specifically deny that the Companies had "contemplated" that Daimler would

necessarily be offered full-time employment at any point, irrespective of his performance or

ability to secure sufficient investments in the Fund.  Defendants further specifically deny that the

Companies had "budgeted a full-time salary for Daimler" or that Daimler ever had a salary that

was "accru[ing]" or would be paid at a later date.

106.     The allegations of Paragraph 106 are admitted in part and denied in part.

Defendants specifically deny that Daimler ever held a "full-time role with the Companies" to which he could "return." Defendants otherwise admit the allegations of Paragraph 106.

107.    Defendants admit the allegations of Paragraph 107.

108.    Defendants admit the allegations of Paragraph 108.

109.    The allegations of Paragraph 109 are admitted in part and denied in part. Defendants admit that the Companies' neutral deadlock advisor, David Mahwinney, broke the deadlock by voting against offering Daimler a full-time role with the Companies. Defendants further admit that the Companies' financial status was one of the bases, but not the sole basis, for Mahwinney's decision. The remaining allegations of Paragraph 109 are denied. Defendants specifically deny that Mahwinney "understood when casting his vote that Daimler's full-time engagement with the Companies would occur at a later date."

110.    The allegations of Paragraph 110 are admitted in part and denied in part. Defendants deny that Daimler was not offered a non-operating role in the Companies. To the contrary, Daimler rejected that offer and insisted on being paid a full-time salary regardless of performance. Defendants admit that Daimler was not provided and was not entitled to compensation, and Defendants admit that Daimler was not offered a "full-time position" in the Companies. By way of further response, Defendants had no obligation to provide Daimler with compensation, or a role of any kind. Indeed, the Court has already held that Daimler "signed an agreement that clearly and unambiguously provided that he had no such right." ECF No. 22 at 16. The remaining allegations of Paragraph 110 are denied.

111.    The allegations of Paragraph 111 do not require a response, as they relate exclusively to claims that have been dismissed by the Court. ECF No. 22. To the extent a response is required, Defendants admit only that Daimler's common units in the Companies were

Case: 23-2611    Document: 28-1    Page: 518    Date Filed: 03/18/2024

Case 2:18-cv-00165-MJH    Document 87    Filed 10/30/20    Page 31 of 52


properly deemed forfeited after he failed to satisfy the express vesting conditions applicable to those units within the specified time period.

The remaining allegations of Paragraph 111 are conclusions of law to which no response is required. To the extent a response is required, the remaining allegations of Paragraph 111 are denied. Defendants specifically deny that the Companies had any obligation to offer Daimler a full-time position "within a year after executing the Daimler Awards." ECF No. 22 at 16.

112.    The allegations of Paragraph 112 do not require a response, as they relate exclusively to claims that have been dismissed by the Court. ECF No. 22. Further, the allegations of Paragraph 112 are conclusions of law that do not require a response. To the extent a response is deemed necessary, Defendants admit that Daimler has no membership or ownership interest in the Companies, thereby making Moehle the Companies' majority member.

113.    Defendants deny the allegations of Paragraph 113. By way of further response, the Companies, in an officially held meeting, voted to remove Daimler from their respective Boards. In addition, the Fund's Limited Partnership Agreement was amended and restated to remove Daimler from the "Key Person" provision by affirmative vote of 100% of the limited partners, which includes individuals and entities other than Moehle. In fact, one limited partner in December 2016 unilaterally approached Moehle to request that Daimler be removed from the "Key Person" provision.

114.    Defendants deny the allegations of Paragraph 114.

**COUNT ONE**
**FRAUD IN THE INDUCEMENT**
**(Against Moehle)**

115.    Defendants incorporate by reference Paragraphs 1 to 114 of this Answer.

116.    Defendants deny the allegations of Paragraph 116.

31

**JA597**

117.     The allegations of Paragraph 117 are conclusions of law that do not require a response. To the extent a response is required, Defendants deny the allegations of Paragraph 117.

118.     The allegations of Paragraph 118 are conclusions of law that do not require a response. To the extent a response is required, Defendants deny the allegations of Paragraph 118.

119.     The allegations of Paragraph 119 are conclusions of law that do not require a response. To the extent a response is required, Defendants deny the allegations of Paragraph 119.

120.     The allegations of Paragraph 120 are conclusions of law that do not require a response. To the extent a response is required, Defendants deny the allegations of Paragraph 120.

## COUNT TWO
## FRAUD IN THE INDUCEMENT
### (Against Robotics Hub)

121.     Defendants incorporate by reference Paragraphs 1 to 120 of this Answer.

122.     Defendants deny the allegations of Paragraph 122.

123.     The allegations of Paragraph 123 are conclusions of law that do not require a response. To the extent a response is required, Defendants deny the allegations of Paragraph 123.

124.     The allegations of Paragraph 124 are conclusions of law that do not require a response. To the extent a response is required, Defendants deny the allegations of Paragraph 124.

125.     The allegations of Paragraph 125 are conclusions of law that do not require a

response.  To the extent a response is required, Defendants deny the allegations of Paragraph

125.

126.    The allegations of Paragraph 126 are conclusions of law that do not require a

response.  To the extent a response is required, Defendants deny the allegations of Paragraph

126.

<div align="center">

**COUNT THREE**
**BREACH OF CONTRACT -- COAL HILL OPERATING AGREEMENT**
**(Against Coal Hill)**

</div>

127.    Defendants incorporate by reference Paragraphs 1 to 126 of this Answer.

128.    The allegations of Paragraph 128 are admitted in part and denied in part.

Defendants admit that Daimler and Coal Hill entered into the Coal Hill Amended and Restated

Operating Agreement. Defendants deny that Daimler signed the Coal Hill Amended and

Restated Operating Agreement on March 23, 2016.  By way of further response, Daimler failed

to sign the Amended and Restated Operating Agreements until later in April.

129.    The allegations of Paragraph 129 are conclusions of law that do not require a

response.  To the extent a response is required, Defendants deny the allegations of Paragraph 129

insofar as they refer to and purport to characterize or interpret the Coal Hill Amended and

Restated Operating Agreement.  Defendants respectfully refer the Court to the document for the

full contents thereof.

130.    The allegations of Paragraph 130 are conclusions of law that do not require a

response.  To the extent a response is required, Defendants deny the allegations of Paragraph

130.

131.    The allegations of Paragraph 131 are conclusions of law that do not require a

response.  To the extent a response is required, Defendants admit in part and deny in part the

allegations of Paragraph 131.  Defendants admit only that Daimler was issued no additional units in Coal Hill.  The remaining allegations of Paragraph 131 are denied.  Defendants specifically deny that Coal Hill agreed to treat any expenditure by Daimler as an "additional capital contribution."

132.    The allegations of Paragraph 132 are conclusions of law that do not require a response.  To the extent a response is required, Defendants deny that Daimler extended any loan to Coal Hill for which he has not yet been repaid in full.

## COUNT FOUR
## FRAUD IN THE INDUCEMENT
### (Against Coal Hill)

133.    Defendants incorporate by reference Paragraphs 1 to 132 of this Answer.

134.    Defendants deny the allegations of Paragraph 134.

135.    The allegations of Paragraph 135 are conclusions of law that do not require a response.  To the extent a response is required, Defendants deny the allegations of Paragraph 135.

136.    The allegations of Paragraph 136 are conclusions of law that do not require a response.  To the extent a response is required, Defendants deny the allegations of Paragraph 136.

137.    The allegations of Paragraph 137 are conclusions of law that do not require a response.  To the extent a response is required, Defendants deny the allegations of Paragraph 137.

138.    The allegations of Paragraph 138 are conclusions of law that do not require a response.  To the extent a response is required, Defendants deny the allegations of Paragraph 138.

**PRAYER FOR RELIEF**

WHEREFORE, Defendants deny all liability to Daimler and demand judgment in their favor, and against Daimler, together with interest, costs, attorneys' fees and such further relief as the Court deems just and appropriate.

## AFFIRMATIVE DEFENSES

Pursuant to Rule 8(c) of the Federal Rules of Civil Procedure, Defendants assert the following Affirmative Defenses to Daimler's Fifth Amended Complaint:

### FIRST DEFENSE

Daimler's claims are barred, in whole or in part, for failure to state a claim against Defendants for which relief can be granted.

### SECOND DEFENSE

Daimler's claims are barred, in whole or in part, by the applicable statute of limitations.

### THIRD DEFENSE

Daimler's claims are barred, in whole or in part, by the equitable doctrines of laches, unclean hands, waiver, and/or estoppel.

### FOURTH DEFENSE

Daimler's claims are barred, in whole or in part, by payment, setoff, settlement, release, and/or accord and satisfaction.

### FIFTH DEFENSE

Daimler's claims are barred, in whole or in part, because Daimler has not suffered any damages as a result of any act or omission taken by Defendants.

**JA601**

SIXTH DEFENSE

Daimler's claims are barred, in whole or in part, because Daimler is not entitled, in whole or in part, to the damages sought in the Fifth Amended Complaint.

SEVENTH DEFENSE

Daimler's claims are barred, in whole or in part, by Daimler's failure to mitigate damages.

EIGHTH DEFENSE

Defendants reserve the right to assert any additional defenses based on information obtained throughout the course of this litigation.

WHEREFORE, Defendants deny all liability to Daimler and demand judgment in their favor, and against Daimler, together with interest, costs, attorneys' fees and such further relief as the Court deems just and appropriate.

**COUNTERCLAIMS**

Counterclaim-plaintiffs Robotics Hub Fund 1, LLC ("Robotics Hub") and Coal Hill Ventures LLC ("Coal Hill") (collectively hereafter the "Companies"), by and through their undersigned counsel, hereby files these Counterclaims against counterclaim-defendant Eric Daimler ("Daimler"), alleging as follows:

**NATURE OF THE CASE**

1.     The Companies hereby incorporate by reference the foregoing responses, and state the following counterclaims against Daimler for fraudulent misrepresentation, unfair competition and cybersquatting in violation of the Lanham Act as a result of Daimler's unauthorized and misleading use of Coal Hill's Robotics Hub trademark, and Daimler's unlawful, unauthorized access to Coal Hill's protected computer in violation of 18 U.S.C. §

1030.

## **PARTIES**

2.     Counterclaim-plaintiff Robotics Hub is a Delaware limited liability company with a principal place of business in Pittsburgh, Pennsylvania.

3.     Counterclaim-plaintiff Coal Hill is a Pennsylvania limited liability company with a principal place of business in Pittsburgh, Pennsylvania.

4.     Counterclaim-defendant Daimler states he is an individual who resides in New York.

5.     This Court has subject matter jurisdiction of the Companies' Counterclaims pursuant to 15 U.S.C. §1121 and 28 U.S.C. §§ 1331 and 1338.

6.     This Court has personal jurisdiction over Daimler for purposes of the Companies' Counterclaims because Daimler filed suit in this Court.

7.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

## **FACTUAL BACKGROUND**

### **A.  Daimler Misrepresents His Credentials**

8.     Chris Moehle ("Moehle") formed Coal Hill on April 28, 2015.

9.     In August of 2015, Moehle and Coal Hill announced plans to launch the Robotics Hub, a business accelerator focused on identifying, building, and guiding promising startup companies in the field of advanced robotics.  In connection therewith, Moehle formed the Robotics Hub Fund 1, LP (the "Fund") which was the vehicle to invest in early-stage robotics companies.

10.     The founding sponsor of the Fund was GE Ventures, General Electric's venture capital and investment arm, which provided Coal Hill with a one-time sponsorship gift to

subsidize the Fund's startup and initial activities. The sponsor gift was provided pursuant to the terms of a Partner Agreement executed between Coal Hill and GE Ventures on May 20, 2015.

11.     In or around August of 2015, approximately six months after starting Coal Hill and soon after beginning planning for the Fund, Moehle was introduced to Daimler.

12.     Following their initial introduction, Moehle and Daimler had several phone conversations, during which they discussed their work and, eventually, the possibility of working together on the Fund.

13.     During those conversations, Daimler portrayed himself as an experienced venture capitalist with the pedigree necessary to raise investments on a scale that would potentially make the relationship worthwhile.

14.     To bolster his false portrayal, and thereby convince the Companies of his value as a potential partner, Daimler represented to Moehle that he had previously served as a "Principal" for Comdisco Ventures, a venture capital firm focused on early/mid-stage technology firms, and, in that capacity, co-"managed" approximately $1.5 *billion* in investments in start-up technology companies with his "partners" at the firm. By representing that he "managed" those investments, Daimler was representing that he had deal attribution for those investments and that he would be able to deliver an audited track record of those investments to provide to potential investors in the Companies.

15.     Daimler first made this representation during his initial phone conversations with Moehle in late 2015, and repeated it in subsequent conversations over the course of their relationship, both before and after the Companies executed the Amended and Restated Operating Agreements and Common Unit Award Agreements.  This particular representation also appeared on Daimler's LinkedIn page, where it remains to this day.

16.     Daimler subsequently repeated his representations regarding his role at Comdisco Ventures in multiple conversations with Moehle over the course of their relationship including when Moehle asked for an audited track record to present to potential investors as a necessary predicate for those investors to commit to provide funds to the Companies.  Daimler never could provide the Companies with such an audited track record.

17.     In addition to his representations regarding his role at Comdisco, Daimler also represented to Moehle that investors had already committed $10,000,000.00 to Daimler's existing venture, Skilled Science, which would be carried over to the Companies if Daimler became a member of the Companies.  Indeed, Daimler stated that he was interested in joining the Companies in large part because they would provide him with the "operating model" he needed for those allegedly existing commitments.

18.     The Companies justifiably relied on Daimler's representations regarding his track record and existing investor commitments, and Daimler's representations were material to the Companies' decision to begin working with Daimler, as opposed to other potential members, with real track records, to whom the Companies were also talking at that time.

19.     Daimler's representations also were material to the Companies ultimately amending and restating their operating agreements to add Daimler as a member and to sign agreements by which Daimler was awarded common units in the Companies, subject to an express vesting schedule.

20.     Daimler's repeated representations to the Companies that he was a skilled venture capitalist with an impressive track record—based on his claimed past experience co-managing *$1.5 billion* in venture capital investments and *$10,000,000.00* in previously committed investments that could be transferred to the Fund—gave the Companies' confidence that Daimler

had the pedigree and track record necessary to raise funds that would justify bringing Daimler on as a member of the Companies.

21.     Daimler's representation regarding his investment management track record was particularly significant to the Companies' decision because the role intended for Daimler as explained by Moehle was to attract "institutional" type investors (e.g., companies with fiduciary duties to those whose money they manage and structured approval processes to invest) as opposed to the high worth individuals and less structured entities that Moehle was to target given his experience and connections.

22.     The Companies believed that having someone with the management track record Daimler represented he had would be a significant value add for the Companies by enhancing their ability to attract those institutional type investors.  Indeed, the Companies were considering others who actually had a real track record for the role Daimler ultimately wrongfully gained.

23.     Unbeknownst to Moehle at the time, Daimler had misrepresented—indeed, fabricated—both his claimed track record and the existence of any $10,000,000.00 investment commitment in Skilled Science.  Indeed, the supposed "investors" never even presented the opportunity to their investment committee.

24.     Daimler was never listed as a "Principal" and did not have any investment management or decision-making responsibility at Comdisco Ventures.  In particular, while Daimler had previously ***worked*** for Comdisco Ventures, his experience involved working as part of a multi-person diligence team that collectively gave recommendations to the principals.  Thus, Daimler's representations to the contrary were false and Daimler knew that his "diligence" work would not provide the track record necessary to convince institutional investors to invest in the Companies.

25.     Upon information and belief, Daimler never had a $10,000,000.00 commitment from investors in Skilled Science.  Over the course of relationship with the Companies, Daimler could not even secure a meeting with the investment committee that allegedly made this commitment to present or recommend investment in the Companies, let alone to obtain the funds that they had supposedly "committed" to provide.

26.     Indeed, during the course of his relationship with the Companies, Daimler proved unable to secure significant investment commitments *at all*, let alone investments on a scale consistent with his claimed track record.  In fact, the only investments that were directly attributable to the minimal work Daimler performed for the Companies were small dollar loans to the Fund (approximately $50,000.00/each) obtained from Daimler's elderly family members and friends, which the Companies repaid with interest when due.

27.     Daimler's failure to perform in this respect contributed heavily to the deterioration of Moehle and Daimler's business relationship over the course of 2016.

28.     The Companies would never have begun working with Daimler, or entered into the Amended and Restated Operating Agreements and Common Unit Award Agreements, if Daimler had not falsely represented to Moehle that he had an extensive venture capital management track record and a substantial committed investment that could be carried over to the Companies and the Fund.

29.     Indeed, much of the Companies' fundraising strategy—i.e. the types of investors they chose to target to the exclusion of others—was based upon their misguided belief that Daimler had an extensive, and thus presumably auditable, venture capital management track record that could be marketed to institutional-type investors.  If not for Daimler's misrepresentation of his track record, Defendants would have hired someone with the credentials

that Daimler misrepresented he had and/or would have focused more heavily on high net worth individuals and families and smaller investors, where Moehle succeeded in attracting investments into the Companies, without Daimler's assistance.

30.      Upon information and belief, Daimler's repeated misrepresentations were intentional, willful and calculated to induce the Companies to enter into a business relationship with Daimler, execute the Amended and Restated Operating Agreements and Common Unit Award Agreements with Daimler.

31.      Indeed, upon information and belief, Daimler was well-aware of his own track record and experience, and specifically made the above-discussed misrepresentations in order to persuade Defendants that Daimler had the pedigree to make the business relationship worthwhile.

**B.  Daimler Removed From the Board of Managers of the Companies**

32.      On January 5 and 6, 2017, Daimler and Moehle met in-person to discuss, among other things, Daimler's future role, if any, in the Companies and to hold the respective Board meetings for the Companies.

33.      During the Board meetings, Moehle voted against offering Daimler full-time employment with the Companies and Daimler voted in favor of the offer, resulting in a deadlock under the respective Operating Agreements.

34.      As part of the further discussions of Daimler's future role, if any, in the Companies, Moehle offered Daimler a part-time non-operating role that included an option for Daimler to earn some upside and/or move into a full-time operating role *if* Daimler's performance improved and he managed to secure sufficient investments in the Fund to justify that upside or full-time operating role.

35.     Daimler refused that offer and, instead, demanded the Companies agree to pay him a full-time salary independent of any performance milestones.

36.     In light of the deadlock, the issue of offering Daimler full-time employment was referred to the Companies' neutral deadlock advisor, David Mahwinney.  Mr. Mahwinney broke the deadlock on March 22, 2017 by voting against offering Daimler a full-time role with the Companies.

37.      On March 27, 2017, in the best interest of the Companies, Daimler was removed from the Board of Managers of the Companies.

**C.  The ROBOTICS HUB Mark**

38.     Since April 2015, Coal Hill has used the ROBOTICS HUB trademark (the "Mark") to advertise and promoted its business which is focused on identifying, building, and guiding promising startup companies in the field of advanced robotics.

39.     Coal Hill has spent significant resources in advertising and promoting its business using the Mark and has received numerous accolades for its business under the Mark.

40.     As a result of Coal Hill's use, marketing, branding and promotion, Coal Hill has established strong trademark rights in the Mark in indelible association with Coal Hill and its business.

41.     In connection with these activities, Coal Hill is the exclusive owner of common law rights in the Mark.  Coal Hill also all right, title, and interest in and to U.S. Trademark Registration No. 5,597,703 for the Mark (the "Registration").

42.     The Registration is valid and subsisting.

**D.  Daimler's Unauthorized Use of Coal Hill Property**

43.     After March 27, 2017, Daimler had no right to use the Companies' property,

which included, but is not limited to, the Companies' information, documents, data, computers and intellectual property.

44. Yet, after March 27, 2017, without authorization from Coal Hill, Daimler transferred control of the roboticshub.io domain name (the "RH Domain Name") from Coal Hill to his private "GoDaddy" account, and caused all attempts to access the roboticsub.io website to be redirected to the website of Daimler's new ventures: c2.capital and, later, SpinGlass.

45. By causing the roboticshub.io website to re-direct to Daimler's own venture, Daimler deliberately sought to trade on the goodwill associated with the Mark and create the false impression that Daimler's new services somehow originated from or were related to Coal Hill, thereby deceiving the relevant consumers and causing confusion or mistake as to the origin or affiliation of Daimler's and Coal Hill's services.

46. Daimler further unlawfully exploited the Mark by using his Robotics Hub e-mail address, and, upon information and belief, the Robotics Hub name and logo found in his e-mail signature, to contact several of the Fund's portfolio companies and suggest that they leave the Fund and instead join c2.capital or SpinGlass.

47. Despite requests from Coal Hill, Daimler refused to transfer the RH Domain Name and email addresses to Coal Hill.

48. In addition, Daimler's unlawful use of the Mark as alleged herein caused the relevant consumers to be confused as to the relationship between Coal Hill and Moehle in light of the fact that the Robotics Hub website redirected to Daimler's companies, not Coal Hill, and Moehle's Robotics Hub email address was deactivated as a result of Daimler's actions.

49. At no time did Coal Hill authorize Daimler or his agents to use the Mark in connection with advertising and promoting Daimler's c2.capital and SpinGlass businesses.

50.    Daimler has used and/or continues to use the Mark to advertise and promote his business so as to trade on the goodwill and recognition that Coal Hill has developed in the Mark.

51.    In addition to unlawfully using the Mark after he was removed as a Member, Daimler also unlawfully accessed and copied information from Coal Hill's Google Drive.

52.    Specifically, after March 27, 2017, Daimler used his credentials to access Coal Hill's protected computer and network systems—namely, the Google Drive which was used in and affected the Companies' interstate commerce, and attempted to remove Moehle's access to the same.

53.    After March 27, 2017, Daimler was not authorized to access Coal Hill's protected computer and network system, including related software, programs, and computers.

54.    Daimler used his unauthorized access to download and obtain confidential information from Coal Hill's protected computer and network system, including investor documents and confidential information about the portfolio.

55.    Daimler subsequently exploited the confidential information he had unlawfully obtained from the Companies' protected computer and network system for profit.  Specifically, Daimler used those materials in public speeches, public presentations and, upon information and belief, in support of forming c2.capital and SpinGlass businesses.

56.    Daimler did not request or receive permission to use the information on the Coal Hill Google Drive in any fashion.  Nor did Daimler pay or offer to pay Coal Hill any royalty before exploiting the information on the Coal Hill Google Drive for his own benefit.

## COUNT I
### (Fraudulent Misrepresentation)

57.    The Companies repeat and re-allege the allegations set forth of Paragraphs 1-56 above as if full set forth herein.

58.    Daimler intentionally misrepresented to the Companies his venture capital management track record.  Daimler also intentionally misrepresented that he had secured a commitment of $10,000,000.00 of investment to Daimler's Skilled Science company which would be carried over to the Companies if the Companies made Daimler a member.

59.    Daimler made such representations knowing they were false or with a reckless disregard as to whether they were true or false.  Such misrepresentations were material because the Companies would not have agreed to make Daimler a member of the Companies and grant him common units in the Companies if they had known Daimler never had any investment management or decision-making responsibility at Comdisco Ventures, could not produce an audited track record, and had no investment commitment in Skilled Science to bring over to the Companies.

60.    Daimler made those misrepresentations to the Companies with the intention of misleading the Companies to rely upon them and agree to make Daimler a member of the Companies and grant him units in the Companies.

61.    The Companies justifiably relied on Daimler's representations regarding his track record and existing investor commitments, and Daimler's representations were material to the Companies' decision to begin working with Daimler, as opposed to other potential members, with real track records, that the Companies were also talking to at that time.  Daimler's misrepresentations were also material to the Companies' decision to develop a fundraising strategy to target institutional-type investors likely to require an auditable track record of the kind Daimler falsely claimed to have rather than to target more heavily the high net worth individuals and families and smaller investors that Moehle succeeded in attracting to invest in the Companies, without any assistance from Daimler.

62.    As a direct and proximate result of the Companies' reliance on Daimler's

misrepresentations regarding his venture capital management track record and supposed

committed investors, Defendants suffered substantial damages directly attributable to Daimler's

misrepresentations, including inability to close investments from interested investors at the time

of the final close of the Fund and costs incurred to cover for Daimler being a non-contributing

member of the Companies, in an amount to be determined at trial but that is greater than

$1,000,000.

## COUNT II
### (Unfair Competition and False Designation of Origin in Violation of 15 U.S.C. § 1125(a))

63.    Coal Hill repeats and re-allege the allegations set forth of Paragraphs 1-56 above

as if full set forth herein.

64.    Coal Hill is the owner of federally-registered and common law rights in the Mark

as described herein.

65.    Coal Hill has established substantial goodwill in the Mark through, among other

things, its exclusive marketing, promotion and branding of the Mark for over four years in

connection with its successful business of identifying, building, and guiding promising startup

companies in the field of advanced robotics.

66.    As described herein, Daimler, without consent or authorization of Coal Hill and in

violation of 15 U.S.C. § 1125(a)(1)(A), intentionally and willfully has made use of the Mark

and/or other words, terms, names, symbols or devices, or any combination thereof, false

designations of origin, and false or misleading representations of fact which are likely to cause

confusion and mistake among the relevant consumers that (a) Daimler is still part of or runs Coal

Hill and/or the Robotics Hub; and/or (b) there is some affiliation, connection or association

between Daimler and Coal Hill and/or the Robotics Hub.

67.    As described herein, Daimler, without consent or authorization of Coal Hill and in violation of 15 U.S.C. § 1125(a)(1)(B), intentionally and willfully has made use of the Mark and/or other words, terms, names, symbols or devices, or any combination thereof, false designations of origin, and false or misleading representations of fact in commercial advertising and promotion which misrepresents the nature, characteristics and qualities of his services, namely giving the false impression that Daimler has some affiliation, connection or association with Coal Hill and/or the Robotics Hub

68.    As described herein, Daimler intentionally and willfully has made us of the Mark to unfairly and improperly trade on the goodwill Coal Hill has developed in the Mark to attract attention to his business efforts.

69.    As a direct and proximate result of Daimler's intentional and willful conduct and pursuant to 15 U.S.C. § 1117, Coal Hill is entitled to recover its actual damages, Daimler's ill-gotten profits, enhanced damages, costs and reasonable attorneys' fees in an amount to be proven at trial.

### COUNT III
### (Unauthorized Computer Access in Violation of 18 U.S.C. § 1030)

70.    Coal Hill repeats and re-allege the allegations set forth of Paragraphs 1-56 above as if full set forth herein.

71.    As alleged herein, after March 27, 2017 Daimler intentionally used his credentials to access Coal Hill's Google Drive.

72.    Coal Hill's Google Drive is a protected computer under 18 U.S.C. §1030.

73.    As alleged herein, after March 27, 2017, Daimler had no right to access Coal Hill's Google Drive or obtain information from that Google Drive.

74.    After accessing and obtaining information from Coal Hill's Google Drive,

Daimler exploited the unlawfully obtained information for his own personal gain to the detriment of Coal Hill.

75.    As a direct and proximate result of Daimler's unauthorized access of the Companies' computer system, Defendants suffered losses in excess of $5,000.00.  Coal Hill is, therefore, entitled to recover its actual damages, costs and reasonable attorneys' fees in an amount to be proven at trial.

## COUNT IV
### (Cybersquatting under 15 U.S.C. § 1125(d))

76.    Coal Hill repeats and re-allege the allegations set forth of Paragraphs 1-56 above as if full set forth herein.

77.    The Mark was distinctive at the time that Daimler registered the RH Domain Name for Coal Hill.

78.    The RH Domain Name is identical to or confusingly similar to the Mark.

79.    After March 27, 2017, Daimler transferred, used and continues to use the RH Domain Name without authorization from Coal Hill and with a bad faith intent to profit from the Mark by, among other things, redirecting the relevant consumers for his own commercial gain.

80.    As a result of Daimler's wrongful conduct, Daimler is liable to Coal Hill for violation of the Anticybersquatting Consumer Protection Act.

81.    Daimler's unlawful transfer and use of the RH Domain Name has caused and will continue to cause damage to Coal Hill, in an amount to be proven at trial.

82.    Coal Hill is entitled to recover its actual damages, Daimler's ill-gotten profits and costs in an amount to be proven at trial, or statutory damages of up to $100,000, as well as treble damages, attorneys' fees and transfer of the RH Domain Name to Coal Hill.

## JURY DEMAND

83.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, the Companies hereby demand a trial by jury on all issues triable of right by a jury.

## PRAYER FOR RELIEF

WHEREFORE, the Companies respectfully request that this Court enter judgment against Daimler on their Counterclaims, and respectfully requests that this Court award the following relief:

(a)    Actual damages suffered by the Companies as a result of Daimler's fraudulent conduct as alleged herein;

(b)    Actual damages suffered by Coal Hill as a result of Daimler's violation of 18 U.S.C. §1030;

(c)    Coal Hill's actual damages and Daimler's profits pursuant to 15 U.S.C. § 1117(a), trebled pursuant to 15 U.S.C. § 1117(b) and/or an award of statutory damages at the election of Coal Hill pursuant to 15 U.S.C. 1117(d);

(d)    Forfeiture of the RH Domain Name and transfer of the RH Domain Name to Coal Hill;

(e)    An order enjoining Daimler from using or exploiting the Mark, or any colorable imitation of the Mark, in connection with advertising and promoting his business;

(f)    Coal Hill's costs, expenses and reasonable attorneys' fees, pre- and post-judgment interest and punitive damages in an amount to be determined at trial; and

(g)    All such other and further relief as this Court deems just and appropriate.

Respectfully submitted,

**K&L GATES, LLP**

/s/ *Christopher M. Verdini*
Patrick J. McElhinny, PA Bar No. 53510
Christopher M. Verdini, PA Bar No. 93245
Jessica L.G. Moran, PA Bar No. 325912
K&L GATES LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, Pennsylvania 15222-2613
Tel:  412-355-6500
Fax:  412-355-6501
Email: patrick.mcelhinny@klgates.com
Email: christopher.verdini@klgates.com
Email: jessica.moran@klgates.com

*Counsel for Defendants Chris Moehle,
Robotics Hub Fund 1 LLC, and Coal Hill
Ventures LLC*

Dated: October 30, 2020

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on October 30, 2020 the foregoing was filed electronically.  Notice

of this filing will be sent to all parties by operation of the Court's electronic filing system.

Parties may access this filing through the Court's system.

<u>/s/ Christopher M. Verdini</u>
K&L Gates LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222-2613
412.355.6500

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ERIC DAIMLER, | ) | |
| | ) | Civil Action No. 18-165 |
| Plaintiff, | ) | Judge Marilyn J. Horan |
| | ) | |
| v. | ) | |
| | ) | |
| CHRIS MOEHLE, ROBOTICS | ) | |
| HUB FUND 1 LLC, and COAL HILL | ) | Electronically Filed |
| VENTURES LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56 of the Local Rules of the United States District Court for the Western District of Pennsylvania, Defendants Chris Moehle, Robotics Hub Fund 1, LLC, and Coal Hill Ventures, LLC, by and through their undersigned counsel, hereby move this Court for an order granting summary judgment in Defendants' favor on all counts of Plaintiff Eric Daimler's ("Daimler") Fifth Amended Complaint (the "Motion"). In support of their Motion, Defendants are filing concurrently herewith, and hereby incorporate by reference their (1) Brief in Support of Motion for Summary Judgment; (2) Declaration of Christopher Verdini in Support of Motion for Summary Judgment; (3) Concise Statement of Material Facts; and (4) Appendix to Defendants' Concise Statement of Material Facts.

In support of this Motion, Defendants state as follows:

1.      Daimler filed his original complaint on February 5, 2018.

2.      After the Court dismissed the complaint *sua sponte* for lack of subject matter jurisdiction, Daimler filed a 209-paragraph First Amended Complaint, which included 18 counts covering a hodge-podge of contract, fraud, tort, and equitable causes of action.

1

**JA619**

3.      Upon Defendants' motion, the Court dismissed 16 of the 18 counts of Daimler's First Amended Complaint.

4.      On October 19, 2020, Daimler filed a Fifth Amended Complaint in which he asserts four causes of action – one count of fraudulent inducement against each of the Defendants and a breach of contract count against Coal Hill.

5.      As set forth more fully in Defendants' Brief in Support Defendants' Motion, Daimler has failed to carry his burden on his fraud and breach of contract claims and, thus, those claims fail as a matter of law.

6.      For his fraud claims, Daimler must come forward with clear and convincing evidence to establish each of the following elements: (1) a material representation; (2) made falsely with knowledge of its falsity or recklessness as to whether it is true or false; (3) made with the intent to induce the other to rely on the representation; (4) justifiable reliance; and (5) resulting injury proximately caused by that reliance.  *Coleman v. Sears, Roebuck & Co.*, 319 F. Supp. 2d 544, 550 (W.D. Pa. 2003).

7.      Daimler cannot carry his burden as to any of the required elements to prove a fraud claim.

8.      ***First***, Daimler has failed to proffer any documentary evidence to establish that Defendants falsely represented to Daimler or any third-party that GE Ventures ("GEV") had "committed" to investing $20 million (the "GEV Representation"), relying solely on his own vague self-serving deposition testimony which does not constitute clear and convincing evidence.

9.      ***Second***, assuming, *arguendo*, that Daimler's testimony sufficiently demonstrated that Moehle made the GEV Representation and it was false, the alleged GEV Representation is not an actionable statement.

2

**JA620**

10.     Among other things, Daimler admitted that he understood any purported "commitment" to invest by GEV was contingent upon GEV successfully spinning out its financial arm and that there were no written or other legally binding agreements between Defendants and GEV for the supposed "commitment."  Daimler also conceded that "[t]he trigger of the $20 million would not occur until that spinout happened.  That was **definitely a risk** that I was taking."

11.     Accordingly, Daimler's testimony demonstrates that any purported representation was nothing more than an opinion or a hope for some future outcome which is not actionable as a matter of law.

12.     **Third**, with regard to fraudulent intent, Daimler's testimony that he did not know how, when, or why he came to learn that the alleged GEV Representation was "untrue," coupled with a complete absence of evidence that would give rise to an inference of reckless or conscious behavior by Moehle, is fatal to Daimler's fraud claims.

13.     **Fourth**, Daimler was willfully blind regarding the veracity of alleged GEV Representation such that he cannot establish justifiable reliance.  Daimler purports to be an experienced investor and businessman and claims to have walked away from a $10 million investment in his own company.  Yet, Daimler admitted that he conducted virtually no independent diligence to determine the veracity of the GEV Representation, despite being presented with myriad opportunities to do so.

14.     Daimler elected not to avail himself of any such opportunities; choosing instead to play ostrich, which precludes him from proving justifiable reliance as a matter of law.

15.     **Finally**, Daimler has failed to proffer evidence of actionable harm, i.e., that he walked away from $10 million in committed investments in his prior business venture, Skilled Science, to join Defendants.  To the contrary, the undisputed record establishes that, even though

3

**JA621**

Daimler formed Skilled Science in 2011, Skilled Science never obtained any funding beyond Daimler's initial capitalization and never had a signed agreement with any third party committing to invest in Skilled Science.

16.     For his breach of contract claim against Coal Hill, Daimler must establish "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *Haywood v. Univ. of Pittsburgh*, 976 F. Supp. 2d 606, 625 (W.D. Pa. 2013).

17.     Daimler has failed to carry his burden on all elements of his breach of contract claim.

18.     To prove the existence of a contract, Daimler must establish (1) "both parties manifested an intention to be bound by the agreement," (2) "the terms of the agreement are sufficiently definite," and (3) there was consideration. *Blair v. Scott Specialty Gases*, 283 F.3d 595, 603 (3d Cir. 2002).

19.     Daimler has not proffered any evidence of the essential terms of the purported agreement to issue additional unspecified units in Coal Hill in exchange for supposed monetary contributions.

20.     Daimler admitted that he did not know any of the material terms under which Moehle (on behalf of Coal Hill) agreed to treat purportedly unreimbursed payments by Daimler as capital contributions entitling Daimler to units in Coal Hill.  For example, Daimler testified that he could not recall: (1) what amount of money was involved in the agreement; (2) how many units the parties purportedly agreed he would receive; (3) what kind of units under the Operating Agreement he would receive – "Common Units" that entitle the holder to additional voting power or "Management Fee Units" that provide economic benefits only; or (4) how the units would vest.

21.     Daimler also has no admissible evidence to support his assertion that he made any unreimbursed monetary payments to Coal Hill.

22.     Finally, Daimler failed to demonstrate that he suffered any damages as a result of the purported breach.  Daimler has no admissible evidence of the supposed monetary contributions he made to Coal Hill for which he has not been reimbursed.

23.     In addition, Daimler's purported expert, James Fee, conceded that he had no knowledge of the terms of any such agreement, how much money – if any – Daimler contributed as capital contributions, or how many units Daimler would be entitled to assuming he had made such capital contributions.

WHEREFORE, Defendants respectfully requests that this Court enter an order in the form filed herewith granting their Motion for Summary Judgment against Daimler and dismissing his claims against Defendants with prejudice.

Dated:  November 23, 2021                          Respectfully submitted,

                                                  **K&L GATES LLP**

                                                  /s/ *Christopher M. Verdini*
                                                  Patrick J. McElhinny, PA Bar No. 53510
                                                  Christopher M. Verdini, PA Bar No. 93245
                                                  Jessica L.G. Moran PA Bar No. 325912
                                                  K&L GATES LLP
                                                  K&L Gates Center
                                                  210 Sixth Avenue
                                                  Pittsburgh, Pennsylvania 15222-2613
                                                  Tel:  412-355-6500
                                                  Fax:  412-355-6501
                                                  Email: patrick.mcelhinny@klgates.com
                                                  Email: christopher.verdini@klgates.com
                                                  Email: jessica.moran@klgates.com

                                                  *Counsel for Defendants Chris Daimler,*
                                                  *Robotics Hub Fund 1 LLC, and Coal Hill*
                                                  *Ventures LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 23, 2021 the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

<u>/s/ Christopher M. Verdini</u>
K&L Gates LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222-2613
412.355.6500